**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| | : | |
| **ABU AGILA MOHAMMAD** | : | |
| **MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' MOTION TO AFFORD VICTIMS OF THE BOMBING OF PAN AM FLIGHT 103 REMOTE VIDEO AND TELEPHONIC ACCESS TO COURT PROCEEDINGS IN THIS CASE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves this Court to provide remote video and telephonic access of the proceedings in this case via the Zoom for Government platform to the victims of Pan Am Flight 103. In support of this motion, the government relies on the following points and authorities, along with those cited in its earlier pleading on this topic, ECF 45, and any additional points and authorities as may be cited at a hearing on this motion. The government also provides, in response to the Court's March 13, 2024, Minute Order, a detailed proposal for providing that remote video and telephonic access.

The government requests that the Court implement Congress's directive for it make reasonable efforts to provide remote access to the victims of the attack on Pan Am Flight 103, without regard to the location of the victim, by using the Court's existing Zoom for Government account. As explained in further detail below and in the declaration from Zoom, attached hereto as Exhibit 1, Zoom for Government provides a secure platform on which the remote users can be authenticated through electronic and visual means—including comparison by a live monitor to a

government-issued photo identification—prior to being admitted to view any proceedings remotely. Zoom has available security features that are designed to mitigate the risk of unauthorized rebroadcasting of the proceedings, including by inserting a unique visual and audio "watermark" into the stream sent to reach remote user's device, which will allow Zoom to later determine, in the event of any unauthorized rebroadcasting, which user's account originally recorded it. Thus, with Zoom's capabilities, the security and integrity of the Court's proceedings remain paramount.

Further, to ensure that this authentication process is seamless, the government is willing and able to provide Department of Justice (DOJ) personnel, including federal law enforcement employees not otherwise involved in the investigation of this case, to monitor the waiting room, verify attendees' identity, and subsequently monitor those who are watching the proceedings to ensure that those watching the Court's proceedings comply with any applicable ground rules that this Court sets, and to work to solve technical issues that may arise. The government will additionally provide trained victim advocates, who will be available to speak with victims privately if they have a desire to speak with someone based on what they see during the proceedings (*e.g.*, a trauma triggering event), which is a role that these trained advocates play every day during their attendance at trials throughout the country.

Congress has recognized the exceptional nature of the attack on Pan Am Flight 103, authorizing remote transmission of District Court proceedings to victims of a specific case for only the second time in history, and mandating for the first time that court proceedings be made available regardless of the location of the victim.[1] The magnitude of this terrorist act and the

---

[1] The first time Congress authorized remote transmissions of District Court proceedings for victims in a specific case was with respect to *United States v. Zacarias Moussaoui*. Pub. L. No. 107-206, § 203. Prior to that, following a venue change in the trial arising from the April 1995

devastation it left in its wake reached worldwide, and to this day, remains the largest terror attack on the United Kingdom, and the second largest terror attack on the United States behind that of the attack of September 11, 2001. As the Scottish Lord Advocate stated in 2001, on the day the verdict was reached in the Scottish trial involving two other defendants arising from this tragedy:

> I need hardly say to the court that each one left relatives, wives, husbands, parents and children. Something of the scale of the impact can be gleaned from the fact that more than 400 parents lost a son or a daughter; 46 parents lost their only child; 65 women were widowed; and 11 men lost their wives. More than 140 lost a parent, and seven children lost both parents.

Lord Advocate Bain Ltr., attached hereto as Exhibit 2, at 1.

The proposals as laid out below allow the Court to provide the access Congress authorized, regardless of the geographic location of the victims, in a secure manner that is live-monitored, protects the integrity of the proceedings, and restricts access to victims.

## FACTUAL BACKGROUND

On December 21, 1988, Pan Am Flight 103 exploded over Lockerbie, Scotland, while *en route* from London's Heathrow Airport to John F. Kennedy International Airport in New York City. The explosion resulted in the deaths of 270 people, 259 of whom were aboard the flight, with another 11 persons killed by debris falling to the ground. The victims included citizens of 21 countries, including 190 Americans, 43 citizens of the United Kingdom, and nationals of Argentina, Belgium, Bolivia, Canada, France, Germany, Hungary, India, Ireland, Israel, Italy, Jamaica, Japan, South Africa, Spain, Sweden, Switzerland, and Trinidad and Tobago. Among those who perished were 35 Syracuse University students returning from studying abroad, five

---

Oklahoma City bombing, Congress authorized remote transmission of District Court proceedings in cases involving a venue change. That legislation was not specific to the case of *United States v. McVeigh*, which arose from that bombing, but rather applied (and still applies) to all cases that involve a change of venue out of state and more than 350 miles from where the case is originally brought. *See* 34 U.S.C. § 20142.

