UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | : |
| Abu Agila Mohammad Mas'ud Kheir Al-Marimi, | : Criminal Action No.: 1:22-cr-00392-DLF |
| a/k/a Abu Agila Muhammad Mas'ud Kheir Al-Marimi, | : |
| a/k/a Abu Agila Muhammad Mas'ud Kheir, | : |
| a/k/a Hasan Abu Ojalya Ibrahim, | : |
| | : |
| Defendant. | : |

**DECLARATION OF M. VICTORIA CUMMOCK**

I, M. VICTORIA CUMMOCK, am an American citizen and declare as follows:

1. I am the widow of John Binning Cummock, a 38-year-old American citizen who was murdered in the terrorist bombing of Pan American Flight 103 over Lockerbie, Scotland, on December 21, 1988, along with 242 other passengers and 16 members of the flight crew *in this targeted terrorist attack against the United States of America*. Eleven additional individuals were killed by airplane debris on the ground in the vicinity of Lockerbie, Scotland.

2. The 270 murdered victims came from 21 nations and included 190 Americans and 52 U.K. citizens, with the victims' ages ranging from two months to 82 years. They were real people like you and me, filled with the promise of what their futures could bring.

3. I have been asked to provide this Declaration in support of this Court's authorizing remote access to all public court proceedings, including pre-trial and post-trial proceedings, to the Living Victims—individuals who have been permanently impacted by this heinous criminal act and who, as set forth in Pub. L. 118-37, 138 Stat. 11 (Jan. 26, 2024), meet the definition of a "victim of crimes associated with the bombing of Pan American Flight 103," including individuals "who suffered direct or proximate harm as a result of the bombing of Pan American Flight 103"; who were present at or near the scene; or "the spouse, legal guardian, parent, child, brother, sister, next of kin, or other relative of, or who is determined by the applicable district court of the United States to be an individual who possesses a relationship of similar significance to" the prior list of individuals.

*MVC*
*03/30/24*

4. Based on my personal knowledge, the number of Living Victims/individuals who qualify under this definition of a "victim of crimes associated with the bombing of Pan American Flight 103" *totals well over a few thousand people*. Living Victims reside across the continental U.S., the Hawaiian Islands, Alaska, and Puerto Rico. Many Living Victims and survivors reside outside of the U.S. throughout the United Kingdom, mostly in Lockerbie, Scotland, and within approximately 20 other countries.

5. On December 21, 1988, I promised my beloved husband, John, that I would dedicate myself to ensuring that he, and all of the 270 victims who were murdered that day, did not die in vain and *their murder would not go unpunished*.

6. At the time of my husband's murder, I was the owner of a successful interior design firm, Cummock Designs, Inc., but the grief and trauma I experienced after the bombing—and bearing that loss and compounding trauma not only for myself but also for my three young children—motivated me to become an advocate and try to prevent the horrors that I had experienced from happening to other families.

7. In June 1991, I laid my husband, John, to rest across the road from where he died in the nose cone of Pan American's *Clipper Maid of the Seas* aircraft, just miles from where his Scottish ancestors originated. I, along with family and friends, routinely make the pilgrimage to John's grave at Tundergarth Cemetery and have visited Lockerbie, Scotland, countless times.

8. From our home in Florida, at 35 years of age and with our three small children—ages 3, 4, and 6—in tow, I became active with many other victims' relatives from across the country. We became the voices seeking justice for our 270 murdered loved ones and, to date, have pressured seven U.S. presidential administrations to activate their pledge and obligation to hold accountable all those who ordered and committed this atrocity.

9. I was a founding member of Victims of Pan Am Flight 103 and served on its Political Action Committee, and I later co-founded and was president of Families of Pan Am 103/Lockerbie, both victim-advocacy groups.

10. I founded and presently serve as CEO and a member of the Board of Directors of the Pan Am 103 Lockerbie Legacy Foundation. The Foundation was established by members of Families of Pan Am 103/Lockerbie to document and codify the history of the December 21, 1988, terrorist bombing of Pan American Flight 103—the second-deadliest terrorist attack against the United States and the deadliest terrorist attack in U.K. history.



11. We also advocate for enhancing the protection of victims' and flyers' rights and ensuring ongoing vigilance against terrorism.

