Declaration of Pamela Dix

I, Pamela Dix, being over 18 years of age and a resident of the United Kingdom, do hereby declare as follows:

Background to Submission

My eldest brother Peter Dix (1953-1988) was killed as a passenger on Pan Am 103. Peter was at that time living in London and was travelling to New York City for a one-day business meeting, in his capacity as a management consultant for Bain & Co. From an Irish family, born and brought up in Dublin, Peter had lived in New York for some time prior to a move to London in 1985 with his family. I was also living in London with my partner, and was an editor at Penguin Books. The course of my life was to alter dramatically with the bombing – I lost my chosen career, instead ending up as a campaigner and advocate for the rights of those affected by disaster.

UK Families Flight 103 (UKFF103)

In March 1989 those bereaved in the bombing who were based in the UK formed a family group, the unincorporated association UK Families Flight 103, for which I acted as secretary for many years. The purpose of the group was to provide mutual support; campaign for an independent public inquiry into the circumstances leading up to the bombing and subsequently; for those accountable to be brought to justice; and for the systemic organisational and governmental failures that enabled the attack to take place to be rectified. These objectives underpinned our stated principles: 'the truth must be known' and 'their spirit lives on'.

Most importantly the group was seen as a safe space for family members to share what at times was an almost overwhelming sense of grief and desolation.

Air Accident Investigation Branch (AAIB) Report 2/1990 on the accident to Boeing 747-121, N739PA, at Lockerbie, Dumfriesshire, Scotland on 21 December 1988

The AAIB was responsible for carrying out a statutory investigation into the circumstances of the downing of Pan Am 103. It was from the Principal Inspector that we were to learn that the aircraft had been bombed, a week after the event. The AAIB meticulously investigated, and reconstructed Pan Am 103 at their hangar in Farnborough, Hampshire, England.

Family members were invited to Farnborough to see the reconstruction and to hear a detailed explanation of the technical report. The humanity, expertise and empathy shown by the inspectors remain a shining illustration of how to treat shocked and deeply upset people with care and consideration and the respect we deserved. No question was thought to be too simplistic to answer. Answers were given honestly, without judgement. What could be uncovered was shared. The inspectors went far beyond their duty as technical investigators.

I set out this example in the interests of furthering an understanding of why it is important to offer and facilitate access to information.

Fatal Accident Inquiry (FAI)

An FAI was held in Dumfries, Scotland, sitting from October 1990 till February 1991, presided over by Sheriff Principal John Mowat QC. UKFF103, along with other family members, were afforded legal counsel for the purposes of the inquiry. The group succeeded in getting the then UK Department of

Transport not only to fund this representation, but to fund accomodation and travel to the FAI for family members. This was unprecedented. The opportunity to sit within the courtroom, seeing and hearing evidence presented, witnesses cross-examined, was a painful but necessary experience for me and others. I gave evidence concerning the identification of my brother – a difficult and intimidating experience. Law officers at that time had not yet engaged with an understanding of what it meant to be in the position of a bereaved person following a major terrorist attack.

The Sheriff's determination that the 270 people who died had been murdered in turn led to the later indictment of Abdelbaset al-Megrahi and Al Amin Khalifa Fhimah in November 1991.

UKFF103 then spent decades seeking a resolution to what happened, not only within the criminal justice sphere but within civil society. Our efforts took a considerable toll on our lives.

Disaster Action (DA)

My experience of the Lockerbie bombing, as it is commonly known, led me into contact with those affected by numerous other disasters of different cause and origin affecting people of any nationality normally resident in the UK. I became one of the founder members of DA, an NGO set up in October 1991 (see www.disasteraction.org.uk) by survivors and bereaved people. I went on to become its Executive Director. The organisation was founded on the principles of support, accountability and prevention. Gradually over time we assisted in the development of new laws, regulations and guidance governing disaster management and response in the UK. Amongst the Acts of Parliament we saw as key achievements were the Civil Contingencies Act 2004 and notably The Corporate Manslaughter and Corporate Homicide Act 2008.

Central to DA's work was the desire to change attitudes and approaches within the statutory and non-statutory services towards bereaved and survivors. During the 1980s and 1990s – including after Lockerbie – those on the receiving end of major incidents were often treated callously, seen as part of the problem, an inconvenience at best. A theme that echoed through the experience of so many people affected by different crimes was the desire – often thwarted – for information and support.

The Code of Practice for Victims of Crime in England and Wales was a watershed in enshrining duties towards those on the receiving end of emergencies. Being treated with respect and afforded openness and transparency are now understood to be key rights.

Such success was hard won and came at considerable personal cost.

September 11 2001 Attacks/January 2002 Bali Bombing/7 July 2005 London Bombings

Part of DA's remit was to offer direct practical and emotional support to others affected by disaster, and in that capacity we brought together those affected by the above incidents, facilitating the development of their survivor and family support groups for people resident in the UK.

