**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| | : | |
| **ABU AGILA MOHAMMAD** | : | |
| **MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' REPLY IN SUPPORT OF MOTION TO AFFORD VICTIMS OF THE BOMBING OF PAN AM FLIGHT 103 REMOTE VIDEO AND TELEPHONIC ACCESS TO COURT PROCEEDINGS IN THIS CASE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this reply in support of its Motion to Afford Victims of the Bombing of Pan Am Flight 103 Remote Video and Telephonic Access to Court Proceedings in this Case, ECF 51. The defense proposal—seeking to make access to victims available only at sixty federal courthouses in the United States, with additional viewing sites abroad, *see* ECF 52 at 10-11—is logistically complicated and largely impracticable for both overseas and domestic victims. Most importantly, requiring victims to access the proceedings through hard sites, in light of the significant protections included in the Zoom for Government proposal, would provide scant, if any, additional security to the proceedings.

**ARGUMENT**

The parties substantially agree on several points. For example: (1) pretrial, nontestimonial hearings should be made available to victims via Zoom, *e.g.*, ECF 52 at 1, n.1;[1] (2) Zoom for

---

[1] The defense states that "specifically, [they] agree that the Court should make a Zoom public access line available, in the same manner as court proceedings were routinely made available to the public throughout the pandemic." ECF 52 at 1, n.1. The government's proposal differs slightly

Government's security is sufficient to allow it to serve as the conduit for the transmission of proceedings, *see id.* at 10; and (3) the government's proposal for the use of Zoom eliminates many security concerns. *Id.* at 4. The parties differ on whether the defense's concerns – such as the possibility that a third party would be illicitly allowed to view the transmission by a *bona fide* victim – necessitates limiting transmissions of proceedings to dozens of fixed viewing sites worldwide. The use of dozens of fixed sites to provide remote access to victims is neither required to address those concerns, nor does it reflect a reasonable effort to provide remote access to victims, regardless of their location, as required by the statute passed by Congress for these proceedings.

I.      PROVIDING REASONABLE REMOTE ACCESS VIA FIXED SITES POSES SIGNIFICANT LOGISTICAL CHALLENGES FOR ALL VICTIMS

At the start, the defense proposal highlights the challenge with providing meaningful access to a group as geographically disparate as the victims in this case. Even according to the defense estimate, to enable an "overwhelming majority" of prospective U.S. victims to view the proceedings at a federal courthouse within 35 miles of their city, sixty such viewing locations would need to be created. *Id.* at 10. For those in the Mountain, Pacific, Alaska, or Hawaii time zones, the viewing locations would need to be opened and staffed much earlier than usual. Setting aside the resources that may be required to open west-coast sites early, each of those sixty locations would then be required to devote resources, ranging from physical space, to screens, to personnel to monitor the viewers and troubleshoot connection issues, in order to implement the defense proposal.

---

in that we request that the Court make its proceedings available to victims via the existing Zoom for Government platform. During the pandemic, remote proceedings in the District of Columbia were generally made available to the public via a dial-in line, rather than via Zoom.

The defense appears to have come to its proposal based on data provided to it by the government on June 6, 2024, that shows the city/state or city/country of multiple hundreds of victims. *See* ECF 52 at 9 ("As of June 6, 2024, the government reported to defense counsel that the list of victims provided is not a finalized list of those it would propose should be afforded remote access to the proceedings"). The government had previously provided data to the defense that was current as of March 2024. Contrary to the defense assumption that the list of U.S. victims will likely diminish as the government continues to refine the list, as it pertains to the U.S.-based victims, the June 6 data likely represents a floor concerning the geographical distribution of those likely to meet the definition of victim as laid out in Pub. L. No. 118-37. As discussed below, the number of confirmed U.S.-based victims is likely to increase due to the additional outreach efforts planned by the government.[2] A visualization of the March and June data provided to the defense is below, with the March data represented by yellow "pushpin" icons, and the June data represented by pink pins.

