## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ABU AGILA MOHAMMAD MAS'UD<br>KHEIR AL-MARIMI,<br><br>*Defendant.* | Criminal No. 1:22-cr-392 (DLF) |

## <u>MEMORANDUM OPINION</u>

Before the Court is the government's Motion for Order to Afford Victims Remote Video and Telephonic Access to Court Proceedings in this Case. Dkt. 51. For the following reasons, the motion will be granted in part and denied in part.

## I.    BACKGROUND

### A.    Factual and Procedural Background

On December 21, 1988, Pan Am Flight 103 exploded 30,000 feet over the small town of Lockerbie, Scotland. *See* Indictment, at 2, Dkt. 8. The indictment alleges that all 259 people aboard died—including citizens of the United States, the United Kingdom, Switzerland, France, Canada, Israel, Argentina, Sweden, Ireland, Italy, Hungary, South Africa, Germany, Spain, Jamaica, Philippines, India, Belgium, Trinidad and Tobago, Japan, and Bolivia. *Id.* It further alleges that debris from the explosion killed eleven townspeople instantly. *Id.*

On November 29, 2022, the defendant Abu Agila Mohammad Mas'ud Kheir Al-Marimi, was indicted. *Id.* at 1–3. He is charged with two counts of destruction of an aircraft resulting in death, in violation of 18 U.S.C. §§ 32(a)(2), 34, and 2, and one count of destruction of a vehicle

used in foreign commerce by means of an explosive, resulting in death, in violation of 18 U.S.C. § 844(i). *Id.* at 1–14.

On February 9, 2023, the government filed an unopposed motion for alternative procedures under the Crime Victims' Rights Act, 18 U.S.C. § 3771, requesting, among other things, that the Court establish a call-in telephone line so that victims could listen to the proceedings in real time. Dkt. 23. The Court denied the government's motion in relevant part, explaining that Rule 53 of the Federal Rules of Criminal Procedure prohibits the broadcasting of criminal court proceedings and that no statutory provision granted the Court authority to provide real-time telephonic access. *See* Minute Order of Feb. 10, 2023.

Thereafter, on January 26, 2024, Congress passed Pub. L. No. 118-37, 138 Stat. 11 (2024) (hereinafter, "Lockerbie Victims Access Act" or "Act"), which directs the Court to order that reasonable efforts be made to provide victims of the Pan Am Flight 103 bombing with remote video and telephonic access to the proceedings in this case.[1] On March 13, 2024, the Court ordered

---

[1] The Act provides, in relevant part:

> [N]otwithstanding any provision of the Federal Rules of Criminal Procedure or other law or rule to the contrary, in order to permit victims of crimes associated with the bombing of Pan Am Flight 103 to access court proceedings in the criminal case against Abu Agila Mohammed Mas'ud Kheir Al-Marimi . . . , the district court of the United States in such a case shall order that reasonable efforts be made to make remote video and telephonic access to proceedings in the case available to victims of crimes associated with the bombing of Pan Am Flight 103.
> . . .
>
> Remote video and telephonic access to proceedings shall be made available . . . to a victim of crimes associated with the bombing of Pan Am Flight 103 without regard to the location of the victim of crimes associated with the bombing of Pan Am Flight 103.

Pub. L. No. 118-37, 138 Stat. 11. The Act further provides that the Court retains the discretion to limit access where necessary to maintain the integrity of the criminal proceedings:

the parties to file proposals to grant the Lockerbie victims access to pretrial and trial proceedings under the Lockerbie Victims Access Act. *See* Minute Order of March 13, 2024. On May 31, 2024, the government filed the instant motion, Dkt. 51, which the defendant opposes, Dkt. 52. The government also filed a supplement to its motion providing additional information on victims. *See* Gov't. Supp. Filing, Dkt. 68. To date, the government has identified 417 victims—244 from the United States, 164 from the United Kingdom, two from the Netherlands, and one from each of the following countries: Spain, the Czech Republic, Ireland, Canada, Mozambique, Australia, and Jamaica. *Id.* at 4–5. The United States and United Kingdom victims are geographically dispersed throughout their respective countries. *Id.*

**B.    The Parties' Proposals**

The government proposes providing victims with real-time video and telephonic access for all pretrial and trial proceedings through the "Zoom for Government" platform. Gov't. Mot. at 1. Verified victims who meet the statutory definition would sign in using two-factor authentication linked to a verified email account or phone number. *Id.* DOJ employees would serve as remote, virtual monitors to visually verify and confirm that only authorized victims joined the Zoom video conference or that those attempting to join the meeting by telephone are calling from verified phone numbers. *Id.* Once an individual joins the proceedings, they would be required to keep their camera on. *Id.* at 11–12. According to the government, remote monitors would be able to ensure that no unauthorized individuals are present and that no one is recording the proceedings.

---

Nothing in this section shall be construed to eliminate or limit the discretion of a district court of the United States to control the manner, circumstances, or availability of remote video or telephonic transmissions where necessary to control the courtroom or protect the integrity of court proceedings or the safety of parties, witnesses, or other participants in the proceedings.

*Id.*

*Id.* The government further contends that remote monitors would be able to remove any individual violating this Court's orders and report any such violations to the Court. *Id.*

To guarantee the security of the proceedings and prevent unauthorized transmissions or recordings, the government proposes using video and audio watermarks. *Id.* at 15. A video watermark would superimpose the user's email address onto the video that reaches that user, which would then be visible in any recording made of the proceedings. *Id.* at 15–16. Similarly, an audio watermark would embed an inaudible sound containing a user's identifying information within the audio sent to their device. *Id.* at 16.

The defendant does not object to the government's proposal to provide victims with video and audio access to non-evidentiary pretrial proceedings. Def.'s Opp'n, at 1, Dkt. 52. But he does oppose providing direct-to-victim Zoom transmission for evidentiary pretrial proceedings and trial itself. *Id.* He contends that the government's proposal could jeopardize the fairness of his trial because it inadequately protects against the risk that unauthorized third parties may observe, record, or disseminate the video or audio streamed to victims' personal devices. *Id.* at 4–5. The defendant instead proposes that the Court designate secure remote viewing sites—such as federal courthouses, United States embassies or consulates, or other federal offices—where victims can observe the Zoom transmission in-person, supervised by designated government personnel. *Id.* at 1–2.

