**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD** | : | |
| **MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**MOTIONS *IN LIMINE* TO PERMIT RULE 404(b) EVIDENCE AND**
**FOR RULINGS ON HEARSAY EXCEPTIONS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits these motions *in limine* regarding the bombing of the La Belle Discotheque. The government requests that the Court make pretrial rulings that (1) evidence on this topic is admissible pursuant to Federal Rule of Evidence 404(b); and (2) certain government exhibits are admissible under hearsay exceptions. The resolution of these issues will significantly affect the government's preparations for trial, including what arrangements must be made to secure the testimony of foreign witnesses. Accordingly, the United States respectfully requests that the Court consider and decide these motions *in limine* earlier than it otherwise would in the ordinary case.

\*      \*      \*

## Table of Contents

I.      Background ................................................................................................. 3

II.     Motion to Permit 404(b) Evidence .......................................................... 5

  A.    Legal background. ..................................................................................... 5

  B.    The La Belle evidence is relevant for multiple permissible purposes ............... 6

      1.  Corroboration of the defendant's statement ........................................ 7

      2.  Motive ............................................................................................... 10

      3.  Knowledge ......................................................................................... 11

      4.  Intent ................................................................................................. 12

      5.  Identity .............................................................................................. 13

  C.    The La Belle evidence passes Rule 403 balancing ........................................ 14

  D.    A limiting instruction would be appropriate ................................................. 15

III.    Motion for Rulings on Hearsay Exceptions .......................................... 16

  A.    Rules governing preliminary questions. ....................................................... 16

  B.    Applicable hearsay exceptions. ................................................................... 16

      1.  Business Records .............................................................................. 16

      2.  Public Records .................................................................................. 18

      3.  Ancient Documents ........................................................................... 18

      4.  Residual Exception ........................................................................... 19

  C.    The government's La Belle exhibits fit multiple hearsay exceptions. ............. 20

      1.  The Stasi documents are Ancient Documents .................................... 24

      2.  The Stasi documents are Public Records. .......................................... 25

      3.  The Stasi documents are immediately derivative of otherwise-admissible Public and Business Records. ............................................................ 26

      4.  The Stasi documents qualify for the Residual Exception. ................... 28

IV.     Conclusion ................................................................................................ 32

## I.    BACKGROUND

This case arises from the bombing of Pan American World Airways Flight 103 ("Pan Am Flight 103") in 1988 over Lockerbie, Scotland, resulting in 270 deaths. The defendant is alleged to have built the bomb on behalf of the Libyan government. He is charged with one count of destruction of an aircraft resulting in death, in violation of 18 U.S.C. § 32(a)(2) and (4); one count of destruction of an aircraft resulting in death, in violation of 18 U.S.C. § 32(a)(1) and (4); and one count of destruction of a vehicle used in foreign commerce by means of an explosive, resulting in death, in violation of 18 U.S.C. § 844(i). *See* ECF 7 (Indictment).

On April 5, 1986, several years before the bombing of Pan Am Flight 103, another terrorist bombing occurred at La Belle Discotheque, a nightclub in West Germany frequented by U.S. servicemembers. The attack killed three people, including two U.S. citizens, and injured more than 200. According to public statements by then-President Ronald Reagan, the bombing was orchestrated by the government of Libya.[1] German authorities ultimately brought charges against six defendants, none of whom was alleged to have designed the bomb. Five of those defendants were convicted after a trial in Germany, with the court finding that the bombing had been planned by components of the Libyan government including its diplomatic mission in East Berlin.[2]

At trial in the instant case, the government anticipates introducing a statement the defendant gave to Libyan law enforcement in which he described his involvement in both the Pan Am Flight 103 and La Belle bombings. The defendant admitted that he was a technical specialist

---

[1] Address to the Nation on the United States Air Strike Against Libya (Apr. 14, 1986), *available at* https://www.reaganlibrary.gov/archives/speech/address-nation-united-states-air-strike-against-libya.

[2] *See* New York Times, "4 Guilty in Fatal 1986 Berlin Disco Bombing Linked to Libya," *available at* https://www.nytimes.com/2001/11/14/world/4-guilty-in-fatal-1986-berlin-disco-bombing-linked-to-libya.html

in Libya's security and intelligence service, the External Security Organization ("ESO") and that in that capacity he had "participated in a number of operations, among them the Berlin night club bombing and the Lockerbie airliner bombing," and others.

Regarding La Belle, the defendant stated, among other things, that:

- He remembered the date as being in April 1986.

- He was tasked by a superior to "travel to East Germany and meet the Security Officer at the Libyan Embassy, a man named Ali Ibrahim Kashlaf."

- He was accompanied on the trip by "an officer from the Organisation[3] named Abdulhakim Mustafa Shadi."

- He and Shadi were received at the airport by Kashlaf and brought to a hotel.

- The next day, he was told by Kashlaf to "prepare an 'explosive package' to be used against an American target." "I was prepared psychologically and mentally to perform this task."

- Kashlaf provided him with materials consisting of plastic explosive, a detonator, and a detonation timing device.

- That evening, shortly before midnight, he learned from the news that an explosion had occurred, and Kashlaf "nodded his head, and I understood that this was the target for which the explosive charge had been prepared."

- "The explosion was in a night-club frequented by individuals and officers of the American army."

The defendant is not charged with any offense relating to the La Belle bombing because no applicable statute existed at the time of the attack. (After the bombing, a statute was enacted making it a crime to commit terrorist murder of U.S. nationals abroad. *See* 18 U.S.C. § 2332.[4])

---

[3] The translation from Arabic to English uses British spelling because it was done by a linguist based in the United Kingdom.

