**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD** | : | |
| **MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MOTION TO ADMIT FOREIGN RECORDS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves *in limine* for the admission of certain foreign records of regularly conducted activities and foreign public records. For the reasons below, each of the government's proposed exhibits is admissible under one or more exceptions to the rule against hearsay.

**FACTS**

This is a prosecution arising from the bombing of Pan American World Airways Flight 103 ("Pan Am Flight 103") in 1988. The plane exploded over Lockerbie, Scotland, shortly after takeoff from London Heathrow Airport en route to John F. Kennedy International Airport in New York City, killing 270 people. The government anticipates proving that the defendant engineered a bomb that was packed inside a suitcase and placed into checked baggage at Luqa Airport in Malta for a flight to Frankfurt, Germany. The suitcase traveled from Malta to Frankfurt, then from Frankfurt to London, where it was loaded onto Pan Am Flight 103, bound for New York.

**ARGUMENT**

Because of the international nature of the case, a great deal of the government's evidence originates from foreign countries. Much of that evidence consists of business records, government

records, and records of other regularly conducted activities, for which the government has obtained

certifications. As explained below, such certifications will permit the admission of the exhibits

without the need for live testimony from a custodian. A pretrial order to this effect will greatly

increase the efficiency of the government's presentation at trial and will obviate the need to arrange

international travel for dozens of witnesses whose testimony would be ministerial in nature.

### A. The Federal Rules and Statute Provide for Admission of Certified Foreign Records.

The rule against hearsay generally forbids the admission of out-of-court statements that are

offered to provide the truth of the matter being asserted. *See* Fed. R. Evid. 801, 802. That rule has

various exceptions, including one for "Records of a Regularly Conducted Activity," which allows

the admission of a "record of an act, event, condition, opinion, or diagnosis" where:

> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

For domestic records, the criteria in Rule 803(6) are typically established by a certificate

under Rule 902(11) ("Certified Domestic Records of a Regularly Conducted Activity"). For

foreign records offered in criminal cases, the applicable authority is 18 U.S.C. § 3505, which

provides:

> (a)(1) In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that--

(A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

(B) such record was kept in the course of a regularly conducted business activity;

(C) the business activity made such a record as a regular practice; and

(D) if such record is not the original, such record is a duplicate of the original;

unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

(2) A foreign certification under this section shall authenticate such record or duplicate.

Business records are exempt from the rule against hearsay because of their "unusual reliability," which stems from "systemic checking," "regularity and continuity which produce habits of precision," "actual experience of business in relying upon them," and "a duty to make an accurate record as part of a continuing job or occupation." Fed. R. Evid. 803, Advisory Committee Note to 1972 Proposed Rules (citing secondary sources). Moreover, employers have an "independent motivation for creating and maintaining reliable business records," which "obviates the need for sworn testimony and cross-examination." *Cobbins v. Tennessee Dep't of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009); *see also Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir. 2013) ("[Business] records are presumed reliable because businesses depend on them to conduct their own affairs, so there is little if any incentive to be deceitful, and because the regularity of creating such records leads to habits of accuracy."). There is consequently no need to impose any "burdensome and crippling" requirement that proponents of business records "produc[e] as witnesses, or account[] for the nonproduction of, all participants in the process of gathering, transmitting, and recording" the information in the records. Fed. R. Evid. 803, Advisory Committee Note to 1972 Proposed Rules.

