**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD** | : | |
| **MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO**
**SUPPRESS STATEMENTS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's motion to suppress statements. As discussed below, and as the government will establish at the suppression hearing, the defendant's version of events is not true. The motion should therefore be denied.

**SUMMARY OF ARGUMENT**

The defendant has asked the Court to suppress highly relevant evidence of his guilt in two major terrorist attacks against Americans. The Court should decline to do so. A full examination of the evidence that will be adduced at the hearing on the defendant's motion will establish that this case lacks the "egregious facts" necessary to establish that the defendant's statements made during questioning by a Libyan police officer were involuntary. *See United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012). In short, the defendant's will was not overborne. *See*, *e.g.*, *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "Jurists and scholars uniformly have recognized that the exclusionary rule imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence." *Colorado v. Connelly*, 479 U.S. 157, 166 (1986). The evidence that the

government will present at the hearing, including testimony from the Libyan police officer who interviewed him and corroborating evidence spanning back to 1986, is more than sufficient to establish that the defendant's statement was given voluntarily. The facts proffered by the defendant will not withstand scrutiny at an evidentiary hearing. Instead, the government's evidence will establish that the defendant's custodial statements in Libya were voluntary, reliable, and accurate. In the fall of 2012, the defendant made a voluntary statement to a Libyan police officer ("the Officer") in which he admitted to having built the bomb that killed 270 people aboard Pan American World Airways Flight 103 ("Pan Am Flight 103") and on the ground in Lockerbie, Scotland, on December 21, 1988, and to having built the bomb that killed three people and injured scores more at the La Belle Discotheque in West Germany on April 5, 1986. The Officer, following the established procedures that he had used hundreds of times before to take statements as part of his routine law enforcement duties, wrote a report of what the defendant said, read it back to the defendant, gave the defendant an opportunity to make any changes, and watched the defendant sign each page of it, confirming its accuracy. In his statement, the defendant described his career arc as a long-time member of the External Security Operations (ESO), outlining the details of operations in which he had taken part: not only the attacks on Pan Am Flight 103 and the La Belle Discotheque, but also aborted attempts to assassinate the U.S. Secretary of State and the Egyptian President. The defendant's statement was one of seven similar statements taken by the Officer in the fall of 2012 from Qaddafi-era intelligence operatives—each one, essentially, a mundane recitation of the interviewee's *curriculum vitae*.

The defendant's current story, proffered in his motion, raises more questions than it answers. The defendant claims that the Officer asked him only leading questions. But the defendant's statement—like the six others taken from intelligence operatives at the same facility

2

by the Officer—evinces a lack of leading questions and a lack of pressure applied to the interviewees. At one point in the defendant's statement, for example, he denied committing crimes against the Libyan people during the 2011 revolution; the Officer did not challenge that denial. Similarly, other interviewees declined to answer questions or denied participating in operations, and the written statements show that the Officer respected their denials and declinations.

The defendant also claims that he was held incommunicado and in isolation, and that detainees in Libya were subjected to inhumane treatment. Again, the defendant's story is inconsistent with the Officer's observations of the facility at which the interview took place. The defendant was interviewed in a detention facility in Libya following the fall of Muammar Qaddafi, at a time when the country was in a state of chaos and the nascent government did not yet have control of facilities like prisons or military bases. While there have been allegations that many similar facilities subjected their prisoners to torture, the Officer will testify that he observed no such torture or signs thereof at this particular facility. The defendant and the other intelligence operatives detained there—who were housed in the same room, in contrast with the defendant's allegation of solitary confinement—appeared to the Officer to be in good health, and to have access to necessities and to news about the outside world through a television.

The defendant further claims to have "had nothing to do" with a script allegedly foisted on him by three masked men. Why, then, is his statement corroborated by extrinsic evidence in ways that would have been nearly impossible for these three masked men to have fabricated? Evidence adduced at the hearing and at trial will show the defendant's statement to the Officer is corroborated by a host of evidence that had been gathered in the late 1980s, close in time to the Pan Am Flight 103 and La Belle Discotheque attacks, but decades before the defendant's admission. Those records include immigration and flight records substantiating that the defendant

went to Malta before departing on the morning of the bombing on the same flight as one of the co-conspirators he names in his statement. Records collected by the East German government corroborate not only the defendant's admission that he traveled to that country to perpetrate the attack on the La Belle Discotheque, but they also corroborate the identity of the person the defendant told the Officer he had traveled with, Abdulhakim Shadi, another member of the ESO. No one but the defendant or his inner circle would have known Shadi's identity, much less the unidentified masked men that the defendant claims coerced him into admitting his role in this crime. Even mundane details from the defendant's statement—including details about his time at the Postal Section of the intelligence services—were corroborated by other Qaddafi-era intelligence operatives interviewed by the Officer.

The four corners of the defendant's own statement to the Officer raise even more questions about the version of events proffered in his motion. If the defendant was ordered to confess to the Lockerbie incident and one other terror attack, and told to stick to the one-page script he was given, why did he admit to participating in five ESO operations outside of Libya? If this was a frame job aimed at former Qaddafi officials, as defendant asserts, why was the defendant permitted to deny committing offenses during the 2011 revolution inside of Libya? Why did they not coerce him into confessing to the domestic crimes with which he was, in 2015, charged, convicted, and sentenced to serve ten years in jail in Libya? Relatedly, if this was a frame job aimed at former Qaddafi officials, why was the defendant not charged in Libya with crimes related to Pan Am Flight 103 or the La Belle Discotheque? If the goal was to humiliate the Qaddafi regime, why did the Officer hold onto the statement for three years, and why was it then only provided to the Scottish government in response to a specific request in 2017?

