UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 1:22-cr-392 (DLF) |
| | ) | |
| ABU AGILA MOHAMMAD | ) | |
| MAS'UD KHEIR AL-MARIMI, | ) | |
| Defendant. | ) | |

**MR. AL-MARIMI'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS MOTION TO SUPPRESS STATEMENTS**

Abu Agila Mohammad Mas'ud Kheir Al-Marimi, through counsel, replies as follows to the government's response, ECF No. 163, to his motion to suppress statements, ECF No. 159:

**I.   A significant factual dispute exists between the parties.**

As is often the case when an accused challenges the voluntariness of his alleged confession, the parties do not agree on the facts. *See, e.g.*, *Jackson v. Denno*, 378 U.S. 368, 390 (1964) ("Expanded concepts of fairness in obtaining confessions have been accompanied by a correspondingly greater complexity in determining whether an accused's will has been overborne—facts are frequently disputed, questions of credibility are often crucial, and inferences to be drawn from established facts are often determinative. The overall determination of the voluntariness of a confession has thus become an exceedingly sensitive task, one that requires facing the issue squarely, in illuminating isolation and unbeclouded by other issues and the effect of extraneous but prejudicial evidence.").

1

The Court has already planned to hold an evidentiary hearing on this motion, and at that hearing, the government bears the burden of proving by a preponderance of the evidence that Mr. Al-Marimi's alleged confession was voluntary. *See, e.g.*, *Lego v. Twomey*, 404 U.S. 477, 484 (1972) ("a judge would admit into evidence only those confessions that he reliably found, at least by a preponderance of the evidence, had been made voluntarily"). Further, for the confession to be admissible at trial, the government must also establish "[a]ll elements of the offense . . . by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." *Smith v. United States*, 348 U.S. 147, 156 (1954).

## II. Mr. Al-Marimi's account of his interrogation aligns creditably with independent investigations into custodial interrogations and conditions in Libya after the fall of the Qaddafi government.

The government's response to Mr. Al-Marimi's suppression motion appears to center on the argument that what Mr. Al-Marimi alleges happened to give rise to his alleged confession is "implausible on its face". ECF No. 163 at 24. But such an assertion is belied by independent, extensive reports about the human and civil rights abuses that pervaded Libya's criminal justice system in the years following the 2011 political revolution in Libya.

For example, on pages 18 and 19 of its response in ECF No. 163, the government cites a 63-page report detailing the United Nations' findings about the criminal trial of alleged former members of Qaddafi's regime. The criminal process

2

detailed therein "was undermined by serious due process concerns during the pre-trial phase and the trial proceedings." U.N. Support Mission in Libya and Off. of the U.N. High Comm'r for Hum. Rts., *Rep. on the Trial of 37 Former Members of the Qadhafi Regime* at 2 (Case 630/2012) (Feb. 21, 2017) ("February 2017 U.N. Report"), https://unsmil.unmissions.org/sites/default/files/regime-trial-report-english.pdf.

The United Nations investigation made several specific findings that apply with full force to Mr. Al-Marimi. Many of the defendants in Case 630/2012, of which Mr. Al-Marimi was one[1], were arrested without a warrant after armed fighters took over Tripoli, Libya in August 2011 and held by "a multitude of armed groups for prolonged periods of time". *Id.* Many of the defendants were detained for prolonged periods of time without being able to communicate with the outside world, including their own lawyers. *Id.* Many of the defendants were held in unofficial detention facilities surrounded by others who were exposed to torture and other forms of mistreatment. *Id.* "Of major concern are reports that initial interrogations of suspects were carried out by members of armed groups and other non-judicial actors, without the presence of lawyers, before the defendants were brought before the prosecutor." *Id.*

---

[1] The government has asserted that Mr. Al-Marimi appears in the February 2017 U.N. report only once. *See* ECF No. 163 at 19. Not true. The report also specifies that Mr. Al-Marimi was one of six defendants whom the United Nations investigators could not even find to interview about the conditions of their confinement despite several attempts until May 2014 when "they were transferred to Al-Jawiya Correction and Rehabilitation Institution in Misrata (Al-Jawiya prison)". *February 2017 U.N. Report* at 25 & n.25.

