**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:22-cr-392 (DLF)** |
| | ) | |
| **ABU AGILA MOHAMMAD** | ) | |
| **MAS'UD KHEIR AL-MARIMI,** | ) | |
| Defendant. | ) | |

**MR. AL-MARIMI'S MOTION TO DISMISS**
**FOR DUE PROCESS VIOLATIONS**

In November 2022, more than three decades after the mid-air explosion of Pan American World Airways Flight 103 ("Pan Am 103") in December 1988, the government charged Mr. Al-Marimi with crimes arising out of the aircraft's destruction. During the first decade, an extensive investigation took place. In the second, the government began investigating Mr. Al-Marimi's alleged involvement; meanwhile, memories began to fade, witnesses passed away, and investigative leads grew cold. Towards the start of the third decade, Mr. Al-Marimi purportedly confessed to his involvement—the evidentiary centerpiece of the government's case against him. But for the next nine years, Mr. Al-Marimi continued to waste away in Libyan prisons, his health and acuity suffering under conditions both the United States and the international community have described as human rights violations. Eventually, the government took steps to bring Mr. Al-Marimi to the United States for prosecution, and Libyan authorities readily complied. This substantial pre-indictment delay has prejudiced Mr. Al-Marimi's defense in violation of his due process rights. It borders on the impossible for Mr. Al-Marimi to investigate his

1

actions and whereabouts thirty years ago, let alone the government's allegations, whereas the government can rely on the fruits of a contemporaneous investigation and decades of preparation by an international cohort of prosecutors and police.

Additionally, material exculpatory evidence has been lost while the government waited to initiate this prosecution. First, according to Mr. Al-Marimi's interrogator, the interrogation was recorded on video. But that video, assuming it ever existed, has not been produced to the defense and reportedly has been lost or destroyed. While the exact contents of the recording are unknown, the potential exculpatory value is clear: Mr. Al-Marimi disputes the voluntariness and reliability of his purported statements, and the recording would reveal exactly what (if anything) was said and the conditions and mindset under which any statements were made. The destruction of the recording, following pressure from the United States on Libyan authorities to produce inculpatory evidence and with clear incentives for the Libyan authorities at the time to facilitate the U.S. investigation and eventual prosecution, reeks of bad faith—especially when the written statement was so carefully preserved. Second, the original copy of Mr. Al-Marimi's supposed written statement has not been produced; until it is, the defense assumes it, too, has been lost or destroyed. Testing of the original has patent potential value. Finally, other material physical evidence no longer exists, leaving the defense to rely on the reports and documentation prepared by law enforcement and government experts in lieu of independent testing and investigation.

The bad-faith loss of material, potentially exculpatory evidence independently has violated Mr. Al-Marimi's due process rights. To remedy these violations and vindicate the important rights at stake, the Court should dismiss the indictment.

## BACKGROUND

Thirty-seven years ago, Pan Am 103 tragically exploded over Lockerbie, Scotland. Immediately, authorities began an international investigation into the explosion to determine what happened and who was responsible. The first charges were filed in 1991 in Scotland against two Libyans, Abdel Baset Ali al-Megrahi and Lamen Khalifa Fhimah, on the theory that the explosion was an act of terrorism.

Even before those charges were filed, evidence already was disappearing. █

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ During the Scottish

trial, on September 28, 2000, a witness testified that he had seen "someone called

Masud," a "technical expert" at Luga Airport in Malta. *See* Scottish Trial Tr.

9/28/2000 at 7048, 7051–52 (USAO-014086, USAO-014089 – USAO-014091); *see* ECF

1-1, ¶ 7 (affidavit of FBI Special Agent Rachel F. Otto) (stating the "original

investigation [] uncovered the suspected involvement of a co-conspirator by the name

of 'Abu Agela Masud'"). ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ █ ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████ ████ █████████ ███████████████████████

███████████ ███████████████████████████

In 2011, a revolution in Libya deposed the country's longtime leader,

Muammar Qaddafi. Around the same time, the investigation into Pan Am 103

appeared to have stalled, and the victims' families grew frustrated. ████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████ █ █████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████ █  In short, the United States wanted progress in the Pan Am 103

investigation, and the Libyan authorities wanted continued U.S. assistance.

        During the Libyan revolution, Mr. Al-Marimi was taken captive for his alleged

involvement with Qaddafi's regime. He was interrogated ████████████████

███████████████████████████████████ about his possible involvement with a

different aircraft explosion. *See* ECF 125-3, ¶ 4; ECF 163, at 10 (discussing

interrogator's anticipated testimony). During this interview, Mr. Al-Marimi is said to

have confessed to his involvement in the Pan Am 103 explosion.[1] The interrogator

claims to have recorded the interview and kept both the confession and the video

recording in a safe for approximately three years before showing the statement to an

official he trusted. ECF 125-1, at 3; ECF 163, at 17–18; *see* ECF 175, at 9–10

(summarizing discovery about the recording).

