UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 1:22-cr-392 (DLF) |
| | ) | |
| ABU AGILA MOHAMMAD | ) | |
| MAS'UD KHEIR AL-MARIMI, | ) | |
| Defendant. | ) | |

**MR. Al-MARIMI'S MOTION TO DISMISS
FOR LACK OF EXTRATERRITORIAL JURISDICTION**

When the United States seeks to prosecute a foreign national for his or her conduct abroad, Congress must clearly state its intention for domestic law to apply extraterritorially. Additionally, the Due Process Clause of the Fifth Amendment requires that the government prove that the application of U.S. law to a foreign national's conduct abroad is neither arbitrary nor fundamentally unfair. Because, under these doctrines, the exercise of extraterritorial jurisdiction is not appropriate in this case, the Court should dismiss the indictment.

**BACKGROUND**

Mr. Al-Marimi is a Libyan national. He was detained and brought to the United States under highly unusual circumstances to face prosecution for offenses arising out of the destruction of Pan Am Flight 103. The government has charged him with three offenses: Count One, placement of a destructive device likely to endanger the safety of an aircraft resulting in death, in violation of 18 U.S.C. § 32(a)(2); Count Two, destruction of aircraft resulting in death, in violation of 18 U.S.C. § 32(a)(1); and Count Three, destruction of vehicle used in foreign commerce by means of an

1

explosive resulting in death, in violation of 18 U.S.C. § 844(i).

The government alleges that Mr. Al-Marimi constructed and transported an explosive device that caused the destruction of Pan Am Flight 103. His alleged conduct and the actions of his alleged coconspirators took place entirely outside of the United States. Mr. Al-Marimi would not be in this country except for his prosecution.

## LEGAL STANDARD

With rare exception, the criminal laws of the United States do not apply to the conduct of foreign nationals in foreign locations. The strong presumption against extraterritoriality "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign, matters." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010); *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949) (presumption "based on the assumption that Congress is primarily concerned with domestic conditions"). "Because Congress's primary arena of sovereignty is the territorial United States, it makes sense to presume, absent other evidence, that its commands linguistically apply only there." *United States v. Delgado-Garcia,* 374 F.3d 1337, 1344 (D.C. Cir. 2004). "United States law governs domestically but does not rule the world." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007).

"The presumption against extraterritorial application helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). It "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *RJR*

*Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016). In the criminal context, the presumption also ameliorates the risk that "the extraterritorial application of the criminal law of the United States may criminalize conduct that is legal in the countries in which it is committed, without providing corresponding constitutional protections against unreasonable searches and seizures, and the use of force at the arrest stage." *Delgado-Garcia*, 374 F.3d at 528 (Rogers, J., dissenting). As the world has grown more interconnected in recent years, the Supreme Court has applied the presumption "with increased clarity and insistence." *United States v. Garcia Sota*, 948 F.3d 356, 358 (D.C. Cir. 2020) (collecting cases).

When the government seeks to apply a statute extraterritorially, the Court must first determine whether Congress intended such application. *Id.* "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255. The Supreme Court and lower courts have described the required "clear indication" in various ways, but there is no question it is a high bar. *See, e.g., E.E.O.C. v. Arabian Am. Oil Co.* ("*Aramco*"), 499 U.S. 244, 248 (1991) ("[U]nless there is 'the affirmative intention of the Congress clearly expressed,' . . . we must presume it 'is primarily concerned with domestic conditions.'"); *Sale v. Haitian Centers Counc., Inc.*, 509 U.S. 155, 176 (1993) (requiring "affirmative evidence of intended extraterritorial application"); *United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) ("[C]ourts should hesitate to give penal statutes extraterritorial effect absent a clear congressional directive."). These phrases "suggest that the required quantum of proof is significantly more than a

preponderance." *United States v. Al-Imam*, 373 F. Supp. 3d 247, 255 (D.D.C. 2019).

