UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 22-cr-392 (DLF) |
| : | |
| ABU AGILA MOHAMMAD : | |
| MAS'UD KHEIR AL-MARIMI, : | |
| : | |
| **Defendant.** : | |

**GOVERNMENT'S THIRD SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION TO ADMIT FOREIGN RECORDS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this third supplemental brief related to its Motion to Admit Foreign Records [ECF 148]. This pleading responds to the Court's oral ruling of January 12, 2026 by (A) transmitting a spreadsheet reflecting the parties' understanding of the status of each exhibit; and (B) providing from the government certain additional information and argument.

**A. Spreadsheet reflecting Court's preliminary rulings.**

During the hearing on January 12, 2026, the Court delivered an oral ruling on the government's Motion to Admit Foreign Records. *See* 1/12/26 Tr. at 12-57. In connection with the ruling, the Court requested that the parties prepare a spreadsheet that identifies each of the government's proposed exhibits, the grounds on which admission was sought, the defense's objections, and the Court's ruling on each." *Id.* at 14.

Pursuant to the Court's instructions, the parties have prepared the spreadsheet attached as Exhibit 1, which we believe reflects the Court's rulings other than the following rulings that were not particularized to specific exhibits:

***Ancient Documents:*** The Court was inclined to rule that "most, if not all, of the proffered business documents could be admitted under the ancient document exception." 1/12/26 Tr. at 51.

***Residual Exception:*** For all of the proposed exhibits, the Court reserved ruling on the applicability of the Residual Exception, Fed. R. Evid. 807, explaining that "the Court cannot determine at this time whether any of the exhibits is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts because the government has not advanced arguments about what other evidence it could obtain if the Court were to exclude any of its proffered records." 1/12/26 Tr. at 57.

If it would assist the Court, the government can provide a copy of the spreadsheet in native Excel format.

### B. Government's supplements on specific exhibits

During the hearing, the Court identified certain exhibits that it was admitting on the present record. Below, the government offers additional information and explanation supporting admission of the exhibits.

These arguments do not address the residual exception. As the Court correctly stated in the oral ruling, the application of the residual exception requires a comparative analysis that considers what other evidence the sponsoring party can reasonably offer on the point at issue. *See* 1/12/26 Tr. at 57. If the Court still finds the exhibits inadmissible after considering the arguments below, the government respectfully requests that it be permitted to brief its residual arguments at a time closer to trial when there is more certainty about what other evidence will be available.

1. <u>Malta</u>

The Court has not yet admitted Exhibit 803 because "the plain-text list includes no indicia of who prepared the list, whether it was an airline or the airplane authorities"; accordingly, the Court "can't say that this table of flights was produced or kept in the ordinary course of business. It may well be the practice of Air Malta to keep such records, but it's just not clear to me, given all the different flights that are reflected on the document, that this was something that was produced

2

or kept in the ordinary course of business, because there's not enough information about its creation by or distribution to Air Malta." 1/12/26 Tr. at 38-39.

The government has consulted its records and located no further information about the authorship of Exhibit 803, which is a schedule of flights from the various airlines operating at Luqa Airport in 1988. The records do, however, support certifying witness A.B.'s attestation that the document was kept in the ordinary course of business by Air Malta. The Scottish police recorded a statement from a then-Senior Executive with Air Malta at Luqa Airport, who was responsible for Ground Services.[1] This person handed over the document to Scottish officers on September 6, 1990, describing it as relating "to all scheduled services operating out of Malta from October 1988. This was valid on 21st December, 1988."[2]

It makes sense that an airline would possess and rely upon a schedule showing flights operated by other airlines at the same airport. Such a document would be necessary to advise passengers on interline itineraries, ensure that connections are made, assist in rebooking in the event of a missed flight, and be aware of the relative busyness of the airport at various times of the day and week. This possession and reliance is enough. The D.C. Circuit has expressly joined other courts in holding "that a record of which a firm takes custody is thereby 'made' by the firm within the meaning of the rule (and thus is admissible if all the other requirements are satisfied)." *United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007); *see also id.* (collecting cases). There is "no requirement that the [business] records be created by the business having custody of them." *Id.* (quoting *United States v. Duncan*, 919 F.2d 981, 986 (5th Cir. 1990)).

---

[1] Produced as HS-USAO-00011702.

[2] Produced as HS-USAO-00011813.

If Exhibit 803 is not admitted as a business record, it should be admitted as an ancient document. It was prepared before January 1, 1988, and there does not appear to be any remaining dispute over its authenticity, especially given the rigorous Scottish recordkeeping procedures according to which it was collected and maintained.

