**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ABU AGILA MOHAMMAD<br>MAS'UD KHEIR AL-MARIMI,<br><br>*Defendant.* | No. 22-cr-392 (DLF) |

## MEMORANDUM OPINION AND ORDER

Before the Court is Abu Agila Mohammad Mas'ud Kheir Al-Marimi's Motion to Dismiss for Lack of Extraterritorial Jurisdiction. Dkt. 252. For the following reasons, the Court will grant the motion in part.

## I.     Background

The charges in this case relate to the December 21, 1988, bombing of Pan American World Airways Flight 103 over Lockerbie, Scotland. Pan Am was a commercial passenger airline based in the United States, and the subject aircraft was leased from and owned by a corporation created under the laws of New York. Indictment ¶ 1, Dkt. 7. At the time of its destruction, Pan Am Flight 103 was en route to John F. Kennedy Airport in New York City from London's Heathrow Airport. *Id.* ¶ 3. All 259 individuals aboard the aircraft—190 of whom were Americans—died in the bombing, along with 11 residents of the town of Lockerbie. *Id.* ¶¶ 4, 6, 12.

Al-Marimi is charged in a three-count indictment. Count I charges Al-Marimi with destruction of an aircraft resulting in death, in violation of 18 U.S.C. §§ 32(a)(2), 34, and 2. Section 32(a)(2) makes it a crime to willfully "plac[e] or caus[e] to be placed a destructive device or substance in, upon, or in proximity to" any aircraft, 18 U.S.C. § 32(a)(2), "in the special aircraft

jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce," *id.* § 32(a)(1).  Section 34 provides for an enhanced penalty when such an action results in death.  *Id.* § 34.

Count II charges Al-Marimi with destruction of an aircraft resulting in death, in violation of 18 U.S.C. §§ 32(a)(1), 34, and 2.  Section 32(a)(1) makes it a crime to willfully "se[t] fire to, damag[e], destro[y], disabl[e], or wrec[k] any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce."  *Id.* § 32(a)(1).

Count III charges Al-Marimi with "maliciously damag[ing] or destroy[ing] . . . by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."  *Id.* § 844(i).

## II.     Legal Standard

Under Rule 12(b)(1) of the Federal Rules of Criminal Procedure, a party "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  Such a pretrial motion may challenge "a defect in the indictment or information" requiring dismissal.  Fed. R. Crim. P. 12(b)(3)(B).  When considering a pretrial motion to dismiss, the trial court must assume the truth of the facts alleged in the charging instrument.  *See United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).

## III.    Analysis

Al-Marimi moves to dismiss each count, arguing that the statutes under which he is charged do not apply extraterritorially.  *See* Mot. to Dismiss 1, Dkt. 252.  For the reasons that follow, the Court will deny Al-Marimi's motion as to Counts I and II but grant his motion as to Count III.

2

### A.    The Presumption Against Extraterritorial Application

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Smith v. United States*, 507 U.S. 197, 204 (1993) (citation modified). The "presumption that United States law governs domestically but does not rule the world" is associated with a corresponding canon of statutory interpretation known as the "presumption against extraterritorial application." *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 115 (2013) (citation modified). That canon provides that, "when a statute gives no clear indication of an extraterritorial application, it has none." *Id.* (citation modified). Properly applied, "[i]t serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).

In applying the presumption against extraterritorial application, federal courts "look to see whether language in the relevant Act gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." *Id.* (citation modified). The canon, however, is not a "clear statement rule." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010) (citation modified). A statute need not announce "this law applies abroad"—a court applying the canon may look beyond the statutory text to consider statutory context as well. *Id.* (citation modified); *see Small v. United States*, 544 U.S. 385, 391 (2005) ("statutory language, context, history, or purpose" may overcome presumption); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1344 (D.C. Cir. 2004) ("[W]e presumptively read the text of congressional statutes not to apply extraterritorially, unless there are contextual reasons for reading the text otherwise."). But where neither text nor context gives a "clear indication of extraterritoriality," *Morrison*, 561 U.S. at 265, or a statute's extraterritorial

3

application is merely "plausible," *Arabian Am. Oil Co.*, 499 U.S. at 250; *see id.* at 253; *Validus Reinsurance, Ltd. v. United States*, 786 F.3d 1039, 1047 (D.C. Cir. 2015), the presumption is not overcome.

