**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 1:22-cr-392 (DLF) |
| | ) | |
| ABU AGILA MOHAMMAD | ) | |
| MAS'UD KHEIR AL-MARIMI, | ) | |
| Defendant. | ) | |

**MR. AL-MARIMI'S MOTION FOR RECONSIDERATION OF THE COURT'S
JUNE 8, 2026 ORAL RULING ADMITTING THE VISITORS LIST,
THE HOTEL REPORT, AND THE FLIGHT RECORD**

Mr. Al-Marimi, through counsel, respectfully asks the Court to reconsider its June 8, 2026 oral ruling provisionally admitting three documents from the Stasi archives. Two are Stasi records—a visitors list compiled from visa requests (Exh. 603) (the "Visitors List"), and a report describing hotel registration information (Exh. 608) (the "Hotel Report")—and the third appears to be a flight manifest from Interflug, the national airline of East Germany (Exh. 611) (the "Flight Record").

Mr. Al-Marimi first requests that the Court reconsider its ruling that these documents are admissible under Rule 404(b). The Court ruled that they were admissible as part of a broader category of "La Belle evidence," but taken by themselves, the three documents at most show Mr. Al-Marimi's presence in Berlin during a particular date range. As such, they are not themselves Rule 404(b) evidence, and their only possible relevance to the case is to corroborate other evidence about his involvement in the bombing of the La Belle Discotheque. This is impermissible under D.C. Circuit caselaw.

1

Mr. Al-Marimi also requests that the Court reconsider its rulings that the three documents do not contain inadmissible hearsay, specifically requesting reconsideration of the rulings that:

(1) the statements underlying the Visitors List fall within the hearsay exemption for coconspirator statements in Rule 801(d)(2)(E) because the unidentified Libyan official who submitted a visa request for Mr. Al-Marimi was part of a lawful joint enterprise to gain Mr. Al-Marimi's admission to East Germany, meaning the official was his coconspirator for purposes of the Rule;

(2) the statements underlying the Hotel Report are admissible on three alternative bases: (a) under Rule 801(d)(2)(A) if Mr. Al-Marimi himself completed the hotel registration card used to generate the Report; (b) under Rule 801(d)(2)(E) if Shadi, who is listed on the report as sharing a room with Mr. Al-Marimi for one night, completed the hotel registration card; and (c) as adoptive admissions under Rule 801(d)(2)(B) if either Mr. Al-Marimi or Shadi dictated the information contained on the card to a hotel clerk; and

(3) the Flight Record, which was in the Stasi archives but is not a Stasi document, has been authenticated as an ancient document because it was "in a place where, if authentic, it would likely be" under Rule 901(b)(8)(B).[1]

Reconsideration is warranted because since the Court's oral ruling on these documents on June 8, 2026, the parties have extensively briefed the Rule 801(d)(2)(E) hearsay exemption for coconspirator statements. *See* ECF 491, 496, 497, 505. The

---

[1] Mr. Al-Marimi maintains all of his prior objections to the admission of these documents, but he limits the scope of this reconsideration motion to these issues.

Court ruled on that issue on August 6, 2026.[2] That issue is directly relevant to the rulings on the Visitors List and Hotel Report, and Mr. Al-Marimi requests reconsideration in part to ensure that the Court's ruling on these documents is consistent with its other rulings on Rule 801(d)(2)(E).

## BACKGROUND

The admissibility of these documents has been addressed extensively in several rounds of briefing and at multiple hearings. *See* ECF 147; ECF 174; ECF 182; ECF 411; ECF 430; ECF 432; ECF 433; ECF 445; ECF 457. The Court is familiar with the nature of the documents and the procedural history of the motions, but Mr. Al-Marimi summarizes this lengthy procedural history below for ease of reference.

## I.    The Visitors List, Hotel Report, and Flight Record

The Visitors List is "a list of persons for whom the Libyan government requested visas to enter East Germany in 1986." ECF 147, at 20. The government has described it as "derived from the original individual visa requests, which were transmitted in writing from the government of Libya to the government of East Germany and processed by the East German Foreign Ministry," and "merely a summary of the details from numerous original visa requests." *Id.* at 21, 27. The Visitors List includes an entry for "ABUAGELA, M. K. Masud." Exh. 603.

The Hotel Report is a "report containing information about hotel occupancy," drawn from a larger Stasi surveillance file. ECF 147, at 22. Its author attests the information therein is drawn from "the hotel's registration cards and/or copies of the

---

[2] Mr. Al-Marimi will promptly file an amended version of this motion after review of the transcripts, should the Court's ruling impact the arguments made here.

guests' passports." Exh. 608-C. The government states it "was not able to obtain any original hotel records" for the relevant booking. ECF 147, at 22. The Hotel Report states that "MASUD and SHADI resided in room 526 of the Interhotel Metropol between 4/4/1986 and 4/5/1986." Exh. 608.

The Flight Record is a one-page document, dated April 22, 1986, that "appears to be a passenger list for flights on April 23, 1986," including the route from Berlin Schönefeld Airport to Tripoli, and containing the names "ABOAGILA/MR" and "ABDULHAKIM/MR." ECF 411, at 7. Unlike the Visitors List and Hotel Report, the government offered no declaration or exemplar document addressing its origin, compilation, or the recordkeeping practices of Interflug, the East German state airline whose logo the document bears. *See id.* The declaration the government submitted in support of the document merely states that the declarant "recognize[s] this Interflug document as having come from the Stasi files." ECF 411-1, at 5.

