**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD** | : | |
| **MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO RECONSIDER ADMISSION OF STASI DOCUMENTS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response to the defendant's Motion for Reconsideration of the Court's June 8 order admitting certain documentary exhibits from the Stasi archives [ECF 597-1].

The government fully agrees with the Court that many of the evidentiary issues presented in this case are novel, and in certain instances, exceedingly complex. *See* Minute Order of 8/10/2026. Recognizing this, the government has endeavored to identify these novel issues for the Court in advance of trial so as to streamline the presentation of evidence to the jury. Indeed, had the government sought to introduce the numerous potential trial exhibits that the Court has already considered without pre-clearing these complex evidentiary arguments in advance of trial, the Court would have been justified in criticizing the government's failure to do so. And the government understands and agrees that subsequent legal rulings on substantive legal issues may call into question preliminary rulings the Court had previously made.

The government does not, however, agree that the Court's preliminary rulings with respect to any of the three exhibits to which defense presents renewed challenges are undermined by the Court's subsequent legal rulings on substantive issues. And to the extent that defense characterizes

their motion as (1) "consolidat[ing] the extensive briefing on this issue into one document – both for the Court's consideration and for any necessary appeal"; and (2) "allow[ing] for review in light of further argument that developed over the recent months," it is not clear that defense does either. ECF 597 at 2.[1] For the following reasons, the defense's motion should be denied.

## ARGUMENT

### A. The documents are admissible Rule 404(b) evidence.

At the June 8 hearing, the Court found that the defendant's alleged participation the La Belle bombing is relevant for all of the following purposes:

- **Intent**, because his "alleged participation in the earlier attack is nonetheless probative of his state of mind when committing the charged offense." Tr. at 30.

- **Motive**, because "[e]vidence that he followed orders to build a bomb that killed American civilians two-and-a-half years before the Lockerbie bombing is probative of the defendant's motive when he followed similar orders to deploy a bomb knowing that the target was, yet again, Americans." *Id.* at 33.

- **Knowledge,** because his role as the La Belle bombmaker "is probative as to whether the defendant possessed the knowledge and skill to build a functioning,

---

[1] The defense filed their motion for reconsideration after hearing the Court's August 6 ruling on the co-conspirator exception but before considering whether it might bear on their arguments; they accordingly represent that an amended brief might be forthcoming after they had the chance to consider the ruling more fully. S*ee* ECF 597-1 at 3 n.2 ("Mr. Al-Marimi will promptly file an amended version of this motion after review of the transcripts, should the Court's [August 6] ruling impact the arguments made here."). The Court ordered the government to respond before the defense files any amended brief. Accordingly, this response both (1) addresses the "consolidated" arguments unrelated to recent developments, and (2) explains why the Court's original ruling has not been undermined by any of its more recent rulings. On that second point, as it pertains to the Court's August 6 ruling, should the defense address new arguments in its reply, the government will seek leave of the Court to file a sur-reply.

military-grade explosive that was portable and able to be detonated by a timer."
*Id.* at 34; and

- **Identity,** under the doctrine of chances, because the fact that "was present in both Berlin and Malta at the time of two major terrorist attacks committed by Libya's ESO" is "probative as to the defendant's role and participation in the charged offense because it lowers the likelihood that the defendant was coincidentally in Malta for an innocent purpose." *Id.* at 37.

The defense's brief does not make any arguments, new or old, for why the Court should reconsider the first three purposes as bases for admission of the defendant's participation in the La Belle bombing. They do, however, dispute the Court's ruling on the doctrine of chances. *See* ECF 597-1 at 15-18. This basis of admission was first raised by the government on April 29, 2026, *see* ECF 432 at 17-19, and briefed and argued on multiple occasions since then.

    1.  <u>The Court's doctrine-of-chances reasoning was sound.</u>

The Court was right to rely on the doctrine of chances as one of the multiple independent bases for admission of the Stasi documents. In its ruling, the Court explained:

> The doctrine of chances is merely one name to call a common sense observation that a string of improbable incidents is unlikely to be the result of chance. *United States v. Henthorn*, 864 F.3d 1241, 1252, note 8, Tenth Circuit.

> The government contends that bombing attacks by Libyan operatives against Americans abroad are rare events, Docket 432 at 18, and that a jury could make certain inferences about the identity of the perpetrator based on evidence that places the same individual in the vicinity of these two bombings occurring at different times across different countries. *United States v. Pricop*, 2025 WL 1869444 at 3, District of Arizona. . . .

> [T]he government proffers that it will show that the defendant's name, birth date, birthplace, and Libyan passport number were all used in April 1986 by an individual traveling from Libya to Berlin, where the La Belle Disco bombing occurred.

3

> That same demographic information was then used in December 1988 by an individual traveling from Libya to Malta, where the government seeks to prove that the suitcase with the explosive was loaded onto a plane with directions to be loaded onto Pan Am Flight 103. See Docket 147 at 20.

> The La Belle evidence is, therefore, probative as to the identity because it helps support two propositions: First, that the same individual played a role in both bombings and that this individual was the defendant; second, under the doctrine of chances, the government proffers that the evidence will show that the defendant, an employee of Libya's ESO technical department, was present in both Berlin and Malta at the time of two major terrorist attacks committed by Libya's ESO.

> Such evidence is probative as to the defendant's role and participation in the charged offense because it lowers the likelihood that the defendant was coincidentally in Malta for an innocent purpose.

6/8/26 Tr. at 35-37.

This Court's logic above is sound, and indistinguishable from the sound logic of *United States v. Pricop*. The defense devotes only a single sentence to that case, describing it as involving evidence of "19 fires that were 'part of a single criminal transaction[,] . . . all involved the same victim, shared similar characteristics, and occurred during a relatively short time period.'" ECF 597-1 at 17 (quoting *Pricop*, 2025 WL 1869444, at *1). The quoted language, however, was from a separate part of the opinion that did not address the doctrine of chances. When addressing the doctrine of chances, which was an independent basis of admissibly, the *Pricop* court saw no need to mention that the fires involved a common victim, similar characteristics, and occurred close in time to one another. Rather, the court articulated precisely the reasoning that the defense here says is invalid: "[T]he factfinder could make certain inferences about the identity of the perpetrator based on evidence that places the same individual in the vicinity of multiple fires occurring at different times across different states." 2025 WL 1869444 at *3. Regardless, the same degree of commonality exists here as in *Pricop.* The other-acts in *Pricop* targeted trucks belonging to the same company; the other-act here targeted personnel belonging to the United States. The other-act

here involved similar, though not identical, characteristics. *See* 6/8/26 Tr. at 34 (noting that La Belle bombing involved "a functioning, military-grade explosive that was portable and able to be detonated by a timer"). And the time period is not meaningfully different: in *Pricop* the fires spanned approximately 27 months (June 2020 through September 2022) and here the bombings were separated by approximately 33 months (April 5, 1986 to December 21, 1988).

