**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE TO COURT ORDER REGARDING MOTION TO RECONSIDER**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response to the Court's Minute Order of August 12, 2026, regarding the government's motion to reconsider, ECF 574. For the reasons that follow, the Court should provisionally admit all records at issue.

The government addresses visa records from the Czech Republic and Switzerland in this pleading, which the government moved for admission of in ECF 490 (and which the Court denied in part on July 16, 2026). This pleading also addresses air-traffic-control records from the United Kingdom, which the defense moved to exclude in its reply in support of its motion *in limine* on exhibits. *See* ECF 507 at 17. The government stated in its sur-reply that it anticipated obtaining a certification for the records pursuant to 18 U.S.C. § 3505. *See* ECF 531-1 at 1-2. The government has since obtained such a certificate, Ex. 229-c, that would establish the air traffic control records' admissibility both as records of regularly conducted activity and as public records. Accordingly, the sufficiency of that certification is implicated by the Court's August 12 Minute Order.

As discussed in further detail below, all of the documents and recordings, once authenticated, are admissible under Rule 803(6), 803(8), and/or 803(16), and none implicate the

concerns articulated by the Court stemming from the potential for double hearsay as described in *United States v. Gurr*, 471 F.3d 144, 152 (D.C. Cir. 2006).

**A. Good cause**

The Court's Minute Order states, "Still the question remains whether the government has good cause for not obtaining an accurate Rule 902(3) certification." The government makes the following proffer of the circumstances of how it obtained the certifications presently before the Court to establish good cause for the lack of any such final certification. As the Court is aware, the vast majority (if not all) of the documents at issue in the government's foreign-document motions were collected pursuant to Scottish and/or U.S. legal requests sometime between 1988 and 1991. Those documents were then prepared for use in a Scottish trial, including in some cases obtaining certifications that complied with Scots law. *See* ECF 242-1 (Scottish Decl.) at 7-8. Many of the documents were presented without witnesses at trial, but others had witnesses testify under oath as to their authenticity. In particular, as relevant to this pleading, witnesses N.M., A.K., and J.H., all of whom signed certifications at issue here, testified at trial in The Netherlands about documents or recordings at issue in their certifications. N.M. testified about the Czech visa documents depicted in Exhibits 901 and 902, A.K. testified about the Swiss visa documents depicted in Exs. 1549 and 1550, and J.H. testified about transcripts of a portion of Exhibit 226, which is an audio recording of air traffic control communications from December 21, 1988. In addition, although V.S., (who also signed a certification regarding the Czech visa records) did not testify at trial, he (along with N.M.) gave statements under oath to Czech law enforcement regarding those documents in 1999, as part of Scottish preparations for trial. The documents at issue in this pleading were not, in other words, documents that the government was seeking from the originating government for the first time 30-some years after the attack; they are documents

whose authenticity had been established by persons with knowledge in a court of law, albeit a foreign one.

Moreover, the witnesses at issue were almost uniformly retired from the positions they used to hold, sometimes for decades. J.H. was already retired by the time of trial in the Netherlands in 2000, for example. V.S. retired in 2008, N.M. left her position in 2010. The government does not know the date on which A.K. retired.

Government counsel and members of the FBI case team in this case have traveled to multiple countries over the past three years to meet with witnesses. The purposes of those meetings were wide-ranging, but they generally involved determining whether the witnesses still possessed a memory of the events or documents at issue, whether they were willing to travel to the United States, and whether they were willing to sign U.S. certifications for the documents about which they possessed personal knowledge. All of the trips were conducted pursuant to a Mutual Legal Assistance Treaty request made by the United States to the host country. In Switzerland and the Czech Republic, as part of the standard protocol followed by each of those countries, the witnesses' identifications were checked and interviews were conducted under oath by local law enforcement. The witnesses were then provided a copy of the statement produced by that law enforcement agency to review, before signing it.[1] In the United Kingdom, the interviews were not under oath, and the FBI produced FD-302s documenting them. During the interview with J.H., the FBI confirmed his identity by checking his government-issued identification card. Given the date that these individuals retired, it is unlikely that a U.S. consular official would be able to certify, in 2026,

[1] Switzerland followed this procedure for an interview of A.K. in January 2024. In a February 2026 meeting with A.K, the Swiss permitted the FBI to record the interview in a FD-302, and it was not conducted under oath. A.K.'s identification was still checked by the Swiss authorities.

to "the official position of the signer or attester." Moreover, as described above: (1) the FBI either observed foreign law-enforcement officers check the witness's identification or checked it themselves; (2) the witnesses' identities and positions have been established under oath in multiple ways; (3) the witnesses had personal knowledge of the initial recovery of documents – they were not simply going to an existing file in 2026 to search for records from 1988; and (4) the resulting certifications were obtained by the United States pursuant to a Mutual Legal Assistance Treaty in place between the United States and the country at issue.

