**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MOTIONS IN LIMINE REGARDING "JAMAL"**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this omnibus motion in limine regarding the testimony of the witness known as "Jamal." For the reasons that follow, the government requests that the Court (1) limit cross-examination regarding the specific details of Jamal's relocation; (2) limit public access to the courtroom for his testimony, but make audio, and if technically feasible, video of other courtroom participants and the admitted exhibits, fully available to the public in the overflow courtroom(s) and in the media room; and (3) implement certain procedures with respect to any attempts to impeach Jamal with his prior deposition testimony.

**MOTION IN LIMINE 1: LIMIT CROSS-EXAMINATION REGARDING [redacted]**

[redacted]

[redacted]

[redacted]

**MOTION IN LIMINE 2: PARTIAL COURTROOM CLOSURE**

The government seeks to limit public access to the courtroom during Jamal's testimony to protect his true identity and, by extension, he and his family's safety and security. Specifically, the government asks this Court to clear the courtroom of everyone but the Court, the jury, the parties, and those affiliated with the Court or parties, such as court staff and members of the defense and government trial teams. The government separately requests that the public be granted full access to the audio, and if technically feasible, video of other courtroom participants and the admitted exhibits, in the overflow courtroom(s), the media room, and at the seven remote fixed sites where verified victims will be present under FBI supervision. Such an arrangement would

[redacted]

be no broader than necessary to protect the government's overriding interest in witness security, and would adequately balance the public's right to access to the trial, the defendant's right to a public trial, and Jamal's testimony.

**A. Legal Background**

As this Court has previously ruled:

> The First Amendment guarantees the press and the public access to aspects of court proceedings," *United States v. El-Sayegh*, 131 F.3d 158, 160 (D.C. Cir. 1997), if (1) "there is an unbroken, uncontradicted history of openness"; and (2) "public access plays a significant positive role in the functioning of the proceeding," *United States v. Brice*, 649 F.3d 793, 795 (D.C. Cir. 2011) (citation modified). Applying that standard, courts have recognized a public right of access to a range of proceedings and documents, including criminal trials, voir dire, preliminary hearings, and completed plea agreements. *See id.* at 795–96.
>
> Even a recognized right of access to a given proceeding or document, however, is "not absolute." *Id.* at 795 (citation modified); *see Press-Enter. Co. v. Superior Ct. of Cal.*, 478 U.S. 1, 9 (1986). Where there is a First Amendment right of access to a judicial proceeding, the presumption of access can be overridden" if, and only if, (1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." *Brice*, 649 F.3d at 796 (citation modified); *see Press-Enter.*, 478 U.S. at 9–10 (The presumption may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." (citation modified)).

ECF 302 at 1-2.

The Sixth Amendment right to a public trial is "no less protective of a public trial than the implicit First Amendment right of the press and public. *Waller v. Georgia*, 467 U.S. 39, 46 (1984). "[U]nder the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the tests set out in Press–Enterprise [sic] and its predecessors" *Id.* at 47. The Court must additionally make findings adequate to support and closure. *Id.* at 48.

Courts have long found witness security and the need to protect sensitive witnesses' identity to be a compelling reason to justify a limited, or sometimes partial, closure of the

courtroom. *See*, *e.g.*, *United States v. Thompson*, 713 F.3d 388, 396 (8th Cir. 2013) (partial closure justified due to "government's interest in protecting its witness and the witness's concern for his own safety justify"); *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997) (finding that the state had an "extremely substantial interest" in maintaining the continued effectiveness of undercover officers); *see also Presley v. Georgia*, 558 U.S. 209, 215 (2010) (concluding that safety concerns could be concrete enough to justify closing *voir dire*).

**B. Argument**

The government's proposal satisfies all of the elements required to justify a partial closure of the courtroom. The government has identified a compelling interest justifying closure in protecting Jamal's true identity and, by extension, he and his family's safety; there is a substantial probability that, absent a partial closure, that interest would be harmed, and there are no alternatives short of the proposed partial closure that would protect that compelling interest. Indeed, the government's proposal here comes very close to full public access.

