**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:22-cr-392 (DLF)** |
| | ) | |
| **ABU AGILA MOHAMMAD** | ) | |
| **MAS'UD KHEIR AL-MARIMI,** | ) | |
| **Defendant.** | ) | |

**MR. AL-MARIMI'S RESPONSE REGARDING**
**THE ADMISSIBILITY OF CERTAIN FOREIGN RECORDS**

Mr. Al-Marimi respectfully submits this response to the Court's August 12, 2026 Minute Order and the government's responses to that Minute Order (ECF 625, 626-1). *See also* ECF 148, 173, 183 (original MIL); ECF 450, 459 (Czech visa inclusion); ECF 490, 509, 519 (supplemental MIL); ECF 574, 596, 610 (MIL reconsideration); ECF 507, 531-1 (air traffic control inclusion); 1/12/26 Tr. (initial § 3505 ruling); 7/16/26 Tr. (ruling on foreign records).

The Court's August 12, 2026 Minute Order identified three potential paths to admission for the records at issue and further acknowledged the possibility of nested hearsay in the visa applications. The government subsequently put forward an additional argument for admission, relying on mutual legal assistance treaties.

## I. Rule 803(8) public records – the government has not shown good cause.

Rule 902(3) provides that a document "that purports to be signed or attested by a person who is authorized by a foreign country's law to do so" is presumptively authentic when "accompanied by a final certification as to the genuineness of the signature and official position[.]" Fed. R. Evid. 902(3). The rule further provides a

limited exception to the certification requirement "for good cause shown," if all parties have had a "reasonable opportunity . . . to investigate the authenticity and accuracy of official documents[.]" *Id.*

While there is a "dearth of case law to consult for guidance on this issue[,]" courts have looked to Civil Rule of Procedure 44(a)(2) and the associated Committee's Note to identify when there is good cause. *United States v. Yousef*, 175 F.R.D. 192, 193–94 (S.D.N.Y. 1997). The note recognizes

> that in some situations it may be difficult or even impossible to satisfy the basic requirements of the rule. There may be no United States consul in a particular foreign country; the foreign officials may not cooperate, peculiarities may exist or arise hereafter in the law or practice of a foreign country.

Fed. R. Civ. P. 44, Notes of Advisory Committee on 1966 Amendment. In other words, good cause exists when the political or practical realities of international cooperation and staffing make compliance exceedingly difficult or impossible. For example, in *United States v. Leal*, 509 F.2d 122, 126 (9th Cir. 1975), the Ninth Circuit found good cause when the government "urged the [certifying] immigration officer to appear at the United States Embassy, but there was no way that they could compel him to do so[,]" so the government proceeded with a signed certification from him made pursuant to the foreign laws. The court concluded "that the government did all that could be done under the circumstances[.]" *Id. See also Haarhuis v. Kunnan Enters., Ltd.*, 177 F.3d 1007, 1015 (D.C. Cir. 1999) (finding good cause "because there was no consular service in Taiwan").

Here, the government seems to argue there is good cause based on the circumstances under which the records were produced prior to 1991 and

authenticated under Scottish law for use at the Camp Zeist trial; the fact that the witnesses "were almost uniformly retired" from their positions and now are of advanced age; the government's efforts to verify the identities of the certifying witnesses; witnesses' prior testimony under oath at the Camp Zeist trial; and the circumstances that led the government to secure deficient certifications, namely misunderstanding the Court's ruling with respect to the applicability of § 3505 to government records. ECF 625, at 2–5. The government ultimately argues that the "genuineness of the signature and official position of the signer or attester" is established "in a myriad of ways" other than a sufficient certification. *Id.* at 5.

These circumstances do not constitute good cause, and the Court should not accept the government's argument that the certification requirement is *sufficient* to satisfy Rule 902(3) rather than *necessary*. First, none of the facts or circumstances identified by the government establish that the government could not have acquired a compliant certification. To the contrary, the government acquired certifications from each witness, including one that was acquired after the Court's July 16, 2026 ruling. By all counts, the witnesses were and remain willing to work with the government. There is no identified absence in the countries' diplomatic staff, no identified hole or gap in the relevant framework for international cooperation, and no identified peculiarity of Czech or Swiss law that impaired the government's ability to work with the witnesses. In short, this situation is quite different from those contemplated by the Committee's Note and addressed in the caselaw above: the government's good cause is that it thought it didn't have to do it the correct way, and

now it doesn't want to expend the resources to redo it correctly.

The government does not explain, for instance, why the fact that the certifying witnesses retired years ago means "it is unlikely that a U.S. consular official would be able to certify" to their official positions. It does not claim that it could not have sought original copies of the records from the foreign governments rather than relying entirely on the existing copies. It does not contend it could not work with the witnesses to produce compliant certifications; indeed, it represents that one of the witnesses (A.K.) is expected to testify at trial. ECF 625, at 5.

Second, the government cannot escape the certification requirement by arguing that genuineness has been established by other means. By its terms, Rule 902(3) does not allow for other means: it requires a final certification unless there is good cause why one could not be produced. In other words, a final certification is necessary to enable the rule's presumption of authenticity, not merely sufficient.

