Filed with the Classified
Information Security Officer
CISO [signature]
Date 03/17/2026

[redacted]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**v.**<br><br><br><br>**ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI,**<br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **No. 1:22-cr-392 (DLF)**<br>**FILED IN CAMERA AND UNDER SEAL WITH THE CLASSIFIED INFORMATION SECURITY OFFICER** |

## MR. AL-MARIMI'S MOTION CHALLENGING ILLEGAL RENDITION

[redacted] Abu Agila Mohammad Mas'ud Kheir Al-Marimi respectfully submits this motion challenging his rendition from Libya to the United States. Mr. Al-Marimi requests an evidentiary hearing to make a record and illuminate the facts of his abduction in Libya, which bear on both recognized exceptions to the *Ker-Frisbie* doctrine. Should the Court find, based on the evidence, that either exception applies, it should dismiss the charges for want of jurisdiction.

## BACKGROUND

### I. The United States requests Mr. Al-Marimi's rendition from Libya.

[redacted] On December 14, 2020, approximately 32 years after the tragic mid-air explosion of Pan American Flight 103, the government charged Mr. Al-Marimi with crimes relating to the destruction of that aircraft. ECF No. 1. At the time, Mr. Al-Marimi was imprisoned in Libya, serving a sentence for unrelated charges. *See* U.N.

[redacted]

Support Mission in Libya & Off. of the U.N. High Comm'r for Hum. Rts., *Rep. on the Trial of 37 Former Members of the Qadhafi Regime* (Case 630/2012) (Feb. 21, 2017), https://unsmil.unmissions.org/sites/default/files/regime-trial-report-english.pdf (finding serious due process concerns with the criminal trial that led to Mr. Al-Marimi's conviction and imprisonment in Libya).

[redacted] On March 15, 2021, the United States, through its ambassador to Libya, formally requested Mr. Al-Marimi's "extradition, expulsion, or otherwise lawful removal" from Libya to stand trial in the United States for the charged offenses. Exh. 1. The request was made "pursuant to the domestic laws of Libya, the United Nations Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation adopted September 23, 1971 ("Montreal Convention"), and the International Convention for the Suppression of Terrorist Bombings, adopted December 15, 1997 ("Terrorist Bombings Convention")." *Id.* The request specifically invoked Articles 8(2) and 8(3) of the Montreal Convention and Articles 9(2) and 9(3) of the Terrorist Bombings Convention, which provide that each agreement may serve as a basis for extradition between signatories with respect to the crimes covered by the agreements. *Id.* at 5–6. Both Libya and the United States are parties to each agreement. *Id.*

[redacted]

[redacted]

[1] While Qaddafi was in power, in August 2008, Libya reached a settlement agreement regarding Lockerbie with the United States. *See* Exh. 2. The settlement was a "final settlement of the Parties' claims, and those of their nationals (including natural . . . persons)"

[redacted]

[redacted]

[redacted]

[redacted]

and precluded "any future suits that may be taken to their courts" if the "claim or suit" was against the other party, or its agencies or instrumentalities or its officials, employees, or agents "whether such officials, employees, or agents are sued in an official and/or personal capacity), or (where the claim or suit implicates in any way the responsibility of any of the foregoing) against the other Party's nationals[.]" *Id.* at 4.

[redacted]

[redacted]

---

[2] Al-Sor was integral to U.S. and Scottish efforts to procure evidence against Mr. Al-Marimi from within Libya, including Mr. Al-Marimi's purported confession and making available to western law enforcement authorities the individual who interrogated Mr. Al-Marimi. *See* ECF 352-2. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] In 2023, GNU Prime Minister Dbeibah got exactly what he asked for. In January 2023, then-CIA director William Burns met with Dbeibah in Tripoli. *See, e.g.*, Reuters, *CIA chief makes rare visit to Libya* (Jan. 13, 2023), available at https://www.reuters.com/world/africa/cia-chief-makes-rare-visit-libya-2023-01-12/ (last visited March 10, 2026). In February 2023, a U.S. representative to the U.N. reported that "his country fully supports the proposed elections-enabling mechanism as UN envoy to Libya" promulgated. *See, e.g.*, LibyaUpdate, *U.S. "fully supports"*

[redacted]

*elections-enabling mechanism proposed by UN envoy to Libya* (Feb. 27, 2023), available at https://libyaupdate.com/u-s-fully-supports-elections-enabling-mechanism-proposed-by-un-envoy-to-libya/ (last visited March 10, 2026). In March 2023, Prime Minister Dbeibah met with Assistant Secretary of State Barbara Leaf. *See, e.g.*, Abdul Kader Assad, *Libyan PM, US Assistant Secretary of State support UN envoy's efforts to reach elections*, The Libya Observer (March 21, 2023), available at https://libyaobserver.ly/news/libyan-pm-us-assistant-secretary-state-support-un-envoys-efforts-reach-elections (last visited March 10, 2026).

