[redacted]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 22-cr-392 (DLF) |
| | : | |
| ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION CHALLENGING ALLEGEDLY ILLEGAL RENDITION**

[redacted] The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the defendant's motion challenging his allegedly illegal rendition to the United States to face trial. For the reasons that follow, the defendant's motion should be denied.

## [redacted] LEGAL STANDARD

[redacted] In accordance with longstanding legal doctrine, a court's jurisdiction is not contingent on the manner by which the defendant arrived before the court. "Under a rule known as the *Ker–Frisbie* doctrine, the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction."[1] *United States v. Rezaq*, 134 F.3d 1121, 1130 (D.C. Cir. 1998) (cleaned up, citing *Frisbie v. Collins*, 342 U.S. 519, 522 (1952) and *Ker v. Illinois*, 119 U.S. 436 (1886)). Regardless of the circumstances that brought the defendant before the court, "due process of law is satisfied when one present in court is convicted of crime after ... a fair trial in accordance with constitutional procedural safeguards.

[1] [redacted] The government neither concedes nor agrees that a "forcible abduction" occurred here, but that is the context in which the applicable line of cases arose.

[redacted]

[redacted]

There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *United States v. Mejia*, 448 F.3d 436, 443 (D.C. Cir. 2006) (quoting *United States v. Alvarez-Machain*, 504 U.S. 655, 661-62 (1992).

[redacted] This doctrine "rest[s] on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." *Frisbie*, 342 U.S. at 522. While notions of due process have been expanded since *Ker* and *Frisbie* were decided, the Supreme Court has consistently reaffirmed the *Ker-Frisbie* doctrine. *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039-40 (1984); *United States v. Crews*, 445 U.S. 463, 474 (1980); *Stone v. Powell*, 428 U.S. 465, 485 (1976); *Gerstein v. Pugh*, 420 U.S. 103 (1975)). A defendant's presence in the judicial district hearing his case is therefore sufficient to permit his trial for the offenses alleged in the indictment.

[redacted] The exceptions to the *Ker-Frisbie* doctrine are extremely limited and do not apply here. One exception is when an extradition treaty exists between the United States and the respective foreign country, and the treaty specifies that "the *only way* by which one country may gain custody of the national of another country for the purposes of prosecution" is through extradition. *Alvarez-Machain*, 504 U.S. at 664 (emphasis added). It is not enough for a treaty to specify a means by which extradition shall be carried out; unless it specifically *prohibits* the conduct at issue, the Court has no jurisdiction to review the transfer. *See id.* at 663 (declining to enforce extradition treaty in a case involving forced abduction of the defendant, where the treaty did not specifically forbid forcible abductions). The D.C. Circuit has also "suggested that there may be a 'very limited' exception for certain cases of 'torture, brutality, and similar outrageous conduct'" that led to a

[redacted]

[redacted]

defendant's presence before the court. *Rezaq*, 134 F.3d at 1130 (quoting *Yunis v. United States*, 924 F.2d 1086, 1092-93 (D.C. Cir. 1991)) (emphasis added).

[redacted] For a treaty to be directly enforceable in a U.S. court, it must be self-executing. The Supreme Court has "long recognized the distinction between treaties that automatically have effect as domestic law, and those that—while they constitute international law commitments—do not by themselves function as binding federal law." *Medellín v. Texas*, 552 U.S. 491, 504 (2008). In the context of treaties, "self-executing" means "that the treaty has automatic domestic effect as federal law upon ratification. Conversely, a 'non-self-executing' treaty does not by itself give rise to domestically enforceable federal law. Whether [a non-self-executing] treaty has domestic effect depends upon implementing legislation passed by Congress. *Id.* at 505 n.2.

[redacted] Even if a treaty is self-executing, it is presumed not to create a private right of action in federal courts absent express language to the contrary. *See id.* at 506 n.3 (collecting Circuit Court of Appeals' decisions so holding). If the treaty does not create a private right of action, a defendant cannot "seek relief pursuant to [it] in court." *United States v. Khatallah*, 160 F. Supp. 3d 144, 153 (D.D.C. 2017).

As the Supreme Court observed over 140 years ago,

> A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress . . . It is obvious that with all this the judicial courts have nothing to do and can give no redress.

*Head Money Cases*, 112 U.S. 580, 598 (1884). *See also Z & F Assets Realization Corp. v. Hull*, 114 F.2d 464, 471 (D.C. Cir. 1941) ("[I]t is not for the judiciary to determine whether a treaty has been broken either by the legislature or the executive"); *McKesson Corp. v. Islamic Republic of*

[redacted]

[redacted]

*Iran*, 539 F.3d 485, 489 (D.C. Cir. 2008) (self-executing treaty's silence on right-of-action question "makes all the difference") (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442 (1989)).

