# Technical Analysis of the Treaty Between the United States and Switzerland on Mutual Assistance in Criminal Matters Signed at Bern, May 25, 1973

## INTRODUCTION

In general, the Treaty provides for broad assistance between the United States and Switzerland in criminal matters. This includes assistance in locating witnesses, the obtaining of statements and testimony of witnesses, production and authentication of judicial and business records, and service of judicial or administrative documents. Special assistance is required where organized crime is involved. The Treaty is invoked by a United States request for assistance addressed to Switzerland or a Swiss request for assistance addressed to the United States. (Requests for assistance under the Treaty are sometimes referred to simply as "requests.")

The Treaty establishes an obligation to furnish assistance in connection with investigations or court proceedings involving certain types of offenses. Except for the special provisions relating to organized crime, compulsory measures are only required to be used in connection with matters which are considered to be criminal offenses in both countries (with one exception) and are listed in the Schedule to the Treaty. Tax crimes are generally excluded, except in certain organized crime situations. Otherwise, the furnishing of information for use in income tax cases is governed exclusively by the Income Tax Convention of May 24, 1951, between the United States and Switzerland.

It is anticipated that most requests for assistance addressed by Switzerland to the United States under the Treaty will be executed by appropriate agencies of the Federal Government of the United States as requested by the Department of Justice, which acts as the "Central Authority" for the United States. It is believed that enabling legislation in the United States will not be required.

State agencies may be involved in the execution of requests under the Treaty to the extent that state court records or other local documents are sought. A state agency may also be involved if it is clearly the most appropriate agency to carry out the request. Except where the participation of a state agency is a practical necessity (e.g., it has custody of a document being sought), the Department of Justice will not ordinarily ask a state agency to execute a request.

Criminal investigations and proceedings at the state level can also benefit from Swiss assistance. The procedure would be for the state to seek assistance through the United States Department of Justice. If a state seeks and obtains materials under the Treaty, a number of provisions of the Treaty designed to facilitate the admissibility in evidence of certain materials obtained thereunder would apply in the state proceeding.



Many of the provisions in the Treaty are based on provisions in the European Convention on Mutual Assistance in Criminal Matters (hereinafter referred to as ECMA) which was entered into by a number of European countries on April 20, 1959. While Switzerland ratified the ECMA on December 20, 1966, it did so with a number of reservations.

The Treaty does not create any new crimes in either country. It is limited to making available to each country evidence and information for use by it in investigating or prosecuting the crimes established by its domestic law. While the assistance provided to the United States by Switzerland depends primarily on whether the acts alleged or suspected would constitute a Swiss crime, only United States law (state or Federal) governs in determining whether a crime has been committed in the United States.

While the requested State will to a large extent apply its own procedure in executing requests under the Treaty, the courts in the requesting State have ultimate control over whether the testimony, documents, and other materials so obtained are admissible in evidence in the requesting State. The Treaty has a number of provisions for the admissibility in evidence of materials obtained thereunder; these provisions are analogous to existing United States statutes or represent modest extensions thereof.

The Treaty contains 41 articles grouped into 9 chapters dealing respectively with: Applicability; Special Provisions Concerning Organized Crime; Obligations of Requested State in Executing Requests; Obligations of Requesting State; Documents, Records and Articles of Evidence; Service for Requesting State and Related Provisions; General Procedures; Notice and Review of Determinations; and Final Provisions. There is also a Schedule listing 35 categories of offenses to which the Treaty is applicable. The Treaty is supplemented by six exchanges of letters interpreting certain language used in the provisions of the Treaty.

The Treaty was negotiated over a period of more than four years by a United States delegation consisting of representatives from the Department of State, the Department of the Treasury, the Department of Justice, and the Securities and Exchange Commission. The many differences between United States and Swiss law, procedure, and traditions made it difficult to reach agreement on substantive points, and in some cases agreement could be achieved only by developing rather involved provisions. The Treaty was made even more complex by the fact that while both Switzerland and the United States have Federal systems, under the Swiss system, in contrast to the United States, almost all criminal enforcement is carried out by the cantons. In addition, once substantive agreement was reached, the language had to be adjusted so that the English and German language texts could be aligned as closely as possible. This procedure left little opportunity for improving the style and readability of the English text after it accurately reflected the substantive meaning.

## ARTICLE 1—OBLIGATION TO FURNISH ASSISTANCE

This Article establishes the obligation to furnish assistance, specifies the types of matters in which assistance will be furnished, and

lists major forms of assistance available. Except as otherwise provided in the Treaty, this Article makes the furnishing of assistance mandatory. It should be noted that Article 38:3 provides that the Treaty shall take precedence over all inconsistent provisions of the municipal laws of the Contracting Parties.

Paragraph 1: a provides that assistance afforded under the Treaty principally relates to "investigations or court proceedings in respect of offenses the punishment of which falls or would fall within the jurisdiction of the judicial authorities of the requesting State or a state or canton thereof." Certain exceptions are provided elsewhere in the Treaty, but unless an exception is specifically set forth in the Treaty, all such offenses are covered.

Swiss domestic law distinguishes between "offenses" and "criminal offenses." In order for an offense to be "criminal" under Swiss domestic law, the possible punishment must include significant imprisonment. Both types of violations are covered by the Treaty. However, where Switzerland is the requested State, it is required to use "compulsory measures" only in the case of violations which under Swiss law are criminal offenses with two exceptions, gambling and organized crime. There is a corresponding limitation in the obligation of the United States to use compulsory measures. See Technical Analysis of Articles 4 and 7.

The phrase "investigations or court proceedings" or "investigation or proceeding" is used to make it clear that the Treaty includes mutual assistance at the investigatory stage as well as at the trial stage. The investigatory stage includes agency investigations and grand jury proceedings.

The expression "or would fall" has a special purpose in that it is intended to indicate that investigations by administrative authorities are covered by the Treaty so long as such investigations might result in criminal proceedings. This means, for example, that an investigation by the United States Securities and Exchange Commission is an investigation for which assistance could be furnished (if the other requirements of the Treaty are met) as long as the investigation relates to conduct which might be dealt with by the criminal courts.

Paragraph 2 provides that acts (or omissions) which constitute the types of related non-criminal matters, including separate civil proceedings. Paragraph 1:b provides for assistance to effect the return of property obtained through offenses covered by the Treaty, but only if the owner is Switzerland or the United States or one of the states or cantons thereof. This refers to a government ownership interest and would not include an ordinary claim, such as a claim for unpaid taxes. Paragraph 1:c provides for assistance in civil proceedings, otherwise provided for in domestic law, for damages for unjustified detention as a result of action taken pursuant to this Treaty. In addition to the types of assistance provided in this Paragraph, it should be noted that Article 5:3 a. provides that materials obtained pursuant to the Treaty may be used by governmental authorities in any investigation or proceeding concerning the civil damages connected with an investigation or proceeding for which assistance has been granted.

Paragraph 2 provides that acts (or omissions) which contribute the elements of the offense described in the request for assistance can be based upon reasonable suspicion as well as admissible evidence. The



"reasonable suspicion" standard is less stringent than the "probable cause" standard applicable in the United States for the issuance of arrest and search warrants. This permits the verification of suspected offenses, which is one of the principal purposes of the Treaty.

Paragraph 3 permits the United States and Switzerland to enter into a further agreement providing for assistance in certain ancillary administrative proceedings in respect of offenses covered by the Treaty. It could cover, for example, proceedings to revoke the driver's license of a person because of conduct which constitutes manslaughter by automobile, or proceedings to disbar a lawyer for an offense covered by the Treaty. However, this Paragraph would apply only to the extent agreed to in a future exchange of diplomatic notes. It is anticipated that the notes will refer to classes of administrative proceedings, although there does not seem to be any legal bar to exchanging notes with respect to individual administrative proceedings. Further details on the operation of this provision presumably would be provided in the exchange of notes. Under Swiss constitutional law the exchange of diplomatic notes could be authorized by the Swiss Federal Council, and would not require legislative approval (other than the approval necessary for the Treaty itself). The United States procedure for the exchange of notes will be worked out at the time of the hearings before the Senate Foreign Relations Committee.

Paragraph 4 lists the major types of judicial assistance to be furnished and states that it is not intended to be exclusive. The listed types of assistance are:

(*a*) ascertaining the whereabouts and addresses of persons;
(*b*) taking the testimony or statements of persons;
(*c*) effecting the production or preservation of judicial and other documents, records, or articles of evidence;
(*d*) service of judicial and administrative documents; and
(*e*) authentication of documents.

### ARTICLE 2—NON-APPLICABILITY

Paragraphs 1 and 2 list seven areas in which the Treaty is not applicable and Paragraph 2 lists some exceptions. Set forth below is a list of the areas of inapplicability with some comments:

(a) *Extradition and Arrests.*—Extradition is covered in the extradition treaty between the United States and Switzerland signed on May 14, 1900, and in supplementary extradition treaties signed January 10, 1935 and January 31, 1940.

(b) *Execution of Criminal Judgments.*—Since most civil matters are not included in the Treaty (see Article 1), the execution of civil judgments is not covered by the Treaty even though not specifically excluded here.

(c) *Six Types of Investigations or Proceedings.*—These are as follows:

(1) *Investigations or proceedings concerning offenses which the requested State considers a political offense or an offense connected with a political offense.* A political offense exception appears in the ECMA and is a standard provision in extradition treaties to which the United States is a party. The Treaty provides, however, that if the investigation or proceeding is with respect to a person

Case 1:22-cr-00392-DLF Document 680-2 Filed 10/08/26 Page 3 of 18



involved in the illegal activities of some organized criminal group (as described in Article 6:2) and the offense was in furtherance of the purposes of such group (as described in Article 6:3) assistance shall be granted regardless of the political offense exception.

(2) *Investigations or proceedings concerning offenses in violation of the laws related to military obligation.*

(3) *Investigations or proceedings concerning offenses against military law which do not constitute an offense if committed by a person not subject to military law in the requested State.*

(4) *Investigations or proceedings for the purpose of enforcing cartel or antitrust laws.* As in the case of the political offense exception, the Treaty provides, however, that if the investigation or proceeding is with respect to a person involved in the illegal activities of an organized criminal group (as described in Article 6:2) and the offense was in furtherance of the purposes of such group (as described in Article 6:3) assistance shall be granted regardless of the cartel-antitrust exception.

