AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO


105TH CONGRESS 2nd Session | SENATE | EXEC. RPT. 105–22

# MUTUAL LEGAL ASSISTANCE TREATIES WITH AUSTRALIA, BARBADOS, BRAZIL, CZECH REPUBLIC, ESTONIA, HONG KONG, ISRAEL, LATVIA, LITHUANIA, LUXEMBOURG, POLAND, TRINIDAD & TOBAGO, VENEZUELA, ANTIGUA & BARBUDA, DOMINICA, GRENADA, ST. KITTS & NEVIS, ST. LUCIA, AND ST. VINCENT & THE GRENADINES

OCTOBER 14 (legislative day, OCTOBER 2), 1998.—Ordered to be printed

Mr. HELMS, from the Committee on Foreign Relations, submitted the following

## REPORT

[To accompany Treaty Docs. 105–6; 105–11; 105–12; 105–22; 105–23; 105–24; 105–27; 105–34; 105–37; 105–38; 105–40; 105–41; 105–42; 105–44; 105–47; and 105–52.]

The Committee on Foreign Relations, to which was referred the Agreement between the Government of the United States of America and the Government of Hong Kong on Mutual Legal Assistance in Criminal Matters, with Annex, signed in Hong Kong on April 15, 1997 (Treaty Doc. 105–6); the Treaty Between the Government of the United States of America and the Government of the Grand Duchy of Luxembourg on Mutual Legal Assistance in Criminal Matters, and related exchange of notes, signed at Washington on March 13, 1997 (Treaty Doc. 105–11); the Treaty Between the United States of America and the Government of the Republic of Poland on Mutual Legal Assistance in Criminal Matters, and related exchange of notes, signed at Washington on July 10, 1996 (Treaty Doc. 105–12); the Treaty Between the Government of the United States of America and the Government of Trinidad and Tobago on Mutual Legal Assistance in Criminal Matters, signed at Port of Spain on March 4, 1996 (Treaty Doc. 105–22); the Treaty Between the Government of the United States of America and the Government of Barbados on Mutual Legal Assistance in Criminal Matters, signed at Bridgetown on February 28, 1996 (Treaty Doc. 105–23); the Treaties Between the Government of the United States of America and the Governments of Four Countries Comprising the Organization of Eastern Caribbean States: Antigua and Barbuda, signed at St. John's on October 31, 1996; Dominica, signed at

Roseau on October 10, 1996; Grenada, signed at St. George's on May 30, 1996; St. Lucia, signed at Castries on April 18, 1996 (Treaty Doc. 105–24); the Treaty Between the Government of the United States of America and the Government of Australia on Mutual Assistance in Criminal Matters, and related exchange of notes, signed at Washington on April 30, 1997 (Treaty Doc. 105–27); the Treaty Between the United States of America and the Republic of Latvia on Mutual Legal Assistance in Criminal Matters, signed at Washington on June 13, 1997, and an exchange of notes signed the same date (Treaty Doc. 105–34); the Treaty Between the Government of the United States of America and the Government of St. Kitts and Nevis on Mutual Legal Assistance in Criminal Matters, signed at Basseterre on September 18, 1997, and a related exchange of notes signed at Bridgetown on October 29, 1997, and February 4, 1998 (Treaty Doc. 105–37); the Treaty Between the Government of the United States of America and the Government of the Republic of Venezuela on Mutual Legal Assistance in Criminal Matters, signed at Caracas on October 12, 1997 (Treaty Doc. 105–38); the Treaty Between the Government of the United States of America and the Government of the State of Israel on Mutual Legal Assistance in Criminal Matters, signed at Tel Aviv on January 26, 1998, and a related exchange of notes signed the same date (Treaty Doc. 105–40); the Treaty Between the Government of the United States of America and the Government of the Republic of Lithuania on Mutual Legal Assistance in Criminal Matters, signed at Washington on January 16, 1998 (Treaty Doc. 105–41); the Treaty Between the Government of the United States of America and the Government of the Federative Republic of Brazil on Mutual Legal Assistance in Criminal Matters, signed at Brasilia on October 14, 1997 (Treaty Doc. 105–42); the Treaty Between the Government of the United States of America and the Government of Saint Vincent and the Grenadines on Mutual Legal Assistance in Criminal Matters, and a Related Protocol, signed at Kingstown on January 8, 1998 (Treaty Doc. 105–44); the Treaty Between the United States of America and the Czech Republic on Mutual Legal Assistance in Criminal Matters, signed at Washington on February 4, 1998 (Treaty Doc. 105–47); the Treaty Between the Government of the United States of America and the Government of the Republic of Estonia on Mutual Legal Assistance in Criminal Matters, signed at Washington on April 2, 1998, and an exchange of notes dated September 16 and 17, 1998 (Treaty Doc. 105–52), having considered the same, reports favorably thereon, each with one understanding, one declaration and two provisos, and recommends that the Senate give its advice and consent to the ratification thereof as set forth in this report and the accompanying resolutions of ratification.

CONTENTS

| | | Page |
|---|---|---|
| I. | Purpose | 3 |
| II. | Background | 3 |
| III. | Summary | 3 |
| IV. | Entry Into Force and Termination | 10 |
| V. | Committee Action | 10 |
| VI. | Committee Comments | 10 |

VII. Explanations of Proposed Treaties .......... 12
VIII. Resolutions of Ratification .......... 367

## I. Purpose

Bilateral mutual legal assistance treaties are intended to establish a formal basis for cooperative law enforcement efforts.

## II. Background

Nineteen mutual legal assistance treaties (MLATs) were submitted to the Senate during the 105th Congress. They include agreements with Hong Kong; Luxembourg; Australia; Venezuela; Israel; Brazil; several of the island nations of the Caribbean (Trinidad and Tobago, Barbados, Antigua and Barbuda, Dominica, Grenada, St. Lucia, St. Kitts and Nevis, and St. Vincent and the Grenadines); as well as several countries in Eastern Europe (Poland, Estonia, Latvia, Lithuania, and the Czech Republic).

The United States already has twenty MLATs in force. Although each of the treaties currently before the Senate has its own distinctive features, the treaties follow a common format and as a group exhibit more similarities than differences.

## III. Summary

### A. General

The treaties generally are arranged in twenty articles. Some have a few more; some a few less. They cover essentially the same matters in essentially the same order, frequently using virtually the same terminology. They are typically aligned as follows with articles on:

- the scope of assistance of the Treaty, in the form a general statement of purpose and a general inventory of the kinds of assistance available;
- identification of the Central Authorities responsible for administration of the Treaty;
- the limitations on assistance available at the discretion of the Central Authority in particular types of cases;
- the form and contents required of any request for assistance under the Treaty;
- the general responsibilities and prerogatives of those called upon to execute requests under the Treaty;
- how the costs associated with a particular request are to be allocated;
- the limitations of use or disclosure of any evidence or information secured pursuant a Treaty request;
- the procedure for hearings conducted at the behest of a foreign country to take testimony or evidence in the Requested State;
- the circumstances under which the Parties are to have access to information found in the records of government agencies of other countries;
- the procedure for inviting witnesses to travel abroad and give testimony in the Requesting State;

ARTICLE 20—RATIFICATION, ENTRY INTO FORCE, AND TERMINATION

Paragraph 1 contains standard provisions on the procedure for ratification and the exchange of the instruments of ratification.

Paragraph 2 provides that the Treaty shall enter into force immediately upon the exchange of instruments of ratification.

Paragraph 3 states that the Parties may amend this Treaty by mutual agreement, and any such amendment shall enter into force upon a written exchange of notifications between the Parties, through the diplomatic channel, that all domestic requirements for its entry into force have been completed.

Paragraph 4 contains standard provisions concerning the procedure for terminating the Treaty. Termination shall take effect six months after the date of written notification. Similar termination provisions are included in other United States mutual legal assistance treaties.

