AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO


104TH CONGRESS
2d Session

SENATE

EXEC. REPT.
104–23

# TREATY WITH THE UNITED KINGDOM ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

JULY 30, 1996.—Ordered to be printed

Mr. HELMS, from the Committee on Foreign Relations, submitted the following

# REPORT

[To accompany Treaty Doc. 104–2]

The Committee on Foreign Relations to which was referred the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters, signed at Washington on January 6, 1994, together with a related exchange of notes signed the same date, having considered the same, reports favorably thereon with two provisos and recommends that the Senate give its advice and consent to the ratification thereof as set forth in this report and the accompanying resolution of ratification.

## I. PURPOSE

Mutual Legal Assistance Treaties (MLATs) provide for the sharing of information and evidence related to criminal investigations and prosecutions, including drug trafficking and narcotics-related money laundering. Both parties are obligated to assist in the investigation, prosecution and suppression of offenses in all forms of proceedings (criminal, civil or administrative). Absent a treaty or executive agreement, the customary method of formally requesting assistance has been through letters rogatory.

## II. BACKGROUND

On January 6, 1994, the United States signed a treaty with United Kingdom on mutual assistance in criminal matters and the President transmitted the Treaty to the Senator for advice and consent to ratification on January 23, 1995. In recent years, the United States has signed similar MLATs with many other countries as

29–115

part of an effort to modernize the legal tools available to law enforcement authorities in need of foreign evidence for use in criminal cases.

States historically have been reluctant to become involved in the enforcement of foreign penal law.[1] This reluctance extended to assisting foreign investigations and prosecutions through compelling testimony or the production of documents. Even now, the shared interest in facilitating the prosecution of transnational crime is viewed as being outweighed at times by unwillingness to provide information to those with different standards of criminality and professional conduct.

Despite these hindrances, the need to obtain the cooperation of foreign authorities is frequently critical to effective criminal prosecution. Documents and other evidence of crime often are located abroad. It is necessary to be able to obtain materials and statements in a form that comports with U.S. legal standards, even though these standards may not comport with local practice. Also, assisting prosecutors for trial is only part of how foreign authorities may assist the enforcement process. Detecting and investigating transnational crime require access to foreign financial records and similar materials, while identifying the fruits of crime abroad and having them forfeited may deter future criminal activity. It is necessary to have the timely and discrete assistance of local authorities.

Still, it was not until the 1960s that judicial assistance by means of letters rogatory—requests issuing from one court to another to assist in the administration of justice[2]—were approved. Even then, the ability of foreign authorities to use letters rogatory to obtain U.S. assistance was not established firmly in case law until 1975.[3] By this time, the United States had negotiated and signed a mutual legal assistance treaty with Switzerland, the first U.S. treaty of its kind. This treaty was ratified by both countries in 1976 and entered into force in January 1977. Since then, the United States has negotiated more than 20 additional bilateral MLATs, 14 of which are in force.[4]

Absent a treaty or executive agreement, the customary method of formally requesting assistance has been through letters rogatory. The Deputy Assistant Attorney General of the Criminal Division has summarized the advantages of MLATs over letters rogatory to the House Foreign Affairs Committee as follows:

---

[1] E.g., Restatement (Third) of the Foreign Relations Law of the United States Part IV, ch. 7, subch. A, Introductory Note and § 483, Reporters' Note 2 (1987); Ellis & Pisani, *The United States Treaties on Mutual Assistance in Criminal Matters: A Comparative Analysis, 19 Int. Lawyer 189, 191–198 (discussing history of U.S. reluctance and evolution of cooperation) [hereinafter cited as Ellis & Pisani].*

[2] *See In re Letter Rogatory from the Justice Court, District of Montreal Canada,* 523 F.2d 562, 564–565 (6th Cir. 1975).

[3] *Id.* at 565–566.

[4] According to the August 4, 1995, Letters of Submittal accompanying the MLATs with Austria and Hungary, the United States has bilateral MLATs in force with Argentina, The Bahamas, Canada, Italy, Jamaica, Mexico, Morocco, the Netherlands, Spain, Switzerland, Thailand, Turkey, the United Kingdom concerning the Cayman Islands, and Uruguay. MLATs not in force but ratified by the United States include those with Belgium, Colombia, and Panama. Signed but unratified MLATs include the five addressed in this reports—those with Austria, Hungary, the Republic of Korea, the Philippines, and the United Kingdom—and one with Nigeria. Treaty Doc. 102–21, 104th Cong., 1st Sess. v (1992).

> An MLAT or executive agreement replaces the use of letters rogatory. * * * However, treaties and executive agreements provide, from our perspective, a much more effective means of obtaining evidence. First, an MLAT obligates each country to provide evidence and other forms of assistance needed in criminal cases. Letters rogatory, on the other hand, are executed solely as a matter of comity. Second, an MLAT, either by itself or in conjunction with domestic implementing legislation, can provide a means of overcoming bank and business secrecy laws that have in the past so often frustrated the effective investigation of large-scale narcotics trafficking operations. Third, in an MLAT we have the opportunity to include procedures that will permit us to obtain evidence in a form that will be admissible in our courts. Fourth, our MLATs are structured to streamline and make more effective the process of obtaining evidence.[5]

Letters rogatory and MLATs are not the only means that have been used to obtain assistance abroad.[6] The United States at times has concluded executive agreements as a formal means of obtaining limited assistance to investigate specified types of crimes (*e.g.*, drug trafficking) or a particular criminal scheme (*e.g.,* the Lockheed investigations).[7] A separate, formal means of obtaining evidence has been through the subpoena power. Subpoenas potentially may be served on a citizen or permanent resident of the United States abroad or on a domestic U.S. branch of a business whose branches abroad possess the desired information.[8]

Additionally, the Office of International Affairs of the Criminal Division of the Department of Justice notes several informal means of obtaining assistance that have been used by law enforcement authorities in particular circumstances. These have included informal police-to-police requests (often accomplished through law enforcement personnel at our embassies abroad), requests through Interpol, requests for readily available documents through diplomatic channels, and taking depositions of voluntary witnesses. Informal means also have included "[p]ersuading the authorities in the other country to open 'joint' investigations whereby the needed evidence is obtained by their authorities and then shared with us." The Justice Department also has made "treaty type requests that, even though no treaty is in force, the authorities in the requested country have indicated they will accept and execute. In some countries (*e.g.,* Japan and Germany) the acceptance of such requests is governed by domestic law; in others, by custom or precedent."[9]

Like letters rogatory, executive agreements, subpoenas, and informal assistance also have their limitations compared to MLATs. Executive agreements have been restricted in scope and application. Foreign governments have strongly objected to obtaining

[5] *Worldwide Review of Status of U.S. Extradition Treaties and Mutual Legal Assistance Treaties: Hearings Before the House Committee on Foreign Affairs,* 100th Cong., 1st Sess. 36–37 (1987) (statement of Mark M. Richard, Deputy Assistant Attorney General, Criminal Division).
[6] U.S. Dept. of Justice, United States Attorneys' Manual §§ 9–13.520 *et seq.* (October 1, 1988).
[7] *Id.* at § 9–13.523.
[8] *Id.* at § 9–13.525.
[9] *Id.* at § 9–13.524.

records from within their territories through the subpoena power.[10] There is no assurance that informal means will be available or that information received through them will be admissible in court.

## III. Summary

### A. GENERAL

Mutual legal assistance treaties generally impose reciprocal obligations on parties to cooperate both in the investigation and the prosecution of crime. Most, but not all, MLATs have covered a broad range of crimes with no requirement that a request for assistance relate to activity that would be criminal in the requested State. The means of obtaining evidence and testimony under MLATs also range broadly. MLATs increasingly are extending beyond vehicles for gathering information to include ways of denying criminals the fruits and the instrumentalities of their crimes.

### B. PRIMARY PROVISIONS

*1. Types of proceedings*

MLATs generally call for assistance in criminal investigations and proceedings. This coverage often is broad enough to encompass all aspects of a criminal prosecution, from investigations by law enforcement agencies to grand jury proceedings to trial preparation following formal charges to criminal trial. Most recent MLATs also cover civil and administrative proceedings—forfeiture proceedings, for example—related to at least some types of prosecutions, most frequently those involving drug trafficking. However, the scope of some MLATs has been more circumscribed than the proposed treaty.

The United Kingdom (UK) Treaty calls for the provision of mutual legal assistance in proceedings (art. 1). Proceedings covers "proceedings related to criminal matters and includes any measure or step taken in connection with the investigation or prosecution of criminal offenses, including the freezing, seizure or forfeiture of the proceeds and instrumentalities of crime, and the imposition of fines related to a criminal prosecution." In addition to criminal proceedings, discretionary authority is given to the Central Authorities of the parties to "treat as proceedings for the purpose of this Treaty such hearings before or investigations by any court, administrative agency or administrative tribunal with respect to the imposition of civil or administrative sanctions as may be agreed in writing between the parties" (art. 19).