United States service members, and employees of the Department of Justice and Central Intelligence Agency.

## PROCEDURAL HISTORY

On November 29, 2022, a federal grand jury in the District of Columbia returned a three-count Indictment charging Abu Agila Mohammad Mas'ud Kheir Al-Marimi (the "Defendant"), a dual citizen of Libya and Tunisia, with the destruction of an aircraft resulting in death, in violation of 18 U.S.C. §§ 32(a)(2), 34, and 2; destruction of an aircraft resulting in death, in violation of 18 U.S.C. §§ 32(a)(1), 34, and 2; and destruction of a vehicle used in foreign commerce by means of an explosive, resulting in death, in violation of 18 U.S.C. §844(i).  He was lawfully transferred to U.S. custody on December 11, 2022, and he made his initial appearance before a U.S. Magistrate Judge on December 12, 2022.[2]

On February 9, 2023, the government filed an unopposed motion for alternative procedures under the Crime Victims' Rights Act, 18 U.S.C. § 3771, that requested (among other things) that the Court make available to victims a call-in telephone line to allow the victims to listen to the proceedings in real time. *See* ECF 23 at 7-8. The Court denied the government's request to make the call-in line available, finding that it did not have the authority to allow victims telephonic access to in-person court proceedings. Minute Order dated February 10, 2023.

On October 13, 2023, DOJ transmitted to Congress proposed legislation that would provide statutory authority for this Court to afford victims of the Pan Am Flight 103 bombing remote video and telephonic access to the proceedings. On December 6, 2023, the U.S. Senate passed the bill

---

[2]     This proceeding was made available to the public via the toll-free line available during many proceedings under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, 15002(b), 134 Stat. 281, 528 (2020), and many family members listened to the proceedings without incident.

by unanimous consent. On January 18, 2024, the House of Representatives passed the bill by a vote of 413-7. The bill was presented to the President on January 24, 2024, and he signed it into law on January 26, 2024. Once signed into law, the legislation was designated Pub. L. No. 118-37.

On March 1, 2024, in response to this Court's order, the parties filed proposals for how to implement Pub. L. No. 118-37. The parties agreed that the Court should make access available to the victims via Zoom (or a comparable platform) for pretrial, non-testimonial hearings. ECF 44 & 45 at 1, and the parties requested additional time in which to file proposals for trial and testimonial hearings. ECF 44 at 6; ECF 45 at 1. By Minute Order dated March 13, 2024, the Court granted the parties' request for additional time, ordering the government to file a proposal "addressing how it will ensure that (1) audio or video proceedings are restricted to victims, see [ECF 45], (2) unauthorized persons do not gain access to the proceedings, and (3) no recording, (re)distribution, or broadcasting of the proceedings occur." The Court's Order also directed the government to "identify government resources, including personnel and facilities, it will dedicate to achieve these ends." This memorandum in support of the government's motion addresses the issues set forth in the Court's Minute Order.

## Statutory Framework

Public Law No. 118-37 provides that the Court, "notwithstanding any provision of the Federal Rules of Criminal Procedure or other law or rule to the contrary, in order to permit victims of crimes associated with the bombing of Pan Am Flight 103 to access court proceedings . . . shall order that reasonable efforts be made to make remote video and telephonic access to proceedings in the case available to victims of crimes associated with the bombing of Pan Am Flight 103." Pub.

L. No. 118-37, Subsection (b)(1). The statute defines victim, in Subsection (a)(1), as any individual:

> (A)    who suffered direct or proximate harm as a result of the bombing of Pan Am Flight 103 that occurred over Lockerbie, Scotland, on December 21, 1988, and was present at or near the scene of the bombing when it occurred, or immediately thereafter; or
>
> (B)    who is the spouse, legal guardian, parent, child, brother, sister, next of kin, or other relative of, or who is determined by the applicable district court of the United States to be an individual who possesses a relationship of similar significance to, an individual described in subparagraph (A) or an individual otherwise described in this subsection.