12. We work to commemorate our loved ones and honor the attack's 270 victims with the most comprehensive collection of color portrait photographs and biographical stories of victims; in our interactive, easily accessible Living Memorial, found on our website (www.PA103LL.org) and exhibited at the Tundergarth Remembrance Room, located across the road from the sacred crash site in Lockerbie, Scotland; at the Police Scotland Museum in Dumfries, Scotland; and on the walls of the DOJ prosecution team's trial-prep evidence room; among others.

13. We connect the survivors and the global Pan Am 103 Lockerbie community and, with our digital Legacy Story Project of oral histories, we bear witness and give voice to the thousands of people whose lives were forever changed.

14. The Foundation aims to be a principal U.S. nonprofit institution dedicated to clarifying the misnomer of the Lockerbie Bombing and raising awareness of the bombing of Pan American Flight 103 as a terrorist attack against America. We educate with online historical timelines, the largest digital archive of primary sources about this historical event, and a forthcoming Pan Am 103 Lockerbie Legacy Museum in Lockerbie.

15. Upon information and belief, in February 1989, I was the first family member of a victim to testify before the House Foreign Affairs Committee, chaired by U.S. Representative Dante Fascell. John and I were constituents in Representative Fascell's Florida district.

16. In all, I have testified before 28 Congressional committees and two White House Presidential Commissions.

17. On April 4, 1989, I organized, and was one of five family members to attend, a meeting of victims' family groups with President George H.W. Bush, the first of numerous White House visits.

18. In mid-1989, I lobbied alongside other family members, testified, and worked with the U.S. Senate Majority Leader and Minority Leader to help write legislation for an Independent Congressional Investigation into the bombing of Pan American Flight 103, an effort that was supplanted by President George H.W. Bush's White House Commission on Aviation Security and Terrorism.



19. In August 1989, I was appointed to the Commission to serve as a Pan Am 103 victims' representative and assist in the development of the Commission's scope of work and agenda. I was one of three family members of victims to testify before the Commission.

20. After this Commission's final report was issued, I worked with Congressional leaders to write, fast-track, and enact the 1990 Aviation Security Improvement Act, Public Law 101-604 (Nov. 16, 1990).

21. I was integrally involved in lobbying efforts to enact the original "terrorism exception" to sovereign immunity as part of the Foreign Sovereign Immunities Act (then codified at 28 U.S.C. § 1605(a)(7)), which, for the first time in U.S. history, allowed civilians to bring suit in U.S. Civil Court for the wrongful deaths of loved ones against countries that sponsor terrorism. These cases resulted in a $10 million no-fault settlement for each of the 270 decedents, with the exception of John B. Cummock (U.S. D.C. District Court Case No. 96-CV-1029 [CKK]).

22. I was involved personally, along with the Pan Am 103 victim-advocacy groups, in other legislation aimed at assisting the victims of terrorism and supporting law enforcement initiatives to combat terrorism, including: the Iran and Libya Sanctions Act of 1996, Public Law 104-172 (Aug. 5, 1996); the Federal Aviation Reauthorization Act of 1996, Public Law 104-264 (Oct. 9, 1996); the Killed in the Hands of Terrorist Act (KITA) of 1990, 26 U.S. Code § 692 (1990), providing terrorism victims with IRS Federal Tax waivers; and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104-132 (Apr. 24, 1996), providing habeas corpus reforms in criminal cases.

23. From 1995 to 1998, I held top-secret Level 3 security clearance and served as a Board member and representative of airline passengers and victims on the FAA's Aviation Security Advisory Committee.

24. In 1996, I served as a commissioner representing airline passengers and victims on President Bill Clinton's White House Commission on Aviation Safety and Security.

25. In 1997, I was the lone dissenter among the 21 commission members on the final report of the White House Commission on Aviation Safety and Security. My complete written dissent was blocked from publication in the final report, and I was denied access to deliberate on the classified annex despite my holding Level 3 security clearance. A civil action ensued in U.S. D.C. District Court Civil Action No. 97-981 (CKK) for violation of certain procedural requirements to provide all commissioners with equal information as the group makes decisions



and conducts inquiry, under the Federal Advisory Committee Act (FACA), 5 U.S.C. app. § 1-15 (1994), and additionally that the Commission violated the Administrative Procedure Act (APA), 5U.S.C. § 701-706 (1994). In 1999, the U.S. D.C. Court of Appeals overturned the lower court ruling, citing that commissioners may not be denied access to information and granting me access to the classified annex and information to complete my dissent, including attachments to be included in the reprinting of the final report to President Clinton of the White House Commission on Aviation Safety and Security.