Eureste

In my role as Executive Director of DA, I worked within the European Union with the British, French and Belgian Red Cross Societies and others to set out core principles and working practices for those involved with bereaved and survivors in the aftermath of terrorist incidents.

Access for Family Members to the Megrahi/Fhimah Trial

Abdelbaset al-Megrahi and Al Amin Khalifa Fhimah were indicted on 13 November 1991 as co-conspirators in the bombing of Pan Am 103. After nearly a decade of negotiation the two men were surrendered by the Libyan government for trial. It had been agreed that the trial would take place under the auspices of Scots law, in a neutral venue, namely at The Hague in the Netherlands, without a jury. Megrahi was found guilty, and Fhimah acquitted, in January 2001.

Office for Victims of Crime (OVC)

The OVC in the United States, led by its then director Kathryn Turman, was central to the development of an access and support structure for family members, supported by the Crown Office in Scotland. The intention was for justice not only to be done, but to be seen to be done by those left behind after the catastrophe.

A website was set up for family members, setting out biographies of all the key players involved, with a timeline of events to date. Daily trial transcripts were uploaded so that they could be read at leisure. A secure password protected part of the site enabled family members to exchange private messages with others around the world if we wished to.

If we were in a position to travel to The Hague, the OVC funded travel and accomodation for a one-week visit. In addition, secure video facilities were set up around the United States, and in Scotland and London. 'Accredited' family members could visit the sites to see the trial in real time. I attended the site in London as often as I could within the normal constraints of family life.

Having such access in real time to the evidence as the trial unfolded was critically important for me and so many others. It is difficult enough to understand the intricacies of evidence presented at such a trial with video and telephonic access – it would be virtually impossible without being able to see and hear it. The access we were enabled to have was transformational.

Access to Megrahi's Appeal

Access was also given to family members via the Crown Office in 2020 to some of Megrahi's posthumous appeal hearings – it was possible to see and listen to the arguments presented by counsel for the defence and prosecution, crucial to an understanding of how and why the final appeal failed.

Why Access is Important

As a family member I do not wish to read about the topline events from the forthcoming trial in the media. The advent of social media, not an issue for the Megrahi Fhimah trial, makes this consideration even more important. We wish to hear the evidence, listen to the tone in which it is given - the responses, the conduct of the defendant, the real-time nuances, are essential to an understanding of the process. The intricacies of the prosecution and the defence response can only be properly understood through direct access.

For decades we have been assured by the investigating and prosecuting authorities that the case remains open. Because of the nature of the Scottish legal system this has in fact resulted in a lack of transparency and access, with some matters being effectively concealed through a blanket application of sub judice. Even with his conviction, it was clear that Megrahi was only a player, not the mastermind behind the event. That his accused co-conspirator was found not guilty meant that

the baffling gaps in our understanding of the crime were left unfilled. Al-Marimi's trial is a much-anticipated opportunity to see those gaps closed.

## Protection of Witnesses

I understand some concerns have been expressed around protection of witnesses in this trial. I see no reason why protections should not be offered by presenting some of the evidence in camera – only if deemed essential to witness safety – or from behind protective screens. Whatever conditions already apply in this regard within the courtroom can be applied in the case of online streaming.

## Challenges for Family Members

With the considerable passage of time since the bombing in 1988, family members are presented with distinct challenges concerning access to the trial – and therefore access to justice.
Many family members of those killed have since died, become old or infirm. It is no longer a necessary or acceptable route to set up secure video link sites even in numerous locations. Not only is doing this expensive, but the technological advances now available mean that secure, password-protected live streaming into the homes of family members should be straightforward to arrange and considered the best option. Where this may be difficult for those unfamiliar with technology, arrangements could be made for vetted, trusted individuals to assist. Distance, which was at one time a barrier, is now just one of the many constraints people are faced with. For those with mobility, health, family, work and other issues and commitments, it will simply not be possible to travel to the courtroom. In addition, the costs for many will be prohibitive.

## My Submission

I wish to see family members enabled to have the same access that anyone present in New York who wishes to attend a trial has. My contention is that this is a basic human right, supported by the passing of Pub. L. No. 118-37., which provides that the Court, "notwithstanding any provision of the Federal Rules of Criminal Procedure or other law or rule to the contrary, in order to permit victims of crimes associated with the bombing of Pan Am Flight 103 to access court proceedings . . . shall order that reasonable efforts be made to make remote video and telephonic access to proceedings in the case available to victims of crimes associated with the bombing of Pan Am Flight 103." The most satisfactory mechanism to achieve this would be through secure streaming.

There are those who suggest that the trial will simply 'bring it all up again', that it must be too painful to go through. My answer to that is that it has never gone away. We live day-to-day with the consequences of the loss of beloved family members whose lives were taken away violently and cruelly. Their only voice in these proceedings is through legal avenues. Let us have the opportunity to fulfil our desires and duties as family members of those murdered on 21 December 1988.

I respectfully request that as the Judge in this case you will understand and agree with my request and suggestions as to how it should be fulfilled.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*Pamela Dix*

Pamela Dix

Executed on   29 May 2024