---

[2]     To create the data provided in June, the government attempted to contact by phone every individual listed in the VNS database who had a U.S. address and to ascertain their relationship to a victim who perished in the attack. As a result of that outreach, the government removed some individuals who appeared in the initial data it provided to the defense in March from the list it provided to the defense in June, *e.g.*, those whose relationship was described as "friend," or those whom another family member informed us are now deceased. Those removals did not comprise a significant percentage of the overall list and do not appear to have materially altered the overall picture of the geographical distribution of the U.S. victims, as demonstrated by the maps depicted below. Thus, the government does not expect that any further refinement of the list would diminish the overall picture of the geographical distribution of victims in the United States.

The government was unable to reach some individuals in VNS via phone prior to filing its motion, and those individuals remain represented in the June 6 data. The government will continue to attempt to contact those individuals and will refine its data accordingly. The government will also continue its outreach efforts, which is likely to increase the number of identified U.S.-based victims who meet the statutory definition.





    As undersigned counsel informed the defense via email on June 6, the U.S. data we
provided on that date includes those with the following relationships to someone who perished in
the attack: aunt, cousin, daughter, fiancé/fiancée, grandparent, niece/nephew, parent, partner,
sibling, sibling-in-law, son, spouse, step-parent, step-child, uncle, next-of-kin, guardian.  All these
relationships are such that they either meet the statutory definition of a "victim," or they are the

type of relationship that the government would expect to make an application to the Court for a finding that they possess a relationship similar to the statutory definition. *See* Pub. L. No. 118-37(a)(1)(B).

The government intends to send hard-copy letters to the entirety of its Victim Notification System (VNS) list, including all of the victims located overseas, whom it is not permitted to contact directly. It will continue in that correspondence, as well as other means of outreach, to encourage anyone who is not yet signed up for VNS to do so if they desire remote access to the proceedings.[3] Thus, if anything, the geographical distribution of U.S.-based victims is more likely to grow than appreciably shrink as the government updates its list. Thus, the defense estimate that 60 sites—along with 60 groups of people to staff those sites in their local time zones—would be required for the overwhelming majority of U.S. victims to reside within 35 miles of a courthouse would appear to be an underestimate.

The defense estimate is by its terms limited to the United States, as it acknowledges that many victims may be located well over 35 miles from a federal courthouse, "especially . . . those overseas." ECF 52 at 11. Here, the defense suggests that the Court consider U.S. Consulates or Embassies, but as the Right Honorable Dorothy Bain, KC, Lord Advocate of Scotland, noted in

---

[3]     As noted in its motion, ECF 51 at 9, the government plans to continue its outreach to domestic and international victims in part by sending a hard-copy letter notifying them of whichever option the Court ultimately chooses. For international victims, some of those letters must be routed through the recipient's home country's government, which may unavoidably and significantly slow down the pace of this correspondence. Considering the Court's Minute Order dated June 18, 2024, directing the government to "finalize its list of individuals who meet the statutory definition of victim and who wish to have access to court proceedings," and "provide the Court with the total number of victims and geographic locations for each victim," the government will send outreach letters as soon as practicable. The government proposes to allow a reasonable amount of time for responses, and to then provide an updated list to the Court in compliance with the Court's June 18 Minute Order. The government submits, however, that even this effort will not result in a "final" list of victims; and it is hard-pressed to imagine a reason to turn away a victim who later comes forward from accessing the proceedings.

her Declaration to this Court regarding the victims located in the United Kingdom, if " … remote sites [were] to be established allowing in-person access at, for example, the United States Embassy in London, or the United States Consulate in Edinburgh, or both, some relatives would still require to travel for many hours to reach these locations, and require to find accommodation in the area for the period during which they wished to view the trial." ECF 51-2 at 2. In addition to the non-local victims who would have to travel to those sites, they would be required to be staffed through approximately 10:00 p.m. local time, daily, for any victims who wished to watch proceedings until the end of the trial day.

Public Law No. 118-37 requires the Court to make "reasonable efforts" to provide remote video and telephonic access to the victims of Pan Am Flight 103, and it reaffirms the Court's discretion to "control the manner, circumstances, or availability of remote video or telephonic transmissions where *necessary* to control the courtroom or protect the integrity of court proceedings or the safety of parties, witnesses, or other participants in the proceedings" (emphasis added). The legislation also requires the Court to make whatever remote access it provides available "without regard to the location of the victim of crimes associated with the bombing of Pan Am Flight 103." For a victim residing in Los Angeles, or in Lansing, or in Lockerbie, a fixed "remote viewing" site in New York may as well not be a remote site at all. Any of those victims could just as easily (or not easily) travel to Washington to attend the proceedings in person as they could travel to New York for "remote" access.