## II.    DISCUSSION

The Lockerbie Victims Access Act directs the Court to "order that reasonable efforts be made" to provide victims of the bombing of Pan Am Flight 103 remote video and telephonic access to proceedings in this case "without regard to [the victims'] location." Pub. L. No. 118-37, 138 Stat. 11. The Act also acknowledges that the Court has discretion to "control the manner,

circumstances, or availability" of transmissions where necessary to "control the courtroom or protect the integrity of court proceedings or the safety of parties, witnesses, or other participants in the proceedings." *Id.* In interpreting the Act, the Court must balance the victims' statutory interests against the defendant's constitutional rights and exercise its discretion to "control the courtroom," "protect the integrity of court proceedings," and guarantee the safety of trial participants. *Id.* It must also determine what constitutes "reasonable efforts" to effectuate the statutory directive to make remote access available to victims "without regard to [their] location." *Id.*

To accomplish these potentially competing ends, the Court does not interpret the Lockerbie Victims Access Act on a blank slate. Although the Act is the first to authorize remote video and telephonic access to victims, it is not the first to grant victims special access to federal criminal proceedings. And the constitutional issues it raises are not novel. Before turning to the Act itself, the Court begins with a discussion of legal precedent addressing the constitutional implications of broadcasting criminal proceedings. Next, it turns to Rule 53 of the Federal Rules of Criminal Procedure, related precedent, and the Judicial Conference's longstanding policy prohibiting the broadcasting and recording of criminal proceedings. The Court then discusses earlier victims' access legislation. Finally, against this backdrop, the Court interprets the language of the Lockerbie Victims Access Act and effectuates Congress's statutory directive.

### A.    Constitutional Implications of Broadcasting

Since this country's founding, criminal trials have been open to the public. "[A] presumption of openness inheres in the very nature of a criminal trial under our system of justice." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980). This bedrock principle is guaranteed by our Constitution: The Sixth Amendment guarantees criminal defendants the right

to a public trial, while the First Amendment guarantees the public the right to access a criminal trial. *See id.* at 580. But this presumption of open criminal proceedings is not absolute—the public's right of access may be limited to ensure that the defendant's Fifth and Fourteenth Amendment due process rights are not abridged. *See Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 14–15 (1986); *Estes v. Texas*, 381 U.S. 532, 540 (1965); *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 378–79 (1979). The Lockerbie Victims Access Act, which authorizes video and audio broadcasting of proceedings in this criminal case, implicates these competing interests.

The Supreme Court first addressed the broadcasting of criminal proceedings in *Estes v. Texas*. There, the Court reversed a state court defendant's criminal conviction because it found that the televised broadcasting of the trial had created such a strong likelihood of prejudice that it violated the defendant's due process rights under the Fourteenth Amendment. *Id.* at 542. The Court noted the "numerous situations in which [televising a trial] might cause actual unfairness— some so subtle as to defy detection by the accused or control of the judge." *Id.* at 545. In particular, it explained that broadcasting criminal trials might undermine a court's ability to invoke Rule 615 of the Federal Rules of Evidence, which permits the exclusion of potential witnesses from the courtroom to prevent them from being influenced by others' testimony. Broadcasting would enable excluded witnesses to hear others' testimony and adjust their own testimony accordingly. *Id.* at 547. Likewise, broadcasting would amplify the risk that jurors could be tainted from exposure to the coverage. *Id.* at 545–46. Finally, the Court noted that cameras in the courtroom could subject trial participants—jurors, witnesses, attorneys, and judges—to psychological pressures from the knowledge that their actions would be reproduced and disseminated publicly, potentially distorting the trial process by causing participants to conduct themselves differently. *Id.* at 545–50.

Subsequently, in *Chandler v. Florida,* 449 U.S. 560 (1981), the Supreme Court clarified that *Estes* did not announce a *per se* constitutional rule against broadcast coverage of criminal trials.  449 U.S. at 573–74.  Rather, to prevail on a post-trial due process challenge based on the broadcasting of court proceedings, a defendant must demonstrate specific prejudice in his case. *Id.* at 568.  In *Chandler*, the Court rejected the defendant's challenge to the televising of his criminal trial because he failed to show that broadcasting has an inherently prejudicial effect on the trial process or that the specific broadcasting procedures employed during his trial deprived him of due process.  *Id.*  In so doing, the Court upheld a canon of the Florida Code of Judicial Conduct which permitted "electronic media and still photography coverage of public judicial proceedings," subject to certain restrictions, *id.* at 566, and which also granted judges the discretion to deny broadcasting entirely, *id.* at 577.

These cases establish that the broadcasting of criminal proceedings is neither constitutionally prohibited nor mandated.  As the Supreme Court has explained, neither the Sixth Amendment nor the First Amendment "require that the trial—or any part of it—be broadcast live or on tape to the public.  The requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed."  *Nixon v. Warner Commc'n,* 435 U.S. 589, 610 (1978).  To determine whether and how a criminal case should be broadcast, courts balance the public's interest in expanded access against the risks to the defendant's constitutional right to a fair trial.  *Cf. Gannett*, 443 U.S. at 378–79.

**B.    The Federal Judiciary's Approach to Broadcasting**

State and federal courts have adopted different approaches to the broadcasting of court proceedings.  While state courts generally have been permissive, *see*, *e.g.*, *Chandler*, 449 U.S. at 566, the Federal Judiciary has adopted a *per se* ban on broadcasting in criminal proceedings due

7

to the significant risk that broadcasting may infringe on a criminal defendant's constitutional right to a fair trial.