[4] Specifically, on August 28, 1986, the President signed Public Law No. 99-399, the Omnibus Diplomatic Security and Antiterrorism Act of 1986. Section 1202 of the Act created a new section, which is now codified as 18 U.S.C. § 2332, that makes it a Federal crime for a terrorist overseas to kill a United States national, attempt to murder a United States national, conspire to murder a United States national, or to engage in physical violence with the intent to cause serious bodily injury to a United States national or with the result that serious bodily injury is caused to a United States national.

## II.    MOTION TO PERMIT 404(b) EVIDENCE

On August 21, 2024, pursuant to the then-applicable scheduling order, the government notified defense counsel of its intention to present evidence governed by Fed. R. 404(b) related to the La Belle bombing. *See* ECF 60; 60-1 (Notice of Filing and attached letter).

The government anticipates that that the specific evidence to be introduced may include some or all of the following:

- The defendant's full written statement, in original Arabic and translated English, which includes his admissions related to the La Belle bombing;

- Records from the archives of the East German Ministry for State Security ("MfS," or the "Stasi") that establish the defendant's presence with Shadi in East Germany at the time of the La Belle bombing;

- Portions of testimony from an expert witness historian discussing the basic chronology of hostilities between Libya and the United States in the 1980s, including the La Belle bombing;

- Testimony from one or more U.S. Army investigators who arrived at the scene as first responders; and

- Testimony from a surviving victim of the explosion; and

### A.  Legal background.

Federal Rule of Evidence 404(a) provides generally that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Similarly, Rule 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Courts have often described Rule 404(b)(1) as forbidding the use of "propensity" evidence. *See, e.g.*, *Old Chief v. United States*, 519 U.S. 172, 181-82 (1997).

Rule 404(b)(2), however, makes clear that there is no prohibition on the use of "other crime[s], wrong[s], or act[s]" for purposes *other* than showing the person's propensity to commit similar acts. The rule lists nine examples of such permissible purposes: "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

As a whole, then, "Rule 404(b) is a rule of inclusion rather than exclusion." *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). As the *en banc* D.C. Circuit observed, "although the first sentence of Rule 404(b) is framed restrictively, the rule itself is quite permissive, prohibiting the admission of other crimes evidence in but one circumstance—for the purpose of proving that a person's actions conformed to his character." *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc) (quoting *United States v. Jenkins*, 928 F.2d 1175, 1180 (D.C. Cir. 1991) (internal quotation marks omitted)). Indeed, just before the rule was enacted, its phrasing was modified to "properly place[] greater emphasis on admissibility." Fed. R. Evid. 404(b), Advisory Committee Note to 1974 Enactment.

When other-acts evidence is offered for a permissible purpose, the court need not make any preliminary finding that the government has proven the other act by a preponderance of the evidence. *See Huddleston v. United States*, 485 U.S. 681, 689 (1988). Instead, the standard is whether a jury could reasonably find that the defendant committed the other act. *See id.* (citing Fed. R. Evid. 104(b)). That question is decided based on "all the evidence in the case" and without weighing credibility. *Id.*

### B.  The La Belle evidence is relevant for multiple permissible purposes.

Any single permissible purpose is sufficient to make evidence admissible under Rule 404(b). *See United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990). We offer five below.

1.  <u>Corroboration of the defendant's statement</u>

A critical task for the jury will be to assess the reliability of the defendant's admission to his role in the bombing of Pan Am Flight 103. The government intends to prove that the defendant's statement was truthful and accurate, in part by showing that its various details are corroborated by substantial extrinsic evidence. For this reason, the extrinsic evidence of the La Belle bombing is relevant to corroborate the defendant's signed statement, which is itself direct evidence of his guilt for the crime charged.

The D.C. Circuit has squarely held that "other acts" evidence can be offered to "corroborate evidence that itself has a legitimate non-propensity purpose." *United States v. Bowie*, 232 F.3d 923, 933 (D.C. Cir. 2000). Other circuits agree. *See id.* (citing *United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987); *United States v. Wimberly*, 60 F.3d 281, 285 (7th Cir. 1995); *United States v. Pitts*, 6 F.3d 1366, 1370-71 (9th Cir. 1993); *United States v. Blakeney*, 942 F.2d 1001, 1018–19 (6th Cir. 1991); *United States v. Jiminez*, 224 F.3d 1243, 1250 (11th Cir. 2000); *United States v. McLean*, 138 F.3d 1398, 1405 (11th Cir. 1998)).[5] This is so even though the rule "does not specifically refer to corroboration as an example of the use of other crimes evidence"; that omission is "not controlling" because "[t]he categories listed in Rule 404(b) are not exhaustive." *United States v. Williams*, 577 F.2d 188, 192 (2d Cir. 1978) (citing 2 Weinstein's Evidence P 404(08), at 404-42 (1977)).

Supreme Court precedent and common sense teach that a person "who is proved to tell the truth about some things is more likely to tell the truth about other things." *Navarette v. California*,

---

[5] Unlike some other circuits, the D.C. Circuit imposes no extra conditions on the use of other-acts evidence for purposes of corroboration. *See Bowie*, 232 F.3d at 933 n. 7 (rejecting rule from some sister circuits "requiring that the corroboration be direct and the corroborated matter be significant").

572 U.S. 393, 398 (2014) (citing *Alabama v. White*, 496 U.S. 325, 331 (1990)).  Accordingly, when a defendant has given a statement that includes details about events other than the charged offense, the government may properly offer evidence of those events to buttress the reliability of the statement as a whole.