The pragmatic justification for the business-records exception is even stronger when the records in question are from foreign countries. Accordingly, Congress enacted § 3505 as a "simple, inexpensive substitute for the cumbersome and expensive procedures" of producing a live witness to satisfy Rule 803(6). *United States v. Al-Imam*, 382 F. Supp. 3d 51, 57 (D.D.C. 2019) (quoting H.R. Rep. 98-907, at 3 (1984); and citing *United States v. Ross*, 33 F.3d 1507, 1515 (11th Cir. 1994); *United States v. Strickland*, 935 F.2d 822, 830 (7th Cir. 1991)). Its purpose, as several circuit courts have noted, was not "to add technical roadblocks to the admission of foreign records, but, rather, to streamline the admission of such records." *Id.* (citing *United States v. Jawara*, 474 F.3d 565, 584 (9th Cir. 2007) (quoting *Strickland*, 935 F.2d at 831); *United States v. Garcia Abrego*, 141 F.3d 142, 178 (5th Cir. 1998)). As with all other documentary evidence, the "benchmark question" for admission of certified foreign records remains whether "the documents bear the indicia of reliability." *Strickland*, 935 F.2d at 831.

In sum, "in complex cases such as this one, that involve the admission of business records from numerous sources, including foreign entities," requiring live testimony to admit business records "would dramatically decrease judicial efficiency at minimal or no gain to the truth-seeking process." *United States v. Qualls*, 553 F. Supp. 2d 241, 246 (E.D.N.Y. 2008)

### B.  The Federal Rules Provide for the Admission of Foreign Public Records.

A second exception to the Rule Against Hearsay involves public records.  As relevant to this motion, Fed. R. Evid. 803(8) provides for the admission of the record of a public office if the record sets out "a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel," Fed. R. Evid. 803(8)(A)(ii), and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Rule 803(8)(B).

Foreign public records may be admitted without a witness if they are certified as such by a person who is authorized by a country's laws to make such certification. *See* Fed. R. Evid. 902(3) & (4). "In substance, Rule 902(3) imposes two conditions on treating a foreign public document as self-authenticating. First, there must be some indication that the document is what it purports to be. Thus, the proffered document must be executed by a proper official in his official capacity, or the genuineness of the document must be attested to by a proper official in his official capacity. Second, there must be some indication that the official vouching for the document is who he purports to be." *United States v. Fuchs*, 118 F.4th 911, 917 (7th Cir. 2024) (internal citations and quotations omitted).

Rule 902(3) also provides that, "if all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may, for good cause:

(A) order that it be treated as presumptively authentic without final certification; or

(B) allow it to be evidenced by an attested summary with or without final certification."

Copies of all foreign records that the government intends to seek to admit under this provision have been provided to defense in discovery.

### C.  The Confrontation Clause does not bar admission of the records.

The records that the government seeks to introduce here are not testimonial—indeed, because they are business records being offered pursuant to Fed. R. Evid. 803(6), the Confrontation Clause poses no impediment to their use as evidence at trial. *See Crawford v. Washington*, 541 U.S. 36, 56 (2004) (business records, by their nature, are not testimonial); *see also United States v. Al-Imam*, 382 F. Supp. 3d 51, 59 (D.D.C. 2019) (in collecting cases, noting that "[e]very court that has addressed this issue has concluded that admission of certifications provided pursuant to Rule 803(6)—including § 3505 and its analogs in Rules 902(11) and (12)—does not pose Confrontation Clause problems").  The D.C. Circuit has separately ruled that reliance on a

certification under Fed. R. Evid. 902(11)—the domestic-records analogue to 18 U.S.C. § 3505—does not violate the Confrontation Clause.  *See United States v. Adefehinti*, 510 F.3d 319, 327-28 (D.C. Cir. 2007).

The government is also offering some documents under Fed. R. Evid. 803(8) as public records.  Admission of those documents similarly does not violate the Confrontation Clause so long as the records were not created for establishing or proving some fact at trial.  *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 327 (2009); *see also, e.g.*, *United States v. Noria*, 945 F.3d 847, 851-52 (5th Cir. 2019) (upholding the admission of U.S. immigration records). The documents the government seeks to introduce in this motion pursuant to Fed. R. Evid 803(8) are routine records created or maintained by foreign immigration agencies, which have similar attributes to those documents whose admission was upheld in *Noria*.