The details that the defendant offers to substantiate his claim of coercion will not stand up to scrutiny. The evidence adduced at the hearing will establish that the defendant's will was not overborne when he was asked open-ended questions by the Officer about topics such as his career in Libyan intelligence and what operations he participated in outside of Libya. The testimony that the government will present will be corroborated by independent evidence that will establish its veracity and reliability. The proffer of facts from the defendant, by contrast, is implausible on its face and will be unsupported by reliable independent evidence. After a full hearing on the merits, the Court should conclude that the defendant's confession is voluntary and admissible at trial.

<p style="text-align:center">*　　　*　　　*</p>

## TABLE OF CONTENTS

Summary of Argument .................................................................................................... 1

Facts ............................................................................................................................... 7

    A.    The defendant was detained legitimately and humanely. .................................. 7

    B.    The defendant gave a voluntary interview according to standard procedure. .... 9

        1.    The Officer's background and assignment ........................................... 9
        2.    The interview process ...................................................................... 10

    C.    The defendant admitted to the Pan Am Flight 103 bombing and
        other attacks. ................................................................................................ 13

    D.    The defendant's statement matches the documentary record. ......................... 15

    E.    Years later, the statement reached U.S. authorities. .......................................... 17

Argument ...................................................................................................................... 19

    A.    Legal Standards. ............................................................................................ 19

    B.    The Court should not credit the defendant's proffered story. .......................... 20

        1.    The defendant must establish the facts he proffers through competent
            evidence subject to cross-examination. ............................................. 20
        2.    Even if the defendant presents evidence consistent with his proffer, his
            account does not bear scrutiny. ......................................................... 21
            a.    The defendant's story is inconsistent with the Officer's account. ............... 21

            b.    The defendant's story is inconsistent with the accuracy of the statement. ... 22

            c.    The defendant's story is inconsistent with the statements of other
              interviewees. ................................................................................. 23

            d.    The defendant's story is implausible on its face. .......................... 24

    C.    Reliable evidence will establish that defendant's statement was voluntary. .... 25

        1.    The defendant is a mature, intelligent professional. ........................... 25
        2.    The Officer's questioning was entirely non-coercive. ....................... 27

Conclusion .................................................................................................................... 30

## FACTS

This prosecution arises from the bombing of Pan Am Flight 103 on December 21, 1988. The plane exploded over Lockerbie, Scotland, shortly after taking off from London Heathrow Airport *en route* to John F. Kennedy International Airport in New York City, killing 270 people. The government anticipates proving that the defendant, an operative of the Libyan External Services Organization (ESO), a branch of the Libyan intelligence services, engineered a bomb that was packed inside a suitcase and placed into checked baggage at Luqa Airport in Malta for a flight to Frankfurt, Germany. The suitcase traveled from Malta to Frankfurt, then from Frankfurt to London, where it was loaded onto Pan Am Flight 103, bound for New York, prior to exploding.

Following the fall of the Muammar Qaddafi regime in 2011, the defendant and other ESO operatives were detained and questioned about their roles in various undertakings of that regime. During that interview, the defendant admitted to his role in the bombing of Pan Am Flight 103, the April 5, 1986, attack on the La Belle Discotheque, in West Germany, and other ESO operations from the 1980s. The resulting signed statement is the subject of the defendant's motion to suppress.[1]

The following sections summarize the facts that the government anticipates proving at the suppression hearing.

### A.  The defendant was detained legitimately and humanely.

After the revolution in Libya in 2011, the country's former government—an authoritarian regime headed by Muammar Qaddafi—ceased to exist. As the Officer who took the statement will

---

[1] The statement was hand-written in Arabic and signed by the defendant. A copy of an English translation of that statement is attached hereto under seal as Exhibit A. In its original format, this exhibit contained footnotes with commentary from the translator.  Those footnotes have been removed in this version.  The original version, with the footnotes, was provided to the defense in discovery.

testify, this sudden disappearance of formal government power meant that facilities like prisons and military bases were for a time administered by various militant groups that had formed during the revolution.

At the same time, there was a nascent government that was attempting to establish the rule of law. The country held elections in July 2012 and the Transitional National Council, which had served as an interim government since November 2011, handed over power to an elected parliament, the General National Congress (GNC), on August 8, 2012, and a prime minister was sworn in on November 14, 2012. Libya 2012 Human Rights Report at 1 ("2012 HR Report"), *available at* https://2009-2017.state.gov/documents/organization/204585.pdf (last visited September 22, 2025). This government did not control large swaths of the country, but it nonetheless existed; people were appointed to cabinet-level positions, and it functioned as the recognized government of Libya. Meanwhile, many people who had been civil servants under the Qaddafi government, like the Officer, retained their titles and positions, and carried out their duties to the best of their ability given the changed circumstances.

Against this backdrop, the defendant and other former members of the Qaddafi regime were taken into custody and investigated for domestic crimes against the Libyan people. This detention served two purposes: First, it was an effort by Libya's new government to ascertain the full extent of atrocities committed by the Qaddafi government, especially in its brutal attempts to repress the revolution, and to hold the responsible individuals accountable. Second, it protected the detainees from the unofficial violent reprisals that were then taking place across the country against former regime members.

The defendant was interviewed at a former military installation in City A ███████, where he was detained along with approximately six other former ESO officials. As noted in the reports

cited by the defendant, conditions at the detention facilities "varied widely." 2012 HR Report at 6. The facility where the defendant's interview took place, however, was well run. The installation was, at the time of the interviews, run by a group that the Officer has described as a militia. The militia in charge of the facility was able to keep its location secret, which afforded a measure of protection to the former ESO operatives detained there. As detailed below, the Officer had the opportunity to observe how the facility was run before he began his interviews. He noted the militia were well organized, wore uniforms, and took orders. He observed that when he gave them orders they carried out his instructions without asking questions. The room in which the defendant and his former colleagues spent most of their time was equipped with fans, windows, and a television (which they were permitted to watch). Detainees had opportunities for recreational time and to wash clothing, and they were permitted to request specialized food and things like juice. The Officer noted that the guards did not use handcuffs when escorting the detainees and that the detainees generally wore clean clothes. Based on the Officer's observations, the facility that the defendant was at held at during his interviews was one of the best available during the chaos of the post-revolution period, and it was the safest place for the defendant and the other ESO operatives to be, given the extent of street violence and anti-Qaddafi sentiment prevailing at the time.