3

In October 2013, the United Nations issued a detailed report[2] about prison conditions in Libya after the 2011 political revolution in Libya. Despite efforts from the recognized Libyan government in 2012 "to bring under the authority of the State the armed brigades which emerged during the 2011 armed conflict, and which are in control of most detention facilities where torture takes place" and a law Libya passed in April 2013 criminalizing torture and "enforced disappearances", as of October 2013, "torture continue[d] in Libya". U.N. Support Mission in Libya and Off. of the U.N. High Comm'r for Hum. Rts., *Torture and Deaths in Detention in Libya* at 2 (Oct. 2013) ("October 2013 U.N. Report"), https://www.ohchr.org/sites/default/files/Documents/Countries/LY/TortureDeathsDetentionLibya.pdf.

The United Nations investigators observed:

> [Torture] is most frequent immediately upon arrest and during the first days of interrogation as a means to extract confessions or other information. Detainees are usually held without access to lawyers and occasional access to families, if any. The vast majority of an estimated 8,000 conflict-related detainees is also held without due process.
>
> From late 2011, the United Nations Support Mission in Libya (UNSMIL) has recorded 27 cases of deaths in custody where there is significant information to suggest that torture was the cause, and is aware of allegations about additional cases which it has not been able to fully investigate. Eleven of the 27 cases, detailed in this report, took place in 2013, all in detention centres under the nominal authority of the Government but effectively under the authority of armed brigades.
>
> The current situation of prolonged detention and interrogation at the hands of armed brigades without experience or training in the handling of detainees or in conducting criminal investigations, and no effective

---

[2] The February 2017 U.N. report cites this October 2013 report. *See February 2017 U.N. Report* at 2 n.1.

> judicial oversight, is a major factor in facilitating the torture or other ill-treatment of detainees.

*Id.* at 2. Even after national elections in Libya in July 2012, "the armed brigades remain[ed] in effective control of territory and State functions, including detention and interrogation, and many have swelled their ranks since the Revolution." *Id.* at 4. "Armed groups were paid salaries by successive governments and some were officially granted law enforcement and custodial functions under the Ministries of Justice, Defence or Interior." *February 2017 U.N. Report* at 8.

Because of concerns about the voluntariness of the alleged confessions, the Libyan prosecutor who tried Mr. Al-Marimi in Case 630/2012 assured the Libyan court that "he conducted new interrogations without any coercion and without relying on any initial interrogation records of armed groups." *Id.* at 2. But, the United Nations found such assertions provided minimal confidence "about how the defendants could have felt safe giving evidence to the prosecution, and indeed later the Court." *Id.* Many of the defendants in Case 630/2012 were "held incommunicado and in solitary confinement prior to their interrogation by the prosecution [and] were exposed to abuse and hindered in their right of contacting their lawyers to seek their assistance during interrogation sessions." *Id.* at 31. Although the Libyan prosecution "stressed that it did not use any records of preliminary interrogations conducted by armed groups, such interrogations may have led defendants to maintain their initial statements, even if given under coercion, give the possible threat of reprisals." *Id.* at 31-32.

5

The United Nations cited corroborating evidence for the concerns reported, including video clips, interviews, and on-site independent visits by U.N. officials. *Id.* at 5-6, 27-30. The "circumstances of the[ defendants'] detention in the hands of armed groups and the specific reports of threats by such group should the defendants change their statements raise[d] questions about how the defendants could have felt safe from possible retaliation when giving their statements to the prosecution, and indeed later the court". *Id.* at 30-31. Thus, rather than being "improbable on its face", what Mr. Al-Marimi has raised comports with what human rights investigators have determined happened, and condemned, to those detained in Libya in 2011 and 2012 after the Libyan revolution began in February 2011.

Whether a confession is a product of coercion in the first instance or a confession derived from a second interrogation tainted by earlier coercion, courts in the United States do not admit at trial involuntarily made statements. *See, e.g.*, *Missouri v. Seibert*, 542 U.S. 600, 613 (2004) (finding Fifth Amendment prohibits two-step interrogation process designed to hide earlier coercion, and observing "the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble"); *Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961) ("convictions following the admission into evidence of confessions which are involuntary . . . cannot stand . . . not because such confessions are unlikely to be true but because the methods used to

6

extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth."); *Lyons v. Oklahoma*, 322 U.S. 596, 605 (1944) ("A coerced confession is offensive to basic standards of justice, not because the victim has a legal grievance against the police, but because declarations procured by torture are not premises from which a civilized forum will infer guilt.").