████████████████████████████████████████████████████████

---

[1] Mr. Al-Marimi denies the voluntariness and reliability of any statements made in captivity during this period.



According to the government, Mr. Al-Marimi's purported confession "first reached western authorities in the fall of 2015" when Scottish authorities inquired about Mr. Al-Marimi to Libyan authorities. ECF 163, at 18. The FBI received a copy of the statement in approximately 2017 and began interviewing the interrogator directly in March 2020. ECF 1-1, ¶ 8; ECF 125-3, ¶ 6. The original written statement has not been produced. As for the recording, the interrogator stated in 2024 that he had located the recording device but could not locate the recording itself. *See* ECF 175, at 9. U.S. law enforcement downloaded and examined the contents of the device but also failed to locate the recording. *Id.*

Meanwhile, Mr. Al-Marimi remained in Libyan custody. In 2015, he was convicted in Libya for offenses relating to alleged activities during the Qaddafi regime and sentenced to 10 years' imprisonment. ECF 163, at 18. At the time, Libyan prison conditions and the treatment of prisoners were widely reported to be atrocious, rising

to the level of human rights violations. *See* ECF 159, at 8–13 (collecting government and independent reporting). ████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ ██ ████████████████████████████████████████████████

████████████████████████████████████ ███████ ████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

    Mr. Al-Marimi was not the only one suffering in Libyan custody. Defense investigation has revealed that at least four of Mr. Al-Marimi's fellow prisoners sadly passed away over the last decade: ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ These individuals were held at the same facilities as Mr. Al-Marimi at various times throughout his Libyan detention and incarceration and could have provided firsthand information about the conditions of confinement and their experiences being interrogated ████████████████████████████ in post-Qaddafi Libya. While the defense is still investigating the timing and circumstances of each man's death, investigation has confirmed that ████████████████████████████████

████, only a few months after the filing of the indictment.

    Several years later, on December 21, 2022, the United States partially unsealed its criminal complaint against Mr. Al-Marimi. ECF 11. The United States requested Mr. Al-Marimi's extradition from Libya in March 2021. *See* BBC,

*Lockerbie: Libya orders probe into suspect handover to US*, at 5 (Dec. 15, 2022) (USAO-00016819). In mid-2022, Mr. Al-Marimi was released from prison in Libya before being "seized at his home" on November 18, 2022, by forces loyal to Libya's Government of National Unity.[2] *See id.*; USAO-00016891–92, at 62–63. Grand jury proceedings began the day Mr. Al-Marimi was captured, and a true bill was returned on November 29, 2022. ECF 7. ███████████████████████████████ ████████████████████████████████████████ ██ ████ ███████████████████ The United States has averred that the government took "continuous efforts" to bring Mr. Al-Marimi into custody during the period between the complaint and the indictment. ECF 11 ¶4.

Thus, the pieces of the government's current theory began coalescing long ago, and the government's delays have prejudiced Mr. Al-Marimi's ability to defend against these charges, including by the loss of potentially exculpatory evidence.

## LEGAL STANDARD

The Due Process Clause of the Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. Among the guarantees of due process is "the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 94, 107–08 (1976). The constitutional guarantee of due process is sacrosanct, even and especially in cases alleging attacks

---

[2] There is no extradition treaty between Libya and the United States. The government has not yet provided discovery related to Mr. Al-Marimi's abduction and transportation to the United States, which was not undertaken pursuant to extradition procedures. The defense has requested but has not yet received "all documents and meeting/communication records/notes of negotiations made/agreements entered into to bring Mr. Al-Marim from Libya to United States in December 2022."

against the United States. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) ("It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad.").

Consistent with due process demands, the United States may not bring an accused to trial if a pre-indictment delay actually and substantially prejudiced the defendant's right to a fair trial and offends the "fundamental conceptions of justice which lie at the base of our civil and political institutions" and "the community's sense of fair play and decency." *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and *Rochin v. California*, 342 U.S. 165, 173 (1952)). Courts have long recognized that significant delay between an alleged crime and its prosecution may force individuals "to defend themselves against charges when the basic facts may have become obscured by the passage of time . . . ." *United States v. Marion*, 404 U.S. 307, 323 (quoting *Toussie v. United States*, 397 U.S. 112, 114–15 (1970)); *United States v. Parish*, 468 F.2d 1129, 1133 (D.C. Cir. 1972) ("[U]ntoward delay in notifying the accused of the charges to be pressed breeds unfairness by adversely affecting the preparation and presentation of his defense.").