Courts may consider a statute's context as well as its text to determine Congressional intent, but they must be careful to "apply the canons of construction to interpret, not rewrite, congressional acts." *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004). A statute's context includes of its surrounding code provisions. *See Bell Atl. Tel. Cos. V. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (stating "textual analysis is a language game played on a field known as 'context'" and "a comparison between" related provisions informs textual meaning); *e.g.*, *Garcia Sota*, 948 F.3d at 358 (noting nearby code provisions provided "context," along with previous versions of the statute).

The party seeking to invoke the court's jurisdiction bears the burden of overcoming the presumption against extraterritoriality. *Aramco*, 499 U.S. at 250. When the textual language relied upon is ambiguous or where equally plausible interpretations exist, the burden is not met. *Id.*

## ARGUMENT

As the party seeking extraterritorial application of U.S. law, the government bears a heavy burden to rebut the presumption against extraterritoriality. It cannot do so. None of the charged offenses feature a clear indication that the statute applies extraterritorially.

I. **The absence of clear textual or contextual support for extraterritorial application should end the inquiry.**

The government may seek to argue that the legislative history or purposes of the statutes in question support extraterritorial application. *See Garvey v. Admin.*

4

*Rev. Bd., U.S. Dep't of Lab.*, 56 F.4th 110, 122 (D.C. Cir. 2022) ("Where the text is not clear, we turn next to assessing whether any indication of congressional intent overcomes the presumption against extraterritoriality."). The Court should not be persuaded. The text of the laws and surrounding provisions should be the start and end of the inquiry.

The presumption against extraterritoriality is rebutted only with a "clear" and "affirmative indication" from Congress in favor of extraterritorial application. *Morrison*, 561 U.S. at 265. "The question is not whether [courts] think 'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court,' but whether Congress has *affirmatively and unmistakably instructed* that the statute will do so." *RJR Nabisco*, 579 U.S. at 335. Such proof must be found in the text of a statute or surrounding provisions. *See Morrison*, 561 U.S. at 265 (referring also to "context"); *Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 119 (2013) (holding "nothing in the *text* of the [law] evinces the requisite clear indication of extraterritoriality"; considering "the historical background against which the [law] was enacted" only to understand the historical meaning of the text) (emphasis added); *Validus Reinsurance, Ltd. v. United States*, 786 F.3d 1039, 1047 (D.C. Cir. 2015) ("[C]ourts must find clear and independent *textual support*—rather than relying on mere inference—to justify the nature and extent of each statutory application abroad.") (emphasis added).

The Supreme Court has consistently emphasized that the text of a statute takes precedence over its legislative history or apparent purposes. The textualist

5

approach is justified by the principle that the written word of the law, as enacted by Congress and signed by the President, stands as the ultimate authority and the only binding expression of legislative intent. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) ("And 'it is ultimately the provisions of' those legislative commands 'rather than the principal concerns of our legislators by which we are governed.'") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)); *Oklahoma v. Castro-Heurta*, 597 U.S. 629, 642 (2022) ("As this Court has repeatedly stated, the text of a law controls over purported legislative intentions unmoored from any statutory text."). The D.C. Circuit has echoed these principles, emphasizing that the sole function of courts is to enforce a statute according to its terms. *Goldring ex rel. Anderson v. D.C.*, 416 F.3d 70, 74 (D.C. Cir. 2005) (quoting *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004)). Courts cannot "rewrite a statute's plain text to correspond to its supposed purposes." *Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009).

Unlike text, legislative history "is itself often murky, ambiguous, and contradictory, having the tendency to become an exercise in looking over a crowd and picking out your friends"; at the same time, "judicial reliance on legislative materials . . . which are not themselves subject to the requirements of Article I may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 338 (D.C. Cir. 2020) (quoting *Exxon*

6

*Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)) (cleaned up, internal quotation marks omitted). Divining a statute's purpose, meanwhile, "is often elusive" and risks allowing "courts to peruse legislative proceedings for subtle emphases supporting subjective impressions and preferences." *Sissel v. U.S. HHS*, 799 F.3d 1035, 1054–55 (D.C. Cir. 2015) (Kavanaugh, J., dissenting) (quoting *McGinnis v. Royster*, 410 U.S. 263, 276–77 (1973)).