2. Czech

The Court expressed "concerns about document 908, the letter from the Libyan Embassy in Prague to the Intercontinental Hotel, and whether it can be admitted as a business record." 1/12/26 Tr. at 40. In light of the defense argument that the "letter lacks any marks of intake or processing by the hotel," the Court directed that the government "offer some evidence that this letter is typical before I will even provisionally admit it."

According to materials that the government was provided in discovery, Scottish police interviewed the Deputy Director of the Intercontinental Hotel on June 26, 1991.[3] The Deputy Director explained that he "was requested to search our records for named individuals who resided at the Hotel." As a result of that search, the Deputy Director located and turned over to Scottish authorities ten items, including the letter the government has proffered as Exhibit 908 as well as other hotel records the Court has already ruled admissible as business records. The letter is dated December 12, 1988, meaning that it remained in the Hotel's records more than two and a half years before it was pulled from their files.

The age of the letter, along with the mundane nature of the surrounding documents that were handled together with is, compel an inference that the Intercontinental Hotel maintained the letter as part of its ordinary recordkeeping. That conclusion is even stronger given the content of the letter: a confirmation that the Libyan government would cover the bills (excluding alcohol and

---

[3] Produced as HS-USAO-00042645.

international calls) of a specific guest. This is the type of correspondence that is necessary to maintain for future reference; for example, if any dispute over billing were to later arise. And in the time before email and electronic hotel bookings became common, it makes sense that a hotel would retain paper correspondence in which customers convey requests and instructions such as this one.

Accordingly, the Court should admit Exhibit 908 as a business record just like it has already admitted the related documents from the Intercontinental Hotel.

3. Germany

The Court preliminarily excluded Exhibits 1013 and 1024[4] as containing nested hearsay. The government respectfully requests that the Court reconsider this analysis.

The Court reasoned that the messages from Pan Am's employees are "offered for the truth of the matter being asserted" because they "are relevant only insofar as they dictated a security policy that would be followed at the Frankfurt airport." 1/12/26 Tr. at 42. We submit, however, that *dictating* a policy that *would be followed* is different from *describing* a policy that *was* followed. The former is a species of command being offered as circumstantial evidence of subsequent action by the recipient, while the latter is a factual assertion being offered for the truth of the matter being

---

[4] As noted before, the government does not intend to offer Exhibit 1024 unless the defense puts it at issue. *See* , ECF 242 at 23. We should nonetheless clarify that the document, despite its unusual appearance, is not a haphazard assembly of sometimes-irrelevant messages. The person whose job it was to send and receive these telexes has explained that the messages were "small pieces of paper that were ripped off the machine," and that he "would staple them to form a page like this" – in other words, it was normal to compile documents in this way, and not something done at the request of investigators. *Id.* at 23 n.11. Moreover, the message that mentions a Christmas Party is not irrelevant. The series of messages shows efforts to communicate between staff at different airports; the "Christmas party" message first mentions airport codes "STO" (Stockholm) and "OSL" (Oslo) and states "Una[ble] to reach anybody." With this context, the statement that follows -- "OSL is having a Christmas party" – is explanation for why the staff at Oslo could not be reached. A subsequent message provides an update that Stockholm, Oslo, and other airports have by that time been "briefed… in detail by telephone."

asserted. To "dictate" something is to speak it into being, not to make a falsifiable assertion of any separately existing fact. *See, e.g.*, *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009) ("[I]f the statements were questions or commands, they could not—absent some indication that the statements were actually code for something else—be offered for their truth because they would not be assertive speech at all. They would not assert a proposition that could be true or false." (citing *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006))).

It is accordingly well-established that orders, instructions, and commands are not hearsay. *See generally* ECF 242 at 25-26. That general principle holds true in the specific context of intra-corporate communications. For example, *Carpenters Local Union 721 v. Limon*, the court rejected a hearsay challenge to an email from a union president to the union's executive committee "confirming [a] new commuting reimbursement policy." 18-cv-8470, 2021 WL 12307440, at *8 (C.D. Cal. Nov. 30, 2021). The court explained that the email was "an admissible command because Lotta was instructing members on how to reimburse moving forward." *Id.*

This theory's viability does not depend on "testimony by a luggage handler who states that he took the action he or she took as a result of reviewing the Telexes." 1/12/26 Tr. at 42. The defense has not cited any cases holding that testimony from the listener is a necessary predicate to "effect on the listener" evidence. The closest is a remark from the Seventh Circuit that "[a] statement is offered to show an effect on the listener only if the listener heard and reacted to the statement." ECF 229 at 20 (quoting *United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022)). It is doubtless true that a statement can have an effect on a listener only if it actually reaches that listener, but there is no reason that such receipt cannot be inferred rather than proven directly.