The party asserting that a statute applies extraterritorially bears the burden of making an "affirmative showing" sufficient to overcome the presumption against extraterritorial application. *Arabian Am. Oil Co.*, 499 U.S. at 250.  Furthermore, "[i]n looking . . . to the statutory text, context, purpose, and legislative history for a clear indication of Congress's intent, the court necessarily avoids any case-by-case attempt to 'divine what Congress would have wanted if it had thought of the situation before the court' so as to 'preserve a stable background against which Congress can legislate with predictable effects.'"  *Validus Reinsurance*, 786 F.3d at 1046 (citation modified) (quoting *Morrison*, 561 U.S. at 261).

**B.      Counts I & II – 18 U.S.C. § 32(a)(1), (a)(2)**

As relevant here, 18 U.S.C. § 32(a)(1) and (a)(2) make unlawful certain acts involving aircraft "in the special aircraft jurisdiction of the United States."  18 U.S.C. § 32(a)(1); *see id.* § 32(a)(2) (referring to "any such aircraft").  For the purposes of both subsections, the term "special aircraft jurisdiction of the United States" encompasses certain "aircraft in flight," including a "civil aircraft of the United States," an "aircraft of the armed forces of the United States,"[1] "another aircraft in the United States,"[2] and "another aircraft outside the United States that has its next scheduled destination or last place of departure in the United States, if the aircraft next lands in the

---

[1] At the time of the charged offense, an "aircraft of the national defense forces of the United States."  49 U.S.C. app. § 1301(38)(b) (1988).

[2] At the time of the charged offense, "any other aircraft within the United States."  49 U.S.C. app. § 1301(38)(c) (1988).

United States."[3]  49 U.S.C. § 46501(2); *see* 18 U.S.C. § 31(b) (cross-referencing 49 U.S.C. § 46501).

The extraterritorial reach of subsections 32(a)(1) and (a)(2) is clear from the statutory text. To start, the disjunctive definition of "special aircraft jurisdiction"—which includes both "a civil aircraft *of* the United States" and "another aircraft *in* the United States," 49 U.S.C. § 46501(2)(A), (C) (emphases added)—establishes that the term encompasses certain civil aircraft of the United States that are not in the United States, as interpreting the definitional provision otherwise would render the former subcategory superfluous. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (noting that "one of the most basic interpretive canons" is that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (citation modified)).  Furthermore, the definition explicitly encompasses certain "aircraft *outside* the United States" that meet certain conditions, 49 U.S.C. § 46501(2)(D) (emphasis added), including any aircraft "that has its next scheduled destination or last place of departure in the United States, if the aircraft next lands in the United States," *id.* § 46501(2)(D)(i). Each of these aspects of the statutory definition of "special aircraft jurisdiction" provides a "clear indication of an extraterritorial application." *Morrison*, 561 U.S. at 255; *see United States v. Yousef*, 327 F.3d 56, 86–87 (2d Cir. 2003) (concluding that 18 U.S.C. § 32(a) applies extraterritorially based on different aspects of the statutory text); *United States v. Hamidullin*, 114 F. Supp. 3d 365, 384 (E.D. Va. 2015) ("The text of the applicable federal statutes makes it clear that Congress intended § 32(a) to apply extraterritorially." (citation modified)).  That clear

---

[3] At the time of the charged offense, "any other aircraft outside the United States that has its next scheduled destination or last point of departure in the United States, if that aircraft next actually lands in the United States. . . while that aircraft is in flight."  49 U.S.C. app. § 1301(38)(d)(i) (1988).

indication ends the Court's inquiry. *See Garvey v. Admin. Rev. Bd.*, 56 F.4th 110, 122 (D.C. Cir. 2022) ("*Where the text is not clear*, we turn next to assessing whether any indication of congressional intent overcomes the presumption against extraterritoriality." (emphasis added)).