## II.    The Government's Rule 404(b) Motion and the Court's Ruling

On September 4, 2025, the government moved *in limine* for a ruling that the Stasi records, which it argued place Mr. Al-Marimi in Berlin at the time of the bombing of the La Belle Discotheque, are admissible under Rule 404(b), along with other evidence related to that bombing. The government's initial briefing put forth several non-propensity purposes for admitting evidence related to La Belle under Rule 404(b): corroboration of Mr. Al-Marimi's alleged statement about the La Belle bombing and the Pan Am 103 bombing; his alleged motive as an officer of the External Security Organization ("ESO"); his alleged knowledge of bombmaking; as *modus*

*operandi* evidence; and intent. ECF 147, at 7–13. In subsequent supplemental briefing, the government expanded its Rule 404(b) theories, including an argument that the documents are admissible to "rule out mere coincidence" under the "doctrine of chances" because it was unlikely to be coincidental that Mr. Al-Marimi was in Berlin around the time of the La Belle bombing and in Malta around the time of the Pan Am 103 bombing. ECF 432, at 16–19.

The Court addressed the Rule 404(b) issues at hearings on May 4, 2026 and June 1, 2026, and ruled on the motion orally on June 8, 2026. The Court ultimately grouped together the three documents and other evidence about the La Belle bombing, concluding that all of this "other acts evidence" was admissible under Rule 404(b). June 8, 2026 Tr. at 19–22. The Court's ruling did not accept the government's theories wholesale, declining to rely on the corroboration theory and rejecting the government's *modus operandi* theory because "the two bombs are insufficiently alike." *Id.* at 38. The Court did, however, find the La Belle evidence probative of intent, knowledge, and identity (based on the doctrine of chances, not *modus operandi*). *Id.* at 30–39. The Court provisionally found that, based on the alleged confession and the three Stasi-related documents at issue here, which the Court characterized as "corroborat[ing] certain facts in the defendant's alleged statement," "a reasonable jury could find by a preponderance of the evidence that the defendant, and not someone else, participated in the La Belle bombing." *Id.* at 43.

Turning to Rule 403, the Court concluded that the risk of unfair prejudice did not substantially outweigh the evidence's probative value. Mr. Al-Marimi had argued

that any probative value was substantially outweighed by the risk of unfair prejudice inherent in asking a jury to consider a second, uncharged act of international terrorism against Americans, stating that "[i]t is hard to imagine what could be more prejudicial than evidence a defendant was involved in *more than one* terrorist bombing against the citizens of the nation that is prosecuting him," ECF 174, at 18 (emphasis in original). He further argued, invoking *Old Chief v. United States*, 519 U.S. 172 (1997), that the government possessed adequate, less prejudicial alternatives. The Court reasoned that the La Belle bombing was, "at most, equal in its seriousness and inflammatory potential to the violent terrorist attack charged in this case and not more so," June 8, 2026 Tr. at 47; that it would limit the scope of the government's presentation in specified ways *id.* at 47–50; and that the evidentiary alternatives were not adequate substitutes. *Id.* at 50–53.

The Court's Rule 404(b) ruling was expressly made contingent on the outcome of Mr. Al-Marimi's then-pending motion to suppress his statement, *id.* at 53. On August 6, 2026, the Court ruled from the bench on that motion, denying it and admitting portions of Mr. Al-Marimi's alleged statement.

## III.   Hearsay Issues in Connection with the Rule 404(b) Motions

The issue of whether the Stasi records are inadmissible hearsay has been litigated extensively since the government's original motion *in limine*, evolving through multiple rounds of briefing and multiple hearings before the Court's ruling. The government has never produced the original documents underlying the Hotel

Report and Visitors List,[3] and it has advanced a shifting sequence of theories to resolve this problem—arguing variously that the underlying documents were not offered for the truth, that they were admissible as public or business records,[4] and that they were admissible as non-hearsay party or coconspirator statements.

### A. Visitors List and Underlying Visa Request

The government attempted to resolve the nested-hearsay problem for the Visitors List by arguing that the underlying visa request was a verbal act incapable of being true or false. ECF 411, at 8–9. In the alternative, the government argued the request qualified as a coconspirator statement under Rule 801(d)(2)(E), or as a public or business record. *Id.* at 9–10.

Mr. Al-Marimi argued the visa request plainly asserted a fact—that a person with particular identifying information sought entry to East Germany on particular dates—and that the government's own use of the document depended entirely on the truth of that assertion. ECF 430, at 20–21. He further argued the coconspirator theory was untethered to any showing that the person who processed the request shared a criminal or otherwise relevant purpose with Mr. Al-Marimi. *Id.* at 22. He

---

[3] At a hearing on November 12, 2025, the government conceded that (1) for the Visitors List, "the actual underlying primary source record that is particular to the defendant could not be found," Nov. 12, 2025 Tr. at 48, and (2) for the Hotel Report, "[t]he actual registration card that was the source of the information is missing" and that it would not be able to call the hotel custodian, *id.* at 46. It also conceded that it had no cases "where a court has allowed the government to certify like a related document but not the document itself in sort of another analogous missing document instance." *Id.* at 49–50.