The defendant's presence in the vicinity of two major terrorist bombings is not just "an innocuous fact," ECF 597-1, and the defense's description ignores common-sense probabilistic reasoning. Europe is a very big place, and – so far as the record reveals – it was not a place where the defendant ever lived or regularly worked or vacationed. When someone travels far from home in a way that corresponds with infrequently-occurring events at the destinations, there is a reasonable inference (not a conclusive inference, but a reasonable one) that the travel probably relates to the event in some way.

For example, imagine that John visits Montreal to see an exhibition of a particular artist. At the hotel bar he meets Sally, who is from Baltimore, and they have a short chat without getting into their reasons for being there. Two years later John visits Omaha, Nebraska,[2] to see the artist's next exhibition, and he again runs into Sally at the hotel bar, and they remember each other. It would be perfectly reasonable for John to suspect that Sally is probably a fan of the same artist and that was her reason for being in Montreal and Omaha. Standing alone, the coincidence would not establish that fact beyond a reasonable doubt, but it would certainly make it much more likely. And it would not require any inference that Sally is the kind of person with a character for going

---

[2] According to online sources, Omaha's current population is similar to the current population of the broader Valetta metropolitan area in Malta.

to art shows. That is exactly the same reasoning underlying the "doctrine of chances" argument here, which has nothing to do with criminal propensity.

The cases cited by the defense, *Banuchi* and *Bass*, do not change matters. They are both distinguishable because they involve a conceptually different application of the doctrine of chances: one that is weaker and invites a propensity inference. In this case and in *Pricop*, the relevant coincidence is between (1) a person's presence at far-flung locations; and (2) the occurrence of rare events at those locations, both of which are concrete objective facts. In *Banuchi* and *Bass*, the purported coincidence is between (1) the defendant's commission of physical acts (fatal police shootings and consumption of drugs, respectively); and (2) the supposedly justifiable or excusable nature of that conduct.

*Banuchi v. City of Homestead*, 608 F. Supp. 3d 1206, 1218 (S.D. Fla. 2022), aff'd, 22-12375, 2024 WL 2014424 (11th Cir. May 7, 2024), a civil case on summary judgment, involved allegations that an officer unreasonably used deadly force. The plaintiff sought to introduce evidence that the officer had been involved in an uncommonly high number of fatal shootings. The doctrine-of-chances argument seems to start with the premise that justified police shootings are rare, so the fact that the defendant was involved in a surprisingly high number of police shootings supports an inference that some or all of them must have been in unjustified. The court found that the plaintiff had provided no support for the argument's essential first premise. The statistics were insufficient to give rise to an inference under the doctrine of chances because there was "no dispute that all six shootings occurred while Green was on duty, as a law enforcement officer, carrying a firearm as part of his duties in policing crime in dangerous. It is not by mere chance that a police officer would be faced with multiple scenarios in which he encounters situations where the need to use lethal force for the defense of himself or others would arise," especially given "the fact that

police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 1218-19 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

*United States v. Bass*, 25-0149, 2026 WL 1882792, at *3 (C.A.A.F. June 24, 2026), is even less persuasive. There, the defendant was charged with consuming a THC-8 based on a positive urinalysis result. The government sought to offer evidence that the defendant had previously been charged with a crime based on THC urinalysis and had been found not guilty after testifying that he had eaten THC gummies without knowing that they contained a controlled substance. The court found that the use of this evidence was improper under the precedents of the Court of Appeals of the Armed Forces, which hold that evidence of prior drug consumption is only admissible under the doctrine of chances when the episodes of consumption share "a highly specific fact pattern." *Bass*, 2026 WL 1882792, at *4 (quoting *United States v. Tyndale*, 56 M.J. 209, 213 (C.A.A.F. 2001) (plurality opinion)). It is sensible to apply the doctrine narrowly in that context, where the "coincidental" event is the defendant's commission of a crime. This has the danger of "merely invit[ing] a forbidden propensity inference–that because the accused had tested positive for marijuana before, he likely used marijuana knowingly and wrongfully on the charged occasion," *Id*. But here, the coincidental event is "mere presence in the same city," ECF 597-1 at 17, which does not suggest a propensity to commit crimes or any bad character. The coincidence of the defendant's travel is a fact that a jury, through probabilistic reasoning, could use to *infer* that he was involved in the crimes committed in those places, but the defendant's travel is not *itself* a crime that would support any propensity inference. This is a subtle but important difference that the defense misses.

Citing *Bass*, the defense asserts that the doctrine of chances theory is unavailable to the government because they "have not raised an innocent narrative justifying his presence in Malta." ECF 597-1. But the defendant's presence in Malta for a wrongful purpose is an essential fact for satisfying the elements of the offense. Without it, the government cannot prove its case. And conversely, if the jury finds that the defendant traveled to Malta on the dates alleged,[3] then logically the defendant *either* was there for an innocent purpose *or* he is guilty; there is no third option. The defendant's reason for being in Malta is therefore inextricable from the elements of the offense, meaning the government does not need to wait for the defense to open the door before admitting evidence in support. That was the view endorsed by both the Court and the defense during the June 1 hearing:

> THE COURT: … [I]f you have evidence that goes to an element of the offense, as I see it, if it otherwise meets the threshold under 404(b) and 403, you can admit that evidence, regardless of what the defense may or may not do in its defense case. On the other hand, it would be inappropriate for the Court to allow the government to introduce evidence prospectively, anticipating what the defense might do in its defense.  […]
>
> MR. MULROE: I think we might just disagree a little bit with the second point of that, depending what Your Honor means by a "defense theory." So I think if the evidence were relevant to rebut some factual part of their case that they may or may not end up offering, then that may well be right. But I think if it's --
>
> THE COURT: If it's going to an element that you have to prove, you're allowed to introduce it in your case-in-chief, assuming it's permissible under 404(b) and 403.
>
> MR. MULROE: Correct; correct. So as to whether it refutes a defense theory or not, we could think of a lot of defense arguments that are arguments seeking to show why we haven't proven a particular element. And those are --

---

[3] The government's anticipated evidence will establish the defendant's presence in Malta using eyewitness testimony, a flight record with the defendant's name, immigration records with the defendant's name, and expert testimony establishing that those immigration records bear the defendant's signature and fingerprints.

THE COURT: That's different, yeah.

MR. MULROE: So if it's something that's sort of untethered to the elements, then maybe we do have to wait for them to open the door, then.

THE COURT: Ms. Koenig or Ms. Minter, do you want to add anything there?

MS. MINTER: Generally speaking, Your Honor, I think that's correct. I think the one point that I would add is [addressing a separate issue].

6/1/26 Tr. at 8-10.

Here, the defendant's reason for being in Malta is "going to an element that [we] have to prove." Its relevance does not depend on "some factual part of their case that they may or may not end up offering."