During meetings with N.M. and V.S. in 2023, each stated that they would be willing to come to the United States to testify, and as a result the government did not seek a certification, anticipating that it would present their testimony to authenticate the Czech visa documents. A.K. signed a public records certification, which the Court later found deficient because the certification form stated that A.K. "caused the production" of the documents at issue. *See* 1/12/2026 Hr'g Tr. at 48. In the meantime, the government learned that N.M. and V.S. were no longer willing to travel to the United States.

Following the January 12, 2026, hearing, the government sought to obtain updated certifications. As described in the government's motion to reconsider, at that hearing, the government did not understand the Court to be ruling that a government-created record could not be admissible under 18 U.S.C. § 3505. *See* ECF 574 at 2-3. It accordingly chose to pursue certifications under Section 3505, obtaining such certifications from A.K., N.M., and V.S. In the case of J.H., with whom the government met with after the Court's July 16, 2026, ruling denying its motion with respect to the Czech and Swiss visa documents, the government obtained a certification that establishes admissibility under both § 3505 and Rule 803(8). *See* Ex. 229-c (stating, as relevant to Rule 803(8), that J.H. is "confident that each of the records I have been

shown is an authentic copy of Air Traffic Control records, and that the Civil Aviation Authority created, received, and/or maintained copies of those documents as part of its ordinary functions of the United Kingdom”). Those certifications should allow the documents’ admission. Even if they do not, the Court should find good cause to treat the documents at issue as presumptively authentic for the reasons set forth above establishing good cause. Rule 902(3)’s “final certification” requirement is to establish the “genuineness of the signature and official position of the signer or attester.” Rule 902(3). Here, that fact is established in a myriad of ways normally not available when a foreign country provides copies of its records, from the identification checks witnessed or performed by the FBI to the witnesses’ prior statements under oath confirming their positions. The witnesses’ age also makes obtaining the final certification significantly more difficult, given the time that has passed since the certifiers held their positions (and superfluous, in light of the prior under-oath statements). The defense has had an opportunity to investigate all documents and recordings at issue and has raised no issue with the documents’ authenticity. The Court should find good cause and treat the documents as presumptively authentic.

**B. Swiss Visa Application Process**

The government expects witness A.K. to testify at trial. As of 1988, A.K. was assigned to work at the Swiss Embassy in Tripoli. The government expects that A.K. will testify that his job at the embassy involved processing visa applications from Libyan nationals. Applications were required to be accompanied by the applicant’s physical passport, which was used for identity-verification purposes. In other words, the regular practice of the visa processing section at the Swiss Embassy involved the receipt of applications, checking those applications against a physical passport, running whatever other checks may be required, and making a decision as to whether to grant the visa. That check against a physical passport would serve to verify information contained within the visa application, including the applicant’s name and nationality. After collecting this

information, Swiss law required that the embassy send them to the archives in Bern, where they would be maintained in accordance with Swiss law.

The government intends to offer at least two such records of granted visa applications in its case in chief.[2] The first, Exhibit 1549, is an application dated June 21, 1988, in the name of Abdelbaset A Mohmed, which is the name on Megrahi's passport. The second, Exhibit 1550, is dated November 16, 1988. A.K. approved both visa applications. The government expects that he will testify that he signified granting the visa by affixing a stamp on both the application itself, and in the passport (Exhibit 1925), both of which A.K. then signed.







**Stamp on Visa Application**

**Stamp in Passport**

The government expects that A.K. will testify that proceeding in the manner described above, *i.e.*, receiving a visa application, checking the details against a physical passport and, if the visa is

[2] The government has asked that the Court provisionally admit others pursuant to the certifications it has supplied. It may use some of the Swiss visa records, including Exhibits 1552 and 1553, in its examination of its handwriting expert regarding co-conspirator Fhimah's writing. The government expects A.K. to be able to authenticate those exhibits during testimony at trial.

granted, stamping both the application and passport (and sending the application to be archived pursuant to Swiss law) was the regular practice of the visa office.