1. <u>The Partial-Closure Serves a Compelling Interest</u>

The government has previously identified multiple reasons why Jamal's true identity must be protected. *See* ECF 125-1, 125-2, 125-3 (Motion for a Rule 15 deposition of Jamal, Examples of Libyan social media posts, and declaration of [redacted]), each of which the government incorporates herein. The Court has already found that the government's interest in protecting Jamal's identity is compelling in the First Amendment context. *See* ECF 302 at 6. Two things have changed since the Court's analysis in ECF 302, neither of which affect the outcome: (1) the

government is now seeking a partial closure during trial, rather than at a suppression hearing, and (2) by the time of any closure at trial, Jamal will be present in the United States.[2]

Once a public right of access attaches to a proceeding, the test for whether a closure of that proceeding may be justified is the same regardless of the type of proceeding. *See*, *e.g.*, *Waller*, 467 U.S. at 48 (applying *Press-Enterprise* standard to suppression hearing). Accordingly, the Court should analyze the same factors it analyzed at the time of the suppression hearing in deciding this motion with respect to trial.

The government's interest in protecting Jamal's identity is just as compelling, if not more so, than it was at the time of the suppression hearing. The government's overriding concern is with protecting Jamal's safety and that of his family. That interest is more intense with respect to trial, which the government expects to receive significantly more media coverage than did the suppression hearing. And for the reasons stated in Part A, *supra*, although [redacted]

[redacted]

[2] The Court's ruling with respect to the suppression hearing also focused on the defendant's concerns regarding pretrial publicity. In this vein, the government's notes that it may be necessary for Jamal to testify more than once during this trial (e.g. in the defense case or in rebuttal).

[redacted] Thus, for the reasons the Court has already found, the government has identified a compelling interest in a partial closure of the courtroom during Jamal's testimony.

2. <u>There is a Substantial Likelihood This Compelling Interest will be Harmed</u>

As the Court noted in its ruling on this issue around the suppression hearing, [redacted] ECF 297 at 6. That finding is not at all diminished when analyzed under the framework of Jamal testifying in a public courtroom at trial. If any Libyan nationals or expatriates attend, or anyone who can sufficiently describe Jamal's likeness to those in Libya, his safety will be in jeopardy. The same is true if the media reports on his likeness or if a sketch artist draws him.

3. <u>The Proposed Closure is Narrowly Tailored to Protect Compelling Interests</u>

Notably, this request for closure is carefully tailored to maximize the defendant's right to confront Jamal, and the public's right of access to the trial. The government's proposal would give the public access to every portion of the trial, except for the ability to visually observe Jamal. The public could hear his voice, hear the questions and answers in real time, hear any non-bench conference legal argument, and the public could view the other trial participants and exhibits by video feed to overflow courtroom(s) and the media room. A transcript of the proceedings would be available to any members of the public who do not attend, to the same extent that any other trial transcript would be available. The rest of the trial, including other witnesses, opening statements, closing arguments, and any mid-trial legal issues would be open to the public.

This partial access would vindicate both the public's right to access the proceedings and the defendant's right to a public trial because the public and press would have real-time access to what happens in the courtroom. The press would be able to report on anything said in court with the same accuracy as if there were no visual restrictions. "The requirement of a public trial is for

the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. at 46, *quoting Gannett Co., Inc., v. DePasquale*, 443 U.S. 368, 380 (1979) and *In re Oliver*, 333 U.S. 257, 270 (1948). Those rights would be just as vigorously vindicated with real-time audio access in overflow courtrooms as they would be with in-person public access.