## II. Rule 803(6) and § 3505 business records – the government's authorities are not persuasive.

Mr. Al-Marimi briefly addresses the government's reply brief, ECF 610, in which the government offered additional authorities in support of § 3505 applying to foreign public and government records. Generally, the government relies on cherrypicked cases applying Rule 803(6) to government records, which do not address the reach of § 3505. ECF 610, at 5.

The government's remaining authorities are few and unpersuasive. To start, the government admits that *United States v. Jawara*, 474 F.3d 565 (9th Cir. 2007), did not address government records. ECF 610, at 3. The government then cites *United*

*States v. Garland*, 991 F.2d 328, 333–35 (6th Cir. 1993), which it asserts found a Ghanian court judgment could be admissible under § 3505. But *Garland* only took judicial notice of the judgment's existence, not its contents, before analogizing to § 3505 and Rule 803(8) to explain why the contents of the foreign judgment could be admissible under the hearsay rules as new evidence following remand. Notably, the court also relied on 18 U.S.C. § 3491, which applies to foreign records certified by consular officers pursuant to 18 U.S.C. §§ 3492, 3494. *Id.* at 333. Finally, the government cites *United States v. Ross*, 33 F.3d 1507, 1515 & n.11 (11th Cir. 1994), which merely acknowledged that foreign public records had been admitted in the lower court pursuant to § 3505 before addressing the defendant's argument that the use of an affidavit to authenticate the records violated the Confrontation Clause. The court was not asked to consider the issue of whether the use of § 3505 was proper with respect to the foreign public records, and acknowledgement is not approval.

## III. Rule 803(16) ancient documents – the government's evidence must authenticate the records.

The government argues the Swiss visa documents are authenticated under Rule 901(b)(8), and thus admissible under the ancient documents hearsay exception, because A.K. will testify that the visa applications are true copies of original records kept by Swiss authorities, and because "the Swiss authorities provided the visa applications to the Scottish authorities in 1991, where they have been maintained in Scottish evidence ever since." ECF 625, at 7. Likewise, the government argues the Czech visas are authenticated by virtue of purportedly being archived by the Czech government before being produced to Scottish investigators and stored for use in Pan

Am 103 prosecutions. *Id.* at 11.

The Court has preliminarily ruled that other evidence could be admitted based on similar showings. Mr. Al-Marimi maintains prior objections and reserves the right to object if the government's evidence at trial falls short of establishing authenticity. Notably, the government does not expect the Czech witnesses to testify.

Alternatively, the government seeks to rely on the § 3505 certifications to authenticate the visa applications. Mr. Al-Marimi maintains § 3505 does not apply, *see* ECF 596 & *supra*, and emphasizes that the present certifications for the Czech witnesses contain a significant error. *See* ECF 625, at 11 n.6.

### IV. Rule 902(4) certified copies of public records – the government's latest theory lacks supporting authority.

The government argues in the alternative that the records are self-authenticating under Rule 902(4), Criminal Rule 27, and Civil Rule 44. ECF 626. The defense has not had sufficient time to thoroughly investigate this novel theory, which the government put forward three days ago on Saturday, August 15, 2026.

The theory seems to be that Rule 902(4) applies when a public record—the rule does not specify foreign or domestic, though subsection (3) expressly refers to foreign public documents—is certified as correct by a certificate that complies with, *inter alia*, a rule prescribed by the Supreme Court. Fed. R. Evid. 902(4)(B). In turn, Criminal Rule 27 provides that a party may prove an official record—again, the rule does not specify foreign or domestic—in the same manner as in a civil action. Fed. R. Crim. P. 27. Then, Civil Rule 44 provides that a foreign record—once again, no modifier—"that is otherwise admissible" is evidenced if attested to by an "authorized person" and

accompanied by, *inter alia*, a "certification under a treaty or convention to which the United States and the country where the record is located are parties." Fed. R. Civ. P. 44(a)(2)(A)(ii). Civil Rule 44 also allows an exception to the certification requirement for good cause shown. Fed. R. Civ. P. 44(a)(2)(C). Finally, the government argues that the certifications here were produced pursuant to MLATs.

There are a number of issues here. For now, Mr. Al-Marimi focuses on whether the certifications being produced *in response to MLATs* means the certifications were produced "*under*" those treaties. The government does not offer any apt authority for that contention. It cites Wright & Miller, which states the record and attestation must be "certified as provided in a treaty"; here, the government has not explained what the applicable MLAT treaties provide. Notably, the Committee's Notes to this part of Civil Rule 44 refer to "consular conventions [that] contain provisions for reception of copies or summaries of foreign official records." Fed. R. Civ. P. 44, Notes of Advisory Committee on 1966 Amendment. The government also cites *United States v. Pintato-Isiordia*, 448 F.3d 1155, 1157 (9th Cir. 2006), which addressed a certification "in accordance with the Hague Convention Abolishing the Requirement of Legalisation for Foreign Public Documents, to which both Mexico and the United States are parties." The government here does not analogize to the Hague Convention, merely noting it is proceeding under the MLATs instead and assuming this situation is comparable. Of course, the United States and Mexico *also* have an MLAT predating *Pintato-Isiordia*, so it remains unanswered why the government there did not proceed under the MLAT for purposes of Civil Rule 44. *See* U.S. Dep't of State, *Mexico (91-*

*503) – Treaty on Cooperation for Mutual Legal Assistance* (May 3, 1991), https://www.state.gov/91-503.