[redacted] Further, Prime Minister Dbeibah also secured financial investments from the United States. Assistant Secretary of State Leaf told the Senate Foreign Relations Committee in May 2023 that the U.S. State Department was recommending that Congress provide $16,000,000 "to support Libya's eventual transition to a democratic, stable, and unified state, complemented by targeted resources from the Prevention and Stabilization Fund." *See* Exh. 3 at 6–7. In March 2023, a U.S. company, Honeywell International, Inc., signed a contract for engineering work on an oil refinery in Libya that would allow Libya to produce large amounts of byproducts, such as "cooking gas, jet fuel and other products, including 1.4 million litres a day of petrol and 1.1 million litres a day of diesel". Reuters, *Libya signs South Refinery contract with Honeywell* (March 26, 2023), available at

[redacted]

https://www.reuters.com/business/energy/libya-signs-south-refinery-contract-with-honeywell-2023-03-26/ (last visited March 10, 2026).

## II. Mr. Al-Marimi is abducted from his home by armed men and transported to the United States.

[redacted] Then, on December 11, 2022, a startling update: at approximately 9:34 Eastern European Time, Mr. Al-Marimi "was lawfully transferred to the custody of the [FBI] . . . in Misrata, Libya, during a United States law enforcement operation." HS-USAO-00000143. The same memorandum tersely reports that Mr. Al-Marimi was thereafter flown to the U.S. aboard a U.S. government aircraft, [redacted] *Id.* Upon arrival in the U.S., at 4:55 Eastern Standard Time, special agents arrested Mr. Al-Marimi "without incident" [redacted] *Id.*

[redacted] Other documents fill in some, but not all, of the blanks. On the day of the "lawful Foreign Transfer of Custody," a group identified only as the "Libyan Authorities" transported Mr. Al-Marimi to the [redacted] airport. HS-USAO-00000144. The U.S. government aircraft arrived at the airport approximately 10 minutes before the Libyan Authorities. *Id.* Mr. Al-Marimi arrived at the airport "seated in the second row of a sport utility vehicle . . . with a loosely-fitted, cloth hood" over his head. *Id.* An FBI special agent and a linguist were waiting for him with the U.S. government aircraft. *Id.* The special agent requested Mr. Al-Marimi's hood be replaced with eye-goggles, but the Libyan Authorities refused and "assertively instructed" the agent not

[redacted]

to remove the hood until Mr. Al-Marimi was on board the aircraft to avoid attracting attention. *Id.* While Mr. Al-Marimi was escorted to the aircraft, the Libyan Authorities pointed out "a few Libyan spectators" and requested the FBI "expedite" Mr. Al-Marimi's movement out of public view. *Id.* The Libyan Authorities then provided a plastic trash bag containing some of Mr. Al-Marimi's belongings, including a Quran, prayer rug, clothing, toiletries, and medicine. *Id.*

[redacted] Inside the aircraft, agents removed Mr. Al-Marimi's hood and visually identified him. *Id.* Mr. Al-Marimi also identified himself upon request. *Id.* Mr. Al-Marimi received a full medical examination, clean clothes, and blankets for the flight. *Id.* He was placed in hand restraints affixed to a leather belt in the front of his body, seat-belted into a seat, and given noise-cancelling hearing protection with an internal communications capability for FBI personnel aboard the aircraft. *Id.* During the flight, Mr. Al-Marimi reportedly had access to a Quran, prayer rug, toilet, as well as food, water, and opportunities to pray and sleep. *Id.* Mr. Al-Marimi reportedly accepted a bottle of water and a cup of almonds. *Id.* Several hours into the transfer, Mr. Al-Marimi received an advice-of-rights form in Arabic, and he requested to speak to an attorney for any questions related to Pan Am 103. *Id.* Eleven FBI personnel are identified as participating in the foreign transfer of custody. *Id.*

[redacted] During the flight, agents also interrogated Mr. Al-Marimi. HS-USAO-00000148. Regarding his rendition, Mr. Al-Marimi recalled that he was released from

[redacted]

prison in Libya on compassionate grounds on September 30, 2021. *Id.*; Exh. 4. After his release, he resided with his family in Tripoli until a few weeks before December 11, when armed men came to his home and rearrested him. HS-USAO-00000148; *but see* Human Rights Watch, *Libya/US: Rights Concerns in Lockerbie Suspect's Extradition* (Feb. 13, 2023), https://www.hrw.org/news/2023/02/13/libya/us-rights-concerns-lockerbie-suspects-extradition. Some men wore uniforms, and many wore masks. HS-USAO-00000148 Mr. Al-Marimi was not told who the men were or which government group they were aligned with, and he was not told why he was being arrested again. *Id.* The armed men transported him to a prison in Misrata where he was eventually removed to solitary confinement. *Id.* He remained there for weeks until approximately December 1, 2022, when he was removed from his cell and briefly permitted to see his family. *Id.* Then, around 7:00 AM the morning of December 11, 2022, Mr. Al-Marimi's captors gave him a sandwich and some tea and instructed him to pack his belongings. *Id.* Mr. Al-Marimi had expected to be released; he had no idea he was being turned over to U.S. agents. *Id.*