[redacted] The presumption against private rights of action carries even more weight in a criminal case. *See United States v. Li*, 206 F.3d 56, 61 (1st Cir. 2000) (*en banc*) (noting, in declining to find that dismissal or suppression were a remedy in a criminal case for alleged violations of the Vienna Convention, "[e]ven stronger than the presumption against private rights of action under international treaties is the presumption against the creation of rights enforceable by the suppression of evidence or by the dismissal of an indictment").

[redacted] As explained in greater detail below, the *Ker-Frisbie* doctrine applies here, and the defendant has not demonstrated that any exceptions are applicable. Even if the doctrine does not apply, the defendant similarly has not demonstrated any violation of a treaty or other international obligation that would afford the defendant the right to dismissal of the indictment or other similar relief. His motion should consequently be denied.

## [redacted] FACTS

[redacted] On December 14, 2020, a magistrate in the District of Columbia signed a criminal complaint charging the defendant with violations of 18 U.S.C. §§ 32, 34, and 844(i). By diplomatic note to Libya dated March 15, 2021, the Embassy of the United States to Libya (via the Libya External Office in Tunis, Tunisia) requested the defendant's "extradition, expulsion, or otherwise lawful removal [from Libya]" to stand prosecution in connection with those crimes. *See* Def. Ex. The Embassy stated that it was making that request pursuant to Libyan domestic law, the United Nations Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation ("Montreal Convention"), and the International Convention for the Suppression of Terrorist

[redacted]

[redacted]

Bombings ("Terrorist Bombings Convention") (collectively, hereinafter the "Conventions"). At the conclusion of the request, the Embassy reiterated its request that the Government of Libya "extradit[e], expel[], or otherwise lawfully remov[e] MASUD to the United States."

[redacted] On January 26, 2022, INTERPOL published a Red Notice based on an arrest warrant issued contemporaneously with the December 14, 2020, criminal complaint. According to INTERPOL, "[a] Red Notice is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action. A Red Notice is not an international arrest warrant. The individuals are wanted by the requesting member country, or international tribunal. Member countries apply their own laws in deciding whether to arrest a person." https://www.interpol.int/en/How-we-work/Notices/Red-Notices/View-Red-Notices (last visited March 25, 2026).

[redacted]

[redacted] the government began implementing a plan for U.S. government personnel to fly to Libya to bring the defendant to the United States to face trial. On December 11, the FBI participated in a law enforcement operation during which custody of the defendant was transferred to the FBI at Misrata International Airport in Misrata, Libya. *See, e.g.*, HS-USAO-000000144. Prior to leaving Libya, the FBI performed a "head-to-toe medical examination," and provided the defendant with "clean cloth[e]s to wear, and blankets for comfort." *Id.* As a result of the medical

[redacted]

[redacted]

examination the defendant was deemed fit to fly. *Id.* The defendant was flown from Misrata to the United States, [redacted]

[redacted] When the defendant arrived in the United States, he was placed under arrest pursuant to the arrest warrant signed by the magistrate. HS-USAO-00000143. Following the defendant's transfer, Prime Minister Dabaiba made public comments acknowledging that the Libyan government authorized the transfer.

[redacted] During the approximately 18 months between when the United States formally requested that the defendant be extradited, expelled, or otherwise lawfully removed to the United States, and December 11, 2022, the date on which that transfer took place, [redacted] The government later learned, in the fall of 2022, [redacted]

[redacted] The government was neither aware of nor consulted on defendant's release from custody, nor was it consulted on or told how the defendant would be brought back into custody to effectuate his transfer to the United States.

[redacted] When law enforcement agents flew to Misrata to effectuate the transfer of custody

[redacted]

[redacted]

of the defendant to the United States, [redacted]

[redacted] Following the transfer, the Libyan government has not registered a diplomatic protest or complaint about that transfer to the United States.[2]

## [redacted] ARGUMENT

[redacted] The defendant argues that this Court lacks jurisdiction over him because he was forcibly abducted from Libya under circumstances that constituted an exception to the *Ker-Frisbie* doctrine, either because the government violated the express or implied terms of an extradition agreement, or because his presence was acquired as the result of the government's deliberate, unnecessary, and unreasonable invasion of his constitutional rights. Mot. at 20-21. The defendant's arguments fail for multiple reasons. The Supreme Court's decision in *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), unequivocally establishes that *Ker-Frisbie* applies to the circumstances of this case, and the defendant is not entitled to the dismissal he seeks. Libya was permitted to transfer the defendant to the United States under any method it chose. It was not required to surrender the defendant under the Montreal or Terrorist Bombing Conventions, even if the United States invoked those Conventions. And in any event, neither the Montreal nor the Terrorist Bombings Conventions create a private right of action that the defendant may pursue in U.S. courts. Nonetheless, the terms of neither Convention were violated by the manner in which the defendant was brought to the United States, and even if they were, dismissal is not a permissible remedy. And [redacted]

[2] [redacted] The defense cites to an August 2008 settlement agreement. *See* Mot. At 3 n.1; Def. Ex. 2. The agreement relates to civil claims. Nothing in any settlement agreement with Libya precludes the bringing or prosecution of criminal charges related to the bombing of Pan Am Flight 103.