(5) *Investigations or proceedings concerning violations with respect to taxes, customs duties, governmental monopoly charges or exchange control regulations* other than the offenses listed in items 26 (gambling) and 30 (illegal drugs; poisons and firearms and explosives) of the Schedule and the related offenses in items 34 (attempts, conspiracy, accessory) and 35 (dealing with jurisdictional elements) of the Schedule. However, assistance is to be given with respect to these violations when organized crime is involved and the special conditions of Article 7 are met (see Technical Analysis of Article 7). The result of this provision is that, unless one of the exceptions applies, investigations or proceedings to enforce the criminal provisions of Title 26 of the United States Code (the Internal Revenue Code and the other specified violations) are not covered by the Treaty. As to civil fraud penalties, since they are civil matters they are also not covered by the Treaty (cf. Article 5:3a re civil damages).

The exclusion of offenses related to government monopoly charges requires special comment. One example of such an excluded offence would be illegal competition with a government monopoly. However, theft from the warehouse of a government monopoly would be covered. In Switzerland government monopolies include a business or activity operated exclusively by federal, cantonal, or communal governments such as those relating to salt or telephone and telegraph services. Other examples would be monopolies granted to private companies such as local railway transport, power companies and the importers of certain liquors. This provision has primary applicability to Switzerland. It is difficult to determine the full extent of its applicability to the United States at this time, although it probably would be applicable to illegal competition with state liquor monopolies.

The exclusion for fiscal offenses does not apply to offenses with respect to taxes on bookmaking, lotteries and other gambling when conducted as a business, or to criminal offenses with respect to taxes on narcotic drugs, on poisonous chemicals and substances injurious to health, or on weapons, explosives and incendiary devices, as described in item 30 of the Schedule. The exclusion is similarly inapplicable to attempts or conspiracies to violate such tax laws and to persons who are accessories to the violations of such tax laws.



Paragraph 3 provides that contributions to social security and governmental health plans, such as taxes paid pursuant to the United States Federal Insurance Contributions Act, are not considered taxes for the purpose of the Treaty and, therefore, offenses with respect to such contributions are not excluded from the Treaty.

Paragraph 4 is designed to reflect the impact of the Swiss doctrine of "consumption" on the Treaty. Under this doctrine assistance cannot generally be given for a common crime which was incidentally committed in carrying out a crime for which assistance cannot be given (unless the latter crime is listed in the Schedule). For example, if a person commits forgery in the process of evading taxes, assistance cannot be given for the forgery if its only possible purpose was to evade taxes. Although the doctrine of "consumption" has no counterpart in United States law, this Paragraph is reciprocal and could be used by either party to deny assistance.

ARTICLE 3—DISCRETIONARY ASSISTANCE

Paragraph 1 sets out two categories of circumstances under which the requested State may, in its discretion, refuse assistance.

First, assistance may be refused to the extent that the requested State considers that execution of a request is likely to prejudice its sovereignty, security or similar essential interests. A similar provision appears in Article 2:b of the ECMA. An exchange of letters relating to Articles 3, 9, 10, 12 and 25 reflects the relationship of essential national interests to the limited grounds for refusal to grant assistance based upon the Swiss economic espionage doctrine contained in Article 273 of the Swiss Penal Code and upon Swiss banking secrecy. These letters are discussed in the Technical Analysis of Articles 10:2 and 10:3.

Generally, the mere fact that the disclosure of manufacturing, business or bank secrets is involved shall not be a valid reason for Switzerland to refuse to grant assistance, unless such disclosure would affect a person who appears not to be connected with the offense upon which the request is based. Even where such a person is not connected with the offense, assistance cannot be denied where the three conditions set out in Article 10:2 have been met.

However, in exceptional circumstances it is recognized that the disclosure of manufacturing, business or banking secrets could be of such significant importance that it could prejudice the requested State's "essential interests". In such a case the requested State would have the right to refuse assistance, regardless of whether or not a person connected with the offense is affected and whether or not the conditions of Article 10:2 were met. An example of such an extraordinary case would be where the disclosure of particular manufacturing secrets in responding to a United States request for assistance could substantially prejudice an entire industry, such as watchmaking, which is of special importance to the Swiss economy. It should be noted that this provision is bilateral, and in similar circumstances could be used by the United States to prevent similar prejudice to its essential interests.

The second category for which the requested State may refuse assistance pertains to requests for the purpose of prosecuting a person for acts or omissions for which he has been acquitted or convicted by a final judgment of a court in the requested State for a substantially similar offense and the sentence has been or is being carried out. This

concept is analogous to double jeopardy in United States domestic law, although technically double jeopardy does not apply to prosecutions in different jurisdictions. Assistance may not be refused, however, when the investigation or court proceeding involves a person who, according to the request, is or is reasonably suspected of being involved in organized crime within the meaning of Article 6:2. Of course, if the concept of double jeopardy is extended by United States courts so as to apply to foreign prosecutions, then a prior Swiss prosecution would be equivalent to a United States prosecution. In such event, even a person involved in organized crime could not be prosecuted in the United States, although the Treaty provides for assistance.

Paragraph 2 provides that before refusing a request under Article 3, the requested State shall determine whether assistance can be given subject to such conditions as it deems necessary. This provision imposes upon the Central Authority of the requested State an obligation to review the matter and make every effort to furnish the assistance in whole or in part. When deemed appropriate, the Central Authority of the requested State may impose conditions and, in such a case, the requesting State must observe them.

### ARTICLE 4—COMPULSORY MEASURES

Article 1:1 makes the furnishing of assistance obligatory except where Articles 2 (nonapplicability) or 3 (discretionary assistance) apply. Article 4 creates a further obligation, where certain conditions are met, to apply compulsory measures in furnishing assistance, to the extent necessary. Thus, if an investigation or proceeding in a criminal matter is involved, the requested State must, in general, furnish assistance, but in furnishing assistance need not apply compulsory measures unless the conditions of Article 4 are met. In those cases where Article 4 conditions are not met, the requested State must, nevertheless, provide assistance to the extent it can be furnished without the use of compulsory measures.

Paragraph 1 provides that the requested State shall use the same compulsory measures in executing a request under this Treaty as it applies in investigations and proceedings in respect of offenses committed within its jurisdiction.

Paragraph 2 requires that compulsory measures be used, if necessary, if two conditions are met. First, the acts or omissions described in the request for assistance would, if proven, establish all of the objective elements of a criminal offense which would be punishable under the law in the requested State if such offense had been committed within its jurisdiction. Second, such acts or omissions would constitute an offense described in the Schedule of the Treaty.

Paragraph 2 contains one exception to the condition that the offense be criminal in the requested State before it is required to use compulsory measures. That exception is with respect to acts described in item 26 of the Schedule: "Offenses against the laws relating to bookmaking, lotteries and gambling when conducted as a business." While all of these are, in general, crimes in the United States, not all are crimes in Switzerland. But under this provision Switzerland is, nevertheless, required to use compulsory measures, if necessary, when the United States makes a request with respect to such offenses.



As indicated in the Technical Analysis of Article 1, Swiss law makes a distinction between an "offense" and a "criminal offense." An offense is considered criminal if the punishment available includes significant imprisonment. Thus, except for situations involving organized crime, which are discussed below, Switzerland is required to use compulsory measures only if the acts or omissions would constitute a criminal offense in Switzerland. If they constitute an offense which is not deemed criminal in Switzerland, compulsory measures are not required to be used. Since the Treaty is intended to operate reciprocally, the United States would not be obligated to use compulsory measures in those cases where Switzerland would not be so obligated.

Paragraph 3 confers upon the Central Authority of the requested State the discretion to require the use of compulsory measures where the acts or omissions described in the request would constitute a criminal offense in the State, even though the offense is not listed in the Schedule, if it determines that the importance of the offense justifies the use of compulsory measures.

Paragraph 4 is designed to deal with cases where some of the elements of an offense under Swiss law and United States law differ. Such differences typically may arise because the legal system of the United States is based on common law and that of Switzerland has its origins in civil law. In addition, certain elements are contained in federal crimes in the United States because of constitutional limitations on federal jurisdiction. Under the Treaty, the requested State must look to the acts or omissions described in the request and determine whether such acts or omissions, if proven, would constitute an offense under its law even though the technical designation or some of the constituent elements of the offense in the requesting State are different.

This same approach is to be followed in determining whether an offense is listed in the Schedule. Thus, for example, if the United States requests assistance in connection with an investigation relating to mail fraud, Switzerland would be required to use compulsory measures, even though an element of the United States crime (the use of the mails) does not appear in Swiss law, provided the acts or omissions would constitute criminal fraud under Swiss law. Similarly, if the offense in the requested State includes additional elements which are not required to be proven in the requesting State, the requested State is, nevertheless, required to use compulsory measures when these elements are described in the request.

Paragraph 5 provides that in those cases where the conditions of Paragraph 2 or 3 have not been met, assistance is to be granted to the extent that it can be furnished without the use of compulsory measures. For example, the requested State is obligated to request the production of documents but it is not obligated to take any action for failure to comply with such a request.

### ARTICLE 5—LIMITATIONS ON USE OF INFORMATION

This Article represents a compromise between the Swiss concept of speciality of use which, in effect, holds that information furnished pursuant to a request for assistance may only be used for the specific purpose for which it was furnished, and the view of the United States

that properly obtained information or evidence should be usable for any purpose by the requesting State. The Swiss view was set forth in its reservation to Article 2:b of the ECMA, wherein its stated that assistance provided is to be "used solely for the purpose of examining and trying the offenses in respect of which mutual assistance is provided."

Paragraph 1 of this Article sets forth the general proposition that assistance furnished cannot be used for investigative purposes nor be introduced into evidence in the requesting State in any proceeding relating to an offense other than the offense for which assistance has been granted.

Paragraph 2 contains exceptions to Paragraph 1 which provide, in effect, that the requesting State can nevertheless use the furnished assistance in situations where it would have been entitled to obtain the information in a separate request, after having given the requested State notice and an opportunity to make its views known as to whether this was so. This obviates the need for an additional request, thereby saving time and reducing the burden that would otherwise be placed on both States. More specifically, this Paragraph provides that the requesting State is entitled to use the previously furnished materials, described in Paragraph 1, for the investigation or prosecution of persons who: are involved in the matter for which assistance was granted and are suspected or accused of having committed another offense for which assistance is required to be granted; are suspected or accused of being participants in, or accessories to, an offense for which assistance was granted; or are described in Article 6:2 as coming within the special provisions concerning organized crime.

Paragraph 3.a permits the materials referred to in Paragraph 1 to be used by the requesting State in any investigation or proceeding concerning the civil damages connected with the matter for which assistance was granted.