**Technical Analysis of the Treaty Between the United States of America and the Czech Republic on Mutual Legal Assistance in Criminal Matters Signed February 4, 1998**

On February 4, 1998, the Attorney General of the United States and the Ambassador of the Czech Republic signed a Treaty on Mutual Legal Assistance in Criminal Matters ("the Treaty"). In recent years, the United States has signed similar treaties with other countries as part of a highly successful effort to modernize the legal tools available to law enforcement authorities in need of foreign evidence for use in criminal cases.

The Treaty with the Czech Republic is a major advance in the formal law enforcement relationship between the two countries, and is expected to be a valuable weapon for the United States in its efforts to combat transnational terrorism, international drug trafficking, and Russian organized crime.

It is anticipated that the Treaty will be implemented in the United States pursuant to the procedural framework provided by Title 28, United States Code, Section 1782. The Czech delegation advised that under Czech jurisprudence, the terms of the Treaty would take precedence over silence in Czech domestic law, and, in case of a conflict between the Treaty and future Czech domestic law, the Treaty would control.

The following technical analysis of the Treaty was prepared by the Office of International Affairs, United States Department of Justice, and the Office of the Legal Adviser, United States Department of State, based upon the negotiating notes. The technical analysis includes a discussion of U.S. law and relevant practice as of the date of its preparation, which are, of course, subject to change. Foreign law discussions reflect the current state of that law, to the best of the drafters' knowledge.

ARTICLE 1—SCOPE OF ASSISTANCE

Paragraph 1 provides for assistance "for criminal proceedings, including investigations to verify the commission of offenses, to gather evidence of offenses, and to prosecute offenses, the punishment of which, at the time of the request for assistance, would fall within the jurisdiction of the judicial authorities of the Requesting State."

By this phrase the negotiators specifically agreed to provide treaty assistance at any stage of a criminal matter.[1] The Czech negotiators explained that under the Czech law, there exists an investigative stage both before and after indictment. This phrase will allow the Czech authorities to secure assistance at both of these investigative stages, as well as later during the prosecution stage. For the United States, this includes not only police-to-police cooperation before a crime is committed, a grand jury investigation, a criminal trial, or a sentencing proceeding, but also an administrative inquiry by an agency with investigative authority for the purpose of determining whether to refer the matter to the Department of Justice for criminal prosecution.[2]

Paragraph 2 lists the types of assistance specifically considered by the negotiators. Most of the items are described in greater detail in subsequent articles. The list is not exhaustive, as indicated by the phrase "assistance shall include" in the paragraph's chapeau and reinforced by the phrase in item (i), which states that assistance shall include "providing any other assistance consistent with the laws of the Requested State." Paragraph 3 specifies that the principle of dual criminality is generally inapplicable. Dual criminality obligates the Requested State to provide assistance only when the criminal conduct committed in the Requesting State would also constitute a crime if committed in the Requested State. In other words, the obligation to provide assistance upon request arises irrespective of whether the offense for which assistance is requested is a crime in the Requested State. However, the paragraph lists an exception to the rule: where execution of the request would require a court order, the Requested State may, in fact, decline to provide assistance in the absence of dual criminality. Even so, the paragraph obligates the Requested State to "make every effort to approve a request for assistance requiring such a court order" and to grant such a request if, using the standard of "reasonable suspicion," the conduct described would also constitute a crime under the laws of the Requested State. The delegations anticipate that

[1] The requirement that assistance be provided under the Treaty at the pre-indictment stage is critical to the U.S., as our investigators and prosecutors often need to obtain evidence from foreign countries in order to determine whether or not to file criminal charges. This obligation is a reciprocal one; the U.S. must assist the Czech Republic under the Treaty in connection with investigations prior to charges being filed in Czech Republic. Prior to the 1996 amendments of Title 28, United States Code, Section 1782, some U.S. courts interpreted that section to require that assistance be provided in criminal matters only if formal charges have already been filed abroad, or are "imminent," or "very likely." McCarthy, "A Proposed Uniform Standard for U.S. Courts in Granting Requests for International Judicial Assistance," 15 Fordham Int'l Law J. 772 (1991). The 1996 amendment to the statute eliminates this problem, however, by amending subsec. (a) to state "including criminal investigation conducted before formal accusation." In any event, this Treaty was intentionally written to cover criminal investigations that have just begun as well as those that are nearly completed; it draws no distinction between cases in which charges are already pending, "imminent," "very likely," or "very likely very soon." Thus, U.S. courts should execute requests under the Treaty without examining such factors.

[2] One United States court has interpreted Title 28, United States Code, Section 1782, as permitting the execution of a request for assistance from a foreign country only if the evidence sought is for use in proceedings before an adjudicatory "tribunal" in the foreign country. In Re Letters Rogatory Issued by the Director of Inspection of the Gov't of India, 385 F.2d 1017 (2d Cir. 1967); *Fonseca v. Blumenthal,* 620 F.2d 322 (2d Cir. 1980). This rule poses an unnecessary obstacle to the execution of requests concerning matters which are at the investigatory stage, or which are customarily handled by administrative officials in the Requesting State. Since this paragraph of the Treaty specifically permits requests to be made in connection with matters not within the jurisdiction of an adjudicatory "tribunal" in the Requesting State, this paragraph accords the courts broader authority to execute requests than does Title 28, United States Code, Section 1782, as interpreted in the India and Fonseca cases.

only on extremely rare occasions will the dual criminality requirement prevent the granting of requested assistance.

Paragraph 4 contains a standard provision in United States mutual legal assistance treaties[3] which states that the Treaty is intended solely for government-to-government mutual legal assistance. The Treaty is not intended to provide to private persons a means of evidence gathering, or to extend generally to civil matters. Private litigants in the United States may continue to obtain evidence from the Czech Republic by letters rogatory, an avenue of international assistance that the Treaty leaves undisturbed. Similarly, the paragraph provides that the Treaty is not intended to create any right in a private person to suppress or exclude evidence provided pursuant to the Treaty, or to impede the execution of a request.

### ARTICLE 2—CENTRAL AUTHORITIES

Paragraph 1 requires that each Contracting State shall "seek and obtain assistance" under the Treaty through their respective Central Authorities.

The Central Authority for the Requesting State will exercise discretion as to the form and content of requests, and the number and priority of requests. The Central Authority of the Requested State is also responsible for receiving each request, transmitting it to the appropriate federal or state agency, court, or other authority for execution, and ensuring that a timely response is made.

The Attorney General has delegated the authority to handle the duties of Central Authority under mutual assistance treaties to the Assistant Attorney General in charge of the Criminal Division.[4] The Central Authority for the Czech Republic will be the Office of the Prosecutor General and the Ministry of Justice.[5] This dual Central Authority arrangement reflects the importance and independence of the Office of the Prosecutor General in the Czech Republic criminal justice system. Both the Czech Constitution and the Czech Criminal Code designate distinct and separate responsibilities and duties to the Office of the Prosecutor General and the Ministry of Justice. The Prosecutor's Office is responsible for handling requests to and from foreign authorities for assistance in criminal matters at the investigation stage, while the Ministry of Justice is responsible for handling requests to and from foreign authorities for assistance in criminal matters at the prosecution stage. The Czech delegation informed the United States delegation that, in practice, the U.S. Central Authority could send all requests to the Office of the Prosecutor General since most foreign requests fall within the investigative stage. If the request falls under the jurisdiction of the Czech Ministry of Justice, however, the Office of

---

[3] *See United States v. Johnpoll,* 739 F.2d 702 (2d Cir. 1984), cert. denied, 469 U.S. 1075 (1984).