*2. Limitations on assistance*

All MLATs except various types of requests from the treaty assistance provisions. For example, judicial assistance typically may be refused if carrying out a request would prejudice the national

[10] Notwithstanding foreign objections, unilateral methods such as issuing subpoenas on domestic branches may actually have promoted the negotiation of MLATs. According to one commentator, "the principal incentive for many foreign governments to negotiate MLATs with the United States was, and remains, the desire to curtail the resort by U.S. prosecutors, police agents, and courts to unilateral, extraterritorial means of collecting evidence from abroad." E. Nadelmann, Cops Across Borders: The Internationalization of U.S. Criminal Law Enforcement 315 (1993) [hereinafter cited as Nadelmann].

security or other essential interest of the Requested State. Requests related to political offenses usually are excepted, as are requests related to strictly military offenses. Unlike the extradition treaties, dual criminality—a requirement that a request relate to acts that are criminal in both the Requested and Requesting States—generally is not required. Nevertheless, some treaties do contain at least an element of a dual criminality standard. Additionally, some treaties go beyond military and political offenses to also except requests related to certain other types of crimes. Requests related to tax offenses at times have been restricted in an MLAT to offenses that are connected to other criminal activities. Before a request is denied, a Requested State generally is required to determine whether an otherwise objectionable request may be fulfilled subject to conditions.

The UK MLAT states that a Requested State may refuse assistance if the Requested Party believes that complying with the request would impair its sovereignty, security, or other essential interest, or would be contrary to important public policy. A request also may be denied if it relates to an individual who, if proceeded against in the Requested State for conduct to which the request relates, would be entitled to be discharged on the grounds of previous acquittal or conviction. Assistance may be denied if a request relates to a political offense, and assistance also may be denied if it relates to a military offense not normally punishable under criminal law. Before assistance may be denied, the parties are to consult to consider whether assistance may be given subject to conditions (art. 3).

*3. Transmittal of requests*

Requests under MLATs are conveyed directly through designated Competent Authorities, which in the United States has been the Criminal Division of the Justice Department. The time and paperwork saved in thereby bypassing the courts and diplomatic channels are among the main advantages of MLATs. For example, a report by the Criminal Justice Section of the American Bar Association has stated that the circuity of the channel for transmitting letters rogatory and evidence obtained under them often effectively frustrates use of letters rogatory as a means of obtaining assistance.[11]

The provisions on the form and contents of requests are contained in article 4 of the respective treaties. The proposed MLAT requires that a request for assistance under an MLAT be in writing, except in urgent situations (in which case a request must be confirmed in writing later, typically within 10 days). Among the information usually to be included in a request are (1) the name of the authority conducting the investigation, prosecution, or proceeding to be assisted by the request; (2) a detailed description of the subject matter and nature of the investigation, prosecution, or proceeding to which the request relates, a description of the pertinent offenses; (3) a description of the evidence or other assistance being

[11] American Bar Association, Criminal Justice Section, Report (No. 109) to the House of Delegates 3 (1989 Annual Meeting in Honolulu) (hereinafter cited as ABA Report).

sought; and (4) the purpose for which the assistance is being sought.

To the extent necessary and possible, other information that may facilitate carrying out the request also is to be provided, including, for example, information on the whereabouts of information or persons sought or a description of a place or person to be searched and of objects to be seized. Additional information may include lists of questions to be asked, a description of procedures to be followed, and information on allowances and expenses to be provided to an individual who is asked to appear in the Requesting State. The proposed UK treaty also expressly mentions providing confidentiality requirements.

*4. Execution of requests*

Under the proposed treaties the Competent Authority of a Requested State is to execute a request promptly or, when appropriate, transmit the request to authorities having jurisdiction within the Requested State to execute it. The competent authorities of the Requested State are to do everything in their power to execute the request.

Article 5 of the proposed MLAT provides that requests are to be executed in accordance with the laws and practices of the Requested State, unless the treaties provide otherwise. At the same time, the method of execution specified in a request is to be followed unless the laws of the Requested State prohibit it. As is typical in other MLATs the proposed treaty provides that the judicial authorities of the Requested State shall have power to issue subpoenas, search warrants, or other orders necessary to execute the request.

The Central Authority of a Requested State may postpone or place conditions on the execution of a request if execution in accordance with the request would interfere with a domestic criminal investigation or proceeding, jeopardize the security of a person, or place an extraordinary burden on the resources of the Requested State.

At the request of a Requesting State, a Requested State is to use its best efforts to keep a request and its contents confidential. If a request cannot be executed without breaching confidentiality, the Requested State shall so inform the Requesting State, and the Requesting State then is given the option to proceed nonetheless. (Provisions on keeping information provided to a Requesting State confidential are discussed below.)

Requested States generally bear the costs of executing a request other than expert witness fees; interpretation, transcription, and translation costs; and travel costs for individuals whose presence is Requested in the Requesting State or a third State.

*5. Types of assistance*

In conducting a covered proceeding, a Requesting State commonly may obtain assistance from a Requesting State that includes (1) the taking of testimony or statements of persons located there; (2) service of documents; (3) execution of requests for searches and seizures; (4) the provision of documents and other articles of evidence; (5) locating and identifying persons; and (6) the transfer of

individuals in order to obtain testimony or for other purposes. Also, mutual legal assistance treaties increasingly have called for assistance in immobilizing assets, obtaining forfeiture, giving restitution, and collecting fines.

*Taking testimony and compelled production of documents in Requested State*

The proposed MLAT permits a State to compel a person in the Requested State to testify and produce documents there. Persons specified in the request are to be permitted to be present and usually have the right to question the subject of the request directly or have questions posed in accordance with applicable procedures of the Requested State. If a person whose testimony is sought objects to testifying on the basis of a privilege or other law of the Requesting State, the person nevertheless must testify and objections are to be noted for later resolution by authorities in the Requesting State. The UK MLAT (art. 8) states that a person whose testimony is compelled may be required to testify in accordance with the law of the Requested State.

With respect to questioning a witness by a person specified in the request, though most treaties grant a right to question, the proposed MLAT with the UK (Art. 8) requires that the questioning be conducted by a legal representative qualified to appear before the courts of the Requested State.

*Service of documents*

Under an MLAT, a Requesting State may enlist the assistance of the Requested State to serve documents related to or forming part of a request to persons located in the Requested State's territory. This obligation generally is stated as a requirement of the Requested State to "use its best efforts to effect service" (art. 13). The UK MLAT also expressly states that service of a subpoena or other process shall not impose an obligation under the law of the Requested State to comply with it.

The treaties require that documents requiring a person to appear before authorities be transmitted by "a reasonable time" before the appearance. The service provisions of the MLAT under consideration is broader than some of those under MLATs currently in force. Provisions under some earlier MLATs provide that a Requested State has discretion to refuse to serve a document that compels the appearance of a person before the authorities of the Requesting State.

*Searches and seizures*

MLATs compel that an item be searched for and seized in the Requested State whenever a Requesting State provides information that would be sufficient to justify a search and seizure under the domestic law of the Requested State. The MLAT authorizes conditioning or otherwise modifying compliance to assure protection of third parties who have an interest in the property seized. The proposed MLAT contains procedures and forms for verifying the condition of an item when seized and the chain of individuals through whose hands the item passed. These provisions state that no other verification is necessary for admissibility in the Requesting State.

In addition to showing that a search and seizure would be justified under the law of the Requested State, the proposed UK MLAT (art. 14) allows a request to be refused if the powers of search and seizure could not be exercised in the Requested State in similar circumstances with respect to the conduct involved.

*Provision of documents possessed by the Government*

MLATs provide a variety of means for obtaining documents abroad. Two means—compelled production in a Requested State by an individual there and search and seizure—have been mentioned. Additionally, a Requesting State generally may obtain publicly available documents. In its discretion, a Requested State may provide a Requesting State documents in its possession that are not publicly available if the documents could be made available to domestic authorities under similar circumstances. The proposed MLAT contains provisions setting out authentication forms.

*Testimony in Requesting State*

MLATs do not require the compelled appearance of a person in a Requesting State, regardless of whether the person is in custody or out of custody in the Requested State. Under provisions on persons not in custody, a Requesting State may ask a Requested State to invite a person to testify or otherwise assist an investigation or proceeding in the Requesting State. A request to invite a witness generally is accompanied by a statement of the degree to which the Requesting State will pay expenses. A Requested State is required to invite the person Requested to appear in the Requesting State and to inform that State promptly of the invited witness's response.

A person in custody may not be transferred to a Requesting State under an MLAT unless both the person and the Requested State consent. A Requesting State is required to keep a person transferred in custody and to return the person as soon as possible and without requiring an extradition request for return. The proposed UK Treaty (art. 11) states that a transferred person may not be required to stay in the Requesting State beyond the date on which the person would have been released from custody in the Requested State. Persons transferred receive credit for time spent in custody in the Requesting State.

The proposed MLAT makes some express provision for immunity from process and prosecution for individuals appearing in the Requesting State in accordance with a treaty request. Under the proposed UK MLAT (art. 11) immunity, which can apply to all acts committed prior to departure from the Requested State, is at the discretion of the Requesting State only for persons not in custody. Immunity from process and prosecution expires if the person appearing in the Requesting State stays beyond a designated period after the person is free to leave or if the person appearing voluntarily reenters the Requesting State after leaving.

*Immobilization of assets and forfeiture*

The proposed MLAT contains a forfeiture assistance provision. A Requesting State is permitted to enlist the assistance of a Requested State to forfeit or otherwise seize the fruits or instrumentalities of offenses that the Requesting State leans are located in

the Requested State. A Requested State, in turn, may refer information provided it about fruits and instrumentalities of crime to its authorities for appropriate action under its domestic law and report back on action taken by it.