The statute includes a subsection entitled "No Limit on Location," which states: "Remote video and telephonic access to proceedings shall be made available under paragraph (1) to a victim of crimes associated with the bombing of Pan Am Flight 103 without regard to the location of the victim of crimes associated with the bombing of Pan Am Flight 103." Pub. L. No. 118-37, Subsection (b)(2). The statute affirms the Court's discretion, "where necessary to control the courtroom or protect the integrity of the proceedings, or the safety of the parties, witnesses, or other participants in the proceedings," to "control the manner, circumstances, or availability of remote video or telephonic transmissions." Pub. L. No. 118-37, Subsection (c).

## ARGUMENT

The Zoom for Government platform provides a reliable, secure, and enforceable way to allow victims from around the country, and the world, to access the court's proceedings remotely. Zoom has further highlighted features of its platform that, when combined with live-monitoring of attendees, who would be required to remain on camera if accessing the video, and identification checks that would take place before any individual is permitted to access the proceedings remotely, approximate the level of control and identity verification that would be present at a physical viewing site with identification checks and a monitor in the room. Those features include the use

of two-factor authentication and controls that do not allow remote attendees to chat with each other or to disrupt the proceedings (but that would allow interactions between the victims and the monitors and/or victim advocates). Some of Zoom's features, such as the use of a personalized "watermark" that would allow Zoom to identify the source of any unauthorized broadcasting or sharing of the proceedings, provide greater security than would be available at traditional physical sites.

The security provided by the combination of Zoom's security and verification features and the live-monitoring and identification checks offered by the government allow the Court to implement Congress's directive to provide remote access to the victims of Pan Am Flight 103, regardless of the location of those victims. As the four attached declarations from victims, along with a letter from the Lord Advocate, Scotland's most senior law officer, make clear, fixed viewing sites will not provide meaningful access to victims located far from major cities, nor would they allow the many victims who are battling health and mobility issues as they age, nor victims who lost siblings but now live abroad, nor victims who live in a city or country without many other victims, to access the proceedings.[3] It was Congress's intent to provide meaningful access to all of those victims, and the Zoom proposals, in combination with live monitoring and identification checks, allow the Court to provide that access in a way that assures that remote access is secure, limited to victims, and is unlikely to be shared or rebroadcast.

---

[3]    The government invited certain victims who are or were affiliated with organized groups connected to the bombing of Pan Am Flight 103 to submit declarations in support of this motion. The government thought these victims' experiences would be helpful to the Court in deciding how best to implement Pub. L. No. 118-37.  Each victim's views are his or her own, shaped by his or her own experiences. To the extent that any of the victim declarations espouse opinions or make assertions based on their personal beliefs, such opinions or assertions represent the views of the individual declarant, and not necessarily the views or opinions of the Department of Justice.

I.      **The Zoom for Government Proposals, in Conjunction with Government Outreach and Monitoring, Will Ensure that Remote Access is Limited to Victims.**

The government has begun taking steps and will continue taking steps, consistent with any guidance provided by the Court, to ensure that it creates a list of individuals who meet the statutory definition of "victim" as set forth in Pub. L. No. 118-37. That list, when combined with any individuals that the Court finds possesses a relationship of similar significance to the statutory definition of victim, *see* Pub. L. No. 118-37(a)(1)(B), would be the list of individuals who would receive an invitation to join the remote broadcast. The government will collect copies of government-issued identification for all individuals on the list who wish to access the proceedings remotely, along with verifying their email addresses and phone numbers (for those that are not yet verified). It will provide that verified information to the Court, which can then send invitations to join the proceedings remotely and can require that individuals sign in using two-factor authentication that links to a verified account or phone number. On the day of any hearing or trial day, the government will assign DOJ employees, including federal law enforcement employees, to act as "monitors" who will conduct a visual comparison in a waiting room between any individual who joins the hearing and their government-issued identification photograph on file, only admitting those who appear on camera to match their identification photo. For any victim who chooses to call in by phone, the monitors will ensure that the phone number calling in matches up with the verified number on file for that victim. Only after such verification is complete will the individual be permitted to access the remote broadcast of the proceedings.[4]

---

[4]      As noted in the Zoom Declaration, some options provide more ability for live monitoring than others.  The government will provide staffing to match any option the Court chooses.  Should the Court desire to have its personnel serve as monitors, as opposed to the DOJ employees we propose here, the government does not object.  Similarly, should the Court prefer that the government send the invitations to the verified list, rather than the Court, it would be happy to do so.