26. In 2006, I met privately in Paris with representatives of Colonel Muammar Qaddafi and the Qaddafi Charitable Organization about organizing restitution for the victims of Libyan terrorist attacks.

27. I was an outspoken opponent of normalization efforts under President George W. Bush between the United States and Libya that did not require Libya to fulfill all terms and conditions of the bilateral sanctions, and of the creation of the U.S.-Libyan Claims Settlement Agreement and the Libyan Claims Resolution Act.

28. In April 2011, I co-financed an operation into Benghazi, Libya, and obtained sworn affidavits by former Gaddafi Justice Minister Mustafa Mohammed Jalil that detail Gaddafi's criminal involvement in the bombing of Pan American Flight 103 and other global terrorist attacks.

29. In September 2011, I met on multiple occasions with Libya's new head of state, Chairman Mustafa Mohammed Jalil, and various other members of the Libyan Transitional Council, at the Libyan Mission to the United Nations.

30. I became a certified disaster responder as a victims' advocate with the American Red Cross and served on the Red Cross's National Board of Governors and the Board of the local Miami chapter. I assisted victims during the search and recovery operations after other mass-casualty disasters, including the Oklahoma City Murrah Federal Building bombing and the aviation disasters of ValuJet Flight 592, TWA Flight 800, and Chalk's Ocean Airways Flight 101.

31. Through it all, my staunchest focus remained on seeking justice and accountability for my husband and the 269 other people killed on December 21, 1988.

32. For more than 35 years, together with other American victims' family members, we have lobbied and pushed for truth, accountability, and justice, demanding seven U.S. Administrations expand their political will to provide law enforcement with adequate resources



for the U.S. effort to investigate, identify, and prosecute all those who committed, ordered, or supported this atrocity, including state sponsors.

33. We have fought to have the U.S. prosecute the two U.S. indictments against Abdelbaset Al-Megrahi and Lamen Khalifa Fhimah for the bombing of Pan American Flight 103 and for the trial to take place in a U.S. Federal Court or under U.S. law at former U.S. airbase Kamp van Zeist in the Netherlands; instead, the trial—known in Scotland as the Lockerbie Criminal Trial—took place at Kamp van Zeist before a specially convened Scottish Court (the High Court of Justiciary) in 2000 and 2001.

34. As with many American victims' family members, we believed that the Scots-law "Lockerbie Trial" at Kamp van Zeist would be followed by a "Pan American Flight 103 Trial" at the same location that would apply U.S. law before a U.S. court, *since the crime was realized aboard a U.S. flag–bearing commercial airliner* and since criminal suspects are routinely tried in multiple jurisdictions for the same crime. Furthermore, there are significant differences between the U.S. and Scottish criminal systems regarding the admissibility of evidence, testimony of witnesses, criminal sentencing, parole, and release.

35. We were unequivocally disavowed of those beliefs by the Office of Victims of Crime ("OVC") within the Department of Justice. Prior to the trial's commencement, we were mailed a complex 186-page "Lockerbie Trial Information Guide" informing us that:

- OVC *would provide support to only two family members per victim* to travel to the Hague and *attend the trial for one week only.* As we later learned, the few American victims' families who attended the trial under these conditions at Kamp van Zeist were rarely permitted to observe the proceedings in the courtroom from start to finish on any given day, or were sent to overflow areas due to space limitations, including seats reserved for media and other interested parties.
- Additionally, OVC, in concert with the Scottish Court Services, set up four remote-viewing sites in London, Dumfries, New York City, and Washington, DC; however, these sites were not well-attended since they required most victims' families to travel hundreds of miles and pay for weeks of travel expenses and lodging—a prohibitively expensive burden of time and money, especially for those working regular jobs or caring for children or other family members.
- Despite good intentions, and demonstrating the limitations on their capabilities, OVC abdicated their responsibility to protect Living Victims' rights to privacy and our access to court proceedings by allocating funds to the Syracuse University College of Law's Lockerbie Trial Families Project to create and maintain a website available to victims' families during the complete course of the trial. Each day, the Scottish court emailed trial transcripts to Syracuse University, where the transcripts were posted online with summaries by SU law professors. Unfortunately, except for the families of the 35 Syracuse University victims, the vast majority of American victims' families never received direct OVC communication, instruction, or support about accessing and utilizing this website.

MNC
05/30/24

36. The 36-week Scottish trial, which began more than 11 years after the bombing and after significant efforts by the American victims' families to move the investigation and prosecution forward, ended up providing us with extremely limited, inconsistent, or no access to the court proceedings.