Given the difficulties many victims have in traveling even to fixed sites close to their homes, or in hearing proceedings without computer-assisted listening devices—as noted in the declarations attached to the government's motion—it would not be reasonable to deny access to the victims who would be unable to cross an ocean, a continent, or even a few hundred miles, to

attend a remote site. As the defense proposal shows, any effort to provide a fixed link less than 50 miles from most of the victims would quickly become a logistical quagmire. The options developed by Zoom provide the Court with the ability make the reasonable efforts to provide the victims with remote access, regardless of geographic location, as the statute requires, and those proposals further allow the Court to discharge its duty to oversee and protect the integrity of the proceedings, as explained in the government's motion and detailed further below.

II.   THE GOVERNMENT PROPOSAL ADEQUATELY SAFEGUARDS THE INTEGRITY OF THE COURT'S PROCEEDINGS

The government's proposals provide sufficient safeguards to protect the integrity of the proceedings. The most important safeguard to the integrity of any judicial proceeding, though, is the Court itself, which can and should impose the Rule on Witnesses and order victim-viewers to comply with the Court's prohibitions on accessing, copying, or further distributing the proceedings by or to non-victims.  It is presumed that the parties, the witnesses, and the victims will follow the orders of this Court; and failure to do so would be subject to contempt proceedings.

Additionally, the government's proposal provides for juror anonymity and would permit witnesses – where they chose – to shield their likeness from broadcast. Thus, the defense's focus on the effect that publicly televised proceedings, or those where videos would be available for free download, may have on witnesses is misplaced. A far better comparator is the District of Columbia Court's current and routine use of overflow courtrooms to provide a type of remote access to individuals within the confines of the Barrett Prettyman Courthouse. Those broadcasts rely on a four-camera setup that trains cameras on the parties, the judge, and the witness stand, and it has been used to broadcast proceedings to overflow courtrooms for many years. This four-camera set-up was repurposed during the COVID-19 pandemic to conduct virtual hearings. Its routine use by courthouse personnel leaves little risk of error. The parties could address with their own witnesses

whether any given witness consents to their image being broadcast, and timely inform the Court. Witnesses who do not wish their likeness to be broadcast could opt out, which the Court personnel could implement by turning off the camera focused on the witness for the duration of their testimony. And there is no risk showing the jury because none of the cameras is directed at the jury box.[4]

The defense relies heavily on Judge Brinkema's decision declining to allow Courtroom Television Network, LLC ("CourtTV") to record and telecast the proceedings in *United States v. Moussaoui*, 205 F.R.D. 183, 184 (E.D. Va. 2002). That decision arose from markedly different circumstances than those the Court faces now, or even those that Judge Brinkema faced later in the *Moussaoui* litigation. First, the application at issue in that decision (1) was lodged prior to the legislation that later authorized remote broadcasts to victims in that case, *compare Moussaoui*, 205 F.R.D. at 183 (opinion issued January 18, 2002) *with* Pub. L. No. 107-206 (approved August 2, 2002); and (2) involved the use of cameras that were not controlled by court personnel to record and broadcast publicly, rather than the use of court-run cameras to simulcast to a defined subset of verified individuals, as the government advocates here, *see Moussaoui*, 205 F.R.D. at 187.  Indeed, most of the concerns stated in the *Moussaoui* decision and cited by the defense are either not applicable to the present case or are directly addressed by the government's proposal.

Moreover, the potential for witness intimidation as the result of the use of Zoom for Government platform is much lower here than in the *Moussaoui* decision cited by the defense, where the applicants requested leave of court to broadcast the proceedings on television, or during

---

[4]       For *voir dire*, as the government has previously noted, the camera can be turned off entirely. ECF 45 at 18. Juror anonymity would thus be preserved. *See* ECF 52 at 3 (expressing concerns that sacrificing juror anonymity would lead to a popular verdict). Similarly, because broadcast would not be public on television, but rather to victims in a controlled manner, the government's proposal would not encourage showmanship. *See id.*

the Judicial Conference's more recent pilot project regarding cameras in the courtroom, where the recordings were intentionally posted to the originating court's website for public access. *See* https://pdfserver.amlaw.com/nlj/Cameras%20pilot%20project%20committee%20report.pdf at 2 (last visited June 19, 2024). Here, by contrast, the proceedings would be broadcast only to those authorized to receive them, and in such a manner that the participants would be informed that recording and rebroadcasting was illegal; the victim participants' identities would be verified prior to accessing the proceedings remotely; and the identity of any victim from whose account any proceedings were re-broadcast was likely to be quickly identified.