### 1.    *Federal Rule of Criminal Procedure 53*

Rule 53 of the Federal Rules of Criminal Procedure categorically forbids the broadcasting of federal criminal proceedings.  It provides that "the court must not permit the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom."[2]  Fed. R. Crim. P. 53.  To the Court's knowledge, the only legal challenges to Rule 53 have been filed by criminal defendants or media organizations.  In each of those cases, courts concluded that Rule 53's ban on broadcasting is both constitutional and justified given the serious risks broadcasting poses to both the defendant's and government's right to a fair trial.

For instance, in *United States v. Kerley*, 753 F.2d 617 (7th Cir. 1985), the Seventh Circuit considered a criminal defendant's First and Sixth Amendment challenges to Rule 53 after a district court had denied his request to record his trial on videotape.  753 F.2d at 617–18.  Citing *Estes*, the Seventh Circuit concluded that the "marginal gains from videotaping and broadcasting an already public trial, which members of the public and media will be free to attend and report on" were "outweighed by the risks and uncertainties the procedure . . . entails."  *Id.* at 621.  The

---

[2] The original Federal Rules of Criminal Procedure were adopted by order of the Supreme Court in 1944, and by Congress in 1945.  *See* Fed. R. Crim. P. historical note.  Rule 53 first took effect in 1946 as part of the initial Federal Rules of Criminal Procedure.  *See History of Cameras, Broadcasting, and Remote Public Access in Courts*, Admin. Off. of the U.S. Cts., https://www.uscourts.gov/about-federal-courts/judicial-administration/cameras-courts/history-cameras-broadcasting-and-remote (last visited Dec. 20, 2024).  Apart from a stylistic change in 2002, *see* Fed. R. Crim. P. 53 advisory committee's note to 2002 amendment, the Judicial Conference has consistently refrained from amending the rule.  *See*, *e.g.*, Report of the Proceedings of the Judicial Conference of the United States 46–47, 67 (Sept. 1994) (declining to amend the Rule to authorize a pilot program on the broadcasting of criminal cases).

Seventh Circuit further emphasized that the preservation of a fair trial was a paramount concern, that the risks of broadcasting outweighed the public's interest in expanded access, and that even the possibility of impending unfairness justified a categorical ban. *See id.* Other circuit courts to have considered the question have reached the same conclusion. *See, e.g.*, *United States v. Hastings*, 695 F.2d 1278, 1282–84 (11th Cir. 1983); *United States v. Edwards*, 785 F.2d 1293, 1295–96 (5th Cir. 1986); *Conway v. United States*, 852 F.2d 187, 188 (6th Cir. 1988).

These concerns were shared by the district court that later interpreted and effectuated a similar victims access statute, Pub. L. No. 107-206, § 203, 116 Stat. 820, 832 (2002) (hereinafter, "9/11 Victims Access Act"). *See United States v. Moussaoui*, 205 F.R.D. 183 (E.D. Va. 2002); *see also infra* Part II.C.2. Before the enactment of the 9/11 Victims Access Act, the district court considered and rejected media groups' motion to record and telecast the criminal trial of al-Qaeda member Zacarias Moussaoui. 205 F.R.D. at 184. Denying the motion under Rule 53, the district court made clear that even if the rule were abrogated, it would still deny the groups' motion "[t]o ensure that both this defendant and the United States receive a fair and orderly trial." *Id.* at 188. The court noted the significant risk of witness intimidation stemming from "the witness' knowledge that his or her face or voice may be forever publicly known and available to anyone in the world." *Id.* at 187. That, in turn, "could lead foreign prosecution witnesses, outside the jurisdiction of the Court, to refuse to testify or withhold their full testimony out of reasonable fears for their personal safety" and "similarly lead witnesses favorable to the defense to refrain from coming forward for fear of being ostracized." *Id.* Further, the district court explained that any retrial of the highly publicized case "would be rendered extremely difficult if the trial proceedings [were] broadcast" because potential jurors could be tainted if they observed those proceedings. *Id.* And any witnesses who faced recrimination for their testimony in the first trial might be reluctant

to testify at any future retrial.  *Id.*  While the court recognized victims' legitimate interests in observing the trial, it determined that those interests could not take precedence over the court's duty to ensure the fair adjudication of the defendant's guilt or innocence.  *Id.* at 188 ("[T]he purpose of this trial is not to provide catharsis to the victims . . . the purpose is to determine the innocence or guilt of this defendant for the specific crimes charged in the Indictment.").

> 2.    *Judicial Conference Policy*

The Judicial Conference of the United States, the principal policymaking body for the federal courts, has long maintained a policy generally prohibiting "either civil or criminal courtroom proceedings in the district courts to be broadcast, televised, recorded, or photographed for the purpose of public dissemination."[3]  Guide to Judiciary Policy, Vol. 10, Ch. 4 § 410.10(a). Though the Guide is not binding, it is "at the very least entitled to respectful consideration." *Hollingsworth v. Perry*, 558 U.S. 183, 193 (2010) (quotation and citation omitted).  This District, like many others, has incorporated the Judicial Conference's broadcasting policy into its local rules.  *See* LCvR 83.1 ("The taking of photographs, recording by audio and video means, broadcasting, and livestreaming of judicial proceedings, are prohibited, unless explicitly permitted under the Federal Rules of Civil Procedure or by the Judicial Conference of the United States."). In the few instances in which broadcasting and recording is permissible,[4] Conference policy

---

[3] The Guide "is the official medium by which direction as to courtroom procedures and other information are provided to the Federal Judiciary in support of its day-to-day operation." *In re Sony BMG Music Entertainment*, 564 F.3d 1, 7 (1st Cir. 2009) (citation omitted).  The prohibition on broadcasting, initially introduced in 1972 in the Code of Conduct for United States Judges, was subsequently incorporated into the Guide to Judiciary Policy in 1990.  *See History of Cameras, Broadcasting, and Remote Public Access in Courts*, *supra* note 3.