For example: In *United States v. Bowie*, the defendant was charged with possessing more than $3,000 in counterfeit currency that was found in his car in May 1997. 232 F.3d at 925-26. When police discovered those counterfeit bills, they brought the defendant in for questioning, and he confessed not only to owning the bills but also that they were part of a larger set of $10,000 that he had purchased earlier and of which he had already spent $1,000. *Id.* at 926. At trial, over the defendant's objection, the government offered evidence under Rule 404(b) that the defendant had previously, in April 1997, been found in a car with roughly $1,300 in counterfeit bills with serial numbers matching those from the May 1997 arrest. *Id.* The D.C. Circuit affirmed the admission of that evidence because, among other non-propensity purposes, the April 1997 incident was relevant to "corroborate [the defendant's] confession" by serving as extrinsic evidence supporting his admission to have previously acquired $10,000 total in counterfeit currency. *Id.* at 933.

Although *Bowie*'s facts are different, its logic is fully applicable to this case. Just like in *Bowie*, the government's evidence includes an admission by the defendant to a broader course of conduct than what the indictment charges. Just like in *Bowie*, the government possesses extrinsic evidence of an uncharged act that was part of that course of conduct. And so just like in *Bowie*, the government here should be allowed to show the jury evidence that corroborates the defendant's statement.

Other cases make the same conceptual point as applied to accomplice testimony. In *United States v. Williams*, the Second Circuit affirmed the admission of a defendant's prior conviction to

corroborate an accomplice who testified that, prior to the charged bank robbery, the defendant claimed he "did bank jobs before." 577 F.2d at 192. In *United States v. Pitts*, a drug case, the Ninth Circuit affirmed the admission of the defendant's prior arrest for gun possession to corroborate an accomplice who testified that she bought firearms for the defendant as part of his drug operation. 6 F.3d 1366, 1370-71 (9th Cir. 1993). And in *United States v. Blakeney*, the Sixth Circuit affirmed the admission of the defendant's prior imprisonment to corroborate an accomplice who testified that the defendant claimed to have met another co-conspirator in prison. 942 F.2d 1001, 1017-19 (6th Cir. 1991).[6]

Of course, the Court must always consider "what is being corroborated and how," to ensure that improper propensity evidence is not simply relabeled as "corroboration." *United States v. Bailey*, 319 F.3d 514, 520 (D.C. Cir. 2003). For example, in *United States v. Linares*, a felon-in-possession case, the government offered evidence that the defendant was arrested for possessing a different gun almost five years earlier. 367 F.3d 941, 945 (D.C. Cir. 2004). The D.C. Circuit found that the admission of the prior arrest was error, rejecting the government's argument that the earlier, uncharged gun possession "corroborated" the testimony of the eyewitnesses to the later, charged gun possession. *Id.* at 948-49. This result makes good sense, because the only way the first episode could "corroborate" the second is through the improper inference that the defendant had a propensity to illegally possess firearms — there was no other logical relationship between the events.

Here, by contrast, the evidence being corroborated is the defendant's own statement, which is direct evidence of his guilt. And that corroboration is direct; unlike in *Linares*, the reasoning

---

[6] The *Blakeney* court also ruled that the evidence was relevant to show opportunity. 942 F.2d at 1018.

does not depend upon any forbidden propensity inference. Accordingly, the government should be permitted to present evidence of the La Belle bombing for the purpose of corroborating the defendant's statement.

### 2. Motive

Motive is "something… that leads one to act." *Black's Law Dictionary* (2024). Here, the government alleges that the defendant was led to act by orders from his ESO superiors as part of Libyan leader Muammar Qaddafi's quest for vengeance against the United States. This case therefore involves multiple layers of motive: the defendant was motivated to act by the orders of his superiors within the ESO, and those superiors were themselves motivated to act by their government's hostility to the United States. This background is crucial to the jury's understanding of how and why the defendant helped execute the bombing of a civilian aircraft.

The defendant's personal motive is inextricably tied to his status as an ESO operative, and his involvement in the La Belle bombing helps establish that status. This use of other-acts evidence is routine in conspiracy cases,[7] where courts regularly affirm the use of Rule 404(b) evidence to "explain the background, formation, and development of the illegal relationship." *United States v. Escobar-de Jesus*, 187 F.3d 148, 169 (1st Cir. 1999) (citing *United States v. Prevatte*, 16 F.3d 767, 775–76 (7th Cir. 1994); *United States v. Jones*, 982 F.2d 380, 382-83 (9th Cir. 1993); *United States v. Passarella*, 788 F.2d 377, 383-84 (6th Cir. 1986); *United States v. Magnano*, 543 F.2d 431, 435 (2d Cir. 1976)). Likewise here, the La Belle evidence serves to "demonstrate a continuing relationship between" the defendant and his ESO co-conspirators. *United States v. Vega*, 285 F.3d

---

[7] Although the defendant in this case is not charged with conspiracy, similar to conspiracy cases, the defendant is alleged to have committed the offense in concert with others in pursuit of a shared objective. *See* ECF 7 at ¶ 10 (Indictment, alleging that defendant conspired with other ESO associates to commit terrorist acts against the United States).

256, 261 (3d Cir. 2002) (quoting *United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir.1988)). That relationship is highly relevant to the defendant's motive, as well as to other permitted purposes like opportunity.

Also relevant is the bigger-picture motive of the Libyan government. "Hostility is a paradigmatic motive for committing a crime," *United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992), and the La Belle bombing was a pivotal step in the escalating hostilities between Libya and the United States that culminated in the bombing of Pan Am Flight 103. The government anticipates offering expert testimony about this sequence of events. Briefly stated, it includes military engagements in the Gulf of Sidra, which motivated Libya's perpetration of the La Belle bombing in retaliation, which motivated U.S. airstrikes against Tripoli as a response to La Belle, which in turn motivated the bombing of Pan Am Flight 103 as retribution for the airstrikes. All of this — and particularly La Belle — is critical backdrop for the jury to understand why agents of the Libyan government would be motivated to bomb an American civilian aircraft.[8]

3. Knowledge

To create an improvised explosive device requires uncommon technical skill as well as access to specialized materials. To carry its burden at trial, the government must persuade the jury that the defendant had the requisite skills and materials — that is, the knowledge — to perpetrate the charged offense.