**D.  Each of the certified records should be admitted.**

Applying the above principles, the Court should make a pretrial finding of the admissibility of each of the various records submitted by the government in this motion. The discussion below proceeds country-by-country, first giving a brief explanation of the country's relevance and then listing each certified record that should be admitted.

The exhibits have been assigned the numbers the government intends to use at trial. For the most part, they are divided numerically into categories based on subject matter: for example, exhibits in the 700 series involve clothing from Malta, exhibits in the 800 series involve travel and airport records from Malta, exhibits in the 1000 series involve Frankfurt airport, and so forth. Certificates have been assigned the same number as the exhibit to which they correspond, with the letter "-c" appended. For example, Exhibit 701 is a purchase order and delivery notes for several items of clothing sold by Eagle Knitwear Co. Ltd. to Mary's Place, while Exhibit 701-c is a pair of § 3505 certificates signed by employees of Eagle Knitwear.

Finally, we note that in many cases, a witness executed a single certificate that covered multiple exhibits. In those instances, for ease of reference, the government has included a separate copy of the certificate for each corresponding exhibit. For example, the certificate that corresponds with Exhibits 1004, 1005, and 1018 is submitted as Exhibit 1004-c, Exhibit 1005-c, and Exhibit 1018-c.[1]

1.  <u>Records from Malta</u>

The conspirators introduced the bomb suitcase into the checked baggage system in Malta. The Maltese certified records relevant to this motion relate primarily to travel and clothing.

***Clothing -*** The bomb was packed inside a suitcase that was otherwise filled with clothing items, some of which the investigation revealed were purchased from a shop in Malta called "Mary's House." One of the government's expert witnesses will testify about his examination of the charred remains of these clothing items and his conclusion that they were inside the same suitcase as the bomb. The fact that these items were sold at a retail store in Malta is corroborative of the government's theory that Malta is where the bomb suitcase originated.[2]  The records related to the clothing include receipts and delivery notes from the clothing companies that manufactured

---

[1] At the time the various certificates were executed, the government's trial exhibit numbers had not yet been assigned; oftentimes, the certificates use a separate numbering system (such as "CP###," "D####" or "M-####") to match the documents with their corresponding certificates. At other times, the country certifying the records did not specifically list the records at issue on the certification form itself.  For purposes of this motion, the exhibits include the cover sheets showing the Crown Production number of each document; however, the government intends to omit these cover pages from the version of the exhibits that will be used at trial.  Likewise, the exhibits sometimes contain the original Scottish certificates of authentication that were used in their system. The government will remove these from the versions shown to the jury.

[2] The shopkeeper at Mary's House was interviewed during the original investigation and immediately recalled selling the items to a man he recognized as Libyan; he later identified Megrahi as the purchaser. Because the shopkeeper is now deceased, the government does not anticipate proving this fact at trial.

and/or sold the items to Mary's House.  These records are accompanied by certifications from representatives of the clothing companies.

*Travel* - The defendant and co-conspirator Abdelbaset al-Megrahi traveled to Malta on multiple occasions, including a trip from in late December during which the government alleges they equipped the bomb and placed it in checked luggage on Air Malta flight KM-180 with a tag that would route it ultimately to Pan Am Flight 103. On the day of the bombing, the defendant and Megrahi departed together on Libyan Arab Airlines flight LN-147, which had a check-in time overlapping with the check-in time for KM-180. There are various records related to the travel of the defendant, al-Megrahi and other co-conspirators that establish the extensive planning of the bombing. These records include flight manifests, airline records and hotel records.  These records are accompanied by certifications from representatives and/or employees of the airlines and the hotels.[3]