**B. The defendant gave a voluntary interview according to standard procedure.**

    1.   <u>The Officer's background and assignment</u>

The Officer graduated from a Libyan academy that included training in various subjects relevant to law enforcement, including Libyan law, weapons training, and physical training. After graduating from the academy (over a decade prior to the fall of the Qaddafi regime), the Officer held various roles in Libyan law enforcement, including ███████████████████

███████████████████████████████████████

████████████████████████████████. Around the time of the interviews, he worked in a Directorate of Security ███████████████████ in City A, which was under the auspices of the ████████████████ Throughout his career, the Officer has conducted hundreds of interviews under Libyan procedure in investigations of various sizes, including in major narcotics and murder cases. The Officer learned how to conduct interviews by studying documents and Libyan court cases; following police investigations; and watching how the Libyan prosecutor's office handled investigations.

The Officer was tasked via letter from the ███████████████, in September 2012, to interview the detained ESO operatives. In later telephone conversations with ████████, the Officer learned the identities of those he would be interviewing, as well as the reason for the interviews: to determine whether any of the detainees were involved in December 22, 1992, crash of Libyan Arab Airlines Flight 1103, near Tripoli International Airport. There had previously been speculation that the Qaddafi regime was involved in that crash, and the Officer was therefore assigned to interview former members of that regime to determine whether those members were in fact involved in the crash. The instructions provided to the Officer included nothing about the attacks on Pan Am Flight 103, or the La Belle Discotheque, or any other operations outside Libya. Indeed, prior to conducting the interviews, the Officer knew no more about the Lockerbie airliner bombing, or the Berlin night club bombing (as the defendant worded them) than what he had heard on the news.

2.  The interview process

On the first day of the interviews, the Officer traveled to the facility where the defendant and his fellow ESO operatives were detained, and he met all the prospective interviewees together. The Officer confirmed their names, ranks, and positions within Libyan intelligence. The Officer observed that the individuals were all detained in the same room, which had fans and a TV, and

that the detainees were able to speak to each other. The Officer observed no signs of torture or coercion during this initial interaction with the detainees, although he did come to the conclusion that many of them appeared to be afraid of one of their fellow former ESO operatives (*i.e.*, afraid of each other, not of their captors).

During the investigation, the Officer concluded that the ESO operatives he was interviewing were not involved in the crash of Libyan Arab Airlines Flight 1103, but he also learned during the course of his interviews that the detainees were involved in major acts of terrorism, which surprised him. He reported to the ███████████ that the detainees were not involved in Flight 1103, but he decided to continue his interviews, given the gravity of what he had learned to that point.

Following this initial meeting, the Officer embarked upon individual interviews with each former ESO member detained at the facility. The individual interviews took place on the premises of the facility where the defendant and other operatives were detained. The Officer was unarmed during these interviews. The room in which the interviews took place had windows, and the interviewees, including the defendant, were not restrained. During the individual interviews, when he had the opportunity to observe each detainee for a significant period of time, the Officer did not notice signs of torture or coercion.

The Officer proceeded to interview each of the ESO operatives using procedures he had learned during his training and his years of experience with the Libyan law enforcement services: he first had a discussion with each operative where he learned what operations that operative was involved in during his time in the ESO, what we will refer to for purposes of this motion as the "oral interview." He then wrote up what he learned, and he returned with a written statement, which he read back to each witness. The witnesses were afforded an opportunity to read it as well

and, regardless of whether they took that opportunity, they were afforded an opportunity to make corrections. For purposes of this motion, we will refer to that second procedure as the "written interview." At the conclusion of the written interview, each witness signed every page of the written account, affirming its accuracy, and the Officer signed the last page. A copy of an English translation of each of the interviews produced by the Officer will be filed under seal as Exhibit B.[2]

These interviews generally were not lengthy. The Officer was unarmed in the interview room, and he appeared in plain clothes. The interviewees were not restrained, and they were afforded their rights under Libyan law, including the right not to answer questions. Indeed, one of the former ESO operatives declined to speak further to the Officer after answering some basic background questions, and the Officer ceased questioning at that point. Ex. B at 76. The reports of interviews generally followed a similar formula: the Officer asked each detainee about his biographical details and his work history. He would then ask about the operative's career in the ESO, including departments worked in and individuals worked for. He would then ask an open-ended question about what operations the witness had participated while working for the ESO. *E.g.*, Ex. B at 4, 14, 28, 35, 51, 62, 76. Depending on the witness's answer to the open-ended question, the Officer would then ask appropriate follow-up questions.

The Officer recorded the substance of what the interviewees told him regardless of whether those statements were incriminatory. The report produced by the Officer included admissions like those made by the defendant to terrorist attacks, but also negative responses to whether the operatives had participated in operations, for example Ex. B at 10, 28, and allegations made by

---

[2] Exhibit B contains the defendant's interview as well. Exhibits A and B were translated by different translators, and, as such, the English text is not identical, but they were translated from the same underlying Arabic-language document.

detainees that they had been recently tortured. (Ex. B at 31). The defendant did not make any such allegation to the Officer. *See generally* Ex. A.