Contrary to the government's assertion of implausibility, after a full evidentiary hearing in this case, it will be clear that Mr. Al-Marimi's alleged confession did not comport with the Fifth Amendment or due process and must be suppressed.

### III. The Libyan interrogator's account of Mr. Al-Marimi's alleged confession warrants extensive scrutiny.

The government spends much of its response bolstering what it perceives to be the truthfulness of the alleged confession. But, as this Court has observed before, "the 'probable truth or falsity of a confession 'is not a permissible standard under the Due Process Clause' on the 'question [of] whether the confession was voluntary and admissible.'" *See United States v. Karake*, 443 F. Supp. 2d 8, 50 (D.D.C. 2006) (quoting *Hutcherson v. United States*, 351 F.2d 748, 753 (D.C. Cir. 1965)); *see also United States v. Raddatz*, 447 U.S. 667, 678 (1980).

To be sure, courts may not admit unreliable confessions into evidence. *See* ECF No. 159 at 15; *see also Smith v. United States*, 348 U.S. 147, 155 (1954) ("An admission

7

which assumes this importance in the presentation of the prosecution's case should not go uncorroborated, and this is true whether we consider the statement an admission of one of the formal 'elements' of the crime or of a fact subsidiary to the proof of these 'elements.'"); *United States v. Stephens*, 482 F.3d 669, 673 (4th Cir. 2007) (reversing conviction where independent evidence did not corroborate confession); *United States v. Bryce*, 208 F.3d 346, 352-56 (2nd Cir. 2000) (same); *United States v. Baggett*, 890 F.2d 1095, 1097 (10th Cir.1989) (same); *United States v. Fearn*, 589 F.2d 1316, 1321-22 (7th Cir. 1978) (same).

But, the government's attempts to prop up the alleged confession by arguing that the Libyan interrogator's testimony is essentially unassailable will fail. Discovery alone makes clear that the Libyan interrogator's version of the alleged confession is rife with concerns about the Libyan interrogator's credibility. For example, the government has proffered that the Libyan interrogator was not instructed to question Mr. Al-Marimi about the Pan Am 103 explosion that is the subject of this case. *See* ECF No. 163 at 10. Yet, a letter dated ███████ ███████████████████████████████████████████████████████████████ ███ that accompanied Mr. Al-Marimi's alleged confession, made clear that the questioning of Mr. Al-Marimi and others was instigated to ███████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████

Further, the seeming lack of preservation of the alleged confession itself is highly questionable. When the Scottish authorities interviewed the Libyan interrogator in 2020 about Mr. Al-Marimi's alleged confession, the Scottish law enforcement officer asked two separate times: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Each time, the Libyan interrogator answered: ▓▓▓▓▓▓▓▓

Yet, when the Libyan interrogator met with members of the U.S. prosecution team and their law enforcement agents on April 22, 2024, the Libyan interrogator reported recording his questioning of Mr. Al-Marimi on his personal Nokia N73 cell phone. On May 3, 2024, the Libyan interrogator promised he would look for this cell phone ▓▓▓▓▓▓▓▓. On May 31, 2024, the Libyan interrogator reported that he had found the cell phone but was surprised to find that no recordings existed on the phone. He then gave the phone to U.S. law enforcement agents, who downloaded and examined the contents of the phone. To date, it does not appear that anyone has been able to locate any recordings of Mr. Al-Marimi's alleged confession.

This "missing" recording is all the more troubling given the government's very recent disclosure to the defense that the government does not have the original version of Mr. Al-Marimi's alleged confession. According to the Libyan interrogator, he handwrote a purportedly verbatim statement of his interrogation of Mr. Al-Marimi and then presented it to Mr. Al-Marimi to sign. When asked directly about the original version's whereabouts, the government responded that not only does it not have the original but that the Scottish law enforcement authorities received only a

9

photocopy of the alleged statement in 2017. Further, the government seems to surmise, but does not seem to know for certain, that unknown Libyan officials may have the original. Based on the government's admission, it is unclear to the defense whether ***anyone*** has the original version of this alleged statement.