To establish a due process violation based on pre-indictment delay, a defendant must show that the delay resulted in "actual prejudice to the conduct of the defense" and that the government either "intentionally delayed to gain some tactical advantage[,]" *Marion*, 404 U.S. at 325, or displayed "reckless disregard of circumstances . . . suggesting that there existed an appreciable risk that delay would

impair the ability to mount an effective defense," *United States v. Lovasco*, 431 U.S. 783, 795 n.17 (1977); *see also Betterman v. Montana*, 578 U.S. 437, 441 (2016) (stating the "Due Process Clause may be violated, for instance, by prosecutorial delay that is 'tactical' or 'reckless'") (quoting *Lovasco*). Prejudice may take the form of "either a loss of witnesses and/or physical evidence or the impairment of their effective use at trial." *United States v. Garcia*, 74 F.4th 1073, 1103 (10th Cir. 2023); *see also Barker v. Wingo*, 407 U.S. 514, 532 (1972) ("If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.").

In addition to protecting against prejudicial delay, the Due Process Clause also provides defendants with "a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed." *California v. Trombetta*, 467 U.S. 479, 485 (1984). To that end, the Supreme Court has set forth several layers of protections related to the government's handling of evidence.

First, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is favorable if it is either exculpatory or bears on the credibility of government witnesses. *United States v. Robinson*, 68 F.4th 1340, 1347–48 (D.C. Cir. 2023); *see Giglio v. United States*, 405 U.S. 150, 154 (1972) (impeachment evidence). And evidence is material "if there is a reasonable probability

10

that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Next, when evidence is lost or destroyed, due process is violated if the evidence's exculpatory value was apparent and the defense cannot obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489.

Finally, a due process violation also occurs when the government fails "*in bad faith* to preserve *material* and *potentially exculpatory* evidence." *United States v. McKie*, 951 F.2d 399, 403 (D.C. Cir. 1991) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). The defendant bears the burden of establishing the failure in bad faith to preserve material and potentially exculpatory evidence. *Id.* The line between *Trombetta* and *Youngblood* and the relevance of the government's good or bad faith turns on whether the lost evidence is exculpatory or only potentially exculpatory. *Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (distinguishing between "material exculpatory" evidence and "potentially useful" evidence). Evidence is "potentially useful" if it "could have been subjected to tests, the results of which *might* have exonerated the defendant." *Youngblood*, 488 U.S. at 57 (emphasis added).

Bad faith "cannot be inferred from the mere act of nonpreservation itself." *Untied States v. Taylor*, 312 F. Supp. 3d 170, 177 (D.D.C. 2018). In other words, "neither negligence nor incompleteness violates the Due Process Clause[.]" *Id.* at 179. However, bad faith is shown when the police "by their conduct indicate that the evidence could form the basis for exonerating a defendant.'" *United States v. Vega*, 826 F.3d 514, 533 (D.C. Cir. 2016); *see Youngblood*, 488 U.S. at 56 n.* (stating the

"presence or absence of bad faith . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed"). For example, the knowing or reckless disregard of procedures or common sense supports finding bad faith. *See United States v. Elliott*, 83 F. Supp. 2d 637, 647–48 (E.D. Va. 1999).

## ARGUMENT

Dismissal of the indictment is warranted for two related reasons. First, the government's significant delay in bringing these charges substantially prejudiced Mr. Al-Marimi's defense through the fading of memories, the loss evidence and witnesses, and the impairment of Mr. Al-Marimi's health and ability to assist in his defense. Because the delay was the product of at least a reckless disregard for its prejudicial effects on the defense—law enforcement tracked the status of witnesses and was aware that Mr. Al-Marimi's health was declining while he was imprisoned in Libya, and the government could have more vigorously pursued its investigation and capture of Mr. Al-Marimi—it violated Mr. Al-Marimi's due process right to a fair trial.

Second, the bad-faith failure to preserve potentially exculpatory evidence, including physical evidence and the video recording of Mr. Al-Marimi's purported confession, also violated the guarantees of due process and fundamental fairness. Scottish and, later, Libyan authorities participated in a joint investigation of Pan Am 103 along with the United States government. The failure of authorities to preserve critical physical evidence despite knowledge that the future prosecutions would be sought supports a finding of bad faith, particularly when contrasted against the

apparently meticulous preservation of evidence favorable to the prosecution. The Libyan interrogator, meanwhile, claims to have either lost or destroyed the recording of Mr. Al-Marimi's purported confession despite preserving a written statement that necessarily offers a more malleable record of what transpired. Such selective preservation, in the context of the ongoing international investigation, the relationships between the governments involved, and the pressure from the United States for inculpatory evidence, supports a finding of bad faith.