Legislative history and purpose are also notoriously difficult to pin down because Congress is not a single actor but rather a deliberative body comprising many legislators with strongly divergent views. *Id.* ("The chances that of several hundred men [and women] each will have exactly the same determinate situations in mind . . . are infinitesimally small.") (quoting Max Radin, *Statutory Interpretation*, 43 Harv. L. Rev. 863, 870 (1930)). At bottom, whatever individual legislators or committees meant to do, courts must focus on what *Congress did*.

For sure, the D.C. Circuit has stated the presumption can be rebutted by a statute's "text, history, or purpose" and that the inquiry must consider "all available evidence." *Garvey*, 56 F.4th at 122 (first quoting *Kiobel*, 569 U.S. at 109, then 509 U.S. at 177). In *Garvey*, the D.C. Circuit considered legislative history and the "stated purpose" of the law alongside text and context. *Id.* at 124, 127. However, this approach misinterprets the law and is inconsistent with the Supreme Court precedent discussed above.

*Garvey*'s out-of-context use of the Supreme Court's statements to support its consideration of purpose, legislative history, and other non-textual or contextual

evidence is not supported by the Supreme Court's holdings or analysis in those cases. For example, the quoted language "text, history, or purpose" from *Kiobel* comes from the Court's syllabus, which is not authoritative. *Kiobel*, 569 U.S. at 109; *see United States v. Hook*, 195 F.3d 299, 308 (7th Cir. 1999) (stating Supreme Court syllabi do not have "precedential authority"). As explained above, the Court's analysis in *Kiobel* focused on the text and its historical meaning, with only passing reference to a party's arguments about purpose. *See Kiobel*, 569 U.S. at 117; *see also Bostock*, 590 U.S. at 674—75 (explaining "historical sources can be useful" to understand "the law's ordinary meaning at the time of enactment"). The quotation about "all available evidence" from *Sale*, meanwhile, was not describing what courts should consider but rather remarking upon the fact that the losing party's position had no support. *Sale*, 509 U.S. at 177. In that case too, the discussion of "history" was with respect to the original meaning of the text and later amendments, and the only mention of "purpose" was a statement that a potential purpose behind the statute was "not a substitute for the affirmative evidence of intended extraterritorial application that our cases require." *Id.* at 174–76.

Consistent with the Supreme Court's guidance, the inquiry into whether a law features a clear and affirmative indication of Congressional intent for its extraterritorial application should be limited to text and context.

## II.   *Bowman* does not apply here.

Relying on a century-old outlier among the Supreme Court's jurisprudence in this area, the D.C. Circuit has ruled that the presumption against extraterritoriality is rebutted with respect to a criminal statute when the offense directly harms the

U.S. government and there is a "great likelihood that the outlawed conduct would occur abroad." *Garcia Sota*, 948 F.3d at 360 (discussing *United States v. Bowman*, 260 U.S. 94 (1922)); *see also Delgado-Garcia*, 374 F.3d at 1346; *Al-Imam*, 373 F. Supp. 3d at 257–61 (discussing circuit doctrine). Because none of the charged offenses target conduct that directly harms the U.S. government, *Bowman* and the circuit precedent interpreting it are inapplicable.

In *Bowman*, the Supreme Court acknowledged the presumption against extraterritoriality: if a statute is intended to include offenses "committed out side of the strict territorial jurisdiction [of the United States], it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard." *Bowman*, 260 U.S. at 98. The Court went on to state that the:

> rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents.

*Id*. It then analyzed a handful of criminal statutes within this "class," including "statutes involving enticing desertions from naval service, thwarting the disposition of property captured as prize, bribing an officer of the United States to violate his duty, or a U.S. consul's certifying a false invoice." *Garcia Sota*, 948 F.3d at 360.