6

Moreover, there are different types of "effect on the listener" usages. In some cases (like the common scenario where a police officer testifies about a report he or she received that prompted some action), the purpose is to explain the reasons why a subsequent action was taken. *See, e.g.*, *United States v. Sallins*, 993 F.2d 344, 346 (3d Cir. 1993) (collecting cases). In such cases, the "why" is only relevant if there is already evidence of a "what" that needs to be explained. But there is a "limitless" number of other "specific non-hearsay purposes in the effect-on-the-listener vein." Wright & Miller, Federal Practice and Procedure § 6719 (2025 ed.). Such purposes can include "evidence [that] supports reasonable inferences about how the statements influenced the listener's… decisions[] or actions in a way that is pertinent to the case," *United States v. Martinez*, 122 F.4th 389, 414 (10th Cir. 2024).

Here, the government is offering the communication of Pan Am's corporate policy to support an inference that employees acted in accordance with that policy. The existence of a directive from a Pan Am officer to his subordinates is circumstantial evidence that the company's employees who received that command would carry it out. By way of analogy, if a party were seeking to support an inference about what a cafeteria served for lunch on a given day, it could introduce an email sent the previous day to staff by the manager saying "please prepare turkey for lunch service tomorrow," because this is a non-hearsay command that does not assert any fact. The same party could not introduce an email from the manager with the assertion "I told the staff to prepare turkey for lunch service," nor an email from the next day saying "we served turkey for lunch yesterday," because those statements would only have probative value if the asserted facts were true. The government's proffered exhibits from Pan Am's management are akin to the first example, not the second or third.

7

Testimony from the recipients is therefore not required. Indeed, if the government had testimony from baggage handlers about their operations in compliance with the policy announcement, then the messages communicating that policy would be almost superfluous, because the handlers' reasons for acting would have little relevance – what matters is what they did, not why they did it. But lacking such testimony, the policy announcement, with its forward-looking operative force, has its own probative value that does not depend on the truth of any embedded factual assertions.

Regardless, even if the Court considers the messages to be hearsay, they are admissible as ancient documents. In the oral ruling, the Court stated: "My willingness to admit under the ancient documents exception as an alternative may reach those documents I excluded because I found they did not qualify as business records." 1/12/26 Tr. at 52. The Court explained, however, that "the ancient document route does not necessarily provide a path around the nested hearsay issues that afflict the Telexes in documents 1013 and 1024." *Id.*

It is a matter of some disagreement whether the ancient documents rule, without more, permits the admission of a document that contains multiple levels of hearsay. *See generally* Gregg Kettles, *Ancient Documents & the Rule Against Multiple Hearsay*, 39 Santa Clara L. Rev. 719, 721 (1999). But in this instance, the substance of the ancient documents consists of only one layer of statement that does not have nested in it any subsidiary hearsay. This is true of the directives that (as discussed above) are the reason the exhibits are being offered, but it goes also for any factual assertions that are incidentally included in the documents. For example:

- Exhibit 1013 says "FAA [official] Salizar has granted X ray as and [*sic*] alternative to searching pass. baggage," not "I heard that FAA Salizar has granted X ray…";

- Exhibit 1013 says "We PAA are x raying or searching interline pax bags for the system," not "The Vice President told me that we are x raying or searching interline pax bags…";

- Exhibit 1024 says "If Panam Psgrs are routed via FRA by other carriers ex HEL pls ensure that same are not thru checked to final dest in USA," not "A telex from Martin said that if Panam Psgrs are routed via FRA…"; and

- Exhibit 1024 says "Una[ble] to reach anybody," not "John said he was unable to reach anybody."

In sum, every sentence in Exhibits 1013 and 1024 is itself a "statement in an ancient document" that does not contain within it a second layer of hearsay. Regardless of the correct treatment of double-hearsay in ancient documents, therefore, these exhibits should be admitted under Rule 803(16).

4. Japan

Regarding the records from Japan, the Court observed that the accompanying certificate was in Japanese and instructed that "the government is going to need to get a translation of the Japanese certification." 1/12/26 Tr. at 45.

By way of clarification, the Japanese certificates were themselves created by a linguist who translated an English-language standard certificate, which is attached as Exhibit 2. If necessary, the government can provide a Certificate of Translation from the linguist who performed the translation.

## CONCLUSION

For the above reasons, the Court should admit the government's proffered exhibits and, at a later time, accept briefing and argument about the application of the residual exception to whatever exhibits have not yet been admitted.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: ***/s/ Conor Mulroe***
CONOR MULROE (NY Bar No. 5289640)
ERIK M. KENERSON (OH Bar No. 82960)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 740-4595 // Conor.Mulroe@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530