Al-Marimi argues that, even if § 32(a)(1) and 32(a)(2) reach aircraft outside the United States, "it does not follow . . . that Congress intended the provisions to apply to *conduct* that occurs outside the United States." Reply 2, Dkt. 280. But an individual who "sets fire to," 18 U.S.C. § 32(a)(1), or "places . . . a destructive device . . . in," *id.* § 32(a)(2), an "aircraft outside the United States that has its next scheduled destination . . . in the United States, 49 U.S.C. § 46501(2)(D)(i), almost certainly performs the prescribed conduct outside of U.S. borders. As such, the proscribed conduct itself "impl[ies] extraterritorial reach." *Kiobel*, 569 U.S. at 118. *Contrast, e.g.*, *id.* ("The [Alien Tort Statute] covers actions by aliens for violations of the law of nations, but that does not imply extraterritorial reach—such violations affecting aliens can occur either within or outside the United States."). This extraterritorial reach is not merely "plausible," *Arabian Am. Oil Co.*, 499 U.S. at 253, but certain. It is therefore sufficient to "override the presumption against extraterritorial application" as to § 32(a)(1) and 32(a)(2). *Id.*

Accordingly, the Court will deny Al-Marimi's motion as to Counts I and II.

### C.    Count III – 18 U.S.C. § 844(i)

The Court will, however, grant Al-Marimi's motion as to Count III. The text, context, and legislative history of § 844(i) do not evince an "affirmative intention of the Congress clearly expressed" sufficient to overcome the presumption against extraterritorial application, *id.* at 248 (citation modified), and the government's arguments in favor of extraterritoriality are unpersuasive.

6

1.      *Text, Context, and Legislative History*

Section 844(i) criminalizes "maliciously damag[ing] or destroy[ing], or attempt[ing] to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."  18 U.S.C. § 844(i).

Nothing in this statutory text provides an "affirmative indication" that § 844(i) applies extraterritorially.  *Morrison*, 561 U.S. at 265.  The provision's sole gesture toward overseas conduct—"foreign commerce"—cannot overcome the presumption against extraterritorial application.  The Supreme Court has "repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to '*foreign* commerce' do not apply abroad." *Id.* at 262–63 (citation modified).  In *New York Central Railroad Co. v. Chisholm*, 268 U.S. 29 (1925), for example, the Supreme Court held that the Federal Employers' Liability Act "contains no words which definitely disclose an intention to give it extraterritorial effect," *id.* at 31, despite "broad jurisdictional language," *Arabian Am. Oil Co.*, 499 U.S. at 251, rendering common carriers by railroad liable for certain injuries while engaging in "interstate or foreign commerce," 45 U.S.C. § 51.  Similarly, in *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963), the Supreme Court held that the National Labor Relations Act does not contain "any specific language" reflecting a congressional intent to extend the Act to foreign-flag ships employing alien seamen, *id.* at 19; *see id.* at 13, notwithstanding the Act's broad references to foreign commerce, *see* 29 U.S.C. § 152(6).  And in *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991), the Supreme Court rejected the argument that Title VII's expansive definition of the jurisdictional term "commerce"—which includes "trade, traffic, commerce, transportation, transmission, or communication . . . between a State and any place outside thereof,"

7

29 U.S.C. § 2000e(g)—"evinces a clearly expressed intent on behalf of Congress to legislate extraterritorially," *Arabian Am. Oil Co.*, 499 U.S. at 248; *see id.* at 248–53.

There is no meaningful difference between § 844(i)'s "general reference to foreign commerce" and those in statutory provisions that the Supreme Court has held fail to "defeat the presumption against extraterritoriality." *Morrison*, 561 U.S. at 263. *Contrast, e.g.*, *United States v. Weingarten*, 632 F.3d 60, 66 (2d Cir. 2011) ("Moreover, § 2423(b)'s reference to 'foreign commerce' is not a 'boilerplate' reference of the type the Supreme Court has found insufficient to support extraterritorial application of federal statutes. Rather than forming part of a generic definition, the words 'travel[] in foreign commerce' here go to the heart of the statute's operative text, describing the specific conduct proscribed by the statute." (citation modified)).

The government asserts that each of the above cited cases is distinguishable as involving a civil statute and suggests that the presumption against extraterritorial application is weaker in the criminal context. *See* Opp'n 8, Dkt. 272. But the Supreme Court has made clear that the presumption applies "in all cases, preserving a stable background against which Congress can legislate with predictable effects." *Morrison*, 561 U.S. at 261. And the D.C. Circuit has observed that the presumption "makes sense" in the criminal context "because we assume that Congress desires to avoid conflict with other nations." *Delgado-Garcia*, 374 F.3d at 1344. Neither the Supreme Court nor the D.C. Circuit has indicated that the presumption against extraterritorial application diminishes when Congress legislates in the criminal sphere.