[4] At the November 12, 2025 hearing, the Court rejected the public records theory because of the Stasi's law enforcement functions. Nov. 12, 2025 Tr. at 43; *see* June 8, 2026 Tr. at 3. The Court also addressed the public records exception at length in connection with other documents at a hearing on January 12, 2026.

later noted the government's failure to address the independent-evidence requirement of *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006)—that "the existence of the 'conspiracy' be established by 'some independent evidence' apart from the statement at issue," since the only evidence of any "joint venture" between Mr. Al-Marimi and the unidentified requesting official was "the statements the government seeks to admit to prove that entry." ECF 457, at 15–16. The Court addressed these arguments at the June 1, 2026 hearing.

The Court's June 8, 2026 ruling rejected the theory that the Visitors List was not offered for its truth. June 8, 2026 Tr. at 10. On the ancient documents exception, the Court first concluded that the Visitors List can be authenticated under Rule 901(b)(8) and that it falls under the hearsay exception in Rule 803(16). The Court then adopted the majority rule that ancient documents are subject to a nested-hearsay analysis. *See, e.g., Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 189–91 (3d Cir. 2016). It concluded the original visa request underlying the ABUAGELA entry in the Visitors List was a coconspirator statement under Rule 801(d)(2)(E), finding "the defendant was operating as an agent of Libya's security organization and the requester operating as an agent of the same country and in furtherance of the common scheme or enterprise of gaining the defendant's admission to East Germany." June 8, 2026 Tr. at 12. The Court stated the requesting official "need not have known" of any bombing-related purpose because "the lawful enterprise facilitating the travel of Libyan officials is sufficient" under *United States v.*

8

*Brockenbrough*, 575 F.3d 726 (D.C. Cir. 2009). June 8, 2026 Tr. at 12. The ruling did not mention *Gewin* or the independent-evidence requirement.

The Court also noted that the visa request may be admissible under the residual exception in Rule 807 but expressly declined to rest its holding on that ground. *Id.* at 14.

### B.  Hotel Report and Underlying Hotel Registration Card

The Hotel Report presented a related problem: the government could not produce the supposedly underlying registration card from the Metropol Hotel. Nov. 12, 2025 Tr. at 46. The government contended that the missing card independently qualified as a business record, supported by a declaration from the Stasi officer who purportedly authored the Hotel Report and by an Archives Declaration offered to establish that a records custodian could serve as a "qualified witness" under Rule 803(6)(D) despite lacking firsthand knowledge of the Metropol's practices. ECF 411, at 10–11. It later argued hotels in East Germany "were overwhelming[ly] state-run," suggesting the Metropol likely followed practices similar to other, better-documented hotels. ECF 445, at 36–37.

At the June 8, 2026 ruling, the Court held the Hotel Report, like the Visitors List, was an ancient record authenticable under Rule 901(b)(8) and falling under the hearsay exception in Rule 803(16). With respect to the nested-hearsay issue, the Court did not rule on the business-records foundation, but held the underlying registration card was not hearsay because it was "more than likely completed by the defendant as a guest of the hotel" and therefore a party admission under Rule

801(d)(2)(A). June 8, 2026 Tr. at 14. Alternatively, if Shadi completed the card on Mr. Al-Marimi's behalf, it would be admissible as a coconspirator statement under Rule 801(d)(2)(E); and even if a hotel clerk transcribed dictated information, the card would be an adoptive admission under Rule 801(d)(2)(B), because Mr. Al-Marimi "manifested the truth of the information on the card by providing the relevant name, date, and passport number." *Id.* at 16.

### C. The Flight Record

The Flight Record entered the case more than six months after the original motion. ECF 411, at 7. Unlike the Visitors List and Hotel Report, for which the government eventually produced exemplar documents from the same purported source (Exhs. 604, 609) and declarations addressing the specific recordkeeping practices of the entities that generated them, the government offered no comparable document-specific foundation here. Its authentication theory relied on the same general Archives Declaration paragraphs used for the other two documents— declarations addressing Stasi recordkeeping, not Interflug's. The government later argued that the Flight Record resembles unrelated flight manifests already conditionally admitted as business records, with a side-by-side visual comparison. ECF 445, at 38–39.

In its June 8, 2026 ruling, the Court held the Flight Record was authenticable as an ancient document. The Court stated, "The government offers no additional evidence of the flight record's authenticity, but the Court notes that the flight record . . . appears much like the flight manifests introduced from other countries in this

case, bears the logo of Interflug and resembles the sort of ministerial recordkeeping that the Court has already found typical to the business of operating an airport or airline." June 8, 2026 Tr. at 8. On whether the document came from a place where, if authentic, it would likely be found, the Court reasoned that "although the Stasis did not create the flight record, the Court finds that it is likely that the Stasi routinely collected this information, too," citing the same Archives Declaration paragraphs relied upon for the other two documents. *Id.* at 9.[5]

## LEGAL STANDARD

A district court may revisit an interlocutory ruling at any time before final judgment "as justice requires." *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004). Rulings *in limine* are "subject to change when the case unfolds[;] . . . even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce v. United States*, 469 U.S. 38, 41–42 (1984).

---

[5] The June 8, 2026 ruling did not end the parties' dispute over coconspirator statements under Rule 801(d)(2)(E). On June 15, 2026, the Court ordered Mr. Al-Marimi to file a supplemental brief addressing "whether and how the government may use the third-party statements in the defendant's alleged confession, together with independent evidence, to prove a conspiracy and, in turn, admit those statements under Rule 801(d)(2)(E)." Mr. Al-Marimi and the government filed further briefing on the rule. *See* ECF 497, 505. At a July 30, 2026 hearing, the Court expressed skepticism toward the government's broadly framed conspiracies, stating they were "so broad and abstract" that they could not be "limited in any way," and indicating it was "more inclined to view" the case as involving narrower, separate conspiracies. July 30, 2026 Tr. at 6, 19. The Court issued further rulings on these issues on August 6, 2026.