2. The Stasi documents are relevant to establish the defendant's participation in the La Belle bombing, which is relevant to his intent, motive, knowledge, and identity.

The defense argues that the Stasi documents should not be admitted because they do not, in isolation, establish his participation in the La Belle bombing. They cite no authority for this approach, which violates the D.C. Circuit's common-sense explanation of how factfinders use separate pieces of evidence to reach conclusions: they "must view the evidence collectively rather than in isolation." *Salahi v. Obama*, 625 F.3d 745, 753 (D.C. Cir. 2010) (citing *Al-Adahi v. Obama*, 613 F.3d 1102, 1105-106 (D.C. Cir. 2010)). "Merely because a particular piece of evidence is insufficient, standing alone, to prove a particular point does not mean that the evidence 'may be tossed aside and the next [piece of evidence] may be evaluated as if the first did not exist.' The evidence must be considered in its entirety in determining whether the government has satisfied its burden of proof." *Id.* (quoting *Al-Adahi*, 613 F.3d at 1106).,

As background: When addressing the government's arguments that the Stasi documents corroborate the defendant's confession through a non-propensity inference, the Court discussed three D.C. Circuit cases:

- *United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000) "note[d]" that corroboration serves a legitimate non-propensity purpose"; however, the Court found *Bowie* "distinguishable" because "[t]he defendant in *Bowie* did not admit to a series of separate incidents of criminal conduct." Tr. at 40. Accordingly, "*Bowie* does not squarely govern this case." *Id.*

- *United States v. Bailey*, 319 F.3d 514 (D.C. Cir. 2003) and *United States v. Linares*, 367 F.3d 941 (D.C. Cir. 2004) used "language is more cautious than the language in the earlier *Bowie* case and suggests that a corroboration theory should work in tandem with other permissible purposes under Rule 404(b)." Tr. at 41. However, *Bailey* and *Linares* are also not on point because they concern a witness's testimony and not a defendant's confession, and both cases held that a corroborating witness's testimony with an unrelated prior criminal act involved a propensity inference." *Id.*

In view of those cases, the Court found that "the case law is not clear about whether corroboration alone satisfies Rule 404(b)." Tr. at 41. Nonetheless, the Court agreed with the basic logic that the government had been arguing since its opening brief:

> [T]he Court does see how the La Belle evidence corroborates the defendant's statement and supports its reliability without an impermissible propensity inference. Specifically, the defendant allegedly admitted that he traveled to Berlin in April 1986 with Shadi and stayed in Germany after the La Belle bombing for apparently two weeks before returning to Libya. Docket 236 at 6.

> And as discussed, the government expects to introduce documentary evidence showing the defendant traveled from Libya to Berlin with Shadi in April 1986 and flew back to Germany from Libya 18 days after the La Belle bombing.

> Assuming the government can show that this information about his travels would not have been widely known, this extrinsic evidence helps corroborate the veracity

and reliability of the defendant's statement. And the defendant's alleged statement helps prove he committed the charged offenses.

Tr. at 42. Therefore, the Court will "likely allow the government to use the other acts evidence to make this argument at trial, but in an abundance of caution, the Court [did] not rely on it as a basis for admitting the other acts evidence here." *Id.* In other words, the Court as a preliminary ruling adopted the narrower reasoning from *Bailey* and *Linares*, where the corroborating evidence – if it tends to implicate the defendant in a separate crime – must ultimately serve an enumerated Rule 404(b) purpose.

The defense first argues that the Stasi documents "are not themselves probative of motive, intent, or knowledge, and should not be admitted to corroborate other evidence admitted under Rule 404(b)." ECF 597-1 at 12-15. The defense has previously argued against the use of the Stasi documents for corroboration in its original Response brief, ECF 174 at 10-12; ____. Among other things the defense has argued that "[t]he government cannot offer the Stasi documents to corroborate the La Belle confession if the La Belle confession does not itself serve a permissible function." ECF 174 at 11. But now the Court has found that the La Belle confession *does* serve multiple permissible functions. The logical chain therefore proceeds as follows: The defendant's confession to the La Belle bombing is relevant to establish his intent, motive, and knowledge at the time of the Pan Am 103, and the Stasi documents are evidence supporting the defendant's involvement in the La Belle attack. They are therefore admissible even under the most defense-friendly reading of the D.C. Circuit's cases on Rule 404(b) corroboration.

In resisting this conclusion, the defense abandons basic concepts of relevance. They argue that "***standing alone***" the documents do not establish the defendant's participation in the La Belle bombing, and that "they are not probative of the charged conduct ***on their own***," and that if one

11

"[r]emove[d] the statement" containing his confession, the documents would show only his "travel to and presence" in Berlin. ECF 597-1 at 12-13 (emphasis added).

The defense cites no authority for this mode of evaluating relevance in a vacuum. If this was the right way to analyze relevance, then almost no evidence would ever be admissible, since the significance of any exhibit or testimony is rarely comprehensible without reference to some other fact in the case. For example, the Court has already admitted numerous documentary exhibits that, on their face, have nothing to do with the bombing of an airplane: clothing receipts, hotel bills, electronics company correspondence, and the like. "Standing alone," as the defense would have it, these documents would be inadmissible, since their relevance depends on their relation to other evidence in the case. But the defense rightly did not challenge the relevance of those documents "on their own." In that context, they grasped that relevance is fundamentally a contextual question, where whether a "fact is of consequence," and whether the evidence has "any tendency to make [that] fact more or less probable," depend completely on how the evidence relates to the broader case. As explained before:

> Evidence is relevant if it "has any tendency to make a fact more or less probable" if the fact "is of consequence in determining the action." Fed. R. Evid. 401. A "fact of consequence" can be "ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence in the determination of the action." *United States v. Edwards*, 388 F.3d 896, 900 (D.C. Cir. 2004) (quoting Advisory Committee Note to Fed. R. Evid. 401). In other words, "[f]acts of consequence include 'not only the "ultimate" facts essential to establishing a charge, claim, or defense, as determined by the applicable substantive law, and "evidentiary" or "intermediary" facts from which the ultimate facts can be inferred, but also facts affecting the credibility of testimony or other evidence, even though not part of the chain of inferences to an ultimate fact.'" *United States v. Sutton*, 21-cr-0598 (PLF), 2024 WL 278070, at *14 (D.D.C. Jan. 25, 2024) (quoting 1 Stephen A. Saltzburg et al., FEDERAL RULES OF EVIDENCE MANUAL § 401.02[2] (12th ed. 2019)).

ECF 432 at 3-4.

The defendant's participation in the La Belle bombing is a "fact of consequence," as established by the Court's well-reasoned Rule 404(b) ruling summarized above, and the defense's motion to reconsider does not appear to challenge that ruling as it related to intent, motive, and knowledge. The Stasi documents make that "fact of consequence" far "more… probable than it would be without the evidence." The defense tries resists this clear logic by severing the inferential links that connect the Stasi documents to the La Belle bombing, but that is not how the law of evidence works.