The Swiss visa documents are also admissible as ancient documents under Rule 803(16), as they were created before January 1, 1998, and they are authenticated. The government also expects A.K. to testify, consistent with the certification he signed, that the visa applications are true copies of the original records kept by the Swiss authorities. In turn, the Swiss authorities provided the applications to the Scottish authorities in 1991, where they have been maintained in Scottish evidence ever since. The passport applications were thus found in a place where, if authentic, they would likely be, *i.e.*, in possession of the Swiss authorities. Accordingly, they are authenticated. *See* Fed. R. Evid. 901(b)(8). Separately, A.K.'s certification pursuant to 18 U.S.C. § 3505 authenticates the documents, even if the Court declines to admit them under the regularly-conducted-activity exception. *See* 18 U.S.C. § 3505(a)(2) ("A foreign certification under this section shall authenticate such record or duplicate); *see also United States v. Khatallah*, 41 F. 4th 608, 622 (D.C. Cir. 2022) ("Under Section 3505, Congress directed that the foreign certification itself shall authenticate such record or duplicate' of the record as long as the district court finds trustworthy the source of information or the method or circumstances of the document's preparation") (cleaned up).

**C. Czech Visa Application Process**

The Czech type of visa record at issue here is often referred to as an "application," but it is better thought of as a granted visa or a border pass.[3] A visa applicant to Czechoslovakia would be required to go to a Czechoslovak consulate and fill out an application, with all the necessary

[3] Indeed, N.M., one of the certifying witnesses described the form thusly: "the name of this form kept changing, at one time, it was border pass, then again a 'visa request', but the meaning was the same."

paperwork. The application included sections that would later be shown at border crossings in Czechoslovakia: One section to be shown at entry, and a second for departure. If a visa was granted, the person's passport would be stamped to indicate the granting of the visa. When the applicant then traveled to Czechoslovakia, at the border, he or she would be required to present his or her passport (with the visa), along with the portions of the application required for entry and departure, *i.e.*, the "border pass." The border agents would then check the documents for authenticity, completeness, the person's appearance on the travel documents, and the documents' validity. If the documents were in order and the foreign national was permitted to enter Czechoslovakia, his passport would be stamped, along with the "entry" portion of the visa application and the "departure" portion. The traveler would keep his passport and the "departure" portion of the application, and the border agents would keep the "entry" portion of the application and archive it, after inputting the traveler's details into a computer.

While the traveler was in Czechoslovakia, he would have his passport and would be required to keep the departure portion of their application – now stamped with an entry stamp – to present upon their departure from Czechoslovakia. When the traveler departed Czechoslovakia, the border agents would perform the same identity verification checks as they did at the first crossing, then stamp the passport and departure portion of the visa application, and collect the latter, sending it to be archived for a period of up to five years. The government computer systems would be updated as well. Government Exhibit 902 is the departure portion of Megrahi's visa application from his trip to Prague in December 1988. It has been self-evidently been affixed with both entry and departure stamps: Entry on December 9, 1988, and departure on December 16, 1988, which indicates that this document was checked at the border against a passport, and that the documents were verified with a visual inspection of the traveler.




**Exhibit 902**

Moreover, Megrahi's passport, Exhibit 1925, contains corresponding stamps, indicating that the border guards stamped both at the same time:




**Page 33 from Exhibit 1925**

Exhibit 902 and its companion from October 1988 (Exhibit 901), which also bears similar stamps (and corresponding stamps in Megrahi's passport), were certified as genuine and as having been kept in the ordinary business of the Czechoslovak government by both a former border crossing officer and a former civilian employee of the Czechoslovak (and later Czech) police department who worked in the Records Administration Department. The above recitation of the procedures for Czechoslovak visa processing and retention come from sworn statements each gave to Czech police officers, as part of a Scottish mutual legal assistance request, in 1999. The government will provide copies of English translations of those statements to the Court via USAfx.[4]

More recently, in December 2023, N.M., one of the government's certifying witnesses, was interviewed in the Czech Republic. The interview was conducted under oath by Czech law

[4] The government is willing to make available any of the prior statements of witness whose certifications are at issue in this pleading.