Courts have, in other cases, approved similar proposals. *See*, *e.g.*, *United States v. Marzook*, No. 03-cr-978, Dkt. 652 (N.D. Ill. 2006) ("*Marzook* Opinion"). In that case, the government sought to have Israeli Security Agency (ISA) agents testify in a closed courtroom with a contemporaneous audio feed of their testimony to an overflow courtroom. *Id.* at 3. The court approved a procedure whereby a live video feed of the courtroom – video of every participant in the trial, other than the ISA witnesses – was piped to an overflow courtroom. The ISA agents' audio testimony could still be heard in the overflow courtroom. *Id.* at 4-5. The government requests that the Court implement as close to this procedure as is feasible with the existing courtroom technology. The *Marzook* court found that the live-feed procedure would "satisfy the goal of providing 'a check on the activities of judges and litigants,'" *Id.* at 5, *citing In re Associated Press*, 162 F.3d 503, 506 (7th Cir. 1998). The court also made a transcript of the ISA witnesses' testimony available to the public. *Marzook* Opinion at 5.

Other courts have reached similar conclusions. *See United States v. Hendricks*, 950 F.3d 348, 355 (6th Cir. 2020) (upholding closed courtroom with live audio during testimony of an undercover officer); *United States v. Kwok Cheung Chow*, 772 Fed. Appx. 429, 431-32 (9th Cir. 2019) (unpub.) (upholding closed courtroom with live video, with undercover agents' faces

obscured); *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 488-89 (S.D.N.Y. 2018) (Approving use of closed courtroom and live audio to overflow, among other measures).

The district court in *Hendricks* considered alternatives such as the use of a physical screen and heavier disguise, but found that the use of the overflow courtroom would be less intrusive, and the Sixth Circuit upheld that decision. *Hendricks*, 950 F.3d at 356. The *Marzook* court also considered options like a physical screen and decided that they would not be as effective as the live feed, because among other things, the views of the jury, defendants, and lawyers might be obscured by a screen. *Marzook* Opinion at 5. In this case, the government has considered whether other options like light- or heavy-disguise, or the use of a screen, would adequately protect its interests, and the government has concluded that they would not. "Light" disguises are often inadequate to actually protect identity, and heavier disguises often make it hard for jurors to judge credibility and lead to confrontation objections from defendants. *See Hendricks*, 950 F.3d at 355-56 (upholding district court's finding that the undercover agent's light disguise would not have fully protected his physical identity, and noting that the defendant warned that a heavier disguise would infringe on his confrontation rights). Judge Lamberth has found that light disguise may interfere with a defendant's confrontation rights. *See United States v. George*, 1992 WL 200027 at *2-*3 (D.D.C. 1992) (choosing to permit CIA witnesses to testify from behind a screen, rather than in light disguise, after defendant stated that was her preference between the two choices).

Many courts have employed the use of screens to hide a testifying witness.[3] The government has concerns that erecting a screen in this specific courtroom would be impracticable.

---

[3] The use of screens has been approved in this district before. *See United States v. George*, 1992 WL 200027 at *2-*3 (D.D.C. 1992) (permitting CIA witnesses to testify from behind a screen prohibiting the public from viewing them, among other measures). Their use has also been upheld in other circuits. *See*, *e.g.*, *United States v. Lucas*, 932 F.2d 1210, 1217 (8th Cir. 1991) (upholding district court's decision to permit undercover detective to testify behind a screen).

While it would be relatively easy to erect a screen around the witness, that would negatively impact the defendant's right to confront the witness and the jury's ability to observe him. And it would be quite challenging, given the layout of the courtroom, to erect a screen that walled the entire public gallery off from the well of the courtroom – the courtroom is very wide, and the witness stand is elevated, which would necessitate the erection of a sizeable barricade. And a screen that walled the public off entirely from the well of the courtroom would also preclude the public from seeing the judge, counsel at the podium, and the exhibits used by the parties. Thus viewing the livestream of the proceedings from the overflow courtroom(s) and the media room will provide the public with a superior opportunity to observe the proceedings.