Mr. Al-Marimi objects to this belated approach, at least until the defense can sufficiently investigate the applicable law.

**V. Nested hearsay**

The government argues the nested hearsay statements in the visa applications—the applicant's own statements, which constitute outsider information—are admissible for two reasons.

First, the government argues the reviewing officials verified the outsider information. For the Swiss application process, the government states A.K. will testify that the regular practice was to check the application against a physical passport and run "whatever other checks may be required[.]" ECF 625, at 5. This cursory and vague explanation does not establish that all the outsider information was verified beyond what could be checked against the physical passport. For the Czech application process, the government relies on prior statements by the Czech officials to investigators. The government does not pincite to within those statements, but it represents that the officials likewise checked the applications against the applicant's passport, and that applicants preliminarily had to complete applications at a consulate "with all the necessary paperwork." *Id.* at 7–8. Again, it is not clear from this explanation that all the outsider information was verified or by whom, beyond what could be gleaned from the applicant's passport and appearance.

The government further argues that the fact that the visa applications were granted supports their reliability, but it does not follow from that that the outsider

information necessarily was verified.

Second, the government argues the outsider information is admissible as coconspirator statements under Rule 801(d)(2)(E) because these applications were purportedly completed by Megrahi.[1] Mr. Al-Marimi acknowledges that the Court has found Megrahi and Mr. Al-Marimi (and Fhimah) to be coconspirators but preserves his objection to those rulings. Beyond participation in the conspiracy, the government also must establish that the statements were made during and in furtherance of the conspiracy. The government argues Megrahi's travel to locations it has associated with MEBO (timers) and Semtex (explosive) furthered the conspiracy. Mr. Al-Marimi maintains that the government has not established the purposes of Megrahi's supposed travel by a preponderance of the evidence.

## VI. Air traffic control records

The government has provided a certification regarding the air traffic control records that covers the requirements of the business records and public records hearsay exceptions. *See* Exh. 229-c. The certification provides a narrative in which the witness describes the bases for his knowledge of the records, including firsthand observation on the night in question. *Id.*

Mr. Al-Marimi maintains § 3505 does not apply, *see* ECF 596 & *supra*. Mr. Al-Marimi reserves the right to object if the government's evidence at trial does not

[1] The government notes Exhibit 1549 "appears" to have been completed by Megrahi based on handwriting analysis, whereas Exhibit 1550 does not appear to have been completed by Megrahi. ECF 625, at 15 n.8. The government speculates that Megrahi adopted the statements. *Id.* The government also notes that Exhibits 1552 and 1553, Fhimah's applications, postdate the Pan Am 103 conspiracy. *Id.* Accordingly, the government offers them not for Fhimah's travel but rather for a handwriting comparison.

establish foundation for these exhibits. While the government states the radar recording, audio recording, and transcripts align, such alignment does not by itself lay sufficient foundation. Moreover, the recordings do not, to a lay person, sound as if they are in the state in which their initial recordings would have been preserved. Rather, they would seem to be separate clips of recordings that were made as part of the investigation and, in some instances, combined. If so, that process requires explanation. The government has not yet laid an adequate foundation for admissibility under those circumstances.

The transcripts are similarly disjointed. They are not traditional transcripts which follow the audio presented in the recording which they accompany. Instead, they are each transcripts of *portions* of the audio, which must be read in conjunction with one another. Even then, again, to a lay person, the transcripts do not appear to capture all of the audio recording. Accordingly, the government would need to lay a far more complex foundation to establish admissibility than it has done thus far.[2]

Finally, the recordings and transcripts are inadmissible under Rule 403 by virtue of the risk of confusion of the issues and their cumulative nature, considering the government's other evidence of the crash.

## CONCLUSION

The Court correctly interpreted § 3505, and it should deny the government's motion for reconsideration regarding the foreign visa applications.

[2] The transcripts were only recently provided in discovery. Defense counsel has identified concerns about their format, and the government has offered to provide further explanation. After that additional information is received, Mr. Al-Marimi will promptly note any additional objections in upcoming exhibit-related briefing.

Respectfully submitted,

**ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI**

By: ________/s/______________________

Whitney E.C. Minter
Va. Bar #47193
Brooke Sealy Rupert
Va. Bar #79729
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0855 (telephone)
(703) 600-0880 (facsimile)
Whitney_Minter@fd.org (email)

Laura Koenig
Va. Bar #86840
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
701 E. Broad Street, Suite 3600
Richmond, Virginia 23219
(804) 343-0800 (telephone)
(804) 648-5033 (facsimile)
Laura_Koenig@fd.org (email)