[redacted] Independent reporting suggests Mr. Al-Marimi was seized from his home "by forces loyal to Abdel Ghani al-Kikili, known as 'Gheniwa,' who commands the Stability Support Authority" of the GNU. Jason Burke, *Lockerbie bomb suspect in US custody was 'abducted from home' by warlord*, The Guardian (Dec. 12, 2022), https://www.theguardian.com/uk-news/2022/dec/12/lockerbie-bomb-suspect-masud-

[redacted]

us-custody. Amnesty International described al-Kikili as "an abusive militia commander whose subordinates have a 'well-documented history of crimes under international law and other serious human rights violations.'" *Id.* "For over a decade, militias under his command terrorized people . . . through enforced disappearances, torture, unlawful killings and other crimes under international law[.]" *Id.*

[redacted] Mr. Al-Marimi's family claimed he had been "kidnapped by armed men" and that they only later learned from unofficial reporting that he had been moved to the U.S. by a "team of Americans[.]" *Id.* A relative of Mr. Al-Marimi told Human Rights Watch that "they knew of no judicial procedures before he was sent from Libya," a claim that the organization credited and concluded raised "serious due process concerns[.]" Human Rights Watch, *Rights Concerns*, *supra*. The relative described Mr. Al-Marimi's abduction on November 17, 2022, as traumatic: an "armed group whose members refused to identify themselves during the arrest, wore no insignias, and came in cars that were unmarked. . . . took him to an undisclosed location[.]" *Id.* The raid occurred around 1:30 AM, and the family members were barred from leaving their home. *Id.* "Members of the group shoved [Mr. Al-Marimi's] wife and beat his daughter, who needed medical attention for her hands after the incident," and beat his son with a rifle. *Id.* They dragged Mr. Al-Marimi across the floor without care for his infirmity and mobility challenges. *Id.* It was not until the following week that the family were able to locate Mr. Al-Marimi at a facility in Misrata controlled by the

[redacted]

Joint Operations Force, an armed group reportedly allied with Prime Minister Dbeibah. *Id.*

[redacted] The circumstances of Mr. Al-Marimi's rendition caused widespread uproar within Libya, with numerous groups, commentators, and political figures questioning the legality of his arrest and removal and demanding his return. *See* Exh. 5 at 3-7.

## III. International agreements

[redacted] Several international agreements are pertinent to this motion. The Montreal Convention seeks to deter and provide appropriate punishment for certain acts that threaten the safety of civil aviation. Article 1 defines the covered offense conduct to include the destruction of an aircraft in service and the placement or caused placement aboard an aircraft in service of "a device or substance which is likely to destroy the aircraft" or cause it serious damage. *See* Exh. 6. Article 3 obligates the contracting parties to "make the offenses mentioned in Article 1 punishable by severe penalties." Articles 5 through 8 generally construct a extradite-or-prosecute regime for the covered offenses. Regarding extradition, Article 8 provides:

> 1. The offenses shall be deemed to be included as extraditable offences in any extradition treaty existing between Contracting States. Contracting States undertake to include the offences as extraditable offences in every extradition treaty to be concluded between them.
>
> 2. If a contracting State which makes extradition conditional on the existence of a treaty receives a request for extradition from another Contracting State with which it has no extradition treaty, it may at its option consider this Convention as the legal basis for

[redacted]

extradition in respect of the offences. **Extradition shall be subject to the other conditions provided by the law of the requested State.**

3. Contracting States which do not make extradition conditional on the existence of a treaty shall recognize the offences as extraditable offences between themselves **subject to the conditions provided by the law of the requested State**.

4. [omitted]

(emphasis added).

[redacted] The Terrorist Bombings Convention employs a similar structure. *See* Exh. 7. Article 2 defines the covered conduct to include the delivery, placement, discharge, or detonation of an explosive or other lethal device into or against certain targets with malicious intent. Article 4 obligates the contracting parties to make such conduct punishable under domestic law with appropriate penalties. Articles 6 through 9 create a extradite-or-prosecute regime, albeit with greater protections for individual rights under international law. Regarding extradition, Article 9 similarly provides:

1. The offenses set forth in article 2 shall be deemed to be included as extraditable offences in any extradition treaty existing between any of the States Parties before the entry into force of this Convention. States Parties undertake to include the offences as extraditable offences in every extradition treaty to be subsequently concluded between them.

2. If a State Party which makes extradition conditional on the existence of a treaty receives a request for extradition from another State Party with which it has no extradition treaty, the requested State Party may, at its option, consider this Convention as a legal basis for extradition in respect of the offences set forth

[redacted]

in article 2. **Extradition shall be subject to the other conditions provided by the law of the requested State.**

3. States Parties which do not make extradition conditional on the existence of a treaty shall recognize the offences set forth in article 2 as extraditable offences between themselves, **subject to the conditions provided by the law of the requested State.**

(emphasis added). Article 14 further provides that any person taken into custody or otherwise impacted pursuant to the Convention "shall be guaranteed fair treatment, including enjoyment of all rights and guarantees in conformity with the law of the State" in which he is present, as well as applicable provisions of international law and human rights law. Finally, Article 17 obligates the parties to act "consistent with the principles of sovereign equality and territorial integrity of States and that of non-intervention in the domestic affairs of other States."