[redacted]

[redacted], is not tantamount to torture or brutality committed by the United States government. The defendant's motion should be denied.

**A. [redacted] The *Ker-Frisbie* doctrine precludes the defendant's claims.**

1. [redacted] Supreme Court and D.C. Circuit precedent establish that *Ker-Frisbie* applies.

[redacted] Neither the Montreal nor the Terrorist Bombings Convention prohibits a government from effectuating a transfer of custody outside of the formal judicial process. The Supreme Court's decision in *United States v. Alvarez-Machain*, 504 U.S. 655 (1992) unequivocally establishes that the defendant is not entitled to the relief he seeks. In that case, the defendant "was forcibly kidnaped from his medical office in Guadalajara, Mexico, to be flown by private plane to El Paso, Texas, where he was arrested by DEA officials. The District Court concluded that DEA agents were responsible for [Alvarez-Machain's] abduction, although they were not personally involved in it." *Id.* at 657. Mexico registered multiple formal protestations of the kidnapping. *See id.* at 669. The District Court held that the abduction violated the U.S.-Mexico extradition treaty, divested itself of personal jurisdiction, and ordered the defendant returned to Mexico. *Id.* at 658.The Ninth Circuit affirmed. *Id.* The Supreme Court reversed, holding that because the U.S.-Mexico extradition treaty did not prohibit forcible kidnapping, the *Ker-Frisbie* doctrine applied, and his forcible abduction did not prevent his standing trial in the United States. *See id.* at 666-670.

[redacted] The D.C. Circuit has since applied *Alvarez-Machain* in circumstances similar to those at issue here, namely where foreign authorities agreed to transfer custody of wanted individuals to the United States. In *United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006), Panamanian authorities "seized [the defendants] in Panama. Hours later, the Panamanians transferred the two men into the custody of United States Drug Enforcement Agency (DEA) agents at Tocumen International Airport in Panama City." *Id.* at 439. Applying *Alvarez-Machain*, the D.C. Circuit noted, in rejecting the defendants' challenge to the manner in which they were brought to the United States, "the U.S.-

[redacted]

Panama treaty contains no prohibition against procuring the presence of an individual outside the terms of the treaty—let alone one barring the signatories from informally cooperating with each other as they did in this case." *Id.* at 443.

[redacted] More recently, Judge Cooper rejected a challenge to an alleged forcible abduction from Libya, where the defendant cited to the same Terrorist Bombings Convention (among other multilateral treaties) relied upon by the defendant here. *See United States v. Al-Imam*, 373 F. Supp. 3d 247, 278-282 (D.D.C. 2019). That defendant (like this defendant) contended that the conventions created an "extradite or prosecute" requirement that was not followed. *See id.* at 279 (quoting Al-Imam's motion to dismiss). Judge Cooper found that there was no violation of the Terrorist Bombings Convention, relying on *Alvarez-Machain* and rejecting Al-Imam's contention that he should read a prohibition on forcible abductions into the Terrorist Bombings Convention or another multilateral convention with similar "extradite or prosecute" language. *See id.* at 280-282. *Alvarez-Machain* and *Mejia* compel the Court to deny the defendant's motion, and *Al-Imam* serves as persuasive authority applying the *Ker-Frisbie* doctrine to one of the Conventions relied upon by the defendant here.

2. [redacted] <u>*Ker-Frisbie* applies to the specific request made in this case.</u>

a. [redacted] <u>Citation to a multilateral convention as part of a request does not alter the analysis.</u>

[redacted] The defendant attempts to distinguish his case by the fact that "the U.S. government sought Mr. Al-Marimi's rendition pursuant to the Conventions." Mot. at. 32. The defendant has cited no case standing for the proposition on which his argument depends, namely that simple invocation of two multilateral conventions in support of a request for extradition, expulsion or lawful removal, means that the extreme remedies of dismissal or divestiture of personal jurisdiction are warranted. *See* Mot. at 32-34. *Alvarez-Machain* is not specific to bilateral treaties

[redacted]

[redacted]

or any other legal instrument invoked by the government in a request for an individual's transfer to the United States., and instead is based on the general principle that the manner by which the defendant became subject to the court's jurisdiction is wholly irrelevant. *See* 504 U.S. at 662 (explaining that there was little difference between the facts of *Ker* and those of *Alvarez-Machain*) and at 669-70 (noting that the decision of whether to return respondent to Mexico, as a matter outside the Treaty, is "for the executive branch," and reaffirming that the "rule of *Ker v. Illinois*" is fully applicable).