Paragraph 3.b permits information or knowledge obtained from an examination of the furnished materials to be used by the requesting State to continue or re-open any criminal matter for which assistance may be given and which was or had been open prior to the date of the request for assistance. However, the materials obtained from Switzerland are not to be introduced into evidence. The use of the word "may" permits the furnished information to be used in all cases covered by the Treaty, including situations where discretionary assistance may be provided pursuant to Article 3:2 and regardless of whether or not compulsory measures are required to be utilized. Such cases would be those which do not meet requirements of dual criminality and would, for example, include those violations of the federal securities laws which are not offenses under Swiss law.

This Article was the subject of extensive discussion during the course of the negotiations, as a result of which understandings were reached concerning its applicability in a number of different situations. These understandings, which are discussed herein, are reflected in the exchange of letters concerning this Article, which accompanies the Treaty.

It was agreed that the limitations on use in this Article are not intended to restrict the requesting State in using information which has become public, any more than such use would be restricted in the requested State.

It was also agreed that the limitations on use in this Article are not intended to apply to the making of additional requests for assistance under the Treaty where the requests relate to offenses which are either listed in the Schedule or are serious in the sense of Paragraph 2 of Article 10. (See Technical Analysis of Exchange of Letters with respect to Article 10:2.)

The limitations on use in this Article would not apply to any use to which the requested State specifically consents. A request for such use might be made under the consultation provisions of Article 39:1.

The limitations on use set forth in this Article are intended only as an agreement between governments and, as provided in Article 37:1, do not give rise to a right on the part of any person to take any action in the United States to suppress or exclude any evidence or to obtain other judicial relief. Where any person alleges that any authority in the United States has used materials obtained from Switzerland in a manner inconsistent with the limitation of Article 5, his recourse would be for him to inform the Central Authority of Switzerland of his allegations for consideration only as a matter between governments. He has no standing to have such allegations considered in any proceeding in the United States. If Switzerland believes that the allegations require explanation, it may make an appropriate inquiry to the United States.

## CHAPTER II

### Special Provisions Concerning Organized Crime

#### SUMMARY AND INTRODUCTION

Articles 6, 7 and 8, the organized crime provisions, provide for assistance in certain situations where it would not otherwise be available because of the requirements of dual criminality and inclusion in the Schedule.

If the subject of the investigation or proceeding is a member, affiliate or participant in an important activity of an organized criminal group, or a public official who is involved with such a group (Article 6:2), neither the dual criminality test nor inclusion in the Schedule is a prerequisite to assistance in any case not specifically excluded by Article 2. For example, assistance would be required as to such individuals even though a fiscal offense (except an income tax violation) is involved, if the information or evidence cannot be obtained without the assistance of the other State or the effort to obtain such materials would impose unreasonable burdens on the requesting State (Article 7:3). Thus assistance would be required even though the facts set forth in the request do not constitute a crime in the requested State or constitute a minor offense for which assistance would not otherwise be required under the Treaty. Other examples would be those offenses under the federal securities laws in the United States which are not offenses under Swiss law.

In addition, under Article 7:2 if the above conditions are met, assistance is also required in investigations or proceedings involving violations of provisions on income taxes but only if, according to the information furnished by the requesting State, the investigation or proceeding involves a person reasonably suspected of belonging to

an upper echelon of an organized criminal group or participating significantly, as a member, affiliate or otherwise, in any important activity of such a group and the following additional conditions are met:

(1) the available evidence is insufficient, in the opinion of the requesting State, for the purpose of a prosecution which has a reasonable prospect of success, to link such person with the common crimes committed by the group with which he is connected; and

(2) it has been reasonably concluded by the requesting State that the assistance will substantially facilitate the prosecution of such person and should result in his imprisonment for a sufficient period of time so as to have significant adverse effect on the organized criminal group.

ARTICLE 6—GENERAL REQUIREMENTS

Paragraph 1 establishes the obligation of the two States to assist each other in the fight against organized crime as provided in Chapter II and with all means available under the Treaty and other provisions of law.

Paragraph 2 provides for the special assistance required under this Chapter where the investigation or proceeding involves a person who, according to the request, is or is reasonably suspected to be:

(*a*) knowingly involved in the illegal activities of an organized criminal group, as described in Paragraph 3, as

(1) a member;

(2) an affiliate of such a group performing supervisory or managerial functions or regularly supporting the group or its members by performing other importing services; or

(3) a participant in any important activity of the group;

or

(*b*) a public official who has violated his official responsibilities in order to knowingly accommodate the desires of such a group or its members.

This Chapter provides for assistance in both the investigative and prosecutive stages as to persons described above. It should be noted that Paragraph 2 applies to persons who participate in any important activity of an organized criminal group, even if they do not participate in a decisive manner. The alleged participation in the illegal activities of the organized criminal group by a member, affiliate, or other person must be a knowing participation which would be sufficient, if proved, to sustain a charge against him as a principal, conspirator, aider and abetter or as an accessory before or after the fact. Ordinarily the services performed for the group would differ from those performed for the general public. For example, a lawyer might counsel the group prospectively with respect to illegal activities or attempt improperly to thwart law-enforcement activities.

Paragraph 2.b applies to a public official who, for example, knowingly protects gambling operations from police raids where that activity provides significant income to such a group.

Paragraph 3 defines an organized criminal group as an association or group of persons combined together for a substantial or indefinite period to obtain monetary or commercial gains or profits for the group or for others, wholly or in part by illegal means, and to protect its illegal activities against criminal prosecution and which, in carrying out its purposes, in a methodical and systematic manner:

(*a*) at least in part of its activities, commits or threatens to commit acts of violence or other acts which are likely to intimidate and are punishable in both States; and

(*b*) either (1) strives to achieve influence in government, politics, commerce, labor unions and similar bodies; or (2) associates itself with other such associations or groups, at least one of which strives to achieve influence in government, politics, commerce, labor unions and similar bodies.

ARTICLE 7—EXTENT OF ASSISTANCE

Paragraph 1 requires assistance, including the use of compulsory measures, even though the crime for which assistance is requested is neither on the Schedule nor a crime in the requested State, if the conditions of Paragraph 3 are met. It is intended to authorize and require federal, state and cantonal law enforcement and judicial authorities to assist, using such process as may be necessary, in carrying out requests for assistance when so requested by the Central Authority. This Paragraph applies to violations of provisions concerning income taxes, only to the extent the conditions of Paragraph 2 are met.

Paragraph 2 provides for assistance with respect to income tax violations if the conditions of Paragraph 3 are met and:

(*a*) the person involved is reasonably suspected by the requesting State of belonging to an upper echelon of an organized criminal group or of participating significantly in any important activity of such a group, even though not a member or affiliate of the group;

(*b*) the available evidence being insufficient, in the opinion of the requesting State, to successfully prosecute the person for the common crimes committed by the group with which he is connected;

(*c*) the requesting State has reasonably concluded that the assistance will substantially facilitate the successful prosecution of such person and should result in his imprisonment for a sufficient period of time so as to have a significant adverse effect on the group.

The reference in Subparagraph 2(a) above to persons belonging to an "upper echelon" of an organized criminal group provides for assistance in income tax investigations or proceedings involving persons of importance in the group. This Subparagraph also provides for such assistance with respect to a person, whether or not a member or affiliate, who participates significantly in an important activity of such a group. The extent of the required participation, as a principal, conspirator, etc. is set forth in the discussion of Article 6. Assistance would not ordinarily be required in investigations or proceedings involving minor members or associates of the group. Such persons would not normally utilize facilities in a foreign country, such as banking facilities.

Case 1:22-cr-00392-DLF Document 680-2 Filed 10/08/26 Page 7 of 18

Subparagraph 2.b. reflects the agreement that assistance will not be sought in investigations or proceedings involving violations of the income tax laws unless there is no reasonable prospect of successfully prosecuting the individual for the common crimes committed by the group with which he associated.

Subparagraph 2.c. above reflects the agreement that assistance in income tax investigations or proceedings will only be given if it can reasonably be anticipated that the ensuing prosecution will have a significant impact on the criminal group. In this connection it was understood that sentencing is a matter over which the Central Authority of the requesting State has no control.

Paragraph 3 sets forth the overall condition that assistance under Paragraphs 1 and 2 will only be given where the requisite information or evidence cannot otherwise be obtained without placing unreasonable burdens on the requesting State.

ARTICLE 8—APPLICABLE PROCEDURE

This Article represents a compromise of divergent views as to whether a representation by the requesting State should be binding on the requested State or whether the latter should have the right to make its own determination based on the facts provided. Although the language does not explicitly so state, Paragraph 2, in effect, requires the requested State to find a request unreasonable in order to conclude that it has not been made credible.

The primary purpose of Paragraph 3 is to authorize Swiss courts and cantonal authorities to use criminal procedures in connection with a request involving an organized crime tax investigation since not all cantons presently have such authority in tax investigations.

Paragraph 4 removes the restrictions on the disclosure of information in connection with a request for assistance in an organized crime tax case. It applies primarily to any limitations imposed by other treaties and to the secrecy provisions of Swiss tax legislation. To the extent that tax authorities in either State may be involved in executing a request for assistance, restrictions on disclosure of information by them are removed. The last sentence was deemed necessary in order to make clear that the Treaty does not limit any present or future provisions permitting tax authorities to make information available to others.

ARTICLE 9—GENERAL PROVISIONS FOR EXECUTING REQUESTS

Paragraph 1 provides that unless otherwise specified in the Treaty requests for assistance will be executed "in accordance with the usual procedure under the laws applicable for an investigation or proceeding in the requested State for offenses committed within its jurisdiction". This makes the domestic procedural laws of the requested State applicable in connection with the execution of requests. It also requires that the requested State follow the same practices in executing a request for assistance as it normally follows in a domestic investigation or proceeding of similar gravity. The applicability of this Paragraph is subject to the provisions of Article 4 with respect to the required use of compulsory measures.



Paragraph 2 provides that upon application of the requesting State, the requested State may consent to apply the procedures in the requesting State applicable to investigations or proceedings and to certification and transmission of evidence, to the extent that such procedures are not incompatible with the laws in the requested State. Under this provision it is anticipated that the requested State will generally honor requests to use such procedures unless they are incompatible with its law. However, it is specifically provided that a search or seizure is to be carried out only in accordance with the law of the place where the request for assistance is executed. It is anticipated that in most cases under this Paragraph the requesting State will be making an affirmative request for the use of particular procedures. However, it can also request that procedures which are available in the requested State, but incompatible with the law in the requesting States, not be used.