[4] 28 C.F.R. § 0.64-1. The Assistant Attorney General for the Criminal Division has in turn delegated this authority to the Deputy Assistant Attorneys General and the Director of the Criminal Division's Office of International Affairs, in accordance with the regulation. Directive No. 81, 45 Fed. Reg. 79,758 (1980), as corrected at 48 Fed. Reg. 54,595 (1983). That delegation was subsequently extended to the Deputy Directors of the Office of International Affairs. 59 Fed. Reg. 42,160 (1994).

[5] Similarly, Article 2(2) of the U.S.-Hungary Mutual Legal Assistance Treaty, signed Dec. 1, 1994, entered into force March 18, 1997 (——— UST ———), provides that the Hungarian Minister of Justice and Office of the Chief Public Prosecutor will serve as a dual Central Authority.

the Prosecutor General will promptly forward the request to the Ministry of Justice for execution.

Paragraph 2 provides that the U.S. Central Authority will "make" requests on behalf of federal, state, and local "prosecutors, investigators with criminal law enforcement jurisdiction, and agencies and entities with specific statutory or regulatory authority to refer matters for criminal prosecution" in the United States. The Czech Central Authority will make requests on behalf of Czech prosecutors and courts.

Paragraph 3 specifies that the Central Authority for the Requesting State shall use its "best efforts" not to make a request if, in its view: (a) the request is based on offenses that do not have serious consequences; or (b) the extent of the assistance to be requested is unreasonable in view of the sentence expected upon conviction. This provision is intended to give the Central Authorities a firm basis on which to refuse to submit a request on behalf of a competent authority because of the insignificance or inappropriateness of the request.

Paragraph 4 states that the Central Authorities shall communicate directly with one another for the purposes of the Treaty. It is anticipated that such communication will be accomplished by telephone, telefax, or Interpol channels, or any other means, at the option of the Central Authorities themselves.

## Article 3—Denial of Assistance

This article specifies the limited classes of cases in which assistance may be denied under the Treaty.

Paragraph (1)(a) permits the Requested State to deny a request if it relates to an offense under military law that would not be an offense under ordinary criminal law applicable generally. Similar provisions appear in many other U.S. mutual legal assistance treaties.

During negotiations, the Czech delegation informed that they do not have a separate military code; rather, military law is covered in a section of the single Czech criminal code dealing with "ordinary criminal law." The delegations understand this provision to provide that a Requested State will have discretion to deny a request under this provision only when there exists a certain criminal conduct that would be an offense under military law, but would not be an offense under ordinary law. For example, showing disrespect to a senior military officer would be a purely military offense and, thus, a basis on which the Requested State would have discretion to deny assistance. On the other hand, if a military officer murders another military officer, this would be a military offense as well as an offense under ordinary law and, thus, the Requested State would not have discretion to deny assistance under this provision. As a practical matter, the negotiating delegations noted that they anticipate that this provision will rarely, if ever, be used as a basis for denial of a request.

Paragraph (1)(b) permits denial of a request if it involves a political offense. It is anticipated that the Central Authorities will employ jurisprudence similar to that used in the extradition treaties for determining what is a "political offense." These restrictions are similar to those found in other mutual legal assistance treaties.

Paragraph 1(c) permits the Central Authority of the Requested State to deny a request if execution would prejudice the sovereignty, security, order public, or similar essential interests of that State. The negotiators anticipate that this provision will be invoked in the rarest and most extreme circumstances. The Czech delegation could not think of a request within recent memory denied on the basis of sovereignty or security. The term "order public" appears in other mutual legal assistance treaties but is not commonly used by the United States; however, the Czech delegation was more comfortable with the term, commonly used in European conventions, and intended that it cover matters that affect the social fabric of the nation, such as, for example, requiring (or denying a request to require) a witness of a certain religion to take an oath that is contrary to the practice of that religion. The phrase "similar essential interests" is intended to convey a concept of substantial national importance. In the United States, because the decision to deny assistance lies with the Central Authority, the Attorney General will work closely with the Department of State and other relevant agencies in determining whether to execute a request that involves "sovereignty, security, order public, or similar essential interests."

Paragraph (1)(d) permits the denial of a request if it is not made in conformity with the Treaty.

Paragraph 2 is similar to Article 3(2) of the U.S.-Switzerland Mutual Legal Assistance Treaty,[6] and obliges the Requested State to consider imposing appropriate conditions on its assistance in lieu of denying a request outright pursuant to the first paragraph of the article. For example, a Contracting Party might request information that could be used either in a routine criminal case (which would be within the scope of the Treaty) or in a politically motivated prosecution (which would be subject to refusal). This paragraph would permit the Requested State to provide the information on the condition that it be used only in the routine criminal case. Naturally, the Requested State would notify the Requesting State of any proposed conditions before actually delivering the evidence in question, thereby according the Requesting State an opportunity to indicate whether it is willing to accept the evidence subject to the conditions. If the Requesting State does accept the evidence subject to the conditions, it must honor the conditions.

Paragraph 3 effectively requires that the Central Authority of the Requested State promptly notify the Central Authority of the Requesting State of the basis for any denial of assistance. This ensures that, when a request is only partly executed, the Requested State will provide some explanation for not providing all of the information or evidence sought. This should avoid misunderstandings, and enable the Requesting State to better prepare its requests in the future.

### ARTICLE 4—FORM, CONTENT, AND LANGUAGE OF REQUESTS

Paragraph 1 requires that requests be in writing, except that the Central Authority of the Requested State may accept a request in

[6] U.S.-Switzerland Mutual Legal Assistance Treaty, May 25, 1973, art. 26, 27 UST 2019, TIAS No. 8302, 1052 UNTS 61.

another form in "urgent situations." A request in another form must be confirmed in writing within ten days unless the Central Authority of the Requested State agrees otherwise. Paragraph 1 also requires that the Treaty request, including any attachments, be in the language of the Requested State, unless otherwise agreed. The last sentence of Paragraph 1 states that the Requested States has no obligation to translate a response to a request, including any attachments.

Paragraph 2 lists the four kinds of information deemed crucial to the efficient operation of the Treaty which must be included in each request. Paragraph 3 outlines kinds of information that are important but not always crucial, and should be provided "to the extent necessary and possible." In keeping with the intention of the Parties that requests be as simple and straightforward as possible, there is no requirement under the Treaty that a request be legalized or certified in any particular manner.

### ARTICLE 5—EXECUTION OF REQUESTS

Paragraph 1 requires each Central Authority promptly to execute requests. If the Central Authority is not competent to execute the request, it must promptly transmit the request to a competent authority for execution.

For the Czech Republic, the Central Authority will determine whether (1) the request complies with the terms of the Treaty, and (2) its execution would prejudice the sovereignty, security, or other essential interests of the Czech Republic. If the request merits execution, the Central Authority will transmit the request to an appropriate department within the Office of the Prosecutor General or the Ministry of Justice for that purpose. The procedure is similar for the United States, except the United States Central Authority normally will transmit the request to federal investigators, prosecutors, or agencies for execution. The United States Central Authority also may transmit a request to state authorities in circumstances it deems appropriate.

Paragraph 1 further requires the competent authorities of the Requested State, including courts, shall do "everything in their power" to execute the requests. This sentence also specifically authorizes and requires a Court of the Requested State to take such action as is necessary and within its power to execute the request. In the Czech Republic, courts, as well as public prosecutors, are empowered under Czech law to issue orders, including subpoenas and search warrants, that are necessary to execute the request. In the Czech Republic, execution of requests will be almost exclusively within the province of the Office of the Prosecutor General, Ministry of Justice, and the courts, whereas in the United States, execution can be entrusted to any competent authority in any branch of government, federal or state. This provision is not intended or understood to authorize the use of the grand jury in the United States for the collection of evidence pursuant to a request from the Czech Republic. Rather, it is anticipated that when a request from the Czech Republic requires compulsory process for execution, the United States Department of Justice would ask a federal court to

issue the necessary process under Title 28, United States Code, Section 1782, and the provisions of the Treaty.[7]

Paragraph 2 reconfirms that, when necessary, the Central Authority of the Requested State shall arrange for requests from the Requesting State to be presented to the appropriate authority in the Requested State for execution. In practice, the Central Authority for the United States will transmit the request with instructions for execution to an investigative or regulatory agency, the office of a prosecutor, or another governmental entity. If execution requires the participation of a court, the Central Authority will select an appropriate representative, generally a federal prosecutor, to present the matter to a court. Thereafter, the prosecutor will represent the United States, acting to fulfill its obligations to the Czech Republic under the Treaty by executing the request. Upon receiving the court's appointment as a commissioner, the prosecutor/commissioner will act as the court's agent in fulfilling the court's responsibility to do "everything in [its] power" to execute the request. In short, the prosecutor may only seek permission from a court to exercise the court's authority in using compulsory measures if he receives permission from the court to do so.