More generally, the MLATs require the parties to assist each other to the extent permitted by their respective laws in proceedings on forfeiting the fruits and instrumentalities of crime. While the UK MLAT (Art. 16) requires assistance in collecting criminal fines, it is silent on assisting in victim restitution. At the same time, it expressly calls for assistance not only in forfeiture proceedings, but also in proceedings on identifying, tracing, and freezing the fruits and instrumentalities of crime. The proposed MLAT provides that forfeited proceeds are to be disposed of under the law of the Requested State, and if that law permits, forfeited assets or the proceeds of their sale may be transferred to the Requesting State.

*Limitations on use*

To address potential misuse of information provided, MLATs restrict how a Requesting State may use material obtained under them. States at times have raised concerns that MLATs could be used to conduct "fishing expeditions," under which a Requesting State could obtain information not otherwise accessible to it in search of activity it considers prejudicial to its interests. Requested States also are concerned that its own enforcement interests may be compromised if certain information provided by them is disclosed except as is compelled in a criminal trial. As a result, the MLAT contains a provision requiring information be kept confidential and limited in use to purposes stated in the request.

Article 7 of the proposed MLAT allows the Requested State to place confidentiality and use restrictions on information and other material. Typically, a Requested State may require that information or evidence not be used in any investigation, prosecution, or proceeding other than that described in the request. Requested States also may request that information or evidence be kept confidential, and Requesting States are to use their best efforts to comply with the conditions of confidentiality. Nevertheless, once information or evidence has been made public in a Requesting State in the normal course of the proceeding for which it was provided, it may be used thereafter for any other purpose.

While MLATs contain confidentiality and use limits, they do vary. Instead of requiring a Requesting State to use "its best efforts" to comply with a confidentiality request, the UK MLAT requires a Requesting State to inform the Requested State if the request cannot be carried out without breaching confidentiality, at which point the Requested State may determine the extent to which the request may be executed.

*Location of persons or items*

In whole or in part, MLAT requests most often require the Requested State to locate a person or item. The proposed MLAT requires the Requested State's "best efforts" in locating the person or item.

*6. MLATs and defendants*

International agreements frequently confer benefits on individuals who are nationals of the State parties. Investment and immigration opportunities, tax benefits, and assistance in civil and commercial litigation are but some of the advantages an individual may enjoy under an international agreement. Nevertheless, it is clear that MLATs are intended to aid law enforcement authorities only.

The resulting disparity between prosecution and defendant in access to MLAT procedures has led some to question the fairness and even the constitutionality of MLATs denying individual rights. (The constitutional provisions most immediately implicated by denying a defendant use of MLAT procedures are the fifth, sixth, and fourteenth amendments.) At the core of the legal objections compulsory process and other effective procedures for compelling evidence abroad if those procedures are available to the prosecution.[12]

Those opposing defendant use of MLAT procedures fear that States would not enter into MLATs if it meant making information available to criminals. Also, MLATs do not preclude accused persons from using letters rogatory to obtain evidence located in the territory of treaty partners, even though the non-mandatory nature of letters rogatory may result in difficulties in obtaining evidence quickly.

In its response to a question for the record by Senator Helms on this issue the State Department stated:

> There are no legal challenges to any of our existing MLATs. It is the position of the Department of Justice that the MLATs are clearly and unquestionably constitutional.
>
> In 1992, Michael Abbell, then—counsel to some members of the Cali drug cartel, did suggest to the Committee that MLATs should permit requests by private persons such as defendants in criminal cases. To our knowledge, no court has adopted the legal reasoning at the core of that argument.

The Department of Justice believes that the MLATs before the Committee strike the right balance between the needs of law enforcement and the interests of the defense. The MLATs were intended to be law enforcement tools, and were never intended to provide benefits to the defense bar. It is not "improper" for MLATs to provide assistance for prosecutors and investigators, not defense counsel, any more than it would be improper for the FBI to conduct investigations for prosecutors and not for defendants. The Government has the job of assembling evidence to prove guilt beyond a reasonable doubt, so it must have the tools to do so. The defense does not have the same job, and therefore does not need the same tools.

None of the MLATs before the Senate provide U.S. officials with compulsory process abroad. None of the treaties require the treaty

[12] In its 1989 report on MLATs, the Criminal Justice Section of the American Bar Association both strongly supported MLATs and also recommended that "every future MLAT should expressly permit criminal defendants to use the treaty to obtain evidence from the Requested country to use in their defense if they can make a showing of necessity to the trial court." ABA Report at 8.

partner to compel its citizens to come to the United States, and none permit any foreign Government to compel our citizens to go abroad. Rather, the MLATs oblige each country to assist the other to the extent permitted by their laws, and provide a framework for that assistance. Since the Government does not obtain compulsory process under MLATs, there is nothing the defense is being denied.

The MLATs do not deprive criminal defendants of any rights they currently possess to seek evidence abroad by letters rogatory or other means. The MLATs were designed to provide solutions to problems that our prosecutors encountered in getting evidence from abroad. There is no reason to require that MLATs be made available to defendants, since many of the drawbacks encountered by prosecutors in employing letters rogatory had largely to do with obtaining evidence before indictment, and criminal defendants never had those problems.

Finally, it should be remembered that the defendant frequently has far greater access to evidence abroad than does the Government, since it is the defendant who chose to utilize foreign institutions in the first place. For example, the Government often needs MLATs to gain access to copies of a defendant's foreign bank records; in such cases, the defendant already has copies of the records, or can easily obtain them simply by contacting the bank.

## IV. Entry into Force and Termination

### A. ENTRY INTO FORCE

The Treaty enters into force upon exchange of instruments of ratification.

### B. TERMINATION

The Treaty will terminate six months after notice by a Party of an intent to terminate the Treaty.

## V. Committee Action

The Committee on Foreign Relations held a public hearing on the proposed treaty on Wednesday, July 17, 1996. The hearing was chaired by Senator Helms. The Committee considered the proposed treaty on July 24, 1996, and ordered the proposed treaty favorably reported with two provisos by voice vote, with the recommendation that the Senate give its advice and consent to the ratification of the proposed treaty.

## VI. Committee Comments

The Committee on Foreign Relations recommended favorably the proposed treaty. The Committee believes that the proposed treaty is in the interest of the United States and urges the Senate to act promptly to give its advice and consent to ratification. In 1996 and the years head, U.S. law enforcement officers increasingly will be engaged in criminal investigations that traverse international borders. The Committee believes that attaining information and evidence (in a form that comports with U.S. legal standards) related to criminal investigations and prosecutions, including drug traffick-

ing and narcotics-related money laundering, is essential to law enforcement efforts.

To cite an example of how an MLAT can benefit the U.S. justice system, the Committee notes the response by the State Department to Chairman Helms' question for the record regarding how the U.S. has made use of the MLAT with Panama after its 1995 ratification:

> Once recent case from the Southern District of Texas serves as an example of the usefulness of the treaty in the prosecution of financial crimes. In that case, the Assistant U.S. Attorney urgently needed bank records from Panama to verify the dates and amounts of certain money transfers of the alleged fraud proceeds in order to corroborate the testimony of a principal witness. The U.S. requested the records only a short time before they were needed in the trial, and we were pleased that Panamanian authorities produced the records promptly. The records were described by the prosecutor as "the crowning blow" to arguments raised by the defense and indispensable to the Government's ultimate success in the trail.

The Committee believes that MLATs should not, however, be a source of information that is contrary to U.S. legal principles. To attempt to ensure the MLATs are not misused two provisos have been added to the Committee's proposed resolution of ratification. The first proviso reaffirms that ratification of this treaty does not require or authorize legislation that is prohibited by the Constitution of the United States. Bilateral MLATs rely on relationships between sovereign countries with unique legal systems. In as much as U.S. law is based on the Constitution, this treaty may not require legislation prohibited by the Constitution.

The second proviso—which is now legally binding in 11 United States MLATs—requires the U.S. to deny any request from an MLAT partner if the information will be used to facilitate a felony, including the production or distribution of illegal drugs. This provision is intended to ensure that MLATs will never serve as a tool for corrupt officials in foreign governments to gain confidential law enforcement information from the United States.

## VII. Explanation of Proposed Treaty

The following is the Technical Analysis of the Mutual Legal Assistance Treaty submitted to the Committee on Foreign Relations by the Departments of State and Justice prior to the Committee hearing to consider pending MLATs.

### TECHNICAL ANALYSIS OF THE MLAT BETWEEN THE UNITED STATES OF AMERICA AND THE UNITED KINGDOM

On January 6, 1994, the United States and the United Kingdom of Great Britain and Northern Ireland signed the Treaty on Mutual Legal Assistance in Criminal Matters ("the Treaty"). In recent years, the United States has signed similar treaties with a number of countries as part of a highly successful effort to modernize the legal tools available to law enforcement authorities in need of foreign evidence for use in criminal cases. The Treaty is expected to be a valuable weapon in the fight against crime, especially drug

trafficking, and violent crime. The United Kingdom has already played a key role in major cases such as the BCCI case and the Pan Am 103 investigation.

The Treaty obliges United Kingdom officials to assist United States prosecutors and investigators in obtaining testimony or documents in the United Kingdom, conducting searches and seizures in the United Kingdom, transferring persons in custody in the United Kingdom who are needed as witnesses in the United States, and cooperating with the United States in asset forfeiture matters. The Treaty can be used in a wide range of criminal matters such as narcotics offenses, money laundering, acts of terrorism, major international fraud and tax cases.