A.  Creation of a List of Victims Who Meet the Statutory Definition

As explained in the government's March 1 proposal for victim access, it maintains a Victim Notification System (VNS) in this case that contains over 700 entries. *See* ECF 45 at 13-15. The government has attempted to contact each individual listed in that database with an address in the United States.[5] In those calls, the government has verified each individual's relationship to someone lost in the attack, as well as their contact information. As a result of that effort, the government maintains a secondary list, apart from VNS, containing only those individuals with whom the government has had recent contact and who possess a relationship that meets the definition of victim set forth in Pub. L. No. 118-37.

The government plans to send hard-copy letters and emails (where appropriate) to the entirety of its VNS list, including foreign-based victims to the extent permitted by the countries in which they reside, notifying them of whichever procedure the Court adopts. The government expects to include in those letters a questionnaire covering, among other things, whether the recipient desires access to the proceedings remotely. If any such individual desires remote access to the proceedings, they will be asked to provide their relationship to a victim, along with contact information for inclusion on the contact list. For those who do not meet the statutory definition but request access to the proceedings, the government will consider whether to apply to the Court for

---

[5]     The government is restricted in its ability to contact victims located abroad directly.  Those restrictions vary by country, and we explain in further detail below our plan to contact and verify foreign-based victims.  The government has provided to the defense an electronic file that plots the city and state (or country) of every entry in VNS that included address data as of March 2024. The government is working on an updated version, based on the calls described above.  With the caveat that the list is necessarily incomplete at this point, the government is willing to share that updated file with the Court and defense.

a finding that the individual possesses a relationship of similar significance to the statutory definition of victim.

The government also expects to require any individuals who desire remote access to submit a copy of a government-issued photo identification in their name. As described in further detail below, these identification photos will later be used by monitors to visually confirm that the person who seeks to access the proceedings is in fact a person who has been verified as a victim who has been cleared to access the proceedings. The government will also require any person who submits an identification to acknowledge that any rebroadcasting or recording of the proceedings, or any attempts to share the remote access with unapproved individuals, is strictly prohibited, and that it could be punishable by contempt, among other things.

The government will maintain a list of individuals who either meet the statutory definition of victim or have been approved by the Court for access through application, and who have also submitted their identification and acknowledged the prohibitions on rebroadcasting, recording, or sharing with unauthorized persons. It will submit that list to the Court ahead of any hearing, to allow court staff to send invitations to those who have met the requirements to receive an invitation. Thus, only those who meet the statutory definition of victim (or who have otherwise been approved by the Court) and whose identities have been verified will receive an invitation to join the waiting room.

B.   Procedure to Ensure that Only Victims Access Proceedings Remotely

As laid out in the Zoom Declaration, Zoom's existing infrastructure provides the Court with options to ensure that only the intended recipients of any invitation are permitted access to the proceedings. After a remote user receives an invitation from court staff, he or she will log into a meeting of the Court's choosing. Notably, no person will receive a link that will allow them to

access the proceedings prior to a visual verification step that is the analogue to having a staff member checking identification at the door.[6] The link would either take the user to a waiting room or to a separate meeting entirely, neither of which would show the proceedings. Those who desire to watch any video from the proceedings would be required to have their camera on, and the meeting can be configured so that remote observers could see monitors, but not each other. The meeting could be further configured so that remote users are required to be logged in and verified via two-factor authentication. Zoom Decl., Att. A at 2-3. Once users enter this anteroom, the DOJ employees who serve as monitors would visually verify each attendee's identity and their login information before allowing them to enter the meetings that include the actual proceedings.[7] Notably, should the Court choose Proposed Solution Three, no link to the meeting that contains the actual proceedings will be distributed. In that solution, monitors would move remote observers from a meeting that serves as a waiting room to the meeting that contains the proceedings. Protecting the link to the actual proceedings would ensure that no one could forward it to anyone who is not a verified victim.