37. This was similar to our experience during our civil lawsuit against Pan American Airways in the Eastern District of New York, where the courtroom could not accommodate all interested parties and gave equal standing to the media, counsel, and victims' families. Courtroom staff informed us that we would not be able to sit in on every day of the trial because we needed to clear space for others to attend.

38. At the conclusion of the highly charged Scottish trial, most American victims' families did not feel that justice was adequately served <u>by acquitting Fhimah and convicting Al-Megrahi, who ultimately served 11.5 days for each of the 270 victims' murders. This blatant miscarriage of justice, without recourse, truly broke our hearts and dashed our expectations for the U.S. authorities—in particular, in the Criminal Justice system's will to pursue and hold accountable those responsible.</u>

39. Now, our combined efforts of more than 35 years, which required immense perseverance and great emotional and financial sacrifice, have brought us to this U.S. Federal Court. This is the first and likely only opportunity for the United States of America—to which John, I, and hundreds of other American Living Victims have pledged allegiance, with hope in the promise of justice for all—to adjudicate the mass murder of our loved ones for the second-deadliest terrorist attack against the country, after the attacks on September 11, 2001.

40. The Federal Crime Victims' Rights are codified at 18 U.S.C. § 3771 and provide the following list of rights:

> (1) The right to be reasonably protected from the accused.
>
> (2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
>
> (3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.
>
> (4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
>
> (5) The reasonable right to confer with the attorney for the Government in the case.

7

*mve*
*05/30/24*

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

(10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

41. Given our collective difficulties in obtaining daily access to public proceedings of the prior criminal and civil trials, and given the physical courtroom space limitations at Prettyman Federal Courthouse in Washington, D.C., and in anticipation of the trial of the Defendant in these proceedings, we sought, lobbied for, and obtained Public Law 118-37 (Jan. 26, 2024) that provides the definition above of "victim of crimes associated with the bombing of Pan American Flight 103" and also provides that "[o]n and after the date of enactment of this Act, and notwithstanding any provision of the Federal Rules of Criminal Procedure or other law or rule to the contrary, in order to permit victims of crimes associated with the bombing of Pan American Flight 103 to access court proceedings in the criminal case against Abu Agila Mohammed Mas'ud Kheir Al-Marimi and against any co-conspirator subsequently charged and prosecuted in a court of the United States for crimes related to the 1988 bombing of Pan American Flight 103, *the district court of the United States in such a case shall order that reasonable efforts be made to make remote video and telephonic access to proceedings in the case available to victims of crimes associated with the bombing of Pan American Flight 103.*" Pub. L. 118-37 at § 1(b)(1). *This access is to be made "without regard to the location of the victim." Id. at § 1(b)(2).*

42. The Living Victims do not seek daily access that would hamper the ability of the Court to control its courtroom or to impede the ability to "protect the integrity of court proceedings or the safety of parties, witnesses, or other participants in the proceedings." *See id.* at § 1(c).

43. Nevertheless, because crime victims differ in their abilities to access trial proceedings, and this collective group of victims' families has been let down in the past despite likely well-intentioned efforts by OVC, I believe it is incumbent upon the Court to ensure that each Living Victim receives individualized access where they are located, rather than requiring travel to the D.C. Courthouse or a centralized remote site in a large city, such as through secure transmission to U.S. Federal Government Buildings, U.S. State Attorneys' Offices, or U.S. Federal

8

*MvC*
*05/30/24*

Courthouses, which would require significantly more funding for OVC to staff, manage, and provide us with logistical support and services.

44. As I have personally learned in my decades of victims' advocacy and as a crime victim myself, not all victims are created equally. We process and respond to the profound trauma of mass murder differently depending on many factors, including relationship to the victim, age at the time of the crime, the magnitude of the crime, media and general public intrusion, and proximity to the crime.

45. Many of us live with post-traumatic stress disorder and find it intimidating or overwhelming to physically attend a public trial that includes the accused offender surrounded by his supporters, and gives equal access to the global media, counsel, and the general public.

46. Furthermore, many of the Living Victims continue to fear travel by airplane since their loved ones were killed on a commercial aircraft; hence, forcing them to travel to a trial location that may be far from their place of residence would impose undue trauma and stress on these individuals.

47. Many of the Living Victims may lack the monetary resources to attend the trial in D.C. or in a centralized viewing location. The trial will likely be lengthy, and lodging, food, and travel may be difficult expenses to bear.