The defense contends that the use of watermarks would "allow for identification of a recording made directly by a victim on their log in device," but would not prevent the making of a recording from a different device in the same room. ECF 52 at 10. Zoom's watermark technology is not so limited. The audio watermark technology would allow Zoom to assist in identifying the account from which any rebroadcast media was recorded, even "if someone records the meeting, with either a separate microphone or 3rd-party [application] and shares the audio file without permission." ECF 51-1 at 6. Similarly, Zoom's video watermark would superimpose a watermark of the user's email address on the screen they would use to view the proceedings. *Id.* If that user— or anyone they illicitly allowed to be in the same room as them, out of view of the monitors—were to record the proceedings using a separate device, that watermarked email address would be visible in the recording.[5]

---

[5] Although monitors could not observe anyone who listened to the proceedings over a telephone line, and the audio watermark technology would not be available for those who listen via telephone, the potential harm any such user who disregards the rules can do is also correspondingly lower, as any such person would necessarily not have access to video of the proceedings.

The defense's concerns about the Rule on Witnesses similarly do not stand up to scrutiny. Very few individuals who meet the statutory definition of victim in Pub. L. No. 118-37 are likely to testify in this case, and many of those who do would have a statutory right, under the Crime Victims' Rights Act, not to be excluded from proceedings in any event unless the Court, "after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding." 18 U.S.C. § 3771(a)(3). Nor does the speculative possibility that a victim, instructed by this Court of the limitations imposed on broadcasts of the proceedings, would allow a non-victim witness to gain access to either a victim's screen or an illicit recording thereof justify the use of only fixed viewing sites. Many high-profile cases have daily coverage of the courtroom proceedings, and indeed some journalists, including those in this courthouse, have posted near-transcripts of trials to X, formerly known as Twitter. *See*, *e.g.*, https://threadreaderapp.com/thread/1589978285270011907.html (last visited June 24, 2024). This type of news coverage can happen regardless of which remote-access solution the Court chooses. In a trial with significant media coverage, that media coverage is much more likely to be a source of access to matters that occurred in the courtroom than illicit recordings made at remote broadcast sites, regardless of whether those remote broadcast sites are fixed or located in a victim's home.[6]

The Rule on Witnesses acts only to exclude potential witnesses from the courtroom and thus would not prevent any prospective witnesses from accessing coverage of an ongoing trial, regardless of the spirit of the Rule on Witnesses. *See* Fed. R. Crim. P. 615(b). However, the Court

---

[6]    The defense notes that the government has not stated whether its proposal would require victims to join from a designated location, such as a home or a private office. ECF 52 at 7. As a general matter, neither party's proposal is set in stone, and the Court can add or subtract requirements in finalizing its plan to implement the remote-access legislation. The government would have no objection to requiring victims to access the proceedings from a private location.

may also issue an order prohibiting prospective witnesses from accessing any trial testimony, even from outside the courtroom. Rule 615(b)(2). Should the Court issue an order pursuant to that subsection of Rule 615, it could fashion that order to apply to remote access to the proceedings as well, and in the event of a violation of that order, the Court could craft a remedy tailored to the specifics of that violation.

The victims in this case have waited decades to witness justice in this case. They are the least likely group to violate orders of this Court imposed to protect the integrity of these proceedings. No reasonable system of broadcasting these proceedings should be premised on the notion that they will violate the Court's orders.

**CONCLUSION**

Based on the foregoing, and for any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the Court make the proceedings in this matter available to victims via the Zoom for Government platform.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

GREGG A. MAISEL
D.C. Bar No. 447902
Chief, National Security Section

*/s/ Erik M. Kenerson*
ERIK M. KENERSON (OH Bar No. 82960)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
National Security Section
United States Attorney's Office
601 D Street N.W.
Washington, D.C. 20530
(202) 252-7201
Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys
Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530