[4] The initial 1990 policy permitted broadcasting, televising, recording, or taking photographs in the courtroom only "during investitive, naturalization, or other ceremonial proceedings."  *See History of Cameras, Broadcasting, and Remote Public Access in Courts*, *supra* note 3.  For non-ceremonial proceedings, judges were authorized to use cameras in the courtroom only

>    (a)  for the presentation of evidence;

requires judges to "ensure that it is done in a manner that will: (1) be consistent with the rights of the parties; (2) not unduly distract participants in the proceeding; (3) include measures, consistent with the parties' responsibilities, to safeguard confidential, sensitive or otherwise protected information; and (4) not otherwise interfere with the administration of justice."  Guide to Judiciary Policy, Vol. 10, Ch. 4 § 420(c).

Central to the Conference's policy is the concern—shared by federal courts—that "camera coverage can do irreparable harm to a citizen's right to a fair and impartial trial."  Letter from Hon. Roslynn R. Mauskopf, Director of the Administrative Office of the United States Courts, to S. Comm. on the Judiciary, at 2 (June 23, 2021).  The Conference has explained that broadcasting can hamper a court's ability to enforce Rule 615 of the Federal Rules of Evidence.  *See Sunshine in the Courtroom Act of 2013: Hearing on H.R. 917 Before the Subcomm. on Cts., Intellectual Property & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 38 (2014) (prepared statement of Hon. Julie A. Robinson, U.S. Dist. Judge, Dist. of Kansas).  Cameras in the courtroom can also "intimidate defendants who, regardless of the merits of the case, might prefer to settle or

---

(b)  for the perpetuation of the record of the proceedings;
(c)  for security purposes
(d)  for other purposes of judicial administration; or
(e)  in accordance with pilot programs approved by the Judicial Conference of the United States.
*Id.*
In the intervening years, the Judicial Conference has incorporated additional exceptions to its policy.  In 1996, the Conference authorized courts of appeals to broadcast appellate proceedings.  *See* Guide to Judiciary Policy, Vol. 10, Ch. 4 § 410.10(d).  Between 2020 and 2023, the Conference temporarily permitted judges to provide the public and media audio access to court proceedings during the COVID-19 pandemic.  Report of the Proceedings of the Judicial Conference of the United States 10 (Sept. 2023); *see also* Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, § 15002(b), 134 Stat. 281, 528 (2020).  Finally, in 2023, the Conference granted judges the discretion to provide live remote audio access to non-trial, non-testimonial civil and bankruptcy proceedings.  *See* Guide to Judiciary Policy, Vol. 10, Ch. 4 § 420(b).

plead guilty rather than risk damaging accusations in a televised trial," *id.* at 28, and cause witnesses to exhibit "bravado and over-dramatization" or "self-consciousness and under-reaction" while testifying, which could impede a jury's ability to accurately assess that witness's credibility, *id.* at 36–37.

Multiple pilot programs have reinforced the concerns expressed by federal courts and the Judicial Conference. Between 1991 and 1994, for example, the Conference authorized electronic media coverage of certain civil proceedings in six federal district courts and two federal courts of appeals. Molly Treadway Johnson & Carol Krafka, Fed. Jud. Ctr., *Electronic Media Coverage of Federal Civil Proceedings: An Evaluation of the Pilot Program in Six District Courts and Two Courts of Appeals* 4–5 (1994). A substantial proportion of trial judges and attorneys who participated in that pilot program noted adverse impacts on various aspects of the trial process, including witnesses' willingness to testify and the quality of witnesses' testimony.[5] *See* Report of the Proceedings of the Judicial Conference of the United States 47 (Sept. 1994).

Similarly, in evaluating another pilot program conducted between 2011 and 2015 that permitted courts in fourteen federal districts to record, edit, and make publicly available certain civil proceedings, *see* Molly Treadway Johnson, Carol Krafka & Donna Stienstra, Fed. Jud. Ctr., *Video Recording Courtroom Proceedings in United States District Courts: Report on a Pilot Project* 1–3 (2016), the Judicial Conference's Court Administration and Case Management

---

[5] Specifically, the data showed that 32% of attorneys and 41% of trial judges felt that, at least to some extent, broadcasting distracted witnesses; 40% of attorneys and 64% of trial judges felt that, at least to some extent, broadcasting made witnesses more nervous than they otherwise would be; 21% of attorneys and 64% of trial judges felt that, at least to some extent, broadcasting caused attorneys to be more theatrical in their presentations; 21% of attorneys and 17% of trial judges felt that, at least to some extent, broadcasting disrupted courtroom proceedings; and 46% of trial judges felt that, at least to some extent, broadcasting made witnesses less willing to appear in court. Johnson & Krafka, *supra*, at 14–15, 20–21.

Committee reported "a number of significant concerns," Jud. Conf. Comm. on Ct. Admin. and Case Mgmt., *Excerpt of Report of the Judicial Conference Committee on Court Administration and Case Management: Cameras Pilot Project* (Mar. 2016). The "most commonly cited potential harms" reported by participating judges "had to do with influencing the behavior of or putting stress on attorneys, witnesses, and jurors." *Id.* (quotation omitted). Fifty-nine percent of judges stated that "the video recording distracted witnesses at least to some extent," and sixty-four percent "found that cameras, at least to some extent, made witnesses more nervous than they otherwise would be." *Id.* (quotation omitted). Based on this data, the Committee recommended preserving the Judicial Conference's policy forbidding cameras in the courtroom for any proceedings—civil or criminal. *Id.*

Recently, in October 2024, a Criminal Rules Subcommittee declined to recommend alterations to Rule 53 in response to media organizations' requests for amendments because of continued concerns that broadcasting criminal trials is likely to have significant negative effects on witnesses and jurors. Memorandum from Profs. Sara Sun Beale and Nancy King to Criminal Rules Advisory Committee Members 1, 4–5 (Oct. 9, 2024) ("Beal & King Memo"). The Subcommittee also considered a proposal to extend Judicial Conference Policy 420—which authorizes judges to provide a public audio line in non-testimonial, non-trial civil and bankruptcy proceedings—to criminal proceedings. *Id.* at 5. Here, too, Subcommittee members were hesitant, explaining that not enough time has passed to determine the impact of the policy, particularly the risk of individuals recording and rebroadcasting such proceedings. *Id.* Ultimately, the Subcommittee "stressed the need for a cautious approach to broadcasting in criminal cases." *Id.* at 4–5.