Because of the specialized nature of the craft, prior episodes of bombmaking by a defendant charged with bombmaking are relevant for the non-propensity purpose of establishing that the

---

[8] To the extent the La Belle bombing is relevant to the motives of persons other than the defendant, such as senior Libyan or U.S. officials, it is still valid as Rule 404(b) evidence. *See United States v. Green*, 617 F.3d 233, 250 (3d Cir. 2010) (rejecting defendant's argument that "motive" is limited to defendant's motive, and affirming admission of evidence about defendant's prior conduct as relevant to the motive of a witness).

defendant possessed the requisite "knowledge and skill." *United States v. Trenkler*, 61 F.3d 45, 48 (1st Cir. 1995) (skill of bombmaking); *cf. also United States v. Barrett*, 539 F.2d 244, 248 (1st Cir. 1976) (skill of burglar-alarm tampering); *United States v. Garcia*, 880 F.2d 1277, 1278 (11th Cir. 1989) (skill of forging documents).

Accordingly, the defendant's prior participation as a bomb technician for the La Belle bombing should be admitted for the purpose of proving that he had the knowledge and skill to play the same role in the Pan Am Flight 103 bombing.

    4.  <u>Intent</u>

At trial, the government will argue that the defendant knew and intended that his bomb would be used to destroy a U.S. aircraft and kill civilians, rather than for some innocent purpose. *See* 18 U.S.C. § 32(a) (statute charged in Counts One and Two, requiring that defendant acted "willfully"); *Bryan v. United States*, 524 U.S. 184, 191 (1998) ("As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a bad purpose." (cleaned up)). His prior involvement in the La Belle bombing is probative of that guilty state of mind.

"The intent with which a person commits an act on a given occasion can many times be best proven by testimony or evidence of his acts over a period of time prior thereto, particularly when the activity involves a continuous course of dealing." *United States v. Harrison*, 679 F.2d 942, 948 (D.C. Cir. 1982). Here, the defendant's ongoing role as a bombmaker for the ESO was a "continuous course of dealing" from which his knowledge and intentions can be inferred based on the results of earlier events. Regardless of what the defendant may have intended or expected for the explosive device used in the La Belle attack, he would thereafter have well understood that his bombs were being used to commit terror attacks directed at civilians. When he later built the bomb that destroyed Pan Am Flight 103, he did so with a bad purpose, and he was under no illusions about the violent use to which it would be put.

5. Identity

In cases where the identity of the perpetrator is at issue, courts have allowed the government to present evidence that the defendant committed similar crimes during a similar timeframe, on the theory that a distinctive pattern of conduct is probative of identity. *See, e.g.*, *United States v. Gomez*, 763 F.3d 845, 854 (7th Cir. 2014); *United States v. Shumway*, 112 F.3d 1413, 1420 (10th Cir. 1997); *United States v. Lamb*, 831 F. App'x 938, 940-42 (11th Cir. 2020) (unpub.); *United States v. Scott*, 631 F. App'x 137, 138 (4th Cir. 2016) (unpub.). Such use of prior acts is known as a "modus operandi" theory, but as one Court of Appeals has noted, "modus operandi is not the exclusive theory for admitting other acts to prove identity." *United States v. Gomez*, 763 F.3d 845, 861 (7th Cir. 2014).

The defendant's involvement in the La Belle bombing is proof of his identity as a bombmaker for the Libyan government, which is itself highly probative of his participation in the Pan Am Flight 103 bombing. His specialized role within an organizational structure is part of the modus operandi of the offense. So too are other features the bombings have in common, like the intended targets (Americans), the materials used (Semtex plastic explosive), and the method of placing the bomb (hiding it inside an inconspicuous container that could be placed in a vulnerable area without arousing suspicion).

Moreover, the La Belle evidence involves other proof of identity that is especially concrete and particularized. As detailed in Section III.C below, the government intends to offer evidence that, when the defendant traveled to East Germany in 1986 for the La Belle bombing, he did so using the same passport number and demographic details as when he traveled to Malta in 1988 for the Pan Am Flight 103 bombing. This consistency helps establish that it was the defendant — and not someone with a similar name — who was in Malta with his co-conspirators when the bomb was placed into checked baggage and routed so as to be placed on Pan Am Flight 103.

**C.  The La Belle evidence passes Rule 403 balancing.**

Once a permissible purpose is shown, Rule 404(b) evidence still must be evaluated under Rule 403, which permits the court to exclude evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. That is not the case here.

On the one side of the balance, as discussed above, the fact of the La Belle bombing and the defendant's admitted role in it are highly probative of the reliability of his statement, his motive for the charged offense, his knowledge and skill to create a bomb, his intent in making that bomb, and his identity.

On the other side, there is no danger of unfair prejudice if the evidence is admitted. As the D.C. Circuit has observed when affirming the admission of a defendant's prior gun possession in a gun-possession case: "'[U]nfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party.  Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" *United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) (quoting *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977)).

Here, there would be no unfair prejudice because there is little chance the jury would use the La Belle bombing as improper propensity evidence. The law regards propensity evidence as dangerous because of "the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment." *Old Chief*, 519 U.S. at 181 (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982) (Breyer, J.)).  That risk is not present here. The primary evidence for the defendant's involvement in the uncharged La Belle bombing is the very same statement in which he admitted to his involvement in the charged Pan Am Flight 103 bombing. These mutually corroborating admissions are likely

to stand or fall together in the jury's eyes. In the unlikely event the jury were to credit one part of the defendant's statement and discredit another, they would be more likely to believe he participated in the Pan Am Flight 103 bombing, since the extrinsic evidence for that offense will constitute the overwhelming majority of the government's trial presentation. Consequently there is no appreciable risk that a jury might find reasonable doubt as to the Pan Am Flight 103 bombing but nonetheless return a guilty verdict based on their belief that the defendant committed the La Belle bombing.