| Exhibit no. | Description |
| --- | --- |
| 701 | Eagle Knitwear Delivery Notes, 11.10.88 Mary's House, 11.9.88 Gauci's order |
| 702 | Eagle Knitwear Delivery Note, Mary's House 12.14.88 |
| 703 | Eagle Knitwear receipt 11.7.88, Puccini cardigan |
| 704 | Eagle Knitwear Delivery Note, Mary's House 11.10.88 |
| 705 | Eagle Knitwear receipt, Mary's House 2.19.85 |
| 706 | Universal Invoice, 8.30.84 |
| 707 | Slalom Logo |
| 708 | Johnson Clothing Ltd. Documents (Slalom) |
| 709 | Johnson Clothing Ltd. Documents (Slalom) |
| 710 | Johnsons Clothing Ltd. Invoice, 10.7.85 |
| 711 | Johnsons Clothing Delivery Note Grey Slalom |
| 712 | Yorkie Clothing delivery note, 11.18.88 |
| 713 | Certified true copy Yorkie cutting control book |
| 714 | Certified true copy Yorkie control delivery book |
| 715 | Abanderado invoice 1.26.88 |
| 716 | Mallia & Son invoice to Mary's House, 10.31.88 |
| 717 | Mallia & Son invoice to Mary's House, 11.25.88 |

---

[3] The government is enumerating the records to be admitted throughout the motion, but the actual records and their accompanying certifications will be digitally transmitted to the Court.

| 718 | Mallia & Son invoice to Mary's House, 12.20.88 |
| | |
| 801 | KM 231 Manifest 12.14.88 |
| 802 | Air Malta Mayfly, 12.14.88 week |
| 803 | Luqa Airport All Airlines Flight Schedule |
| 804 | KM 230 Manifest, Accepted Passenger List, 10.10.88 |
| 805 | LN 142 Manifest, 12.4.88 |
| 806 | KM 230 Manifest, 10.10.88 |
| 807 | KM 230 Passenger Lists, 12.17.88 |
| 808 | KM 140 Manifest, 10.10.88 |
| 809 | KM 180 Ramp Aircraft Progress Report, 12.21.88 |
| 810 | KM 231 Manifest, 12.20.88 |
| 811 | KM 180 Passenger List, 12.21.88 |
| 812 | Holiday Inn Log, 12.7.88 |
| 813 | Holiday Inn Registration Card, 10.18.87 to 10.20.87 |
| 814 | LAA Airside Passes |
| 815 | LN 146, LN 147 Flight Manifests 12.7.88 |
| 816 | LN 143 Manifest, 12.18.88 |
| 817 | LN 533 Manifest, 12.29.88 |
| 818 | LAA Timetables, Winter 1988 |
| 819 | LN 145 Manifest, 12.9.88 |
| 820 | LN 147 Manifest, 12.21.88 |
| 821 | Hilton Hotel card, Elwarshfani 1.10.86 |
| 822 | Holiday Inn registration card, 10.9.88 to 10.10.88, Megrahi |
| 823 | Holiday Inn departure list 12.9.88, Megrahi |

2. <u>Records from The Czech Republic</u>

On two separate occasions after the defendant and co-conspirator Megrahi traveled together to Malta, Megrahi continued onward from Malta to Prague, in what was then Czechoslovakia. The first such trip, which occurred in October 1988, was paid for by the Libyan Military Procurement Office. The second such trip, which occurred in December 1988 approximately just over a week before the bombing, was paid for by the Libyan Embassy to Czechoslovakia.

| Exhibit no. | Description |
| --- | --- |
| 903 | Account Reminder form to Libyan Jamahiriya |
| 904 | Intercontinental Hotel October 1988 |
| 905 | Letter from Libyan Military Procurement Office |

| 906 | Account Reminder form to Libyan Jamahiriya |
| 907 | Intercontinental Hotel Invoice December 1988 |
| 908 | Letter to Intercontinental Hotel from Libyan Embassy Prague |

3. Records from Germany

Frankfurt Airport in Germany is where the bomb suitcase was transferred from flight KM-180 to pan Am Flight 103A (PA-103A) en route to London Heathrow, a feeder flight for Pan Am Flight 103.[4] The records listed below are relevant to prove that transfer; specifically, they establish that an unaccompanied piece of luggage (that is, an item with no corresponding passenger) was transferred from KM-180 to PA-103A prior to the takeoff of PA-103A.