The interview of the defendant took place over two days. The Officer observed the defendant, looking for any signs of ill-treatment, and he did not observe any. The defendant appeared in excellent health, he showed no difficulty understanding what was asked, and he spoke with confidence. The Officer asked the defendant whether he consented to be interviewed, and he freely gave his consent. The Officer neither offered anything to the defendant, nor threatened him with any consequences if he failed to cooperate. After the interview, the Officer read the statement back to the defendant before the defendant signed each page of it, confirming its accuracy. During the interview, the defendant was afforded a lunch break, and he was afforded both an opportunity and the proper facilities to pray.

### C.  The defendant admitted to the Pan Am Flight 103 bombing and other attacks.

The interview of the defendant followed the same general plan as the other six: The Officer elicited background details about the defendant and his career in the ESO, and then asked, "Have you ever participated in the carrying out of any intelligence operations or of any other kind outside Libya?" Ex. A at 4. The defendant's answer, without any further prompting, was that he had "participated in a number of operations, among them the Berlin night club bombing and the Lockerbie airliner bombing, as well as the attempted assassination of the American Secretary of State in Pakistan, and also an operation in Saudi Arabia to cause a type of disorder, a so-called 'open operation.' I also participated in training a number of Ghanaians from Ghana in how to handle explosives – 'preparing them and combatting them.'" *Id.* The Officer then went on to ask specific, open-ended questions about each of these operations, to which the defendant provided detailed responses.

With regard to the attack on Pan Am Flight 103, the defendant told the Officer that in the winter of 1988, he was directed by one of his superiors in the ESO to travel to Malta with a booby-trapped suitcase prepared by the Technical Operations Section. *Id.* at 6. The defendant described the suitcase as a medium-sized Samsonite suitcase used for carrying clothes when traveling. *Id.* at 7. The defendant recalled being informed that Abdelbaset Al-Megrahi and Al-Amin Fhimah would meet him in Malta. *Id.* at 6. He traveled to Malta as instructed, and after three or four days in a hotel, Megrahi and Fhimah met him and instructed him to wake up at 7:00 a.m. the following day and set the timer in such a way that the explosion would occur exactly eleven hours later. *Id.* at 6-7. The defendant was given $500 and told to purchase clothes to put in the suitcase instead of his own, which he did. *Id.* at 7.[3]

On the day of the attack, the defendant traveled to Malta Airport, where he stood near the platform for loading passengers' luggage, and he saw Megrahi and Fhimah pass in front of him. *Id.* Fhimah moved to an airside position, and he signaled to the defendant to hand him the suitcase, which the defendant did. *Id.* The defendant received a boarding card for a flight from Malta to Tripoli, and he departed on that flight back to Libya. *Id.* The defendant explained that Fhimah was able to receive the suitcase airside, near the conveyor belts, because he had access as an employee of the Libyan airline. *Id.* at 8. Although the defendant did not know the specific target of his "booby-trapped" suitcase, he knew that the attack would be directed at Americans. *Id.* at 7-8.

---

[3] The government alleged in its original indictment of co-conspirators Megrahi and Fhimah that Megrahi purchased clothes that went into the suitcase, and a witness (now deceased) who testified at the Scottish trial of Megrahi and Fhimah identified Megrahi as the purchaser of many items of clothing that were forensically determined to have been in the suitcase containing the bomb. That evidence does not foreclose the possibility that the defendant also purchased clothes that were placed in the suitcase.

With respect to La Belle, the defendant stated that he was summoned by a superior in the ESO named Said Rashid, who asked him to travel to East Germany to meet a security officer at the Libyan Embassy there. *Id.* at 4. While at the embassy, the defendant was informed by the security officer that he was to prepare an explosive package to be used against an American target. *Id.* The defendant then prepared the explosive package and explained to the security officer how to set the detonation timing device. *Id.* at 5. That evening, as German news stations covered the bombing, the security officer nodded his head, and the defendant knew that his bomb had carried out that attack. *Id.*

The defendant also detailed his personal and professional history to the Officer. He was over 60 years old at the time of the statement, he had a secondary school certificate, and he was married with six children. *Id.* at 1, 15. He joined the ESO in 1973. *See id.* at 2. From there, he eventually rose to the rank of colonel prior to the revolution. *Id.* In the course of his career with the ESO, which he worked for continuously between 1973 and the fall of the Qaddafi regime, the defendant worked for both the Technical Operations Postal Security sections, within the Technical Affairs Directorate. *See id.* The defendant was head of the Postal Security Section until 2008, when he became Deputy Head of the Technical Affairs Directorate. *Id.* During the revolution, the defendant began unofficially running the Technical Affairs Directorate. *Id.*

### D. The defendant's statement matches the documentary record.

Through a decades-long investigation, U.S. and Scottish authorities have collected an enormous amount of evidence relating to the bombing of Pam Am Flight 103 and the La Belle Discotheque. If the defendant were presented by revolutionaries with a one-page pre-written factual recitation regarding something he knew nothing about, as he claims, it would be unlikely that minute details of the resulting interview would be corroborated. A comparison of the

defendant's admission against the documentary record confirms the accuracy of certain details that the defendant told the Officer. For example:

The defendant told the Officer that he traveled to Malta in the winter of 1988, a few days before the bombing. Ex. A at 6. The government possesses Maltese Immigration Records Office (IRO) cards showing that the defendant entered Malta on December 7 and 14, 1988 (the latter was seven days before the bombing).

The defendant told the Officer that, after handing the suitcase to Fhimah, he received a boarding card for a Libyan flight to Tripoli, which was scheduled to depart was around 9:00. *Id.* at 7. The IRO cards and flight records show that the defendant left Malta for Tripoli on the day of the bombing, December 21, 1988, on the same flight as co-conspirator Megrahi, who was traveling under a pseudonym.[4] The records confirm that the flight to Tripoli was open for check-in from 8:50-9:50 a.m., a period overlapping with the check-in period for Air Malta Flight 180, which carried the bomb-rigged suitcase from Malta to Frankfurt.