The convenient timing of when the alleged written confession of Mr. Al-Marimi first surfaced begs close scrutiny as well. The government alleges that the Libyan interrogator questioned Mr. Al-Marimi on September 12, 2012. That was the day after a group of armed men attacked the U.S. Special Mission office in Benghazi, Libya, killing several American diplomats. The Libyan interrogator has reported that despite obtaining purportedly precise, concise, and highly inculpatory statements from Mr. Al-Marimi and others suspected to have been part of Qaddafi's regime, the Libyan interrogator did not tell anyone else about these statements for more than three years. Instead, he kept them tucked away in a private safe he kept at home (which he says is the same safe where he kept the Nokia cell phone with the purported recording of his interrogation of Mr. Al-Marimi, which has now simply vanished).

It was not until about six weeks after PBS's Frontline aired the third episode of a series titled "My Brother's Bomber", which identified Mr. Al-Marimi as a possible suspect in the Pan Am 103 explosion, that the Libyan interrogator apparently dug up these September 12, 2012, statements and showed them to someone else. The third episode aired publicly on October 13, 2015. On November 3, 2015, Scottish law enforcement officers met with a Libyan government official and asked specifically if the Libyan government official had any statements from Libyan witnesses who ▮

███████████ The Libyan government official said he would look into it. Ten days later, on November 13, 2015, the United States killed the leader of an insurgent militant group (ISIS) that was steadily gaining control of a coastal city in Libya.

In January 2012, Michael Morell—then the deputy director of the C.I.A.—and Michael Vickers—then the undersecretary of defense for intelligence—traveled to Libya to meet with the interim prime minister about building a Libyan intelligence service to fight groups the United States perceived as terrorists. Then, for the first time, on January 28, 2016, the Libyan government official informed Scottish law enforcement officials that the Libyan government official did indeed have copies of statements from individuals allegedly confessing to the Pan Am 103 explosion and other incidents. It was not until January 2017, however, that anyone from the Libyan government shared a photocopy of these alleged statements to foreign law enforcement authorities. This elongated timeline raises not only chain-of-custody concerns for the alleged confession document but also underscores the dubiousness of the Libyan interrogator's veracity.

After considering these facts and the evidence to be adduced at the suppression motion, the Court cannot place any meaningful weight on the Libyan interrogator's version of how he obtained a confession from Mr. Al-Marimi.

### IV. The government's proffered corroboration for the alleged confession does not provide the support the government asserts.

Furthermore, the extrinsic evidence that the government points to as corroboration for Mr. Al-Marimi's alleged confession does not carry the weight asserted. For example, the government argues that the statements of other

11

individuals that the Libyan interrogator interviewed on September 12, 2012, "strongly corroborate the Officer's account of events and refute the defendant's proffered version." ECF No. 163 at 23.

But, according to the February 2017 U.N. report, at least three of those individuals were held in similar conditions to Mr. Al-Marimi after the 2011 political revolution in Libya[3]. Other purported confessions, particularly ones seemingly obtained in the same coercive manner, on the same day, and from the same questionable interrogator, do not provide sufficient assurances of reliability. *See, e.g., United States v. Smith*, 348 U.S. 147, 155-56 (1954) (finding that where extrinsic evidence cast doubt on the accuracy of the alleged admissions, "the statement is one which should be carefully scrutinized in the light of the available ***independent*** evidence") (emphasis added); *Al Rabiah v. United States*, 658 F. Supp. 2d 11 (D.D.C. 2009). The same is true for when the government, as it seems to do here—*see* ECF No. 163 at 13-15, tries to corroborate the alleged confession by referring to other parts of the alleged confession. *See, e.g., United States v. Rodriguez-Soriano*, 931 F.3d 281, 290 (4th Cir. 2019) ("government cannot rely on a second uncorroborated confession