## I.       Prejudicial delay

Regarding pre-indictment delay, "the concern of the Due Process Clause is the erosion of the accused's capability to muster his response to the charges." *Parish*, 468 F.2d at 1134. Substantial delay that results in burdening a defendant with "the almost impossible task of trying to reconstruct [his] whereabouts, locate witnesses and documents and prepare a defense to events that occurred years ago" raises an important due process interest and demands scrutiny of the reasons for that delay. *United States v. Whitehorn*, 710 F. Supp. 803, 809 (D.D.C. 1989). When the delay was motivated by an intentional or reckless desire for tactical advantage, dismissal is the appropriate remedy. *Marion*, 404 U.S. 323; *Lovasco*, 431 U.S. at 789.

Here, decades passed between the alleged crime and the indictment. The explosion aboard Pan Am 103 occurred on December 21, 1988. Less than three years later, following an extensive international investigation and the reconstruction and testing of physical evidence that had spread over 770 square miles, Scottish authorities charged Megrahi and Fhimah. The pair were tried between 2000–2001.

But it would be another 20 years before the United States symbolically charged Mr. Al-Marimi on the 32nd anniversary of Pan Am 103, and another two years before he appeared in this district for prosecution. In total, approximately 34 years of pre-indictment delay elapsed. To put things in perspective, when the alleged crimes occurred, the Berlin Wall still stood and the World Wide Web had yet to link computers over the internet.

This extreme delay has resulted in substantial prejudice to Mr. Al-Marimi's defense. Investigating and defending against charges more than three decades after the fact is far more difficult than doing so close in time to the alleged events. At a high level, Mr. Al-Marimi is less able to defend against these charges because his own memories and the memories of his family, his acquaintances, and surviving witnesses have necessarily faded or vanished since the underlying events. It is commonly accepted that "memory decreases over time[.]" *Robertson v. McCloskey*, 676 F. Supp. 351, 354 (D.D.C. 1988); *see also Andrus v. Texas*, 590 U.S. 806, 820 n.4 (2020) (agreeing memory can decay "within a matter of days" and grows "exponentially" more problematic "the greater the time interval between the incident" and the recall). Accordingly, the Supreme Court has acknowledged that the inability of witnesses "to recall accurately events of the distant past" supports a showing of prejudice, with the caution that "[l]oss of memory . . . is not always reflected in the record because what has been forgotten can rarely be shown." *Barker*, 407 U.S. at 532.

This issue permeates the case, from the government's allegations of specific dates of travel, to the specific events alleged to have occurred in Malta, to the

discovery and identification of the timer component of the alleged bomb, to the alleged prior bad acts in Germany and elsewhere, to the purported confession. Each event that could have been tested through meaningful cross-examination of lucid witnesses in many instances is no longer possible. And most of the government's allegations could be rebutted by compelling alibis that are no longer an option due to spotty memories and the loss of documentary evidence.

For example, the government's interviews with the Maltese witnesses that the parties have discussed in the context of the 18 U.S.C. § 3505 foreign-documents briefing (ECF Nos. 148, 173, 183, 204, 229, 242) reveal a wide range of recall between witnesses. While some profess to have strong recall of the events at issue and their prior involvement in this case, others expressed uncertainty, confusion, and doubt when asked about events that took place decades ago. Even if the government does not intend to rely on the latter witnesses at trial, they represent a potential avenue of investigation that the defense no longer can pursue due to the passage of time. For a concrete example, during the Rule 15 deposition of Allen Feraday, the government's explosives reconstruction expert, Feraday was unable to independently recall the specifics of his review/report, which resulted in him reviewing it during his testimony. While the defense was able to cross-examine Feraday, because his own memory was poor, it was effectively an examination of his report. Had the details of Feraday's report still been fresh in his mind, cross-examination might have yielded more useful discoveries or inconsistencies.

Even at the time of the Scottish trial, the memories of key witnesses had begun to fade. Erwin Meister, the former partner of Bollier, testified that he had trouble remembering material information: "I have a problem with memory. Quite often I confuse things that weren't the way I believed they would have been, and then I think they were that way; and this is my main problem." USAO-000009113. For example, he testified that he could not recall the identities of his company's customers or their agents from the 1980s due to his "problem with [his] memory"—it was "too long ago." USAO-000009162. When pressed, he confirmed that he had previously informed the Scottish authorities of his memory problems, which were "getting worse." USAO-000009163.

Additionally, material witnesses have died, leaving the defense unable to examine the reliability of their recorded inculpatory testimony or elicit favorable testimony on key issues. Of note:

- Megrahi died in May 2012, following his compassionate release from Scottish custody. *Lockerbie bomber Abdelbaset al-Megrahi dies in Tripoli*, BBC, https://www.bbc.com/news/world-africa-18137896. Even if Megrahi did not testify on Mr. Al-Marimi's behalf at trial, he would have served as a valuable resource to the defense in understanding the government's evidence and its flaws by virtue of having participated in the previous trial and—according to the government and the Scottish verdict—been involved in the underlying events.