The D.C. Circuit has interpreted *Bowman* to permit the inference that Congress intended the extraterritorial application of a criminal law if the law proscribes conduct that directly harms the U.S. government and there is a "great likelihood that the outlawed conduct would occur abroad." *Garcia Sota*, 948 F.3d at

360 (citing *Delgado-Garcia*, 374 F.3d at 1346 (application to law prohibiting the inducement of and assistance with unauthorized entry into the U.S.)). The defense maintains the latter part of that interpretation is unsound and flies in the face of other Supreme Court precedent. However, the Court need not concern itself with these arguments because the laws here do not check the first box.

None of the charged offenses target conduct that "directly harms the U.S. government." *See Al-Imam*, 373 F. Supp. 3d at 261. That requirement arises out of *Bowman*'s statement that the class of special criminal laws to which the presumption against extraterritoriality applies with less force include only those that implicate "the right of the government to defend itself." *Bowman*, 260 U.S. at 98. Courts have interpreted this class to include laws that protect federal property and personnel. In *Al-Imam*, for example, this Court held several criminal laws applied extraterritorially after finding each targeted a form of harm suffered directly by the government. *See, e.g.*, 373 F. Supp. 3d at 262 (murder of U.S. officers and employees); *id.* at 264 (killing during attack on federal facility); *id.* at 265 (damaging and destroying U.S. property with fire and an explosive); *id.* at 266 (material support to terrorists; ancillary crime to preceding substantive offenses).

Conversely, §§ 32(a)(1) and (2), as applied to the destruction of "civil aircraft," ECF No. 7, ¶¶ 2, 14, do not proscribe conduct that directly harms the United States government. *See* 49 U.S.C. § 40102(a)(16) (defining "civil aircraft" to mean "an aircraft except a public aircraft"); 18 U.S.C. § 31(b). Section 844(i), which broadly targets harm to real or personal property used in interstate or foreign commerce, also

10

falls outside *Bowman*'s box by virtue of Pan Am 103 being a civil aircraft and not property of the U.S. government.

To the extent the Court disagrees, the defense maintains that the D.C. Circuit's interpretation of *Bowman* is inconsistent with how the Supreme Court has instructed courts to apply and enforce the presumption against extraterritoriality.[1] A judge's speculation about the "great likelihood" of a statute's extraterritorial reach could not be further from a clear textual indication. It is pure judicial guesswork based on a statute's likely applications. It also is circular. *See Delgado Garcia*, 324 F.3d at 527 (Rogers, J., dissenting) (criticizing the rule as making application of the presumption "depend in the first instance on whether a statute is 'domestic' when that is the question that application of the canon is supposed to resolve").

To see how a simple test focused on a statute's likely reach is inconsistent with how the Supreme Court has applied the presumption against extraterritoriality, one need look no further than *Kiobel*. *Kiobel* held a law did not apply extraterritorially even though it permitted actions by aliens for violations of the law of nations, including typically foreign violations like the violation of safe conducts, infringement of the rights of ambassadors, and piracy, which the Court expressly recognized "typically occurs . . . beyond the territorial jurisdiction of the United States."[2] *Kiobel*,

---

[1] The defense acknowledges this Court is bound to follow the rule in this circuit as expressed in *Garcia Soto* and progeny until that rule is overturned by the *en banc* D.C. Circuit or the Supreme Court. The following arguments are made to preserve the issues for appeal.

[2] That *Kiobel* was a civil case is irrelevant, as the Supreme Court has instructed courts to "apply the presumption *in all cases*" in which extraterritorial application is sought. *Morrison*, 561 U.S. at 261 (emphasis added).

11

569 U.S. at 119–21.

Even if the D.C. Circuit's interpretation is a fair reading of *Bowman*—and that is doubtful, considering that *Bowman* involved the prosecution of three U.S. citizens who were working for a corporation wholly owned by the U.S. government, *see* 260 U.S. at 94–95, and the Court expressly reserved ruling on jurisdiction over a foreign defendant, *id.* at 102–03—*Bowman* is more than a century old and not regularly relied upon. A controlling majority of the Supreme Court cited *Bowman* most recently in 1958, in passing and on a different point.[3] *See Rainwater v. United States*, 356 U.S. 590, 593 (1958). While it has not been formally overruled and may still find use among the circuits, its reasoning has been eroded, and it should be overturned in light of the Supreme Court's more recent understanding of the presumption against extraterritoriality.