The government further argues that § 844(i)'s context and legislative history show that the provision applies extraterritorially. In particular, the government notes that neither § 844(i)'s surrounding subsections nor neighboring provision § 842 "explicitly provide extraterritorial jurisdiction in a way that would support a negative inference from [§ 844(i)'s] silence on the

8

issue," while "several" neighboring provisions "involve the importation of explosives"—an act the government argues is "inherently international." Opp'n 8–9 (citation modified). The government also contends that § 844(i)'s legislative history indicates that Congress "'intended to protect all business property,' a category to which a U.S. commercial airliner clearly belongs, wherever it happens to be at the time it is destroyed." *Id.* at 10 (citation modified) (quoting *Russell v. United States*, 471 U.S. 858, 862 (1985)); *see id.* at 9–10.

The Court disagrees. To start, the absence of a negative inference from surrounding provisions does not establish a positive inference suggesting extraterritorial application. *Contrast, e.g.*, *United States v. Sota*, 948 F.3d 356, 358 (D.C. Cir. 2020) ("Congress's explicit provision for extraterritorial jurisdiction in one provision . . . militates against inferring any such application for a closely related and nearby provision with no such signal."); *Garvey*, 56 F.4th at 124 ("Congress's silence on Section 806's scope—even as it amended the provision and provided for extraterritoriality elsewhere in the same statute—weighs strongly against a finding that Congress intended to provide for the overseas application of Section 806."). Furthermore, even assuming that the government is correct that neighboring provisions regarding the importation of explosives involve an "inherently international transaction," Opp'n 9 (citation modified), § 844(i) does not itself concern importation. The mere fact that § 844(i) was enacted alongside several neighboring provisions concerning importation does not, as the government contends, suggest that any inference of extraterritoriality extends also to § 844(i). Finally, legislative history indicating that Congress intended § 844(i) to "protect all business property," *id.* at 10 (citation modified), does not "evince an unambiguous congressional intent" to protect all such property wherever located, *Validus Reinsurance*, 786 F.3d at 1048; *cf. Kiobel*, 569 U.S. at 118 ("[I]t is well established that generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality."). "[N]o

legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). And the presumption against extraterritorial application gives "particular force" to the principle that "the task of statutory interpretation cannot be reduced to a mechanical choice in which the interpretation that would advance the statute's general purposes to a greater extent must always prevail." *Validus Reinsurance*, 786 F.3d at 1049 (citation modified).

2.    *Bowman*

The government's argument in favor of extraterritorial application relies primarily on the Supreme Court's decision in *United States v. Bowman*, 260 U.S. 94 (1922), "a nearly century-old chestnut of extraterritoriality doctrine" that "sits uneasily" with more modern Supreme Court precedent. *United States v. Abu Khatallah*, 151 F. Supp. 3d 116, 125 (D.D.C. 2015). For the reasons that follow, the Court will conclude that *Bowman* does not counsel in favor of a finding of extraterritoriality as to § 844(i).

i.    The Supreme Court's Decision in *Bowman*

*Bowman* involved 18 U.S.C. § 35, a criminal statute that then proscribed knowingly making or conspiring to make certain "false, fictitious, or fraudulent" claims "upon or against the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder." *Bowman*, 260 U.S. at 100 n.1 (citation modified); *see id.* at 101–02. The defendants in the case had allegedly conspired to defraud the United States Shipping Board Emergency Fleet Corporation—of which the United States was the sole stockholder—while aboard an Emergency Fleet Corporation vessel as it approached and upon reaching a harbor in Brazil. *See id.* at 95–96. No party disputed that the charged conduct occurred outside of the borders of the United States. *See id.* at 96–97. Rather, the defendants' "sole

10

objection was that the crime was committed without the jurisdiction of the United States or of any State thereof and on the high seas or within the jurisdiction of Brazil." *Id.*