## ARGUMENT

I.     **The Visitors List, Hotel Report, and Flight Record are not admissible under Rule 404(b).**

A. **The records are not themselves probative of motive, intent, or knowledge, and should not be admitted to corroborate other evidence admitted under Rule 404(b).**

At the June 8, 2026 hearing, the Court conducted the Rule 404(b) analysis of all of the La Belle evidence as a whole. On reconsideration, Mr. Al-Marimi asks that the Court reconsider its ruling and analyze the Visitors List, Hotel Report, and Flight Record apart from the other La Belle evidence under Rule 404(b). Standing alone, these documents show that a person using Mr. Al-Marimi's name and certain other information requested entry to East Germany, stayed at a hotel in East Berlin, and departed on a flight to Tripoli, all within a three-week window in April 1986. That is all. Their entire evidentiary value lies in corroborating other evidence about the La Belle bombing, not in independently satisfying any permissible Rule 404(b) purpose. They clearly are not probative of three of the bases on which the Court admitted the broader La Belle evidence: Mr. Al-Marimi's alleged intent with respect to the charged conduct, his motive as an ESO officer, and his knowledge of bombmaking. Mr. Al-Marimi asks that the Court reconsider its ruling that they are admissible for these Rule 404(b) purposes. The government's "doctrine of chances" argument about identity, the Court's fourth basis for admission, is addressed separately below, *see infra* Section I(B).

The Court should not admit the documents as probative of intent, knowledge, or motive based on the purported corroboration of other Rule 404(b) evidence. In

*United States v. Linares*, 367 F.3d 941 (D.C. Cir. 2004), the D.C. Circuit squarely held that "corroboration . . . does not provide a separate basis for admitting evidence. . . . [P]rior-acts evidence must corroborate other evidence by proving a proper element, such as intent or identity." *Id.* at 949. Where the uncharged evidence does not itself establish a permissible purpose under Rule 404(b) but is offered only because it happens to line up with other evidence in the case, admission is improper. *See id.*

At the June 8, 2026 hearing, the Court properly distinguished *United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000), on which the government has relied throughout this litigation. As the Court noted, "[t]he defendant in *Bowie* did not admit to a series of separate incidents of criminal conduct"; rather, "[t]he other acts evidence in *Bowie* was directly relevant to the charged conduct." June 8, 2026 Tr. at 40. Because the allegations here concern two *separate* incidents, the Court concluded that "*Bowie* does not squarely govern this case." *Id.* Moreover, the uncharged act in *Bowie*—the defendant's possession of a separate batch of counterfeit currency a month before his arrest—was itself an independent bad act, and its relevance did not depend on some other piece of evidence describing what the defendant did with it. The other-acts evidence in *Bowie* corroborated the defendant's confession precisely because it *independently* proved a fact (possession of counterfeit currency from the same bundle) that was itself probative of the charged conduct.[6]

---

[6] Separately, *Bowie* declined to follow the Second and Ninth Circuits, which hold that "for bad acts evidence introduced for the purpose of corroboration, . . . the corroboration [must] be direct and the corroborated matter [must] be significant." *Bowie*, 232 F.3d at 933 n.7 (declining to follow *United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987), and *United States v. Pitts*, 6 F.3d 1366, 1370–71 (9th Cir. 1993)); *see also United States v. Figueroa*, 976 F.2d 1446, 1454 (1st Cir. 1992) (requiring directness and significance); *United States v.*

Here, the relationship runs the other way. The Visitors List, Hotel Report, and Flight Record are not probative of the charged conduct on their own. At best, they become relevant only when read through the lens of Mr. Al-Marimi's alleged statement: under the theory that Mr. Al-Marimi was in Berlin to be involved in the La Belle bombing, the documents are probative of his presence in Berlin at the time. Remove the statement, and the documents show only his travel to and presence there. This is precisely the kind of "corroboration" theory that *Linares* forbids.

The problem is not merely academic. If documents that establish nothing more than a defendant's presence in a particular place at a particular time could be admitted under Rule 404(b) simply because that presence corroborates a separately-offered confession to an uncharged crime, then Rule 404(b) would impose no meaningful limit at all: the government could always locate some innocuous fact—a hotel stay, a purchased ticket, a border crossing—that lines up with a defendant's own account of an uncharged act, and admit it as "corroboration" without ever identifying which of the Rule's enumerated purposes the fact independently serves. That is exactly the maneuver *Linares* rejected when it explained that the government cannot invoke "corroboration" as a talisman to admit evidence that does not itself prove intent, identity, motive, or another proper purpose. 367 F.3d at 949.[7]

---

*Blakeney*, 942 F.2d 1001, 1019 (6th Cir. 1991) (same). Mr. Al-Marimi acknowledges that *Bowie* is binding precedent, but he maintains that, to the extent evidence used for corroboration is permissible at all, the approach of the First, Second, Sixth, and Ninth Circuits is correct. Any corroboration provided by the documents at issue here is not direct, and the matter of whether Mr. Al-Marimi was in Berlin at the time of the La Belle bombing is not significant to the charged conduct.