Moreover, even if (for the sake of argument) one adopts the defense's mode of analyzing relevance in a vacuum, their arguments still fail. They assert that, since the documents do not directly establish the defendant's involvement, they do not "independently satisfy[] any permissible Rule 404(b) purpose." ECF 597-1. But that is the wrong question. The government has explained before that:

> As the D.C. Circuit has repeatedly emphasized, "Rule 404(b) is a rule of inclusion rather than exclusion." *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). The rule "'is quite permissive,' prohibiting the admission of other crimes evidence 'in but one circumstance'—for the purpose of proving that a person's actions conformed to his character;" that is, barring "not evidence as such, but a theory of admissibility." *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (quoting *United States v. Jenkins*, 928 F.2d 1175, 1180 (D.C. Cir. 1991)). When making this point, the Circuit has frequently cited to its own opinion in *United States v. Miller*, which "thoroughly explain[s]" and "carefully analyzes" the application of the rule. *Jenkins*, 928 F.2d at 1180 (citing *Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990)). In rejecting a defendant's argument that Rule 404(b) precludes the use of uncharged acts to demonstrate the state of mind of a witness, the *Miller* court explained:

>> This argument misconceives the nature of Rule 404(b). The rule was intended not to define the set of permissible purposes for which bad-acts evidence may be admitted but rather to define the ***one impermissible purpose*** for such evidence. "Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely than men

generally to have committed the act in question." In other words, under Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character.

*Miller*, 895 F.2d at 1436 (quoting 2 J. Weinstein & M. Berger, supra note 9, ¶ 404[8] at 404–52) (emphasis in original).

ECF 432 at 5. If the documents were considered in isolation, like the defense wants, then there would be no conceivable argument that they support a propensity or character inference, and Rule 404(b) would not preclude their admission. But of course, as the defense recognizes, the documents in conjunction with other evidence do much more than establish the "defendant's presence in a particular place at a particular time." ECF 597-1. That is why they wish to keep them out.

Finally on the relevance point, arguing against a basis of admission that the Court has not yet even adopted, the defense asserts that under the broader corroboration theory,

> Rule 404(b) would impose no meaningful limit at all: the government could always locate some innocuous fact—a hotel stay, a purchased ticket, a border crossing—that lines up with a defendant's own account of an uncharged act, and admit it as "corroboration" without ever identifying which of the Rule's enumerated purposes the fact independently serves. That is exactly the maneuver *Linares* rejected when it explained that the government cannot invoke "corroboration" as a talisman to admit evidence that does not itself prove intent, identity, motive, or another proper purpose. 367 F.3d at 949.

As the Court has already explained, the reasoning above is *not* the "maneuver *Linares* rejected." *See* Tr. at 41 ("*Bailey* and *Linares* are also not on point because they concern a witness's testimony and not a defendant's confession, and both cases held that a corroborating witness's testimony with an unrelated prior criminal act involved a propensity inference."). In *Linares*, a witness said "the defendant did *X*," which the government argued was corroborative of evidence that defendant later committed the similar crime *Y*. This is obviously propensity reasoning because the events have no other relation to each other. It is a completely different fact pattern when a defendant says, "I did *X* at place *A* and I did *Y* at place *B*," and the government can prove that the defendant was actually

present at place *A* when *X* happened and at place *B* when *Y* happened. The government maintains that, although not enumerated in Rule 404(b)(2), this is a form of reasoning that does not involve any propensity or bad-character inference. If there is any doubt, just change *X* from a crime to an innocent act; the same logic still holds. Documentary corroboration is powerful non-propensity evidence, and such evidence is especially important here, where the defense is vigorously arguing that the statement may have been a fabrication authored by others.

### B. The documents pass Rule 403 balancing.

The defense makes a cursory Rule 403 argument that the Stasi documents have "little probative value, if any" as corroboration. ECF 597-1 at 15. They offer nothing further on this point except a citation to *Bailey* which, as the Court noted in its ruling, involved much different facts. This argument should be rejected. As the Court has already stated in its thorough Rule 403 ruling, the extrinsic corroboration provided by the Stasi documents is precisely what makes the La Belle evidence so important to the government's case. *See* Tr. 52 ("Because the La Belle evidence is supported by extrinsic evidence corroborating the defendant's alleged admissions, it holds significantly more probative value than abstract statements taken out of context."). On this point the government also adopts the arguments in its prior briefing:

> Corroboration of Statement: The defendant's statement is the centerpiece of the government's case, and almost all the other evidence serves in some degree to corroborate it by confirming the various details in the defendant's account. The corroborative value of the La Belle evidence, however, is uniquely strong for two reasons.
>
> First, it is individualized to the defendant in a way that virtually none of the other evidence is. For example, the defendant says in his statement that he used Semtex in the Pan Am 103 bomb, and the forensic analysis confirms that Semtex was indeed used, but that forensic analysis can't show whether it was the defendant who used it. The Stasi documents that corroborate the La Belle portion of the statement, by contrast, prove that *the defendant* did exactly what he claimed to have done, namely, travel to Berlin in April 1986. The only other corroborating documentary

15

evidence of any part of the statement that is so individualized and direct is the "IRO cards" and flight records that show the defendant's travel to and from Malta at times relevant to the Pan Am 103 bombing.

Second, the portions of the statement addressing La Belle can be corroborated on the basis of facts that are not otherwise public, or that are far less public than those that can otherwise be corroborated. The bombing of Pan Am Flight 103 resulted in a highly public trial in which the Scottish government sought to establish Libya's responsibility for the attack. The defense can, and likely will, argue that a careful observer of that trial would be able to fabricate a statement that is broadly consistent with the evidence possessed by western authorities. But the same is not true of the Stasi documents, which contain highly specific details about the defendant's operational travel with respect to La Belle. The defense has already argued that someone in Libya could have known these details because portions of some of the documents were briefly displayed on an American public television program that aired in 2015. *See* ECF 176-2 at 13. The weakness of this argument reflects the strength of the La Belle evidence for establishing the statement's reliability.

ECF 445 at 12-13. The government further adopts its arguments from the June 1, 2026 hearing:

I do just want to close by emphasizing how this documentary evidence and his involvement in that bombing goes directly to the reliability of the statement. And that statement is just -- it's impossible to overstate how important the reliability of the statement is. It is the critical issue in the case.

And so I'm going to demonstrate that as we've seen this afternoon, the corroborative evidence, the documentary corroboration that is specific to him consists of two points: That he was present in Malta, just like he said he was, and that he was present in Berlin, just like he said he was. Both of those things are objectively verifiable, in our view, and both of those are points that not many people other than him would have known about.

And so if we are not able to show the jury the La Belle half of that, then we've just cut in half the documentary extrinsic corroboration. We've lost half of our individualized corroboration.

6/1/26 Tr. at 31-32.