enforcement pursuant to a U.S. MLAT request, and U.S. prosecutors and FBI agents were present. During that interview, N.M. confirmed the authenticity of Exhibits 901 and 902, along with a blank visa application exemplar. N.M. also confirmed that she personally located the originals of these documents in the Czech archives when they were originally provided to the Scottish authorities. V.S., the other certifying witness, was interviewed on the same trip, on November 30, 2023. The interview was also conducted under oath by Czech law enforcement pursuant to an MLAT request from the United States, and U.S. prosecutors and FBI agents were present. V.S. confirmed the authenticity of the documents and explained the process, including the routine practice of archiving the documents presented by the traveler.[5] Because they were found in the Czechoslovak archives and then provided to the Scottish authorities, who then maintained them as evidence, they are also authenticated under Rule 901(8). Separately, N.M.'s and V.S.'s certifications pursuant to 18 U.S.C. § 3505 authenticate the documents, even if the Court declines to admit them under the regularly-conducted-activity exception. *See* 18 U.S.C. § 3505(a)(2) ("A foreign certification under this section shall authenticate such record or duplicate); *see also United States v. Khatallah*, 41 F. 4th 608, 622 (D.C. Cir. 2022) ("Under Section 3505, Congress directed that the foreign certification itself shall authenticate such record or duplicate' of the record as long as the district court finds trustworthy the source of information or the method or circumstances of the document's preparation") (cleaned up).[6]

---

[5] Although the Czech protocols do not specify which specific documents were shown to the witness, the FBI recorded FD-302s of the interviews that noted the documents shown to them. Those 302s, which will also be submitted via USAfx, confirm that the witnesses were shown Exs. 901 and 902 (which correspond to Crown Productions 776 and 777).

[6] As previously noted, there was a typo in the § 3505 certificates of each witness. The government is in the process of rectifying that error and will update the Court and counsel when it has a new certificate. Regardless, however, as described above, the witnesses' statements under oath, which the Court can consider because they are under oath, establish that they were discussing Exhibits 901 and 902.

**D. Air traffic control recording**

The government also seeks admission of an air traffic control voice recording and video of an air traffic control radar screen, Exhibits 226 and 229. The certification of those records, Exhibit 229-c, establishes that those documents were made at the time of the events depicted therein, that they are the kinds of records that were made and kept an in the course of a regularly conducted business activity. It also establishes that the records were created, received, and/or maintained by the Civil Aviation Authority of the United Kingdom as part of its ordinary functions under the laws of the United Kingdom. The government obtained that certification pursuant to the Mutual Legal Assistance Treaty between the United States and the United Kingdom,.

The audio recording of the air traffic control communication with Pan Am Flight 103 is authenticated a second way as well. On the day after the attack, UK authorities obtained a transcript, certified under United Kingdom law, of the air-traffic control radio broadcasts regarding Pan Am Flight 103 from December 21, 1988. Exhibit 230. A copy of that certification is below:

> I certify that this extract, consisting of 6 sheets each of which bears my signature, from the Radiotelephony Recording Log kept at Sc & OATCC ATLANTIC HOUSE by the CIVIL AVIATION AUTHORITY, has been prepared under my direction and has been examined and checked by me; that column 4 thereof is a transcription of the recording believed by me to be accurate in all respects.
>
> Signature ________ Date 22 December 1988

A week later, those authorities obtained a transcript of telephone traffic between air traffic controllers that was similarly certified. Exhibit 231. A copy of that certification is below:

> I certify that this extract, consisting of 8 sheets each of which bears my signature, from the Radiotelephony Recording Log kept at Sc & OATCC ATLANTIC HOUSE by the CIVIL AVIATION AUTHORITY, has been prepared under my direction and has been examined and checked by me; that column 4 thereof is a transcription of the recording believed by me to be accurate in all respects.
>
> Signature ____________ Date 29 December 1988

Exhibits 231 and 231 were later provided to the United States pursuant to the MLAT between the United States and United Kingdom. The Court should treat them as presumptively authentic for the same reasons stated above, with the exception of the fact that the FBI did not separately interview this certifier. The transcripts and recordings were also found by the Scottish Authorities in a place where, if authentic, they would be likely to be found, *i.e.*, the U.K. Civil Aviation Authority, and they are therefore also authenticated pursuant to Rule 901(8).