Here, the government believes that the jury needs an unfettered opportunity to observe Jamal's testimony. The government expects that defense will vigorously challenge Jamal's credibility; and the Court appears to agree based on its statements during the ruling on the motion to suppress. And Jamal's testimony is central to the government's case. Given these facts, the jury's opportunity to observe and assess his credibility will be of paramount importance, both for the government <u>and</u> for the defense. The government thus has serious concerns that the use of disguise here that would hide Jamal's facial features, impeding the jury's ability to judge his credibility. And the government has concerns that it would be difficult to erect a screen that would neither impinge on the jury's ability to view Jamal nor thwart the defendant's confrontation rights. The Court already has the technology in place to implement the government's proposal seamlessly, and there is no practical difference between a public that can hear (but not see) the witness in the same physical courtroom and a public that can hear (but not see) the witness in an overflow courtroom. As the jury's assessment of Jamal's credibility is paramount, it should have every opportunity to observe him as he testifies. The government's proposal balances the compelling

interest in protecting Jamal's identity with the defendant's right of confrontation, the jury's vital function in assessing Jamal's credibility, and the public's right of access.

The government is aware of no authority suggesting that physical proximity to a witness is relevant to the public's right of access. Experience would suggest the opposite: in this District, trials of significant public interest are commonly broadcast via audio-visual feed to a "media room," and members of the press often view the trial from that location rather than the courtroom because they deem access to electronic devices to be more important than seeing proceedings in the flesh. Likewise, members of the public often view the proceedings from overflow courtroom(s) in large trials where demand exceeds the available spaces in the public gallery. And regardless, the overwhelming majority of the public learns about judicial proceedings secondhand. Even in 1980, in the seminal public-access case *Richmond Newspapers, Inc. v. Virginia*, the Supreme Court recognized that "most people receive information concerning trials through the media" rather than by "relying on personal observation or reports from neighbors as in the past." 448 U.S. 555, 577 n.12 (1980). That statement is even truer today, meaning that most members of the public will have no reason to know or care whether live attendees were in the courtroom with visual access or in an overflow room listening to audio.

Thus the government's proposal is narrowly tailored to put forth the narrowest restriction possible to vindicate the government's compelling interest in protecting Jamal's identity, and the Court should implement it.

**MOTION IN LIMINE 3: IMPEACHMENT WITH PRIOR DEPOSITION**

When Jamal testifies at trial, it may become necessary for one side or the other to impeach him with his deposition testimony. Jamal testified through translation from Arabic into English, and the official record of his testimony is the English language translation of his testimony. To the

extent that either party wishes to impeach Jamal, the government suggests that there are two methods by which this impeachment could occur – through use of the English language transcript, and through use of the video of Jamal's prior testimony.

With respect to the use of the English language transcript, the government expects that impeachment would proceed as follows:

> And isn't it true, Jamal, that during your deposition you were asked the following question and you gave the following answer: Q: On page 25, are there any lines that you did not make? A: Yes. Q: Tell me from the top, please. A: 13.

Counsel would presumably direct the parties to the portion of the transcript at issue (here, Tr. Vol. V, 2/10/2206, at p. 45, lines 20-24). At the conclusion of this impeaching question, the interpreter would translate the question into Arabic, Jamal would answer in Arabic, and the interpreter would translate the answer into English. Were Jamal to deny his answer, the impeaching party could seek to introduce that portion of the transcript to prove up the impeachment.

Alternatively, the parties may seek to use the video of the same portion of the deposition to impeach the witness. As the Court noted, there were sometimes apparent issues with translation during that deposition. Were a party to use the video to impeach Jamal, however, the government submits that it would be appropriate to use both the English language portions and the Arabic language portions of the video. Accordingly, the government requests that on such occasions, the party attempting to impeach Jamal with his prior transcript be required to play the entire question(s) and answer(s) at issue in English and Arabic. For example, if a lawyer asked Jamal, A"Are there any lines on page 25 that you did not make," and he responded, "no" and counsel would need to play the entirety of that portion of the video deposition video to impeach him:

> Q: On page 25, are there any lines that you did not make?
> Q: Arabic translation of question.
> A: Arabic answer to question.

A: Yes.
Q: Tell me from the top, please.
Q: Arabic translation of question.
A: Arabic answer.
A 13.

## CONCLUSION

For the above reasons, the government's motion in limine regarding Jamal should be granted.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: ***/s/ Erik Kenerson***
ERIK M. KENERSON (OH Bar No. 82960)
CONOR MULROE (NY Bar No. 5289640)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 252-7201 // Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530