## IV. Libyan law

[redacted] The Libyan Code of Criminal Procedure, available at https://security-legislation.ly/latest-laws/the-code-of-criminal-procedure/, establishes procedures that govern extradition under Libyan law. *See* Exh. 8 (relevant portions of the code). Title 4, Part 9, Article 493(A) limits extradition to cases in which certain circumstances are met:

- The act upon which the extradition request is based is criminalized by Libyan law and the law of the country requesting the extradition.
- The crime or penalty has not lapsed under Libyan law and the law of the country requesting the extradition.

[redacted]

- The laws of both countries allow for a criminal case to be brought.
- The subject of the extradition request is not a Libyan National.
- The crime is not a political crime or a crime connected to a political crime.

*Id.* at 1. Article 494 prohibits extradition if the person "is being heard before the Libyan judiciary system for another crime" or "if a criminal verdict has been issued on such case." *Id.* at 2. Additionally, Article 495 requires "a decision by the Criminal Court that has jurisdiction over the extradited person's place of residence" unless the extradition concerns only one country and the person does not object. *Id.*

[redacted] Article 497 addresses Libyan arrests pursuant to foreign extradition requests. It provides for approval by the Minister of Justice and the issuance of an arrest warrant by the Prosecutor-General. *Id.* at 3. It further requires presentment of the person to the Public Prosecution within 24 hours of arrest for confirmation of identity and approval of detention. *Id.* Article 498 requires the Prosecutor-General or Chief Prosecutor with jurisdiction to request presentment of the person before the Court of Appeals within three days of arrest. *Id.*

[redacted] Article 399 requires the head of the Court of Appeal to make available a defense lawyer and to designate a counsellor of the Criminal Court to conduct an investigation. *Id.* at 4. Article 500 requires the investigation counsellor to begin the investigation and interview the person within 24 hours after being designated. *Id.* Article 502 requires the Public Prosecution to submit a written memorandum to the

[redacted]

court, with all supporting documents, within five days of the investigation's completion. *Id.* It further requires that the person have an opportunity to present a defense memorandum. *Id.* Afterwards, pursuant to Articles 503 and 504, the Counsellor must transfer the case to the criminal court with a full summary of the investigation and arguments, and the court must conduct a hearing, study the materials, hear from the prosecution and the defense, and issue a ruling. *Id.* at 4–5.

[redacted] Under Article 505, the court's ruling must consider applicable law and relevant international conventions and norms. *Id.* at 5. Unless it is substantiated, the court's ruling is deemed void under Article 506. *Id.* Article 507 permits appeals. *Id.* Last, Article 509 prohibits extradition before a ruling becomes final. *Id.*

## LEGAL STANDARD

[redacted] The Supreme Court has limited the grounds on which a person forcibly brought to the United States for prosecution may challenge a court's jurisdiction over him. Generally, "[u]nder a rule known as the *Ker-Frisbie* doctrine, the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction."[3] *United States v. Rezaq*, 134 F.3d 1121, 1130 (D.C. Cir. 1998) (internal quotation marks omitted) (quoting *Frisbie*

[3] The *Ker-Frisbie* rule broadly aligns with the international legal principle of "male captus, bene detentus." *See* Restatement (Fourth) of Foreign Relations Law § 427 n.7 (2018) (noting "an increasing number of states . . . have refused to apply this principle . . . where the presence of the accused was secured through an abuse of process").

[redacted]

*v. Collins*, 342 U.S. 519 (1952), and *Ker v. Illinois*, 119 U.S. 436 (1886)). This rule, as explained by the Supreme Court nearly 75 years ago, rests on the belief

> that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

*Frisbie*, 342 U.S. at 522.

[redacted] There are two recognized exceptions to the *Ker-Frisbie* doctrine. *See Rezaq*, 134 F.3d at 1130. If either exception applies, then a court lacks personal jurisdiction over a defendant who has been forcibly abducted from his asylum state, and dismissal is warranted.

[redacted] **First**, due process requires a court "to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." *United States v. Toscanino*, 500 F.2d 267, 275 (1974). This exception arose out of the tension between the *Ker-Frisbie* doctrine's apparent tolerance for forcible abductions and "the expanded interpretation of due process expressed by the [Supreme] Court in later cases . . . ." *United States v. Best*, 304 F.3d 308, 311–12 (3d Cir. 2002); *see also Gov't of Virgin Islands v. Ortiz*, 427 F.2d 1043, 1045 n.2 (3d Cir. 1970) (observing that the *Ker-Frisbie* doctrine "has been seriously questioned because it condones illegal police conduct"). In *Toscanino*, the Second Circuit concluded the

[redacted]

"erosion" of the *Ker-Frisbie* doctrine permitted an exception in cases of shocking governmental conduct. *Toscanino*, 500 F.2d at 273–75.