[redacted] There is no bilateral extradition treaty between the United States and Libya. Libya, as a sovereign nation, is permitted to transfer custody of an individual informally if it so chooses. *See, e.g.*, *Mejia*, 448 F.3d at 439 (U.S.-Panama treaty contains no prohibition barring signatories from informally cooperating with each other); *Factor v. Laubenheimer*, 290 U.S. 276, 287 (1933) ("[A] government may, if agreeable to its own constitution and laws, voluntarily exercise the power to surrender a fugitive from justice to the country from which he had fled"). [redacted] As explained in greater detail below, the Court lacks authority to question Libya's decision as to whether to extradite, expel, or otherwise lawfully remove an individual from its territory especially where, as here, the United States requested that Libya "extradit[e], expel[], or otherwise lawfully remov[e] MASUD to the United States."

[redacted] The defense has likely made no such argument because Libya is indeed permitted to surrender a defendant in using any mechanism it chooses, regardless of which (if any) legal instruments the requesting country cites. In the context of a bilateral extradition treaty, the Third Circuit has considered and rejected a claim comparable in a key respect to the one the defendant makes here, namely that once an extradition treaty (or convention) is invoked, any transfer outside

[redacted]

[redacted]

the terms of that treaty should result in dismissal. In *United States v. Riviere*, 924 F.2d 1289 (3d Cir. 1991), the United States invoked the bilateral extradition treaty then in force to seek the defendant's extradition from Dominica based on narcotics offenses. The Dominican magistrate granted that request as to narcotics offenses. *See* 924 F.2d at 1292. Separately, a Dominican Minister executed a waiver of "any and all Rights and Objection and Protest of the Commonwealth of Dominica," which stated that Dominica would not object to Riviere's prosecution on other offenses. *Id.* The United States later charged Riviere with weapons offenses, and he moved to dismiss those counts, arguing that prosecuting him on those would violate the "rule of specialty" provision of the extradition treaty, as he was only extradited for narcotics offenses. *Id.* at 1296. In refusing to grant the defendant any relief for the non-narcotics offenses, the Third Circuit noted that in light of Dominica's consent to any additional charges, Riviere was effectively "surrendered on two bases: under the treaty for the marijuana offense and as a matter of comity for the firearms offenses," *id.* at 1301, and the court refused to dismiss the case as to the firearms charges.

[redacted] The logic of *Riviere* applies to U.S. prosecution of the defendant here as well: Just as Dominica could consent as a matter of international comity to Riviere's prosecution for charges beyond the scope of Dominica's extradition surrender warrant, [redacted].[3] If anything, the comity argument is even stronger here than in *Riviere*, where the question concerned the Rule of Specialty provisions in the applicable extradition treaty, as here there are no extradition treaty terms that apply to the defendant's surrender.

---

[3] [redacted] As explained in greater detail *infra*, the fact that Libya has not objected to the defendant's transfer under the Conventions precludes what little claim he may have to cite them as a reason to dismiss the indictment based on them.

[redacted]

[redacted]

b. [redacted] Neither the Montreal nor the Terrorist Bombings Convention mandate the use of formal judicial extradition.

[redacted] Even if the Conventions did control, the defendant has not established that they were violated. The central holding of *Alvarez-Machain* controls the Court's analysis: "If [this Court] conclude[s] that the [Conventions]" do not expressly prohibit [redacted], "the rule in *Ker* applies, and the [C]ourt need not inquire as to how respondent came before it." 504 U.S. at 662. Nothing in the text of the Conventions prohibits transfer outside the formal extradition process, and indeed even if it did, neither of the Conventions specify what constitutes a formal extradition process. "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín*, 552 U.S. at 506. Beginning with the provisions cited by the defendant, Article 8 of the Montreal Convention states that contracting states shall consider offenses under its ambit extraditable offenses under bilateral treaties; that states *may* consider the Convention as the legal basis for an extradition request (emphasis added); and that states "shall recognize the offences as extraditable offences between themselves." *See* Mot. at 15-16. Those provisions all speak to how contracting states must treat offenses in an extradition proceeding – they must consider them extraditable – but nowhere does the Convention mandate that any request made under the Convention *must* proceed by formal judicial extradition. The Terrorist Bombing Convention follows a similar structure. *See id.* at 16-17. Without any such provision, the defendant's claim must fail in light of *Alvarez-Machain*, *Mejia*, and *Al-Imam*.

[redacted] The defendant's argument that the Conventions "expressly limit the means of rendition" to judicial extradition, Mot. at 30, is belied by the text of the Conventions. The provisions he claims are limiting – Article 8 of the Montreal Convention and Article 9 of the Terrorist Bombings Convention – only compel signatory countries to recognize the offenses at issue as extraditable offenses. Paragraph 2 of each operative Article states that a signatory country

[redacted]

[redacted]

which makes extradition conditional on the existence of a bilateral extradition treaty and receives a request under the Convention in the absence of a bilateral extradition treaty "may, *at its option*, consider the Convention as the legal basis for extradition in respect of the offences" (emphasis added). This language signals that applying the Convention to provide a basis for extradition in this context is optional and within the discretion of the requested state. Only after does that paragraph then continue, "Extradition shall be subject to the other conditions provided by the law of the Requested States." Likewise, Paragraph 3 of the operative article of both Conventions states that signatory countries which do not make extradition conditional on the existence of a treaty "shall recognize the offences [] as extraditable offences between themselves, subject to the conditions provided by the law of the requested state." While these provisions define the scope of extraditable offenses for contracting states and may provide a legal basis for extradition in the absence of a bilateral extradition treaty, there is no language which mandates the use of extradition rather than the transfer of custody through other means, and there is no indication that Libya construed the Convention as the legal basis for extradition in its transfer of custody in this case.[4]