Paragraph 3 requires that the appropriate federal and state or cantonal judicial and other officers in the requested State assist, by all legal means within their power, in the execution of requests. This provision is designed to provide the necessary authority for both federal and state officers to assist in executing requests under the Treaty.

It is anticipated that most requests made to the United States will be transmitted to federal investigatory or judicial officials. However, they may be transmitted to state officials for execution, where the Central Authority deems it appropriate.

It is understood that requests made to Switzerland will generally be transmitted by the Federal Department of Justice and Police to cantonal officials for execution.

ARTICLE 10—DUTY TO TESTIFY IN REQUESTED STATE

Paragraph 1 requires the requested State to compel the furnishing of information and the production of documents and articles of evidence to the same extent as in criminal investigations or proceedings in the requested State. However, compulsory measures may be employed only where the conditions of Article 4 have been met. This Paragraph, like Article 9:1, makes it clear that the requested State is required to follow the same practices and employ the same legal compulsion in executing a request for assistance as it uses in enforcing its own criminal laws. Such compulsion must be used by the executing authority in the requested State even though there is no analogus crime in that State. This could arise, for example, in an organized crime situation involving a fiscal offense. In such a case the procedures to be used would be those used in the investigation or prosecution of the most analogous crime in the requested State.

Paragraph 1 also provides that a person cannot be compelled to furnish information or produce a document or article of evidence, if under the law in either State he has a right to refuse. This would include, for example, the right to claim such privileges as the attorney/client privilege or the privilege against self-incrimination. Where such a right is claimed to be applicable in the requesting State, the requested State

will rely on a certificate of the Central Authority of the requesting State in determining whether the right exists and is applicable.

Paragraph 2 of this Article relates very closely to Article 3:1:a. These provisions touch upon the Swiss doctrines of economic espionage and banking secrecy which are discussed in the exchange of letters relating to Articles 3, 9, 10, 12 and 25. The relation of economic espionage to the Swiss obligation to render assistance under this Treaty is set forth in the Technical Analysis of Article 3. The relation of bank secrecy to this obligation is set forth below.

As indicated above, a person cannot be compelled to furnish information or produce a document or article of evidence if he would have a right to remain silent in a comparable criminal proceeding in either the United States or Switzerland. In that regard, the exchange of letters relating to Articles 3, 9, 10, 12 and 25 sets forth the understanding of both Governments that banking secrecy does not generally provide a right to remain silent in a Swiss criminal proceeding.

As indicated in the Technical Analysis of Article 3, both Governments also recognize that the execution by Switzerland of a request which would require the disclosure of information normally protected by banking secrecy is not comprehended by the concept "likely to prejudice its sovereignty, security or similar essential interest", set forth in Article 3:1:a. Nevertheless, the exchange of letters relating to Articles 3, 9, 10, 12 and 25 recognizes the Swiss policy that, to the extent facts which a bank is ordinarily required to keep secret affect a person who appears not to be connected in any way with the offense to which a request for assistance relates, Switzerland considers itself obligated to balance the interests of such person with the need and the importance of the criminal investigation or proceeding in the requesting State. Therefore, the letters set forth the understanding that Switzerland may decline to furnish information protected by banking secrecy if it affects a person who appears not to be connected in any way with the offense which is the subject of the request. However, even where the person affected by the information appears not to be connected in any way with the offense, Switzerland is required to furnish the information, in spite of the protection which banking secrecy would ordinarily give to such information, if three conditions are met:

(1) the request concerns the investigation or prosecution of a serious offense;

(2) the disclosure is of importance for obtaining or proving facts which are of substantial significance for the investigation or proceeding;

(3) reasonable but unsuccessful efforts have been made in the United States to obtain the evidence or information in other ways.

The exchange of letters indicates the further understanding that except for the limited exception for banking secrecy discussed above, Switzerland will not otherwise decline to furnish assistance required by Articles 9, 10, 12 and 25.

Paragraph 2 strikes a balance between the interest of the United States in obtaining broad assistance in connection with important criminal cases and the Swiss interest in not departing from banking secrecy except where the reasons for doing so are compelling from the point of view of international cooperation in the fight against crime.

Paragraph 3 sets forth the procedure to be followed in cases involving economic espionage or banking secrecy where Switzerland is not satisfied that the affected person is connected with the offense or that the conditions described above (serious offense; disclosure of significance; unsuccessful efforts to obtain evidence) are met. In such a case, Switzerland shall request from the United States information indicating why it believes Paragraph 2 does not prevent disclosure. Switzerland is required to accept the determination of the United States except where, in the opinion of the Swiss Central Authority, the United States has not made a credible presentation.

Paragraph 4 obligates the requested State to prosecute for any act, such as perjury, or for any failure to act, such as refusal to answer a question which is not protected by a privilege, in connection with the execution of a request for assistance in the same manner as it would prosecute for such acts or omissions in a proceeding in that State. This obligation applies even though the requested State has been using the procedure of the requesting State in executing the request.

## ARTICLE 11—LOCATING PERSONS

This Article provides for ascertaining the whereabouts and addresses of persons in the requested State, including witnesses and experts, where such information is of importance to the requesting State in connection with an investigation or proceeding, regardless of the availability of compulsory measures.

## ARTICLE 12—SPECIAL PROCEDURAL PROVISIONS

Paragraph 1 requires that the testimony or statement of a person be under oath or affirmation if the requesting State makes an express application therefor, even if the procedural law of the requested State has no provision for either an oath or affirmation. The term "person" does not include a suspect or defendant because, under Swiss law neither a suspect nor a defendant can be compelled to give testimony under oath or affirmation. While not all Swiss cantons authorize the use of an oath, all authorize the use of an affirmation. In recognition of this situation Paragraph 1 equates an affirmation with an oath and authorizes the substitution of an affirmation by the requested State, even where an oath has been requested, if an oath is incompatible with the local law. The Paragraph further provides that such testimony shall be admitted in evidence in the requesting State as though it had been given under oath. This is in accord with the present United States Code. See Title 1, U.S.C., Section 1.

This Paragraph is a modification of Article 3:2 of the ECMA which requires compliance with an express request for an oath if the law of the requested States does not prohibit it, but does not provide for the alternative use of an affirmation. It was agreed that the term person as used in the Paragraph would include both witnesses and experts. It should be noted that under European law an expert is not usually included in the term "witness". If there are no provisions for an oath or affirmation in the procedural laws of the requested State, the time and form of the oath or affirmation shall then be governed by the appropriate procedural provisions in the requesting State. "Time" refers to

the point in the proceeding at which the oath or affirmation is administered. "Form" includes the actual wording of the oath or affirmation and the formalities incident thereto.

Paragraph 2 provides for the presence of a suspect or defendant and his counsel, or both, at the execution of a request whenever the requesting State so requests, thus providing for the right of confrontation. This right of confrontation is consistent with the procedure for authentication of business documents under Article 18:5 and would authorize the presence of the defendant and his counsel when the authentication procedures of Article 20 are used. It also would allow the taking of depositions to preserve testimony on the motion of the prosecution pursuant to the provisions of Title 6 of the Organized Crime Control Act of 1970 (18 U.S.C. 3503), and the proposed amendment of Rule 15, Federal Rules of Criminal procedure, which is presently under consideration by the Advisory Committee on Criminal Rules of the Judicial Conference of the United States.

Paragraph 3.a. provides for the presence of representatives of an authority in the requesting State at the execution of the request if such presence is required by its law to obtain admissible evidence. The provision is intended to authorize the presence of a United States prosecutor at a deposition in Switzerland whenever United States law requires such presence as a condition of admissibility.

Paragraph 3.b. provides that the requested State shall permit the presence of such a representative where it agrees that the complexity of the matter involved or other special factors described in the request for assistance indicate that such presence is likely to substantially facilitate a successful prosecution.

Paragraph 3.c. permits such a presence in other cases, at the discretion of the requested State, upon application by requesting State.

Paragraph 3.d. reserves to Switzerland the right to exclude United States representatives in situations where bank secrets or manufacturing secrets would be disclosed and the requirements for disclosure in Article 10:2 have not been met.

Paragraph 3.e. permits the exclusion of United States representatives at any time during the execution of a request until the Swiss determine whether the requirements for disclosure in Article 10:2 have been met.

Paragraph 4 allows any person whose presence is permitted under Paragraph 2, a suspect or defendant and his counsel, or under Paragraph 3, a representative of the United States, to ask questions which are not improper under the laws of either State. Examples of improper questions would be leading questions, which are not allowed under Swiss law, and questions about former arrests which are not allowed in some United States jurisdictions for the purpose of attacking a defendant's credibility when he chooses to testify.

Paragraph 5 provides that persons giving testimony or statements shall be entitled to retain counsel to assist them if such testimony or statements are sought in accordance with the procedures in the requesting State. Such persons are to be apprised at the beginning of the proceeding of their right to legal counsel. There is a provision for appointment of counsel for such persons, if necessary, but only after the consent of the Central Authority of the requesting State has been obtained. The requirement of consent by the requesting State was considered necessary since under Article 34 the requested State could seek reimbursement from the requesting State for fees paid to appoint counsel. Here it should be noted that the term "persons" could include suspects or defendants, if an oath or affirmation is not required.

Paragraph 6 provides that if the requesting State expressly requests a verbatim transcript the executing authority shall make every effort to comply. This is in recognition of the fact that it may not always be possible to provide for a verbatim transcript.

ARTICLE 13—RESTRICTIONS ON USE OF TESTIMONY

This provision was the subject of considerable discussion at the final round of negotiations. The Swiss wanted to preclude any future use against a person of testimony given by him as a witness in the requested State pursuant to the Treaty. The United States side, on the other hand, argued that testimony obtained from a witness pursuant to the Treaty should, in accordance with the usual legal practice, be available for use in any later criminal proceeding against him in which it is relevant.

Article 13, as adopted, is a compromise between the two divergent views. It provides that the testimony of a citizen of the requested State given in that State as a witness, as distinguished from a suspect or defendant, may not be introduced in evidence against such person in a criminal proceeding in the requesting State, unless at the time of his appearance in the requested State he was advised of his right to refuse testimony under Paragraph 1 of Article 10, e.g., on the basis of possible self-incrimination or any other privilege available in either State.