The situation with respect to the Czech Republic is different. The U.S. Central Authority will transmit all requests to either the Czech Republic Office of the Prosecutor General or the Ministry of Justice. If the case is in the investigative stage, the Office of the Prosecutor General will assign the request to an appropriate department within that office. Public prosecutors in the Czech Republic have authority to order compulsory process, including, but not limited to, requiring a witness to appear to provide testimony, issuing subpoenas to compel the production of documents or other evidence, and ordering a search and seizure. The exercise of this authority by Czech prosecutors does not require the consent of a court. In other words, unlike in the United States, a Czech prosecutor may execute a foreign request seeking compulsory process without the assistance of the Czech courts.

If the request to the Czech Republic relates to an indicted case, the Office of the Prosecutor General of the Czech Republic will transmit the request to the Ministry of Justice for forwarding to an appropriate court with general advice regarding the Czech Republic's treaty obligation and the general evidentiary and procedural requirements of the United States.

Paragraph 3 is inspired by Article 5(5) of the U.S.-Jamaican Mutual Legal Assistance Treaty[8], and provides, that "[a] request shall be executed in accordance with the laws of the Requested State except to the extent that this Treaty provides otherwise." Thus, the method of executing a request for assistance under the Treaty must be in accordance with the Requested State's internal laws absent specific contrary procedures in the Treaty itself. Neither State is expected to take any action pursuant to a treaty request which would be prohibited under its internal laws. For the United States,

[7] This paragraph of the Treaty specifically authorizes United States courts to use all of their powers to issue subpoenas and other process to satisfy a request under the Treaty.

[8] U.S.-Jamaica Mutual Legal Assistance Treaty, July 7, 1989.

the Treaty is intended to be self-executing; no new or additional legislation will be needed to carry out the obligations undertaken.

The same paragraph requires that procedures specified in the request shall be followed in the execution of the request except to the extent that those procedures cannot lawfully be followed in the Requested State. This provision is necessary for two reasons.

First, there are significant differences between the procedures which must be followed by United States and Czech Republic authorities in collecting evidence in order to assure the admissibility of that evidence at trial. For instance, United States law permits documentary evidence taken abroad to be admitted in evidence if the evidence is duly certified and the defendant has been given fair opportunity to test its authenticity.[9] The law of the Czech Republic currenontains no similar provision. Thus, documents assembled in the Czech Republic in strict conformity with Czech procedures on evidence might not be admissible in United States courts. Similarly, United States courts utilize procedural techniques such as videotape depositions to enhance the reliability of evidence taken abroad, and some of these techniques, while not forbidden, are not used in the Czech Republic.

Second, the evidence in question could be needed for subjection to forensic examination, and sometimes the procedures which must be followed to enhance the scientific accuracy of such tests do not coincide with those utilized in assembling evidence for admission into evidence at trial. The value of such forensic examinations could be significantly lessened—and the Requesting State's investigation could be retarded—if the Requested State were to insist unnecessarily on handling the evidence in a manner usually reserved for evidence to be presented to its own courts.

Paragraph 4 states that a request for assistance need not be executed immediately when the Central Authority of the Requested State determines that execution would interfere with an ongoing investigation or legal proceeding in the Requested State. The Central Authority of the Requested State may, in its discretion, take such preliminary action as deemed advisable to obtain or preserve evidence that might otherwise be lost before the conclusion of the investigation or legal proceedings in that State. The paragraph also allows the Requested State to provide the information sought to the Requesting State subject to conditions needed to avoid interference with the Requested State's proceedings.

It is anticipated that some United States requests for assistance may contain information which under our law must be kept confidential. For example, it may be necessary to set out information that is ordinarily protected by Rule 6(e), Federal Rules of Criminal Procedure, in the course of an explanation of "the nature and stage of the proceeding" as required by Article 4(2)(b). Therefore, Paragraph 5 of Article 5 enables the Requesting State to call upon the Requested State to keep the information in the request confidential.[10] If the Requested State canxecute the request without dis-

[9] Title 18, United States Code, Section 3505.

[10] This provision is similar to language in other United States mutual legal assistance treaties. *See e.g.,* U.S.-Mexico Mutual Legal Assistance Treaty, Dec. 9, 1987, art. 4(5); U.S.-Canada Mutual Legal Assistance Treaty, Mar. 18, 1985; art. 6(5), U.S.-Italy Mutual Legal Assistance

Continued

closing the information in question (as might be the case if execution requires a public judicial proceeding in the Requested State), or if for some other reason this confidentiality cannot be assured, the Treaty obliges the Requested State to so indicate, thereby giving the Requesting State an opportunity to withdraw the request rather than risk jeopardizing an investigation or proceeding by public disclosure of the information.

Paragraph 6 states that the Central Authority of the Requested State shall respond to reasonable inquiries by the Requesting State concerning progress of its request. This is to encourage open communication between the Central Authorities in monitoring the status of specific requests.

Paragraph 7 requires that the Central Authority of the Requested State promptly notify the Central Authority of the Requesting State of the outcome of the execution of a request. If the assistance sought is not provided, the Central Authority of the Requested State must also explain the basis for the outcome to the Central Authority of the Requesting State. For example, if the evidence sought could not be located, the Central Authority of the Requested State would report that fact to the Central Authority of the Requesting State.

### ARTICLE 6—COSTS

This article obligates the Requested State to pay all costs "relating to" or ordinarily associated with the execution of a request, with the exception of those enumerated in the article: (1) the fees of experts; (2) the costs of interpretation, translation, and transcription; and (3) the allowances and expenses related to travel of persons traveling outside the local judicial district in the Requested State for the convenience of the Requesting State or pursuant to Articles 11, 12, and 13.

Costs "relating to" execution means the costs normally incurred in transmitting a request to the executing authority, notifying witnesses and arranging for their appearances, producing copies of the evidence, conducting a proceeding to compel execution of the request, etc. The negotiators agreed that costs "relating to" execution to be borne by the Requested State do not include expenses associated with the travel of investigators, prosecutors, counsel for the defense, or judicial authorities to, for example, question a witness or take a deposition in the Requested State pursuant to Article 9(3), or travel in connection with Articles 11, 12, and 13.

Paragraph 2 of this article provides that if it becomes apparent during the execution of a request that complete execution of a request would require extraordinary expenses, then the Central Authorities shall consult to determine the terms and conditions under which execution may continue.

### ARTICLE 7—LIMITATIONS ON USE

Article 7 states that the Central Authority of the Requested State may require that the Requesting State not use any information or evidence obtained under this Treaty other than in the pro-

Treaty, Nov. 9, 1982, art. 8(2); U.S.-Philippines Mutual Legal Assistance Treaty, Nov. 13, 1994, art. 5(5).

ceeding described in the request without the prior consent of the Central Authority of the Requested State.

Article 7 states that the Central Authority of the Requested State may require that information provided under the Treaty not be used for any purpose other than that stated in the request without the prior consent of the Requested State. If such confidentiality is requested, the Requesting State must comply with the conditions. It will be recalled that Article 4(2)(d) states that the Requesting State must specify the purpose for which the information or evidence sought under the Treaty is needed.