It is not anticipated that the Treaty will require any new implementing legislation. The United States Central Authority expects to rely heavily on the existing authority of the federal courts under Title 28, United States Code, Section 1782, in the execution of requests. The United Kingdom Central Authority will implement the Treaty pursuant to the Criminal Justice Act of 1990.

The following technical analysis of the Treaty was prepared by the United States delegation that conducted the negotiations.

*Article 1—Scope of assistance*

This article provides for assistance in proceedings for criminal law enforcement matters. The term "proceedings" is defined in article 19 and includes the entire spectrum of activities in connection with criminal prosecution, including any criminal trial, grand jury proceeding in the United States, and court or administrative hearing aimed at the imposition of civil or administrative sanctions as may be agreed upon. The proceedings covered by the Treaty need not be strictly criminal in nature. For example, proceedings to forfeit to the government the proceeds of drug trafficking sometimes are civil in nature,[13] but it is intended that such proceedings fully qualify for assistance under the Treaty.

Paragraph 2 lists the major types of assistance specifically considered by the negotiators. The items listed in this paragraph are described in further detail in subsequent articles. However, the list is not intended to be exclusive, as is indicated by the word "include" in the first clause of the paragraph and by subparagraph (h).

Paragraph 3 makes it clear that the Treaty sets forth the rights and obligations between the governments of the United States and the United Kingdom, and that the Treaty is not intended for use by nongovernmental parties or institutions. Thus, private parties may not invoke the Treaty to obtain assistance or seek evidence for use in solely private matters. This is consistent with other United States mutual legal assistance treaties[14] and reflects the fact that the purpose of the Treaty is to enhance the effectiveness of criminal law enforcement activities, and not to provide an alternative method of evidence-gathering for others.[15] Private litigants in the

[13] See 21 U.S.C. § 881; 18 U.S.C. § 1964.

[14] See generally Ellis and Pisani, United States Treaties on Mutual Assistance in Criminal Matters: A Comparative Analysis, 19 Int'l Law. 189 (1985).

[15] Thus, article 1 generally does not authorize assistance for investigations in either Party that are not being pursued by law enforcement authorities. This is consistent with United States case law on mutual legal assistance, which does not permit such assistance. *See* In re Letter

Continued

United States may continue to seek evidence in the United Kingdom by letters rogatory, an avenue of assistance which the Treaty leaves undisturbed.

Paragraph 3 also states that the Treaty is not intended to create any rights to impede execution of requests or to suppress or exclude evidence obtained thereunder. Thus, a person from whom records are sought may not oppose the execution of the request by claiming that it does not comply with the Treaty's formal requirements, such as those specified in article 4, or the substantive requirements set out in article 3. Therefore, there would be no basis under the Treaty under which any evidence obtained by the United States from the United Kingdom that could be suppressed or excluded on the basis that the United States request somehow failed to comply with the Treaty. This is a standard provision in our mutual legal assistance treaties.[16]

The definition of "proceedings" is important, as paragraph 1 provides that the Treaty applies to investigations and "proceedings" for law enforcement purposes. The Treaty makes it clear that "proceedings" include any proceedings before a criminal court, such as pre-trial hearings, trials, or post-trial hearings. "Proceedings" also include the process by which judicial authorities determine whether to formally charge an offender, and hence include grand jury proceedings in the United States. In article 19(2), the definition of "proceedings" includes any judicial or administrative action which could result in an order directing the forfeiture of proceeds. This provision, upon agreement of the Parties, could include all court or administrative actions of any kinds which would result in the forfeiture of ill-gotten gains (such as disgorgement proceedings in securities cases).

*Article 2—Central authorities*

This article requires that each Party designate a "Central Authority" for transmission, reception, and handling of Treaty requests. The Central Authority of the United States would make all requests to the United Kingdom on behalf of federal agencies, state agencies, and local law enforcement authorities in the United States. The United Kingdom Central Authority would make all requests originating from its officials. The Central Authority of the Requesting Party will exercise some discretion as to the form, content, number, and priority of requests.

Paragraph 2 provides that the Attorney General will be the Central Authority for the United States, as is the case under all other United States mutual legal assistance treaties. The Attorney General has delegated these responsibilities to the Assistant Attorney General in charge of the Criminal Division.[17] Paragraph 3

of Request to Examine Witnesses From the Court of Queen's Bench of Manitoba, Canada, 59 F.R.D. 625 (N.D. Cal. 1973), aff'd, 488 F.2d 511 (9th Cir. 1973).

[16] See Ellis and Pisani, United States Treaties on Mutual Assistance in Criminal Matters: A Comparative Analysis, 19 Int'l Law. 211–12, 221–22 (1985); see also *United States* v. *Johnpoll,* 739 F.2d 702 (2d Cir. 1984).

[17] 28 C.F.R. § 0.64–1. The Assistant Attorney General for the Criminal Division has in turn delegated this authority to the Deputy Assistant Attorneys General and the Director of the Criminal Division's Office of International Affairs, in accordance with the regulation. Directive No. 81, 44 Fed. Reg. 18,661 (1979), as amended as 45 Fed. Reg. 6,541 (1980); 48 Fed. Reg. 54,595 (1983). That delegation subsequently was extended to the Deputy Directors of the Office of International Affairs. 59 Fed. Reg. 42,160 (1994).

specifies that the Central Authority for the United Kingdom shall be the Secretary of State for the Home Department or a person designated by the Secretary of State for purposes specified in the designation.

The Central Authority of the Requested Party is also responsible for receiving each request from the Requesting Party and transmitting it to the appropriate federal or state agency, court or other authority for execution, with a view to ensuring that a timely response is made.

*Article 3—Limitations on assistance*

This article specifies the limited classes of cases in which assistance may be denied under the Treaty.

Paragraph 1(a) permits the Central Authority of the Requested Party to deny a request if execution of the request would prejudice its sovereignty, security or other essential interests, or would be contrary to an important public policy. In an exchange of diplomatic notes dated January 6, 1994, the Parties agreed that the term "important public policy" in paragraph 1(a) would include a Requested Party's policy of opposing the exercise of jurisdiction which in its view is extraterritorial and objectionable. For example, the United Kingdom advised that what are known as "re-export cases" would closely scrutinized, and it was possible that assistance for such cases would be denied under the "important public policy" clause of 3(1)(a).

Paragraph 1(b) permits the Requested Party to deny assistance under the Treaty if the target of the investigation or the defendant in the case had previously been tried and convicted or acquitted on the same facts outlined in the request.[18] This approach is similar to the concept of non bis in idem in international extradition treaties. In an exchange of diplomatic notes dated January 6, 1994, the Parties agreed that paragraph 1(b) shall not affect the availability of assistance with respect to other participants in the offense who are not the subjects of a previous acquittal or conviction.

Paragraph 1(c)(i) permits the Requested Party to deny the request if it relates to a political offense, and paragraph 1(c)(ii) permits denial if the offense is a military offense. These restrictions are similar to those found in other mutual legal assistance treaties. It is anticipated that the Central Authorities will employ jurisprudence similar to that used in the extradition context for the application of these provisions.

Extradition treaties sometimes condition the surrender of fugitives upon a showing of "dual criminality," i.e., proof that the facts underlying the offense charged in the Requesting Party would also constitute an offense in the Requested Party. The United States usually resists including such a provision in its mutual legal assistance treaties. During the negotiations with the United Kingdom, a dual criminality requirement was considered but rejected. It was agreed, however, that assistance would not be provided under the Treaty in one specified class of offenses which is considered criminal in one Party but not in the other. In an exchange of diplomatic

[18] A similar provision is found in the U.S.-Bahamas Treaty, June 12 & Aug. 18, 1987, art. 3(1)(c) T.I.A.S. No.—; and the U.S.-Panama Treaty, Apr. 11, 1991, art 3(1)(c), T.I.A.S. No.—.

notes dated January 6, 1994, the Parties agreed that the Treaty shall not apply to antitrust or competition law investigations or proceedings.[19] This agreement was reached because in the United Kingdom, antitrust and anticompetitive policy are not enforced by criminal sanctions, often involve sensitive issues of national economic policy and implicate the United Kingdom's relations with its fellow European Union member-states.

Paragraph 2 is similar to article 3(2) of the United States-Switzerland Mutual Legal Assistance Treaty, and obliges the Requested Party to consider imposing appropriate conditions on its assistance in lieu of denying a request outright pursuant to paragraph 1. For example, a Party might request information that could be used either in a routine criminal case (which would be within the scope of the Treaty) or in a political prosecution (which would be subject to refusal under the Treaty's terms). This paragraph would permit the Requested Party to provide the information on the condition that it be used only in the routine criminal case. Naturally, the Requested Party would notify the Requesting Party of any proposed conditions before actually delivering the evidence in question, thereby according the Requesting Party an opportunity to indicate whether it is willing to accept the evidence subject to the conditions. If the Requesting Party does accept the evidence, it must respect the conditions specified by the Requested Party with respect to the evidence.

*Article 4—Form and contents of requests*

This article is similar to article 29 of the United States-Swiss Treaty, which, in turn, is based on article 14 of the European Convention on Mutual Assistance in Criminal Matters.

Paragraph 1 requires that requests be in writing. If exigent circumstances make this impracticable, it is understood that the Central Authorities will communicate the written request within ten days of an oral one.