Once a victim joins the remote proceedings, those who did not dial in via telephone would be required to keep their camera on during the proceedings, and the meeting could again be configured such that the participants could not see each other, but that a monitor could see them.

---

[6]     As noted in the Zoom Declaration, the webinar option does not have this option.  The government's recitation here thus focuses on Proposed Solutions Two and Three from the Zoom Declaration, both of which leverage Zoom's "meetings" product, rather than its "webinar" product. *See* Zoom Decl., Att. A, at 3-6.

[7]     For any users who opt to dial into the meeting via telephone, such visual verification would not be possible.  However, the monitors would still verify that the number calling in is a verified number associated with a verified victim.  Because anyone calling in via telephone would necessarily only have audio access, the government submits that phone number verification would be sufficient.   Zoom Decl., Att. A, at 2-3.

Monitors would be tasked with looking at screens of up to 25 people at a time to ensure that, for example, no new people have entered the camera's field of vision and no one appears to be recording the proceedings. Monitors could also be tasked with monitoring for any victim who needs technical assistance, or who may need to speak to a victim advocate, and connecting them with any services they may need.[8] Monitors would moreover have the ability to remove any individual they observed not following the rules and/or report violations to the Court, for any action the Court may deem necessary. The government would provide enough monitors to ensure that each was not tasked with monitoring more than two screens at a time.

By combining the above steps—verification of prospective victims' relationship to someone lost in the attack on Pan Am Flight 103, verification of those individuals' contact information, collection of copies of government-issued photos identification for those who are entitled to remote access, and verification by Zoom and by monitors that victims are logging in through known credentials and, if accessing video from the courtroom, visual verification by monitors that continues throughout the proceedings—the government submits that the Court can be reasonably assured, with a similar level of certainty to the use of monitored fixed viewing sites with identification checks, that only victims will have access to the remote proceedings in this case.

---

[8]     The government expects to devote trained victim advocates from around the country, through its Crime Victim Assistance Team, who would view the proceedings remotely and would be available to speak to any victim who may need help, for example, discussing any trauma-related responses they may have to what they observe during the proceedings.  The victim advocates would not be tasked with serving as "monitors."  The government does additionally expect to have limited funds to cover travel expenses for some victims who wish to view the trial proceedings in person, and who are physically able to do so, up to a certain number of days per victim.

II.     **Unauthorized Individuals Are Unlikely to Gain Access to the Proceedings**

There are two main ways that, in the absence of safeguards, unauthorized individuals could gain access to the proceedings: (1) illicitly accessing the proceedings by bypassing authorization, *e.g.*, by "hacking" into the meeting, to use a colloquial term, or (2) by someone who is authorized to access the proceedings allowing someone unauthorized to access the system, *e.g.*, by sharing a link to a remote session with someone not authorized to receive it. The safeguards laid out by Zoom, however, dramatically decrease the likelihood of either scenario, to the point that the Court should be reasonably assured that unauthorized individuals are unlikely to be able to access the proceedings.

A.  The Zoom for Government Platform is Secure

The Zoom for Government platform is certified at the "moderate" level by the Federal Risk and Authorization Management Program ("FedRAMP"), a government-wide program that promotes the adoption of secure cloud services across the federal government by providing a standardized approach to security and risk assessment for cloud technologies and federal agencies. *See* Zoom Decl., Att. A at 2. Certification at the "moderate" level means that Zoom for Government is approved by FedRAMP for use by federal agencies "where the loss of confidentiality, integrity, and availability would result in serious adverse effects on an agency's operations, assets, or individuals." *See* https://www.fedramp.gov/understanding-baselines-and-impact-levels/ (last visited May 24, 2024). The Zoom for Government platform moreover uses U.S.-based infrastructure and data centers, and it is managed by U.S. persons only. *Id.*

The reliability of the Zoom for Government platform for conducting judicial proceedings remotely was demonstrated in the District of Columbia during the COVID-19 pandemic, and many hearings, including some testimonial hearings, were conducted via this Court's existing Zoom for

Government account. *See generally* ECF 45 at 4-8. Additionally, at least one jury trial was made available over the court's public access telephone line, in *United States v. Dustin Thompson*, *et. al.*, No. 21-cr-161 (RBW).[9]  Although the District of Columbia did not allow public participation via Zoom, some District Courts throughout the country did, at least one, the District of Massachusetts, still does.[10] Between Zoom for Government's FedRAMP certification, its U.S.-based infrastructure and management, and its proven track record in the District of Columbia and other District Courts, this Court should find that the risk of unauthorized access through hacking or some similar malicious attack is low, even if some remote users are based outside of the United States.