48. Given that the bombing of Pan American Flight 103 took place on December 21, 1988—over 35 years ago—many of the Living Victims are advancing in age and/or have mobility issues, making travel itself difficult or impossible.

49. As stated previously, OVC is the agency charged with communicating with the families regarding all aspects of this criminal case, including means of accessing the video or audio broadcast of the trial; however, OVC has chosen to communicate with the Living Victims through intermediary organizations—rather than directly—including, but not limited to, Syracuse University College of Law and Victims of Pan American Flight 103. Membership in these groups is open to individuals outside of the category of "victims of crimes associated with the bombing of Pan American Flight 103" and exclude the majority of Living Victims' family members.

50. It appears that OVC's and the Department of Justice's contact list for those who qualify for access under Pub. L. 118-37 is woefully out-of-date and incomplete and excludes hundreds of family members who have never received direct contact or information from OVC about our case. Hence, most Living Victims have not been privy to official information, new

MNC
05/30/24

developments, or been invited to attend briefings, such as the annual U.S./U.K. law enforcement briefings at Syracuse University, which occur in person and are shared electronically, or commemorative services at Arlington National Cemetery.

51. By comparison, the Pan Am 103 Lockerbie Legacy Foundation's list contains nearly 1,000 family members, including children, grandchildren, or siblings of decedents who were too young to appear in earlier FBI or OVC contact lists, as well as family members who have assumed management of matters related to Pan American Flight 103 from their elders. These individuals reside across the United States and abroad. Our Foundation wishes to share our list with OVC, to allow OVC to vet these individual contacts and implement a system for direct OVC communication, perhaps by hiring additional OVC victim services staff, utilizing Victims of Crime Act (VOCA) funding.

52. Upon belief and information, most Living Victims are willing to adhere to safeguards and protocols ensuring that the integrity of the Court proceedings is protected, and we are adamant that in 2024—given the technological advances since the Scottish trial in 2000–2001—this access should be individualized for the location of each victim's choosing. It is up to the DOJ and Court to seek solutions to security concerns related to remote access, as they have done in other criminal cases after the passage of the Coronavirus Aid, Relief, and Economic Security (CARES) Act of 2020, Public Law 116-136 (Mar. 27, 2020), allowing federal courts to conduct criminal court procedures by telephone and video hookups under rule 53.

53. The bombing of Pan American Flight 103 on December 21, 1988, not only took the lives of 270 victims but shattered those of thousands of survivors and Living Victims. Your Honor, I am now 71 years old and have lived more than half of my life without my husband, best friend, and the father of my three children. For more than 35 years, I and other Living Victims have been trying to pick up the pieces of our lives, process our losses, rebuild and move forward. We were given a life sentence to live in the shadows of injustice. *Taken* was our peace of mind and sense of security. *Taken* was the opportunity to become the mother, father, sister, brother, daughter, son, friend, neighbor, colleague, or person we wanted to be. *Taken* was our family life as we knew and enjoyed it. *Taken* were the childhoods of our once-happy, carefree children, leaving them instead with decades of feelings of pain, fear, and injustice and with repeated questions: "Mommy, why aren't the bad guys who killed Daddy in jail?" "Why are they still free to kill us or other families?" "Why hasn't law enforcement cared enough to help us?" And for



many of us, *taken* was our unquestioned allegiance and faith in our country as we thought we knew it: promising equal rights and justice for all.

We have suffered immeasurable loss and many indignities and been routinely marginalized from proceedings for more than 35 years. The Court and Government have a unique opportunity to correct these injustices by enforcing law that the U.S. Congress passed and President Biden signed. I want to implore the Court and Government to fulfill their responsibility and uphold their moral obligation to utilize all means available to facilitate, support, and not discourage or prevent the Living Victims from bearing witness to the adjudication.

Please do not take anything else away from us. Help me keep my promise to John, and all of our promises to our murdered loved ones, by restoring our rights and dignity. Please give us the support we need to bear witness to the U.S. Court proceedings.

54.    I thank the Court for accepting this Declaration in support of permitting individualized, direct, remote access to the pre-trial, trial, and post-trial proceedings in this case for each "victim of crimes associated with the terrorist bombing of Pan American Flight 103."

I declare under penalty of perjury that the foregoing is true and correct.


Dated: May 30, 2024
Miami, Florida

M. VICTORIA CUMMOCK