### C.    Earlier Victims Access Legislation

The Lockerbie Victims Access Act is not the first victims' access legislation to be enacted by Congress.  In two other terrorism-related criminal cases, Congress passed legislation that provided federal district courts the statutory authority to permit limited broadcasting, notwithstanding Federal Rule of Criminal Procedure 53.  In both instances, Congress respected the "the need for careful guidelines and standards" in authorizing broadcasting by "provid[ing] precise and detailed guidance with respect to the wide range of issues implicated by the broadcast." *Hollingsworth*, 558 U.S. at 197.  Congress also gave trial courts the discretion to effectuate the legislation in a manner that protected the defendants' due process rights.

### 1.    *Justice for Victims of Terrorism Act*

In 1996, after the District Court for the Western District of Oklahoma transferred the criminal case against Timothy McVeigh to Colorado, Congress enacted a statute that authorized district courts to order closed-circuit televising ("CCTV") of criminal trial proceedings "in cases where the venue of the trial is changed—(1) out of the State in which the case was initially brought; and (2) more than 350 miles from the location in which those proceedings originally would have taken place."  34 U.S.C. § 20142 (originally codified at 42 U.S.C. § 10608).  Only those persons determined by the court to have a compelling interest in viewing the proceedings and unable to do so due to the inconvenience and expense of a venue change would be permitted to access the CCTV broadcast.  *Id.*  The statute explicitly forbade the public broadcast or dissemination of televised proceedings.  *Id.* § 20142(c)(2).  It further provided that courts would retain exclusive control over the television signal and that violations of court orders related to the CCTV broadcast would be punishable as contempt of court.  *Id.* § 20142(c)(3).  To effectuate the legislation, the district court established a victim application process and broadcast the trial via CCTV to an

14

auditorium in Oklahoma City, which was overseen by a retired Colorado state judge.  *See* Off. for Victims of Crime, U.S. Dep't of Just., NCJ 183949, *Responding to Terrorism Victims: Oklahoma City and Beyond* 6 (2000).

          2.      *September 11 Access Act*

After the September 11, 2001 terrorist attacks, Congress enacted the 9/11 Victims Access Act to permit "victims of crimes associated with the terrorist acts of September 11, 2001, to watch trial proceedings in the criminal case against Zacarias Moussaoui."  Pub. L. No. 107-206, § 203, 116 Stat. 820, 832 (2002).  The 9/11 Victims Access Act directed the District Court for the Eastern District of Virginia to order "closed circuit televising of the trial proceedings to convenient locations the trial court determines are reasonably necessary for viewing by those victims."  *Id*. The 9/11 Victims Access Act reincorporated the restrictions contained in 34 U.S.C. § 20142 and further provided that the district court would retain "discretion to control the manner, circumstances, or availability of the broadcast where necessary to control the courtroom or protect the integrity of the trial proceedings or the safety of trial participants."  *Id.*

In giving effect to the 9/11 Victims Access Act, the district court endeavored to maximize victims' ability to access the trial while ensuring the trial remained orderly, manageable, and fair. To that end, the court required victims to apply for credentials with the Victim Witness Unit of the United States Attorney's Office for the Eastern District of Virginia.  Order of March 11, 2003, in No. 1-cr-455-A (E.D. Va.), Dkt. 39-1.  The Victim Witness Unit determined the eligibility of each victim-applicant to access the trial by verifying the information provided in their application.  *Id.* For victims deemed ineligible or whose information could not be verified, the Victim Witness Unit transmitted the application to the district court for a judicial determination of eligibility.  *Id.*

Once the application process concluded, the district judge ordered that the trial be broadcast over CCTV to six federal courthouses along the east coast of the United States to "reasonably accommodate the majority of victims who have expressed interest in viewing these proceedings." Order of November 22, 2005, in No. 1-cr-455-A, Dkt. 39-2. Although at least 198 victims resided in California, *see* Letter from Paul J. McNulty to Judge Leonie H. Brinkema (Aug. 8, 2002), at 2, Dkt. 43-2, the district court declined to designate a remote viewing site in California because accommodating the three-hour time difference would have significantly burdened court staff, *see* Letter of Judge Leonie H. Brinkema (Feb. 7, 2006), Dkt. 43-4. Finally, the district court ordered that "all CCTV sites [were] deemed extensions of" the federal courtroom in which the *Moussaoui* trial was taking place; prohibited any attendee from bringing in any electronic devices or attempting to record or transmit the criminal proceedings; and required each CCTV courtroom to be monitored by at least two United States Marshals or court security officers. Order of March 1, 2006, in No. 1-cr-455-A, Dkt. 39-3.

### D.    The Lockerbie Victims Access Act

Under the Lockerbie Victims Access Act, the Court retains discretion to "control the manner, circumstances, or availability" of video and audio transmissions to ensure the integrity of court proceedings. Relatedly, the Court has a constitutional duty to give effect to the Act in a manner that adequately protects the defendant's due process rights, including his right to a fair trial. *Gannett*, 443 U.S. at 378 (noting that "a trial judge has an affirmative constitutional duty" to protect a criminal defendant's due process rights); *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). Accordingly, under the Act, the Court must "order that reasonable efforts be made" to provide victims of the bombing of Pan Am Flight 103 with "remote video and telephonic access" in this case, where such access does not

16

impair "the integrity of court proceedings" to the detriment of the defendant's due process right to a fair trial.  Pub. L. No. 118-37.