Nor would the presentation of this evidence confuse the issues, mislead the jury, cause undue delay, waste time, or lead to cumulativeness. The government should therefore be permitted to present evidence about the La Belle bombing during its case-in-chief.

**D.  A limiting instruction would be appropriate.**

Federal Rule of Evidence 105 provides that, if evidence is admitted for "a purpose—but not… for another purpose," the court must give a limiting instruction to the jury upon request. The Supreme Court has described Rule 105, along with other ordinary rules of evidence, as providing "protection against… unfair prejudice" that negates any need for restrictive gatekeeping of Rule 404(b) evidence by the trial court. *See Huddleston*, 485 U.S. at 692.

The government will not object to a limiting instruction that directs the jury to consider the La Belle bombing evidence only for those purposes for which it was admitted.

### III.    MOTION FOR RULINGS ON HEARSAY EXCEPTIONS

Having established the relevance of the La Belle bombing as permissible Rule 404(b) evidence, we now turn to the hearsay exceptions applicable to the government's proposed exhibits.

#### A.  Rules governing preliminary questions.

In deciding what evidence should reach the jury, the court is bound by Federal Rule of Evidence 104, governing "Preliminary Questions." As a general matter, the rule provides that the court must decide preliminary questions — including "whether… evidence is admissible" — without being bound by the rules of evidence except those on privilege. Fed. R. Evid. 104(a). For example, when deciding whether a hearsay exception applies, a court can consider hearsay that would itself be inadmissible at trial. *See, e.g.*, *United States v. White*, 838 F. Supp. 618, 622 (D.D.C. 1993), aff'd, 116 F.3d 903 (D.C. Cir. 1997) (collecting cases).

#### B.  Applicable hearsay exceptions.

The hearsay exceptions relevant to this motion *in limine* are discussed below. Although they vary in their particulars, they each reflect the same basic principle: hearsay statements should be admitted when they are *reliable* and *necessary*. That is, the general rule against admissibility of out-of-court statements is overcome when (1) the statement is of a type that inspires confidence about its truthfulness and accuracy; and (2) the statement is of a type where its exclusion would unreasonably impair the factfinder's ability to correctly decide the issues.

##### 1.  Business Records

Federal Rule of Evidence 803(6), commonly known as the business records exception, provides a hearsay exception for "Records of a Regularly Conducted Activity," that is, records of acts, events, conditions, opinions, and diagnoses if:

> (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) neither the opponent does not show that the source of information nor or the method or circumstances of preparation indicate a lack of trustworthiness.

The rule is justified by the "unusual reliability" of business records, which stems from "systemic checking," "regularity and continuity which produce habits of precision," "actual experience of business in relying upon them," and "a duty to make an accurate record as part of a continuing job or occupation." Fed. R. Evid. 803, Advisory Committee Note to 1972 Proposed Rules (citing secondary sources). It reflects the understanding that employers have an "independent motivation for creating and maintaining reliable business records," which "obviates the need for sworn testimony and cross-examination." *Cobbins v. Tennessee Dep't of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009). *See also Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir. 2013) ("[Business] records are presumed reliable because businesses depend on them to conduct their own affairs, so there is little if any incentive to be deceitful, and because the regularity of creating such records leads to habits of accuracy.").

The business-records exception is also a product of necessity. The alternative would be a "burdensome and crippling" requirement that proponents of business records "produc[e] as witnesses, or account[] for the nonproduction of, all participants in the process of gathering, transmitting, and recording" the information in the records. Fed. R. Evid. 803, Advisory Committee Note to 1972 Proposed Rules.

2. <u>Public Records</u>

Federal Rule of Evidence 803(8) provides a hearsay exception for "Public Records," allowing admission of a record or statement of a public office if:

> (A) it sets out:
>
>> (i) the office's activities;
>>
>> (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>>
>> (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Like the business records exception, the public records rule is justified on the bases of reliability and necessity. As to reliability, there exists an "assumption that a public official will perform his duty properly;" as to necessity, an "unlikelihood that he will remember details independently of the record." Fed. R. Evid. 803, Advisory Committee Note to Paragraph (8) of 1972 Proposed Rules (citing *Wong Wing Foo v. McGrath*, 196 F.2d 120 (9th Cir. 1952); *Chesapeake & Delaware Canal Co. v. United States*, 250 U.S. 123 (1919)).

3. <u>Ancient Documents</u>

Federal Rule of Evidence 803(6) provides a hearsay exception for "Statements in Ancient Documents," that is, any "statement in a document that was prepared before January 1, 1998, and whose authenticity is established." In turn, Rule 901(b)(8) provides that a document can be proven to be authentic by "evidence that it: (A) is in a condition that creates no suspicion about its authenticity; (B) was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when offered."

This exception, again, is justified by reliability and necessity. Regarding reliability, Rule 803(16) reflects the long-established understanding that ancient documents are, as a general matter, safe from the concerns that animate the rule against hearsay. As the Advisory Committee explained, with ancient documents the "danger of mistake is minimized by authentication requirements, and age affords assurance that the writing antedates the present controversy." Fed. R. Evid. 803, Advisory Committee Notes to 1972 Proposed Rules (citing *Dallas Cnty. v. Com. Union Assur. Co.*, 286 F.2d 388, 390 (5th Cir. 1961)). And regarding necessity, "[a]fter passage of a long period of time, witnesses are unlikely to be available or, if available, are unlikely to recall reliably" events that are very old. 2 McCormick on Evid. § 323 (9th ed.).