| Exhibit no. | Description |
|---|---|
| 1004 | Interline writers' sheet |
| 1005 | Baggage coders' worksheet |
| 1006 | Printout from "KIK" baggage computer system |
| 1007 | List of interline stations |
| 1008 | Passenger manifest for FRA-LHR leg of PA103 |
| 1009 | Baggage dispatch log sheet ([redacted]'s Worksheet) |
| 1011 | Flight coupons for FRA-LHR leg of PA103 |
| 1012 | Message to [redacted] 3/10/88 |
| 1013 | Message from [redacted] 3/28/88 |
| 1014 | Pan Am operations bulletin |
| 1015 | Pan Am operations bulletin 2 |
| 1016 | List of Pan Am loading crews 12/21/1988 |
| 1017 | Daily report for Frankfurt Airport computer system |
| 1018 | FA32 Duty Log |
| 1019 | KIK computer system daily reports for 12/21-22/1988 |
| 1020 | KIK computer system daily eval for 12/21/1988 |
| 1022 | Load Plan for FRA-LHR leg of PA103 |
| 1024 | Pan Am Telexes re Helsinki Warning |
| 1026 | Pan Am Procedures re Helsinki Warning |
| 1028 | Schematic of Frankfurt luggage system |
| 1031 | Alert security aircraft activity report |

---

[4] Germany is also relevant as the location of the La Belle discotheque, the target of a bombing perpetrated by the defendant and co-conspirators. Evidence relating to La Belle is addressed in a separate pleading, the government's Motions in Limine to Permit Rule 404(b) Evidence and for Rulings on Hearsay Exceptions.

4.  <u>Records from Senegal</u>

On February 20, 1988, two Libyan commandos were arrested in Dakar, Senegal, after being found in possession of explosives, weapons, and an MST-13 timer. As noted below, this type of timer, which was sold by a Swiss firm to the Libyan government, is the type that brought down Pan Am Flight 103. The evidence from Senegal links the use of MST-13 timers to the Libyan government. The certified record the government seeks to introduce in this motion help establish the arrestees' nationality, and it is noted in the table below.

| Exhibit no. | Description |
|---|---|
| 1403 | Record of Prisoner Transfer |

5.  <u>Records from the United Kingdom</u>

The bomb suitcase was transferred from flight Pan Am Flight 103A onto Pan Am Flight 103 at London's Heathrow Airport. The flight was then headed to JFK Airport in New York. Law enforcement obtained records that regarding the loading of Pan Am Flight 103, which is relevant to show where the bomb suitcase came from and where it was placed in the plane. These records are accompanied by certifications from people who prepared and relied on these records in 1988.

| Exhibit no. | Description |
|---|---|
| 1101 | PA 103 Closeout Sheet LURN 8656 |
| 1102 | Cargo Load Sheet PA 103 LURN 8661 |
| 1103 | PA 103 Final Weight and Balance Sheet LURN 8661 |
| 1104 | PA 103 Final load distribution document LURN 8662 |
| 1105 | PA 103 Load Plan LURN 8666 |
| 1106 | PA 103 Actual Load Plan LURN 8667 |
| 1107 | PA 103 Prelim Load Info LURN 18325 |

6. Records from Switzerland

Switzerland was the home of an electronics firm, which manufactured—and sold to Libya—the "MST-13" brand timer that the defendant used to detonate the explosive device that brought down Pan Am Flight 103.