The defendant told the Officer that Fhimah was able to have airside access because he was a member of the Libyan airline. The government possesses a copy of a Fhimah's Luqa Airport airside access badge, valid through December 31, 1988 (even though he stopped working for the airline in October 1988), which was seized from his office in Malta.

Likewise on the La Belle Discotheque bombing: the defendant told the Officer that, when he traveled to East Germany in April 1986 to carry out the bombing, he traveled with an individual named Abdulhakim Shadi. The government possesses records of the East German Ministry for State Security ("MfS," or the "Stasi") establishing that the Libyan Embassy requested an East

---

[4] The records show that the defendant traveled under his true name – just as he described in his admission. *See* Ex. A at 14.

German visa for the defendant and Shadi, with travel dates from April 3 to May 2, 1986.[5] *See* ECF 147 (government's motions *in limine* regarding La Belle) at 20-22. The records further show that the defendant and Shadi stayed together at the Interhotel Metropol from April 4-5, 1986, overlapping with the date of the bombing in the early morning hours of April 5, 1986. *See id.* at 22-23.

The evidence collected across the La Belle and Pan Am Flight 103 attacks corroborates the defendant's statement in more subtle ways as well. For example, the defendant stated that he acted on the orders of Said Rashid with respect to the La Belle Discotheque attack. Although Rashid did not factor into the defendant's statement regarding Pan Am 103, investigators learned as early as 1990 that Rashid was involved in ordering 20 prototypes of the timing device that ultimately triggered the detonation that brought down Pan Am Flight 103. Additionally, forensic evidence establishes that the bomb that brought down Pan Am Flight 103 was placed in a specific model of Toshiba radio-cassette recorder. Toshiba records establish that the majority of Toshiba's sales of those radio-cassette recorders were made to Libya during the relevant period, and that its contract for those sales was with the Libyan Electric General Company, a company owned by Rashid.

### E.  Years later, the statement reached U.S. authorities.

Following the interviews, the Officer knew that the report of those interviews that he produced—the report attached hereto in translated form as Exhibit B—contained highly sensitive information. Given the chaos and political instability in Libya, the Officer did not want to alert anyone he could not trust to its existence. He did not even tell the ███████████. The Officer instead held onto the report, keeping it safe in his residence, for approximately three years,

---

[5] The passport number used on the Stasi documents matches the passport number listed on the defendant's Maltese IRO cards.

until he believed he had found someone he could trust within the Libyan government to give it to, a senior government official referred to here as "the Libyan Official." Once he found this trusted official, the Officer provided the report, approximately three years after he conducted the interviews. The Officer was not part of any further investigation involving the ESO operatives he interviewed in 2012.

Consistent with the Officer's account of having provided the statement to the Libyan Official approximately three years after the interviews he conducted in the fall of 2012, the statement first reached western authorities in the fall of 2015. In November 2015, Scottish authorities met with the Libyan Official and asked whether the defendant made any statements about Pan Am Flight 103. At the next meeting, in January 2016, the Libyan Official provided an oral summary of the defendant's statement. In January 2017, the Libyan Official provided Scottish authorities with a copy of the Arabic-language interviews that are attached in translated form as Exhibit B, accompanied by a letter signed by the Libyan Official. The Scottish authorities later provided copies of those documents, as well as English translations, to the United States.

The government is aware of no public reporting of the contents of the defendant's statement to the Officer prior to the unsealing of the complaint in this case, which occurred on December 21, 2020. Following the taking of the statement in 2012, the defendant and multiple other former Qaddafi officials were charged under Libyan law with crimes committed during the 2011 revolution, to include building bombs on behalf of the regime. In or around 2015, the defendant was convicted for his role and sentenced to 10 years' imprisonment. The Officer was not involved in that investigation or prosecution.  The United Nations Support Mission in Libya produced a 63-page report on that trial. Report on the Trial of 37 Former Members of the Qadhafi Regime (UNSMIL Report), *available at* https://unsmil.unmissions.org/sites/default/files/regime-trial-

report-english.pdf (last accessed September 24, 2025). That trial did not involve the statement at issue here, nor did it involve the Pan Am Flight 103 or La Belle Discotheque attacks. As reflected in the report, some of the defendants in the 2015 trial made allegations of torture or coercion through their attorneys. The defendant in this case, conversely, is only recorded in that report as it relates to the trial as having objected to his case not being severed from that of his co-defendants. *See* UNSMIL Report at 52.

## ARGUMENT

### A. Legal Standards.

"Jurists and scholars uniformly have recognized that the exclusionary rule imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence." *Colorado v. Connelly*, 479 U.S. 157, 166 (1986), (quoting *United States v. Janis*, 428 U.S. 433, 448-49 (1976)). "[T]he central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence." *Id.*, (quoting *Delaware v. Van Ardsall*, 475 U.S. 673, 681 (1986)). In the Fourth Amendment context, the Supreme Court has reaffirmed on multiple occasions that "exclusion has always been our last resort, not our first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009), (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) internal quotations omitted)).

"Statements obtained by foreign law-enforcement officers, even without *Miranda* warnings, generally are admissible, as long as they are voluntary." *United States v. Straker*, 800 F.3d 570, 614 (D.C. Cir. 2015) (quoting *United States v. Abu-Ali*, 528 F.3d 210, 227 (4th Cir. 2008) (internal quotation marks omitted)); *see also United States v. Yousef*, 327 F.3d 56, 145-46 (2d Cir. 2003); *United States v. Martindale*, 790 F.2d 1129, 1131 (4th Cir. 1986); *United States v. Nolan*, 551 F.2d 266, 273 (10th Cir. 1977); *Kilday v. United States*, 481 F.2d 655, 656 (5th Cir. 1973); *United States v. Chavarria*, 443 F.2d 904, 905 (9th Cir. 1971).