---

[3] *Compare* ECF No. 163 Ex. B at 1 ▮▮▮ *with February 2017 U.N. Report* at 25 n.25, 40, 59 (Said Ibrahim Sa'dallah al-Gharyani, Assistant Head of the Technical Operations Department with the External Security Organization); *compare* ECF No. 163 Ex. B at 26-27 ▮▮▮ *with February 2017 U.N. Report* at 25 n.25, 59 (Jamal Ali Hmeida al-Shahed, Technical Operations Department staff with the External Security); *compare* ECF No. 163 Ex. B at 60(B) ▮▮▮ ) *with February 2017 U.N. Report* at 59 (Mohsen al-Hadi Muhammad al-Lamuji who worked in technical operations with the External Security Officer).

as independent evidence corroborating an initial one, particularly where the second does nothing to 'fortify the truth of the confession' by offering further corroboration that a crime was committed.") (citing *United States v. Stephens*, 482 F.3d 669 (4th Cir. 2007)).

The government further argues that critical parts of the alleged confession could have been known only by Mr. Al-Marimi and therefore must be true. For example, the government makes much of evidence it proffers to show that Mr. Al-Marimi traveled with a man named Abdulhakim Shadi to East Germany in April 1986 to carry out a bombing at the La Belle Discotheque. *See* ECF No. 163 at 4, 16-17. According to the government: "No one but the defendant or his inner circle would have known Shadi's identity, much less the unidentified masked men that the defendant claims coerced him into admitting his role in this crime." *Id.* at 4. But, contrary to the government's assertion, the third episode of PBS's Frontline series "My Brother's Bomber" (which again, publicly aired on October 13, 2015, weeks to months before the alleged confession's existence came to light) clearly displays a typed East German Stasi document that not only names but purports to connect Mr. Al-Marimi with Shadi and the La Belle Discotheque bombing. *See* PBS Frontline, *My Brother's Bomber: Episode 3* from 26:00-26:44 (Oct. 13, 2015), https://www.pbs.org/wgbh/frontline/documentary/my-brothers-bomber/#video-3.

The other points that the government relies on to corroborate the alleged confession were also publicly reported before the alleged confession surfaced. *See* ECF No. 163 at 15-17. For example, Frontline posted an interactive guide to the "My

13

Brother's Bomber" series on September 30, 2015, which reported that Mr. Al-Marimi had allegedly traveled to Malta not long before the Pan Am explosion. *Compare* PBS Frontline, *Abu Agela "The Bomb Expert"* (Sept. 30, 2015) ("Abu Agela"), https://www.pbs.org/wgbh/frontline/interactive/bomber-dossier/ *with* ECF No. 163 Ex. A at 16-17. The same interactive guide reported that Mr. Al-Marimi obtained a travel card from Malta to Libya on December 21, 2015[4]. *Compare* Abu Agela *with* ECF No. 163 Ex. A at 17. The interactive guide also reported that Al-Fhimah—who had been charged with the Pam Am 103 explosion by Scotland and was acquitted—had worked as a station manager for Libyan Arab Airlines at Luqa Airport and Malta. *Compare* PBS Frontline, *Lhamen Fhimah "The Acquitted"* (Sept. 30, 2015), https://www.pbs.org/wgbh/frontline/interactive/bomber-dossier/#person/lhamen-fhimah *with* ECF No. 163 Ex. A at 18.

These public reports available worldwide shortly before Mr. Al-Marimi's alleged confession surfaced more than three years after it was allegedly made raise rather than quell more concern about the authenticity of the alleged confession.

V.  **The circumstances of a coerced confession do not have to amount to torture to warrant suppression.**

The government also argues that because Mr. Al-Marimi has not alleged that he was personally physically tortured, his alleged confession was not coerced. *See*

---

[4] The materials related to the Frontline series do not appear to publicly identify a specific time that the flight from Malta allegedly left for Libya on December 21, 1988. But, the Scottish verdict against Mr. Al-Marimi's purported co-conspirator Al-Megrahi publicly reported as early as January 2001 that the flight from Malta was "scheduled to leave at 10.20am." *Her Majesty's Advocate v. Al–Megrahi*, No. 1475/99 (High Court of Justiciary at Camp Zeist (Jan. 31, 2001)).