16

- Tony Gauci, the Maltese shop owner who was a key but problematic witness at the previous trial, passed away in October 2016. Herman Grech, *Maltese man who determined Lockerbie bombing trial dies*, Times of Malta (Oct. 29, 2016), https://timesofmalta.com/article/maltese-man-who-determined-lockerbie-bombing-outcome-dies.629403. Gauci sold clothing that was found among the crash debris and gave conflicting statements about the dates of the sales and the appearance/identity of the buyer of critical items of evidence.

- Ulrich Lumpert, the Swiss engineer, who served as the MEBO employee primarily responsible for technical matters: Mr. Lumpert was employed by MEBO from 1978-1994. He designed, constructed, and executed MEBO products. More specifically, Mr. Lumpert designed the MST-13 timer. USAO 000006386-000006388. Defense investigation surely would have involved an attempt to interview the designer of a critical piece of evidence, but he is believed to have passed away in 2021.

- ███████████████████████████████████████████████████
  ███████████████████████████████████████████████████
  ████████████████████████ *See* ECF 163-2 at 33, 75. These individuals could have corroborated Mr. Al-Marimi's account of his detention and interrogation, supporting his arguments for the suppression of his statements.

- Two men who were held with Mr. Al-Marimi in various prisons and detention centers in Libya from 2011 onward: ████████████████████████████████
  ██████ *See* ECF 163-2 at 29, 51, 68; Exhs. A & B. Again, these individuals

could corroborate portions of Mr. Al-Marimi's account of his time in Libyan custody, confirming the horrific conditions and human rights violations that contributed to the coercive pressures Mr. Al-Marimi faced prior to his interrogation.

- Other witnesses have yet to be tracked down. The defense investigation is ongoing, but it has proved difficult to date to locate several material witnesses, some of whom likely have passed away. For strategic reasons, the defense will not disclose the details of its efforts at this time or before the status of any such witness has been confirmed.

As the Supreme Court has observed, when "witnesses die or disappear during a delay, the prejudice is obvious." *Barker*, 407 U.S. at 532; *see also, e.g.*, *United States v. Barket*, 530 F.2d 189, 196 (8th Cir. 1976) (holding multi-year delay severely prejudiced the defense when potential witnesses were "dead or unable to recall circumstances that existed more than five years ago"); *United States v. Santiago*, 987 F. Supp. 2d 465, 485 (S.D.N.Y. 2013) (holding defendant "easily" met the standard for actual prejudice when the delay resulted in the unavailability of a key exculpatory witness); *United States v. Sabath*, 990 F. Supp. 1007, 1012 (N.D. Ill. 1998) (finding due process violation when key witness no longer had an independent recollection of the underlying events). All these witnesses died after Mr. Al-Marimi allegedly confessed, and most died after the government claims to have learned of his confession.

Important physical evidence has similarly been lost due to the passage of time. While the government has represented that the crash debris was catalogued and stored by Scottish authorities, *see* ECF 242-1, at 2 n.1 (Declaration of Paul Grainger), that is not the only material physical evidence in this case.[3] The government's case theory relies in part on how a suitcase from Malta moved through three airports before boarding Pan Am 103. However, relevant locations in Malta—including Mary's House, the store at which Mr. Al-Marimi or others allegedly purchased the clothing that was packed into the suitcase bomb, and the Luqa airport terminal from which the first flight allegedly departed—have closed or been substantially renovated, leaving the defense reliant on documentary materials and witness statements rather than independent investigation. Similarly, the baggage handling facilities at each airport have no doubt changed and been modified or moved. The government may not have been equipped to preserve airports of private buildings for decades, but had its investigation proceeded expeditiously to indictment, it would not have had to, and these locations would still have existed in states that could have provided material information and additional investigative leads for the defense.

Documentary evidence, too, has disappeared. During ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ While the contents of these files are lost to time, the value of the information is apparent, both for impeachment and further investigation into the

---

[3] At this time, the defense is not aware of the destruction of any material crash debris. The defense will promptly notify the Court if that changes.

company allegedly responsible for producing the timers used in Pan Am 103.

Finally, Mr. Al-Marimi's defense is hampered by his own mental and physical deterioration, almost all of which occurred during the years he spent in Libyan custody. Mr. Al-Marimi's eyesight has deteriorated significantly over the years, making it difficult even with magnification for him to review maps, photographs, or written documents. He has suffered numerous surgeries both during his Libyan incarceration and his American incarceration, leaving him with pain that can distract his attention during longer court proceedings. ██████████████

██████████████████████████████████████████

██████████████████████████████████ But it waited. And now, Mr. Al-Marimi is limited primarily in his ability to physically view and process physical and documentary evidence in ways that poses immense challenges to his defense team.