### III. The charged statutes do not clearly express Congressional intent for extraterritorial application.

The government will not be able to rebut the presumption against extraterritoriality with respect to the charged statutes. There is no textual basis from which the Court can infer the necessary Congressional intent, either in the provisions themselves or the surrounding code sections. Indeed, each provision "contrasts sharply with other statutes that rebut the presumption against extraterritoriality by stating, for example, that they apply to offenses taking place 'outside the United States' or that they create 'extraterritorial jurisdiction over' the prohibited conduct."

---

[3] Justice Scalia cited *Bowman*, also in passing, in 1993, writing for four members of the Court. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 814 (1993) (Scalia, J., dissenting).

12

*See Garvey*, 56 F.4th at 123 (citing cases).

### A. Counts One and Two – 18 U.S.C. § 32(a)(1) & (2)

The text of 18 U.S.C. § 32(a)(1) and (2) does not make clear that Congress intended those provisions to apply extraterritorially. Subsection (a)(1), charged in Count Two, reads

> Whoever willfully sets fire to, damages, destroys, disables, or wrecks any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce . . . shall be fined under this title or imprisoned not more than twenty years or both.

18 U.S.C. § 32(a)(1). Subsection (a)(2), charged in Count One, reads

> Whoever willfully places or causes to be placed a destructive device or substance in, upon, or in proximity to, or otherwise makes or causes to be made unworkable or unusable or hazardous to work or use, any such aircraft, or any part or other materials used or intended to be used in connection with the operation of such aircraft, if such placing or causing to be placed or such making or causing to be made is likely to endanger the safety of any such aircraft . . . shall be fined under this title or imprisoned not more than twenty years or both.

18 U.S.C. § 32(a)(2).

Neither provision contains any textual reference to extraterritorial application. The terms "whoever" and "any" do not suffice. It is "well established that generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality." *Kiobel*, 569 U.S. at 118. In *Kiobel*, the Supreme Court rejected the argument that the Alien Tort Statute's text supported extraterritorial application based on its broad coverage of "any civil action," even though that phrase included actions arising out of foreign conduct. *Id.* The Court explained that "such violations affecting aliens can occur either within or outside the United States." *Id.*

13

The Second Circuit reached a contrary conclusion in *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003), but that case was wrongly decided on that point. The court's two-paragraph analysis turned on the fact that § 32(a) reaches conduct that harms certain classes of aircraft, "wherever in the world [they] may be."[4] *Id.* at 86–87. Because the targeted aircraft in *Yousef* were covered by the statute, the court determined it was appropriate to apply the statute to the defendant's extraterritorial conduct. *Id.* This reasoning cannot stand in the wake of the Supreme Court's guidance in 2013 in *Kiobel*. The fact that a statute's text may reach some foreign conduct is not sufficient to rebut the presumption against extraterritoriality. *Kiobel*, 569 U.S. at 118. Section 32(a)(1) and (2) could plausibly be read to cover the conduct of *Americans* that affect flights anywhere in the world; it is not the case that the only reasonable interpretation of the statutes contemplates foreign application.

The sections and subsections surrounding § 32(a) do not evidence the required intent, either. To the contrary, adjacent laws in Title 18, Chapter 2 of the U.S. Code provide a clear indication of Congress's intent that *those laws* should apply extraterritorially, further undermining the argument that Congress intended § 32(a) to do the same. *See Garcia Sota*, 948 F.3d at 358 (stating "context reinforces the case against extraterritorial application of § 1114" because the nearby § 1116, enacted at

---

[4] The Second Circuit also noted the statute incorporated a definition of "foreign air commerce" that covered aircraft traveling between the United States and places outside the United States. *Yousef*, 327 F.3d at 87 (citing 49 U.S.C. § 40102(a)(22)). But the simple reference to foreign commerce, like the use of generic terms, does not "definitely disclose an intention to give . . . extraterritorial effect." *E.E.O.C. v. Arabian Am. Oil Co.* ("*Aramco*"), 499 U.S. 244, 251 (1991).