The district court held that § 35 did not reach extraterritorial conduct. *See United States v. Bowman*, 287 F. 588, 593 (S.D.N.Y. 1921). The court noted that "[o]ne of the accepted functions of a sovereign is to regulate the ships under its flag on the high seas and the conduct of its citizens while on those ships" and that "Congress has power to enact legislation such as that embodied in [§ 35], applicable upon the high seas, if it so determines." *Id.* at 592. And it further acknowledged that, although the criminal laws of the United States are ordinarily effective only within U.S. territory, "the high seas are a part peculiarly within the jurisdiction of the United States in the application of its criminal laws, as distinguished from the states and their laws." *Id.* at 592–93. The district court observed, however, that "[w]hen . . . the Congress has intended that its laws shall be operative on the high seas, it has so stated." *Id.* at 593. Because "[j]urisdiction of criminal offenses" must be conferred rather than inferred and § 35, unlike other criminal statutes, did not contain "language extending the locus of the crime to the high seas or beyond the territory of the United States," the district court held that the statute did not extend to offenses committed on the high seas. *Id.*

On direct review, the Supreme Court reversed. *Bowman*, 260 U.S. at 103. The Court noted that the locus of a statute, "when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations." *Id.* at 97–98. "Crimes against private individuals or their property," the Court explained, "affect the peace and good order of the community" and "must of course be committed within the territorial jurisdiction of the government where it may properly exercise it." *Id.* at 98. Accordingly, "[i]f punishment of

11

them is to be extended to include those committed outside of the strict territorial jurisdiction, it is

natural for Congress to say so in the statute, and failure to do so will negative the purpose of

Congress in this regard." *Id.* The Court reasoned, however, that this "rule of interpretation" should

not be applied to criminal statutes that are "not logically dependent on their locality for the

Government's jurisdiction, but are enacted because of the right of the Government to defend itself

against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens,

officers or agents." *Id.* "Some such offenses," it explained, "can only be committed within the

territorial jurisdiction of the Government because of the local acts required to constitute them."

*Id.* But other offenses, the Court continued, "are such that to limit their *locus* to the strictly

territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave

open a large immunity for frauds as easily committed by citizens on the high seas and in foreign

countries as at home." *Id.*; *see id.* at 102 (referencing laws that "protect [the United States] and its

property"). "In such cases," the Court observed, "Congress has not thought it necessary to make

specific provision in the law that the *locus* shall include the high seas and foreign countries, but

allows it to be inferred from the nature of the offense." *Id.* at 98.

The Supreme Court proceeded to identify six federal crimes that, like § 35, fell within a

chapter of the U.S. Code entitled "Offenses against the operations of the Government," and, in the

Court's view, gave rise to an inference of extraterritoriality:[4]

- *Knowingly certifying a false invoice as a consul.* – "Clearly the *locus* of this crime as intended by Congress is in a foreign country." *Id.* at 99.

- *Forging or altering ship's papers.* – "The natural inference from the character of the offense is that the sea would be a probable place for its commission." *Id.*

---

[4] Although the Supreme Court's discussion of these statutory provisions was dicta, they "are important data points for understanding *Bowman*'s underlying rationale," especially in light of the fact that "*Bowman* has been entirely absent from the Supreme Court's modern extraterritoriality decisions." *Abu Khatallah*, 151 F. Supp. 3d at 126–27.

- *Enticing desertions from the naval service.* – "Is it possible that Congress did not intend by this to include such enticing done aboard ship on the high seas or in a foreign port, where it would be most likely to be done?" *Id.*

- *Bribing a United States officer of the civil, military, or naval service to violate his duty or to aid in committing a fraud on the United States.* – "It is hardly reasonable to construe this not to include such offenses when the bribe is offered to a consul, ambassador, an army or a naval officer in a foreign country or on the high seas, whose duties are being performed there and when his connivance at such fraud must occur there." *Id.*

- *Willfully doing or aiding to do any act relating to the bringing in, custody, sale or other disposition of property captured as prize, with intent to defraud, delay or injure the United States or any captor or claimant of such property.* – "This would naturally often occur at sea, and Congress could not have meant to confine it to the land of the United States." *Id.*

- *Stealing, embezzling, or knowingly applying to one's own use ordnance, arms, ammunition, clothing, subsistence, stores, money, or other property of the United States furnished or to be used for military or naval service.* – "It would hardly be reasonable to hold that if any one . . . were to steal or embezzle such property which may properly and lawfully be in the custody of army or naval officers either in foreign countries, in foreign ports or on the high seas, it would not be in such places an offense which Congress intended to punish by this section." *Id.* at 99–100.