[7] Mr. Al-Marimi recognizes that the Court's ruling did not rest its 404(b) analysis on corroboration alone; the Court expressly declined to rely on that theory "in an abundance of

Moreover, even if the Court finds corroboration to be a permissible purpose under Rule 404(b), it has little probative value, if any, and should be excluded under Rule 403. *See United States v. Bailey*, 319 F.3d 514, 520 (D.C. Cir. 2003) (holding "[t]he likelihood of confusion and prejudice seems overwhelming" when evidence had "little probative value for permissible corroborative purposes," and "[t]he permissible link is subtle, the impermissible one obvious and likely to be salient.").

## B. The records should not be admitted as evidence probative of Mr. Al-Marimi's identity under the doctrine of chances.

"The doctrine of chances permits the factfinder, *in rare cases*, to infer that a repeated, highly unusual event is unlikely to have occurred innocently when the underlying incidents share a sufficiently specific factual pattern." *United States v. Bass*, No. 25-0149, slip op. at 8, 2026 WL 1882792, at \*4 (C.A.A.F. June 24, 2026) (emphasis added); *accord People v. Spoto*, 795 P.2d 1314, 1319–20 (Colo. 1990) ("Dissimilar prior acts are not probative under the doctrine of chances. 'Since it is the improbability of a like result being repeated by mere chance that carries probative weight, the essence of this probative effect is the likeness of the instance.' . . . [S]imilarity is crucial when the theory of logical relevance is the doctrine of chances.") (quoting 3 J. Wigmore, *Evidence* § 302 (1979)).

The Court reasoned that Mr. Al-Marimi's alleged presence near two separate locations purportedly relevant to terrorist bombings was too improbable to be

---

caution," June 8, 2026 Tr. at 42, when evaluating the La Belle evidence generally. But that caution was not extended to the documents specifically. The documents were folded into the same category as the statement and evaluated under the same umbrella of intent, motive, knowledge, and identity—purposes that the documents do not independently serve.

15

coincidental. But the doctrine of chances depends on the recurrence of a distinctive, improbable event—not just alleged presence in a city, but participation in a specific act—happening to the same person more than once. As the Court stated on May 4, "it's not enough to simply say you're in two locations." May 4, 2026 Tr. at 83.

Courts have rejected the doctrine of chances even where the prior acts were far more specific than mere presence in two cities years apart. For example, in *Bass*, the defendant had testified in 2021 that he "unknowingly ingested THC-8 through vitamin gummies supplied by his wife," but at a subsequent trial about a separate positive urinalysis result, he did not raise an "innocent ingestion narrative tied to similar circumstances." Slip op. at 9. The Court of Appeals for the Armed Forces held that, because the defendant did not raise such a narrative as a defense, "the 2021 urinalysis results and prior testimony merely invited a forbidden propensity inference that because the accused tested positive before, he likely used THC-8 knowingly and wrongfully on the charged occasions[.]" *Id.*

Similarly here, Mr. Al-Marimi has not raised an innocent narrative justifying his presence in Malta.[8] Accordingly, the Visitors List, Hotel Report, and Flight Record merely invite the forbidden propensity inference that because he was in Berlin at the time of the La Belle bombing, he is more likely to have been involved in the Pan Am 103 bombing. *See also Banuchi v. City of Homestead*, 608 F. Supp. 3d 1206, 1218–19 (S.D. Fla. 2022), *aff'd,* No. 22-12375, 2024 WL 2014424 (11th Cir. May 7, 2024) (holding evidence that police defendant had been involved in six shootings—including

---

[8] At the May 4 hearing, this Court contemplated that such a defense could open the door. May 4, 2026 Tr. at 82.

16

three fatal ones—in ten years, and raised self-defense in each case, "falls flat," even though the court found "the recited statistics, without more, disturbing").

The cases the government relies on all involve much more specific conduct than mere presence in the same city as two incidents, years apart. In *United States v. Henthorn*, 864 F.3d 1241, 1252 (10th Cir. 2017), the Tenth Circuit found admissible evidence about two prior incidents—one involving the defendant's first wife, and one involving his second wife, the decedent in the case—which, like the charged conduct, "occurred in a remote location which impeded communications, delayed emergency responders, and reduced the likelihood of accidental witnesses," to which the defendant was the only witness, and about which the defendant told inconsistent stories. In *United States v. Pricop*, No. CR-22-02747-001-TUC-JCH (EJM), 2025 WL 1869444, at *1 (D. Ariz. July 7, 2025), a case charging three counts of arson for setting fire to three Swift tractor trailers, the government was allowed to introduce evidence about 19 fires that were "part of a single criminal transaction[,] . . . all involved the same victim, shared similar characteristics, and occurred during a relatively short time period." And in *Miller v. Baldwin*, 723 F. App'x 408, 410 (9th Cir. 2018), the Ninth Circuit held, in a case charging the defendant with murdering his two wives, that evidence of each of the defendant's wives' disappearance was admissible in the case of the other wife's murder.

The government cites no cases in which a court has held that an innocuous fact like presence in two different cities at the same time as two different incidents can be admitted under the doctrine of chances. Because the Visitors List, Hotel Report, and

17

Flight Record do not independently establish that Mr. Al-Marimi committed, or even was present at the scene of, an "act" within the meaning of Rule 404(b), the Court should not admit them under the doctrine of chances.