The defense's perfunctory citation of Rule 403 in their motion to reconsider does not respond at all to any of the arguments above or to the Court's thoroughly explained ruling. It flatly ignores the Court's observation that, with the general La Belle evidence admitted on Rule 404(b)

grounds, the documentary "proof of the defendant's proximity to the La Belle bombing has *immense probative value* for the government's case." 6/8/26 Tr. at 13 (emphasis added)). The Rule 403 argument should be rejected.

### C. The Visitors List is Admissible

At the June 8 hearing, the Court correctly ruled that the Visitors List was admissible. That ruling should stand, notwithstanding the defense's arguments that the list includes nested hearsay in the form of the underlying visa applications that predicate the list.

That is so for three independently sufficient reasons: First, as the Court correctly found, the visa application for the defendant to enter Germany was a statement by a fellow member of a joint enterprise in furtherance of that joint enterprise. Second, as the Court has previewed, the visa application would be admissible under the residual exception even if it were otherwise inadmissible hearsay. Third, the visa application is not hearsay at all because, as a pure "request," it is not asserting anything that can be proven true or false and is not being offered for the truth of anything being asserted. The court has previously considered and rejected this last argument, but that ruling should be reconsidered; it is therefore addressed below with reference to the Court's more recent rulings on non-assertive communications.

1. The visa request was a statement in furtherance of a discrete joint enterprise.

In its June 8 ruling, the Court found that the visa requests were admissible under Rule 801(d)(2)(E) as statements in furtherance of a joint enterprise:

> As the D.C. Circuit has explained, admission is not contingent upon the finding of an unlawful combination. *United States v. Brockenbrough*, 575 F.3d 726, 735. Rather, Rule 801(d)(2)(E) allows for the admission of statements by individuals acting in furtherance of a lawful joint enterprise. 575 F.3d at 735.

> Here, a preponderance of the evidence establishes that the defendant was operating as an agent of Libya's security organization and the requester operating as an agent

17

of the same country and in furtherance of the common scheme or enterprise of gaining the defendant's admission to East Germany.

The requesting officer need not have known that the defendant was traveling to East Berlin to engage in a bombing of civilians because the lawful enterprise facilitating the travel of Libyan officials is sufficient under Rule 801(d)(2)(E).

Accordingly, the Court holds that the visa request for Abu Agila and Shadi that underlies entries 55 and 56 of the visitors list is admissible as a co-conspirator statement under Rule 801(d)(2)(E).

6/8/26 Tr. at 12.

The defense now argues that this ruling was unsound because "[t]here is not even a scintilla of independent evidence of the existence of such a joint enterprise" other than the visa request itself. ECF 597-1 at 19. That is incorrect. All of the following evidence, fully independent from the challenged "statement" of the visa request, supports the existence of a "joint enterprise" to facilitate the defendant's travel to Berlin:

- The defendant's statement, which the Court has now ruled admissible, in which he described being sent to East Germany by a superior within the Libyan government during a timeframe consistent with the visa request;

- The Hotel Report, which establishes that the defendant and Abdulhakim Shadi (who was the subject of a concurrent visa request) stayed together at a hotel in East Germany during the time period covered by the visa request; and

- The Flight Record, which establishes that the defendant and Shadi returned to Libya from East Germany within the time period covered by the visa request.

This is far more than a scintilla of independent evidence.

Nor has the Court's ruling been undermined by any recent developments. In its August 6 ruling, the Court further addressed the doctrine of lawful joint enterprise. The government does

not yet possess a transcript of that ruling,[4] but based on counsel's recollection and notes, the Court's August 6 ruling does not undermine its June 8 ruling. The Court found that the government had proffered sufficient evidence of separate conspiracies among Libyan government operatives to carry out two discrete objectives: the bombing of the La Belle Discotheque and the bombing of Pan Am Flight 103. The Court found that the government had not established the defendant's participation in a separate conspiracy to impede the investigation of the Pan Am 103 bombing because the evidence suggested that the defendant resisted, rather than obeyed, the orders from a superior that would have made him a party to that agreement. And, as most relevant here, the Court found that the government had not persuasively established the existence of two other, broader conspiracies to carry out acts of terrorist violence against westerners and to conduct the general affairs of the ESO, because both theories were too broad. The government surmises that this last ruling – on the theory of the ESO as a "lawful joint enterprise" – is the one that the defense would argue has undermined the Court's June 8 ruling on the visa request.

But here, the object of the joint enterprise was not a broad and ongoing institutional purpose like conducting the affairs of the ESO. It was, instead, accomplishing a discrete objective: getting the defendant and Shadi to East Germany. Indeed, that is exactly how the Court phrased it: "the common scheme or enterprise of gaining the defendant's admission to East Germany." If something this narrowly defined cannot qualify as a lawful joint enterprise, then the D.C. Circuit's lawful joint enterprise doctrine is a dead letter. *See United States v. Gewin*, 471 F.3d 197, 200 (D.C. Cir. 2006) ("stock promotion" as lawful joint enterprise); *United States v. Brockenborrugh*, 575

---

[4] The government intended to promptly order the transcript on an expedited basis, but because of a clerical error that order was not placed until today.

19

F.3d 726, 736 (D.C. Cir. 2009) ("business relationship" to acquire real estate as lawful joint enterprise).

The Court's Rule 801(d)(2)(E) reasoning on the visa application therefore remains sound.

2. <u>The visa request is admissible under the Residual Exception.</u>

The Court's June 8 ruling explained that, even if it were not admissible on any other basis, the visa request "arguably… could be admitted under Rule 807's residual exception." 6/8/26 Tr. at 12. The Court explained:

> First, the underlying visa request, though not located by the government, enjoys sufficient guarantees of trustworthiness. As already discussed earlier with regard to authentication, the visitors list is corroborated from an example visa request at Exhibit 604. That same example shows that the missing visa request for the defendant is similar to the types of documents admitted as public records under Rule 803(8) because it was a part of the Libyan consular's regular activities.
>
> The Stasi had no apparent reason to fabricate the contents of the underlying visa request for the defendant and Shadi when the ministry's goal was to collect as much accurate information on foreign agents as possible.
>
> Moreover, the request, as accurately captured in the visitors list, aligns closely with the defendant's name, passport number, and dates in the hotel report and the narrative laid out in the defendant's statement regarding the La Belle bombing.
>
> Second, the missing request is more probative on the point for which it is offered than any other evidence that the government can obtain through reasonable efforts. The request is the source of the defendant's and Shadi's permission to travel to East Germany, as captured in the visitors list, which along with the hotel report and the flight record is the only available documentary evidence that the defendant traveled to Berlin during the bombing. And should the Court rule in the government's favor on the Rule 404(b) motion, the proof of the defendant's proximity to the La Belle bombing has immense probative value for the government's case.

6/8/26 Tr. at 12-13. The Court found it unnecessary to apply the residual exception, however, because the documents were already admissible on other bases.