The transcripts in question, thus authenticated, can be compared to the audio recording by and the radar screen in Ex. 226 and 229 by the trier of fact, *see* Rule 901(b)(3), and Exs. 226 and 229 can also be authenticated by their distinctive characteristics, including appearance, contents, and substance, based in part on that comparison. *See* Rule 901(b)(4). The audio of the portions of Exhibit 226 that the government seeks to play at trial, for example, matches up perfectly to a combination of Exs. 230 and 231. The radar video screen in Exhibit 229, which was certified in Ex. 229-c, further matches the audio transmission: the singular block that represented Pan Am Flight 103 on the screen broke into multiple pieced at 19:03 local time, with that break-up continuing past 19:04, which is when air traffic control began trying, unsuccessfully, to contact the pilot via radio.







Once authenticated, the air traffic control transmissions are admissible under multiple hearsay exceptions. The radar screen recording in Exhibit 229 contains no statements, and thus it is not hearsay at all (and to the extent it contains any statements, they are admissible under Rule 803(8)(A)(i) & (ii) and 803(6)). The audio in Exhibit 229 also contains no assertions of fact, but to the extent it does, those assertions are admissible under both 803(8)(A)(i) & (ii) and 803(6), and also under Rule 803(1), as the air traffic controllers were describing events as they happened in real-time. Finally, the transcripts are admissible under Rules 803(8)(A)(i) & (ii) and 803(6). Those rules cover the first layer of hearsay, *i.e.*, the making of the transcript, and the second layer is covered by those same rules, as well as Rule 803(1), as the transcript is wholly derivative of the recording. All of the air traffic control documents are all separately admissible under Rule 803(16), as they are authenticated as described above.

**E. Nested Hearsay**

There are no nested hearsay issues with respect to the visa applications. Assuming that the portions of the forms filled out by the applicants are "statements" as defined by Rule 801, those statements are nonetheless admissible for multiple reasons.[7] First, as discussed above, the evidence establishes that the applications at issue were verified as a part of the regular operations

[7] The government disagrees that the visa applications contain nested hearsay and maintains, for the reasons stated in previous filings, that visa requests do not have assertive intent.

of the Czech and Swiss government officials who processed them. *See United States v. Gurr*, 471 F.3d 144, 152 (D.C. Cir. 2006) (statements by 'outsiders' can be admissible for their truth upon a showing "that it was standard practice for the preparer to verify information from outside sources"); *See also United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007) ("record of which a firm takes custody is thereby 'made' by the firm within he meaning of" Rule 803(6).

Second, all of the visa documents at issue in this motion are completed visa documents, *i.e.*, they were reviewed by the country to whom the applicant applied, the applications were granted, and the person at issue used the visa to actually travel to the country, as established by the document itself in the case of the Czech documents (as supported by the stamps in Megrahi's passport), and as established by the stamps in Megrahi's passport as to the Swiss visa records. The fact that countries granted visa applications and those visas were actually used in international travel supports their reliability.

Third, all "statements" at issue in visa applications at issue in this pleading were made by co-conspirator Megrahi during and in furtherance of the conspiracy. The Court has preliminarily found that the government has established by a preponderance of the evidence that there was a conspiracy to bomb Pan Am Flight 103, and that Megrahi and the defendant were co-conspirators. Megrahi's travel in 1988, especially in October and December 1988, to the locations where Semtex was made (at Libyan government expense) and to the location where MEBO was headquartered was necessary to further the conspiracy. Accordingly, any statements he made in visa applications in 1988 were made in furtherance of that conspiracy and are admissible under Rule 801(d)(2)(E).[8]

[8] Exhibit 1549 appears, based on handwriting analysis, to have been filled out by Megrahi. Exhibit 1550, by contrast, appears to have been prepared by some sort of a service. Even if Megrahi did not fill it out, he would have necessarily had to approve its contents, making it his statement. Separately, as noted above, Exhibits 1552 and 1553 involve applications by co-conspirator Fhimah. Those post-date the Pan Am Flight 103 conspiracy, so the government does

## CONCLUSION

For the above reasons, the Court should provisionally admit Exhibits 1549, 1550.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: ***/s/ Erik Kenerson***
ERIK M. KENERSON (OH Bar No. 82960)
CONOR MULROE (NY Bar No. 5289640)
BRITTANY KEIL (D.C. Bar No. 500054)
CHARLES R. JONES (D.C. Bar Number 1035541)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 252-7201 // Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530

not maintain that they are made in furtherance of that conspiracy. The government seeks their admission only for purposes of handwriting comparison, rather than the "truth" of any travel and, in any event, all the visa documents' reliability is established for the reasons stated above.