[redacted] The D.C. Circuit has acknowledged the potential availability of the *Toscanino* exception, including in cases of "torture, brutality, and similar outrageous conduct." *Rezaq*, 134 F.3d at 1130 (quoting *U.S. ex rel. Luhan v. Gengler*, 510 F.2d 62, 65 (2d Cir. 1975)). However, no court in this circuit has applied the *Toscanino* exception. In the Second Circuit, the defendant must provide "evidence that the action was taken by or at the direction of United States officials." *Toscanino*, 500 F.2d at 281. And only the most "outrageous" government conduct that "shocks the conscious" triggers the exception. *U.S. ex rel. Lujan v. Gengler*, 510 F.2d 62, 65–66 (2d Cir. 1975) (finding no "complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process" when there was "no deprivation greater than that which [the accused] would have endured through lawful extradition").

[redacted] <u>**Second**</u>, *Ker–Frisbie* is inapplicable when the government violates the express or implied terms of an extradition agreement. *See Rezaq*, 134 F.3d at 1130. When such an agreement provides that it is "the only way by which one country may gain custody of a national of the other country for the purposes of prosecution," deviation from the required procedures deprives a court of jurisdiction. *Id.* (quoting *United States v. Alvarez-Machain*, 504 U.S. 655, 662 (1992)); *see Ford v. United States*, 273

[redacted]

U.S. 593, 605–06 (1927) (holding "the *Ker* case does not apply here" because "a treaty of the United States is directly involved"). In other words, this exception recognizes that "the government may limit its own jurisdiction by entering into a treaty." *Id.* (citing *Alvarez-Machain*, 504 U.S. at 662).

[redacted] To claim this exception, "a defendant must demonstrate, by reference to the express language of a treaty and/or the established practice thereunder, that the United States affirmatively agreed not to seize foreign nationals from the territory of its treaty partner." *United States v. Noriega*, 117 F.3d 1206, 1213 (11th Cir. 1997); *see also Rezaq*, 134 F.3d at 1130.

## ARGUMENT

[redacted] Mr. Al-Marimi challenges his illegal and forcible rendition under both recognized exceptions to the *Ker-Frisbie* doctrine. First, Mr. Al-Marimi's rendition involved outrageous and shocking governmental conduct: the use of a militia group to stage an illegal kidnapping when diplomatic negotiations adhering to procedures set forth in the invoked treaties stalled, the use of violence against Mr. Al-Marimi and his family, a prolonged illegal detention in isolated conditions, and an utter disregard for Libyan law and sovereignty. This Court should not condone or reward the government's lawlessness by permitting this prosecution to continue. Second, because the United States initially sought Mr. Al-Marimi's rendition by invoking international agreements that required adherence to Libyan law and respect for

[redacted]

Libyan sovereignty, the government's ultimate decision to bypass Libyan law as a mere inconvenience falls outside the boundaries of *Ker-Frisbie*. Both arguments arise out of the inescapable conclusion that Mr. Al-Marimi's rendition in the fall of 2022 violated Libyan law at every step—a conclusion the government cannot dispute.

## I. Mr. Al-Marimi's rendition shocks the conscience based on his violent abduction by a militia, his prolonged detention, and the deliberate bypass of Libyan legal procedures.

[redacted] The record of Mr. Al-Marimi's rendition provides a stark display of "the government's deliberate, unnecessary and unreasonable invasion" of his rights. *Toscanino*, 500 F.2d at 275. What Mr. Al-Marimi suffered in Libya was the absence of process, plain and simple. He was violently seized and arbitrarily detained at the behest of a foreign power, without regard for the legal protections of his country. He was held in custody without access to legal counsel before being turned over to foreign law enforcement, despite the robust legal regime created to govern such handovers. Neither his arrest, nor his detention, nor his rendition was ever presented before or ruled upon by a neutral, judicial authority. So as not to "reward police brutality and lawlessness[,]" the Court should decline to exercise jurisdiction. *Id.* at 272.

[redacted] The Second Circuit in *Toscanino* held that the *Ker-Frisbie* doctrine must permit exception for cases in which the government's conduct in bringing the accused before the court shocks the conscience. *Toscanino*, 500 F.2d at 275. The court reasoned that the *Ker-Frisbie* doctrine was rooted in an understanding of due process

[redacted]

that could not be squared with the Supreme Court's more recent decisions that recognized the right is not "limited to the guarantee of 'fair' procedure at trial." *Id.* at 272. In particular, the court relied on *Rochin v. California*, 342 U.S. 165 (1952), which set aside a state court conviction that rested on evidence obtained through police brutality. *Id.* at 273. The Second Circuit echoed the Supreme Court's statement in *Rochin* that the Due Process Clause "inescapably imposes . . . an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) in order to ascertain whether they offend canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *Id.* (quoting *Rochin*, 342 U.S. at 169).