---

[4] [redacted] Nothing else in the Conventions mandates the use of extradition to the exclusion of other means of transfer of custody, and even if they did, there is nothing to indicate that Libya responded to the United States's invocation of the Conventions by instituting procedures thereunder in Libya. Articles 5-8 of the Montreal Convention and 6-9 of the Terrorist Bombings Convention provide for the use of judicial extradition procedures. *See* Mot. at 15-16. Article 5 of the Montreal Convention obligates the contracting state to create offenses to give themselves jurisdiction; Article 6 states, "*[u]pon being satisfied that the circumstances so warrant*," (emphasis added) the state shall take the offender into custody, but only for so long as necessary to enable criminal or extradition proceedings to be instituted, and Article 7 states that if the country in which the offender was found does not extradite him, it shall "without exception whatsoever" submit the case to its competent authorities for purposes of prosecution. The Terrorist Bombings Convention follows a similar structure. The phrase "upon being satisfied that the circumstances so warrant" signifies that contracting states have some discretion in whether to follow the procedure outlined in Articles 5-8, and there is no indication that Libya did so here, further underscoring that [redacted]

[redacted]

c. [redacted] The Act of State Doctrine precludes any review of Libyan sovereign acts taken within Libya.

[redacted] Even if the Conventions mandated that the signatory countries proceed via judicial extradition, U.S. courts do not have the ability to enforce Libyan law or to determine how the Libyan government should proceed. "[U]nder the act of state doctrine, American courts are prohibited from questioning the validity of a foreign sovereign power's public acts committed within its own territory. The doctrine applies if "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its territory." *United States v. Trabelsi*, 28 F. 4th 1291, 1299 (D.C. Cir. 2022)[5] (cleaned up, citing *World Wide Mins., Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) and *W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp.*, 493 U.S. 400, 405 (1990)). In *Trabelsi*, Belgian courts and its executive disagreed over the legality of his extradition and prosecution in the United States. *See Trabelsi*, 28 F. 4th at 1296 (summarizing Belgian court holdings and diplomatic notes). The Court there found no cause, based on the Belgian judicial opinions, to reopen the question it had decided in *Trabelsi II*, namely whether Trabelsi's extradition violated the applicable bilateral treaty. *Id.* at 1302.

[redacted] The defense cites to Libyan procedure that allegedly was not followed in this case. *See* Mot. at 17-19, 31. Even assuming *arguendo* that the provisions it cites are good law in Libya, [redacted], this Court has no authority to determine whether Libyan law was complied with under the Act of State Doctrine. *See, e.g.*, *Trabelsi*, 28 F. 4th at

[5] [redacted] The government will refer to the 2022 D.C. Circuit *Trabelsi* opinion as "*Trabelsi*" and, in accord with the naming conventions used by the D.C. Circuit in that opinion, it will refer to the 2017 D.C. Circuit opinion in *Trabelsi*, 845 F.3d 1181 (D.C. Cir. 2017), as "*Trabelsi II*".

[redacted]

[redacted]

1299-1300. When U.S. courts do have the power to review whether the terms of an extradition treaty were complied with, it is precisely because the U.S. Government has agreed to those specific terms by ratifying the treaty at issue. *See, e.g.*, *Trabelsi II*, 845 F.3d 1181, 1187 (D.C. Cir. 2017) ("Because Article 5 of the Extradition Treaty provides a rule of decision for the case before us, we have jurisdiction to ensure Trabelsi's extradition complied with that rule" (cleaned up)). The United States has not, conversely, agreed to make the provisions of Libyan law cited by the defendant applicable in U.S. courts the way, for example, the terms of most bilateral extradition treaties carry legal force in the United States.

[redacted] Here, under the rules explained in *Trabelsi* and *Trabelsi II*, even if the Conventions did control (and for the reasons stated above, they do not), the Court's review would be limited to the terms of the Conventions as agreed by the President and ratified by the Senate, not aspects of Libyan criminal procedure, which were not so agreed to and ratified. The terms of the Conventions, as established above, do not establish that any particular process must be followed. Moreover, even if the Conventions did require "extradition" without further definition, this Court owes "great deference" to Libya's determination that the defendant should be surrendered. *Trabelsi II*, 845 F.3d at 1188. As in *Trabelsi II*, here it was "for [Libya], as the requested party, to determine whether to grant extradition." *See id.* [redacted]

The Court should consequently deny the defendant's motion.[6]

---

[6] [redacted] Even if the Act of State Doctrine were not applicable, this Court nonetheless owes great deference to Libya's interpretation of its own laws. *See, e.g.*, *Grin v. Shine*, 187 U.S. 181, 185, 190 (1902) ("[I]t can hardly be expected of us that we should become conversant with the criminal laws of [the requesting country], or with the forms of warrants of arrest used [in that country] for the apprehension of criminals."); *Casey v. U.S. Dep't of State*, 980 F.2d 1472, 1477

[redacted]

[redacted]

**B. [redacted] Even if the *Ker-Frisbie* doctrine does not apply, the defendant is not entitled to relief.**

1. [redacted] Neither Convention creates a private right of action in U.S. courts.