A specific exception allows the use of such testimony in prosecutions for offenses against the administration of justice, e.g., perjury, contempt of court, and obstruction of justice. Also, the restriction is only applicable if the person appearing as a witness in the requested State is a citizen of that State. Further, since the Article merely states that the testimony "may not be introduced as evidence", presumably it could be used as a basis for formulating questions in a future prosecution in which the witness testified on his own behalf.

ARTICLE 14—EXCLUSION OF SANCTIONS

This Article was adopted at the insistence of the Swiss who were concerned that United States authorities might take recriminatory action against Swiss nationals who failed to cooperate fully in a request under the Treaty. The United States delegation pointed out the difficulty of ascertaining whether a particular action, e.g., denial of a visa, was taken because of failure to cooperate in carrying out a request under the Treaty. Both delegations recognized that in many situations a sanction imposed could result from a number of factors, only one of which involved non-cooperation in a request under the Treaty, and it would, therefore, be difficult to determine how much weight could be attributed to the non-cooperation. Accordingly, the Article, as adopted, precludes any legal sanction being imposed in the requesting State against any citizen of the requested State solely because he refused to give non-compulsory testimony or information or because

compulsory measures had to be applied to obtain such testimony or information. The term "non-compulsory" as used here permits a witness to insist on the use of compulsory measures to obtain his testimony or information and to exercise any right, recognized by the Treaty, to refuse to give such testimony or information. Therefore, the exercise by a witness of any of these rights cannot, of itself, be the basis for the imposition of a sanction against him in the requesting State.

ARTICLE 15—PROTECTION OF SECRECY

This Article reflects the concern of the Swiss that every effort be made to limit access to information provided pursuant to the Treaty which affects a person who appears not to be connected in any way with the offense for which assistance was given. It provides that in such situations, upon application of the requested State, the requesting State shall keep the evidence or information from public disclosure to the fullest extent compatible with the latter State's constitutional requirements. The constitutional requirement of concern here is the public trial provision of the Sixth Amendment to the United States Constitution. In an exchange of letters accompanying this Article there is set forth the understanding of the two States with respect to decisions of the United States Supreme Court interpreting the public trial provision insofar as it would be applicable to testimonal and documentary evidence obtained pursuant to the Treaty. In the case of testimonial evidence, the right of public access appears to be absolute. With respect to documentary evidence, where the proscription against denying public access may not be absolute, the United States has agreed, in an early case under the Treaty, to seek a protective order limiting access to the documents. Access would be limited to the court, jury, prosecution, defendant, and his counsel at the trial and appellate stages. To the extent that the use of a protective order is upheld, the United States has agreed to apply for such orders in handling documentary evidence furnished by Switzerland as to which a request therefor is made pursuant to Article 15. See the exchange of letters to Article 15 and the Technical Analysis thereof.

ARTICLE 16—COURT AND INVESTIGATIVE DOCUMENTS

This Article provides that certain documents and articles shall be made available to the requesting State on the same conditions and to the same extent as they would be available to authorities performing comparable functions in the requested State. It recognizes that because of the difference in legal systems a criminal investigation that would be conducted by a prosecutive authority in one State might be conducted by an administrative agency in the other. In this respect it is broader than Article 13:1 of the ECMA on which it is based.

Paragraph 1:a provides for the furnishing of judgments and decisions of courts. However, this provision has little applicability to courts decisions and judgments in the United States since such records are generally available to the public.

Paragraph 1:b provides, subject to the conditions referred to below, that certain documents, records, and articles of evidence, including grand jury transcripts and official summaries of testimony, be made available to the requesting State.

Paragraph 2 limits the mandatory applicability of Paragraph 1:b to materials that relate solely to a closed case. With respect to such cases, official summaries of evidence in Swiss court files and grand jury transcripts in the United States (in both federal and state proceedings) are required to be furnished to the requesting State to the same extent and under the same conditions as they would be furnished to comparable authorities in the requested State. With respect to open or active cases the materials will only be made available when, and to the extent, determined by the Central Authority of the requested State in its discretion.

ARTICLE 17—COMPLETENESS OF DOCUMENTS

This Article provides that all documents and records furnished pursuant to a request for assistance shall be complete and in unedited form except to the extent banking secrecy or Article 3 applies. Nevertheless, where banking secrets, manufacturing and business secrets (the Swiss doctrine of economic espionage) are involved, complete and unedited documents and records must be furnished by Switzerland if under Article 10:2 Switzerland is required to transmit evidence or information on these grounds, except to the extent Article 3:1:a is applicable. In general, Switzerland cannot refuse if the person affected by the secrets is connected with the offense or the three conditions listed in Article 10:2 (serious offense, evidence of significance, reasonable but unsuccessful efforts to obtain evidence) are met. This requirement for complete and unedited documents and records, or extracts from documents or records, will help assure their admissibility into evidence in the United States.

Article 3:1:a generally permits the refusal of assistance in cases where the requested State considers that the execution of the request is likely to prejudice its sovereignty, security or similar essential interests. However, Article 3:2 requires the requested State, before refusing a request pursuant to Paragraph 1, to determine whether assistance can be given subject to such conditions as it deems necessary, which could include the editing of records.

Article 17 also provides, following the ECMA, that upon the application of the requesting State, the requested State shall make every effort to furnish original documents and records. However, it should be noted that in many cases original documents and records are not required for admissibility in the United States. See Technical Analysis of Articles 18 and 19.

ARTICLE 18—BUSINESS RECORDS

This Article sets forth the procedures to be employed in obtaining business records or copies thereof in a manner that will render them admissible in evidence without the necessity of an authenticating witness identifying them in the courts of the requested State. With respect to the United States, this Article was designed to establish a rule of evidence for federal and state courts. It was adopted so that bankers and other business personnel would not have to appear in courts in the requesting State to identify records in order to render them admissible under applicable procedural law. This Article is in

contrast to Article 17 of the ECMA which requires no form of authentication.

Paragraph 1 is based on the language contained in several United States statutes. The types of documents to which this Article relates are specifically set forth in the first sentence of Paragraph 1, which is taken from 18 U.S.C. 3491 dealing with foreign business records and their admissibility into evidence in a criminal proceeding in the United States. Official documents provided for in Article 19 are specifically excluded. The second part of the sentence obligates the requested State to require production of the requested document pursuant to a procedural document, if the requesting State specifically so requests. The term "procedural document", rather than "subpoena *duces tecum*", was used because it encompasses the processes for compelling production of documents in both States. In this regard see the exchange of letters accompanying Article 22 and the Technical Analysis thereof.

The second sentence of Paragraph 1 requires the executing official in the requested State to obtain specified testimony concerning the genuineness of the document. This is analogous to 18 U.S.C. 3493 which requires a United States consular official to take testimony concerning the genuineness of certain foreign documents. Four specific determinations are to be made by the executing official. The document must be found to be genuine, a requirement found in 18 U.S.C. 3492 and 3494. Further, the document must have been made as a memorandum or record of the act, transaction, occurrence or event which it purports to record; it must have been made in the regular course of business; and it must be shown that it was the regular course of such business to make such document at the time of the act, transaction, occurrence or event or within a reasonable time thereafter. The latter three requirements are contained in 28 U.S.C. 1732, the shopbook rule, and incorporated by reference in 18 U.S.C. 3492.

The requirements of Paragraph 2, that a record be made of testimony taken concerning the authenticity of the document and that the testimony be attached to the document, are modelled after the analogous provisions of 18 U.S.C. 3493.

Paragraph 3 requires the official to certify as to the procedures followed and the determinations made pursuant to Paragraph 1 and to authenticate by his attestation the document, or copy thereof or extract therefrom, and the record of testimony taken. These provisions are similar to those found in 18 U.S.C. 3494 and Rule 44(a)(2) of the Federal Rules of Civil Procedure (F.R.C.P.). 18 U.S.C. 3494 requires the designated U.S. consular official to certify that the document is genuine if he is so satisfied, and Rule 44(a)(2) provides for attestation of genuineness as well as certification. While there is no precise statutory precedent for requiring a certification as to the procedures followed, such a requirement can be inferred from 18 U.S.C. 3492(a).

Paragraph 4 specifies who may certify as to the genuineness of the signatures when the authenticated document is being transmitted. This Paragraph also provides for certification as to the genuineness of the signature and the official position of the attestor and each person in the chain of custody. Alternate individuals who may make the final certification include those individuals or officials specified in Rule 44(a)(2) F.R.C.P. as well as those specified in 18 U.S.C. 3494.



Paragraph 5 provides for the right of a defendant to confrontation, in those situations where criminal charges have been filed, by permitting the defendant to be present personally and represented by counsel and to examine the person producing the document as to its genuineness and admissibility. When the defendant elects to be present, or represented, this Paragraph also permits a representative of the requesting State, or a state or canton thereof, to be present and put questions to the witness. The concept of representation of all parties in this type of proceeding follows 18 U.S.C. 3492(a).

Paragraph 6, in providing for the admissibility into evidence of duly authenticated documents, without any additional foundation or authentication, is analogous to 18 U.S.C. 3491. Other evidentiary tests, such as materiality and relevancy, must still be complied with. With respect to the United States, this provision was designed to be self-executing to avoid the need for implementing legislation. Thus it establishes an evidentiary presumption binding on federal and state courts.

Paragraph 7 places the burden on any party to a proceeding who denies the genuineness of a document authenticated pursuant to this Article to establish to the satisfaction of the court at the time the document is offered in evidence that it is not genuine. Thus, documents authenticated pursuant to this Article, and not otherwise inadmissible, would be admitted into evidence, unless the defendant meets his burden of establishing that the documents are not genuine. This requirement is based upon 18 U.S.C. 3491.

### ARTICLE 19—OFFICIAL RECORDS

Article 19 is based upon the foreign official records provision of 28 U.S.C. 1741, which incorporates the provisions of Rule 44(a)(2) of the Federal Rules of Civil Procedure (F.R.C.P.). By implication this Article imposes an obligation on the requested State to obtain the document by use of a procedural document, if necessary.

Paragraph 1 requires attestation of the fact that the document is authentic, in similar fashion to Rule 44(a)(2) F.R.C.P. The second sentence requires the individual attesting to sign and state his official position. The third sentence requires that the seal of the authority executing the request be affixed to the document furnished. These requirements combine provisions of Rule 44(a)(2), F.R.C.P., and 18 U.S.C. 3494. The procedures for certification when the document is transmitted, set forth in Article 18:4, are to be followed.