It is not anticipated that the Central Authority of the Requested State will routinely request use limitations under this article. Rather, it is expected that such limitations will be requested sparingly, only when there is good reason to restrict the utilization of the evidence.

### ARTICLE 8—ALTERATION OF CONDITIONS

Paragraph 1 states that nothing in Article 8 shall preclude the use or disclosure of information to the extent that there is an obligation to do so under the Constitution of the Requesting State. Any such proposed disclosure shall be notified by the Requesting State to the Requested State in advance. If the United States Government were to receive evidence under the Treaty that seems to be exculpatory to the defendant in another case, the United States might be obliged to share the evidence with the defendant in the second case.[11]

Paragraph 1 further requires that the Requested State use its “best efforts” to permit modification of a request for the purpose of disclosure. This “best efforts” language was used because the purpose of the Treaty is the production of evidence for use at trial, and that purpose would be frustrated if the Requested State could routinely permit the Requesting State to see valuable evidence, but impose confidentiality restrictions which prevent the Requesting State from using it. In fact, where the condition is imposed pursuant to Article 8, the disclosure shall be allowed unless prohibited by the law of the Requested State.

Paragraph 2 states that once information or evidence obtained under the Treaty has been revealed to the public in accordance with Paragraph 1, the Requesting State is free to use the evidence for any purpose. Once evidence obtained under the Treaty has been revealed to the public in a trial, that information effectively becomes part of the public domain, and is likely to become a matter of common knowledge, perhaps even be described in the press. The negotiators noted that once this has occurred, it is practically impossible for the Central Authority of the Requesting Party to block the use of that information by third parties.

The negotiators expect the good faith protection of confidentiality up to the point that the evidence is used in the prosecution of the offense for which it was provided; as a result, some previously confidential evidence may become public when introduced as evidence at trial or otherwise disclosed as part of related judicial proceed-

---

[11] *See Brady v. Maryland,* 373 U.S. 83 (1963).

ings (e.g., for the United States, as part of the plea or sentencing process).

ARTICLE 9—EVIDENCE IN THE REQUESTED STATE

Paragraph 1 states that a person in the Requested State from whom evidence is sought shall be compelled, if necessary, to appear and either testify or provide a statement, or produce items, including documents, records, or articles of evidence. The compulsion contemplated by this article can be accomplished by subpoena or any other means available under the law of the Requested State.

In the United States, a prosecutor asks a U.S. court to appoint him as a commissioner empowering him to execute subpoenas on behalf of the foreign authority. The procedure in the United States as described is used regardless of whether the request concerns a matter at the investigative stage or a case that has been indicted. In the Czech Republic, the authority of the public prosecutor to issue subpoenas and to use other compulsory measures exists independently of the courts. Therefore, in the Czech Republic, where the request concerns a matter at the investigative stage and is handled by the Office of the Prosecutor General, the public prosecutor may use his power to issue subpoenas to compel the production of documents or other evidence on behalf of the foreign authority. Where the request concerns an indicted case and is handled by a court, the court uses its power to issue subpoenas to compel the production of documents or other evidence on behalf of the foreign authority.

The criminal laws in both States contain provisions that sanction the production of false evidence. The second sentence of Article 9(1) explicitly states that the criminal laws in the Requested State shall apply in situations where a person, other than an accused, in that State provides false evidence in execution of a request. The negotiators expect that were any falsehood made in execution of a request, the Requesting State could ask the Requested State to prosecute for perjury and provide the Requested State with the information or evidence needed to prove the falsehood. The Czech delegation advised that Section 175 of the Czech Penal Code provides that a person who provides false statements to a court, prosecutor, police, or investigating commission of the Czech Parliament may be subject to criminal punishment.

Paragraph 2 requires that, upon request, the Requested State shall furnish information in advance about the date and place of the taking of testimony or evidence.

Paragraph 3 provides that any persons specified in the request, including the defendant and his counsel in criminal cases, shall be permitted by the Requested State to be present and pose questions during the taking of testimony under this article. The Czech negotiators assured the U.S. delegation that a stenographer could be present at depositions in the Czech Republic. The presence of a stenographer is generally critical to preserve testimony of witnesses inasmuch as the United States practice is to introduce into evidence a verbatim transcript of out-of-court testimony rather than a summary or abbreviated form of the testimony as is the practice in civil law jurisdictions. The United States practice is intended, among other things, to allow the trier of fact to receive testimony,

to the extent possible, as if the witnesses were present at the United States court proceeding.

Paragraph 4 does require that if a witness attempts to assert a privilege that is unique to the Requesting State, the Requested State will take the desired evidence and turn it over to the Requesting State along with notice that it was obtained over a claim of privilege. The applicability of the privilege can then be determined in the Requesting State, where the scope of the privilege and the legislative and policy reasons underlying the privilege are best understood. A similar provision appears in many of our recent mutual legal assistance treaties. [12]

Article 9(5) is primarily for the benefit of the United States. The United States evidentiary system requires that evidence that is to be used as proof in a legal proceeding be authenticated as a precondition to admissibility. This paragraph provides that evidence produced in the Requested State pursuant to Article 9 may be authenticated by an "attestation." Although the provision is sufficiently broad to include the authentication of "[e]vidence produced . . . pursuant to this Article," the negotiators focused on and were primarily concerned with business records. In order to ensure the United States that business records provided by the Czech Republic pursuant to the Treaty could be authenticated in a manner consistent with existing U.S. law, the negotiators crafted Form A to track the language of Title 18, United States Code, Section 3505, the foreign business records authentication statute. If the Czech authorities properly complete, sign, and attach Form A to executed documents, or submit Form B certifying the absence or non-existence of business records, a U.S. judge may admit the records into evidence without the appearance at trial of a witness. The admissibility provided by this paragraph provides for an exception to the hearsay rule; however, admissibility extends only to authenticity and not to relevance, materiality, etc., of the evidence; whether the evidence is, in fact, admitted is a determination within the province of the judicial authority presiding over the proceeding for which the evidence is provided.

### Article 10—Official Records

Paragraph 1 obliges each Party to furnish the other with copies of publicly available records, including documents or information in any form, possessed by a government department or agency in the Requested State. The term "government departments and agencies" includes all executive, judicial, and legislative units of the Federal, State, and local level in each country. For the Czech Republic, this includes the executive, legislative, and judicial authorities at the central and regional government levels.

Paragraph 2 provides that the Requested State may share with its treaty partner copies of nonpublic information in government files. The obligation under this provision is discretionary, and such requests may be denied in whole or in part. Moreover, the article states that the Requested State may only exercise its discretion to

[12] *See e.g.*, U.S.-Netherlands Mutual Legal Assistance Treaty, June 12, 1981, art. 5(1), TIAS No. 10734, 1359 UNTS 209; U.S.-Bahamas Mutual Legal Assistance Treaty, June 12 & Aug. 18, 1987, art. 9(2); U.S.-Mexico Mutual Legal Assistance Treaty, *supra* note 10, art. 7(2); U.S.-Philippines Mutual Legal Assistance Treaty, *supra* note 10, art. 8(4).

turn over information in its files "to the same extent and under the same conditions" as it would to its own law enforcement or judicial authorities. It is intended that the Central Authority of the Requested State will determine that extent and what those conditions would be.

The discretionary nature of this provision was deemed necessary because government files in each State contain some kinds of information that would be available to investigative authorities in that State, but that justifiably would be deemed inappropriate to release to a foreign government. For example, assistance might be deemed inappropriate where the information requested would identify or endanger an informant, prejudice sources of information needed in future investigations, or reveal information that was given to the Requested State in return for a promise that it not be divulged. Of course, a request could be denied under this clause if the Requested State's law bars disclosure of the information.