Paragraph 2 lists information which is deemed crucial to the efficient operation of the Treaty and so must be included in each request. Paragraph 3 outlines kinds of information which are important but not crucial, and which should be provided "to the extent necessary and possible."

In keeping with the intention of the Parties that requests be as simple and straightforward as possible, there is no requirement under the Treaty that a request be legalized or certified in any particular manner.

*Article 5—Execution of requests*

Paragraph 1 requires each Party to "take whatever steps it deems necessary" to execute a request.

---

[19] The exchange of notes also states that the Central Authorities may, at their discretion, treat as proceedings for the purpose of the Treaty such individual antitrust or competition law matters, or antitrust or competition law matters generally, as may be agreed in writing between the Parties at a later date. The Parties also agreed that while antitrust matters are not covered by the Treaty, assistance in such matters may be provided under other applicable arrangements, agreements, practices, or policies. For example, the United Kingdom may provide assistance under the Criminal Justice (International Cooperation) Act 1990, which permits assistance for any criminal matter.

The Treaty contemplates that the Central Authority which receives a request will first review the request and immediately notify the Central Authority of the Requesting Party if it is of the opinion that the request does not comply with the Treaty's terms. If the request does satisfy the Treaty's requirements and the assistance sought can be provided by the Central Authority itself, the request will be fulfilled immediately. If the request meets the Treaty's requirements but its execution requires action by some other entity in the Requested Party, the Central Authority will see to it that the request is promptly transmitted to the correct entity for execution.

When the United States is the Requested Party, it is anticipated that the Central Authority will transmit most requests to federal investigators, prosecutors, or judicial officials for execution. A request may be transmitted to state officials for execution, however, if the Central Authority deems it more appropriate to do so.

Paragraph 1 authorizes and requires the federal, state, or local agency or authority selected by the Central Authority to take whatever action would be necessary and within its power to execute the request. This is not intended or understood to authorize the use of the grand jury in the United States for the collection of evidence pursuant to a request from the United Kingdom. Rather, it is anticipated that when a request from the United Kingdom requires compulsory process for execution, the Department of Justice would ask a federal court to issue the necessary process under Title 28, United States Code, Section 1782 and the provisions of the Treaty.

It is understood that if execution of the request entails action by a judicial authority or administrative agency, the Central Authority of the Requested party shall arrange for the presentation of the request to that court or agency at no cost to the other Party. Since the cost of retaining counsel abroad to present and process letters rogatory is sometimes quite high, this provision for reciprocal legal representation should be a significant advance in international legal cooperation. It is also understood that should the Requesting Party choose to hire private counsel in connection with a particular request, it is free to do so.

Paragraph 3 requires that the method of execution specified in the request shall be followed except to the extent that the method is incompatible with the laws and practices of the Requested Party. This provision is necessary for the following two reasons.

First, there are significant differences between the procedures that must be followed by United States and United Kingdom authorities in collecting evidence in order to safeguard the admissibility of that evidence at trial. For instance, United States law permits documentary evidence taken abroad to be admitted into evidence, if duly certified and if the defendant was given a fair opportunity to test its authenticity.[20] Similarly, United States courts sometimes prefer that depositions abroad be videotaped in order to better preserve and present to the jury the witness's demeanor. While United Kingdom law enforcement officials do not utilize these procedures in preparing cases for submission to United Kingdom courts a this time, there is no legal prohibition against these

[20] 18 U.S.C. § 3505.

techniques being used in the United Kingdom to prepare evidence for use in the United States.

Second, the evidence in question could be needed for subjection to forensic examination, and sometimes the procedures which must be followed to enhance the scientific accuracy of such tests do not coincide with those utilized in assembling evidence for admission into evidence at trial. The value of such forensic examinations could be significantly lessened—and the Requesting Party's investigation could be hampered—if the Requested Party were to insist unnecessarily on handling the evidence in a manner usually reserved for evidence to be presented to its own courts.

Both delegations agreed that the Treaty's primary goal of enhancing law enforcement could be frustrated if the Requested Party were to insist on producing evidence in a manner which renders the evidence inadmissible or less persuasive in the Requesting Party. For this reason, paragraph 3 requires the Requested Party to follow the procedure outlined in the request to the extent that it can, even if the procedure is not that usually employed in its own proceedings. However, if the procedure called for in the request is unlawful in the Requested Party (as opposed to simply unfamiliar there), the appropriate procedure under the law applicable for investigations or proceedings in the Requested Party will be utilized.

Paragraph 4 states that a request for assistance need not be executed immediately when execution would interfere with an investigation or legal proceeding in progress in the Requested Party. The Central Authority of the Requested Party will determine when to apply this provision. The Central Authority of the Requested Party may, in its discretion, take such preliminary actions as it deems advisable to obtain or preserve evidence which many otherwise be lost before the conclusion of the investigation or legal proceeding taking place in that Party. If this is done, the Requesting Party should not be seriously disadvantaged by having to wait for the conclusion of the proceedings in the Requested Party. This paragraph, like article 3(2), allows the Requested Party to consider imposing appropriate conditions on its assistance after consultation with the Requesting Party.

Paragraph 5 requires that the Central Authority of the Requested Party facilitate the participation in the execution of requests any persons specified in the requests.

Paragraph 6 states that the Requested Party may request information from the Requesting Party in order to give effect to its request.

Paragraph 8 requires that the Central Authority of the Requested Party promptly notify the Central Authority of the Requesting Party of the outcome of the execution of the request. This ensures that the Requesting party will be kept informed of the status of the execution of its request and that when a request is only partly executed, the Requested Party will provide some explanation for not providing all of the information or evidence sought.

*Article 6—Costs*

This article proceeds from the basic principle that the Requested Party should bear all expenses incurred in the execution of the request, but obliges the Requesting Party to pay fees of private ex-

perts and allowances and expenses related to travel, unless otherwise mutually decided in a particular case. For example, a major case in the Requesting Party could involve substantial (and costly) investigative efforts in the Requested Party, while the law enforcement authorities of the two Parties have finite resources. Therefore, paragraph 2 requires that the Central Authorities consult "with a view to reaching agreement" on the conditions under which the request shall be executed and the manner in which costs shall be allocated" if execution of the request requires costs or other resources of an extraordinary nature.

*Article 7—Confidentiality and limitations on use*

Paragraph 1 states that upon request, the Requested Party shall keep confidential any information that might indicate that a request has been made or responded to. If the request cannot be executed without breaching confidentiality (as may be the case if execution requires a public judicial proceeding in the Requested Party), the Requested Party shall so inform the Requesting Party, which shall then determine the extent to which it wishes the request to be executed.

Paragraph 2 requires that the Requesting Party refrain from using any information provided under the Treaty for any purpose other than stated in the request without the consent of the Central Authority of the Requested Party.

The United Kingdom delegation expressed particular concern that information it supplies in response to United States requests receive the same kind of confidentiality accorded exchanges of information via diplomatic channels, and not be disclosed under the Freedom of Information Act. The Parties agreed that this clause of the Treaty, as drafted, would mean that a Requested Party would not use or disclose any information or evidence obtained under the Treaty for any purposes unrelated to the proceedings stated in the request without the prior consent of the Requested Party.

If the United States government were to receive evidence under the Treaty in one case which proved to be exculpatory to the defendant in another case, the United States could be obliged to share the evidence with the defendant in the second case.[21] Therefore, in an exchange of diplomatic notes dated January 6, 1994, the Parties agreed that paragraph 2 shall not preclude the use or disclosure of information to the extent that there is an obligation to do so under the Constitution or law of the Requesting Party in a criminal prosecution. Notice of any such proposed disclosure shall be provided by the Requested Party in advance.

Once evidence obtained under the Treaty has been revealed to the public in a trial, that information effectively becomes part of the public domain. The information is likely to become a matter of common knowledge, perhaps even cited or described in the press. When such information has been made public, it is practically impossible for the Central Authority of the Requesting Party to block the use of that information by third parties. Therefore, paragraph 3 provides that once information or evidence becomes public, the Requesting Party is free to use it for any purpose.

[21] See *Brady* v. *Maryland,* 373 U.S. 83 (1963).

*Article 8—Taking testimony and producing evidence in the territory of the Requested Party*

Paragraph 1 states that a person in the Requested Party may be compelled, if necessary,[22] to appear and testify or produce documents, records, of articles of evidence. The compulsion contemplated by this article can be accomplished by subpoena (if the Requested Party's law so provides) or any other means available under the law of that Party. This provision means that the procedure for executing a request under the Treaty would have to conform with the laws of the Requested Party. It should be stressed that it is the Treaty that determines whether assistance is required, and local law governs the different (if equally important) question of how the assistance is provided.

Paragraph 2 ensures that no person would be compelled to furnish information if the person has a right not to do so under the law of the Requested Party. Thus, a witness questioned in the United States pursuant to a Treaty request from the United Kingdom is guaranteed the right to invoke any of the testimony privileges (e.g., attorney-client, inter-spousal) usually available in proceedings in the United States, as well as the constitutional privilege against self-incrimination.[23] Of course, a witness testifying in the United Kingdom may raise any of the similar privileges available under United Kingdom law.

Since the law is unclear on the extent to which a person in one country may stand on a privilege available only under the law of a foreign country, the Treaty neither requires nor forbids the recognition in the Requested Party of privileges existing only under the law of the Requesting Party. Paragraph 2 does require that in cases in which a witness attempts to assert a privilege unique to the jurisprudence of the Requesting Party, the authorities in the Requested Party will take the desired evidence and turn it over to the Requesting Party along with notice that it was obtained over a claim of privilege. The applicability of the privilege can then be determined in the Requesting Party, where the scope of the privilege and the legislative and policy reasons underlying it are best understood.[24] A similar provision appears in many of our recent mutual legal assistance treaties.