B.   Safeguards Significantly Reduce the Risk of Unauthorized Access Through Sharing

Zoom's proposals similarly mitigate the risk of unauthorized access through link sharing or account sharing. Both of Zoom's Meetings-based proposals would not permit any individual to gain access to the proceedings prior to (1) confirmation that the person is accessing the meeting from a verified, vetted email address and/or phone number and, in the case of those who desire access to the video, (2) confirmation via a live monitor of a visual match between the person logging in and their government-issued identification. In the case of Zoom's Proposed Solution

---

[9]     In its March 1 filing on this topic, the government stated that the public access line was not available during trials.  ECF 45 at 9, n.3.  Undersigned counsel were not aware of the use of the line during the *Thompson* trial at that time.

[10]     The calendar for the District of Massachusetts is available at the following link: https://forms.mad.uscourts.gov/courtlist.html (last visited May 30, 2024), and it shows which cases allow for remote access.  Anyone desiring to access a proceeding remotely must request such access, including an acknowledgement of the prohibitions against rebroadcasting, recording, and photography, and afterwards they receive a Zoom link if the proceedings are available via Zoom (upon information and belief, some proceedings are available via Zoom, others are available only via telephonic dial-in, and some are not available remotely at all).

Three, no member of the public, victim or not, would even receive a link to the meeting that contained the remote broadcast of the proceedings.

### III.     Zoom's Proposals Mitigate the Risk of Recording, Redistribution or Broadcasting of the Proceedings

All victims who desire remote access will be required to acknowledge, prior to receiving a link to access any proceedings remotely, that recording, distribution, or broadcasting or the proceedings is a violation of federal law and can be punishable by contempt of court. This Court can and should remind anyone listening remotely of that fact at the beginning of each hearing. The Court can also control who appears on camera, allowing anyone (including lawyers, witnesses, and court staff) who did not consent to their image being remotely transmitted to the victims to opt out of being shown on camera.[11]

The combination of solutions proposed by Zoom will act to further discourage any remote broadcast of the proceedings. First, any individual who wishes to watch the video will be required to be on camera and be monitored throughout the proceedings, which would discourage the use of, *e.g.,* cell phones or cameras to video-record the proceedings. Second, the broadcast could be configured such that Zoom's native recording tools are disabled. Third, to discourage recording by some outside device, such as a phone, Zoom's audio- and visual-watermarks will further serve to discourage recording and broadcasting and, in the event a recording is made, Zoom will be able to assist in identifying who made it.

Zoom's video watermark feature superimposes an image of the user's email address onto the video that reaches his or her screen, which would be visible in any recording they may make,

---

[11]     The government expects that the cameras used for video transmission would be the same four-camera setup that has been used for years in the District of Columbia for transmissions to overflow courtrooms and the media room, *i.e.*, camera that focus on (1) the podium, (2) the bench, (3) the witness, and (4) any exhibit transmitted on a screen to the public.

assuming that they were able to make such a recording without one of the monitors noticing. Zoom's audio watermark feature is potentially even more powerful, as it embeds an inaudible watermark of a user's personal information in the audio stream that is sent to their device. Thus, if a user illicitly records any of the audio using, e.g., their phone or a third-party app, even if the device they use to record it is outside of the view of the monitors, Zoom would be able to assist in identifying the user responsible. Zoom Decl., Att. A, at 2. The government submits that publicizing the use of these features would be a strong deterrent to any individual who might otherwise plan to illicitly record the proceedings. However, should any individual choose not to heed those deterrents, once a culprit was identified, the Court could take any action it deemed appropriate, ranging from a warning to denying that user any additional access, to initiating contempt proceedings.