Because it is difficult to remedy any violation of the defendant's constitutional rights after the fact, "our criminal justice system permits, and even encourages, trial judges to be over-cautious in ensuring that a defendant will receive a fair trial."  *Gannett*, 443 U.S. at 379 n.6; *see also id.* at 378 ("And because of the Constitution's pervasive concern for these due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary.").  Informed by a long history of legal precedent, rules, judicial experience, and judiciary policy, the Court will carefully consider the ways in which video and audio broadcasting could potentially impair these proceedings and thereby jeopardize the defendant's right to a fair trial.  In giving effect to the Act, the Court will ensure victims are granted remote access to proceedings in this case in a manner that sufficiently mitigates any such risks.

1.    *Non-evidentiary, non-testimonial pretrial hearings*

Heeding those risks, the Court will draw a distinction between non-evidentiary pretrial hearings and trial.  The Court agrees with the parties that granting victims remote video and telephonic access to non-evidentiary pretrial matters presents minimal risk to the integrity of these proceedings.  *See* Def.'s Response to the Court's Feb. 26, 2024 Order, at 1, Dkt. 44; Gov't. Response to the Court's Feb. 26, 2024 Order, at 9–11, Dkt. 45.  There is a low likelihood that the unauthorized viewing, recording, or dissemination of non-evidentiary pretrial proceedings will have an adverse impact on witnesses, jurors, or other trial participants.  Even so, the Court will direct the government to take proactive measures to ensure compliance with the Act.  Those measures include identifying and verifying victims and requiring victims to sign a sworn certification that acknowledges that unauthorized access, recording, or dissemination of audio or

video of the proceedings is strictly prohibited and could result in contempt sanctions.  *See* Order

of Mar. 11, 2003, in No. 1-cr-455-A.  In addition, the government shall use remote monitors and

Internet searches, among other methods, to ensure that access is restricted to verified victims, and

promptly notify the Court of any violation of its orders.  Following input from the parties, the

Court will issue a comprehensive order that sets forth the obligations of the government and the

victims.  Subject to these conditions, the Court will grant the government's motion in part and

permit non-evidentiary, pretrial proceedings to be transmitted to victims over Zoom and approved

telephone lines.

### 2. *Evidentiary hearings and trial*

With respect to evidentiary hearings and trial, however, the Court will deny the

government's motion to permit transmission of live video and audio feeds of these proceedings to

victims' personal electronic devices.  *See* Gov't. Mot. at 8–12.  The Court shares the defendant's

concern that there is a substantial risk that unauthorized third parties could violate the Court's

orders by gaining access to evidentiary hearings and trial proceedings and recording and

disseminating them.  *See* Def.'s Opp'n at 4.  Such violations could impair the proceedings and

jeopardize the defendant's right to a fair trial in a number of ways.  First, potential jurors could be

tainted if they obtained access to recorded evidentiary or trial proceedings, particularly if such

recordings depicted inculpatory but ultimately inadmissible evidence.  *Estes*, 381 U.S. at 545;

*Gannett*, 443 U.S. at 378–79.  That risk is particularly acute when it comes to livestreamed pretrial

evidentiary hearings, whose entire purpose is to screen out evidence that may not be introduced to

the jury.  *Cf. Gannett*, 443 U.S. at 378–79.  Second, the rule on witnesses, Fed. R. Evid. 615, could

be circumvented if a witness were exposed to others' testimony.  *See Estes*, 381 U.S. at 547.  Third,

the dissemination of unauthorized recordings, even audio alone, could adversely affect witnesses'

willingness to testify and the quality of their testimony.  *See id.*; Beale & King Memo, *supra*, at 4–5; *see also generally supra* Part II.B.2.  For example, witnesses might be chilled and otherwise impacted by the Court's inability to protect their testimony from being circulated, perhaps permanently, on the Internet.  The resultant harm to the integrity of the proceedings and the defendant's due process rights would be difficult to detect and could be irreversible and irreparable, warranting the Court's heightened caution.  *Cf. Gannett*, 443 U.S. at 378–79; *Hollingsworth*, 558 U.S. at 195–96.

Although the government proposes various safeguards, none would be effective in preventing those potential harms.  *See* Gov't. Mot. at 8–12; Gov't. Reply, at 10 n.6, Dkt. 54. Neither monitors, watermarks, nor pre-identified private locations, *see* Gov't. Mot. at 8–12; Gov't. Reply at 10 n.6, would sufficiently mitigate the risk of unauthorized access to proceedings.  First, remote monitors located in the United States would only be able to police what they could observe on camera.  *See* Def.'s Opp'n at 4–5.  Thus, even in an identified private location, unauthorized third parties outside of the camera's field of view would be undetectable by remote monitors.  *See id.*  Monitors' effectiveness could be further impeded by connectivity and other technical issues.

Second, identificatory watermarks, *see* Gov't. Mot. at 11–13, would have limited deterrent value.  These safeguards would not prevent the unauthorized viewing or recording of court proceedings, much less the later dissemination of any such recording.  As Judge Mehta explained in a recent *civil* case in which he denied the parties' request to provide a publicly accessible audio feed of trial proceedings, a court has no ability to enforce a warning against the recording of proceedings.  *United States v. Google LLC*, No. 20-cv-3715 (APM), 2023 WL 6291644, at *2 (D.D.C. Sep. 8, 2023).  The potential consequences of an authorized viewing or distribution in a

criminal case like this one would be far more severe, potentially jeopardizing the defendant's constitutional right to a fair trial.

Third, when it comes to individuals listening in by telephone, the government admittedly offers no safeguards at all. Gov't. Reply at 9 n.5 (acknowledging that "monitors could not observe anyone who listened to the proceedings over a telephone line, and the audio watermark technology would not be available for those who listen via telephone"). With no means of identifying who is listening to or recording an audio feed, the risk of unauthorized observation and rebroadcasting is exponentially magnified.