4. <u>Residual Exception</u>

Finally, Rule 807 provides a Residual Exception for any hearsay statement that, although not falling within a defined exception, satisfies the following conditions:

> (1) the statement is supported by sufficient guarantees of trustworthiness-- after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Here, the requirements of reliability and necessity are written directly into the rule itself. The residual exception "was designed to encourage the progressive growth and development of federal evidentiary law by giving courts the flexibility to deal with new evidentiary situations which may not be pigeon-holed elsewhere." *United States v. Slatten*, 865 F.3d 767, 806 (D.C. Cir. 2017) (quoting *United States v. Mathis*, 559 F.2d 294, 299 (5th Cir. 1977). The rule formerly required that the statement carry circumstantial guarantees of trustworthiness "equivalent" to those of the specifically exempted forms of hearsay in Rules 803 and 804. *See id.* That requirement was removed in 2019 based on the rulemakers' judgment that it was difficult to apply and that some

statements may be trustworthy for reasons not comparable to any Rule 803/804 exception. Fed. R. Evid. 807, Advisory Committee Note to 2019 Amendments.

**C.  The government's La Belle exhibits fit multiple hearsay exceptions.**

The government intends to offer two archival Stasi documents that are probative of the defendant's involvement in the La Belle bombing and corroborative of his statement. Both items were obtained from an official German government source, the Federal Commissioner for the Records of the State Security Service of the former German Democratic Republic (Der Bundesbeauftragte für die Unterlagen des Staatssicherheitsdienstes der ehemaligen Deutschen Demokratischen Republik), or "BStU," which became responsible for the records of the Stasi after the reunification of Germany.

The Visitors List: The first document, which the government has submitted to chambers as Exhibit 603,[9] is a list of persons for whom the Libyan government requested visas to enter East Germany in 1986 (the "Visitors List"). Each entry includes identifying information such as the person's birthyear, birthplace, and passport number. Entry 56 on the list is "ABUAGELA, M. K. Masud," the defendant. Entry 55 is "SHADI, Abdulhakim M," whom the defendant named in his statement as his traveling companion to East Berlin ahead of the bombing. Both entries indicate that the requested travel dates are from April 3 to May 2, 1986, overlapping with the date of the bombing. "Abuagela" is described as having been born in a specific year in Tunis and having the passport number 835004. These details match the birthdate, birthplace, and passport number used by the defendant to travel to Malta in 1988, according to Maltese immigration records.

---

[9] To avoid confusion in the record, the, the government will use the exhibit numbering it intends to use at trial in this and all future motions in *limine*. Exhibit numbers ending in "-t" denote English translations of the corresponding foreign-language original.

The Visitors List is derived from the original individual visa requests, which were transmitted in writing from the government of Libya to the government of East Germany and processed by the East German Foreign Ministry. *See* Ex. 603-c (declarations from Stasi officials). An example of one such visa request, corresponding with entry 61 on the list, is submitted as Ex. 604 (original) and 604-t (English translation). A comparison of the documents shows that the Visitors List accurately reflects the underlying information from the original visa request:



Ex. 603 (excerpt):

Ex. 604 (excerpt):

**Name, birth year, place of birth**

**Passport no.**

**Dates of visit**

**Local host**

The Stasi Records Agency was unable to locate the original visa requests that underlay entries 55 (Shadi) and 56 (Abuagela). However, signed declarations from two knowledgeable former Stasi employees confirm that such requests must have once existed and that their details would have been accurately copied into the visitors list. *See* Ex. 603-c. Although these declarations are out-of-court statements, the Court can rely on them in deciding whether a hearsay exception is satisfied. *See* Fed. R. Evid. 104(a).

The Hotel Report: The second document, submitted as Exhibit 608 (original) and 608-t (English translation), is a report containing information about hotel occupancy (the "Hotel Report"). The report comes from a larger file Stasi "OPK" file[10] on a person codenamed "Rinde" or "Flunder." The file as a whole, which is 244 pages long and has been provided in discovery, contains extensive reporting on and analysis of "Rinde/Flunder," who the Stasi suspected of being associated with Syrian intelligence. Although the Rinde report does not contain extensive reporting on the defendant and Shadi, or even on Libyan activities generally, it does contain what appear to be several incidental references to the pair's presence in East Berlin. Specifically, the report excerpted as Exhibit 608 notes the existence of the visa request discussed above, and states that "MASUD and SHADI resided in room 526 of the Interhotel Metropol between 4/4/1986 and 4/5/1986." Ex. 608 at 4-5; Ex. 608-t at 5-6. The Stasi author of the hotel report has confirmed in a signed declaration that the information about hotel occupancy came from directly from the records of the relevant hotels. *See* Ex. 608-c (Hotel Declaration). The government was not able to obtain any original hotel records for Masud's and Shadi's stay; however, the "Rinde" file contains guest

---

[10] "OPK," or "Operative Control of Persons," was the Stasi term for a preliminary investigation of persons or conduct that was suspected of posing a threat to the state.

registration cards from the same hotel for other guests, Ex. 609, which confirm that the hotel collected names and demographic information:

Ex. 609, p.3 (followed by machine translation)

The Visitors List and the Hotel Report are each admissible under multiple hearsay exceptions, as discussed below.

1.  The Stasi documents are Ancient Documents.

The Visitors List is dated April 16, 1986. The Hotel Report is dated April 15, 1986. Both documents predate the 1998 cutoff for what qualifies as an "ancient document." *See* Fed. R. Evid. 803(16).

Further, the documents' authenticity is established, satisfying Rule 901(b)(8). The documents are more than twenty years old; they are in a condition that creates no suspicion about their authenticity; and they came from a place where, if authentic, they would likely be. Those last two factors go hand-in-hand, since the records came from the carefully regulated Stasi archives, an official German government entity that takes great pains to ensure that Stasi records are appropriately preserved and maintained. Indeed, the archive is governed by a comprehensive statute that "regulates the registration, safekeeping, administration and use" of Stasi records to, among other things, "ensure and promote the historical, political, and juridical reappraisal of the activities of the State Security Service."[11] There are few ancient documents whose provenance can be more conclusively established than these, which the German federal government has taken such great care to preserve.