***MEBO Supplier Records*** - During the course of the investigation, law enforcement obtained records relating to MEBO. These records included invoices from MEBO suppliers for the components of MST-13 timers. A list of the MST-13 supplier records that the government seeks to admit in this motion is below:

| Exhibit no. | Description |
|---|---|
| 1514 | Circuit Board and Plan for MEBO Timer |
| 1515 | Invoice for 12 Rose Housings |
| 1520 | Circuit Board Accounts and Invoiced Dated 13 August 1985 |
| 1530 | Delivery Note Dated 5 November 1985 |
| 1531 | Invoice dated 12 November 1985 |
| 1579 | Records from MEBO supplier [redacted] |

***Records from MEBO*** - Law enforcement also obtained records from or kept by MEBO. Those include records relating to business MEBO did with the Libyan government. MEBO also rented space to a Libyan firm known as ABH Holdings, which was run by a Libyan national, and the co-conspirator Megrahi, maintained an office on MEBO's premises related to ABH Holdings. Some of the records thus relate to MEBO's relationship with ABH. A list of MEBO-related records that the government seeks to introduce in this motion is below[5]:

| Exhibit no. | Description |
|---|---|
| 1513 | Circuit Drawing for MST-13 Timer |
| 1519 | Flight Ticket, Folio, Expense Report – December 1988 |
| 1525 | Check |
| 1526 | Draft Contract |
| 1529 | Master Photographic Negatives of MST-13 Timers |

---

[5] The government represents that, upon information and belief, these items were certified, but the government has not yet received a copy of that certification from the Swiss authorities.

| 1533 | Receipt for CHF 10,000 |
| 1534 | Receipt for CHF 10,000 |
| 1537 | Invoice Dated 26 November 1987 |
| 1539 | Export Declaration dated 10 February 1985 |
| 1541 | Export Declaration dated 17 July 1984 |
| 1546 | Letter of Invitation |

*Travel Records* – Megrahi and other Libyan nationals traveled to Switzerland on multiple occasions relevant to the bombing of Pan Am Flight 103. Records related to that travel have been certified by members of the Swiss government. The certification for these records tracks the requirements of Fed. R. Evid. 803(8), rather than 18 U.S.C. § 3505. A list of the Swiss travel exhibits that the government seeks to introduce in this motion is below:

| Exhibit no. | Description |
| --- | --- |
| 1549 | Swiss Visa Application dated 21 June 1988 |
| 1550 | Swiss Visa Application Dated 16 November 1988 |
| 1551 | Swiss Visa Application Dated 23 June 1988 |
| 1558 | Swiss Visa Application Dated 4 October 1987 |
| 1559 | Swiss Visa Application Dated 18 February 1988 |
| 1573 | Letter Dated 21 May 1987 in Support of Visa Application |
| 1574 | Letter Dated 20 June 1988 in Support of Visa Application |
| 1575 | Letter Dated 11 February 1988 in Support of Visa Application |
| 1576 | Letter Dated 22 September 1987 in Support of Visa Application |
| 1577 | Letter Dated 18 November 1988 in Support of Visa Application |

7. Records from Japan

The investigation into the bombing of Pan Am Flight 103 established that the improvised explosive device that destroyed the aircraft was secreted in a specific model of Toshiba radio-cassette recorder known as an "RT-SF16." Records obtained from the Toshiba Corporation help establish (1) that charred bits of circuit board recovered from the crime scene did in fact come from the family of Toshiba radio-cassette recorders that included the RT-SF16,

and (2) that during the time period of October 1988 to March 1989, nearly 76 percent of

Toshiba's worldwide sales of RT-SF16 radio-cassette recorders were to Libya.[6]

| Exhibit no. | Description |
|---|---|
| 1301 | Toshiba Printed Circuit Board Use List |
| 1302 | Toshiba Country Code List |
| 1305 | Toshiba Sales Reports |

### E. The Maltese "IRO cards" and Czech visa applications should be admitted as records of regularly conducted activity and public records.