A statement is voluntarily taken so long as the defendant's will was not overborne. *See, e.g., Dickerson v. United States*, 530 U.S. 428, 434 (2000). Put another way, a statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *See Culombe v. Connecticut*, 367 U.S. 568, 602 (1961) (internal quotations marks omitted). "[E]gregious facts [are] necessary to establish that the statements [a defendant] made during questioning were involuntary." *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012)

In determining whether a defendant's will was overborne, courts should assess "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 69, (D.D.C. 2017), (quoting *Schneckloth*, 412 U.S. at 226. Relevant considerations include "the youth of the accused, his lack of education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id*. (citations omitted). "[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." *Khatallah*, 275 F. Supp. 3d at 69, *quoting Lego v. Twomey*, 404 U.S. 477, 489 (1972).

**B. The Court should not credit the defendant's proffered story.**

1. <u>The defendant must establish the facts he proffers through competent evidence subject to cross-examination.</u>

The defendant has proffered facts that he "anticipates would be adduced at a hearing." ECF 159 at 2 n.1. The defendant has indicated that he will present "testimony from witnesses to his arrest from his home in Tripoli by armed militia members in civilian clothes," ECF 159 at 5, but defendant has promised no corroboration of the facts at the heart of his motion, such as the defendant's supposed encounter with masked men who allegedly presented him with a pre-written confession to memorize. For the Court to consider the facts proffered by the defendant, it must

require those facts to be introduced by competent evidence that can be subjected to meaningful cross-examination.

Granted, at a suppression hearing, the Court is not bound by the Federal Rules of Evidence (except as to privilege), and hearsay is admissible. *See, e.g.*, *United States v. Straker*, 596 F. Supp. 2d 80, 84 n.4 (D.D.C. 2009). However, when it comes to the facts at the heart of the defendant's motion, the Court should give little or no weight to evidence that cannot be tested through cross-examination. That is especially so because of the importance of the facts at issue. The defendant's account of his supposed coercion is the lynchpin of his motion to suppress the statement that is critical to the jury's determination of the facts at issue. Given the importance of the Court's factfinding here, it is essential that both sides' evidence be subjected to rigorous scrutiny. *Cf. United States v. Abrego*, 3:25-cr-115, 2025 WL 1727738, at *11 (M.D. Tenn. June 22, 2025) (explaining that, when considering hearsay in detention hearing, "[t]he more critical the evidence is, the more demanding the measure of reliability").

      2. <u>Even if the defendant presents evidence consistent with his proffer, his account does not bear scrutiny.</u>

To be clear, even if the defendant presents evidence to support the facts described in the motion, the government will still refute his allegations of coercion, in multiple ways.

      a. <u>The defendant's story is inconsistent with the Officer's account.</u>

First and foremost, assuming the defendant presents evidence of the same facts proffered in the motion, that evidence will be irreconcilable with the Officer's testimony on critical points. For one thing, the Officer will testify that he asked open-ended questions to which the defendant gave detailed responses, while the defendant claims that the person who interviewed him supplied the details himself by posing leading questions that contained answers the defendant was forced to accept. For another, the defendant claims to have been held alone in a small room from his

arrival at the facility through the date of his interview, essentially in solitary confinement, while the Officer will testify that the defendant was housed with other ESO detainees in one room that, among other things, included a TV set.[6]

The government anticipates that the Officer will easily win the battle of credibility that results from these dueling accounts, not least because, unlike the defendant, he stands to gain or lose little of consequence because of his testimony. *See, e.g.*, *United States v. Gaines*, 457 F.3d 238, 244 (2d Cir. 2006) ("[A] testifying defendant in a criminal trial has a personal interest in its outcome that is as deep as it is obvious.").[7]

> b. The defendant's story is inconsistent with the accuracy of the statement.

Second, as noted in the Facts above, the statement signed by the defendant is consistent with extrinsic, independently provable facts, some of which would not have been known to anyone except the defendant and his closest accomplices. The extent of the corroboration prompts the

---

[6] The defendant also claims that he felt he had to comply with the alleged masked men's directive to confess because he had witnessed beatings in other prisons, because he personally knew about a friend's daughter who had been shot before his detention, and because he had seen bodies in the street on his way to the detention facility. The defendant does not specify what his understanding is of who shot this person or what group they were affiliated with. The defendant's subjective fear of non-state actors does not provide a reason to suppress his confession. *See Colorado v. Connelly*, 479 U.S. 157, 166 (1986) ("The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause"). Put another way, "the mere admission of a purportedly involuntary confession [without coercive conduct by law enforcement] at a criminal trial does not satisfy the state action requirement." *United States v. Elsheikh*, 578 F. Supp. 3d 752, 775 (E.D. Va. 2022), *aff'd*, 103 F.4th 1006 (4th Cir. 2024), (citing *Connelly*). The defendant's subjective fear that is not tied to state coercion does not provide a reason to suppress his statement. With respect to the alleged masked men, the defendant claims only that he could tell they were "revolutionaries," and he further contends that the Officer was "unaware" of all the allegedly coercive circumstances that led the defendant to be in the officer's presence. ECF 159 at 6. Even if the defendant's account is credited, if the actions of the masked men cannot be tied to the Libyan government or to the Officer (who was, in fact, a member of the Libyan government), the defendant's statement should not be suppressed.

[7] The defendant's bias is relevant whether he takes the stand or whether the information comes to the Court through a third-party relaying information the defendant told him or her.

question: Is the defendant claiming that the statement is false (in which case the authors must have benefited from an extraordinary series of coincidences)? Or does he concede that the statement, even if written for him and signed under duress, is true (in which case the authors must have been a highly select and knowledgeable cadre)? The closest the defendant comes to answering this question is his claim that he told the masked men he "had nothing to do" with the paper he gave them. But that claim is belied by the granular accuracy of the details of his admissions.

       c.   <u>The defendant's story is inconsistent with the statements of other interviewees.</u>

The defendant's statement, moreover, does not exist in isolation; rather, it is one of many written statements that resulted from the series of interviews conducted by the Officer. Taken as a whole, those statements strongly corroborate the Officer's account of events and refute the defendant's proffered version.