14

ECF No. 163 at 28. But, coercion sufficient to render a confession involuntary takes many forms. *See, e.g.*, *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) ("Interrogation tactics need not be violent or physical in nature to be deemed coercive. Psychological coercion is equally likely to result in involuntary statements, and thus is also forbidden.").

Unreasonable delays between a person's arrest and their arraignment have been deemed coercive. *See, e.g.*, *United States v. Wilson*, 838 F.2d 1081, 1085-87 (9th Cir. 1988) (finding unreasonable delay between arrest and arraignment for purpose of obtaining confession warranted finding that confession was involuntary); *United States v. Monroe*, 397 F. Supp. 726, 732 (D.D.C. 1975) (observing the "rule against unreasonable delay before arraignment was meant to prevent confessions being made because of the coercive effect of prolonged periods in isolated police custody"). Here, Mr. Al-Marimi was held in custody with minimal, if any, access to counsel and no arraignment for about a year before the Libyan interrogator says that he produced the alleged confession in this case. Such a delay was unreasonable and coercive.

Psychological coercion—such as precluding access to counsel and family or threats of harm to loved ones—has also been deemed to render a confession involuntary. *See, e.g.*, *Mincey v. Arizona*, 437 U.S. 385, 401 (1978) (observing that beatings and like treatment are not the only precursors of coerced confessions); *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) ("coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. A number of cases have demonstrated, if demonstration

were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion.'"); *Collazo*, 940 F.2d at 417 (finding that denigration of basic constitutional rights during interrogation can constitute coercion). Here, Mr. Al-Marimi was held for a prolonged period with no or minimal access to the outside world and under threat of harm to his loved ones if he did not comply with his captors' orders. Such conditions render any confession he made coercive.

The thrust of these holdings centers on our nation's commitment to ensuring that each person brought to court is provided all process due and to preserving the integrity of the individual rights underpinning our republic.

> As important as it is that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence. Thus, in cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will. This insistence upon putting the government to the task of proving guilt by means other than inquisition was engendered by historical abuses which are quite familiar.
>
> But neither the likelihood that the confession is untrue nor the preservation of the individual's freedom of will is the sole interest at stake. As we said just last term, 'The abhorrence of society to the use of involuntary confessions also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.'

*Blackburn*, 361 U.S. at 206-07 (internal citations omitted). Thus, the gravity of the case and the outcome of suppression is not a determinative factor. Rather, our society's devotion to upholding the rule of law is.

## VI. The question of an alleged confession's voluntariness is properly presented pretrial, and its purported reliability remains subject to challenge at trial if the Court allows the statement's admission.

While Mr. Al-Marimi has properly raised the voluntariness of his alleged confession pretrial, should the Court deny his motion at this stage, he retains the right[5] to challenge the lack of reliability of his alleged confession at trial. *See, e.g.*, *United States v. Raddatz*, 447 U.S. 667, 678 (1980) ("A defendant who has not prevailed at the suppression hearing remains free to present evidence and argue to—and may persuade—the jury that the confession was not reliable and therefore should be disregarded.").

## CONCLUSION

As set forth above and as in ECF No. 159, the circumstances of Mr. Al-Marimi's arrest, incommunicado detention, and captivity in a system well known for human rights abuses—including those he personally witnessed—render any statement he made during his Libyan captivity inadmissible. Further, the government will not be able to present reliable corroboration to justify the alleged confession's admission.

Respectfully submitted,

**ABU AGILA MOHAMMAD
MAS'UD KHEIR AL-MARIMI**

By: _____/s/_____
Whitney E.C. Minter
Va. Bar # 47193
Brooke Sealy Rupert

---

[5] Should the Court deny Mr. Al-Marimi's suppression motion, he also retains the right to challenge the admissibility of his alleged statement at trial—in whole or in part as applicable—under the Federal Rules of Evidence.

17

Va. Bar #79729
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
1650 King Street, Suite 500
Alexandria, Virginia  22314
(703) 600-0800 (telephone)
(703) 600-0880 (facsimile)
whitney_minter@fd.org (email)

Laura Koenig
Va. Bar #86840
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
701 E. Broad Street, Suite 3600
Richmond, Virginia  23219
(804) 343-0800 (telephone)
(804) 648-5033 (facsimile)
Laura_Koenig@fd.org (email)