There is no reasonable explanation or justification for this prejudicial delay. The Scottish trial amply demonstrates that the overwhelming bulk of the evidence in this case was available to the government in 2000. As for Mr. Al-Marimi in particular, the government suspected his involvement for many decades and was confident of its suspicions for at least seven years prior to indictment. ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████ During the

Libyan revolution, Mr. Al-Marimi purportedly confessed at a time when the Libyan

authorities felt pressure from the United States to advance Western interests,

including the Pan Am 103 investigation. Finally, in 2017, the government obtained a

copy of the alleged confession. Still, the government did not seek an indictment until

2022 (five years later), an extradition order until 2021 (four years later), or even file

a criminal complaint until 2020 (three years later).

      Even if one assumes the "break in the case" for Mr. Al-Marimi's alleged

involvement was his purported confession—an assumption that is undermined by the

presence of several previously accessible leads, ████████ and the troubling

circumstances of Mr. Al-Marimi's interrogation that the defense maintains involved

coercion and leading questions—years passed between the government becoming

aware of that evidence and any effort to charge him or bring him to the United States.

No significant investigation took place over this period, and certainly nothing that

the government could not have pursued sooner. While the government need not bring

charges as soon as it is satisfied it has proof beyond a reasonable doubt, *see Lovasco*,

431 U.S. at 794–95, it cannot wait years with the knowledge that the suspect's health

and ability to defend against the charges are declining. In light of that knowledge,

the government's delay displays at least reckless disregard for the mounting

prejudice.

      The "inability of a defendant adequately to prepare his case skews the fairness

of the entire system." *Barker*, 407 U.S. at 532. Because a trial at this point would

infringe on the guarantee of a fair trial protected by the Due Process Clause of the Fifth Amendment, the Court should dismiss the indictment.

## II.    Loss or destruction of interrogation video

It is not surprising, given the extreme pre-indictment delay in this case, that evidence has been lost or destroyed over the years. Much that has been lost or destroyed cannot fairly be attributed to the government beyond its delay in bringing charges against Mr. Al-Marimi,[4] but that is not true for the video recording of the interrogation during which he allegedly confessed to a role in the bombing of Pan Am 103 and other Libyan security operations. The bad-faith failure to ensure the preservation of the interrogation video violated Mr. Al-Marimi's due process rights by depriving him of potentially exculpatory evidence which could have attacked the centerpiece of the government's case against him.

There is no question the video would be "potentially useful" evidence under *Youngblood*. Mr. Al-Marimi challenges the voluntariness and reliability of any statements he made in Libyan custody, and a recording of his alleged confession would have provided a trove of information about the interrogation itself, as well as Mr. Al-Marimi's mindset during it.

This case is analogous to *United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015), in which the Ninth Circuit found a due process violation based on the government's failure to preserve video footage of the defendant's illegal entry into the

---

[4] For example, the loss of the original documents the government claims link Mr. Al-Marimi to the La Belle disco bombing, *see* ECF No. 147, at 22, cannot be blamed on the government because nothing suggests the government was involved in the creation or destruction of those documents.

United States despite having notice of her planned duress defense. Regarding the potential exculpatory value of the video, the court found the recording may have shown the defendant taking a variety of actions that she claimed she performed "to make herself 'obvious' to law enforcement[,]" which would have been "particularly helpful" to establishing a key element of duress. *Id.* at 978. Additionally, the video could have "shed light on the extent to which [someone] was overseeing and controlling" the defendant and whether the defendant could have alerted inspectors at an earlier time. *Id.* Essentially, because the video may have supported the defendant's version of events, it was "potentially useful" to her defense. *See id.*

So too here. A picture is worth a thousand words, and a video comprises dozens of pictures every second. The interrogation video may have shown Mr. Al-Marimi appearing nervous, apprehensive, uncomfortable, tense, jumpy, subdued, or any combination of those states at various times. He may have been sweating; his language may have been stilted; he may have avoided eye contact; or he may have continuously glanced at a door or window. Depending on when the video began, the recording may have captured the behavior of the guards who escorted Mr. Al-Marimi. It may also have captured some of his interrogator's actions; at the very least, it would have captured the questions that were asked and the precise language of any responses. Any discrepancy between the recording and the written statement or the interrogator's descriptions of the conversation would provide powerful fodder for cross-examination and impeachment. *See Bagley*, 473 U.S. at 676 (rejecting any distinction between "exculpatory evidence" and "impeachment evidence") (citing

23

*Giglio v. United States*, 405 U.S. 150, 154 (1972)).