14

the same time, "explicitly applied to conduct abroad). Section 37, for example, proscribes acts of violence at international airports and includes a subsection that expressly provides for extraterritorial jurisdiction. 18 U.S.C. § 37(b)(2) ("There is jurisdiction over the prohibited activity in subsection (a) if . . . the prohibited activity takes place outside the United States and (A) the offender is later found in the United States; or (B) the offender or a victim is a national of the United States . . . ."). Likewise, § 38(f) clarifies the "territorial scope" of criminal fraud involving aircraft by expressly declaring the statute "applies to conduct occurring outside the United States" in certain circumstances. 18 U.S.C. § 38(f). Even within § 32, Congress provided for "jurisdiction over" the conduct proscribed in subsection (b) whenever a U.S. national is on board the aircraft, the offender is a U.S. citizen, or the offender is "found in" the United States. 18 U.S.C. § 32(b). But Congress did not include similar language with respect to § 32(a).

Because neither the text of § 32(a)(1) and (2) nor their context clearly evince Congressional intent for extraterritorial application, the presumption against extraterritoriality forbids application of the statutes to Mr. Al-Marimi's alleged conduct. The Court should dismiss Counts One and Two.

### B. Count Three – 18 U.S.C. § 844(i)

Count Three fares no better. The charged provision states:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both; and if personal injury results to any person, including any

15

>public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both; and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment.

18 U.S.C. § 844(i).

Again, nothing in the text sufficiently indicates Congressional intent for extraterritorial application. The text merely refers to property and interstate or foreign commerce. For reasons already explained, the latter references do not suffice to rebut the presumption against extraterritoriality. And here too, no adjacent provisions fill that gap.

The only court to have addressed the extraterritorial reach of § 844(i) found the law could be applied to extraterritorial conduct, but its analysis was seriously flawed. In *Untied States v. Reumayr*, 530 F. Supp. 2d 1210 (D.N.M. 2008), the district court first observed, correctly, that the text did not manifest clear Congressional intent to reach extraterritorial conduct. *Id.* at 1216. The closest the text came was the statute's references to "interstate or foreign commerce." *Id.* The court agreed with the defendant that "reading the inclusion of the word 'foreign' to implicate any explosion anywhere in the world" resulted in "potential overbreadth[.]" *Id.* But the court went on to note that the defendant was charged with attempting to destroy property inside the United States, and it concluded the statute's legislative history supported its extraterritorial application to his conduct. *Id.* at 1217–18. It also relied on *Bowman*, which it read broadly to permit an inference of the necessary Congressional intent anytime "limiting the locus of the statute to the territorial

16

jurisdiction of the United States would severely curtail the scope and usefulness of the statute." *Id.* at 1218. The court then expressed its belief that "the evolving nature of domestic terrorist attacks has shown that a crippling act of domestic terrorism may just as easily be planned by Saudi members of Al-Qaida residing in Pakistan as by a homegrown Timothy McVeigh" and concluded that the statute's purpose would be frustrated by limitation to domestic acts. *Id.*

*Reumayr* reveals the perils of reliance on legislative history and a court's understanding of a statute's purpose. The district court's conclusions read like motivated reasoning: the statute can apply extraterritorially because foreign actors threaten the United States. *See id.* at 1216 (using the events of 9/11 for proposition that U.S. government has a security interest in private property); *id.* at 1218 (equating "Saudi members of Al–Qaida residing in Pakistan" with Timothy McVeigh). While the court pointed to statements in the legislative history that it believed supported its position, it was ultimately the court's own concerns, unmoored from the text of the statute, that drove the court's decision. This Court should depart from *Reumayr*'s motivated reasoning, adhere to the text, and dismiss Count Three.