"What [wa]s true of" each of these criminal provisions, the Supreme Court concluded, "[wa]s true of § 35." *Id.* at 100; *see id.* at 100–03. The Court further noted that Congress had amended the statute in 1918 to include a corporation in which the United States owns stock in order to "protect the Emergency Fleet Corporation . . . from fraud." *Id.* at 101–02. In light of that amendment and the fact that the Corporation "was expected to engage in, and did engage in, a most extensive ocean transportation business and its ships were seen in every great port of the world open during the war," the Court "c[ould] not suppose that when Congress enacted the statute or amended it, it did not have in mind that a wide field for such frauds upon the Government was in private and public vessels of the United States on the high seas and in foreign ports and beyond the land jurisdiction of the United States." *Id.* at 102. Accordingly, the Court held that Congress intended to encompass such frauds within § 35. *Id.*

13

ii.        The D.C. Circuit's Application of *Bowman*

While contemporary Supreme Court cases involving the presumption against extraterritorial application have neither cited nor applied *Bowman*, the D.C. Circuit has twice applied the case in recent years.

In *United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004), the D.C. Circuit held that 8 U.S.C. § 1324(a)—which criminalizes encouraging or inducing an alien to enter the United States illegally, or bringing or attempting to bring an unauthorized alien to the United States— applies to extraterritorial conduct. *See id.* at 1340, 1344. The court explained that "this country's border-control policies are of crucial importance to the national security and foreign policy of the United States." *Id.* at 1345. That "contextual feature," the court reasoned, "establishes that [§ 1324(a)] is fundamentally international, not simply domestic, in focus and effect" and serves as "affirmative contextual evidence of congressional intent" to extend the statute extraterritorially. *Id.*

The D.C. Circuit further found that "specific textual evidence" suggested that, as in *Bowman*, "the natural inference from the character of [§ 1324(a)'s proscribed] offenses is that an extraterritorial location would be a probable place for their commission." *Id.* (citation modified). For example, the court noted that § 1324(a) proscribes *attempts* to bring aliens to the United States. *Id.* at 1347. "Many incomplete attempts," the court reasoned, "occur outside the territorial jurisdiction of the United States"—"[b]ecause an alien will not be in the United States if the attempt is incomplete, the offender will ordinarily also be outside the United States during the attempt." *Id.* The court further noted that § 1324(a)'s "prohibition on encouraging or inducing illegal immigration . . . also has many natural extraterritorial applications," as it is "much easier" to induce an illegal immigrant to come to the United States "when in proximity to the immigrant."

14

*Id.* at 1347–48.  As such, the court concluded that the provision "by its terms contemplates application to much extraterritorial conduct."  *Id.* at 1348.  Based on this "textual evidence" and § 1324(a)'s "international focus," the D.C. Circuit found the presumption against extraterritorial application overcome.  *Id.* at 1351.

More recently, in *United States v. Sota*, 948 F.3d 356 (D.C. Cir. 2020), the D.C. Circuit held that 18 U.S.C. § 1114—which criminalizes killing or attempting to kill any officer or employee of the United States—did not, as then enacted, apply extraterritorially.  *Id.* at 357.[5]  The court began by concluding that the statute did not on its face "speak to extraterritorial application one way or the other" and that a "closely related and nearby provision" with explicit extraterritorial jurisdiction "militate[d] against inferring any such application" for § 1114.  *Id.* at 358; *see id.* at 358–59.

The court then proceeded to hold that *Bowman* did not counsel otherwise.  *See id.* at 359–60.  Rejecting the government's suggestion to "read *Bowman* as a broad rule that criminal statutes that protect the United States government from harm should not be construed to apply only within the United States," the court explained that it had in *Delgado-Garcia* "rested [its] finding that Congress intended extraterritorial application largely on the great likelihood that the outlawed conduct would occur abroad."  *Id.* at 360 (citation modified).  Finding no such "high probability" as to § 1114, the court declined to construe the statute as applying extraterritorially.  *Id.*

---

[5] Shortly after the D.C. Circuit issued its decision in *Sota*, Congress amended § 1114 "in light of the opinion" and to "clarify the original intent" that the statute "applies extraterritorially."  Jaime Zapata and Victor Avila Federal Officers and Employees Protection Act, Pub. L. No. 117-59, § 2(5), 135 Stat. 1468, 1468 (2021).