## II. The statements in the Visitors List derived from underlying visa requests do not fall within the hearsay exemption for coconspirator statements in Rule 801(d)(2)(E).

In *Bourjaily v. United States*, 483 U.S. 171 (1987), the Supreme Court described the showing needed to claim the coconspirator hearsay exemption:

> Before admitting a coconspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule. There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made "during the course and in furtherance of the conspiracy."

*Id.* at 175 (quoting Fed. R. Evid. 801(d)(2)(E)). Each factor represents a preliminary question under Rule 104(a) that the proponent must establish by a preponderance of the evidence. *See id.*; *Gewin*, 471 F.3d at 201.

A statement offered under Rule 801(d)(2)(E) "must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it . . . ." Fed. R. Evid. 801(d)(2). The D.C. Circuit has held that a finding of admissibility "must rest on some *independent evidence* of the conspiracy." *Gewin*, 471 F.3d at 201 (emphasis added) (citing *United States v. Gatling,* 96 F.3d 1511, 1520–21 (D.C. Cir. 1996)). The Sixth Circuit has described "appropriate and sufficient independent evidence" as "not merely a scintilla, but rather enough to rebut the presumed unreliability of hearsay. Admissibility of the hearsay, therefore, hinges on whether some sufficiently corroborating evidence exists which overcomes the suspected unreliability of out-of-

18

court statements" and establishes what the rule requires. *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994).[9]

The Visitors List contains entries derived from underlying visa requests, which are not available. These entries are subject to a nested-hearsay analysis under Rule 805. The Court concluded that the entries fall within Rule 801(d)(2)(E) because the unidentified Libyan official who submitted a visa request for Mr. Al-Marimi was part of a lawful joint enterprise to gain Mr. Al-Marimi's admission to East Germany, meaning the official was his coconspirator for purposes of the Rule.

In other words, the "conspiracy"—a legal joint enterprise to obtain travel documents—is proven only by the very statement whose admissibility depends on that conspiracy's existence. This is precisely the kind of circular logic *Gewin* forbids. There is not even a scintilla of independent evidence of the existence of such a joint enterprise, let alone enough to rebut the presumed unreliability of hearsay. In fact, the requesting official is never identified by name, role, or any biographical detail. The only proof of any relationship between this person and Mr. Al-Marimi is the fact that a request was submitted—which is the challenged statement itself, not independent evidence of it.

There is no precise form that the independent evidence of the conspiracy must take, but courts have consistently required *some* independent evidence supporting a finding of a conspiracy. *See, e.g.*, *Bourjaily*, 483 U.S. at 180–81 (evidence showed

---

[9] Mr. Al-Marimi incorporates by reference his response to the Court's June 15, 2026 Minute Order, in which he set forth in detail the legal standard governing the applicability of the coconspirator hearsay exemption. ECF 497, at 1–9.

defendant visited a location, brought money, and picked up drugs, as predicted by the challenged coconspirator statements); *Gatling*, 96 F.3d at 1520–22 (testimony and financial transactions). In this case, there is *no* independent evidence to weigh. That is enough to conclude the analysis; the entries in the Visitors List are not admissible under Rule 801(d)(2)(E).

The government's failure to identify the alleged conspirator poses an additional obstacle to admission. The proponent of Rule 801(d)(2)(E) evidence must show that the opposing party and the declarant both "agree[d] to enter and 'knowingly participate[d] in the conspiracy with the intent to commit the offense'" or otherwise accomplish the joint venture's objective. *United States v. Carson*, 455 F.3d 336, 366 (D.C. Cir. 2006) (quoting *Gatling*, 96 F.3d at 1518); *see also United States v. Childress*, 58 F.3d 693, 707–08 (D.C. Cir. 1995) (explaining that conspiracy requires specific and purposeful intent or "conscious desire" to achieve a "result"; *Carson* acknowledged these requirements in the hearsay context). Courts have held identification of the declarant by name is not required, but those cases involved strong showings that the unnamed declarant was a willing participant in the conspiracy. *See, e.g., United States v. Man*, 891 F.3d 1253, 1272 (11th Cir. 2018) (finding owner of anonymous email address was a participant based on defendant's inculpatory emails to that address). In this case, by contrast, nothing is known of the Libyan official who sent the visa request or the nature of his assumed participation.

The visa request underlying the Visitors List also does not fall into the residual exception under Rule 807. As an initial matter, the residual exception requires the

proponent to give reasonable notice of "the declarant's name." Fed. R. Evid. 807(b). The government's failure to identify the name of the Libyan official who sent the request is fatal to its attempt to introduce the request under the residual exception. *See United States v. Mandel*, 591 F.2d 1347, 1369 (4th Cir.), *on reh'g,* 602 F.2d 653 (4th Cir. 1979) (holding government failed to meet the notice requirement, which at the time required providing "the names and addresses of the declarants," even though "the possible declarants [we]re limited to the members of the Maryland Senate . . . given the general proposition that the rule is not to be construed broadly").

"The residual hearsay exception is extremely narrow and requires testimony to be very important and very reliable. . . . Thus, only in the most exceptional circumstances does Rule 807 make admissible a statement that does not fall within one of Rule 803's or Rule 804's enumerated hearsay exceptions." *United States v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017) (internal quotation marks, citations, and alterations omitted). As Mr. Al-Marimi has previously briefed,[10] the government has failed to produce the underlying visa request, and the totality of circumstances under which it was produced is a matter of pure speculation. *See* ECF 430, at 20.