20

The defense's arguments against the application of the residual exception consist almost entirely of a recitation of the legal standard and an incorporation-by-reference of arguments from the defense's prior briefing. *See* ECF 597-1 at 21 & n.10. Those arguments are all refuted by the Court's well-reasoned comments quoted just above, as well as by all the government's prior briefing on this topic. The only specific argument the defense makes now is one that they have also made before: that "The government's failure to identify the name of the Libyan official who sent the request is fatal to its attempt to introduce the request under the residual exception." ECF 597-1 at 21. We reiterate our previous response to that argument:

> The defense notes that Rule 807(b) requires that the proponent make notice of its intent to offer the statement, including by providing "the declarant's name." ECF 430 at 21. The defense has the declarant's name for the Hotel Report, and they know the identities of the institutions that generated the Visitors List and Flight Record, which suffices to satisfy the notice requirement. *See United States v. Burdulis*, 753 F.3d 255, 264 (1st Cir. 2014) (identity of corporation that manufactured device with inscribed statement offered under Rule 807). The government has disclosed everything it has been able to learn about the documents after a diligent inquiry, giving the defense a fair opportunity to meet the evidence. *See Sours v. Glanz*, 24 Fed. Appx. 912, 916–17 (10th Cir. 2001) (Henry, J., concurring) ("If the declarant's name and address are unknown despite reasonable efforts to locate the information, it is enough to give all the information the proponent has been able to acquire by diligent inquiry." (quoting 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 807.04[2] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2001)).

ECF 445 at 41 n.23.

On the notice requirement, the defense newly cites *United States v. Mandel*, 591 F.2d 1347, 1369 (4th Cir.), *on reh'g,* 602 F.2d 653 (4th Cir. 1979), a public corruption case where the Fourth Circuit excluded, as hearsay, testimony by state senators describing statements by other unidentified state senators about the defendant governor's position on a political issue. The court

found the residual exception could not justify admission of these out-of-court statements, among

other reasons because:

> We are dealing with a purely legislative political scene. Some of the ***most damaging hearsay statements were repeated by long-time political enemies*** of the Governor. Further, the statements were made on and around the senate floor in the heat of political battle, where ***rumors, opinion and gossip abound***. We are ***not dealing with an objectively observable factual event***. We are dealing with circumstantial proof of the position a governor took on two pieces of legislation. ***Evidence based on rumors*** and general discussions is ***the worst type of hearsay***. Such testimony, especially from unidentified declarants, does not possess the requisite guarantees of trustworthiness to justify a new exception to the hearsay rule.

*Id.* at 1369 (emphasis added). As a fair reading of *Mandel* demonstrates, the government's failure

to meet the then-applicable notice requirements was the least of the issues requiring exclusion in

that case.  The facts here are far different, in that (1) the challenged statement documents an

objectively observable factual event and is highly reliable, as the Court has already found; (2) the

government has provided to the defense all of the information in its possession, including

identifying the institutional declarant who authored the visa applications; and (3) the passage of

time, the collapse of the former Qaddafi government, and declarant's location in a foreign country

would all make it practically impossible for the defense to locate and call the declarant as a witness

even if his identity were known. Accordingly, *Mandel* does not rebut the authorities cited by the

government in its prior brief, ECF 445 at 41 n.23.

       3.   <u>The visa request is not offered for the truth of any factual assertion.</u>

The government has previously argued that the visa applications that underlie the Visitors

List are not hearsay because they are not factual assertions being offered for the truth of the matter

asserted. The Court rejected the government's non-truth argument as follows:

> The example visa request at Exhibit 604 is offered for the fact that a Libyan consular official requested entry for a Mr. Musbah Alabani who had a particular

birth year, birthplace, and passport number. It is that factual assertion from the requesting Libyan official that the Stasi embedded in the visitors list.

6/8/26 Tr. at 10. The government respectfully submits that the Court was mistaken in this ruling.

Hearsay is a statement offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). To apply this definition, it is necessary to identify (1) the "matter being asserted in the statement" (i.e., the fact or opinion that the declarant asserts to be true) and (2) the fact the proponent is trying to prove. If (1) and (2) are the same thing, the statement is hearsay. A useful test is to ask whether the statement could be proven false and, if so, whether that would destroy its usefulness to the offering party. If the answer to either of those questions is "no," then the statement is not being offered to truth of the matter asserted.

It follows from that definition that, as a general matter, requests and commands are not hearsay. When someone says "please make me a sandwich," or "open the door," they are not asserting a fact that can be proven true or false. Granted, a request or command can sometimes include an embedded factual assertion that could be taken for its truth. For example, during the most recent ruling, the Court identified the statement "[Rashid] asked me to travel to East Germany and meet the Security Officer at the Libyan Embassy, a man named ʿAlī Ibrāhīm Kashlāf" as being partly a command and partly a factual assertion that "the Security Officer at the Libyan Embassy" was a man named Keshlaf. If offered to prove that Keshlaf was the Security Officer, this would be hearsay.

It is the factually-descriptive nature of a statement that transforms it from a pure request to a hybrid request/assertion. The inclusion of specific details in a request does not transform the request into an assertion unless those details are assertive in nature. For example, "please make me a sandwich" is a request, but it is still a request if the speaker says "please make me a sandwich with turkey, cheese, and pickles, with toasted bread and sliced on a diagonal." An out-of-court

statement that *asserted the existence of the request* would be hearsay, like if the proponent tried to admit an email from Bob saying "yesterday I ordered a turkey and cheese sandwich." But the primary-source request for the sandwich, if offered, would not be hearsay because Bob was not "asserting" the "truth" of any "matter" when he ordered the sandwich. He was only making a request, albeit a detailed one, and it is incoherent to ask whether his request was "true" or "false."[5]

The visa requests here are like Bob's sandwich order. Each visa application from the Libyan government to the East German government was nothing more than a request that a visa be issued with particular demographic information. They said, in effect, "Please issue a visa for the following name, with the following passport number, for the following dates," and so forth. The government is seeking to prove that the defendant traveled to Berlin in April 1986 on behalf of the Libyan government. The fact that the Libyan government requested a visa in the defendant's name is valid circumstantial evidence that arrangements were in place for him to make that travel. *See* 8/4/26 Tr. at 92 (Court admitting airline ticket "to establish that [named ticketholder] had the means and plan to make the relevant travel" (citing *United States v. David*, 96 F.3d 1477, 1481 (D.C. Cir. 1996); *United States v. Marino*, 658 F.2d 1120 (6th Cir.1981)). And there is no question of veracity here – the written visa application has operative effect arising from the words that are written on it; it makes no sense to ask whether the author was being truthful or not when he wrote those words, any more than it would make sense to ask whether Bob was telling the truth when he requested his turkey sandwich.