[redacted] The Second Circuit further explained that the judicial responsibility not to reward shocking government conduct was consistent with *Mapp v. Ohio*, 367 U.S. 643 (1961), which relied on due process to extend the exclusionary rule to state prosecutions. *Toscanino*, 500 F.2d at 273. Even though the exclusionary rule had "nothing to do with the fair determination of the guilt or innocence of the accused[,]" it was incorporated into the Fourteenth Amendment as an important tool "to deter disregard for constitutional prohibitions and give substance to constitutional rights." *Id.* at 273–74. The Second Circuit linked the philosophy underlying *Mapp* to the principle that courts should deny aid to a party that "has violated the law in connection with the very transaction as to which he seeks legal redress." *Id.* at 274

[redacted]

(quoting *Olmstead v. United States*, 277 U.S. 438, 484 (1928) (Brandeis, J., dissenting)). Judicial inaction in such circumstances maintains respect for the law, promotes confidence in the administration of justice, and preserves the judicial process from contamination:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means–to declare that the government may commit crimes in order to secure the conviction of a private criminal–would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

*Id.* (quoting *Olmstead*, 277 U.S. at 485 (Brandeis, J., dissenting)).

[redacted] The Second Circuit summarized that "[s]ociety is the ultimate loser when, in order to convict the guilty, it uses methods that lead to decreased respect for the law." *Id.*; *see also United States v. Russell*, 411 U.S. 423, 431–32 (1973) (anticipating a situation "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction").

[redacted] The alleged government conduct in *Toscanino* was indeed shocking. The defendant there claimed he had been forcibly abducted from Uraguay, surreptitiously transported to Brazil, and tortured and interrogated for 17 days. *Toscanino*, 500 F.2d

[redacted]

at 269–70. The U.S. government allegedly planned the operation and paid his kidnappers, some of whom were law enforcement officers in Uruguay. *Id.* The defendant was lured from his home along with his pregnant wife, and he was beaten and knocked unconscious in her presence. *Id.* Regarding the torture and interrogation, the defendant alleged a United States Attorney prosecuting his case was aware of the brutality and received periodic reports, and that a U.S. drug investigator was present and participated. *Id.* Eventually, the defendant was brought to an airport, drugged, and placed on a flight to the United States. *Id.*

[redacted] The precise level at which a confluence of rendition-related rights violations undermines a court's personal jurisdiction over an accused has not been settled in this circuit, or any circuit. Certainly, the standard for claiming the *Toscanino* exception is a high bar. *See Lujan*, 510 F.2d at 65–66 (finding standard not met when the accused, a pilot, was lured to another country through a deceptive flight contract, arrested and held for one week, then turned over to American agents). Mr. Al-Marimi submits that the government's shocking conduct in this case rises to that level.

[redacted] Starting with Mr. Al-Marimi's abduction, which was a cloak-and-dagger operation conducted in the dead of night, reportedly by a militia with a reputation for brutality and disdain for human rights. Mr. Al-Marimi's relatives recall that armed men who wore no insignias and refused to identify themselves arrived at the family's residences in Tripoli. The group barred anyone from leaving under the unmistakable

[redacted]

threat of violence. They presented no warrant or other display of lawful authority justifying Mr. Al-Marimi's seizure. During the encounter, members of the group beat Mr. Al-Marimi's son with a rifle, shoved his wife, and attacked his only daughter to the point of her requiring medical attention. Ultimately, they removed Mr. Al-Marimi into an unmarked vehicle by dragging him across the ground, with no care for his health and mobility issues. It is not clear whether Mr. Al-Marimi was able to take any belongings with him, including medication or religious items.

[redacted] Mr. Al-Marimi was taken hundreds of kilometers away to Misrata, a bastion for a faction reportedly affiliated with the GNU and Prime Minister Dbeibah. Independent reporting suggests the kidnapping may have been perpetrated by the Stability Support Authority, a GNU-affiliated force with a reputation for rights violations. In Misrata, Mr. Al-Marimi may have been held by the Joint Operations Force, another armed group connected to the GNU and Dbeibah. In Misrata, Mr. Al-Marimi was held for weeks in uncertain conditions and permitted extremely limited contact with his family (who were lied to about his detention and potential release). At no point was Mr. Al-Marimi presented with a lawful basis for his detention or provided with the opportunity to meet with an attorney. He never appeared before any Libya court before he arrived at the Misrata airport, hooded and restrained, to be handed off to U.S. agents.

[redacted]

[redacted] While Mr. Al-Marimi sadly is no stranger to unlawful detention, the utter lack of process throughout his captivity and rendition is truly shocking. Libya has enacted robust rules to govern requests for the transfer of accused persons for foreign prosecution. The U.S. was aware of these rules, having been advised of them repeatedly by Libyan representatives throughout its years-long collaboration. Reviewing those rules, collected in Exhibit 8, reveals that *not one* was followed here. There were no findings about whether Mr. Al-Marimi qualified for rendition in light of his nationality, the criminality of the alleged conduct in each country, or any other requirement. Nothing suggests any neutral, judicial authority was involved at any point—not in the decision to facilitate rendition; not in the issuance of approval of any arrest warrant; not in the final handover. Mr. Al-Marimi never received the assistance of legal counsel. No investigation took place. No hearing was held, and no opportunity was provided for Mr. Al-Marimi to challenge or appeal the apparent approval of his rendition. No court—not even one hand-selected by those seeking Mr. Al-Marimi's extradition—*ever* considered the legality of Mr. Al-Marimi's rendition. Even the semblance of process was apparently too much to ask.