[redacted] "Even when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" *Medellín v. Texas*, 552 U.S. 491, 506 n. 3 (2008) (quoting 2 Restatement (Third) of Foreign Relations Law of the United States § 907, cmt. a (1987)). If the treaty does not create a private right of action, a defendant cannot "seek relief pursuant to [it] in court." *United States v. Khatallah*, 160 F. Supp. 3d 144, 153 (D.D.C. 2017); *see also United States v. al Liby*, 23 F. Supp. 3d 194, 203 (S.D.N.Y. 2014) "[W]here a treaty does not provide a particular remedy, either expressly or implicitly, it is not for the federal courts to impose one."

[redacted] Generally speaking, "individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved." *Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir. 1990). An exception to this rule is if the treaty expressly creates privately enforceable rights. *See United States v. Barinas*, 865 F.3d 99, 105 (2d Cir. 2017); *see also Alvarez-Machain*, 504 U.S. at 658-59 (noting that the Ninth Circuit, which had ordered the indictment dismissed before the Supreme Court reversed that decision, believed Mexico's formal protest was necessary for that defendant to pursue his individual claim in U.S. courts). Libya has filed no such formal protest here.

[redacted] A review of the applicable language of each Convention establishes that the Conventions' obligations are directed at nation-states, with no mention of individual rights. The

---

(D.C. Cir. 1992) ("[A] foreign court's holding as to what that country's criminal law provides should not lightly be second-guessed by an American court—if it is ever reviewable.").

[redacted]

[redacted]

defendant thus cannot establish that he has a right to enforce any violation of the Conventions in a U.S. court. *See McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 489 (D.C. Cir. 2008) (self-executing treaty's silence on right-of-action question "makes all the difference"). Additionally, because rights under extradition treaties generally accrue to *nations*, not to *individuals*, and those nations can choose to waive those rights. *See, e.g.*, *United States v. Riviere*, 924 F.2d 1289, 1300-01 (3d Cir. 1991) (where Dominica waived objection to trial on matters outside scope of extradition order, defendant had no standing to object to his trial on those matters) *see also Casey v. Dep't of State*, 980 F.2d 1472, 1476 (D.C. Cir. 1992) (citing *Riviere* approvingly in noting that "countries are free to waive extradition treaty provisions").

[redacted] The government has separately consulted with the Office of Treaty Affairs at the Department of State, which informed undersigned counsel that State's position is that all the provisions of the Conventions at issue are either self-executing or implemented by legislation, but that none of those provisions confer private rights enforceable in United States courts. "It is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'" *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (quoting *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184 n. 10 (1982)). For the reasons above, the State Department's interpretation is sound, and the defendant has offered nothing to the contrary.

[redacted] The only case the defendant cites in support of his claim that he can enforce a claimed violation of the Conventions through divestiture of personal jurisdiction, *see* Mot. at 32, is *United States v. Murillo*, 826 F.3d 152 (4th Cir. 2016).[7] That case says nothing about whether a multilateral

[7] Even then, although the defendant cites the case in the context of an argument regarding the purported self-executing nature of the Conventions, he makes no argument that the Conventions bestow an individual right of action on those who claimed to be aggrieved by a violation of the either Convention.

[redacted]

[redacted]

treaty with an extradition provision creates any enforceable rights in U.S. courts. It merely notes that the United States cited a different multilateral treaty in making an extradition request *to a foreign government*. *See id.* at 155 (emphasis added). That government then chose to respond under the applicable Convention. *Id.* Making a request to a foreign government under a multilateral convention provides no insight into whether that convention creates an individual right to redress in U.S. courts where no nation-state has claimed a violation.

[redacted] The defendant's motion should be denied because he has no standing to pursue an individual remedy in U.S. courts under either Convention.

2. [redacted] Any right of action the defendant has is not enforceable through dismissal or divestiture of personal jurisdiction.