Paragraph 2 provides for the admissibility into evidence of documents obtained through use of the procedures set forth in this Article without additional authentication or foundation. It is based upon 18 U.S.C. 3491 and, as under that provision, the materiality and relevancy tests must still be complied with. It also allows for any less stringent admissibility requirements which may exist under the law in the requesting State. Thus, a document might be admissible in evidence in courts in the requesting State if the procedures followed complied with local law, even though all the requirements of this Article were not met. A provision similar to that in Article 18:7 was deemed unnecessary with respect to foreign official documents in view of the case law under

Rule 44(a)(2), F.R.C.P., and 28 U.S.C. 1741 which would allow any party to contest the authenticity of a foreign official document.

With respect to the United States, this Article like Article 18, was designed to be self-executing to avoid the need for implementing legislation. Thus it establishes a rule of evidence for federal and state courts, without in any way affecting the continued vitality of any other provisions for the admissibility of foreign official documents, such as those contained in 28 U.S.C. 1741.

ARTICLE 20—TESTIMONY TO AUTHENTICATE DOCUMENTS

This Article authorizes the Central Authority of the requested State to serve a procedural document on persons to appear in that State before representatives of the requesting State or its states or cantons and to produce and give testimony with respect to documents, records or articles of evidence. This authority is conditioned on the procedure being necessary for the admissibility into evidence of the materials in a criminal proceeding in the requesting State. With respect to requests to Switzerland, this provision is necessary to enable representatives of the requesting State to perform a "judicial act" in the requested State.

Paragraph 1 refers to testimony with respect to documents, records or articles of evidence supplied by the requested State and includes materials previously furnished which were not authenticated at that time. This Article would, for example, enable the provisions of 18 U.S.C. 3491–3496 to be used in Switzerland to authenticate documents. Without such a treaty provision, Switzerland would not allow a foreign official (U.S. consular officer under 18 U.S.C. 3491) to perform a judicial act on its territory. The right of confrontation is provided for by Article 12:2 which has general applicability to the Treaty.

Paragraph 2 gives the requested State the right to have a representative present at the taking of testimony, in order to object to questions which are either incompatible with the law and practices in that State or which go beyond that which is needed for admissibility into evidence.

The exchange of letters accompanying this Article and Article 18 sets forth the understanding that the questions asked are not to go beyond the scope of Paragraph 1, insofar as they relate to the genuineness and the admissibility of the documents, records or articles of evidence. The exchange of letters sets forth six areas of permissible questioning, which are generally in accord with the requirements of 28 U.S.C. 1732 and 18 U.S.C. 3491–3496 with respect to the authentication of business records.

Since Articles 18 and 20 both pertain to foreign business records it might be well to note how they differ. First, under Article 18 the authentication proceeding is before an official of the requested State, whereas under Article 20 the proceeding is before a representative of the requesting State in the requested State. Second, Article 18 imposes a mandatory duty on the requested State whereas Article 20 merely authorizes the requested State to allow a representative of the requesting State to carry out the authentication procedure in the requested State. Third, Article 18 pertains only to business records, whereas Article 20 also covers other records and articles of evidence.



ARTICLE 21—RIGHTS IN ARTICLES OF EVIDENCE

This Article provides for the disposition of documents, records or articles of evidence upon the completion of their use in the matter for which they were furnished. It provides that right, title or interest in such items is governed by the law of the place where the rights were acquired. It makes clear, however, that the obligation for production or surrender of such items under this Treaty takes precedence over the rights of the requested State and third parties, which rights remain otherwise unaffected.

ARTICLE 22—SERVICE OF DOCUMENTS

This is a procedural Article which is similar to Article 7 of the ECMA. "Procedural documents" do not include arrest warrants since they are specifically excluded from the Treaty by Article 2:1:a. The exchange of letters on this subject, which accompanies the Treaty, specifies that the phrase "procedural documents" includes subpoenas and summonses.

Paragraph 1 of this Article creates an obligation on the part of the Central Authority of the requested State to effect service of procedural documents. It is anticipated that when the United States is the requested State, any requested personal service will be effected by the United States Marshals Service.

It is contemplated that service under the Treaty will be made by registered mail in the absence of a specific request. However, since United States criminal procedure generally requires personal service, it is anticipated that the United States will usually request service in that manner. Personal service is consistent with Swiss law and is provided for in Paragraph 1 of this Article.

Paragraph 2 provides that the requested State may refuse to effect service on a national, other than a national of the requesting State, calling for his appearance in the requesting State in a proceeding in which he is a defendant. The Swiss considered this provision to be required by their law and policy. This Paragraph has no applicability to extradiction or arrests since they are specifically excluded from the Treaty by Article 2:1:a.

This Article is not a limitation on Section 1783 of Title 28 of the United States Code, which authorizes the issuance of subpoenas in criminal proceedings to citizens and nationals of the United States who are in a foreign country, because of the provisions of Article 38. Article 22 should facilitate the service of subpoenas issued for citizens and nationals of the United States who can be located in Switzerland.

The limitations on service contained in the Treaty are applicable only when the Treaty is utilized to effect service. See the Technical Analysis of the exchange of letters which accompanies this Article and the Analysis of Article 24 as to the effect of a document served pursuant to this Article.

ARTICLE 23—PERSONAL APPEARANCE

This Article was taken from Article 10 of the ECMA with few changes. The Swiss Delegation stated that Swiss law would not permit

a defendant to appear and that exception was accordingly written into Paragraph 1. The request may be refused by the person served and appearance in the requested State is not obligatory. This Article is related to Article 22 in that at the time of the request for service, a specification must be made if personal appearance is desired and the subject matter of the interrogation indicated.

Paragraph 2 imposes an obligation on the requested State to invite the person to appear and apprise the requesting State of the response. See the Analysis of Article 24 as to the effect of service.

The requesting State is obligated to indicate in the request the kind and amount of allowances and expenses payable. Such allowances and expenses would include appropriate travel and subsistence expenses as well as witness fees. Paragraph 3 of this Article provides for advance payment which, if made, would be deducted from the amount otherwise due.

ARTICLE 24—EFFECT OF SERVICE

Article 24 generally follows Article 8 of the ECMA with respect to the person served being free to refuse to go to the requesting State without incurring any penalty. An exception is made for citizens and nationals of the requesting State. Under the exception, the provisions of 28 U.S.C. 1783 and Rule 17(e)(2), Federal Rules of Criminal Procedure, would be applicable and a United States citizen or national personally served by the Swiss under the Treaty would be subject to contempt penalties under 28 U.S.C. 1784 for failure to comply with a subpoena. Under 28 U.S.C. 1783, a U.S. Court may order the issuance of a subpoena directed to a United States citizen or national in a foreign country if the court finds that particular testimony or the production of a specified document by the witness is necessary in the interest of justice.

This Article does not cover execution of arrest warrants since they are specifically excluded from the Treaty by Article 2:1:a.

Paragraph 2 provides that the law of the requesting State will determine whether failure to accept or comply with a procedural document permits any action to be taken in the proceeding from which the document arose. The applicability of this Paragraph is not restricted to nationals of the requesting State.

Paragraph 3 provides that service of a procedural document, pursuant to this Article, on a person, other than a national of the requesting State, does not confer jurisdiction in the requesting State.

ARTICLE 25—COMPELLING TESTIMONY IN REQUESTING STATE

This Article has no known counterpart in any international agreement to which the United States is a party or in the ECMA.

Paragraph 1 provides that a person appearing in the requesting State pursuant to a procedural document served under the provisions of this Treaty may not be compelled to give testimony, make a statement or produce a document, record or article of evidence if under the law in either State he has a right to refuse. This right to refuse must be based upon a recognized privilege, or other legal basis, under the law in either State. It is deemed to exist in the requested State only to the extent that it would be recognized there if the conduct involved in the investigation or proceeding had been committed in its jurisdiction. The right of refusal under the law in the requesting State is consistent with United States jurisprudence under which constitutional and other testimonial privileges are available to citizens and aliens alike. The provision for a right of refusal under the law in the requested State is in recognition of the assistance rendered by it to the requesting State.

Paragraph 2 does not deal with a privilege in the usual sense but pertains to banking secrecy, and business and manufacturing secrets in the maintenance of which Switzerland may claim to have an essential interest. It allows the witness to refuse to answer or produce articles of evidence in those situations in which the Swiss Central Authority could decline to transmit evidence or information pursuant to Article 10:2 and 3. As explained with respect to Article 10, Article 273 of the Swiss Penal Code is not applicable to the disclosure of information in Swiss legal proceedings since it only proscribes disclosure of business secrets to a foreigner. Article 273 has applicability here only to the extent that the disclosure affects a person unconnected with the offense and the conditions of Article 10:2 are not met.

Paragraph 3 requires the requesting State to rely on a certification by the requested State as to the existence of a right to refuse claimed under the law in the requested State or as to the applicability of the restrictions of Paragraph 2. In the latter situation, the requesting State makes its own determination as to the applicability of Subparagraphs a, b, and c of Article 10:2, after considering the certification of the requested State. See Technical Analysis of Article 10.

ARTICLE 26—TRANSFER OF ARRESTED PERSONS

This Article is based on Article 11 of the ECMA.

Paragraph 1 provides for the transfer to the requesting State of a person held in custody.

Paragraph 2 provides that the person shall be made available if he consents, no substantial extension of his custody is anticipated, and the requested State concludes that there are no other important reasons against transfer.

Paragraph 3 provides for the postponement of the transfer for as long as the person's presence is necessary in the requested State.

The United States Delegation expressed concern that it might have difficulty in returning an individual should he appeal to United States courts to prevent his return, especially if he were a United States citizen. The United States Delegation therefore proposed Paragraphs 4 and 5 to alleviate this problem. Paragraph 4 provides the United States with authority to retain the individual in custody even though the basis for custody is a foreign judgment of commitment. Paragraph 5 is intended to make clear that the United States would have the necessary authority to return a United States citizen.

The United States Delegation noted that despite Paragraphs 4 and 5 a delay could arise in the return of a person should he appeal to the United States courts. The Swiss Delegation acknowledged their understanding of the foregoing, particularly with reference to United States citizens, and indicated that this would be weighed in deciding whether to grant the request. The Swiss Delegation expressed the view that

Switzerland would probably grant the request if the individual were not being held on serious charges.

ARTICLE 27—SAFE CONDUCT

This Article is based on Article 12 of the ECMA.

Paragraph 1 provides that a person appearing in the requested State pursuant to legal process served under the Treaty shall not be prosecuted or detained with respect to any act or conviction which preceded his departure from the requested State. Paragraph 1 has no applicability to an arrested person transferred pursuant to Article 26.