The delegations discussed whether this article should serve as a basis for exchange of information in tax matters. It was the intention of the United States delegation that the United States be able to provide assistance under the Treaty in tax matters, and such assistance could include tax return information when appropriate. The United States delegation was satisfied after discussion that this Treaty is a "convention relating to the exchange of tax information" for purposes of Title 26, United States Code, Section 6103(k)(4), and the United States would have the discretion to provide tax return information to the Czech Republic under this article in appropriate cases. [13]

[13] Under 26 U.S.C. § 103(i) information in the files of the Internal Revenue Service (generally protected from disclosure under 26 U.S.C. § 103) may be disclosed to federal law enforcement personnel in the United States for use in a non-tax criminal investigations or proceedings, under certain conditions and pursuant to certain procedures. The negotiators agreed that this Treaty (which provides assistance both for tax offenses and in the form of information in the custody of tax authorities of the Requested State) is a "convention . . . relating to the exchange of tax information" under Title 26, United States Code, Section 6103(k)(4), pursuant to which the United States may exchange tax information with treaty partners. Thus, the Internal Revenue Service may provide tax returns and return information to the Czech Republic through this Treaty when, in a criminal investigation or prosecution, the authority of the Czech Republic on whose behalf the request is made can meet the same conditions required of United States law enforcement authorities under Title 26, United States Code, Sections 6103(h) and (i). As an illustration, a request from the Czech Republic for tax returns to be used in a non-tax criminal investigation, in accordance with 26 U.S.C. 6103(i)(1)(A), would have to specify that the law of the Czech Republic enforcement authority is:

Personally and directly engaged in—

(i) preparation for any judicial or administrative proceeding pertaining to the enforcement of a specifically designated criminal statute of the Czech Republic (not involving tax administration) to which the Czech Republic is or may be a party. (ii) any investigation which may result in such a proceeding, or (iii) any proceeding in the Czech Republic pertaining to enforcement of such a criminal statute to which the Czech Republic is or may be a party. (See 26 U.S.C. 6103(i)(1)(A).)

The request would have to be presented to a federal district court judge or magistrate for an order directing the Internal Revenue Service to disclose the tax returns as specified at 26 U.S.C. 6103(i)(1)(B). Before issuing such an order, the judge or magistrate would have to determine, also in accordance with 26 U.S.C. 6103(i)(1)(B), that:

(i) there is reasonable cause to believe, based upon information believed to be reliable, that a specific criminal act has been committed, (ii) there is reasonable cause to believe that the return or return information is or may be relevant to a matter relating to the commission of such act, and (iii) the return or return information is sought exclusively for use in a criminal investigation in the Czech Republic or proceeding concerning such act, and the information sought to be disclosed cannot reasonably be obtained, under the circumstances, from another source.

In other words, the law enforcement authorities of the Czech Republic seeking tax returns would be treated as if they were United States law enforcement authorities—undergo the same access procedure where they would be held to the same standards.

Paragraph 3 provides for the authentication of records produced pursuant to this Article by a government department or agency responsible for their maintenance. Such authentication is to be effected through the use of Form C appended to the Treaty. If the Czech authorities properly complete, sign, and attach Form C to executed documents, or submit Form D certifying the absence or non-existence of such records, a U.S. judge may admit the records into evidence as self-authenticating under Rule 902(3) of the Federal Rules of Evidence. The admissibility provided by this paragraph provides for an exception to the hearsay rule; however, admissibility extends only to authenticity and not to relevance, materiality, etc., of the evidence. Whether the evidence is, in fact, admitted is a determination within the province of the judicial authority presiding over the proceeding for which the evidence is provided.

ARTICLE 11—APPEARANCE OUTSIDE THE REQUESTED STATE

This article provides that upon request, the Requested State shall invite persons who are located in its territory to travel to the Requesting State or a third State to appear before an appropriate authority there. It shall notify the Requesting State of the invitee's response. An appearance in the Requesting State or a third State under this article is not mandatory, and the invitation may be refused by the prospective witness.

When the United States seeks to have the Czech Republic invite a person to appear in the United States or a third State, the United States Central Authority will send a letter of invitation through the Czech Republic Central Authority. The person invited is free to decline and shall not be subject to any penalty for doing so or for failing to appear after agreeing to do so. This does not preclude the United States from seeking under Article 14 service of a document such as a subpoena issued under Title 28, United States Code, Sections 1783-1784 and directed to a United States citizen or resident located in the Czech Republic, which subpoena may entail sanctions for failure to appear in the United States as directed by the subpoena.

Paragraph 2 provides that the person shall be informed of the amount and kind of expenses which the Requesting State will provide in a particular case. It is assumed that such expenses would normally include the costs of transportation, and room and board. When the person is to appear in the United States, a nominal witness fee would also be provided. Paragraph 2 also provides that the person who agrees to travel to the Requesting State may request and receive an advance for expenses. The advance may be provided through the embassy or a consulate of the Requesting State.

Paragraph 3 provides assurances that an invited person who appears in the Requesting State pursuant to a request for assistance shall not be "prosecuted, detained, or subjected to any restriction of personal liberty" for acts committed prior to the invitee's leaving the Requested State. This provision does not protect against civil suits, prosecution, punishment, or restriction of personal liberty with respect to acts committed after departure from the Requested State. Any person appearing in the United States pursuant to a request under Article 11 or Article 12 will have such assurances un-

less the United States Central Authority specifies otherwise in the request inviting the person to appear.

Paragraph 4 terminates the safe conduct provided in paragraph 1 if, after the person with safe conduct is notified that his or her presence is no longer required, that person, although free to leave, remains in the Requesting State for seven days, or, having left, voluntarily returns.

### ARTICLE 12—TEMPORARY TRANSFER OF PERSONS IN CUSTODY

In some criminal cases, a need arises for the testimony in one country of a witness in custody in another country. In some instances, foreign countries are willing and able to "lend" witnesses to the United States Government, provided the witnesses would be carefully guarded while in the United States and returned to the foreign country at the conclusion of the testimony. On occasion, the United States Justice Department has arranged for consenting federal inmates in the United States to be transported to foreign countries to assist in criminal proceedings.[14]

Paragraph 1 provides an express legal basis for cooperation in these matters. It is based on Article 26 of the United States-Switzerland Mutual Legal Assistance Treaty,[15] which in turn is based on Article 11 of the European Convention on Mutual Assistance in Criminal Matters.

Paragraph 2 provides that a person in the custody of the Requesting State whose presence in the Requested State is sought for purposes of assistance under this Treaty may be transferred from the Requesting State to the Requested State if the person consents and if the Central Authorities of both States agree. This would also cover situations in which a person in custody in the United States on a criminal matter has sought permission to travel to another country to be present at a deposition being taken there in connection with the case.[16]

Paragraph 3 provides express authority for the receiving State to maintain such a person in custody throughout the person's stay there, unless the sending State specifically authorizes release. This paragraph also authorizes the receiving State to return the person in custody to the sending State, and provides that this return will occur in accordance with terms and conditions agreed upon by the Central Authorities. The initial transfer of a prisoner under this article requires the consent of the person involved and of both Central Authorities, but the provision does not require that the person consent to be returned to the sending State.

Once the receiving State has agreed to assist the sending State's investigation or proceeding pursuant to this article, it would be inappropriate for the receiving State to hold the person transferred and require extradition proceedings before allowing him to return

[14] For example, in September, 1986, the United States Justice Department and the United States Drug Enforcement Administration arranged for four federal prisoners to be transported to the United Kingdom to testify for the Crown in *Regina v. Dye,* Williamson, Ells, Davies, Murphy, and Millard, a major narcotics prosecution in "the Old Bailey" (Central Criminal Court) in London.

[15] U.S.-Switzerland Mutual Legal Assistance Treaty, *supra* note 6, art. 26.