Paragraph 3 requires that upon request, the Central Authority of the Requested Party must notify the Central Authority of the Requesting Party "in advance" of the date and place of the taking of testimony. Although the time period "in advance" is undefined, the negotiations understood that each Party would attempt to accommodate the needs of the other in this regard.

---

[22] Use of the words "if necessary" appears at first glance to make the obligation to execute a request for testimony discretionary. However, the words "if necessary" were used in the Treaty in order to make it clear that compulsory process is not required in every case. For instance, a witness may be willing to provide the needed testimony voluntarily. Use of the words "may be compelled" without the words "if necessary" might appear to oblige the Requested Party to issue a subpoena or other compulsory process even if it was not necessary. The United States and United Kingdom delegations fully intended that the Treaty establish a mandatory obligation to arrange the production of the requested testimony, leaving it to the Requested Party's discretion whether to use compulsory judicial process to fulfill that obligation.

[23] This is consistent with the approach taken in Title 28, United States Code, Section 1782.

[24] Cf., *F. & J. Dick Co.* v. *Bass,* 295 F. Supp. 758 (N.D. Ga. 1966); *Reg.* v. *Rathbone, Exp. Dikko,* 2 W.L.R. 375 (1985).

Advance notice is of particular importance to the United States because our authorities sometimes rely heavily on deposition testimony when a witness is unwilling or unable to come to the United States to testify at trial. With assurances of advance notice, a United States trial court can order that a deposition take place in the United Kingdom on a date to be specified by British authorities; the United States court may even indicate a preferred date. The Central Authorities will attempt to accommodate the court and will notify the court sufficiently in advance of the depositions in order to permit the parties to be present.

Paragraph 4 provides that interested parties, including the defendant and defense counsel in criminal cases, may be permitted to be present and pose questions during the taking of testimony under this article.

Paragraph 5 states that documentary information produced pursuant to the Treaty may be authenticated by having a custodian of records or other qualified person complete, under oath, a certification in a specified form. A model of the form to be used by the United States is appended to the Treaty. Thus, the provision establishes a procedure for authenticating United Kingdom records for use in the United States in a manner essentially similar to that provided for under Title 18, United States Code, Section 3505.[25]

The final sentences of the article provide that the evidence is "admissible," but it will be the responsibility of the judicial authority presiding at the trial to determine whether the evidence should in fact be admitted. The negotiators intended that evidentiary tests other than authentication (e.g., relevance and materiality) will still have to be satisfied in each case.

*Article 9—Records of government agencies*

This article serves to ensure speedy access to government records, including records of the executive, judicial, and legislative branches at the federal, state, and local levels.

Paragraph 1 obliges each Party to furnish the other copies of publicly available records of government departments and agencies. The term "government departments and agencies" includes executive, judicial, and legislative units at the federal, state, and local levels in either Party.

Paragraph 2 provides that the Requested Party "may" share with the Requested Party copies of non-public information in its government files. The article states that the Requested Party may only utilize its discretion to turn over information in its files "to the same extent and under the same conditions" as it would with respect to its own law enforcement or judicial authorities. It was the intention of the negotiators for the Central Authority of the Requested Party to determine the extent and the nature of the conditions. The discretionary nature of this provision is necessary because official files in each Party contain some information that would be available to investigative authorities in that Party, but which justifiably would be deemed inappropriate to release to a foreign government. Examples of instances in which assistance might

[25] It is understood that the second and third sentences of the article provide for the admissibility of authenticated documents as evidence without additional foundation or authentication. With respect to the United States, this paragraph is self-executing.

be denied under this provision would be when disclosure of the information is barred by law in the Requested Party or when the information requested would identify or endanger an informant, prejudice sources of information needed in future investigations, or reveal information which was made available to the Requested Party in return for a promise that it not be divulged.

Paragraph 3 states that documents provided under this article will be authenticated pursuant to a certificate in a form appended to the Treaty. Thus, the authentication will be conducted in a manner similar to that required by rule 902(3), Federal Rules of Evidence, and the records will be admissible into evidence without additional foundation or authentication.

In discussing this article, the United States delegation explained the significance of Title 26, United States Code, Section 6103(k)(4), and indicated that if the negotiators agreed that the Treaty was intended to be a vehicle by which tax information could be provided, then the United States could give the United Kingdom assistance when it needs information in the possession of the Internal Revenue Service which otherwise could not be furnished. The United Kingdom delegation responded that the assistance it intends to grant will include tax information in some circumstances. Therefore, the United States delegation was satisfied that the Treaty, like the other United States mutual legal assistance treaties, is a “convention” within the meaning of Title 26, United States Code, Section 6103(k)(4).

The article refers to the provision of copies of government records, but the Requested Party would not be precluded from delivering the original government records to the Requesting Party, upon request, if the law in the Requested Party permits it and if it is essential to do so.

*Article 10—Personal appearance in the territory of the Requesting Party*

This article provides that upon request, the Requested Party shall invite witnesses who are located in its territory and needed to testify in the Requesting Party for that purpose. An appearance in the Requesting Party under this article is not mandatory; the invitation may be refused by the prospective witness.

Of course, the Requesting Party would be expected to pay the expenses of such an appearance. It is assumed that such expenses would normally include the costs of transportation, room, and board. When the witness is to appear in the United States, a nominal witness fee would also be provided.

Paragraph 3 provides that a person who is in the Requesting Party to testify or for confrontation purposes pursuant to the Treaty shall be immune from criminal prosecution, detention or any other restriction on personal liberty, or service of process in a civil suit while present in the Requesting Party. This “safe conduct” is limited to acts or convictions which preceded the witness’s departure from the Requested Party. It is understood that this provision does not, of course, prevent the prosecution of a person for perjury or any other crime committed while in the Requesting Party.

Paragraph 4 states that the safe conduct guaranteed by this article expires 15 days after the witness has been officially notified

that the witness's presence is no longer required, or if the witness leaves the territory of the Requesting Party and thereafter returns to it.

*Article 11—Transfer of persons in custody*

In some recent criminal cases, a need has arisen for the testimony at a trial in one country of a witness serving a sentence in another country. In some instances, the country involved was willing and able to "lend" the witness to the United States government, provided the witness would be carefully guarded while here and returned at the conclusion of the testimony.[26] In some recent cases, the United States government was able to arrange for federal inmates in the United States to be transported to foreign countries to testify in criminal proceedings there.[27] This article calls for mutual assistance in situations of this kind and thereby provides an express legal basis for cooperation in these matters. The provision is based on article 26 of the United States-Switzerland Treaty, which is in turn based on article 11 of the European Convention on Mutual Assistance in Criminal Matters.

Recently, some persons in custody in the United States have demanded permission to travel to other countries to be present at depositions to be taken there in connection with their criminal cases.[28] This article addresses this situation.

Paragraph 2 provides express authority for the receiving Party to maintain the person in custody throughout the person's stay there, unless the sending Party specifically authorizes release. The paragraph also obliges the receiving Party to return the person in custody to the sending Party, and provides that this return will occur as soon as circumstances permit or as otherwise agreed to. The transfer of a prisoner under this article requires the consent of the person involved and of the Parties, but the prisoner need not consent to be returned to the sending Party.

Once the receiving Party has agreed to assist the sending Party in its investigation or proceeding pursuant to this article, it would be inappropriate for the receiving Party to hold the person transferred and require formal extradition proceedings before permitting the person's return to the sending Party. Therefore, paragraph 2(c) contemplates that extradition proceedings will not be required before the status quo is restored by the return of the person transferred.

*Article 12—Location or identification of persons*

This article provides that the Requested Party is to ascertain the location or identity in the Requested Party of persons (such as witnesses, potential defendants, or experts) when such information is of importance in connection with an investigation or proceeding covered by the Treaty. The Treaty requires only that the Requested Party make "best efforts" to locate or identify such persons.

[26] Federal law provides for this situation. See 18 U.S.C. § 3508.

[27] For example, in September, 1986, the Justice Department and the Drug Enforcement Administration arranged for four federal prisoners to be transported to the United Kingdom to testify for the Crown in *Regina* v. *Dye,* a major narcotics prosecution in Central Criminal Court ("the Old Bailey") in London.

[28] See *United States* v. *King,* 552 F.2d 833 (9th Cir. 1976) (defendants insisted on travelling to Japan to be present at deposition of certain witnesses in prison).

*Article 13—Service of documents*

This article creates an obligation on the part of the Central Authority of the Requested Party to arrange for or effect the service of summonses, complaints, subpoenas, or other legal documents at the request of the Central Authority of the Requesting Party.

It is expected that when the United States is the Requested Party, service under the Treaty will be made by registered mail (in the absence of a request by the United Kingdom to follow any other specified procedure for service) and by the United States Marshals Service in instances when personal service is requested.

It is anticipated that this article will facilitate service of subpoenas on United States citizens located in the United Kingdom pursuant to United States law.[29]

Paragraph 3 states that when the document to be served calls for the appearance of a person in the Requesting Party, the document must be transmitted by the Requesting Party to the Requested Party by a reasonable time before the scheduled appearance. Thus, if the United States were to ask the United Kingdom to serve a subpoena issued pursuant to Title 28, United States Code, Section 1783 on a United States citizen in the United Kingdom, the request would have to be submitted well in advance of the hearing or trial at which the citizen is expected to appear. This is to allow sufficient time for service to be effected and for the person to make arrangements for the appearance.