**IV.    The Zoom Proposals are the Best Vehicles Through Which to Accomplish Congress's Directive to Provide Remote Access to Victims**

Pub. L. No. 118-37 directs this Court to make reasonable efforts to provide remote telephonic and video access to victims of the attack on Pan Am Flight 103, "without regard to the location of the victim." Congress's grant of authority in this case is notably broader than in previous legislation authorizing remote access for victims. For example, the legislation that authorized remote broadcasts for victims in connection with *United States v. Moussaoui* limited the remote broadcasts to "convenient locations the trial court deems necessary," and included no language about providing access to victims regardless of their location. *See* Pub. L. No. 107-206; *see also generally* ECF 45 at 8-9, 15 (noting the broader authorization provided by the Pan Am Flight 103 Legislation when compared to Pub. L. No. 107-206).

The broader grant of Congressional authority in this case, which is reflective of the advancement in technology between 2002 and 2024, as well as the geographical disparateness of

the victims of this attack, should be reflected in the Court's implementation of that authority. Congress's intent to provide remote access to court proceedings to victims of the attack on Pan Am Flight 103 without regard for their location, *see* Pub. L. No. 118-37, subsections (b)(1) & (b)(2), will not be realized by the use of fixed sites for viewing. As the attached declarations from victims (Exs. 3, 4, 5, and 6), along with the letter from the Right Honorable Dorothy Bain, Lord Advocate of Scotland,[12] illustrate, fixed viewing sites would be inadequate to serve the needs of victims who are physically located in geographically disparate locations. Notably, the use of fixed viewing locations, combined with daily written updates, during the trial of co-conspirators Abdelbaset Ali Mohmed Al Megrahi and Lamin Khalifa Fhimah, although technologically sophisticated for its time, was still insufficient for many victims who wanted to take advantage of that access. *See* Lord Advocate Bain letter at 2; Weipz Decl. at ¶ 18 Cummock Decl. at ¶¶ 35-36.

Kara Weipz, the President of the U.S.-based Victims of Pan Am Flight 103, Inc. ("VPAF103"), notes that her organization has members in 36 states and the District of Columbia. Many live multiple hours from the closest major city. Weipz Decl. at ¶ 14. Aside from physical distance from likely viewing sites, many members of VPAF103 are battling various serious health conditions, have issues traveling, and use hearing aids that are attached to their computers or cell phones that would make either traveling to Washington or another fixed site a practical impossibility. *Id.* at ¶ 15. Indeed, Ms. Weipz explained to Senators and Congressional Members

---

[12]    The Lord Advocate is the senior of the two Scottish Law Officers. She is a Minister in the Scottish Government and the holder of an historic office dating back to the 1400s. The Lord Advocate has a range of duties associated with the maintenance of the rule of law and the proper administration of justice. The role of Lord Advocate has four main components and as such they are: (1) the head of the systems of criminal prosecution and investigation of deaths, and all prosecutions on indictment in Scotland run in the name of the Lord Advocate; (2) the principal legal adviser to the Scottish Government; (3) responsible for representing the Scottish Government in civil proceedings, and (4) for representing the public interest in a range of statutory and common law civil and constitutional functions.

about the difficulties in using designated fixed "downlink" sites when discussing the legislation that was ultimately passed to afford victims access to court proceedings in this case. *Id.* at ¶ 24.

Melina Hudson, who was 16 years old when she lost her life aboard Pan Am Flight 103, is survived by her father Paul Hudson, who is based in Sarasota, FL, as well as siblings in South America, Miami, and New York. Hudson Decl. at ¶ 16. John Binning Cummock was 38 years old when he was killed onboard Pan Am 103. Cummock Decl. at ¶ 1. He was survived by his wife Victoria and three young children. *Id.* at ¶¶ 1, 6. Ms. Cummock notes that many of the surviving victim family members suffer from post-traumatic stress disorder and find it intimidating or overwhelming to attend in person the court proceedings in a case such as this. *Id.* at ¶ 45. She likewise notes that many of these surviving victim family members fear airplane travel since their loved ones were killed aboard a commercial airplane. *Id.* at ¶ 46.