These risks would be further heightened because hundreds of victims will access audio and video of these proceedings from locations outside the United States. *See* Gov't. Supp. Filing at 9–10. Thus, the government's ability to uncover, investigate, and prosecute violations will be severely limited because evidence of such violations will likely be located outside the jurisdiction of the United States. In international investigations, the government lacks the authority to subpoena records and witnesses overseas and instead must rely on burdensome and protracted MLAT procedures. *See* U.S. Dep't of State, 7 Foreign Affairs Manual § 962.1; *see also*, *e.g.*, *In re Search of Info.*, No. 16-mj-757 (BAH), 2017 WL 3445634, at *26 & n.28 (D.D.C. July 31, 2017) (discussing the difficulties with gathering evidence located abroad through the MLAT process). And even those mechanisms for evidence gathering do not exist in all foreign countries. *See* Off. of Int'l Affs., U.S. Dep't of Just., Mutual Legal Assistance Treaties of the United States (2022). Thus, as a practical matter, the deterrent effect of the Court's contempt power will be limited to violators within the United States. Moreover, it is unlikely the Court will have the authority to issue an order of contempt on a non-party outside of its territorial jurisdiction. *See, e.g.*, *S.E.C. v. Homa*, 514 F.3d 661, 673–75 (7th Cir. 2008) (a non-party outside the court's

territorial jurisdiction who violates a court's order may be subject to the court's contempt power only if the non-party had actual notice of the order and aided and abetted a party in violating that order).  Thus, overseas third parties who gain unauthorized access to the proceedings could act with impunity.

The Court recognizes that federal courts conducted remote proceedings and used public-access audio lines during the COVID-19 pandemic.  *See* Gov't. Reply at 13–14; *see also* CARES Act § 15002(b); *Judiciary Provides Public, Media Access to Electronic Court Proceedings*, Admin. Off. of the U.S. Cts. (Apr. 3, 2020), https://www.uscourts.gov/data-news/judiciary-news/2020/04/03/judiciary-provides-public-media-access-electronic-court-proceedings.  But the circumstances surrounding the use of those authorities were different in several key respects.  First, those carefully circumscribed procedures were enacted in response to an unprecedented national emergency that severely limited, if not entirely banned, the public's access to courthouses.  *See* CARES Act § 15002(a); *Judiciary Provides Public, Media Access to Electronic Court Proceedings*, *supra*.  Second, the defendant had to consent to remote proceedings.  CARES Act § 15002(b)(4).  And finally, federal courts were required to balance multiple constitutional rights during the unprecedented national emergency: a defendant's constitutional (and statutory) right to a speedy trial, *see*, *e.g.*, *Elms v. United States*, 457 F. Supp. 3d 897, 901–05 (D. Nev. 2020); a defendant's right to a fair and open trial, *see, e.g., United States v. Allen*, 34 F.4th 789, 797–99 (9th Cir. 2022); and the public's right to access court proceedings, *see*, *e.g.*, 34 F.4th at 797–99.  This calculus was fundamentally different from the interest balancing the Court must apply here.  In applying the Lockerbie Victims Access Act, only one constitutional right is at stake: the defendant's due process right to a fair trial.

21

Notably, during the pandemic, federal courts still attempted to adhere to Rule 53's ban on broadcasting. Courts rarely broadcasted criminal trials and instead allowed a limited number of spectators in the courtroom or permitted the public to view the trials from a separate courthouse room over a live video feed. *See Allen*, 34 F.4th at 798 (collecting cases); *see also, e.g.*, *United States v. Babichenko*, 508 F. Supp. 3d 774, 780–81 (D. Idaho 2020) (permitting limited remote attendance by Zoom only upon a showing of particularized need in light of Rule 53).

That federal courts utilized public audio lines during COVID-19 does not by itself lead the Court to conclude that the government's proposal would adequately protect the integrity of the proceedings and the defendant's due process rights. Indeed, the Subcommittee to the Criminal Rules Advisory Committee recently recommended that Rule 53 not be amended to permit publicly accessible audio feeds in part due to the lack of information regarding the issue of illicit recording and rebroadcasting of audio transmissions. *See* Beale & King Memo, *supra*, at 5; *see also* Jud. Conf. Comm. on Ct. Admin. and Case Mgmt., *Report of the Judicial Conference Committee on Court Administration and Case Management* 8 (Sept. 2023) (raising various concerns regarding remote public access to trials or proceedings in which a witness is testifying, including the potential for witness intimidation and complications with witness sequestration). For good reason, the Judicial Conference has consistently urged caution in broadcasting criminal proceedings. *See supra* Part II.B.2.

The Court recognizes that the Lockerbie Victims Access Act grants the Court broader authority than previous victim access statutes. *See* Gov't. Mot. at 16. But while the Act directs the Court to order that "reasonable efforts be made to make remote video and telephonic access to proceedings to victims" "without regard to the location of the victim," Pub. L. No. 118-37, it does not mandate that the Court provide victims with a video or audio link to access in their homes or

22

offices.  In the Act, Congress explicitly acknowledged that the Court retains the discretion to prescribe "the manner, circumstances, or availability" of video or audio transmissions as needed "to protect the integrity of court proceedings."  Pub. L. No. 118-37.  Accordingly, what constitutes "reasonable efforts" under the Act must take into account the need to adequately protect courtroom proceedings from outside interference so as not to jeopardize the defendant's right to a fair trial.  Broadcasting evidentiary and trial proceedings directly to victims' personal devices would entail significant, unmanageable risks to the fairness of this trial, *see supra* pp. 18–21, and would thus be unreasonable to authorize here.