The status of the Stasi records as ancient documents is dispositive of their admissibility as excepted hearsay; there is no need for them to satisfy the requirements of any other exception. *See United States v. Firishchak*, 468 F.3d 1015, 1022 (7th Cir. 2006) ("The ancient documents rule and the business records exception are independent grounds for determining admissibility. Because the

---

[11] *Act Regarding the Records of the State Security Service of the Former German Democratic Republic (Stasi Records Act)*, available at https://www.bundesarchiv.de/assets/ bundesarchiv/en/Downloads/StUG_Englisch_2024_barrierefrei.pdf.

documents in question were admissible under the ancient documents rule, whether they were kept in the ordinary course of business is irrelevant." (cleaned up)). Regardless, several other hearsay exceptions also apply and provide alternate grounds for admissibility of the records.

     2.   The Stasi documents are Public Records.

The Stasi records were generated by an official arm of the East German government as part of its duties to observe and report on matters affecting the security of the state. They are therefore admissible as public records under Rule 803(8)(A)(ii). Although this subsection includes a carveout in criminal cases making "matter[s] observed by law enforcement personnel" inadmissible, that provision is not applicable here.

The "matter[s] observed by law enforcement personnel" carveout was predicated on a concern that "observations by police officers at the scene of the crime or the apprehension of the defendant are not as reliable as observations by public officials in other cases because of the adversarial nature of the confrontation between the police and the defendant in criminal cases." Fed. R. Evid. 803, Advisory Committee Note to 1974 Enactment. Consistent with that legislative purpose, courts have read the provision narrowly. *See, e.g.*, *United States v. Hansen*, 583 F.2d 325, 333 (7th Cir. 1978) (building inspectors not excluded); *United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) (medical examiners who make criminal referrals not excluded); *Manocchio v. Moran*, 919 F.2d 770, 777 (1st Cir. 1990) (medical examiner's autopsy report not excluded); *United States v. Edelmann*, 458 F.3d 791, 813-14 (8th Cir. 2006) (Federal Bureau of Prisons inmate systems manager not excluded); *but see United States v. Ruffin*, 575 F.2d 346, 356 (2d Cir. 1978) (excluding IRS records under law-enforcement personnel carveout). As multiple federal circuits have held, the analysis turns on whether the records in question "report the observation or investigation of crimes," in which case they are excluded, or whether they "merely document routine, unambiguous

factual matters," in which case they are eligible for the public-records exception. *Edelmann*, 458 F.3d at 814 (quoting *United States v. Dancy*, 861 F.2d 77, 79 (5th Cir. 1988)).

The concern animating the "law enforcement personnel" exclusion is not implicated here. Although the Stasi served an investigatory function in East Germany, enforcing the criminal law was not their sole or primary responsibility. In this case, the relevant Stasi personnel were not enforcing the criminal law but were instead engaged in intelligence gathering for the purpose of preventing future harm. *See* Ex 608-c (Hotel Declaration, explaining that hotel report was created while "compil[ing] intelligence that would be used to prevent acts of terrorism" for "intelligence purposes" and not "for use in court"). That is why, unlike in the scenario contemplated by the rule's authors, the records here have nothing to do with any "crime scene" or "apprehension of the defendant," nor were they made in the of an "adversarial confrontation between the police and *any* defendant, let alone the defendant charged here. The documents "merely document routine, unambiguous factual matters" — specifically, visa applications and hotel occupancy — and should therefore be admitted as public records. *Edelmann*, 458 F.3d at 814.

3.  <u>The Stasi documents are immediately derivative of otherwise-admissible Public and Business Records.</u>

Even if the Court were to rule that the Stasi records were not ancient documents, and were to construe them as falling within the "law enforcement personnel" carveout of the public records exception, the records should still be admitted because the relevant information in each was derived directly from source documents that would themselves be admissible under other hearsay exceptions. In each case, the original underlying records are no longer available, but that is no barrier to the admission of these derivative exhibits as substitutes. *See* Fed. R. Evid. 1004 ("An original is not required and other evidence of the content of a writing, recording, or photograph is admissible if: (a) all the originals are lost or destroyed, and not by the proponent acting in bad

faith…."). The Court can safely conclude that the Visitors List and the Hotel Report each constitute an accurate reproduction (in substance, if not in form) of the underlying admissible information.

Visitors List: As noted above, the Visitors List is merely a summary of the details from numerous original visa requests; an example of one such request is attached as Exhibit 604. These underlying source documents would qualify both as records of a regularly conducted activity under Rule 803(6) and as public records under Rule 803(8)(A)(i). *See Ngamfon v. U.S. Dep't of Homeland Sec*., 349 F. Supp. 3d 975, 980 n.1 (C.D. Cal. 2018) (ruling U.S. visa records admissible under both Rule 803(6) and Rule 803(8)). And the signed declarations of two individuals who worked in the relevant Stasi department and were familiar with these types of records, confirm that every entry on the list can be relied on as an accurate reproduction of the information from the corresponding original visa request. *See* Ex. 603-c at ¶ 5. The government has been unable to identify the person who compiled the Visitors List, and even if the person could be located, he or she would be unlikely to possess any independent recollection given the volume of information, the routine circumstances of its creation, and the long passage of time. Regardless, the method of the list's creation is clearly apparent, and as a near-mechanical reproduction of the visa-request details it should be admitted to the full extent that the originals would be. *See Wong Wing Foo v. McGrath*, 196 F.2d 120, 123 (9th Cir. 1952) (noting public-records exception's purpose to obviate the need for testimony from "a public official [who] would have no memory at all respecting his action in hundreds of entries that are little more than mechanical").