A substantial portion of the government's exhibits from Malta are immigration cards from

Malta's Immigration Records Office, or "IRO cards," which were created and retained for

international travelers pursuant to Maltese law. These include "disembarkation cards" for

passengers arriving at Malta from other countries and "embarkation cards" for passengers

departing Malta for foreign countries. In each case, the cards were filled out at the point of

arrival/departure (here, Luqa airport), with the passenger completing some portions of the card and

an immigration officer completing the rest.   The cards recorded information including the

passenger's name, date of birth, nationality, address in Malta, passport number, and date and place

of arrival. An example follows:

---

[6] The Japanese witnesses signed a certification form in their native language.   The government will submit a blank copy of the English form that was translated into Japanese, along with the Japanese exhibits and certifications.

 

*Front of card*                                    *Back of card*

Similarly, the government intends to introduce immigration records maintained by the Czechoslovak government showing that Megrahi in fact traveled to Prague by air in October and December 1988. The records include routine biographical and travel details. An example is below:



At present, the government intends to call live witnesses from Malta and the Czech Republic to testify about the immigration records and has therefore not obtained § 3505 or Rule 902(3) certifications for these exhibits. Should the government later elect not to call a live witness on this topic, we would anticipate obtaining and submitting a certification for the records. Regardless, the Court can and should make a finding on the current record that the IRO cards will be admissible at trial, both as records of a regularly conducted activity under Rule 803(6) and as public records under Rule 803(8), if the government lays the foundation to authenticate them.

      1.   The immigration records are admissible under Rule 803(6).

The government has conducted recorded interviews of multiple Maltese witnesses who are each qualified to offer testimony that will satisfy all the requirements of Rule 803(6). For example, immigration officers who worked at Luqa airport in Malta in 1988 would testify that the IRO cards

were filled out as part of their regularly conducted activity at the time of the activity, and maintained in the regular course of their employment. The government has also conducted interviews of former employees of the Czechoslovak government, who established that the information in the Megrahi immigration records was regularly collected and stored by that government.

    2.   <u>The immigration records are admissible under Rule 803(8).</u>

In addition to being admissible as records of a regularly conducted activity, the Maltese IRO cards and Czech visa documents are also public records admissible under Rule 803(8). That rule provides for the admission of a "record or statement of a public office if… it sets out… a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel." Fed. R. Evid. 803(8)(A)(ii). Because "public offices" routinely engage in their own "regularly conducted activity," Rules 803(6) and Rule 803(8) can overlap. *See, e.g.*, *Ngamfon v. U.S. Dep't of Homeland Sec.*, 349 F. Supp. 3d 975, 980 n.1 (C.D. Cal. 2018) (ruling U.S. visa records admissible under both Rule 803(6) and Rule 803(8)). That is the case here.

The anticipated testimony of the Maltese witness(es) will establish that it was the legal duty of the immigration officers to ensure that an IRO card was completed for all arriving and departing passengers, and the Czech testimony will establish that the visa documents were routinely collected at border crossings and kept by the Czechoslovak government.

Moreover, Rule 803(3)(A)(iii)'s carveout in in criminal cases for "matter[s] observed by law-enforcement personnel" is not applicable here. That carveout exists because "observations by police officers at the scene of the crime or the apprehension of the defendant are not as reliable as observations by public officials in other cases because of the adversarial nature of the confrontation between the police and the defendant in criminal cases." Fed. R. Evid. 803, Advisory Committee

Note to 1974 Enactment. Consistent with that legislative purpose, courts have read the provision narrowly. *See, e.g.*, *United States v. Hansen*, 583 F.2d 325, 333 (7th Cir. 1978) (building inspectors not excluded); *United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) (medical examiners who make criminal referrals not excluded); *Manocchio v. Moran*, 919 F.2d 770, 777 (1st Cir. 1990) (medical examiner's autopsy report not excluded); *United States v. Edelmann*, 458 F.3d 791, 813-14 (8th Cir. 2006) (Federal Bureau of Prisons inmate systems manager not excluded); *but see United States v. Ruffin*, 575 F.2d 346, 356 (2d Cir. 1978) (excluding IRS records under law-enforcement personnel carveout). As multiple federal circuits have held, the analysis turns on whether the records in question "report the observation or investigation of crimes," in which case they are excluded, or whether they "merely document routine, unambiguous factual matters," in which case they are eligible for the public-records exception. *Edelmann*, 458 F.3d at 814 (quoting *United States v. Dancy*, 861 F.2d 77, 79 (5th Cir. 1988)). Here, the Maltese immigration officials were not law-enforcement officials in the strict sense, nor were they making "observations... at the scene of the crime[7] or the apprehension of the defendant." They were simply processing the "routine, unambiguous factual matter[]" of travelers entering and leaving the country.