The questioning for all witnesses followed an orderly sequence, proceeded from background biographical questions to an open-ended prompt about what operations the witness participated in, followed by follow-up questions tailored to the responses the witnesses gave.

In the course of this questioning, witnesses occasionally gave self-exculpating statements, such as denying their participation certain operations, and when they did so the Officer generally accepted their "no" answer and did not challenge them. *See, e.g.*, Ex. B at 10 (Q. Did you participate in that operation? A. No. Never.); *id. at* 37 (Q. Did you participate in that operation? A. No I did not participate at all in that operation); *id.* at 28. In fact, the defendant himself gave one such exculpatory denial: when asked whether he "ever carried out any assassinations, bombings, or bobby-trap bomb attacks inside Libya," or whether he "carried out any acts against the 17th February revolution after it started," the defendant gave a denial on both points, allowing only that he had conducted telephone surveillance on the revolutionaries. Ex. A at 16.

Particularly illuminating is the final interview in the series, at the end of Exhibit B. In that statement, the Officer was questioning an ESO operative whom the defendant said was a part of the attempted assassination on the U.S. Secretary of State. Ex. B. at 75-76. The government expects the Officer to testify that this ESO operative declined to answer questions at a certain point in the interview, and this testimony is corroborated by the Officer's report, which stops abruptly early into the interview. *Id.*

On the whole, the written record of the interviews is not consistent with the sham process described by the defendant, involving a pre-authored set of facts that were extracted from the interviewee through leading questions. The collective interviews are instead entirely consistent with the voluntary, open-ended questioning that the Officer will testify he conducted.

Additionally, the different statements cross-corroborate each other. For example, one detainee stated that the Officer would need to ask the defendant about "mail and its link to the External Security Organisation."[8] Ex. B at 10. The defendant, in turn, gave a description of how the ESO monitored mail. Ex. A at 3. When the defendant described his participation in the aborted attempt to assassinate the U.S. Secretary of State, he named some of the other participants. One of those participants corroborated the defendant's account of that aborted assassination attempt. *Compare* Ex. A at 10-14 *with* Ex. B at 62-66.

> d.   The defendant's story is implausible on its face.

Finally, even on its own terms, the defendant's story defies logic and common sense. Even before being subjected to cross-examination, the account raises questions without plausible answers. For example, why, if the Officer was going to extract the confession by leading questions,

---

[8] Exhibit B is an English-language translation of a series Arabic language statement that uses British spellings. When quoting from the translations, the government will use the spellings used in the exhibit.

was it necessary to give the defendant a one-page document to memorize ahead of time? If the purpose was to discredit the Qaddafi regime, why didn't the confession involve offenses against the Libyan people (such as the plane crash that was the original purpose of the interviews or participation in operations during the 2011 revolution)? Indeed, why does the supposedly coerced confession include the defendant's specific *denials* of having committed crimes within Libya? [9] If the purpose was to frame the defendant for Pan Am Flight 103 and La Belle, why did the confession include details about other terrorist acts? And whatever conceivable purpose there was to coerce the defendant's confession, why did the Libyan government then do nothing with it for three years and, even then, not use the confession themselves but instead gave it to the Scottish authorities? Because of these internal problems, along with all the reasons identified above, the Court should reject the defendant's fictitious account of the interview.

**C. Reliable evidence will establish that defendant's statement was voluntary.**

Contrary to the incredible proffer offered by the defendant, the evidence at the hearing will affirmatively establish that the statement was fully voluntary – both because of the defendant's background characteristics and because of the circumstances of the questioning.

1. <u>The defendant is a mature, intelligent professional.</u>

A defendant's history and characteristics, including age, intelligence, and level of education, are relevant to the question whether allegedly coercive circumstances were sufficient to overbear his will. *See*, *e.g.*, *United States v. Roberson*, 573 F. Supp. 3d 209, 221 (D.D.C. 2021) (weighing age and education against a twenty-seven-year-old with a high school education); *United States v. Abu Ali*, 528 F.3d 210, 233 (4th Cir. 2008) (personal characteristics of an

---

[9] After the defendant's denial, the Officer did not push the point, but instead asked appropriate follow-up questions based on the answer the defendant did give. This sequence underscores the voluntary nature of the questioning conducted by the officer. *See* Ex. A at 16.

intelligent, well-educated man who could converse with his interrogators in Arabic did not render him susceptible to coercion or pressure). Here, the defendant's traits made him especially resistant to coercion.

When the defendant was interviewed, according to the date of birth he gave the Officer, he was approximately 61 years old.[10] Ex. A at 1. He had received a secondary school certificate, he was married, and he was a father of six children ███████████████████████████████████ ████████████████████████████████████ *Id.* at 1, 15-16. The defendant owned his own home and car, *id.* at 15, and he had worked in the Libyan government, specifically in the ESO, since 1973. *Id.* at 2. At the time of the fall of the Qaddafi regime, in other words, the defendant had been a Libyan government employee for approximately 38 years.

During the defendant's time in the Libyan government, he rose to be head of the Postal Security Section and Deputy Head of the Technical Affairs Directorate within the ESO. *Id.* The defendant's work in those sections involved security for VIPs and heads of state; overseeing the offices and officials of Libyan embassies abroad; and monitoring the telephones of embassies and international calls. *Id.* at 2-3. During these roles, the defendant undoubtedly had to become familiar with Libyan legal procedure generally. For example, he knew that "for domestic calls, monitoring and interception required written permission from an official of the Organisation and was for limited periods." *Id.* at 3-4. The defendant's status as a former high-ranking government official familiar with Libyan legal procedure made him less susceptible to coercion than an average detainee.