No comparable evidence is reasonably available. Without the video, Mr. Al-Marimi is left with the testimony of those involved in the interrogation—himself and his interrogator. Simple cross-examination is no substitute for potential impeachment evidence or a neutral recording of what took place. Without the ability to review the recording of what actually took place, Mr. Al-Marimi will be limited in his ability to contest government witness testimony. And while the testimony of third parties about the conditions detainees like Mr. Al-Marimi faced in Libya can provide circumstantial support for his version of events, its probative value is less than what would be provided by direct evidence in the form of a corroborating video. *See Elliott*, 83 F. Supp. 2d at 644 ("Only the physical item of evidence itself would enable the defendant to use the exculpatory potential of the destroyed evidence.").

Despite its obvious importance, the interrogation recording was lost or destroyed. The conduct of the interrogator in losing or destroying the recording supports a finding that he acted in bad faith. To start, this is not a case where the contents of the evidence were unknown to the party responsible for its loss; the Libyan interrogator witnessed what transpired. *Cf. Vega*, 826 F.3d at 533–34 (noting "the agents necessarily knew the results of their photo-array presentations and thus had actual knowledge whether such documents were actually (and not just potentially) exculpatory") Nor is this a case where the value of the evidence was unknown. Indeed, that a recording was made at all suggests the interrogator, before the interrogation began, considered the preservation of the non-verbal and non-

transcribable aspects of the interrogation to be important. According to the government, ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████ ██ ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ ██ ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████

Yet, after the interview, he kept the recording secret and did not share it. He did not create any backups. He did not check on it. He did not mention it to anyone, including his superiors, until years after the fact. It was not until he was asked to provide a copy of the recording to U.S. law enforcement in 2024 that the recording suddenly vanished. ██████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████  ████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ █ ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

Here too, *Zaragoza-Moreira* is informative. On the issue of bad faith, the Ninth Circuit focused on the fact that the law enforcement agent in that case who had failed to preserve the video evidence knew of its potential exculpatory value before its destruction. *Zaragoza-Moreira*, 780 F.3d at 979. The agent had interviewed the defendant shortly after her apprehension, and the defendant repeatedly alerted the

---

[5] The defense has further requested from the government "all documents and meeting/communication records/notes of communications from the U.S. and/or British governments to Libyan officials/citizens seeking information about Lockerbie from 2011 to 2016" but has not yet received further information.

agent "to her duress claim and the potential usefulness of the pedestrian line video footage" during that interview. *Id.* Even though the agent testified that she simply overlooked retrieving the video, the Ninth Circuit found bad faith because the record showed the agent "undoubtedly appreciated the significance of [the defendant's] claims" but nevertheless "made no attempt to view or preserve" the video before it was destroyed. *Id.* at 980.

Perhaps the most damning indication of bad faith is the preservation and continued availability of the written statement, which represents a controlled, manipulable, and inculpatory form of the same basic evidence. The written statement is inculpatory to its core; it represents the government's version of events, for both Pan Am 103 and other uncharged acts it blames on Mr. Al-Marimi. The fact that it is available while the potentially exculpatory recording that was made contemporaneously and supposedly stored under the same conditions by the same person, despite its obvious importance, strongly supports that the video was not preserved in bad faith. *See Vega*, 826 F.3d at 533–34 ("The Government's failure to retain records for witness identifications—records for which the inculpatory or exculpatory value seems obvious—is troubling.").

The government may argue it cannot be blamed for the actions of foreign authorities, including Mr. Al-Marimi's Libyan interrogator. But courts have recognized that the government is accountable for the conduct of foreign actors that work as part of a "joint venture" with the United States. *See United States v. Straker*, 800 F.3d 570, 615 (D.C. Cir. 2015) ("The 'joint venture' doctrine ensures that United

States law enforcement agents cannot circumvent their obligations under *Miranda* just by outsourcing custodial interrogation to foreign agents . . . ."); *United States v. Alexander*, 817 F.3d 1178, 1182 (9th Cir. 2016) (noting doctrine applies "[i]n the context of the exclusionary rule"). The doctrine applies when the governments undertake a "closely coordinated investigative effort[,]" such as when U.S. personnel actively or substantially participate in the foreign conduct or have the foreign officials act as their agents or virtual agents. *Straker*, 800 F.3d at 616.