## IV. The extraterritorial application of U.S. law to Mr. Al-Marimi violates due process.

The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property without due process of the law." U.S. Const. amend. V. Even when a "criminal statute having extraterritorial reach is declared or conceded substantively valid under the Constitution, its enforcement in a particular instance must comport with due process." *United States v. Brehm*, 691 F.3d 547, 552 (4th Cir. 2012). The

17

circuits have, however, split over how to define a due process violation in this context.

The D.C. Circuit has stated the "animating principle governing the due process limits of extraterritorial jurisdiction" is "the idea that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2015) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)). In *Ali*, the D.C. Circuit rejected a due process challenge to the extraterritorial application of a U.S. law that criminalized hostage-taking. *Id.* It reasoned the International Convention Against the Taking of Hostages provided "global notice that certain generally condemned acts are subject to prosecution by any party to the treat" and concluded "the Due Process Clause demands no more." *Id.* The Court made clear that its holding did not turn on the offense being subject to universal jurisdiction under international law—which hostage taking is not—but rather the "universal condemnation of the offender's conduct" "as reflected in widely-accepted international agreements and resolutions of international organizations." *Id.* at 945.

In contrast, the Second, Fourth, and Ninth Circuits have found that the Due Process Clause of the Fifth Amendment requires "a sufficient nexus between the defendant and the United States, so that such application [of the criminal law] would not be arbitrary or fundamentally unfair." *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011). This "sufficient nexus" test in the criminal context "serves the same purpose as the 'minimum contacts' test in [civil] personal jurisdiction. It ensures that a United States court will assert jurisdiction only over a defendant who 'should

18

reasonably anticipate being haled into court' in this country.'" *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *see also Brehm*, 691 F.3d at 549; *Yousef*, 327 F.3d at 111 (finding jurisdictional nexus where Middle Eastern terrorists plotted to bomb American commercial aircraft in Southeast Asia"); *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990) (finding jurisdictional nexus where defendant was seized off the coast of California while trying to smuggle marijuana into the United States).

Here, under the D.C. Circuit's test in *Ali*, the 1973 Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation ("1973 Montreal Convention") (requiring signatory states to criminalize and facilitate the prosecution of aircraft-related terrorism) appears to foreclose a due process challenge to Mr. Al-Marimi's prosecution. Under the Second, Fourth, and Ninth Circuit's nexus test, however, whether the government can prove that Mr. Al-Marimi's actions intentionally or knowingly targeted Americans and thus would provide a sufficient nexus appears to depend on the government's ability to present evidence of Mr. Al-Marimi's purported confession. Should the alleged confession not be entered into evidence in this case, Mr. Al-Marimi preserves his right to appeal the due process issue—specifically the appropriate standard—to higher courts of review.

## CONCLUSION

The extraterritorial application of U.S. law to Mr. Al-Marimi is improper. Congress has not clearly expressed an intent for such a prosecution under the charged

19

statutes, and the prosecution is both arbitrary and fundamentally unfair in violation of due process. The Court should dismiss the indictment.

        Respectfully submitted,

        Geremy C. Kamens,
        Federal Public Defender


        By: _____/s/_____
        Whitney E.C. Minter
        Va. Bar # 47193
        Brooke Sealy Rupert
        Va. Bar #79729
        Assistant Federal Public Defender
        Attorney for Mr. Al-Marimi
        1650 King Street, Suite 500
        Alexandria, Virginia  22314
        (703) 600-0855 (telephone)
        (703) 600-0880 (facsimile)
        Whitney_Minter@fd.org (email)

        Laura Koenig
        Va. Bar #86840
        Assistant Federal Public Defender
        Attorney for Mr. Al-Marimi
        701 E. Broad Street, Suite 3600
        Richmond, Virginia 23219
        (804) 343-0800 (telephone)
        (804) 648-5033 (facsimile)
        laura_Koenig@fd.org (email)