iii.    Analysis

Taken together, *Bowman*, *Delgado-Garcia*, and *Sota* stand for the principle that courts may infer extraterritorial application where (1) the offense directly harms the U.S. government, *see Bowman*, 260 U.S. at 98; *Delgado-Garcia*, 374 F.3d at 1346–47; *Sota*, 948 F.3d at 359–60; *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 381 (1948) (construing *Bowman* as involving "crimes directly affecting the Government"); *Skiriotes v. Florida*, 313 U.S. 69, 73–74 (1941) (similar); and (2) there is a "high probability that the criminalized conduct would occur abroad," *Sota*, 948 F.3d at 360; *see Delgado-Garcia*, 948 F.3d at 1346–48 ("much" of the criminalized conduct must "occu[r] beyond the borders of the United States"), such that "to limit [the statute's] *locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute," *Bowman*, 260 U.S. at 98; *see Delgado-Garcia*, 948 F.3d at 1345–46.[6]

Section 844(i) does not satisfy this standard.

To start, § 844(i) does not have textual or contextual features that suggest that it criminalizes conduct that harms the United States or its property. *Delgado-Garcia*, 374 F.3d at 1345; *see Bowman*, 260 U.S. at 98, 102. Unlike a statute referencing government property or personnel, § 844(i) speaks of generalized harms to "real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). *Contrast, e.g.*, *Bowman*, 260 U.S. at 100 n.1 (criminal statute pertaining to "false, fictitious, or fraudulent" claims "upon or against the Government of the United States, or any department or

---

[6] Another court in this District has crafted a similar rule, finding that "*Bowman* is satisfied when (1) a federal criminal offense directly harms the U.S. Government, and (2) enough foreseeable overseas applications existed at the time of a statute's enactment (or most recent amendment) to warrant the inference that Congress both contemplated and authorized prosecutions for extraterritorial acts." *Abu Khatallah*, 151 F. Supp. 3d at 129; *see United States v. Alahmedalabdaloklah*, 94 F.4th 782, 805 (9th Cir. 2024) (adopting this rule).

16

officer thereof, or any corporation in which the United States of America is a stockholder"); *id.* at 99–100 (discussing various offenses against the government); *Delgado-Garcia*, 374 F.3d at 1340, 1348 (discussing offenses involving border control policies). And there is no indication that Congress enacted § 844(i) with an eye toward safeguarding government property or interests. *Contrast, e.g.*, *Bowman*, 260 U.S. at 101–02 (Congress had amended statute in order to protect corporation in which the United States owned stock from fraud); *Delgado-Garcia*, 374 F.3d at 1345 (statute, by its terms, implicated government's border control policies).

Nor does "specific textual evidence," *Delgado-Garcia*, 374 F.3d at 1345, suggest that much of § 844(i)'s proscribed conduct would "[c]learly," "most likely," or "naturally" occur abroad, *Bowman*, 260 U.S. at 99. A broad proscription against damaging or destroying "real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce," 18 U.S.C. § 844(i), does not "by its terms contemplat[e] application to much extraterritorial conduct," *Delgado-Garcia*, 374 F.3d at 1348. *Contrast, e.g.*, *id.* at 1347 (reasoning that "[m]any incomplete attempts" to bring aliens to the United States "occur outside the territorial jurisdiction of the United States" because the offender "will ordinarily also be outside the United States during the attempt"). Indeed, it sounds in the register of a statute addressing "[c]rimes against private individuals or their property" that "affect the peace and good order of the community" and are most naturally "committed within the territorial jurisdiction of the government." *Bowman*, 260 U.S. at 98. Accordingly, the Court cannot conclude that limiting § 844(i)'s "*locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute" by "leav[ing] open a large immunity." *Id.*

The government's arguments in favor of extraterritorial application under *Bowman* are unpersuasive.

First, the government argues that § 844(i) "protects U.S. national security" because "[a]ir travel is a highly regulated industry that forms a critical part of the nation's transportation infrastructure." Opp'n 11; *see id.* at 11–12. Whatever force that argument would have as to a criminal statute specifically directed at safeguarding air travel, *see, e.g.*, 18 U.S.C. § 32(a), § 844(i) is not such a provision. Indeed, under the logic of the government's argument, a criminal statute would implicate a security interest of the United States so long as *any* application of the statute could be said to do so.