## III.   The statements in the Hotel Report derived from underlying guest registration cards are inadmissible hearsay.

### A.   The Court cannot find by a preponderance the facts supporting the admission of the nested hearsay in the Hotel Report.

Under Rule 104(a), the Court "must decide any preliminary question about whether . . . evidence is admissible." Fed. R. Evid. 104(a). "The proponent of evidence

---

[10] Mr. Al-Marimi incorporates by reference his previous briefing on the residual exception. *See* ECF 174, at 27–30; ECF 430, at 16–20.

must show by a preponderance of the evidence that any necessary prerequisites for admission have been met." *United States v. Khatallah*, 278 F. Supp. 3d 1, 4 (D.D.C. 2017) (citing *Bourjaily*, 483 U.S. at 176).

The Hotel Report contains information purportedly derived from underlying guest registration cards, which, like the visa requests underlying the Visitors List, are not available themselves and are subject to a nested-hearsay analysis. The government introduced a declaration stating that the entries are derived from the hotel's registration cards and/or copies of the guests' passports. Exh. 608-C, ECF 411-1. It introduced no evidence specific to the guest registration card at issue here, or even any evidence specific to the Hotel Metropol. In other words, there is no evidence from which to determine whether the guest registration card includes statements from "MASUD" (alleged to be Mr. Al-Marimi), "SHADI," or a hotel employee.

At the June 8, 2026 hearing, the Court held the underlying registration card was not hearsay because it was "more than likely completed by the defendant as a guest of the hotel" and was therefore a party admission under Rule 801(d)(2)(A). June 8, 2026 Tr. at 14. To the extent this constitutes the factual finding by a preponderance of the evidence required by Rule 104(a), it is not supported by any evidence in the record. The government has not met its burden to establish the requisite facts for admission of the statement under Rule 801(d)(2)(A). In fact, the Court went on to address alternative factual scenarios in which Shadi or a hotel employee completed the card, showing the speculative nature of any finding that Mr. Al-Marimi himself completed the card. Offering three alternative, unproven, and mutually exclusive

22

theories about the identity of the declarant does not amount to a preponderance finding that any single one of them is correct.[11]

### B. The Court's alternative holdings do not cure the error.

The Court concluded in the alternative that, if Shadi completed the card on Mr. Al-Marimi's behalf, it would be admissible as a coconspirator or agent statement under Rule 801(d)(2)(E). The Court further held that, even if a hotel clerk completed the card using dictated information, the card would be an adoptive admission under Rule 801(d)(2)(B) because Mr. Al-Marimi "manifested the truth of the information on the card by providing the relevant name, date, and passport number." *Id.* at 16.

As an initial matter, the government's failure to establish by a preponderance the facts supporting the admissibility of the statement on the hotel registration card cannot be cured by consideration of other *possible* scenarios. That is especially so given that the justification for the hearsay exemptions in Rule 801(d)(2) is the *identity* of the declarant, precisely the fact that the government has failed to establish.

Further, there is no support in the record for holding that the statements would be adoptive admissions if the card was completed by a hotel clerk. In order to be an adoptive admission, Mr. Al-Marimi must have "manifested an adoption or belief in [the] truth" of the hotel clerk's statement and have "understood and unambiguously

---

[11] Mr. Al-Marimi is aware of no cases in which a statement made by an unknown declarant was admitted as a party admission. Even for hearsay exceptions for which the identity of the declarant is less important, like the excited utterance exception, for which "[h]earsay statements of unidentified declarants are not automatically precluded, . . . the party seeking to introduce such a statement is not relieved of the burden of demonstrating the declarant's personal knowledge of the event, a burden which naturally becomes more difficult to meet when the declarant is unknown." *Ash v. Reilly*, 433 F. Supp. 2d 37, 45 (D.D.C. 2006).

assented to [the hotel clerk's] statement, but his understanding and assent may be established through conduct as well as through words." *United States v. Beckham*, 968 F.2d 47, 52 (D.C. Cir. 1992) (alteration and citations omitted). It is impossible to apply this test to a hypothetical scenario where the hotel clerk filled out the registration card. Even attempting to do so shows its absurdity; the record says nothing about how that hypothetical exchange would have unfolded.

Moreover, even if it is assumed that Mr. Al-Marimi provided his passport to the hotel clerk, if the hotel clerk did not show Mr. Al-Marimi the completed guest registration card, then Mr. Al-Marimi did not manifest an adoption of it or unambiguously assent to the statement.

Finally, as with the Visitors List, the residual exception does not apply here. Again, the government has failed to identify the name of the declarant for the guest registration card. *See* Fed. R. Evid. 807(b). The government has failed to produce the underlying registration card, and the totality of circumstances under which it was generated is a matter of pure speculation. *See* ECF 430, at 20.

## IV.     The Flight Record is not admissible as an ancient document under Rule 901(b)(8).

Rule 901(b)(8) requires evidence that the document (A) shows no facial suspicion of inauthenticity, (B) came from a place where, if authentic, it would likely be, and (C) is old enough to qualify. Mr. Al-Marimi requests that this Court reconsider its ruling that the Flight Record satisfies subpart (B), the requirement that it came from a place where, if authentic, it would likely be.