---

[5] This still holds if Bob phrases his request in a way that looks like an assertion, such as "I am asking that you please make me a sandwich." This statement is only "asserting" its own existence, and it is not falsifiable because, by speaking the words, Bob has already made the request.

Accordingly, the government respectfully disagrees with the Court's reasoning at the June 8 hearing when it ruled that (1) a visa request is "offered for the fact that a Libyan consular official requested entry for a [person] who had a particular birth year, birthplace, and passport number" and (2) "[i]t is that factual assertion from the requesting Libyan official that the Stasi embedded in the visitors list." The government agrees with the Court's first statement, but not the second, because in the government's view the underlying visa-request document was not a "factual assertion that from the requesting Libyan official" asserting that a request was made. The document ***was itself*** the request.

For the same reason, the defense is incorrect to say "the visa request plainly asserted a fact—that a person with particular identifying information sought entry to East Germany on particular dates." ECF 597-1 at 7. The visa request did not "assert… that" there was a request for entry; the visa request ***was*** the request for entry.

To further clarify the non-hearsay status of the visa requests, it helps to distinguish the two layers of "statements" at issue here. As the government has always conceded, the Visitor's List itself is hearsay. It makes the assertive statement that the East German government received a visa request from the Libyan government for a person with the defendant's name, and we are offering it to prove that the East German government received a visa request from the Libyan government for a person with the defendant's name. If the author of the Visitor's List was lying or mistaken, that would mean no such visa request was received, and the Visitor's List would no longer be relevant. This is like someone saying "Bob ordered a turkey sandwich," if the proponent is trying to prove that Bob ordered a turkey sandwich.

However, the underlying visa request is different. It is not ***asserting the existence of*** the request; it is the request. It is like Bob saying "Please make me a sandwich." As an operative

statement intended to prompt action rather than assert a fact, its "significance… lies solely in the fact that it was made," so "no issue is raised as to the truth of anything asserted, and the statement is not hearsay. *United States v. Tann*, 425 F. Supp. 2d 26, 30 (D.D.C. 2006), *aff'd,* 532 F.3d 868 (D.C. Cir. 2008) (quoting Fed. R. Evid. 801(c) advisory committee note). A request – and particularly a formal application from one government to another for the issuance of a visa – is a type of "utterance of an operative fact that gives rise to legal consequences"; it is "not hearsay because the statement is admitted merely to show that it was actually made, not to prove the truth of what was asserted." *Id.* (quoting 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 801.11[3] (2d ed. 2005) and citing *United States v. Stover*, 329 F.3d 859, 870 (D.C. Cir. 2003)).

Another way to look at the visa request is as a statement relevant for its effect on the listener. All countries exert some degree of control over their borders, and that was especially true of East Germany. For the defendant to have been present in East Germany at the time of the La Belle bombing, as the government alleges, it was necessary for the East German government to have allowed him entry into the country. And that required a visa request. The Visitors List establishes that the East German government received and processed a request that a person with the defendant's name be allowed to enter the country. The significance of that fact does not depend on the truth or accuracy of any "assertions" within the request. For example, hypothetically, if the person submitting the request had subjectively intended to request a visa for "Mahmud" but accidentally wrote "Masud," that scrivener's error would not change the practical effect of the request: Masud's entry into the country. Unlike for true hearsay, reliability is not an issue: the document said what it said, and that is all that matters.

## D.  The Hotel Report is Admissible.

The defense asks the Court to revisit its ruling admitting the Hotel Report. *See* ECF 597-1 at 21-24. The defense accuses the Court of conjuring "alternative factual scenarios" that "show[] the speculative nature of any finding that" the defendant completed the registration card for the room he reportedly stayed in. ECF 597-1 at 22. They then describe these scenarios as "alternative, unproven, and mutually exclusive," which "does not amount to a preponderance finding that any single one of them is correct." *Id.* at 22-23.

The practical reality is this: Someone filled out a registration card in the defendant's name, with a passport number that matches his passport number as documented in other places. The evidence in the record uniformly indicates that the practice of hotels at that time was for guests to fill out their own cards. *See* ECF 411-1 at 3-4 ¶ 16 (Archives Declaration). If for some reason that practice was not followed in this instance, the person completing the card must have been someone with access to the defendant's passport, since the card accurately records his passport number. People tend to maintain possession of their own passports, and the Court can take judicial notice of the commonplace fact that, when people check into a hotel, they regularly present their identity documents to the hotel staff for registration purposes. On these facts, it is also conceivable that Shadi – the defendant's traveling companion and roommate at the hotel – may have filled out the cards for both of them.

Under any of these three scenarios, the card would be admissible under Rule 801(d)(2), as the Court found:

> The Court finds that the Metropol registration card was more than likely completed by the defendant as a guest of the hotel and, thus, is not hearsay under Rule 801(d)(2)(A). Rule 801(d)(2)(A) provides that a statement is not hearsay if it was made by the party in an individual or representative capacity.

27

Based on the examples in Exhibit 604, which are other hotel registration cards from the Metropol that were found in the Flunder file, hotel guests filled in their names, nationalities, and passport numbers on their registration cards. That information, in turn, formed the basis of the hotel report.

Assuming that the defendant filled in his own card, rather than Shadi completing it on his behalf, the statements contained therein are admissible under Rule 802(d)(2)(A).

If Shadi, who shared Room 526 with the defendant, filled in the defendant's card for him, then it would be admissible as a co-conspirator statement under 802(d)(2)(D).

As already discussed, a preponderance of the evidence suggests that Shadi was the defendant's co-conspirator in the bombing enterprise. The defendant's statement allegedly states that he traveled to Berlin with Shadi, that the visitors – and the visitors list establishes that Libya requested permission for the two to visit East Germany for the same period of time, and the flight records show that the two traveled from Berlin to Tripoli on the same flight 18 days after the bombing.

And even if neither the defendant nor his co-conspirator Shadi physically wrote upon the hotel registration cards but instead dictated their information to a hotel clerk, the statements contained in the card would be admissible as one offered against an opposing party that the party manifested that it adopted or believed it to be true.

Rule 802(d)(2)(B) provides that a statement may be offered against an opposing party as non-hearsay if it is one the party manifested that it adopted or believed to be true. So here, even if the hotel clerk filled in the card on the defendant's behalf, the defendant would have manifested the truth of the information on the card by providing the relevant name, date, and passport number to enable his stay at the hotel.

In short, the facts add up to a preponderance of evidence that *either* the defendant filled out the card himself *or* Shadi did to facilitate their travel together *or* the hotel clerk did in the defendant's presence using information provided by him, satisfying Rule 801(d)(2) regardless of how exactly it happened.

The defense does not offer any alternative theory on how a registration card with the defendant's name and passport number might have come into being, let alone a theory plausible enough to tip the scales back in his direction from the preponderance of evidence weighing on the other side. Instead, they assert that the Court needs to identify *just one* of the scenarios as being sufficiently probable to satisfy Rule 104(a)'s preponderance-of-the-evidence standard. *See* ECF 597-1 at 22-23 ("Offering three alternative, unproven, and mutually exclusive theories about the identity of the declarant does not amount to a preponderance finding that any single one of them is correct.").