[redacted] As explained in the above background, the timing and circumstances of the illegal rendition are highly suggestive of U.S. influence and pressure. Once it became inconvenient to abide by Libyan sovereignty and due process, the U.S. undertook extra-legal measures to accomplish its goal. It leveraged its relationship with "Libyan

[redacted]

authorities" to induce bypassing procedural protections and violate Mr. Al-Marimi's rights, then sent agents with handcuffs and an airplane when it was time to receive its captive.

[redacted] This is not the rule of law. It is the rule of the strong. Mr. Al-Marimi's rendition sends a chilling message to the people of the world: "If we want you, we will take you, and your resistance will be met with violence against you and your family." On the night of his abduction, Mr. Al-Marimi went to bed secure in his belief that his country's laws meant something. His forcible rendition shattered those beliefs. If his lawless rendition is now upheld as consistent with U.S. law, faith in the rule of law and the global order will erode further. The Court should refuse to condone the government's shocking and violent trampling of Mr. Al-Marimi's rights.

## II. The government sought Mr. Al-Marimi's rendition pursuant to the Montreal Convention and the Terrorist Bombings Convention, but it did not adhere to the requirements of both agreements to respect the conditions for extradition set by Libyan law.

[redacted] Mr. Al-Marimi additionally challenges his illegal rendition as a violation of the Montreal Convention, the Terrorist Bombings Convention, and the incorporated international legal principles of sovereign equality, territorial integrity, and non-interference. Because the United States formally and diplomatically invoked the Conventions to secure Mr. Al-Marimi's appearance in U.S. court, it was bound not to effectuate his rendition in a manner that violated them. But, it did; the U.S. abandoned its contractual commitment to respect Libyan law and the international

[redacted]

legal order.

[redacted] As summarized in the background section, both Conventions obligate the contracting parties to extradite or prosecute persons who commit certain offenses. They do not permit the parties to accomplish the rendition of such persons by means other than extradition, and the extradite-or-prosecute frameworks leave no room for such alternative measures once a request for extradition is made. At the same time, the articles governing extradition—Article 8 in the Montreal Convention and Article 9 in the Terrorist Bombings Convention—expressly limit the means of rendition by providing that extradition shall, in all instances, be "subject to the conditions provided by the law of the requested State." That limitation applies regardless of whether the requested party makes extradition contingent on the existence of a bilateral extradition treaty.

[redacted] Notably, Article 14 of the Terrorist Bombings Convention expressly provides that persons taken into custody pursuant to the Convention "shall be guaranteed fair treatment, including enjoyment of all rights and guarantees in conformity with the law of the State" and applicable provisions of international law. The Convention additionally incorporates the international legal principles of "sovereign equality and territorial integrity of States" and "non-intervention in the domestic affairs of other States" in Article 17, and it refers to the U.N. Charter as a guiding document in its

[redacted]

preamble.4 These principles represent a "consensus of international opinion that condemns one Nation's violation of the territorial integrity of a friendly neighbor." *Alvarez-Machain*, 504 U.S. at 678–81 (Stevens, J., dissenting) (collecting sources for the principle that an official seizure effected in a foreign jurisdiction is "monstrous" and a "gross violation of international law"); *Toscanino*, 500 F.2d at 277–78 (noting the "settled" disapproval of international kidnappings).

[redacted] For the reasons already explained, there can be no dispute that Mr. Al-Marimi's rendition did not comply with Libyan law as required by both Conventions and the incorporated international legal principles. Instead, the U.S. effected an extra-legal abduction and took custody of Mr. Al-Marimi in a lawless manner, without any semblance of process or oversight by the Libyan judiciary.

[redacted] The relevant articles of both conventions are self-effectuating and, thus, a part of the domestic law of the United States. *See Al-Bihani v. Obama*, 619 F.3d 1, 13 (D.C. Cir. 2010) (Kavanaugh, J., concurring) (explaining that "statutes and self-executing treaties are domestic U.S. law and thus enforceable in U.S. courts"); *United States v. Postal*, 589 F.2d 862, 875 (5th Cir. 1979) (noting "treaties affect the municipal law of the United States only when those treaties are given effect by congressional legislation or are, by their nature, self-executing"). While parts of the Conventions

[4] The U.N. Charter, 59 Stat. 1031 (June 26, 1945), recognizes in Article 2 and throughout the principles of sovereign equality, territorial integrity, and non-intervention between states. *See Alvarez-Machain*, 504 U.S. at 666; *id.* at 678 n.20 (Stevens, J., dissenting).

[redacted]

anticipate implementing legislation, the extradite-or-prosecute requirements are self-executing by virtue of the language used and the type of obligations created. Indeed, the United States has invoked similar Conventions to obtain the extradition in other cases. *See, e.g.*, *United States v. Murillo*, 826 F.3d 152, 155 (4th Cir. 2016) (noting U.S. request for extradition and foreign state's compliance "pursuant to [] obligations under the IPP Convention"); *see also Terlinden v. Ames*, 184 U.S. 270, 288 (1902) ("Treaties of extradition are executory in their character [.]").