[redacted] Even if the Conventions establish a private right of action in a U.S. court, the defendant has not established that dismissal or divestiture of personal jurisdiction is the proper remedy for any violation. Multiple Circuit Courts of Appeal have declined to take the weighty step of dismissal of an indictment or suppression of evidence in response to alleged violations of a multilateral treaty. *See United States v. Li*, 206 F.3d 56, 61 (1st Cir. 2000) ("Even stronger than the presumption against private rights of action under international treaties is the presumption against the creation of rights enforceable by the suppression of evidence or by the dismissal of an indictment"); *United States v. De La Pava*, 268 F.3d 157, 165 (2d. Cir. 2001) (citing *Li*); *United States v. Emuegbunam*, 268 F.3d 377, 390-91 (same); *United States v. Jiminez-Nava*, 243 F.3d 192, 198-99 (declining to apply exclusionary rule for alleged treaty violation); *see also Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350 (2008) (declining to direct states to enforce the exclusionary rule on for alleged treaty violation).

[redacted] All of the foregoing cases arose in the context of the Vienna Convention on Consular Relations, but their logic applies with equal force to the defendant's claims with respect to the

[redacted]

[redacted]

Montreal and Terrorist Bombing Conventions. *Li's* observation, often cited by other Circuits, that the "presumption against the creation of rights enforceable by ... the dismissal of an indictment," 206 F.3d at 61, is greater than even the presumption against finding individual rights of action under treaties, applies universally. So too does the Second Circuit's observation that "[t]he dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights. *De La Pava*, 268 F.3d at 165 (internal quotations omitted). As the Supreme Court has repeatedly reaffirmed, "due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." *United States v. Alvarez-Machain*, 504 U.S. at 662 (quoting *Frisbie v. Collins*, 342 U.S. 519, 522 (1952)).

[redacted] The First Circuit's analysis of why the Vienna Convention does not rise to the level of creating rights that can be vindicated by dismissal of an indictment applies similarly to an analysis of the Montreal and Terrorist Bombings conventions. As the *Li* court noted, both the Vienna Convention and a bilateral convention at issue in that case are "facially ambiguous on the subject of whether they create individual rights at all, and do not even address whether those rights would justify suppression of evidence or the dismissal of an indictment." *Li*, 206 F.3d at 62. There is no ambiguity about treaties at issue here: there is nothing in them that suggests they create an individual right of action for the reasons stated above, let alone rights that would warrant the extraordinary remedy of dismissing the criminal case. In addition, the State Department's interpretation that the Conventions create no such right of action is entitled to "great weight." *See Abbott*, 560 U.S. at 15. To the extent that either Convention does create a right of action, however, neither addresses whether the rights would justify dismissal or divestiture of personal jurisdiction, and nothing in the treaties suggests that they were meant to confer rights on par with those in the

[redacted]

[redacted]

Constitution that can typically result in those remedies. Accordingly, the Court should decline to impose the remedies the defendant seeks, even if he has an individual right of action.

**C. [redacted] was not tantamount to torture or brutality.**

1. [redacted] <u>*Toscanino* does not apply here.</u>

[redacted] The defendant argues [redacted] was "shocking conduct" that rises to the level of "torture, brutality, and similar outrageous conduct" required to invoke a purported exception to the *Ker-Frisbie* doctrine, first recognized by the Second Circuit in *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), and almost immediately thereafter limited by the same Circuit in *U.S. ex rel. Luhan v. Gengler*, 510 F.2d 62, 25 (2d. Cir. 1975). *See Mot.* at 21, 26. At the outset, it is far from clear whether the so-called *Toscanino* exception relied upon by the defendant is even applicable. Multiple Circuit Courts have explicitly rejected it as a viable exception to the *Ker-Frisbie* doctrine. *See United States v. Winter*, 509 F.2d 975, 987 (5th Cir. 1975); *United States v. Darby*, 744 F.2d 1508, 1531 (11th Cir. 1984); *Matta-Ballesteros v. Henman*, 896 F.2d 255 (7th Cir. 1990). Although others have adopted *Toscanino*, the D.C. Circuit has only stated that it "may" apply in cases of "torture, brutality, and similar outrageous conduct." *United States v. Rezaq*, 134 F.3d 1121, 1130 (D.C. Cir. 1989). There, the D.C. Circuit cited *Luhan*, which specifically limited the *Ker-Frisbie* exception announced in *Toscanino* to torture, brutality, and similar outrageous conduct. *See Luhan,* 510 F.2d at 65.

[redacted] Even within the Second Circuit, "[i]t is reasonably clear that *Toscanino* no longer is good law. To the extent, if any, that it survives, its holding is restricted to the outrageousness of its facts." *United States v. al Liby*, 23 F. Supp. 3d 194, 195 (S.D.N.Y. 2014). As the *al-Liby* court noted, The Supreme Court repeatedly has reaffirmed the *Ker–Frisbie* rule since *Toscanino*,

[redacted]

[redacted]

including in *United States v. Alvarez–Machain*, 504 U.S. 655, 660–62, (1992). Multiple Circuits have determined that, in light of Supreme Court decisions upholding *Ker-Frisbie* since *Toscanino*, *Toscanino* should no longer be considered good law. *See al-Liby*, 23 F. Supp. 3d at 199 n.24 (collecting cases).