Paragraph 2 provides that the restrictions of Paragraph 1 do not apply to a person appearing to answer a criminal charge. Such a person may be tried and sentenced for an offense specified in the document calling for his appearance, or for a lesser included offense. Since extradition proceedings and execution of arrest warrants are specifically excluded from the Treaty by Article 3:1.a., the document served under the Treaty pursuant to which the person is appearing would have to be some form of notice such as the summons provided for in Rule 4, F. R. Cr. P.

Paragraph 3 imposes on the safe conduct provided in Paragraph 1 a time limitation which begins to run after notification that appearance is no longer required.

ARTICLE 28—CENTRAL AUTHORITY

This Article establishes a Central Authority for each State. Appropriate requests are to be transmitted by one Central Authority directly to the other to request assistance under the Treaty. The Central Authority of the requested State transmits such requests to its appropriate federal, state or cantonal court or authority for execution.

Paragraph 1 establishes the Division of Police of the Federal Department of Justice and Police in Bern and the Attorney General or his designee as the Central Authorities for Switzerland and the United States respectively.

Paragraph 2 requires that requests for assistance be approved by the Central Authority of the requesting State. It was understood that some discretion would be exercised by the Central Authority of the requesting State not only as to the form and content but also as to the number and priority of requests which would be sent to the requested State. Requests approved by the Central Authority are made by that Authority to the requested State on behalf of federal, state or cantonal courts and authorities which have been authorized to investigate or prosecute offenses.

The term "authorities" as used in Paragraph 2 is intended to include prosecutors, police officials and administrative agencies at the federal, state and cantonal levels.

Paragraph 3 provides for direct communications between the Central Authorities for the purpose of facilitating the carrying out of the provisions of the Treaty.

ARTICLE 29—CONTENT OF REQUESTS

This Article is similar to, but much more detailed than, Article 14 of the ECMA.

Paragraph 1 requires that the request indicate the name of the authority conducting the investigation or proceeding, and insofar as possible, the subject matter and nature of the investigation or proceeding and, except in cases of requests for service, a description of the essential acts or omissions alleged or sought to be ascertained. It also requires that the request indicate the principal need for the evidence or information sought and data with respect to the identification of the persons who are the subject of the investigation or proceeding.

Paragraph 2 requires, to the extent necessary and insofar as possible, identifying data with respect to the person to be located or from whom information or evidence is being sought; the particular procedure to be followed; whether sworn or affirmed testimony or statements are required; a description of the information, statement or testimony sought; a description of the materials to be produced or preserved as well as a description of the appropriate person to produce them and the form in which the materials should be reproduced and authenticated. With respect to a person whose appearance in the requesting State is sought, the allowances and expenses to which he would be entitled are to be set forth. In this context, see Technical Analysis of Article 23.

ARTICLE 30—LANGUAGE

This Article is similar to provisions in extradition treaties requiring that requests for assistance and all accompanying documents be transmitted with a translation into the language of the requested State. At the request of the United States Delegation, the Swiss Delegation agreed that translation would be into the French language unless the use of German or Italian was specifically requested by the Swiss. The Treaty does not require the preparation of an official translation.

ARTICLE 31—EXECUTION OF REQUESTS

This procedural Article provides for immediate notification as to requests which, in the opinion of the requested Central Authority, do not comply with the provisions of the Treaty. While awaiting the receipt of a satisfactory request, the requested Central Authority is authorized, in its discretion, to take such preliminary action as it deems advisable. For example, it might take action to preserve or obtain documents or testimony which might otherwise be lost.

The Treaty contemplates that requests which comply with the Treaty will then be transmitted by the requested Central Authority to the appropriate federal, state, cantonal, or other local authority for execution. This Article also contains language intended to insure that the power necessary to execute a request is available to the assigned authority.

Paragraph 3 imposes an obligation on the executing authority to issue, when necessary, a subpoena or other procedural documents in order to carry out the request. For example, this would authorize and require the federal, state or local agency or authority, selected as appropriate by the Central Authority, to take whatever action would be necessary to effect the request. The selected authority could be a court or law enforcement agency, or both.

Paragraph 4 provides for the use of an appropriate private party to execute a request when the circumstances so require.

Paragraph 5 provides that a request shall be executed as promptly as circumstances permit.

ARTICLE 32—RETURN OF COMPLETED REQUESTS

This procedural Article is based in part on Article 6 of the ECMA. Paragraph 1 provides for the return, by the executing authority, of the original request and all information obtained pursuant thereto, to its Central Authority and thence to the requesting Central Authority. It is intended to establish a chain of custody for evidentiary purposes.

Paragraph 2 provides that the requested State may delay delivery of items covered by a request where they are needed in an official action pending in the requested State and in case of documents or records, copies have been offered to the requesting State.

ARTICLE 33—INABILITY TO COMPLY

The concepts contained in this procedural Article expand on those in Article 7 of the ECMA. When a request cannot be fully complied with, this Article requires the requested State to promptly inform the requesting State of the reasons therefor. Inability to comply may result from the limitations of the Treaty, inability to locate the person sought, inability to locate the evidence sought, or other physical impediments.

ARTICLE 34—COSTS OF ASSISTANCE

This Article lists certain classes of expenses which, upon application of the requested State, will be paid or reimbursed by the requesting State. All other expenses will be borne by the requested State or its states or cantons, and reimbursement from the requesting State is not to be claimed therefor.

The expenses which the requesting State must, upon request, pay or reimburse are:

(*a*) Travel expenses.
(*b*) Fees of experts.
(*c*) Costs of stenographic reporting by other than salaried government employees.
(*d*) Costs of interpreters.
(*e*) Costs of translation.
(*f*) Fees of private counsel appointed with the approval of the requesting State for a person giving testimony or for a defendant.

Paragraph 3 specifically provides that all expenses incurred in relation to a request pursuant to Article 26, which provides for the transfer of arrested persons for the purpose of having them appear as a witness or for purposes of confrontation before an authority in the requesting State, shall be borne by that State.

This Article also provides that the requested State may not require any bond, guaranty or security for expected costs.

ARTICLE 35—RETURN OF ARTICLES OF EVIDENCE

This Article requires the return of original records, documents or other articles of evidence delivered in execution of a request unless the requested State indicates that such will not be necessary. If there is ownership of such items in the requesting State, an appropriate authority in that State has the right to retain them and dispose of them pursuant to its laws unless there is an unsecured claim on the item by a person in the requested State.



ARTICLE 36—NOTICE

This Article requires that notification shall be given by the requested State to any person from whom information, documents or articles of evidence are sought; any suspect or defendant who resides in the requested State, if the law in the requesting State so requires and the requesting State so requests; and any defendant, where the law in the requested State so requires.

The United States may request that a suspect or defendant be given an opportunity to participate in a proceeding in Switzerland in order to make the evidence obtained admissible in the United States. For example, 18 U.S.C. 3491–3496 provides for the admissibility of foreign documents under certain conditions. One condition is that a United States court must grant an application for a commission to obtain evidence on the basis of written or oral interrogatories. In the case of oral interrogatories, the defendant must be permitted to be represented by counsel of his choosing. If the defendant is in Switzerland, the United States may request that Switzerland notify the defendant of the request for assistance.

Subparagraph c provides for notice to a defendant in a criminal proceeding where the law in the requested State so requires. This provision was inserted at the request of Switzerland, since in its view there may be cases where the assistance to be furnished is unusual, necessitating notice to the defendant. Such a case may be the special assistance provided in connection with organized crime.

ARTICLE 37—REVIEW OF DETERMINATIONS

This Article governs the rights of persons to appeal determinations with respect to requests for assistance pursuant to the Treaty. Separate provisions were necessary for each country because of differences in legal requirements. Enforcement of the provisions of the Treaty is a matter for the Contracting Parties and does not give rise to any right on the part of defendants, subjects, witnesses or other persons to obtain judicial relief except as specifically provided therein.

With regard to actions in the United States, Paragraph 1 provides that except for rights with respect to:

(*a*) searches and seizures (Article 9:2);
(*b*) privileges in connection with requested testimony (Article 10:1);
(*c*) restrictions on use of testimony (Article 13);
(*d*) rights to question the genuineness of documents furnished pursuant to the Treaty (Article 18:7);
(*e*) limitations on compelling testimony in the requesting State (Article 25:1);
(*f*) limitations in the Treaty on the transfer of persons (Article 26); and

(*g*) provisions in the Treaty on safe conduct of witnesses (Article 27);

the restrictions in the Treaty shall not give rise to a right on the part of any person to take action to suppress or exclude evidence or to obtain other judicial relief.

Paragraph 2 provides that the right to and procedures for appeals in Switzerland against decisions of Swiss authorities in connection with requests under this Treaty shall be regulated by Swiss domestic legislation. It is understood that Switzerland is considering the need for special legislation to establish procedures under this Article. Presumably such legislation could be based upon Swiss practice which permits various interested parties to appeal determinations to furnish assistance under a mutual assistance treaty or to appeal determinations to exchange information under a tax convention. Any resulting legislation would in no way reduce Switzerland's obligation to furnish assistance required by the Treaty.

Paragraph 3 provides a remedy to any person who claims that a State, either as the requesting or requested State, has failed to comply with its obligations under the Treaty and no other remedy is available under Paragraph 1 or 2 of this Article. The remedy is to inform the Central Authority of the other State and if that State deems an explanation necessary, an inquiry will be made to the other State and, if necessary, the matter will be resolved under the consultation and arbitration provisions of Article 39.

ARTICLE 38—EFFECT ON OTHER TREATIES AND MUNICIPAL LAWS

Paragraph 1 of this Article provides that whenever the procedures provided by this Treaty would facilitate assistance in criminal matters between the United States and Switzerland provided under any other convention or under the law in the requested State, the procedure provided by this Treaty shall be used to furnish such assistance. For example, the United States and Switzerland are parties to a convention dealing with the suppression of narcotics which provides for assistance in very general terms. Whenever assistance under that convention is to be provided, the requested State is required to use the more detailed procedures of this Treaty if to do so would facilitate the furnishing of assistance.

Paragraph 1 also provides that the assistance and procedures provided by this Treaty shall be without prejudice to any available under any other international convention or arrangement or under the municipal laws in the Contracting States.

Paragraph 2 provides that the Treaty shall not prevent either Switzerland or the United States from conducting investigations and proceedings in criminal matters in accordance with its own law. This means that the Treaty does not in any way limit or restrict any procedures that otherwise are or may become available.