[16] *See* Title 18, United States Code, Section 3508. *See also United States v. King,* 552 F.2d 833 (9th Cir. 1976), *cert. denied,* 430 U.S. 966 (1977), where the defendants insisted on traveling to Japan to be present at the deposition of certain witnesses in prison there.

to the sending State as agreed. Therefore, Paragraph (3)(c) contemplates that extradition proceedings will not be required before the status quo is restored by the return of the person transferred. Paragraph (3)(d) states that the person is to receive credit for time served while in the custody of the receiving State. This is consistent with United States practice in these matters. Paragraph 3(e) provides that, where the receiving State is a third state, the Requesting State shall make all arrangements necessary to meet the requirements of this paragraph.

Paragraph 4 states that safe conduct for the transferred person may be provided for by the Central Authority of the receiving State under the same terms set forth in Article 11, subject to the conditions set forth in paragraph 3 of this article.

## Article 13—Transit of Persons in Custody

Most modern extradition treaties provide for cooperation in the transit of persons being extradited, [17] although the extradition treaty currently in force between the United States and the Czech Republic is silent on this topic. Article 13 is not focused on the transit of extradited persons. Rather, this article provides a basis for mutual cooperation with respect to prisoners who are involved in a criminal investigation or prosecution other than as extradited fugitives (e.g., as witnesses appearing to testify or as defendants appearing to be present at a proceeding).

Paragraph 1 gives each Party the power to authorize transit through its territory of a person being transferred to the other Contracting State by a third state. Paragraph 2 obligates each Party to keep in custody a person in transit during the transit period. Requests for transit are to contain a description of the person being transported and a brief statement of the facts of the case for which the person is sought. Paragraph 3 allows each Party to refuse transit of its nationals.

Under this article, no advance authorization is needed if the person in custody is in transit to one of the Contracting States and is traveling by aircraft and no landing is scheduled in the territory of the other. Should an unscheduled landing occur, a request for transit may be required at that time, and the Requested State may grant the request if, in its discretion, it is deemed appropriate to do so. Where transit is granted, the person in transit shall be kept in custody until such time as the person may continue in transit out of the Requested State.

## Article 14—Location or Identification of Persons or Items

This article provides for ascertaining the whereabouts in the Requested State of persons (such as witnesses, potential defendants, or experts) or items if the Requesting State seeks such information. This is a standard provision contained in all United States mutual legal assistance treaties. The Treaty requires only that the Requested State make "best efforts" to locate the persons or items

---

[17] *See, e.g.,* U.S.-Hungary Extradition Treaty, signed Dec. 1, 1994, entered into force March 18, 1997, art. 19; U.S.-Japan Extradition Treaty, signed March 3, 1978, entered into force March 26, 1980, art. 15 (31 UST 892, TIAS 9625); U.S.-Mexico Extradition Treaty, signed May 4, 1978, entered into force Jan. 25, 1980, art. 20 (31 UST 5059, TIAS 9656).

sought by the Requesting State. The extent of such efforts will vary, of course, depending on the quality and extent of the information provided by the Requesting State concerning the suspected location and last known location.

The obligation to locate persons or items is limited to persons or items that are or may be in the territory of the Requested State. Thus, the United States would not be obliged to attempt to locate persons or items in third countries. In all instances, the Requesting State is expected to supply all available information about the last known location of the persons or items sought.

### Article 15—Service of Documents

Paragraph 1 creates an obligation on the Requested State to use its best efforts to effect the service of documents such as summons, complaints, subpoenas, or other legal papers relating in whole or in part to a Treaty request. Identical provisions appear in several U.S. mutual legal assistance treaties.

It is expected that when the United States is the Requested State, service under the Treaty will be made by registered mail (in the absence of any request by the Czech Republic to follow a specified procedure for service) or by the United States Marshal's Service in instances in which personal service is requested. Service in the Czech Republic typically will be made by mail, unless the United States specifies that some other form is necessary; Czech authorities typically will be able to accommodate such requests.

Paragraph 2 provides that when the documents to be served call for the appearance of a person in the Requesting State, the documents should be received by the Central Authority of the Requested State a reasonable time before the date set for any such appearance.

Paragraph 3 requires that proof of service be returned to the Requesting State in the manner specified in the request.

### Article 16—Search and Seizure

It is sometimes in the interests of justice for one State to ask another to search for, secure, and deliver articles or objects needed in the former as evidence or for other purposes. United States courts can and do execute such requests under Title 28, United States Code, Section 1782.[18] This article creates a formal framework for handling such requests.

The negotiators agreed that requests for the production of physical evidence usually will be executed pursuant to Article 9. In situations in which a subpoena duces tecum or demand for production is inadequate, however, this article permits a search and seizure.

Article 16 requires that the search and seizure request include "information justifying such action under the laws of the Requested State." This means that normally a request to the United States from the Czech Republic will have to be supported by a showing of probable cause for the search. A United States request to the Czech Republic would have to satisfy the corresponding evidentiary standard applicable there at the time of the request.

---

[18] *See e.g.*, United States ex Rel. Public Prosecutor of Rotterdam, *Netherlands v. Van Aalst,* Case No 84-52-M-01 (M.D. Fla., Orlando Div.) (search warrant issued February 24, 1984).

When the Central Authority of the United States submits a request for search and seizure to one of the Central Authorities of the Czech Republic, the United States Central Authority may specify whether it wishes a Czech court or public prosecutor to issue the search and seizure order. Czech authorities can accommodate this request. If the United States request does not specify which Czech authority should execute the request, however, typically a Czech public prosecutor will issue the order and then engage the Czech police to conduct the search and seizure. Under Czech law, there is no need for Czech courts to be involved in the issuance of search and seizure orders. In fact, the practice is that search and seizure orders, as well as subpoenas, generally are issued by public prosecutors.

Paragraph 2 is designed to establish a chain of custody for evidence seized pursuant to a request and to provide a method for proving that chain by certificates admissible in a judicial proceeding in the Requesting State. The Requested State is required to maintain a reliable record, from the time of a seizure, of the “identity of the item, the integrity of its condition, and the continuity of its condition.” This record takes the form of custodians’ certificates. Each successive custodian prepares a certificate that, when joined with the other certificates from other custodians, provides a reliable record tracing the route of the item seized (and any change in its condition) from the Requested State to the judicial proceeding in the Requesting State at which it is introduced into evidence. If the judge in the Requesting State finds that the process is trustworthy, the judge may admit the evidence with the accompanying certificates as authentic. The judge is free to deny admission of the evidence in spite of the certificates if another reason exists to do so aside from authenticity. For the United States, this provision is intended to limit the need to summon officials of the Requested State to testify at trial to situations in which the reliability of the evidence (its origin or condition) is not in serious question. For the Czech Republic, the chain of custody is not a significant factor in the admissibility of evidence.

Paragraph 3 states that the Requested State may require that the Requesting State agree to terms and conditions necessary to protect the interests of third parties in the item to be transferred. This article is similar to provisions in many other United States mutual legal assistance treaties.[19]

ARTICLE 17—RETURN OF ITEMS

This article requires that upon request by the Central Authority of the Requested State, the Central Authority of the Requesting State return as soon as possible any item, including a document, record, or article of evidence, provided by the Requested State pur-

[19] *See e.g.*, U.S.-Argentina Mutual Legal Assistance Treaty, Dec. 4, 1990, art. 15(3); U.S.-Bahamas Mutual Legal Assistance Treaty, *supra* note 12, art. 15(3); U.S.-Canada Mutual Legal Assistance Treaty, *supra* note 10, art. 15(4); U.S.-U.K. Mutual Legal Assistance Treaty Concerning the Cayman Islands, Jul. 3, 1986, art. 15(3); U.S.-Hungary Mutual Legal Assistance Treaty, Dec. 1, 1994, *supra* note 5, art. 15(3); U.S.-Korea Mutual Legal Assistance Treaty, Nov. 23, 1993, art. 15(3); U.S.-Panama Mutual Legal Assistance Treaty, Apr. 11, 1991, art. 15(3); U.S.-Philippines Mutual Legal Assistance Treaty, *supra* note 10, art. 15(3); U.S.-Spain Mutual Legal Assistance Treaty, Nov. 20, 1990, art. 15(3); U.S.-U.K. Mutual Legal Assistance Treaty, Jul. 3, 1986, art. 15(4).

suant to the Treaty. The second sentence of this article provides that when a request for the return of an item is not made until after the transfer has already occurred, the Requesting State shall comply with the request to the extent feasible.