Paragraph 4 requires that proof of service be returned to the Requesting Party.

*Article 14—Search and seizure*

It is sometimes in the interests of justice for one Party to ask another to search for, secure, and deliver articles or objects needed as evidence or for other purposes. United States courts can and do execute such requests under Title 28, United States Code, Section 1782.[30] The United Kingdom delegation felt that such requests could be carried out under current United Kingdom law if made by letters rogatory.

This article creates a framework for handling such requests. Pursuant to paragraph 1's requirement that the request include "information justifying such action under the laws of the Requested Party," a request to the United States from the United Kingdom will have to be supported by probable cause for the search. A United States request to the United Kingdom would have to satisfy the corresponding evidentiary standard there. It is contemplated that the request would be carried out in strict accordance with the law of the Requested Party.

Paragraph 2 allows the Central Authority of the Requested Party to refuse a request for search and seizure if it necessitates actions that would not be legally exercisable in the Requested Party in similar circumstances.

Paragraph 3 is designed to ensure that a record is kept of articles seized and delivered under the Treaty. This provision effec-

[29] See 28 U.S.C. § 1783.

[30] See, e.g.,*United States ex rel. Public Prosecutor of Rotterdam, Netherlands* v. *Van Aalst,* Case No. 84–67-Misc-018 (M.D. Fla., Orlando Div.).

tively requires that detailed and reliable records be kept regarding the condition of the article at the time of the seizure and the chain of custody between the time of seizure and time of delivery to the Requesting Party.

The article also requires that the certificates prepared for this purpose be admissible at trial without additional authentication. This is intended to avoid the burden, expense, and inconvenience to the Requested Party of sending its officials to the Requesting Party to provide testimony concerning authentication and the chain of custody every time evidence produced pursuant to this article is introduced. the fact that the certificates are admissible without additional authentication leaves the trier of fact free to accord the certificates such weight as is due.

Paragraph 4 states that the Requested Party need not surrender any articles it has seized unless it is satisfied that any interests of third parties therein are adequately protected. This article is similar to provisions in many United States extradition treaties.[31]

*Article 15—Return of documents and articles*

This article provides that any documents, records or articles of evidence furnished under the Treaty must be returned to the Requested Party unless such return is waived by the Requested Party. Documents or items provided to the United States pursuant to a Treaty request therefore must be returned to the United Kingdom once they are no longer needed here, unless authorities in the United Kingdom give permission for a different disposition. The negotiators anticipated that unless original records or articles of some intrinsic value were provided, the Requested Party will routinely waive return, but this is a matter best left to development of practice.

*Article 16—Assistance in forfeiture proceedings*

A primary goal of the Treaty is to enhance the efforts of both Parties in the war against narcotics trafficking. One major strategy in drug enforcement by United States authorities is to seize and confiscate the money, property, and other proceeds of drug trafficking.

This article is designed to further that strategy. Paragraph 1 states that the Parties shall aid one another in proceedings involving the identification, tracing, seizure or forfeiture of the proceeds and instrumentalities of crime. The traditional rule was that no country was obliged to aid another in the execution of penal laws respecting enforcement of fines or forfeiture of criminal assets. However, this rule is gradually changing, at least in instances in which the foreign country's laws are designed to provide redress to individual victims, or when the foreign country has already perfected its title to the assets it claims.[32] Moreover, any country is always free to assume a treaty obligation broader than a customary international obligation. In article 16, the Parties agree to aid one

[31] See, e.g., United States-Canada Extradition Treaty, Dec. 3, 1971, art. 15, 27 U.S. T. 983, T.I.A.S. No. 8237.

[32] See, e.g., *Mutual Assistance in Criminal Matters: A Commonwealth Perspective* at 32–34 (prepared by Dr. David Chaikin and Commonwealth Secretariat for meeting of Commonwealth Law Ministers, Colombo, Sri Lanka, Feb. 14–18, 1985).

another, upon request, in proceedings involving the identification, tracing, seizure and forfeiture of illegally obtained assets, in restoring illegally obtained funds or articles to their rightful owners, and in the collection of fines imposed at sentencing. The term "proceeds and instrumentalities" would include items such as money, vessels, or other valuables either used in the commission of the offense or obtained as a result of the offense.

Thus, if the law of the Requested Party enables it to seize assets in aid of a proceeding in the Requesting Party or to enforce a judgment of forfeiture or fine levied in the Requesting Party, the Treaty requires the Requested Party to do so. The article does not mandate institution of forfeiture proceedings in either Party against property identified by the other Party if the relevant prosecutive authorities do not deem it proper to do so.

Paragraph 2 states that one Part may notify the other of the location of assets in its territory which may be forfeitable or otherwise subject to seizure. Upon receipt of notice under this article, the Central Authority of the Party in which the proceeds are located may take whatever action is appropriate under the law of that Party. For instance, if the assets in question are located in the United States and were obtained as a result of a fraud in the United Kingdom, they may be seized in aid of a prosecution under Title 18, United States Code, Section 2314,[33] or may be made subject to a temporary restraining order in anticipation of a civil action for the return of the assets to the lawful owner. If the assets are located in the United Kingdom, we expect similar action may be taken pursuant to United Kingdom law.[34] If the assets in question are the fruit of drug trafficking, it is anticipated that the Parties will move quickly and expeditiously to freeze them and ensure their confiscation.

Paragraph 3 provides for the disposition of forfeited proceeds or property. Such disposition shall be in accordance with the law of the Requested Party. The Requested Party may keep the forfeited assets or the proceeds thereof or share them with the Requesting Party.

United States law permits the transfer of forfeited property or a portion of the proceeds of the sale thereof to any foreign country that participated directly or indirectly in the seizure or forfeiture of the property.[35] The amount transferred generally reflects the contribution of the foreign government in the law enforcement activity that led to the seizure or forfeiture of the property under United States law. United States sharing statutes require that the transfer recommended by the Attorney General or the Secretary of the Treasury be authorized in an international agreement between the United States and the foreign country and be agreed to by the Secretary of State. Article 16 is intended to authorize and provide

---

[33] This statute makes it an offense to transport money or valuables in interstate or foreign commerce knowing that they were obtained by fraud in the United States or abroad. 18 U.S.C. § 2314.

[34] Under some circumstances, English common law at the present time permits this to be done. See *Mareva Compania Naviera SA* v. *Int'l Bulkcarriers SA,* All ER 213 (1980), *Bankers Trust Co.* v. *Shapira,* 1 W.L.R. 1274 (1980).

[35] E.g., 18 U.S.C. § 981(i)(1).

for the transfer of forfeited assets or the proceeds of such assets to the United Kingdom pursuant to United States sharing statutes.

Title 18, United States Code, Section 981(a)(1)(B) also permits the forfeiture to the United States of property "which represents the proceeds of an offense against a foreign nation involving the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act) within whose jurisdiction such offense or activity would be punishable by death or imprisonment for a term exceeding one year and which would be punishable by imprisonment for a term exceeding one year if such act of activity had occurred within the jurisdiction of the United States." The United States delegation intended that article 16 will permit full implementation of this legislation.

*Article 17—Compatibility with other arrangements*

This article provides that the Parties are free to provide assistance pursuant to other international agreements or arrangements or other agreements or practices which may be applicable between the two Parties. It also provides that the Treaty shall not be deemed to prevent recourse to any assistance available under the internal laws of either Party. Thus, the Treaty leaves the law of the United States and the United Kingdom on letters rogatory completely undisturbed and does not alter any pre-existing agreements concerning assistance.

On such agreement discussed by the Parties is the Agreement Concerning the Investigation of Drug Trafficking Offenses and the Seizure and Forfeiture of Proceeds and Instrumentalities of Drug Trafficking, done at London February 9, 1989, which is also known as "the Drug Agreement." Since the Drug Agreement was intended as an interim measure pending negotiation of this Treaty, article 16 of the Drug Agreement states that it will terminate when the Treaty enters into force. Both the United States and the United Kingdom, however, now prefer that the Drug Agreement remain in effect. Therefore, in a January 6, 1994, exchange of diplomatic notes, United States and the United Kingdom representatives indicated their governments' desires that the Drug Agreement remain in force notwithstanding the entry into force of the Treaty. The Parties also amended the Drug Agreement by deleting the passage which would otherwise require its expiration.

*Article 18—Consultation*

Paragraph 1 calls upon the Parties to consult on the implementation of the Treaty, either generally or with respect to particular requests for assistance. Experience has shown that as the Central Authorities of mutual assistance treaties work together, they learn practical ways to make implementation of the treaties more effective. A similar requirement is found in other mutual legal assistance treaties.

Paragraph 1 indicates that consultations maybe particularly appropriate when "in the opinion of either Party or Central Authority, the expenses or other resources required for implementation of this Treaty are of an extraordinary nature.* * *" Article 6(2) provides for consultations if the execution of any individual request

might require extraordinary costs or other resources on the part of the Requested Party. The United Kingdom delegation was concerned, however, that situations might arise in which no single request, standing alone, is unreasonable, but one Party receives such a large volume of requests from the other Party that an untenable administrative burden is imposed. The United States delegation did not agree that either Party should be able to deny requests on this basis but did agree that consultations between the Central Authorities would be appropriate in such circumstances.