The inadequacy of fixed sites is not limited to a country the size of the United States. As the Lord Advocate notes, "[w]ere remote sites to be established allowing in-person access at, for example, the United States Embassy in London, or the United States Consulate in Edinburgh, or both, some relatives would still require to travel for many hours to reach these locations, and require to find accommodation in the area for the period during which they wished to view the trial. This would pose both financial and practical challenges for these relatives and those supporting them." Lord Advocate Bain Ltr. At 2. Pamela Dix was living in the United Kingdom at time she lost her brother in the attack on Pan Am Flight 103, and she remains in the United Kingdom today. She notes that distance is only one of many constraints victim family members are faced with: "for those with mobility, health, family, work and other issues and commitments, it will simply not be possible to travel to the courtroom." Dix Decl. at 4. Ms. Dix was available to make use of the fixed viewing sites during the trial at Camp Zeist in 2000, *id.* at 3, but Ms. Weipz

was not, despite the fact that she became a board member of VPAF103 in October 2000, which was while that trial was ongoing. *See* Weipz Decl. at ¶ 6. It is notable that the declarations from both Ms. Weipz and Ms. Dix, who had different results in their ability to use the remote viewing sites for the first trial, as well as the Lord Advocate's letter and the Declaration of Ms. Cummock, emphasize that the fixed sites would not, in their view, be sufficient, given the logistical hurdles those sites impose on victims who are either not located close to them or who have difficulty traveling any distance.

Moreover, the use of fixed-site locations, which the defense has suggested, *see* ECF 44 at 1, would come at significant unnecessary expense and would result in some level of exclusion of victims based on their geographic location, in direct contravention of the statutory language. For an illustrative example, the Court need look no further than *Moussaoui*, a case that involved hijacked planes that were destined for California. Despite the numerous victims who lived in that state, there were no viewing sites in California, in part because "viewing the trial in California would have to start at 6:30 a.m. PST. The courthouse would have to be opened well before 6:30 a.m. and necessary security staff would have to be in place by 5:30 a.m. Those hours would place an unreasonable burden on limited judicial and Marshals Service staff." ECF 43-4 (Letter from Judge Brinkema to a victim in the *Moussaoui* case, explaining her decision to not include a viewing site in California). The opposite issue would exist in the United Kingdom, where trial would end on most days around 10:00 p.m., local time, and each remote viewing site would need to be staffed through that time.

The government's proposals as outlined herein provide economies of scale and, crucially, the ability to base those individuals tasked as serving as "monitors" in the Eastern time zone. The defense proposal would require, among other things, at each location: (1) physical space in which

some number of victims will be permitted to sit to view the proceedings; (2) display screen(s), such as a television monitor, on which the proceedings would be viewed; (3) some physical staff presence to verify that only authorized persons can access the remote broadcast of the proceedings; and (4) some physical staff presence to either screen those present for electronic devices or watch to ensure that they are not recording.

For any fixed remote viewing site that is outside of the Eastern or Central Time Zones, the logistical challenges of staffing the site would be much more complex, for the reasons identified by Judge Brinkema. The government's proposal here would permit some small number of monitors, all of whom could be based in the same time zone in which the trial is taking place, to authenticate users' identity and watch for any potential rule violations. The number of monitors would be in direct proportion to the total number of users, without regard for those users' location. There would be no need to locate and coordinate physical space and television monitors in multiple jurisdictions worldwide, as the victims who desire remote access would provide their own space and their own device on which to access the proceedings. The government's proposal has the distinct advantage of making use of Zoom's audio and video watermark technology, which will make identifying and imposing consequences on anyone who breaks the rules much easier. By contrast, if an individual were to secrete an audio recording device into a viewing site, and later post that recording to the internet, it would be very challenging to identify the source of that audio and take remedial action.

The government's proposal provides for the secure, remote transmission of proceedings to victims in this case, regardless of their geographic location. It does so in a way that will prevent disruptions to the proceedings, allow for identification checks akin to those that would take place in person outside of a fixed viewing site, allow for live monitoring of participants, and that will

allow for accurate identification of any user who may seek to break the rules on rebroadcasting or sharing of the proceedings. The Court should adopt the proposal to effect Congress's intent to provide remote access to all victims of the attack on Pan Am Flight 103, regardless of their location, and the government stands ready to assist the Court in implementing the proposals as outlined herein.

**CONCLUSION**

Based on the foregoing, and for any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the Court make the proceedings in this matter available to victims via the Zoom for Government platform.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

GREGG A. MAISEL
D.C. Bar No. 447902
Chief, National Security Section

*/s/ Erik M. Kenerson*
ERIK M. KENERSON (OH Bar No. 82960)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
National Security Section
United States Attorney's Office
601 D Street N.W.
Washington, D.C. 20530
(202) 252-7201
Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys
Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530