As for location-based limitations on access, *see* Gov't. Mot. at 17, the Act does not impose an affirmative duty on the Court to provide victims with access wherever they reside.  Instead, paragraph 2 of the statute, entitled "No Limit on Location," orders that "[r]emote video and telephonic access to proceedings shall be made available under paragraph (1) to a victim… without regard to the location of the victim."  *Id.*  This language means that the Court cannot condition the availability of access to a victim solely on a victim's geographical location.  But it does not follow that the Court must remove all location-related burdens on victims' access.[6]  The Act instead directs the Court to ensure that "reasonable efforts be made to make remote video and telephonic access available."  Pub. L. No. 118-37.  That some victims may, as a practical matter—due to age, health, finances, or other obligations, *see* Gov't. Reply at 2–7—be unable to travel to a remote viewing location does not violate the statute's command so long as "reasonable efforts" are made to facilitate access.  Victims routinely travel great distances to view criminal proceedings—even

---

[6] The government does not appear to dispute that some location-based restrictions are permissible under the statute—in its reply brief, it noted that it "would have no objection to requiring victims to access the proceedings from a private location," such as their home or office, to minimize the risk of third-party eavesdropping.  Gov't. Reply at 10.

terrorism-related proceedings.  *See, e.g.*, Feb. 7, 2006 Letter of Judge Brinkema (declining to designate a remote viewing location in California, where at least 198 victims were located).  And while the Act grants victims unprecedented access to proceedings in this case, such access cannot undermine the defendant's constitutional right to a fair trial or the integrity of the proceedings.  *Cf. Gannett*, 433 U.S. at 378–79; *Moussaoui*, 205 F.R.D. at 188.

For these reasons, the Court finds that restricting victims' remote access to evidentiary and trial proceedings to designated secure viewing locations, such as U.S. courthouses and U.S. embassies, sufficiently mitigates the above risks while providing victims throughout this country and around the world with unprecedented access to court proceedings.

### E.  Implementation Process

To make proceedings promptly accessible to victims without regard to location, Pub. L. No. 118-37, the Court will order the Department of Justice to submit within 60 days a "reasonable," *id.*, and specific implementation proposal that:

(1) Establishes an application process for interested victims similar to the process adopted in *Moussaoui*, *see* Dkt. 39-1.  The proposal shall include a victim notice letter, *see* Dkt. 39-5, a victim application form, *see* Dkt. 39-4, and a sworn victim certification form on which victims acknowledge their legal obligations;

(2) Ensures that non-evidentiary pretrial hearings are promptly made available to identified victims by video and audio in accordance with the government's original proposal, *see* Gov't. Mot. at 6–12;

(3) Ensures that evidentiary and trial proceedings are made accessible to identified victims (a) at courthouses across the United States and (b) at secure locations outside the United States, such as U.S. embassies; and

(4) Ensures that U.S. monitors are trained to supervise victim access in and outside of the United States.  Trained monitors shall be subject to the Court's contempt power and shall complete sworn certifications acknowledging their obligations.  Among other things, monitors shall ensure that access is restricted to identifiable "victims," as defined in the Act, *id.*; and enforce this Court's orders, including (a) a ban on all cell phones and other electronic devices inside secured viewing locations and (b) a ban on any audio- and video-recordings of court proceedings.

(5) Includes recommendations on how to accomplish these goals in the most reasonable, efficient, and cost-effective manner.

The Court will also take measures to ensure that the general public and the press have maximum access to court proceedings here in this District.  In particular, the Clerk's Office will set up multiple overflow courtrooms, as necessary, that will display real-time audio and visual coverage of evidentiary proceedings and trial.  The Court will also designate one or more media rooms to accommodate the press in the courthouse for pretrial and trial proceedings.

\* \* \*

Today's decision interprets the plain language of the Lockerbie Victims Access Act in a manner that effectuates Congress's directive to provide victims of the Lockerbie bombing with remote access to pretrial and trial proceedings, while safeguarding the integrity of those proceedings and the defendant's constitutional right to a fair trial.  As a result, victims will have unprecedented access to pretrial and trial proceedings in the criminal case against Abu Agila Mohammad Mas'ud Kheir Al-Marimi.

The Court recognizes that it would be more convenient and less expensive for the Lockerbie bombing victims to access evidentiary and trial proceedings from their homes and

offices.  But livestreaming such proceedings to individuals' personal devices is fraught with risks of a constitutional dimension.  It is impossible to anticipate the numerous ways in which an inadvertent or intentional unauthorized accessing or rebroadcasting of evidentiary or trial proceedings could prejudice the defendant's due process rights.  Because witness testimony and other evidence is admitted in real time in the courtroom, even a single breach of procedure could be incurable.  In today's Internet age, a rebroadcasted court proceeding could travel around the world and remain electronically preserved forever.  *See* Beale & King Memo, *supra*, at 4 (noting concerns with digital preservation of broadcasted information).  Not only would such a breach jeopardize the defendant's right to a fair trial, it could also taint any future retrial.  *See Moussaoui*, 205 F.R.D. at 187.

The Court also appreciates that facilitating remote viewing locations will be more costly and administratively burdensome to the government than allowing U.S. and foreign victims to access evidentiary and trial proceedings from their personal devices.  But this is the unfortunate consequence of a crime of this nature being committed overseas.  In our legal system, regardless of the scope, date, or circumstances of a crime, the role of the Court is to ensure that the parties, particularly the charged defendant, receive a fair trial.  While establishing secure remote viewing locations will be onerous, a mistrial of a months-long trial would be potentially irremediable and far more expensive to the parties and to the Court.  *Cf. Moussaoui*, 205 F.R.D. at 187.

To fulfill its constitutional duty to ensure that the defendant receives a fair trial, the Court must mandate effective safeguards to protect the integrity of the proceedings, even if such safeguards come at some cost to the victims of the Pan Am Flight 103 bombing and the government.  Consistent with the Act, the Court exercises its statutory authority to grant victims access to non-evidentiary pretrial proceedings from their homes and offices by Zoom and

26

telephone, as well as access to livestreamed video and audio feeds of evidentiary and trial proceedings in courthouses across the United States and other secure, monitored locations around the world. Such access most reasonably furthers the victims' substantial interests in having remote access to pretrial and trial proceedings without undermining the integrity of those proceedings or the defendant's constitutional right to a fair trial.

.

## CONCLUSION

For the reasons stated, the government's Motion for Order to Afford Victims Remote Video and Telephonic Access to Court Proceedings in this Case, Dkt. 51, is granted in part and denied in part. A separate order consistent with this decision accompanies this memorandum opinion.

*Dabney L. Friedrich*
DABNEY L. FRIEDRICH
United States District Judge

December 23, 2024