Hotel Report: The author of the Hotel Report has provided a declaration explaining how his department would routinely learn the identities of hotel guests by consulting the hotels' records. *See* Ex. 608-C (Hotel Declaration). Although the original Metropol guest cards for the defendant and Shadi are no longer available, the Court can safely conclude that such records did exist and

that they were the source of the information in the Hotel Report. The Hotel Declaration establishes that the hotel registration cards would satisfy all the requirements of Rule 803(6): they were made at or near the time of the event in question by a person with knowledge; they were kept in the course of the hotel's regularly conducted activity; and it was the hotel's regular practice to make the record. *See* Ex 608-c at ¶ 4; *see also Saks Int'l, Inc. v. M/V Exp. Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987) (noting that business records can be admitted "even though the foundation for their receipt is laid by a witness who is not an employee of the entity that owns and prepared them" (citing *United States v. Mendel*, 746 F.2d at 166; *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir.1986))). Moreover, the Metropol registration cards that are available as examples from the same time period, Ex. 609, provide independent confirmation that such records were routinely generated by the hotel and that they documented the types of information reflected in the Hotel Report: guest names, birthyears, nationalities, etc.

### 4. The Stasi documents qualify for the Residual Exception.

Finally, even if the Stasi records were not admissible under the above rules, they would qualify for the residual exception under Rule 807. For the reasons already noted above, and as discussed further below, the records are both "supported by sufficient guarantees of trustworthiness" and "more probative on the point for which [they are] offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(1), (2).

#### a. Trustworthiness

The Stasi records are reliable for all the same reasons as the categories of documents discussed above.

Like ancient documents, these records predate the current controversy, meaning no one involved in their creation had any incentive to alter their contents in a way that would advantage either side in the trial of this case.

Like business records, they were generated under circumstances evincing a "lack of deceitful incentive and the habitual accuracy implicit within regularity." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956 (7th Cir. 2021). Just as businesses have a profit motive to keep accurate records, the Stasi felt an acute need for completeness and accuracy in order to carry out their security function within the East German state. *See, e.g.*, Ex. 603-c ¶ 5 ("The Ministry of State Security took great care to accurately record information in documents like these.").

And like public records, they involve a "minimum of motive on the part of public officials and employ[ee]s to either make false entries or to omit proper ones." *Chesapeake & Delaware Canal Co. v. United States*, 250 U.S. 123, 129 (1919). Since the purpose of the reports was to prevent East Germany's perceived enemies from harming the state, the Stasi had every incentive to be accurate in their recordkeeping, and zero incentive to record false information about the defendant, who appears only tangentially in the documents.

Moreover, the highly specific nature of the recorded information (including the defendant's name, demographic data, and passport number), along with the circumstances of its collection and documentation, leave no possibility that it was the product of mistake or fabrication. The only plausible way the defendant's name, passport number, year of birth, and place of birth could have wound up on a list of visa applications is if the Libyan government did, in fact, submit a visa application for him. And the only plausible way his name, year of birth, place of birth, and passport number could have wound up in a Stasi report about guests at the Metropol hotel is if he had, in fact, been staying at that hotel.

Finally, the Stasi records have circumstantial indicia of reliability in that they are consistent with the defendant's own description of his travel in his statement, summarized in Part I above. *See* Fed. R. Evid. 807(a)(1) (providing that trustworthiness under residual exception be assessed

in view of the "evidence, if any, corroborating the statement"). Particularly significant, the documents both portray the defendant as having had a travel companion named Shadi, just like he said in his statement.

For all these reasons, the Stasi records are supported by more-than-sufficient guarantees of trustworthiness, and the first prong of the residual exception is satisfied.

      b.  <u>Probative value</u>

The Stasi records are also more probative on the point for which they are being offered, the defendant's presence in East Berlin with Shadi in the days leading up to the La Belle bombing, than any other available evidence.

The government's burden at trial will be to persuade the jury beyond a reasonable doubt that the defendant's written statement is genuine and that it accurately describes his participation in the bombing of Pan Am Flight 103. To do so, the government must refute any suspicion that the statement was fabricated, either by the defendant himself ("admitting" to things he did not actually do) or by a third party (seeking to falsely implicate him). A critical part of this task will be demonstrating that the statement accords with otherwise-known facts in ways that cannot be mere coincidence.

The government has undertaken extensive efforts to locate and interview former Stasi employees who might have been percipient witnesses to the events documented in the reports. Many of these identified individuals are deceased, and the others have no remaining recollection of the relevant facts.[12] Without firsthand testimony, the best and only way of proving these highly relevant facts is through the Visitors List and Hotel Report.

---

[12] The government's discovery productions to the defense include summary reports of these interviews, as well as verbatim transcripts of interviews by Scottish authorities of numerous former Stasi employees.

Accordingly, the Court should rule that the government's proposed Exhibit 603 (Visitors List) and Exhibit 608 (Hotel Report) are admissible under one or more of the hearsay exceptions discussed above. The Court should further rule that Exhibit 604 (Abulgasem visa request) and Exhibit 609 (Hotel Metropol registration cards) are admissible for the purpose of establishing to the jury the reliability of Exhibits 603 and 608.

\*      \*      \*

## IV.    CONCLUSION

For the reasons above, the Court should (1) permit the government to offer evidence about the La Belle Discotheque bombing under Rule 404(b); and (2) issue the pretrial evidentiary rulings requested above.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    */s/ Conor Mulroe*
CONOR MULROE (NY Bar No. 5289640)
ERIK M. KENERSON (OH Bar No. 82960)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
National Security Section
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 740-4595
Conor.Mulroe@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys
Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530