**F.  Other applicable exceptions.**

Although the arguments above are sufficient to support pre-trial findings of admissibility for all of the exhibits covered by this motion, we offer the below authorities as additional bases for the Court to find that none of the records are excludable as hearsay.

    1.  <u>The Ancient Documents Rule.</u>

All of the above documents are admissible under the Ancient Documents exception, Rule 803(16), which applies to any "statement in a document that was prepared before January 1, 1998,

---

[7] Granted, the airport in Malta was among the many places where relevant offense conduct occurred, but it was not recognized as such until long after the fact.

and whose authenticity is established." In turn, Rule 901(b)(8) provides that a document can be proven authentic by "evidence that it: (A) is in a condition that creates no suspicion about its authenticity; (B) was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when offered." The records at issue in this motion were collected in a place where they would be expected to be, show no signs of inauthenticity, and are more than 20 years old at this point. The Scottish labels and Scottish certificates of authenticity attached to some of those documents lend circumstantial evidence to the government's argument about how the documents were collected.

    2.  <u>The Residual Exception.</u>

The residual exception provides that "a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804," as long as:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Courts have often admitted uncertified business records under the residual exception. For example, in *United States v. Turner*, the Third Circuit affirmed the admission of foreign bank records that were found in a co-conspirator's resident and office, where the district court had found the records trustworthy based on "(1) the appearance of the records, including their internal consistency; (2) the contents of the records; and (3) the circumstances surrounding the discovery of the records." 718 F.3d 226, 234-35 (3d Cir. 2013). In *United States v. Nivica*, the First Circuit affirmed the admission of foreign bank records where, despite the absence of any custodian or other qualified witness to lay foundation, the district court had found that the documents were

authentic, reliable, and trustworthy. 887 F.2d 1110, 1126 (1st Cir. 1989). In *Karme v. Comm'r*, the Ninth Circuit affirmed the tax court's admission of uncertified foreign bank records in the absence of a custodian where the records, which were provided by a foreign government pursuant to a treaty, had "circumstantial guarantees of trustworthiness." 673 F.2d 1062, 1065 (9th Cir. 1982). And in *United States v. Wilson*, the Fifth Circuit affirmed the admission of uncertified foreign bank records — despite apparent gaps, clerical errors, and a convoluted chain of custody — because the government offered some corroboration of their authenticity and because bank documents are inherently reliable. 249 F.3d 366, 375 (5th Cir. 2001) (abrogated on other grounds by *Whitfield v. United States*, 543 U.S. 209 (2005)).

Were the Court to find that the certifications at issue in this motion are insufficient or otherwise lacking, the Court should admit the records under the residual clause. Each of the records at issue in this motion was received pursuant to either a treaty or a formal request of a foreign government, Even if the certifications are deficient in some way, the existence of said certifications, combined with the fact that the government received them via treaty, and that many have Scottish labels and Scottish certificates of authenticity attached to them, provides more circumstantial guarantees of trustworthiness than the cases cited above that allowed admission of documents under the residual exception.

## CONCLUSION

For the foregoing reasons, the Court should admit the enumerated business records as properly certified foreign business records and should find that the Czech and Maltese immigration records are admissible if the government lays the proper foundation.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    ___*/s/ Conor Mulroe*_____
CONOR MULROE (NY Bar No. 5289640)
ERIK M. KENERSON (OH Bar No. 82960)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
National Security Section
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 740-4595
Conor.Mulroe@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys
Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530