---

[10] The defendant stated he was born in 1951. Other records indicate potential dates of birth for the defendant in 1954 and/or 1943.

The defendant has also shown an unusual ability to act decisively while under intense pressure and facing potentially severe consequences. In his statement to the Officer, the defendant described his participation in an aborted attempt to assassinate a sitting U.S. Secretary of State at a state funeral in Pakistan. *See generally* Ex. A at 10-14. The plot involved the defendant detonating a booby-trapped overcoat that was to be worn by a different member of the party the defendant traveled with. *Id.* at 10-11. When the defendant realized that the would-be suicide bomber assigned to wear the coat did not know he was in fact carrying out a suicide mission, the defendant decided unilaterally not to carry out the attack. *Id.* at 11. The defendant did not push the trigger, despite his superior in the ESO being present and asking what was going on. *Id.* An intelligence operative willing to unilaterally decline to carry out a lethal assignment while in the presence of his superior in that intelligence organization is unlikely to be particularly susceptible to coercion or pressure.

2.  <u>The Officer's questioning was entirely non-coercive.</u>

The circumstances of the questioning likewise compel the conclusion that the defendant gave his admissions voluntarily. On this point, courts have considered factors like "the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Schneckloth*, 412 U.S. at 226; *see also United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (factors to be considered include the length of detention and the nature of the questioning).[11] Here, the questioning was neither lengthy

---

[11] The defendant notes that he was not given "anything equivalent to a Miranda warning" or advised of certain rights arising under the U.S. Constitution. ECF 159 at 25. That omission is immaterial, because the defendant was rightly advised of his rights under Libyan law, including his right to decline questioning. Foreign law enforcement officers are not required to apprise interviewees of their *Miranda* rights. *See, e.g.*, *United States v. Straker*, 800 F.3d 570, 614 (D.C. Cir. 2015). "[B]ecause the *Miranda* exclusionary rule would have little, if any, deterrent effect upon foreign police officers, courts have held that statements obtained from a defendant by foreign law enforcement officers, even without Miranda warnings, generally are admissible as long as they

nor aggressive, and physical punishments such as deprivation of food or sleep were not used at the facility where the Officer conducted his interview of the defendant.

To start, in the leadup to the interview there were no signs of mistreatment. The Officer observed the conditions of confinement prior to the interview, and saw that the defendant had access to laundry, television, and recreational time, among other things. He was housed with other men from similar employment backgrounds, and all appeared well-fed and relaxed. Consistent with those conditions, on the day of the interview the defendant appeared to be in good health, good spirits, and carrying himself confidently. In short, he was subjected to no "inhumane treatment," let alone the type of treatment described in the cases cited by the defendant. *See* ECF 159 at 24 (citing cases involving "depriv[ation] of food and sleep," "darkness and constant loud music," "poor nutrition," and "the screams of other prisoners").

The interview was conducted over two days, and the Officer did not notice any signs of distress from the defendant. The interview took place in a typical office-type room. The Officer was the only other person in the room, and he was unarmed. The defendant was not restrained. He was asked whether he consented to be interviewed, and he agreed. At no point during the interview did he ask to stop or otherwise revoke that consent. The defendant was able to understand what was asked, and neither inducements nor threats were made to the defendant during the interview.

In sum, the defendant was treated with respect and subjected to no coercion during his interview by the Officer. There are none of the "egregious facts" that are "necessary" to render the statement involuntary. *Mohammed*, 693 F.3d at 198. Indeed, even in cases involving treatment less gentle than the defendant received here, courts have declined to impose the extreme remedy of

---

are voluntary." *United States v. Straker*, 800 F.3d 570, 614 (D.C. Cir. 2015) (internal citations and quotations omitted).

suppression. *See United States v. Yunis*, 859 F.2d 953, 960-61 (D.C. Cir. 1988) (reversing the grant of a motion to suppress where the defendant was nauseous and exhausted from seasickness, stayed in a hot and cramped room, and had detailed and exhaustive questions posed to him over a period of four days); *Mohammed*, 693 F.3d at 196-98 (statement was voluntary where defendant was arrested by the Drug Enforcement Agency (DEA) and Afghan police at a checkpoint, handcuffed and blindfolded, and driven to a DEA base where he was questioned by three DEA agents, one of whom was armed, and falsely informed that his hands tested positive for heroin); *Roberson*, 573 F. Supp. 3d at 221-22 (statements were voluntary where interview took place in close quarters a car with three law-enforcement agents).

Suppression is not warranted in these circumstances. As the Supreme Court has made clear, suppression is an extreme remedy that "imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence." *Colorado v. Connelly*, 479 U.S. 157, 166 (1986). It should be used only as a last resort, where the conduct at issue is so egregious that the Court has no other options. This is not such a case.

## CONCLUSION

For the foregoing reasons, the Court should find that the defendant's statement was voluntarily given. His motion should be denied.

<div style="margin-left:40%">

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

</div>

By:    ***/s/ Erik M. Kenerson***
       ERIK M. KENERSON (OH Bar No. 82960)
       CONOR MULROE (NY Bar No. 5289640)
       BRITTANY KEIL (D.C. Bar No. 500054)
       Assistant United States Attorneys
       JEROME J. TERESINSKI (PA Bar No. 66235)
       Special Assistant United States Attorney
       National Security Section
       United States Attorney's Office
       601 D Street NW
       Washington, D.C. 20530
       (202) 252-7201
       Erik.Kenerson@usdoj.gov

       KATHLEEN CAMPBELL (MD Bar No. 9812170031)
       JENNIFER BURKE (MD Bar No. 9706250061)
       Trial Attorneys
       Counter Terrorism Section
       National Security Division
       950 Pennsylvania Avenue NW
       Washington, D.C. 20530