Here, there is no question the United States and Scotland are cooperating such that the actions of Scottish authorities are equally constrained by the U.S. Constitution. The American prosecution relies heavily on the evidence that was collected, presented, and preserved by Scottish authorities for the Scottish trial. *See* ECF 242-1, at 2, 8–10 (describing Scottish activities and noting materials were provided to the U.S. Department of Justice pursuant to a Mutual Legal Assistance Request for Mr. Al-Marimi's prosecution). The two countries have worked together at every step, pooling resources, sharing leads, and synthesizing information. Indeed, investigators often refer to the joint nature of this long-running investigation. *See, e.g.*, ECF No. 1, ¶ 6 ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

As set forth above, U.S. and Scottish officials have for decades employed Libyan government officials to ferret out evidence about Lockerbie. As also discussed above, the purported confession was obtained, and the video created, at a time when

the U.S. government was facing pressure to make progress in the Pan Am 103 investigation and the Libyan authorities then in power desired to maintain a positive and mutually beneficial relationship with the United States during a period of civil strife. Notably, the interrogator was instructed to interview Mr. Al-Marimi—the interrogation was a directive from higher up. And the statement that he produced was *exactly* what the United States wanted: wholly inculpatory, crystal clear, and seemingly conclusive as to *multiple* ongoing investigations that had stumped the international community for decades. In any event, after the provision of the written statement to the United States, the relationship deepened, to the point where the interrogator began working directly with U.S. prosecutors and law enforcement. The government cannot reasonably claim that it bears no responsibility for the circumstances of this breakthrough in its case.

The loss or destruction of the video permanently deprived Mr. Al-Marimi of his due process right "to use all evidence which tends to exculpate him of guilt of the charges against him[,]" *Elliott*, 83 F. Supp. 2d at 641 (collecting cases), and to receive a fair trial with a "verdict worthy of confidence," *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Accordingly, the superseding indictment must be dismissed.

Before concluding, the defense emphasizes that it has not yet had an opportunity to formally cross-examine the Libyan interrogator. That process will reveal additional information, some of which will likely contradict what is known to date about the creation, preservation, and loss of the video, as well as the circumstances of the interrogation more generally and the nature of the relationship

between the United States and Libya during the relevant period. Likewise, the evidence adduced at the upcoming suppression hearing will likely provide additional information relevant to the potential exculpatory value of the lost video.

### III.    Loss and destruction of other potentially exculpatory evidence

Two other ways in which evidence has been lost or destroyed bear mention. First, the original written copy of Mr. Al-Marimi's purported statement has not been produced. The government has represented that it believes the statement remains in Libya, but until it is produced or otherwise verified, the defense assumes that it, like the video, has been lost or destroyed. The potential usefulness of the original writing is clear. Independent testing could verify facts about the statement's creation that might undermine the interrogator's version of events, including through the collection of forensic evidence. At the same time, the original signatures could be examined and compared against Mr. Al-Marimi's in a more reliable way. A copy is not an effective substitute and does not offer the same manner of information. The ongoing failure to provide the original, despite its obvious utility, suggests bad faith; there is no justification for withholding it unless there is something to hide, and if it no longer exists, there is a strong inference that something has been hidden.

Separately, and decades before Mr. Al-Marimi allegedly confessed, foreign authorities destroyed evidence from other attempted bombings that would have been very valuable to the defense. ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████ no expert can examine the physical object to determine if subtle clues show they are not MEBO timers or provide a basis to distinguish them from MEBO timers.

In another instance, ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██ ████ Examination and testing of these devices, which hold obvious exculpatory value in that they appear to show non-Libyan groups used similar tactics close in time to the alleged bombing, would have proved highly valuable. Again, simple documentation is no substitute for original forensic evidence or the ability to independently assess the similarities between pieces of equipment. While the seeming destruction of the devices was purportedly undertaken pursuant to official policies, the fact that they were destroyed at all despite the ongoing international efforts to investigate and prosecute those responsible for Pan Am 103 supports bad faith.

## <u>CONCLUSION</u>

It is highly unusual for a criminal case to proceed to trial a decade after the underlying events, let alone multiple decades. The long delay leading up to this prosecution and the loss of potentially exculpatory evidence has impaired Mr. Al-Marimi's ability to defend against the charges, in violation of his due process right to a fair trial. Dismissal of the indictment is warranted.

Respectfully submitted,

Geremy C. Kamens,
Federal Public Defender

By: _____/s/_____
Whitney E.C. Minter
Va. Bar # 47193
Brooke Sealy Rupert
Va. Bar #79729
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
1650 King Street, Suite 500
Alexandria, Virginia  22314
(703) 600-0855 (telephone)
(703) 600-0880 (facsimile)
Whitney_Minter@fd.org (email)

Laura Koenig
Va. Bar #86840
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
701 E. Broad Street, Suite 3600
Richmond, Virginia  23219
(804) 343-0800 (telephone)
(804) 648-5033 (facsimile)
Laura_Koenig@fd.org (email)