Second, the government contends that "[b]ombings of vehicles used in foreign commerce are likely to happen abroad." Opp'n 13. However true that statement might be, neither *Bowman* nor D.C. Circuit precedent call for a finding of extraterritoriality on the basis that the criminalized conduct is *likely* to occur abroad. Rather, there must be a "*great likelihood* that the outlawed conduct would occur abroad," *Sota*, 948 F.3d at 360 (emphasis added), such that the efficacy of the statute depends on the statute applying extraterritorially, *see Bowman*, 260 U.S. at 98. For the reasons already stated, such a "high probability" is not implicated here. *Sota*, 948 F.3d at 360.

Third, the government suggests that the Court's extraterritoriality analysis can be limited to the question whether "*this* application of the statute—to the midair bombing of a U.S.-registered aircraft owned by a U.S. company and carrying U.S. citizens *en route* to the United States—is within the scope of what Congress sought to authorize." Opp'n 14. But the task before the Court is to determine whether Congress intended § 844(i) to apply extraterritorially, *see Validus Reinsurance*, 786 F.3d at 1046, not whether Congress would have wanted § 844(i) to reach certain proscribed offenses if conducted abroad, *cf. Morrison*, 561 U.S. at 261 ("The results of judicial-speculation-made-law—divining what Congress would have wanted if it had thought of the situation before the court—demonstrate the wisdom of the presumption against extraterritoriality.

18

Rather than guess anew in each case, we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects.").  The government offers neither binding nor persuasive authority to support its argument that a finding of extraterritoriality as to the charged conduct would not compel a finding of extraterritoriality as to all conduct that § 844(i) proscribes.

Finally, the government asserts in a footnote that, should the Court rule that § 844(i) does not apply extraterritorially, "the government reserves the right to argue to the jury that the offense occurred within the special maritime and territorial jurisdiction of the United States," which it contends "would be a domestic application of the statute."  Opp'n 14 n.12 (citing 18 U.S.C. § 7(5)). But § 844(i) does not, by its terms, extend to the "special maritime and territorial jurisdiction of the United States."  18 U.S.C. § 7.  *Contrast, e.g.*, *United States v. Corey*, 232 F.3d 1166, 1169–72 (9th Cir. 2000) (addressing 18 U.S.C. §§ 2241 and 2242, both of which "proscribe sexual assault within the 'special maritime and territorial jurisdiction of the United States,' a phrase defined by 18 U.S.C. § 7").  And, in any event, the D.C. Circuit has suggested that such jurisdiction qualifies as extraterritorial.  *See United States v. Abukhatallah*, 41 F.4th 608, 630 n.12 (D.C. Cir. 2022).[7]

Accordingly, the Court concludes that the government's alternative argument is foreclosed and will dismiss Count III for lack of extraterritorial application.

### D.      Due Process

Al-Marimi further argues that the extraterritorial application of U.S. law to the charged conduct violates due process.  *See* Mot. to Dismiss 17–19.  The circuits are split on the appropriate

---

[7] Both the Criminal Complaint and the Indictment in this case, for their part, allege that the charged conduct occurred "in London, England, Lockerbie, Scotland, and airspace above Lockerbie, Scotland, and, therefore, outside of the jurisdiction of any particular state or district of the United States, *but within the extraterritorial jurisdiction of the United States*."  Criminal Compl. 1, Dkt. 1 (emphasis added); *see* Indictment ¶ 11 (similar).

19

standard for such a due process challenge.  *Compare, e.g.*, *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013) ("What appears to be the animating principle governing the due process limits of extraterritorial jurisdiction is the idea that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." (citation modified)), *with, e.g.*, *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) ("In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." (citation modified)).  But the D.C. Circuit has "repeatedly declined . . . to hold that the Due Process Clause demands [a nexus between the proscribed overseas conduct and the United States]—or to even resolve whether the Due Process Clause constrains the extraterritorial application of federal criminal laws at all."  *In re Sealed Case*, 936 F.3d 582, 593–94 (D.C. Cir. 2019) (citation modified).  As Al-Marimi acknowledges, *see* Mot. to Dismiss 18–19, this authority binds this Court and forecloses his due process challenge.

* * *

Accordingly, it is

**ORDERED** that the defendant's Motion to Dismiss for Lack of Extraterritorial Jurisdiction, Dkt. 252, is **DENIED** as to Counts I and II and **GRANTED** as to Count III.

**SO ORDERED.**

DABNEY L. FRIEDRICH
United States District Judge

May 26, 2026

20