24

By the government's account, the Flight Record "appears to be" a passenger list for an April 1986 flight from the main airport of East Germany to Tripoli. ECF 411, at 7. That uncertain phrasing reflects the fact that the government has no meaningful extrinsic information about the record. For the Visitors List and Hotel Report, the government has offered testimony from witnesses with some firsthand knowledge about the statements—witnesses involved in the creation of a document or at least associated with the organization that produced the document. For the Flight Record, there is nothing.

Unlike the Visitors List and Hotel Report, which are documents authored by the Stasi, the Flight Record is purportedly a record of a third-party business that was merely found within Stasi custody. The only extrinsic information the government offers is the Archives Declaration. That witness claims no firsthand knowledge about the record or any association with the business that supposedly produced it. All the witness can say is that the record is stamped BStU; that Interflug was the airline of East Germany; and that "it was common for the Stasi to obtain records from airlines and make the records part of their files." ECF 411-1 ¶ 20. The witness cannot explain what any of the data entries on the Flight Record mean or why so many fields are blank. *See* ECF 430, at 5–6.

At the June 8, 2026 hearing, the Court stated that the Flight Record "appears much like the flight manifests introduced from other countries in this case, bears the logo of Interflung [*sic*] and resembles the sort of ministerial recordkeeping" typical of airline records. June 8, 2026 Tr. at 8–9. This analysis may be relevant to Rule

25

901(b)(8)(A)'s requirement that there be no facial suspicion of inauthenticity, but it does not satisfy Rule 901(b)(8)'s requirement that *this* document be shown to have come from a place where, if authentic, it would likely be found. The Court also stated that "although the Stasis did not create the flight record, the Court finds that it is likely that the Stasi routinely collected this information, too," citing Exhibits 603-C and 603-C2, the Hoffman and Ernst declarations. June 8, 2026 Tr. at 9.

A finding that "it is likely" that the Stasi routinely collected documents similar to the Flight Record does not satisfy Rule 104's requirement that findings about the admissibility of evidence be supported by a preponderance of the evidence, *see supra* Section III(A). The Hoffman and Ernst declarations contain no information about whether the Stasi collected information about flights. In fact, the declarations were filed before the government was even aware that the Flight Record existed. To the contrary, the finding depends entirely on the premise that, because the Stasi collected *other* categories of information from *other* institutions (visa requests from the Foreign Ministry; guest information from hotels), it is therefore likely they also collected *this* category (airline manifests) from *this* institution (Interflug).

Further, neither *United States v. Stelmokas*, 100 F.3d 302, 312 (3d Cir. 1996) nor *United States v. Kairys*, 782 F.2d 1374 (7th Cir. 1986) provides a basis to find the government's evidence sufficient. The evidence supporting authentication in those cases was much more robust than the bare record here. In *Stelmokas*, ancient documents relating to the Lithuanian *Schutzmannschaft*, or Nazi-controlled Lithuanian units, were admissible based on expert testimony that the documents

were authentic and not forgeries; that "documents found in Soviet possession are as reliable as documents from western countries"; and that "one would expect to find documents relating to the Lithuanian *Schutzmannschaft* in Vilnius, the Lithuanian capital." *Id.* The documents were also "certified by competent Lithuanian archival personnel." *Id.* In *Kairys*, the evidentiary showing supporting the admissibility of a German SS identity card was robust. *See United States v. Kairys*, 600 F. Supp. 1254, 1260–62 (N.D. Ill. 1984), *aff'd*, 782 F.2d 1374 (7th Cir. 1986). There was "expert testimony on all aspects of that document," including about whether testing of the paper showed it was consistent with paper in existence in 1942, whether the signature on the card matched the defendant's, and about whether the thumbprint matched the defendant's. *Id.* at 1260–61. The district court also recognized that "the document was properly certified as coming from the Soviet archives—the repository of virtually all SS and related activities in Poland as the result of the overrunning of Poland by the Soviet armies in the latter days of the Second World War—" and that other Treblinka guards had verified SS identity cards "in substantially similar form." *Id.* at 1261.

In stark contrast to the robust evidentiary showing in *Stelmokas* and *Kairys*, the Flight Record is supported by no testimony, expert or otherwise—merely the government's assertion that "[t]he German authorities recently identified and provided an additional document . . . [which] appears to be a passenger list" containing the name "ABOAGILA/MR." ECF 411, at 7.

## CONCLUSION

27

Mr. Al-Marimi respectfully requests that the Court reconsider its June 8, 2026 ruling admitting Exhibits 603, 608, and 611. He requests that the Court exclude them under Federal Rule of Evidence 404(b). In the alternative, he requests that the Court (1) exclude as inadmissible hearsay the statements from underlying visa requests in the Visitors List, (2) exclude as inadmissible hearsay the statements from underlying hotel registration cards in the Hotel Report, and (3) exclude the Flight Record because it has not been authenticated under Rule 901(b)(8).

Respectfully submitted,

**ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI**

By: _____/s/_____
Whitney E.C. Minter
Va. Bar #47193
Brooke Sealy Rupert
Va. Bar #79729
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
1650 King Street, Suite 500
Alexandria, Virginia   22314
(703) 600-0855 (telephone)
(703) 600-0880 (facsimile)
Whitney_Minter@fd.org (email)

Laura Koenig
Va. Bar #86840
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
701 E. Broad Street, Suite 3600
Richmond, Virginia  23219
(804) 343-0800 (telephone)
(804) 648-5033 (facsimile)
Laura_Koenig@fd.org (email)