For the sake of illustration only: If Scenario A is 40% likely, and Scenario B is 30% likely, and Scenario C is 20% likely, and they are all mutually exclusive, then the probability is 90% that one of the scenarios was true. If each of the scenarios would satisfy Rule 801(d)(2), then there is a 90% chance that the statement was made by someone who, under the rules of evidence, speaks for the defendant. But on the defense's reasoning, the preponderance standard has not been satisfied because none of the scenarios *alone* rises above the 50% threshold.  The defense cites no authority for this approach, and the Court should not adopt it. Regardless, the Court already found that the card was "more than likely completed by the defendant" himself, meaning the preponderance standard is satisfied by that scenario alone with no need to aggregate probabilities. 6/8/26 Tr. at 14.

On the hotel-clerk scenario, the defense accuses the Court of basing its ruling on an "absurdity," stating that it is "impossible" to imagine a scenario where the defendant manifested a belief in the accuracy of the card. ECF 597-1 at 24. Let us try: The defendant approached the desk and was asked for his passport, which he provided. The defendant then stood there while the clerk copied the information from the defendant's passport onto the registration card. Quite likely, the

clerk addressed him by the name he was writing on the card. Once the card was complete, rather than telling the clerk, "No, that's the wrong information," the defendant took the key and went to his room. This is an adoptive admission under Rule 801(d)(2)(B), and even if it were not that, the card would constitute the clerk's present-sense impression, making it admissible under Rule 803(1).

The defense also says they are "aware of no cases in which a statement made by an unknown declarant was admitted as a party admission." ECF 597-1 at 23 n.11. However, in the context of Rule 801(d)(2)(E), statements by unidentified declarants are commonly admitted when it is circumstantially clear that the declarant fits the rule, whoever he or she is. Such cases include:

- *United States v. Dynalectric Co.*, 859 F.2d 1559, 1582 (11th Cir. 1988) – In a bid-rigging case, the challenged statement was an anonymous phone call providing instructions to place bid and asserting "there had been an arrangement that was satisfactory to the parties." The court found that there was sufficient foundation for 801(d)(2)(E) even though there was no evidence about the caller's identity or that person's involvement in the conspiracy other than the call itself.

- *United States v. Aponte-Suarez*, 905 F.2d 483, 495 (1st Cir. 1990) – In a drug-trafficking case, the challenged statement was an unknown declarant who told a cooperating witness that the defendant couldn't fit on a plane because it was too full of cocaine. The court affirmed admission of the cooperator's testimony because it was circumstantially clear that the source of the information must have been a co-conspirator.

- *United States v. Cruz*, 910 F.2d 1072, 1081 & n. 10 (3d Cir. 1990) – An unidentified woman showed up at a police raid and made a statement indicating drugs were at a certain address. Third Circuit: "[A]ll the district court needed to know for the conspiracy

determination was that the declarant, whoever she was, was connected to Cruz and Guzman," which connection was "evident from the text of the statement" and the surrounding circumstances.

- *United States v. El-Mezain*, 664 F.3d 467, 505 (5th Cir. 2011) held, "consistent with those of our sister circuits" that "anonymous statements may be admissible under Rule 801(d)(2)(E) if sufficient evidence is presented to connect the declarant with the conspiracy at issue." (citing *United States v. Martinez*, 430 F.3d 317 (6th Cir. 2005); *United States v. Smith*, 223 F.3d 554, 570 (7th Cir. 2000); *United States v. Dynalectric Co.*, 859 F.2d 1559, 1582 (11th Cir. 1988); *United States v. Zuniga–Perez*, 69 Fed. Appx. 906, 913 (10th Cir. 2003) (unpub.)).

The government has cited cases from this line of authority before, ECF 505 at 33, and the defense has not disputed their holdings except to note that this is an issue "the D.C. Circuit has not addressed." ECF 532 at 4.

Regardless of how any of the above is resolved, the document would still be admissible under the residual exception. Although the Court did not address the application of the residual exception to the Hotel Report in the June 8 ruling, its explanation of how the residual exception would apply to the visa requests underlying the Visitors' List is fully applicable here. *See* 6/8/26 Tr. at 12-13. If necessary, the Court should rely on the residual exception to admit the document.

### E. The Flight Record is Authentic.

The defense finally argues that the government has not sufficiently authenticated the flight record. This argument is easily disposed of. The Court ruled on June 8:

> The government's BStU declarant has explained that the unified German government prioritized preservation of the Stasi archives, and although many documents were lost or destroyed, many others survived and were placed in the archives.

Moreover, the BStU archives are secure such that original documents cannot be removed or altered.

The declarant, who retrieved these documents from the archives, recognized them as authentic based on the BStU stamps. At trial, the government intends to offer testimony from a different BStU archivist who will explain that many records in the archive never left the building, and others were collected from regional offices shortly after reunification at the archive.

The Court agrees with the government and the approach of the Third and Seventh Circuits. See *U.S. v. Stelmokas*, 100 F.3d 302, and *U.S. v. Kairys*, 782 F.2d 1374. A proponent need not show exactly how the specific documents made it to an otherwise organized and trustworthy historical archive like the BStU. . . .

As the Seventh Circuit explained, it is not necessary to show a chain of custody for ancient documents. Rule 901(b)(8) merely requires that the document be found in a place where, if authentic, it would likely be.

Given that standard was satisfied, the Court found that the defendant's vague allegation that the Soviet Union regularly releases forged documents was not sufficient to make the document suspicious for purpose of admissibility.

As in *Kairys*, the Stasi archive is where one could expect to find the Stasi's documents the government seeks to admit at trial.

6/8/26 Tr. at 4-7.

The defense now tries to distinguish *Stelmokas* and *Kairys* by asserting that "the Flight Record is supported by no testimony, expert or otherwise—merely the government's assertion that "[t]he German authorities recently identified and provided an additional document . . . [which] appears to be a passenger list" containing the name 'ABOAGILA/MR.'" ECF 597-1 at 27 (quoting ECF 411 at 7). But that is incorrect. The Flight Record was authenticated by the Archives Declaration. *See* ECF 411-1 at 5 ¶ 20. Moreover, as the defendant's counsel of record are aware, the authenticity of the Flight Record as a document from the Stasi archives will also be established by testimony the government anticipates offering at trial, which has been disclosed to the defense in the form of an expert notice that largely mirrors the Archives Declaration.

## CONCLUSION

For the above reasons, the defense's motion to reconsider should be denied.


Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    */s/ Conor Mulroe*
CONOR MULROE (NY Bar No. 5289640)
ERIK M. KENERSON (OH Bar No. 82960)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 740-4595 // Conor.Mulroe@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530