[redacted] The government likely will argue this case remains controlled by *Ker-Frisbie*, but the Court should not be persuaded. This case is distinguishable from *Alvarez-Machain*, *Ker*, and other cases in which courts rejected challenges to rendition based on extradition treaties that did not expressly forbid rendition by other means. In addition to the treaty obligations identified above that set this case apart, the simple fact that the U.S. government sought Mr. Al-Marimi's rendition pursuant to the Conventions places this case outside the ambit of the *Ker-Frisbie* doctrine. As in *Ford*, an international extradition agreement of the United States was "directly involved" in Mr. Al-Marimi's rendition. *Ford*, 273 U.S. at 605–06; *see also United States v. Rauscher*, 119 U.S. 407 (1886) (rejecting defendant's extradition as inconsistent with the applicable extradition treaty).

[redacted] In *Alvarez–Machain*, the Supreme Court "observed that the *Ker–Frisbie* doctrine is inapplicable to cases where a person is forcibly abducted from a

[redacted]

country in violation of an extradition treaty to which the United States is a party." *Best*, 304 U.S. at 314. The Supreme Court ultimately rejected the defendant's challenge to his forcible rendition because the extradition treaty between Mexico and the United States did not expressly or implicitly prohibit rendition outside of its terms. *Alvarez-Machain*, 504 U.S. at 666, 669–70. But in *Alvarez-Machain*, the U.S. government never formally sought the defendant's extradition pursuant to the bilateral extradition treaty. Instead, prior "to the successful abduction of Dr. Machain, the DEA attempted to secure his presence . . . through informal negotiations with representatives of the Mexican government." *United States v. Caro-Quintero*, 745 F. Supp. 599, 602 (C.D. Cal. 1990). When those informal and below-the-table negotiations broke down, U.S. law enforcement employed an informant and a network "former military police officers, various civilians, and at least two current police officers" to kidnap the defendant. *Id.* at 602–03. No U.S. law enforcement agents participated in the kidnapping until the defendant arrived in the United States. *Id.* at 603. Because the extradition process had not been invoked, the Supreme Court's focus was on whether the treaty nevertheless foreclosed other means of rendition and not whether the U.S. adhered to its treaty obligations

[redacted] So too in other cases. In *Ker*, the Supreme Court's ruling was premised on its findings that the extradition treaty between the United States and Peru "was not called into operation, was not relied upon, [and] was not made the pretext for the

[redacted]

arrest." *Ker*, 119 U.S. at 443. The officer in that case never delivered the "necessary papers" requesting Ker's extradition. *Id.* at 438 Similarly, in *United States v. Mejia*, 448 F.3d 436, 442 (D.C. Cir. 2006), the defendants challenged the court's jurisdiction because they were brought to the United States from Panama in a manner inconsistent with the formal requirements of the extradition treaty between the two countries. The D.C. Circuit applied *Ker-Frisbie* and *Alvarez-Machain* and rejected the challenge because the extradition treaty did not expressly prohibit rendition by other means. *Id.* at 443. But again, the rendition in *Mejia* reflected "informal" cooperation between the U.S. and Panama; the extradition treaty was not invoked. *Id.*; *see also United States v. Al-Imam*, 373 F.Supp.3d 247, 253 (2019) (rejecting challenge that was based in part on the Terrorist Bombings Convention; no suggestion that the rendition was requested pursuant to that Convention or any other treaty).

[redacted] Twice over, the U.S. government bound itself to play by the rules. First by entering into the Conventions and agreeing to the extradite-or-prosecute regimes they created, and then by invoking those treaties to secure Mr. Al-Marimi's presence. By failing to adhere to the terms of those treaties, the government deprived this Court of personal jurisdiction over Mr. Al-Marimi for purposes of this prosecution. Mr. Al-Marimi must be returned to Libya.

[redacted]

## CONCLUSION

[redacted] The Court should rule Mr. Al-Marimi's rendition to the United States violated the law and dismiss the charges against him for want of personal jurisdiction.

Respectfully submitted,

**ABU AGILA MOHAMMAD**
**MAS'UD KHEIR AL-MARIMI**

By: ______________________
Whitney E.C. Minter
Va. Bar # 47193
Brooke Sealy Rupert
Va. Bar #79729
Assistant Federal Public Defenders
Attorneys for Mr. Al-Marimi
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800 (telephone)
(703) 600-0880 (facsimile)
whitney_minter@fd.org (email)

Laura Koenig
Va. Bar #86840
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
701 E. Broad Street, Suite 3600
Richmond, Virginia 23219
(804) 343-0800 (telephone)
(804) 648-5033 (facsimile)
laura_koenig@fd.org (email)

[redacted]

CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2026, I delivered the foregoing pleading to the Classified Information Security Officer ("CISO"), who will deliver the pleading to opposing counsel and the Court.

By: ______________________

Laura Koenig
Va. Bar #86840
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
701 E. Broad Street, Suite 3600
Richmond, Virginia 23219
(804) 343-0800 (telephone)
(804) 648-5033 (facsimile)
laura_koenig@fd.org (email)