2. [redacted] <u>The facts of this are not outrageous.</u>

[redacted] Even if the Court were to follow *Toscanino*, it should find that the allegations presented by the defendant fall far short of the outrageous conduct alleged in *Toscanino*. In 36 pages, the closest the defense gets to alleging that the U.S. government was involved in some sort of misconduct is a claim that the United States should have insisted that Libya proceed via formal judicial extradition. The Second Circuit has clarified that the rule it announced in *Toscanino* is limited to a finding "that the gross mistreatment leading to the forcible abduction of the defendant was perpetrated by representatives of the United States Government." *United States v. Lira*, 515 F.2d 68, 70 (2d Cir. 1975). Because the defendant has not alleged, much less sustained an allegation, that the United States was a participant in any "use of a militia group to stage an illegal kidnapping . . . the use of violence against Mr. Al-Marimi and his family, a prolonged illegal detention in isolated conditions, and an utter disregard to Libyan law and sovereignty,[8]" Mot. at 22, his motion must be denied.

(U) Even making two large *arguendo* assumptions – that the actions that the defense describes within Libya (1) occurred as stated in the motion,[9] and (2) are attributable to the United

---

8 [redacted]

9 The Court should not accept as fact the unsworn statements of the defendant's family as reported in the media. *See* Mot. at 11-15. The evidence proffered by the defense that originates from the defendant's family members does not even take the form of a declaration, let alone testimony subject to cross-examination. The Court should disregard it. *See United States v. al Liby*,

[redacted]

[redacted]

States government – his motion nonetheless fails. As the defense concedes, "the standard for claiming the *Toscanino* exception is a high bar." Mot. at 26. It has not been met here. Courts have declined to apply the doctrine under circumstances much more extreme than what is alleged here, including some involving direct U.S. government participation. For example, in *Alvarez-Machain*, the District Court concluded that DEA agents were responsible for the defendant being "forcibly kidnapped from his medical office in Guadalajara, Mexico," and the Supreme Court nonetheless held that it was inappropriate for the District Court to have divested itself of jurisdiction. 504 U.S. at 657, 670. In *United States v. Matta-Ballesteros*, 71 F.3d 754 (9th Cir. 1995), the Ninth Circuit upheld the District Court's decision not to divest itself of jurisdiction despite the fact that U.S. Marshals, in conjunction with Honduran Special Forces troops, "bound [the defendant's] hands, put a black hood over his head, thrust him on the floor of a car operated by a United States Marshal, and drove him to a United States Air Force base in Honduras." *Id.* at 761. There, the defendant alleged (although the government contested) that, at the direction of the Marshals, he was "beaten and burned with a stun gun," including on his feet and genitals. *Id.* The Ninth Circuit found that the defendant's treatment, *even if taken as true*, does not demonstrate government conduct of the most shocking and outrageous kind, so as to warrant dismissal. *Id.* at 764 (emphasis added).[10]

---

23 F. Supp. 3d 194, 197 (S.D.N.Y. 2014) (motion may be denied when based on counsel's proffer and not testimony or a declaration).

[10] In *Toscanino*, the one case of which the government is aware where a court found that there may be some relief available under this exception to the *Ker-Frisbie* doctrine, Second Circuit remanded to determine whether the defendant's allegations – that the Uruguayan authorities kidnapped him, knocked him unconscious, took him over the border to Brazil, where he was tortured and interrogated for 17 days – was substantiated. 500 F.2d at 270. Toscanino alleged that the U.S. Attorney was aware of the interrogations and received updates, and that a member of the Department of Justice was present for parts of the interrogation. *Id.* He alleged that "agents of the United States government attached electrodes to his earlobes, toes, and genitals," and that he was shocked with electricity. *Id.* He also alleged that American officials "bribed an employee of the public telephone company to conduct electronic surveillance of him." *Id.* If his allegations were

[redacted]

[redacted]

[redacted] By contrast, the defendant's complaints about the U.S. government's "shocking" involvement that purportedly "rises to the level" of *Toscanino*'s prohibition on torture and brutality, *see* Mot. at 26, amount to "the government should have insisted on judicial extradition." *See generally* Mot. at 26-29. At the time of the defendant's transfer, an INTERPOL Red Notice was in place, along with a request from the United States to effectuate the defendant's extradition, expulsion, or other lawful transfer of custody, [redacted] Even taken at face value, the defendant's version of events does not rise to the level of the allegations rejected by the Ninth Circuit in *Matta-Ballesteros*, and even then, any actions of the Libyan militias are not attributable to the United States, as would be required for his claim to succeed.

---

sustained, the Second Circuit reasoned, he would be entitled to some relief. *Id.* at 275-76. The defendant's allegations here pale in comparison to the allegations in *Toscanino*.

[redacted]

[redacted]

## CONCLUSION

For the above reasons, the defendant's motion must be denied.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: ______________________________
ERIK M. KENERSON (OH Bar No. 82960)
CONOR MULROE (NY Bar No. 5289640)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 252-7201 // Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530

[redacted]