Paragraph 3 provides that the Treaty shall take precedence over any inconsistent provisions of the municipal laws in either Switzerland or the United States. The effect of this general provision is subject to other provisions of the Treaty which specifically recognize the applicability of municipal law in certain limited situations. For example, see the Technical Analysis of Articles 3 and 10 for an explanation of the relationship of the Swiss doctrines of economic espionage and banking secrecy to the Treaty.

Paragraph 4 states that with respect to furnishing of information for use in cases concerning income taxes, the 1951 income tax convention between the United States and Switzerland governs exclusively, except for matters covered by Chapter II of the Treaty (organized crime). The obligation of Switzerland to furnish information to the United States under the tax convention is set forth in Article 16 of that convention and was construed in a decision published by the Swiss Federal Court on December 23, 1972.



ARTICLE 39—CONSULTATION AND ARBITRATION

Paragraph 1 provides for direct exchange of views between the representatives of the Central Authorities on interpretation, application or operation of the Treaty. Such provisions are common in technical agreements or treaties, enabling the persons directly responsible to exchange views without the necessity of employing the diplomatic channel.

Paragraphs 2 thru 6 set forth the procedures for resolution of disputes which may arise as to the interpretation or application of the Treaty. These paragraphs outline a commonly employed procedure for compulsory arbitration which, as provided in Paragraph 7, is binding on both parties.

ARTICLE 40—DEFINITION OF TERMS

Paragraph 1 of this Article defines a number of terms frequently used in the Treaty.

Paragraph 2 permits the use of a hand stamp by an authority other than the Central Authority in meeting the requirements for a seal.

Paragraph 3 provides that the expression "articles of evidence" shall not be construed to exclude items which may not be admissible in evidence.

Paragraph 4 was included in the Treaty at the request of Switzerland to assure that a number of provisions relating to the admissibility of evidence which were included in the Treaty at the request of the United States would not affect the principle of free consideration of evidence which is applicable in Swiss courts. Under that principle a Swiss court is free to admit or exclude any evidence.

Paragraphs 5–10 define or explain certain terms frequently used in the Treaty.

ARTICLE 41—ENTRY INTO FORCE AND TERMINATION

The provisions of this Article are standard entry into force and termination provisions. The five year termination provision is not unusual for treaties involving technical matters.

Paragraph 2 contains language making the provisions of the Treaty retroactive in application to acts or omissions committed before the entry into force of the Treaty.

### Schedule

The Schedule's importance relates to the obligation to use compulsory measures as set forth in Article 4. Except where the organized crime provisions are applicable, the offenses listed in the Schedule are the only offenses for which compulsory measures are required to be applied. Compulsory measures are also to be used pursuant to Article 4:3, if the request relates to any acts which constitute an offense in both countries, although not listed in the Schedule, and the requested State determines that the importance of the offense justifies their use.

The Swiss desired the inclusion of a list of offenses due to their lack of familiarity with criminal offenses in the United States. Compulsory measures would automatically be required, assuming dual criminality, if the offense is included in the list. In addition, the Schedule may prove useful to the United States in ameliorating problems resulting from differences in terminology and classification of offenses.

Certain offenses listed in the Schedule, particularly certain offenses under the United States Code, have no exact counterpart in Swiss law. Accordingly, the listing of these offenses in the Schedule, together with provisions of Article 4:2, should facilitate the granting of assistance in cases where the elements are not identical in both countries. For example, fraud is a crime in Switzerland and a state and federal crime in the United States. However, it is only a federal crime in the United States, if an additional jurisdictional element, such as use of the mails, is present. The existence of this additional element would not dispense with the requirement that compulsory measures be used in connection with a request for assistance by the United States in a mail fraud investigation (see Item 35 of Schedule).

The majority of the offenses listed in the Schedule are those which are routinely included in extradition treaties. No specific comment is therefore necessary with the exception of the following:

21—Since SEC-type offenses are not generally comprehended under Swiss law, dual criminality does not exist and they were not included in the Schedule as such. The offenses listed in this Item, not often found in extradition treaties, were proposed by the United States Delegation to cover Swiss offenses which are counterparts of SEC offenses under United States law and not covered elsewhere in the Schedule, such as under the fraud provision. For this reason, these offenses were taken directly from Swiss law. In order to determine the applicability of a given fact situation to these offenses, it was agreed by both delegations that Swiss law would determine whether the fact situation contained the necessary elements required thereunder to constitute an offense under Item 21.

26—While Swiss law establishes certain gambling offenses, they are generally considered to be minor unless the gambling-type activity is conducted as a business. Accordingly, for this provision to be operative a United States request for assistance will have to describe a fact situation in which the activity is conducted as a business.





### Exchange of Letters with Respect to Articles 3, 9, 10, 12, and 25

This exchange of letters sets forth the relationship of the Treaty to the Swiss doctrines of banking secrecy and economic espionage (manufacturing or business secrets as covered by Article 273 of the Swiss Penal Code). Generally, banking secrecy and economic espionage will not limit the assistance available under the Treaty unless under Article 10:2 a person unconnected with the offense forming the basis for the request is involved and three conditions (serious offense, substantial significance, reasonable but unsuccessful efforts) have not been met. Nevertheless, in exceptional circumstances the requested State may, pursuant to Article 3:1:a., refuse to disclose facts which a bank is ordinarily required to keep secret where such disclosure would prejudice its "essential interests".

See the Technical Analysis of Articles 3 and 10 for further discussion of this matter.

### Exchange of Letters with Respect to Article 5

This exchange of letters reflects a number of understandings which were reached during the negotiations concerning the applicability of Article 5 in a number of different situations. An explanation of the material discussed therein is contained in the Technical Analysis of Article 5.

### Exchange of Letters with Respect to Article 10:2

This exchange of letters explains the meaning of the term "serious offense" as used in Article 10:2:a. Paragraph 2 of that Article deals with the obligation of the Swiss Central Authority to provide evidence or information which would disclose banking, manufacturing, or business secrets affecting a person who appears not to be connected in any way with the offense which is the basis of the request. Item a of Article 10:2 is the first of three conditions which would have to be satisfied before the Swiss are obligated to supply the requested information. It specifies that the request must concern "the investigation or prosecution of a serious offense."

The letter provides some standards for determining whether an offense is "serious". Certain offenses, such as murder and voluntary manslaughter, are presumed to be serious in the absence of clear indication to the contrary. Likewise, offenses involving the use of violence or weapons, those committed by a gang, and those resulting in serious harm to the victim are also presumed to be serious.

Whether offenses involving illegal traffic in certain drugs, poisonous chemicals, weapons, and explosives are "serious" would in each case depend upon the nature and quantity of the materials, the nature of the alleged crime, and other activities of those involved.

Property offenses involving an amount in excess of $1,000 would be considered "serious".

Whether the offenses referred to in Item 34 (attempt, conspiracy, participation or accessory after the fact) and Item 35 (additional federal jurisdictional elements such as use of the mails) of the Schedule are "serious" will be determined by considering the underlying offenses.

Case 1:22-cr-00392-DLF Document 680-2 Filed 10/08/26 Page 18 of 18

Where an individual connected with organized crime is involved, the acts of violence or other serious offenses committed by his organized criminal group shall be taken into account in determining the seriousness of the offense.

EXCHANGE OF LETTERS WITH RESPECT TO ARTICLE 15

This exchange of letters was agreed upon in order to set forth the applicability of the public trial provision of the Sixth Amendment to the United States Constitution with respect to testimonial and documentary evidence furnished under the Treaty. The letters also deal with situations in which the United States believes access might be limited, as well as one area where it agreed to seek a judicial determination as to the extent, if any, limitation on access would be possible.

The United States letter sets forth the full text of the Sixth Amendment with appropriate underlining of the public trial provision. Its applicability to testimony, including testimony taken in Switzerland pursuant to the Treaty and offered in evidence in a criminal trial in the United States, is discussed. It concludes that federal court interpretations of the public trial provision indicate that any attempt to bar public access to testimony relating to the guilt or innocence of an individual being prosecuted would be unconstitutional.

With respect to documents relating to guilt or innocence, the letter notes that the public trial provision may not be absolute. Accordingly, the United States has agreed to seek a protective order in an appropriate early case in which documentary evidence is furnished by Switzerland. The protective order would seek to limit access at the trial and appellate stages to the documentary evidence, as distinguished from the oral testimony with respect thereto, to the court, jury, prosecution, defendant, and his counsel. The United States further agreed, to the extent that the use of a protective order is upheld by United States courts, to apply for such orders in handling documentary evidence furnished pursuant to the Treaty, if Switzerland makes an application under Article 15.

Further, the United States letter notes that a defendant in a criminal proceeding may voluntarily request to waive his right to a public trial which request, if granted by the court, would result in limiting public access to evidence and information obtained from Switzerland.

In the letter the United States also agreed, regardless of the extent to which secrecy is permitted during the trial or appeal that, after completion of the trial or appeal, it will seek to have the court seal those parts of the official record which consist of materials obtained from Switzerland, if an application is made by Switzerland under Article 15.

The Swiss response acknowledges the United States explanation of the applicability of the public trial provision and expresses the hope that United States efforts to obtain a higher degree of protection for evidence and information will be successful and further expresses the hope that as the United States legal system evolves, the protection will go beyond the limits indicated in the United States letter.

EXCHANGE OF LETTERS WITH RESPECT TO ARTICLES 18 AND 20

This exchange of letters sets forth the understanding that the questions which may be asked by representatives of the requesting State



under Articles 18 and 20, or by the defendant or his counsel under Article 18 will not go beyond those which are necessary for the authentication of business records so as to establish their genuineness and admissibility under the shop-book rule, 28 U.S.C. 1732, and the foreign business records statute, 18 U.S.C. 3491, et. seq. The exchange of letters indicates general areas of questioning which would be appropriate for these purposes.

While Article 18 relates only to business records, Article 20 is applicable to other records and articles of evidence. For a comparison of the two Articles see the Technical Analysis of Article 20.

EXCHANGE OF LETTERS WITH RESPECT TO ARTICLE 22:1

At the request of the United States Delegation, the Swiss Delegation agreed to an exchange of letters specifically defining the term "procedural documents" as including but not limited to subpoenas and summonses to appear or to appear and produce documents in the requesting State. It is understood that this definition does not include warrants of arrest, since they are specifically excluded by Article 2:1:a.

(This *Technical Analysis* was prepared by the members of the U.S. Government negotiating team, which consisted of representatives from: The Department of State, The Department of the Treasury, The Department of Justice, The Securities and Exchange Commission, July 9, 1973.)

○