ARTICLE 18—FORFEITURE

A major goal of the Treaty is to enhance the efforts of both the United States and the Czech Republic in combating narcotics trafficking. One significant strategy in this effort is action by United States authorities to seize and confiscate money, property, and other proceeds of drug trafficking.

Paragraph 1 provides that, upon request, the Requested State shall use its best efforts to determine whether proceeds or instrumentalities of a crime, which might be forfeitable or seized, are located in the Requested State. The second sentence requires that the request state the grounds for believing that such proceeds or instrumentalities, in fact, are located in the Requested State. Finally, the last sentence of this paragraph requires that the Requested State inform the Requesting State of the results of its inquiry. Upon notification, the Central Authority of the Contracting Party in which the proceeds or instrumentalities are located may take whatever action is appropriate under its law. If the Contracting Party in which the proceeds or instrumentalities are located takes any action with regard to forfeiture and/or immobilization of the property, its Central Authority shall report to the other Central Authority on the action taken. The phrase "proceeds and instrumentalities of offenses" includes money, securities, jewelry, automobiles, vessels and any other items of value used in the commission of the crime or obtained as a result of the crime.

Paragraph 2 states that the Parties shall assist one another to the extent permitted by their laws in proceedings relating to the forfeiture of the proceeds or instrumentalities of offenses, to restitution to crime victims, or to the collection of fines imposed as sentences in criminal convictions. It specifically recognizes that the authorities in the Requested State may take immediate action to temporarily immobilize the assets pending further proceedings. Thus, if the law of the Requested State enables it to seize assets in aid of a proceeding in the Requesting State or to enforce a judgment of forfeiture levied in the Requesting State, the Treaty provides that the Requested State shall do so. The language of the article is carefully selected, however, so as not to require either State to take any action that would exceed its internal legal authority. It does not mandate institution of forfeiture proceedings or initiation of temporary immobilization in either country against property identified by the other if the relevant prosecution authorities do not deem it proper to do so.[20]

The limited obligation to assist in this regard is carefully crafted to require action only to the extent permitted by the laws of either Contracting Party. If the law of the Requested State enables it to seize assets in aid of a proceeding in the Requesting State or to en-

---

[20] In the Czech Republic, unlike the U.S., the law does not currently allow for civil forfeiture. However, Czech law does permit forfeiture in criminal cases, and ordinarily a defendant must be convicted in order for the Czech Republic to confiscate the defendant's property.

force a judgment or forfeiture in the Requesting State, then the Treaty encourages the Requested State to do so. However, the obligation does not require one Contracting Party to initiate legal proceedings on behalf of the other; the only obligation is to assist the other with its proceedings. As suggested by paragraph 1, institution of forfeiture proceedings in a Contracting Party against assets located there remains a decision for the appropriate authorities of that Contracting Party.

Paragraph 3 gives discretion to the Requested State, to the extent permitted by its laws, to give effect to any final legal determination given in the Requesting State for the forfeiture of such proceeds or instrumentalities, or to initiate its own legal action for the forfeiture of such assets.

United States law permits the government to transfer a share of certain forfeited property to other countries that participate directly or indirectly in the seizure or forfeiture of the property. Under regulations promulgated by the Attorney General, the amount transferred generally reflects the contribution of the foreign government in law enforcement activity which led to the seizure and forfeiture of the property. The law requires that the transfer be authorized by an international agreement between the United States and the foreign country, and be approved by the Secretary of State.[21] Paragraph 4 is consistent with this framework, and will enable a Contracting Party having custody over proceeds or instrumentalities of offenses to transfer forfeited assets, or the proceeds of the sale of such assets, to the other Contracting Party, at the former's discretion and to the extent permitted by their respective laws.

The Czech Republic does not prohibit sharing and, thus, the Czech delegation stated that it thought that Czech authorities could share a percentage of forfeited proceeds with the United States on a case-by-case basis.

### ARTICLE 19—RESTITUTION

This provision obligates the Contracting States to assist each other to the extent permitted by their laws to facilitate restitution. One type of assistance envisioned includes the transfer of items obtained through criminal activity.

### ARTICLE 20—CRIMINAL FINES

This Article obligates the Contracting States to assist, to the extent permitted by their laws, in proceedings regarding criminal fines. The second sentence of this provision specifically states that such assistance is not intended to include the collection of criminal fines.

### ARTICLE 21—COMPATIBILITY WITH OTHER TREATIES

This article states that assistance and procedures provided by this Treaty shall not prevent assistance under any other applicable international agreements. Article 17 also provides that the Treaty shall not be deemed to prevent recourse to any assistance available

[21] *See* Title 18, United States Code, Section 981 (i)(1).

under the internal laws of either country. Thus, the Treaty would leave the provisions of United States and Czech Republic law on letters rogatory completely undisturbed, and would not alter any pre-existing agreements concerning investigative assistance.

ARTICLE 22—CONSULTATION

Experience has shown that as the parties to a treaty of this kind work together over the years, they become aware of various practical ways to make the treaty more effective and their own efforts more efficient. This article anticipates that the Contracting Parties will share those ideas with one another, and encourages them to agree on the implementation of such measures. Practical measures of this kind might include methods of keeping each other informed of the progress of investigations and cases in which treaty assistance was utilized, or the use of the Treaty to obtain evidence that otherwise might be sought via methods less acceptable to the Requested State. Very similar provisions are contained in recent United States mutual legal assistance treaties.[22] It is anticipated that the Central Authorities will conduct annual consultations pursuant to this article.

ARTICLE 23—RATIFICATION, ENTRY INTO FORCE, AND TERMINATION

Paragraph 1 contains standard provisions on the procedure for ratification and the exchange of the instruments of ratification

Paragraph 2 provides that the Treaty shall enter into force two months after the exchange of instruments of ratification.

Paragraph 3 provides that the Treaty shall apply to any request presented after its entry into force, even if the relevant acts or omissions occurred before the date on which the Treaty entered into force. Provisions of this kind are common in law enforcement agreements.

Paragraph 4 contains standard provisions concerning the procedure for terminating the Treaty. Termination shall take effect six months after the date of written notification. Similar termination provisions are included in other United States mutual legal assistance treaties.

## Technical Analysis of the Treaty Between the United States of America and Dominica on Mutual Legal Assistance in Criminal Matters

On October 10, 1996, the United States signed a treaty with Dominica on Mutual Legal Assistance in Criminal Matters ("the Treaty"). In recent years, the United States has signed similar treaties with a number of countries as part of a highly successful effort to modernize the legal tools available to law enforcement authorities in need of foreign evidence for use in criminal cases.

The Treaty is expected to be a valuable weapon for the United States in its efforts to combat organized crime, transnational ter-

[22] *See, e.g.*, U.S.-Philippines Mutual Legal Assistance Treaty, *supra* note 10, art. 18; U.S.-Canada Mutual Legal Assistance Treaty, *supra* note 10, art. XVIII; U.S.-U.K. Mutual Legal Assistance Treaty Concerning the Cayman Islands, *supra* note 19, art. 18; U.S.-Argentina Mutual Legal Assistance Treaty, *supra* note 19, art. 18.