Paragraph 1 also indicates that consultations may be appropriate if the Requested Party's execution of the request might place it in conflict with its obligations under other bilateral or multilateral arrangements. The United Kingdom requested this provision because it is a member-state of the European Union (EU), and its obligations to its fellow EU member-states are continually evolving pursuant to EU directives. This provision ensures discussions and consultations between the Parties should those obligations appear inconsistent with the terms of the Treaty.

Paragraph 2 is similar to article 17(3) of the United States-Cayman Islands Mutual Legal Assistance Treaty. It provides that neither Party shall enforce any compulsory measures requiring an action to be performed by a person located in the territory of the other Party unless the Party contemplating such enforcement has first exhausted the procedures established in paragraphs 3 and 4.[36] In an exchange of diplomatic notes dated January 6, 1994, the Parties agreed on a definition of "compulsory measures."[37]

Paragraphs 3 and 4 require that the Central Authority of a Party intending to enforce a compulsory measure inform the other Central Authority, which may request formal consultations regarding the matter. If such a request is made, the Central Authorities shall consult in an effort to determine whether the Treaty could be used to obtain the needed evidence without enforcement of the compulsory measure. The Central Authorities shall also consider other means of resolving the matter, such as introducing different evidence to prove the fact at issue, or employing such other agreements or arrangements as may be applicable.

Paragraph 5 places strict time limits on this consultation process. If the Central Authority proposing to enforce a compulsory measure receives a request from the other Central Authority for consultations on the matter, it may not enforce the measure for 60

---

[36] This provision is somewhat broader than article 17(3) of the United States-Cayman Islands Treaty, which deals only with compulsory measures relating to the production of documents. See U.S.-Cayman Islands Mutual Legal Assistance Treaty, July 3, 1986, art. 17(3), T.I.A.S. No. —.

[37] The exchange of notes provides that "compulsory measures" (including, in the case of the United States, a grant jury subpoena) are those measures that require an action to be performed by any person located in the territory of the Party not issuing the measure and that fall within one of the following categories:

(i) any measure for the production of evidence located in the territory of the Party not issuing the measure;

(ii) any measure relating to assets in the territory of the Party not issuing the measure; or

(iii) any measure compelling a natural person who is in the territory of one Party to make a personal appearance in the territory of the other Party unless:

(a) the Party compelling the appearance has lawfully obtained jurisdiction over that person; or

(b) the person is a national of the Party compelling the appearance,

without prejudice to whether a Party objects to these compulsory measures or the jurisdiction claimed by the other Party. The Central Authorities may add to or amend these categories as may be agreed to in writing between the Parties.

days after receipt of the request for consultations. If the consultations are unsuccessful, or if the delay in enforcing the measure is jeopardizing the successful completion of the proceedings in the Party proposing to enforce the compulsory measure, written notice to this effect may be given, and the consultation obligations under the Treaty shall terminate 21 days after the date of such notice.

Paragraph 6 states that even in those cases in which the Parties' obligations under this article have been fulfilled, each Party shall continue to exercise moderation and restraint. This is similar to obligations undertaken in the exchange of notes dated July 3, 1986, which accompanied the United States-Cayman Islands Treaty. The requirement of "moderation and restraint" contemplated in this paragraph is not meant to imply that the United States will forego the right to unilaterally enforce compulsory measures that are not foreclosed by the Treaty itself. It is intended to signal that both Parties maintain open lines of communication and continue to work together even when the time limits on consultation have expired.

Both delegations viewed article 18 as a useful vehicle for minimizing conflict over investigatory techniques and perceived extraterritorial process without prejudice to the principles of either Party. The United Kingdom delegation was concerned that the article does not go as far as it would have wished, since it does not constrain the issuance and enforcement of compulsory measures. The United States was unable to agree to restrictions only regarding the issuance of compulsory measures.

Therefore, in an exchange of diplomatic notes dated January 6, 1994, the government of the United States, in the spirit of cooperation, mutual respect and good will, and in the interests of facilitating the cooperative use of the Treaty with respect to criminal offenses that fall within its scope, and of avoiding measures which could result in conflicts between our respective laws, policies, or national interests, informed the government of the United Kingdom that upon Senate advice and consent to ratification of the Treaty, the United States Department of Justice will take the following measures to reduce the potential for conflict in this regard:

(1) instruct all federal prosecutors not to seek grand jury or trial subpoenas for the production of evidence located in the United Kingdom in any matter covered by the Treaty, unless the United States Central Authority has concluded that the provisions of article 18 have been satisfied;

(2) instruct all federal prosecutors not to enforce any grand jury subpoenas, trial subpoenas, administrative subpoenas or agency summonses that seek evidence located in the United Kingdom in any matter covered by the Treaty, unless the provisions of article 18 have been satisfied;

(3) use its best efforts to coordinate the issuance of administrative subpoenas or summonses by other agencies for evidence located in the United Kingdom in any matter covered by the Treaty, by advising all United States government agencies not to seek such process without consultation and coordination with the United States Central Authority; and

(4) use its best efforts to bring sensitivity to other matters which may involve potential conflicts over any matter covered

by the Treaty, and to encourage the careful screening and evaluation of such matters before actions are taken.

It was also agreed that the Central Authority of each Party will undertake to discuss with the other any case brought to its attention involving an exercise of jurisdiction with respect to criminal matters falling within the Treaty which may result in the production of evidence located in the territory of the other Party, with a view to resolving any differences in a mutually satisfactory manner.

*Article 19—Definitions*

This article defines the term “proceedings” for purposes of the Treaty. It specifies that “proceedings” relate to criminal matters, and include any measure or step taken in connection with the investigation or prosecution of criminal offenses. The term also includes the freezing, seizure, or forfeiture of the proceeds and instrumentalities of criminal offenses and the imposition of fines related to criminal prosecutions.

In the United States, prosecutors may pursue in rem forfeiture with respect to crimes such as drug trafficking, and such proceedings may be civil or administrative in nature. The term “proceedings” for purposes of the Treaty includes such civil or administrative forfeiture proceedings that relate to a criminal matter.

Article 19 further provides that the Central Authorities may at their discretion treat as “proceedings” for purposes of the Treaty such hearings before or investigations by any court, administrative agency, or administrative tribunal with respect to the imposition of civil or administrative sanctions as may be agreed to in writing between the Parties. This provision was agreed to because in both the United States and the United Kingdom, swift and efficient civil or administrative sanctions sometimes are as much an integral part of combatting criminal behavior as actual criminal prosecution. For instance, efforts to illegally manipulate the securities markets can be addressed by a criminal investigation of the manipulator, or by an administrative action to halt the relevant trading, or a civil action to disgorge unlawfully obtained profits. Other examples include an administrative action to cancel the driver’s license of a person convicted of drunk driving, or an attempt to disbar a lawyer who defrauded clients.

The Securities and Exchange Commission (SEC) and the Commodities Futures Trading Commission (CFTC) were concerned that their investigations involving conduct that might fairly be described as criminal be eligible for coverage under this provision of the Treaty. The United Kingdom agreed to this. However, the SEC and CFTC did not want their civil and administrative proceedings to be covered by the Treaty’s exclusivity and first-resort provisions under article 18 without their consent. Therefore, it was agreed that a civil or administrative matter before the SEC or CFTC will be covered by the Treaty only if both Central Authorities agree to this under paragraph 2, and only when that agreement has been confirmed via diplomatic channels.

*Article 20—Territorial application*

This article provides that with respect to the United Kingdom, the Treaty shall apply to England, Wales, Scotland, Northern Ireland, the Isle of Man, the Channel Islands, and any other territory whose foreign policy is the responsibility of the United Kingdom [38] and to which the Treaty shall have been extended by agreement between the Parties. This article gives either Party the right to terminate such extension agreements upon six months notice. The mutual legal assistance treaty between the United States and the United Kingdom regarding the Cayman Islands was subsequently extended to several other United Kingdom dependent territories in the Caribbean. It is possible that the Parties may agree to extend the Treaty in a similar fashion.

*Article 21—Ratification and entry into force*

This article contains standard language concerning the procedures for the exchange of the instruments of ratification and the entry into force of the Treaty.

*Article 22—Termination*

This article contains the standard provision in mutual legal assistance treaties concerning the procedure for terminating the Treaty. Either Party must provide six months notice of an intent to terminate the Treaty.

## VIII. Text of the Resolution of Ratification

*Resolved, (two-thirds of the Senators present concurring therein),* That the Senate advise and consent to the ratification of The Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters, signed at Washington on January 6, 1994, together with a Related Exchange of Notes signed the same date. The Senate's advice and consent is subject to the following two provisos, which shall not be included in the instrument of ratification to be signed by the President:

> Nothing in the Treaty requires or authorizes legislation or other action by the United States of America that is prohibited by the Constitution of the United States as interpreted by the United States.
>
> Pursuant to the rights of the United States under this Treaty to deny requests which prejudice its essential public policy or interest, the United States shall deny a request for assistance when the Central Authority, after consultation with all appropriate intelligence, anti-narcotic, and foreign policy agencies, has specific information that a senior government official who will have access to information to be provided under this Treaty is engaged in a fel-

[38] An example of such a territory is Bermuda.

ony, including the facilitation of the production or distribution of illegal drugs.

○